## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| **MICHELLE DEULEY,** *et al.* | ) |
| | ) |
| **Plaintiffs,** | ) |
| | ) **C.A. No. 06-605 (GMS)** |
| **v.** | ) |
| | ) |
| **DYNCORP INTERNATIONAL, INC.,** | ) |
| *et al.* | ) |
| | ) |
| **Defendants**. | ) |

## DEFENDANTS' BRIEF IN SUPPORT OF THEIR MOTION TO DISMISS, OR IN THE ALTERNATIVE, MOTION TO TRANSFER VENUE

SMITH, KATZENSTEIN & FURLOW LLP

*Of Counsel*:
Robert B. Wallace
Kevin P. Farrell
Yoora Pak
WILSON, ELSER, MOSKOWITZ,
EDELMAN & DICKER LLP
The Colorado Building
1341 G Street, N.W., 5th Floor
Washington, DC 20005
Telephone:     (202) 626-7660
Facsimile:     (202) 628-3606

_____/s/_____Robert K. Beste_____.
Robert J. Katzenstein (Del. ID No. 378)
Robert K. Beste, III (Del. ID No. 3931)
800 Delaware Avenue, 7th Floor
P.O. Box 410
Wilmington, DE 19899 (Courier 19801)
Telephone:     (302) 652-8400
Facsimile:     (302) 652-8405

*Attorneys for Defendants*
*DynCorp International, Inc., DynCorp*
*International LLC, and CSC Applied*
*Technologies LLC*

October 25, 2006

**TABLE OF CONTENTS**

TABLE OF CONTENTS ...................................................................................................................i

TABLE OF AUTHORITIES.......................................................................................................... iii

NATURE AND STAGE OF THE PROCEEDING .........................................................................1

SUMMARY OF ARGUMENT........................................................................................................2

FACTUAL BACKGROUND ..........................................................................................................3

   A.   Allegations in the Complaint................................................................................................3

   B.   CIVPOL .................................................................................................................................5

ARGUMENT ...................................................................................................................................6

   A.   STANDARD OF REVIEW....................................................................................................6

       1. Rule 12(b)(1) Motions ....................................................................................................6

       2. Rule 12(b)(6) Motions ....................................................................................................7

   B.   PLAINTIFFS WAIVED THEIR RIGHTS TO ASSERT ANY CLAIMS AGAINST DEFENDANTS AND THUS THIS CASE SHOULD BE DISMISSED FOR FAILURE TO STATE A CLAIM UPON WHICH RELIEF MAY BE GRANTED PURSUANT TO RULE 12(b)(6) ........................................................................................................................8

       1. Relevant Provisions of the Employment Agreements ...................................................8

       2. The Employees and Plaintiffs Have Waived All Claims Against Defendants .........................................................................................................................9

       3. The Waiver Is Not Void Under 33 U.S.C. § 915(b) .....................................................10

       4. The Waiver Is Valid Under Dubai Law and the Laws of Delaware, Virginia, and Texas ......................................................................................................11

   C.   DEFENDANTS ARE IMMUNE FROM LIABILITY UNDER THE GOVERNMENT CONTRACTOR DEFENSE AND THUS THIS CASE SHOULD BE DISMISSED FOR FAILURE TO STATE A CLAIM UPON WHICH RELIEF MAY BE GRANTED PURSUANT TO RULE 12(b)(6).........................................................................................12

       1. The Government Contractor Defense .........................................................................12

       2. The Third Circuit in *Carley* Applies the Government Contractor Defense to Nonmilitary Procurements.......................................................................14

       3. The Government Contractor Defense Applies to Nonmilitary Service Contracts .....................................................................................................................14

       4. The Government Contractor Defense Immunizes Defendants From Tort Liability In This Case...........................................................................................16

   D.   THE EMPLOYEES ARE COVERED BY THE DEFENSE BASE ACT, WHICH PROVIDES THE EXCLUSIVE REMEDY FOR PLAINTIFFS, AND THUS THIS CASE SHOULD BE DISMISSED FOR FAILURE TO STATE A CLAIM UPON WHICH RELIEF MAY BE GRANTED PURSUANT TO RULE 12(b)(6) ...............................18

       1. The Employees Received DBA Coverage During Their Employment.......................18

       2. Defendants Are Immune From Tort Actions Under the DBA. ...................................19

3. Plaintiffs Have Not Pleaded an Intentional Tort. .......................................................21

4. The Benefits Under the LHWCA Are the "Exclusive Remedy" for Covered "Injuries" ....................................................................................................23

E. PLAINTIFFS' CLAIMS ARE NONJUSTICIABLE DUE TO THE POLITICAL QUESTION DOCTRINE AND THUS THE CASE SHOULD BE DISMISSED FOR LACK OF SUBJECT MATTER JURISDICTION PURSUANT TO RULE 12(b)(1) .................24

1. Political Question Doctrine ..........................................................................................24

2. The Issues Raised by Plaintiffs Are Constitutionally Committed to the Political Branches ........................................................................................................25

3. The Issues Raised by Plaintiffs Are Not Susceptible of Resolution by Judicially Discoverable Standards ...............................................................................28

4. The Issues Raised by Plaintiffs Cannot Be Decided Without an Initial Policy Determination Reserved for the Political Branches ..........................................29

F. VENUE IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF DELAWARE IS IMPROPER AND THUS THE CASE SHOULD BE DISMISSED FOR IMPROPER VENUE PURSUANT TO RULE 12(b)(3), OR, IN THE ALTERNATIVE, THIS CASE SHOULD BE TRANSFERRED TO THE EASTERN DISTRICT OF VIRGINIA PURSUANT TO 28 U.S.C. § 1404(a) ........................................................30

1. Venue Is Improper in This Judicial District and Thus the Case Must Be Dismissed ..................................................................................................................30

2. In the Alternative, This Case Should Be Transferred to the Eastern District of Virginia, Alexandria Division ......................................................................33

CONCLUSION ................................................................................................................37

## <u>TABLE OF AUTHORITIES</u>

### <u>CASES</u>

Acierno v. Haggerty,
2005 U.S. Dist. LEXIS 30353 (D. Del. Nov. 23, 2005) ................................................ 7

Adorno v. Correctional Services Corp.,
312 F. Supp. 2d 505 (S.D.N.Y. 2004) ........................................................................ 16

Baker v. Carr,
369 U.S. 186 (1962) ..............................................................................24, 25, 28, 29

Bancoult v. McNamara,
445 F.3d 427 (D.C. Cir. 2006)..........................................................................25, 26, 29

Bennett v. Andree,
252 A.2d 100 (Del. 1969)........................................................................................ 10

Berven v. Fluor Corp.,
171 F. Supp. 89 (S.D.N.Y. 1959) .............................................................................. 19

Boyle v. United Tech. Corp.,
487 U.S. 500 (1988) ........................................................................12, 13, 14, 15, 16

C.R. Bard Inc. v. Guidant Corp.,
997 F. Supp. 556 (D. Del. 1998) ............................................................................... 34

Cal. Pub. Employees' Ret. Sys. v. The Chubb Corp.,
394 F.3d 126 (3d Cir. 2004) ................................................................................. 7, 10

Carley v. Wheeled Coach,
991 F.2d 1117 (3d Cir. 1993), <u>cert. denied</u>, 510 U.S. 868 (1993)................................ 14

Chaplin v. Nationscredit Corp.,
307 F.3d 368 (5th Cir. 2002) ................................................................................... 11

Charles v. Pepco Holdings, Inc.,
437 F. Supp. 2d 248 (D.De. 2006) .............................................................................. 7

Chi. & S. Air Lines, Inc. v. Waterman S.S. Corp.,
333 U.S. 103 (1948) .............................................................................................. 26

Conley v. Gibson,
355 U.S. 41 (1957) .................................................................................................. 7

Cottman Transmission Systems v. Martino,
36 F.3d 291 (3d Cir. 1994 ................................................................................. 31, 33

Ferrostaal, Inc. v. M/V Sea Phoenix,
447 F.3d 212 (3d Cir. 2006) ........................................................................................ 11

Fisher v. Halliburton, Inc.,
2006 U.S. Dist. LEXIS 68413 (S.D. Tex. Sept. 22, 2006) ......................................... 25

Flying Tigers Lines, Inc. v. Landy,
370 F.2d 46 (9th Cir. 1966) ....................................................................................... 18

Fox v. Rodel, Inc.,
1999 U.S. Dist. LEXIS 12246 (D. Del. Jul. 14, 1999) ............................................... 11

FS Photo, Inc. v. Picturevision, Inc.,
48 F. Supp. 2d 442 (D. Del. 1999) ....................................................................31, 33, 35

Gross v. German Foundation Indus. Initiative,
456 F.3d 363 (3d Cir. 2006) ..............................................................................24, 25, 27, 30

Houston v. Bechtel Assoc. Prof. Corp.,
522 F. Supp. 1094 (D.D.C. 1981) ............................................................................... 22

Hudgens v. Bell Helicopters/Textron,
328 F.3d 1329 (11th Cir. 2003) ....................................................................12, 14, 15, 17

In re Burlington Coat Factory Sec. Litig.,
114 F.3d 1410 (3d Cir. 1997) .................................................................................... 7

In re Digital Isl. Sec. Litig.,
223 F. Supp. 2d 546 (D. Del. 2002), aff'd, 357 F.3d 322 (3d Cir. 2004) ..........................7, 10, 19

In re World Trade Center Disaster Site Litig.,
2006 U.S. Dist. LEXIS 75020 (S.D.N.Y. Oct. 17, 2006) ............................................ 16

In re: Jean Fowler,
2006 Bankr. LEXIS 2117 (D. Del. Sept. 11, 2006) ..................................................... 6

In re: Nazi Era Cases Against German Defendants Litig. (Rozenkier v. AG Schering),
2006 U.S. App. LEXIS 19477 (3d Cir. Aug. 2, 2006) ................................................ 25

In re: Rockefeller Center Prop., Inc. Sec. Litig.,
311 F.3d 198 (3d Cir. 2002) ...................................................................................7, 10, 19

Japan Whaling Ass'n v. Am. Cetacean Soc'y,
478 U.S. 221 (1986) .................................................................................................... 24

Jumara v. State Farm Ins. Co.,
55 F.3d 873 (3d Cir. 1995) ......................................................................................... 34

Kos Pharm., Inc. v. Andrx Corp.,
369 F.3d 700 (3d Cir. 2004) ........................................................................................... 6

Leroy v. Great Western United Corp.,
443 U.S. 173 (1979) ...................................................................................................... 31

Luftig v. McNamara,
373 F.2d 664 (D.C. Cir.) , cert. denied, 387 U.S. 945 (1967) ...................................... 26

Lum v. Bank of Am.,
361 F.3d 217 (3d Cir.), cert. denied, 543 U.S. 918 (2004) ............................................ 7

Malesko v. Correctional Services Corp.,
229 F.3d 374 (2d Cir. 2000), rev'd on other grounds, 534 U.S. 61 (2001) ................... 16

Nations v. W.W. Morris,
483 F.2d 577 (5th Cir.), cert. denied, 414 U.S. 1071 (1973)................................... 21, 22

Nokia Corp. v. Interdigital Communications,
2005 U.S. Dist. LEXIS 34899 (D. Del. Dec. 21, 2005) ................................................. 6

Oetjen v. Cent. Leather Co.,
246 U.S. 297 (1918) ...................................................................................................... 26

Padcom, Inc. v. Netmotion Wireless, Inc.,
2004 U.S. Dist. LEXIS 9658 (D. Del. May 24, 2004) ......................................33, 34, 35

Pulley v. Peter Kiewit Son's Co.,
223 F.2d 191 (7th Cir. 1955) ........................................................................................ 19

Richland-Lexington Airport Dist. v. Atlas Prop., Inc.,
854 F. Supp. 400 (D.S.C. 1994) ...............................................................12, 15, 16, 17

Rivanna Trawlers Unlimited v. Thompson Trawlers, Inc.,
650 F. Supp. 1378 (W.D. Va. 1986), aff'd, 840 F.2d 236 (4th Cir. 1988) ................... 11

Ross v. DynCorp,
362 F. Supp.2d 344 (D.D.C. 2005)............................................................................... 18

Schneider v. Kissinger,
412 F.3d 190 (D.C. Cir. 2005), cert. denied, __ U.S. __, 126 S. Ct. 1768 (2006) ................. 27, 29

Sharp v. Elkins,
616 F. Supp. 1561 (W.D. La. 1985) ............................................................................. 23

Smith v. Halliburton Co.,
2006 U.S. Dist. LEXIS 61980 (S.D. Tex. Aug. 30, 2006) ........................................... 25

Sparks v. Wyeth Lab., Inc.,
431 F. Supp. 411 (W.D. Okla. 1977)............................................................... 19

The Plum Tree, Inc. v. Stockment,
488 F.2d 754 (3d Cir. 1973) ........................................................................... 33

Vega-Mena v. United States,
990 F.2d 684 (1st Cir. 1993) ........................................................................... 21

Waste Distillation Tech., Inc. v. Pan Am. Resources, Inc.,
775 F. Supp. 759 (D. Del. 1991) .............................................................. 31, 35

Whitake v. Kellogg Brown & Root, Inc.,
2006 U.S. Dist. LEXIS 45708 (M.D. Ga. Jul. 6, 2006)................................... 25

Yearsley v. W.A. Ross Constr. Co.,
309 U.S. 18 (1940) ......................................................................................... 13

## STATUTES

28 U.S.C. § 1391(b)........................................................................................ 31
28 U.S.C. § 1404(a)..........................................................................1, 2, 34, 37, 38
Defense Base Act, 42 U.S.C. § 1651................................................................. 2
Defense Base Act, 42 U.S.C. § 1651(a) .......................................................... 10
Defense Base Act, 42 U.S.C. § 1651(a)(4)....................................................... 18
Defense Base Act, 42 U.S.C. § 1651(b)(1) ...................................................... 19
Defense Base Act, 42 U.S.C. § 1651(c) ...................................................... 20, 22
Defense Base Act, 42 U.S.C. § 1651(d) ...................................................... 20, 21
Del. Code Ann. tit. 10, § 3701 (2006) ............................................................ 10
Longshore and Harbor Workers' Compensation Act, 33 U.S.C. § 902(1) .................................... 23
Longshore and Harbor Workers' Compensation Act, 33 U.S.C. § 902(2) .................................... 23
Longshore and Harbor Workers' Compensation Act, 33 U.S.C. § 905(a).............................. 20, 22
Longshore and Harbor Workers' Compensation Act, 33 U.S.C. § 905(c)..................................... 22
Longshore and Harbor Workers' Compensation Act, 33 U.S.C. § 906(b) .................................... 10
Longshore and Harbor Workers' Compensation Act, 33 U.S.C. § 908 ....................................... 10
Longshore and Harbor Workers' Compensation Act, 33 U.S.C. § 909 ....................................... 10
Longshore and Harbor Workers' Compensation Act, 33 U.S.C. § 910........................................ 10
Longshore and Harbor Workers' Compensation Act, 33 U.S.C. § 915(b)................................... 10
U.S. Const. art. I, § 8, cls. 1, 3, and 10............................................................ 27
U.S. Const. art. II, § 2................................................................................... 27

## OTHER AUTHORITIES

http://www.state.gov/p/inl/civ/ ...................................................................... 6
http://www.state.gov/p/inl/rls/fs/47799.htm .................................................... 6

## RULES

Federal Rule of Civil Procedure 12(b)(1)....................................................1, 2, 30, 37
Federal Rule of Civil Procedure 12(b)(3)....................................................... 1, 2, 38
Federal Rule of Civil Procedure 12(b)(6)....................................................1, 2, 7, 11, 37
Federal Rule of Civil Procedure 44.1 ............................................................. 11

COME NOW, Defendants DynCorp International, Inc. ("DI Inc."), DynCorp International LLC ("DI LLC"), and CSC Applied Technologies LLC ("CSC") [hereinafter collectively referred to "Defendants"], by and though counsel, Smith, Katzenstein & Furlow LLP, and hereby move this Honorable Court for an Order pursuant to Rule 12(b)(1), Rule 12(b)(3), and/or Rule 12(b)(6) of the Federal Rules of Civil Procedure dismissing the Complaint or, in the alternative, transferring venue to the U.S. District Court for the Eastern District of Virginia, Alexandria Division pursuant to 28 U.S.C. § 1404(a). If this Honorable Court determines that the case should not be dismissed or transferred at this time, Defendants respectfully request that the Court enter an Order limiting discovery, set a discovery schedule with respect to the issues raised in this Motion and establish a briefing schedule for an anticipated motion for summary judgment. As grounds for Defendants' Motion, Defendants state as follows:

## NATURE AND STAGE OF THE PROCEEDING

This action arises out of the deaths of John Deuley and Gerald Gibson and alleged serious and permanent injuries sustained by Plaintiff Joseph Dickinson while performing their employment duties under a subcontract to a federal government contract in Kabul, Afghanistan. See D.I. 1 (Defendants' Notice of Removal), Exhibits 1-3 (Complaint), ¶¶ 2-4 [hereinafter referred to as "the Complaint"]. The surviving spouses and executrices of the estate of the decedents, on their own behalf and on behalf of decedents' surviving children, allege survival and wrongful death actions, and Plaintiffs Joseph and Kim Dickinson allege personal injury actions. See generally, Complaint, ¶¶ 47-59.

Plaintiffs originally filed this action in the Superior Court for the State of Delaware in and for New Castle County on or about August 22, 2006. Defendants removed the action from state court to this Honorable Court on September 27, 2006. On October 4, 2006, this Court granted Defendants' motion for extension of time to Answer or otherwise respond to the Complaint.

**SUMMARY OF ARGUMENT**

I.      Plaintiffs have failed to state a claim upon which relief may be granted because decedents John Deuley and Gerald Gibson and Plaintiff Joseph Dickinson waived their right to assert any claims against Defendants for death, injury or disability arising out of their employment in Afghanistan.   Thus, the case must be dismissed under Rule 12(b)(6) of the Federal Rules of Civil Procedure.

II.      Plaintiffs have failed to state a claim upon which relief may be granted because Defendants were government contractors who were acting under color and direction of the U.S. Department of State and are immune from liability under the government contractor defense. Thus, the case must be dismissed under Rule 12(b)(6) of the Federal Rules of Civil Procedure.

III.      Plaintiffs have failed to state a claim upon which relief may be granted because, by virtue of the circumstances of their employment, the death and disability benefits provided by the Defense Base Act, 42 U.S.C. § 1651 ("DBA"), are the exclusive remedies for Plaintiffs. Thus, the case must be dismissed under Rule 12(b)(6) of the Federal Rules of Civil Procedure.

IV.      This case should be dismissed for lack of subject matter jurisdiction pursuant to the political question doctrine because (1) the Executive Branch's foreign policy decisions are implicated in almost every aspect of this case; (2) there are no judicially discoverable standards by which this Court could determine the adequacy of security measures in a hostile, conflict-ridden country like Afghanistan while simultaneously balancing the State Department's policy, numerous government, coalition, and U.N. interests and authorities; and (3) the Court would essentially be second-guessing the Executive Branch's commitment to a vital foreign policy. Thus, the case must be dismissed under Rule 12(b)(1) of the Federal Rules of Civil Procedure.

V.      This case should be dismissed for improper venue under Rule 12(b)(3).  In the alternative, this case should be transferred to the Eastern District of Virginia, Alexandria Division, pursuant to 28 U.S.C. § 1404(a), because it is the proper forum for adjudicating Plaintiffs' claims.

2

## FACTUAL BACKGROUND

A.      Allegations in the Complaint

This action arises out of the deaths of John Deuley and Gerald Gibson and alleged serious and permanent injuries sustained by Plaintiff Joseph Dickinson [hereinafter collectively referred to as "the Employees"[1]].   Complaint, ¶¶ 2-4.   Plaintiffs allege that the deaths and injuries occurred while the Employees were performing their employment duties in support of the U.S. Department of State Civilian Police mission in Afghanistan ("CIVPOL").  Id., ¶¶ 1-4.

It is alleged that the Employees were employed by DynCorp International FZ-LLC ("DI FZ"), which is not a party to this lawsuit and which subcontracted with Defendants to hire personnel and provide services in support of the CIVPOL contract.  Id., ¶¶ 11-14.  Plaintiffs allege that Defendants "transferred some or all of the duties under the CIVPOL contractor to subcontractor FZ-LLC Dubai for liability, tax, and business purposes."  Id., ¶ 22.

The Employees entered into employment agreements with DI FZ which defined the terms and conditions of their employment.  Id., ¶¶ 26-27; see also Exhibit ("Ex.") 1 (Employment Agreement for John Deuley), Ex. 2 (Employment Agreement for Gerald Gibson) and Ex. 3 (Employment Agreement for Joseph Dickinson).  The Employment Agreements contain a waiver provision which provides that "neither Employer [DI FZ] nor its affiliates will be liable in the event of death, injury, or disability to Employee" and that "[t]he Employee agrees to accept these insurance benefits as full satisfaction of any claim for death, injury or disability against Employer and its affiliates."  Ex. 1, ¶ 10; Ex. 2, ¶ 10; Ex. 3, ¶ 10.  In addition to these insurance benefits, Plaintiffs allege that DI FZ properly secured Defense Base Act ("DBA") insurance coverage for

---

[1]  Defendants' collective reference to John Deuley, Gerald Gibson, and Joseph Dickinson as "the Employees" throughout this Brief is not an admission or other acknowledgement as to the relationship between Defendants and Messrs. Deuley, Gibson, and Dickinson.  The collective reference is solely for ease of reference to these three individuals.  Without dispute, Plaintiffs acknowledge that these three individuals were employed by DynCorp International FZ-LLC, an entity which is not a party to this lawsuit.  Complaint, ¶ 11-14.

the Employees and that the DBA insurance premiums were "explicitly paid" by the CIVPOL contract.  Complaint, ¶¶ 15, 20.

Plaintiffs allege that Defendants are general contractors to the U.S. Department of State in support of its CIVPOL mission.  Id., ¶¶ 1, 9.  Plaintiffs further allege that Defendants referred to its CIVPOL contractual obligations as the Afghanistan International Police Program ("AIPP").  Id., ¶ 23.

Under its CIVPOL contract, it is alleged that Defendants were required "to recruit, select, equip, and deploy civilian police officers . . . to help the democratic government of Afghanistan develop a modern, indigenous police force to maintain peace and stability."  Id., ¶¶ 9, 18.  Plaintiffs further allege that the CIVPOL contracts included "requirements provided by the Department of State for defendants to follow as they recruited, selected, equipped, and deployed civilian police officers from the United States" (id., ¶ 19), and "provisions relating to employee safety, including not but limited to, requirements that the general contractor and any subcontractors maintain a minimal standard of security described by the contract" (id., ¶ 21).

It is alleged that the headquarters for AIPP's operations was located in a "dense urban area" in a building that was allegedly previously used by Osama bin Laden.  Id., ¶ 38.  It is alleged that al Qaeda's former logistics center was located next door.  Id.  Plaintiff alleged that the AIPP headquarter building was referred to as "DynHouse."  Id.  Decedent Deuley is alleged to have been the supervisor for the Close Protection Unit, and Plaintiff Dickinson is alleged to have been the Program Security Manager.  Id., ¶ 39.

It is alleged that on August 28, 2004, the International Security Assistance Force ("ISAF") (which is based in Kabul, Afghanistan, organized by the United Nations, and commanded by the North Atlantic Treaty Organization ("NATO")), issued a warning that coalition targets in downtown Kabul may be attacked by a body-bourne or vehicle-bourne improvised explosive device ("VBIED") in the next 48 hours.  Id., ¶ 42.  Plaintiffs claim that Defendants received this warning.  Id., ¶ 42.

Upon receipt of the ISAF warning, it is alleged that Messrs. Deuley and Dickinson "canceled all unnecessary movements and alerted the foreign guards and all employees of the possibility of an attack." Id., ¶ 43.  Without alleging that Defendants had the authority to do so, Plaintiffs allege that Defendants would not allow the streets adjacent to the building to be closed or vehicle barricades to be deployed.  Id., ¶ 44.  On August 29, 2004, it is alleged that "an Al Qaeda operative detonated a VBIED immediately adjacent to the entrance to DynHouse" and that as a result of this attack, Messrs. Deuley and Gibson were killed and Plaintiff Dickinson was allegedly severely injured.  Id., ¶ 45.

B.    CIVPOL

The Bureau of International Narcotics and Law Enforcement Affairs ("INL") of the U.S. Department of State oversees the participation of the United States in the CIVPOL program in various countries.  See Ex. 4, ¶ 4 (Declaration of Angelic Little-Turner).  Most CIVPOL missions are sponsored by the United Nations, although some missions are sponsored by regional security organizations.  Id., ¶ 5.

The United States regards the CIVPOL program as "a vital tool in U.S. foreign policy and important as peacekeeping missions."  Id., ¶ 6.  The highest levels of the federal government are consulted in deciding whether to deploy U.S. CIVPOL, including the White House, Department of State, Department of Defense, and other agencies.  Id.

The deployment of personnel in support of the United States' participation in CIVPOL missions is done through contracts with private companies.  Id., ¶ 11.  The State Department describes the mechanisms for deploying personnel in support of U.S. CIVPOL missions as follows:

> Because the United States does not maintain a national police force, we must seek volunteers on an individual basis. To handle such a large task, the State Department contracts with private companies, currently DynCorp International, Civilian Police International LLC, and PAE Government Services, Inc. **The contractors implement requirements provided by the State Department to recruit, select, equip, and deploy police from all over the country.** After

conducting a rigorous screening process, the companies contract with individual
officers to provide their salary and benefits for one year.

Following pre-deployment training in the United States, officers are sent to the
mission area and are "seconded" to the UN (or other sponsoring organization --
such as the [Organization for Security and Cooperation in Europe]). In mission,
officers are under the operational control of the sponsoring organization, which
also provides officers with an allowance to cover food, lodging, and incidental
expenses. The contractors maintain offices in the mission areas to handle
administrative and support (e.g. medical) issues, and assist with programs
designed to improve quality of life (i.e., video libraries, fitness equipment).

Throughout the life of a mission, the **State Department provides funding and
oversight for mission operations, manages U.S. policy on CIVPOL
operations and other related law enforcement and <u>civilian security issues,</u>**
provides bilateral assistance to local police forces, engages with the UN and
other CIVPOL contributing countries on mission priorities and challenges, and
keeps Congress, other U.S. Government agencies, and the White House informed
of progress.

<u>See</u> Ex. 5 (U.S. Dep't of State, Statement Regarding CIVPOL, available at
http://www.state.gov/p/inl/civ/ and http://www.state.gov/p/inl/rls/fs/47799.htm) (emphasis
added)[2]; Ex. 4 (Little-Turner Dec.), ¶¶ 8-10, 15-17.

## ARGUMENT

A.    <u>STANDARD OF REVIEW</u>

    1.    <u>Rule 12(b)(1) Motions</u>

When the Court reviews a factual challenge to subject matter jurisdiction pursuant to a

Rule 12(b)(1) motion to dismiss for lack of subject matter jurisdiction, it does not have to

"presume the truth of the plaintiff's allegations, and the existence of disputed material facts will

not preclude the court from evaluating for itself the merits of jurisdictional claims." <u>Nokia Corp.</u>

<u>v. Interdigital Commc'ns.</u>, 2005 U.S. Dist. LEXIS 34899, at * 4-5 (D. Del. Dec. 21, 2005)

(attached hereto as Ex. 7).  The Court may consider matters outside the pleadings, including

---

[2] Defendants respectfully request that the Court take judicial notice of the U.S. Department of
State's official pronouncements regarding the CIVPOL program as officially posted on the State
Department's website at www.state.gov.  <u>See</u> <u>Kos Pharm., Inc. v. Andrx Corp.</u>, 369 F.3d 700, 705
n.5 (3d Cir. 2004) (taking judicial notice of Patent and Trademark Office records available on-
line); <u>In re: Jean Fowler</u>, 2006 Bankr. LEXIS 2117, at *5 n.2 (D. Del. Sept. 11, 2006) (taking
judicial notice of IRS publications available on IRS's website) (attached hereto as Ex. 6).

affidavits, depositions, and testimony, to resolve any factual issues concerning jurisdiction. Acierno v. Haggerty, 2005 U.S. Dist. LEXIS 30353, at * 15 (D. Del. Nov. 23, 2005) (holding same) (attached hereto as Ex. 8).

     2.    Rule 12(b)(6) Motions

     The standard of review for analyzing a motion to dismiss is well settled. A court may dismiss a complaint pursuant to Rule 12(b)(6) "only if, accepting all well pleaded allegations in the complaint as true, and drawing all reasonable factual inferences in favor of the plaintiff, it appears beyond doubt that the plaintiff can prove no set of facts in support of the claim that would warrant relief." Cal. Pub. Employees' Ret. Sys. v. The Chubb Corp., 394 F.3d 126, 143 (3d Cir. 2004); Charles v. Pepco Holdings, Inc., 437 F. Supp. 2d 248, 251 (D. Del. 2006) (citing Conley v. Gibson, 355 U.S. 41, 45-46 (1957)). In making this determination, the court "need not credit a complaint's 'bald assertions' or 'legal conclusions.'" Cal. Pub. Employees' Ret. Sys., 394 F.3d at 143; In re Digital Isl. Sec. Litig., 223 F. Supp. 2d 546, 550 (D. Del. 2002), aff'd, 357 F.3d 322 (3d Cir. 2004). In addition, "legal conclusions draped in the guise of factual allegations may not benefit from the presumption of truthfulness." In re: Rockefeller Center Prop., Inc. Sec. Litig., 311 F.3d 198, 216 (3d Cir. 2002).

     It is also well settled that in deciding a motion to dismiss, court generally consider only allegations in the complaint, exhibits attached to the complaint, matters of public record, and documents that form the basis of a claim. Lum v. Bank of Am., 361 F.3d 217, 222 n.3 (3d Cir.), cert. denied, 543 U.S. 918 (2004). "A document forms the basis of a claim if the document is 'integral to or explicitly relied upon in the complaint.'" Id. (quoting In re Burlington Coat Factory Sec. Litig., 114 F.3d 1410, 1426 (3d Cir. 1997)). Moreover, the plaintiff is on notice that a document will be considered for purposes of a motion to dismiss when the plaintiff also relies on the document. Id. Thus, there is no unfairness or prejudice to the plaintiff. Id.

     In this case, Plaintiffs explicitly rely on the Employment Agreements of the Employees in support of their claims against Defendants. See Complaint, ¶¶ 15-16, 24-28. Specifically,

Plaintiffs rely on and refer to the Employment Agreements to establish the employer-employee relationship between the Employees and DI FZ in support of their allegation that Defendants do not have "the immunities of an employer under the DBA or [Longshore and Harbor Workers' Compensation Act]."  Id., ¶¶ 15-16; see Exs. 1-3.  Plaintiffs also rely on and refer to the Employment Agreements in support of their allegation that the waiver of claims for death, injury or disability contained in the Employment Agreement against Defendants is void as a matter of law.  Complaint, ¶ 28.  While these allegations are completely specious, as demonstrated below, without being able to assert such allegations, Plaintiffs would not be able to bring this lawsuit.  Consequently, the Employment Agreements are integral to Plaintiffs' claims and explicitly relied upon in the Complaint.  Accordingly, this Court may consider the Employment Agreements when reviewing Defendants' Motion to Dismiss without converting the motion into a motion for summary judgment.

B.    PLAINTIFFS WAIVED THEIR RIGHTS TO ASSERT ANY CLAIMS AGAINST DEFENDANTS AND THUS THIS CASE SHOULD BE DISMISSED FOR FAILURE TO STATE A CLAIM UPON WHICH RELIEF MAY BE GRANTED PURSUANT TO RULE 12(B)(6)

1.    Relevant Provisions of the Employment Agreements

It is alleged in the Complaint that the Employees were employed by DI FZ, which is not a party to this litigation, and that they entered into employment agreements with DI FZ.  Complaint, ¶¶ 11-14.

The employment agreements for all of the Employees contain a waiver provision that provides:

> The Employee understands and accepts the fact that he or she will be exposed to dangers due to the nature of the mission.  The Employee agrees that neither Employer nor its affiliates will be liable in the event of death, injury, or disability to Employee, except as stated below.  Employer will obtain the insurance described in Attachment A on behalf of Employee.  The Employee agrees to accept these insurance benefits as full satisfaction of any claim for death, injury or disability against Employer and its affiliates.

<u>See</u> Ex. 1, ¶ 10; Ex. 2, ¶ 10; Ex. 3, ¶ 10.

The Employment Agreements also provide that the agreements are to be governed by and interpreted under the laws of the Dubai Internet City of the Dubai Technology, Electronic Commerce and Media City Free Zone.  <u>See</u> Ex. 1, ¶ 19; Ex. 2, ¶ 20; Ex. 3, ¶ 19.

       2.       <u>The Employees and Plaintiffs Have Waived All Claims Against Defendants</u>

The language of the waiver is clear - Messrs. Deuley, Gibson and Dickinson agreed not to hold their employer or their employer's affiliates "liable in the event of death . . .or disability to Employee."  <u>See</u> Ex. 1, ¶ 10; Ex. 2, ¶ 10; Ex. 3, ¶ 10.  In exchange for this release, the Employees agreed to accept the additional insurance benefits provided to them as a benefit of their employment "as full satisfaction of any claim for death . . . or disability against Employer and its affiliates."  <u>Id.</u>

While the term "affiliates" is not defined in the Employment Agreements, Plaintiffs allege in their Complaint that Defendants "transferred some or all of the duties under the CIVPOL contractor to subcontractor FZ-LLC Dubai for liability, tax, and business purposes."  Complaint, ¶ 22.   Thus, for purposes of this motion, Plaintiffs themselves have established a corporate affiliation between Defendants and DI FZ.  Accordingly, there can be no dispute that the Employees have waived all of their claims in the event of their death, injury, or disability against Defendants.

In addition, because Messrs. Deuley and Gibson have waived their rights to bring all claims in the event of their deaths, under Delaware's Survival Statute, Plaintiff Deuley, individually and in her capacities as surviving spouse of John Deuley, and as executrix of the estate of John Deuley, deceased and as mother, guardian, and/or next friend of Amberyle Marie Deuley, Justin Andrew Deuley, and Jordan Aubrey Deuley, minor children of John Deuley, and Plaintiff Gibson, individually and in her capacities as surviving spouse of Gerald Gibson and as executrix of the estate of Gerald Gibson, do not have any rights to bring any claims related to or arising from the deaths of Messrs. Deuley and Gibson.  <u>See</u> Del. Code Ann. tit. 10, § 3701

(2006); Bennett v. Andree, 252 A.2d 100 (Del. 1969) (holding that estate administrator has the same cause of action that deceased had prior to his death based on Delaware's Survival Statute).

> 3.    The Waiver Is Not Void Under 33 U.S.C. § 915(b)

In an attempt to void this clear release of claims against Defendants, Plaintiffs allege that the waiver violates 33 U.S.C. § 915(b) because the Employees signed the waiver in consideration for an Additional Death and Dismemberment policy ("AD&D Policy"). Complaint, ¶ 28. As a legal conclusion, this assertion is not entitled to any presumption of truth for purposes of this motion. See Cal. Pub. Employees' Ret. Sys., 394 F.3d at 143; In re: Rockefeller Ctr., 311 F.3d at 216; In re Digital Isl. Sec. Litig., 223 F. Supp. 2d at 550. As explained below, Plaintiffs' argument is simply wrong.

The statutory provision cited by Plaintiffs, 33 U.S.C. § 915(b), provides: "No agreement by an employee **to waive his right to compensation under this Act** shall be valid." Longshore and Harbor Workers' Compensation Act ("LHWCA"), 33 U.S.C. § 915(b) (emphasis added). Thus, a waiver would only violate the DBA and the LHWCA if its execution was conditioned on the forfeiture of the statutory benefits.[3]  Section 915(b) does not prohibit an employer from conditioning the receipt of <u>additional</u> insurance benefits, such as an AD&D policy, on the signing of a waiver. Because the waivers contained in the employment agreements of the Employees were conditioned on the receipt of AD&D insurance benefits, and not the forfeiture of any DBA benefits, the waivers contained in their employment agreements do not violate the DBA and/or the LHWCA.

---

[3] As explained in Section D, footnote 5, <u>infra</u>, the DBA extends the benefits provided by the Longshore and Harbor Workers' Compensation Act ("LHWCA") to employees who are injured, disabled or killed while working under a government contract outside of the United States. 42 U.S.C. § 1651(a). Compensation under the LHWCA is based on the applicable national average weekly wage as determined by the U.S. Secretary of Labor. LHWCA, 33 U.S.C. § 906(b); <u>see also</u> 33 U.S.C. § 908 (defining "Compensation for Disability"), § 909 (defining "Compensation for Death"), § 910 (defining "Determining of Pay").

4.    The Waiver Is Valid Under Dubai law and the Laws of Delaware, Virginia, and Texas

As noted above, the employment agreements at issue in this case include a choice of law provision that provides that the agreements are to be governed by and interpreted under the laws of the Dubai Internet City of the Dubai Technology, Electronic Commerce and Media City Free Zone ("Dubai").  See Ex. 1, ¶ 19; Ex. 2, ¶ 20; Ex. 3, ¶ 19.  Pursuant to Rule 44.1 of the Federal Rules of Civil Procedure, determinations of foreign law are questions of law and the Court may consider any relevant material provided to it in determining foreign law.  Fed. R. Civ. Proc. 44.1; Ferrostaal, Inc. v. M/V Sea Phoenix, 447 F.3d 212, 216 (3d Cir. 2006).  The Court may also conduct its own independent research, but it is not required to do so.  Id.  The burden is on the parties to prove foreign law and where the parties fail to do so, a court may apply the forum's law.  Id.

Defendants respectfully submit that the waivers as contained in the Employees' employment agreements are valid and enforceable under Dubai law.[4]  In addition, the waivers are valid and enforceable under the laws of the states of Delaware, Virginia, and Texas - the three possible venue considerations.  See Fox v. Rodel, Inc., 1999 U.S. Dist. LEXIS 12246, at * 23-24 (D. Del. Jul. 14, 1999) (holding that "Delaware has a long history of recognizing the validity of general releases") (attached hereto as Ex. 9); Rivanna Trawlers Unlimited v. Thompson Trawlers, Inc., 650 F. Supp. 1378, 1385 (W.D. Va. 1986), aff'd, 840 F.2d 236 (4th Cir. 1988) (holding that "a party executing a general release does so at his own risk"); Chaplin v. Nationscredit Corp., 307 F.3d 368, 373 (5th Cir. 2002) (holding that "public policy favors . . . enforcement of releases").

Accordingly, the Complaint should be dismissed for failure to state a claim under Rule 12(b)(6) of the Federal Rules.

---

[4]Defendants will supplement this Motion with evidence and other material in due course in support of their argument regarding the enforceability of the waivers under Dubai law.

11

C.     DEFENDANTS ARE IMMUNE FROM LIABILITY UNDER THE GOVERNMENT CONTRACTOR DEFENSE AND THUS THIS CASE SHOULD BE DISMISSED FOR FAILURE TO STATE A CLAIM UPON WHICH RELIEF MAY BE GRANTED PURSUANT TO RULE 12(b)(6)

Defendants are entitled to immunity from all of the allegations made by Plaintiffs in this case because they satisfy the modified three-part test for the government contractor defense that was first articulated by the Supreme Court in Boyle v. United Tech. Corp., 487 U.S. 500 (1988). Under this modified three-part test, Defendants are entitled to immunity because: (1) the U.S. Department of State at all relevant times managed U.S. policy on civilian security issues and established standard operating procedures and protocols for implementing security measures and responding to security warnings; (2) Defendants complied with the State Department's policy, standard operating procedures, and protocols; and (3) Defendants were not aware of dangers posed by the policies, standard operating procedures or protocols issued by the State Department with respect to security issues.  See Hudgens v. Bell Helicopters/Textron, 328 F.3d 1329, 1335-1345 (11th Cir. 2003) (holding that government service contractors are entitled to the government contractor defense and applying a modified three-part test to service contracts); Richland-Lexington Airport Dist. v. Atlas Prop., Inc., 854 F. Supp. 400 (D.S.C. 1994) (holding that nonmilitary government service contractors were entitled to the government contractor defense and applying a modified Boyle three-part test).  Because Defendants are immune from the allegations under the government contractor defense, this case should be dismissed under Rule 12(b)(6) for failure to state a claim upon which relief may be granted.

1.     The Government Contractor Defense

In Boyle, the Supreme Court held that a military government contractor that built the helicopter involved in the death of a U.S. Marine could not be held liable "when (1) the United States approved reasonably precise specifications; (2) the equipment conformed to those specifications; and (3) the supplier warned the United States about the dangers in the use of the equipment that were known to the supplier but not to the United States." Boyle, 487 U.S. at 512.

In reaching its holding, the Supreme Court concluded that the procurement of equipment by the federal government was an "area of uniquely federal interest," id. at 507, and that there was a significant conflict between the application of state law to an exercise of discretionary authority by the federal government, id. at 511-512. Specifically, the Supreme Court held:

> We think that the selection of the appropriate design for military equipment to be used by our Armed Forces is assuredly a discretionary function . . . . It often involves not merely engineering analysis but judgment as to the balancing of many technical, military, and even social considerations, including specifically the trade-off between greater safety and greater combat effectiveness. And we are further of the view that permitting "second-guesses" of these judgments . . . through state tort suits against contractors would produce the same effect sought to be avoided by the [Federal Tort Claims Act discretionary function] exemption. . . . It makes little sense to insulate the Government against financial liability for the judgment that a particular feature of military equipment is necessary when the Government produces the equipment itself, but not when it contracts for the production.

Id. at 511.

The Supreme Court in Boyle also referred to an earlier case, Yearsley v. W.A. Ross Constr. Co., 309 U.S. 18 (1940), in which contractors were performing work pursuant to a contract with the United States Government, under the direction of the Secretary of War and the Chief of Engineers, to improve the navigation of the Missouri River. 309 U.S. at 19. The Supreme Court in Yearsley held that a government contractor could not be held liable where the "authority to carry out the project was validly conferred, that is, if what was done was within the constitutional power of Congress, there is no liability on the part of the contractor for executing its will." Yearsley, 309 U.S. at 20-21. Under Yearsley, a government contractor can only be found liable for acting on behalf of and pursuant to orders from the U.S. Government if it can be shown that the contractor "exceeded his authority or that it was not validly conferred." Id. at 21 (citations omitted). The Supreme Court in Boyle noted that the "federal interest justifying this holding surely exists as much in procurement contracts as in performance contracts." Boyle, 487 U.S. at 506.

13

2.     The Third Circuit in *Carley* Applies the Government Contractor Defense to Nonmilitary Procurements

Boyle involved a military government contractor.  See  487 U.S. at 502.  In Carley v. Wheeled Coach, 991 F.2d 1117 (3d Cir. 1993), cert. denied, 510 U.S. 868 (1993), the Third Circuit Court of Appeals applied the government contractor defense to a nonmilitary government contractor.   In doing so, the Third Circuit Court of Appeals explained that the "modern government contractor defense" is premised on the supposition that a "private contractor who is compelled by a contract to perform an obligation for the United States should, in some circumstances, share the sovereign immunity of the United States."  Carley, 991 F.2d at 1120 (discussing Boyle).  While acknowledging the military government contracts at issue in Boyle involved "considerations of combat effectiveness," the Third Circuit concluded that "all of the other policy reasons cited by the Court in support of the government contractor defense are equally applicable to military and nonmilitary procurements."  Id. at 1121.

3.     The Government Contractor Defense Applies to Nonmilitary Service Contracts

In Carley, the Third Circuit stated that "the federal interest in a performance contract . . . [is] essentially the same as the federal interests in procurement contracts."  Carley, 991 F.2d at 1120.   Recognizing that there is "no basis for a distinction" between performance and procurement contracts, Boyle, 487 U.S. at 506, several courts have held that the government contractor defense is applicable to service contracts.

Relying on Boyle, the Eleventh Circuit Court of Appeals held in Hudgens v. Bell Helicopters/Textron, 328 F.3d 1329 (11th Cir. 2003), that the government contractor defense applied to a maintenance service contract between the Army and DynCorp, one of the defendants in Hudgens.  The Eleventh Circuit recognized that the Supreme Court's decision in Boyle was made with regard to a procurement contract, but held that the central focus of the Supreme Court's decision in Boyle was "whether subjecting a contractor to liability under state tort law would create a significant conflict with a unique federal interest."  Id. at 1334.  That court

14

concluded that it would be "exceedingly hard-pressed to conclude that the unique federal interest recognized in <u>Boyle</u>, as well as the potential for significant conflict with state law, are not likewise manifest in" a case involving a service contract.  <u>Id.</u>

The Eleventh Circuit then modified the <u>Boyle</u> three-part test used to determine whether there is a significant conflict between federal policy and state law.  <u>Id.</u> at 1335.  It held that the service contractor would not be liable under state tort law if: "(1) the United States approved reasonably precise maintenance procedures; (2) the contractor's performance of maintenance confirmed to those procedures; and (3) the contractor warned the United States about the dangers in reliance on the procedures that were known to the contractor but not to the United States."  <u>Id.</u> The court affirmed the district court's findings that: (1) the maintenance procedures, which included multiple daily checklists and an instructions manual, issued by the Army were reasonably precise; (2) that the contractor had performed its maintenance duties in accordance with its contract; and (3) that the Army was aware of the danger of not incorporating certain precautions articulated by the FAA and the helicopter manufacturer.  <u>Id.</u> at 1335-1345. Accordingly, it affirmed the granted of summary judgment to the contractor on the ground that it was entitled to immunity from state tort law liability based on the government contractor defense. <u>Id.</u> at 1345.

Similarly, in <u>Richland-Lexington Airport Dist. v. Atlas Prop., Inc.</u>, 854 F. Supp. 400 (D.S.C. 1994), the district court, relying heavily on <u>Boyle</u>, <u>Yearsley</u>, and <u>Carley</u>, concluded that the government contractor defense applied to service contracts.  <u>Id.</u> at 418-424.  In the <u>Richland-Lexington</u> case, the district court held that the difference between a performance contract and a procurement contract was a "distinction without a difference because the federal interest in performance of a contract, as in <u>Yearsley</u>, was as equally compelling as the federal interest in the procurement contract, as in <u>Boyle</u>.  Performance therefore is on an equal footing with procurement, provided that there exists the uniquely federal interest . . . ."  <u>Id.</u> at 422 (citing <u>Boyle</u>, 487 U.S. at 506-507)).    The district court concluded that the government contractor

defense applied after concluding that: (1) the EPA approved the site and determined the best method and mode to execute the activity; (2) the contractor performed its duties according to the specifications issued by the EPA; and (3) there was no evidence that the contractor was aware of any dangers that the EPA was not. Id. at 423-424.

While the Second Circuit Court of Appeals declined to rule on whether the government contractor defense applied to nonmilitary contractors, it recognized that the "government contractor defense . . . shields a government contractor from claims arising out of its actions where the government has exercised its discretion and judgment in approving precise specifications to which the contractor must adhere." Malesko v. Correctional Services Corp., 229 F.3d 374, 381-382 (2d Cir. 2000) (holding that the government contractor defense would not have applied to a nonmilitary government contractor because there were no allegations that the government played any role in formulating or approving the policies or practices at issue), rev'd on other grounds, 534 U.S. 61 (2001) (stating in dicta that "[w]here the government has directed a contractor to do the very thing that is the subject of the claim, we have recognized this as a special circumstance where the contractor may assert a defense").  See In re World Trade Center Disaster Site Litig., 2006 U.S. Dist. LEXIS 75020 (S.D.N.Y. Oct. 17, 2006) (holding that "the immunity traditionally afforded to the federal government for actions taken in furtherance of its government functions" has been extended to "private entities hired to facilitate the government in the implementation of its programs and goals") (attached hereto as Ex. 10); Adorno v. Correctional Services Corp., 312 F. Supp. 2d 505, 521-522  (S.D.N.Y. 2004) (assuming applicability of the government contractor defense to a nonmilitary service contract).

> 4.      The Government Contractor Defense Immunizes Defendants From Tort Liability In This Case

Neither the Third Circuit Court of Appeals nor this District Court has applied the Boyle three-part test to nonmilitary service contracts.  As articulated in Hudgens and Richland-Lexington, a nonmilitary government contractor is entitled to immunity under the government

contractor defense if: (1) the federal government agency approved reasonably precise procedures regarding performance under the contract; (2) the contractor's performance under the government contract conformed to those procedures; and (3) the contractor warned the federal government agency about the dangers in reliance on the procedures that were known to the contractor but not to the government. See Hudgens, 328 F.3d at 1335; Richland-Lexington, 854 F. Supp. at 423-424. As set forth below, all three prongs are satisfied.

First, the State Department "manage[d] U.S. policy on . . . civilian security issues" in Kabul, Afghanistan. See Ex. 5. Moreover, as alleged in the Complaint, the contract "included provisions relating to employee safety, including but not limited to, requirements that the general contractor and any subcontractors maintain a minimal standard of security described by the contract." Complaint, ¶ 21. Thus, the government provided reasonably precise specifications for security.

Second, Plaintiffs do not at any time allege that the State Department disapproved or disallowed Defendants' performance under the CIVPOL contract. Plaintiff also do not allege that Defendants did not provide security in accordance with State Department policies or guidelines. Plaintiffs simply assert that that they were not allowed to close the street or deploy vehicle barricades without alleging that Defendants were required or permitted to do so by State Department regulations.

Finally, as to the third prong, Defendants were not aware of any danger about which the State Department did not already know. It is alleged that the warning was issued by a group organized by the United Nations and NATO, thereby raising the inference that a warning issued by ISAF would be more broadly announced than to just Defendants.

In summary, the government contractor defense applies to service contracts entered into with the United States Government. Because at all times relevant to this action Defendants were acting under the direction of, and in accordance with, the State Department's policies, requirements and standards, they were acting as its agents. Accordingly, Defendants are entitled

17

to invoke the government contractor defense and are immune from Plaintiffs' claims.  Therefore, the Complaint should be dismissed pursuant to Rule 12(b)(6) of the Federal Rules for failing to state of claim upon which relief can be granted.

D.    THE EMPLOYEES ARE COVERED BY THE DEFENSE BASE ACT, WHICH PROVIDES THE EXCLUSIVE REMEDY FOR PLAINTIFFS, AND THUS THIS CASE SHOULD BE DISMISSED FOR FAILURE TO STATE A CLAIM UPON WHICH RELIEF MAY BE GRANTED PURSUANT TO RULE 12(b)(6)

1.    The Employees Received DBA Coverage During Their Employment.

Plaintiffs readily concede that the Employees were covered by the DBA while they were employed by DI FZ in Afghanistan under a subcontract to the CIVPOL contract.[5]  Complaint, ¶ 15.  Thus, whether DBA coverage is required and whether it has been properly provided are not issues in this case.

As recognized by the courts, for employees who are covered by the DBA, the death and disability benefits provided under the LHWCA are the exclusive remedy for the deaths and injuries suffered by DBA-covered employees.  See Ross v. DynCorp, 362 F. Supp.2d 344, 358 (D.D.C. 2005) (granting judgment as a matter of law on the ground that the LHWCA, pursuant to the DBA, provided the exclusive remedies to plaintiffs who brought wrongful death and survivorship actions based on the death of an employee working under a government contract in Columbia, South America).  See also Flying Tigers Lines, Inc. v. Landy, 370 F.2d 46, 52 (9th Cir. 1966) (holding that the DBA evidenced Congress' intent that the LHWCA compensation scheme

---

[5]There can be no question that the Employees were covered by the DBA.  The DBA, 42 U.S.C. § 1651, applies to employees who are employed under a government contract or subcontract (1) entered into with the United States or an applicable department or agency thereof; (2) that is to be performed outside the continental United States; and (3) entered into for the purpose of engaging in public work.  42 U.S.C. § 1651(a)(4).  Applying these factors to the present case, as alleged in the Complaint, it is clear that the Employees were covered by the DBA and that they received such coverage.  See Complaint, ¶¶ 15-16.  The Employees were employed under a subcontract to a general contract with the U.S. Department of State, thereby satisfying the first criterion.  See id., ¶¶ 1-4, 9, 11.  The Employees were employed to perform their duties in Afghanistan, thereby satisfying the second criterion for DBA coverage.  The Employees were employed under service contracts "to assist the democratic government of Afghanistan in developing a modern, indigenous police force to maintain peace and stability," a "public work" as defined by 42 U.S.C. § 1651(b)(1) (defining "public work" as any "service contracts or projects in connection with the national defense or with war activities" for the "public use of the United States or its allies").

18

is to be the employee's sole remedy); <u>Pulley v. Peter Kiewit Son's Co.</u>, 223 F.2d 191, 194 (7th Cir. 1955) (holding that the remedies provided by the LHWCA were exclusive as long as the employer complied with the mandates of the statute); <u>Sparks v. Wyeth Lab., Inc.</u>, 431 F. Supp. 411, 417 (W.D. Okla. 1977) (holding that the DBA "makes the exclusive remedy of an employee of a covered government contractor against that contractor a compensation remedy under the [LHWCA]"); <u>Berven v. Fluor Corp.</u>, 171 F. Supp. 89, 90 (S.D.N.Y. 1959) (dismissing complaint based on exclusivity of LHWCA benefits pursuant to the DBA).

       2.     <u>Defendants Are Immune From Tort Actions Under the DBA</u>.

      Plaintiffs, however, argue that Defendants are not immune from tort actions because they are not "employers" under Section 905(a) of the LHWCA.  <u>See</u> Complaint, ¶ 16.  As a legal conclusion, this assertion is not entitled to any presumption of truth for purposes of this motion. <u>See</u> <u>Cal. Pub. Employees' Ret. Sys.</u>, 394 F.3d at 143; <u>In re: Rockefeller Center</u>, 311 F.3d at 216; <u>In re Digital Isl. Sec. Litig.</u>, 223 F. Supp. 2d at 550.

      In their attempt to strip Defendants of their immunity from tort actions, Plaintiffs rely exclusively on the language of Section 905(a) of the LHWCA[6] and pointedly ignore the exclusivity provision set forth in Section 1651(c) of the DBA, which plainly immunizes Defendants as contractors, as well as Section 1651(d) of the DBA, which defines "contractors" as "employers" under the LHWCA.  <u>Compare</u> LHWCA, 33 U.S.C. § 905(a) <u>with</u> DBA, 42 U.S.C. § 1651(c) and § 1651(d).  Because it is the DBA, and not the LHWCA, that is the operative statute in this case, the exclusivity and definitional provisions of the DBA are paramount to this analysis.

      The exclusivity provision of the DBA provides:

---

[6]The exclusivity provision contained in the LHWCA provides in relevant part:

      The liability of an employer prescribed in section 4 [33 USC § 904] shall be exclusive and in place of all other liability of such employer to the employee, his legal representative, husband or wife, parents, dependents, next of kin, and anyone otherwise entitled to recover damages from such employer at law or in admiralty on account of such injury or death . . .

33 U.S.C. § 905(a).

> Liability as exclusive.  The liability of an employer, *contractor (or any subcontractor or subordinate subcontractor with respect to the contract of such contractor) under this Act shall be exclusive and in place of all other liability of such employer, contractor, subcontractor, or subordinate contractor to his employees (and their dependents)* coming within the purview of this Act, under the workmen's compensation law of any Sate, Territory, or other jurisdiction, irrespective of the place where the contractor hire of any such employee may have been made or entered into.

42 U.S.C. § 1651(c) (emphasis added).  As the plain language of the DBA states, a contractor's liability is limited to those remedies available under the DBA and its DBA liability "shall be exclusive and in place of all other liability."  Id.   The immunity from "all other liability" goes to any claims brought by the employees, such as the Employees, and their dependents, such as Plaintiffs.  Id.  Thus, under Section 1651(c) of the DBA, Defendants, who are contractors (see Complaint, ¶¶ 1, 9, 10, 18), are immune from the tort claims brought by Plaintiffs arising out of the the deaths and injuries suffered by the Employees.

Moreover, the DBA provides that a contractor shall have "the rights, obligations, liability and duties *of the employer* under such Longshoremen's and Harbor Workers' Compensation Act."  Id. § 1651(d) (emphasis added). Thus, the DBA expressly provides that a contractor is also an employer for purposes of "the rights, obligations, liability and duties" under the LHWCA. Because Defendants are deemed to be employers under the LHWCA by the DBA, Defendants are entitled to the immunity provided to an employer under the LHWCA.  Accordingly, because the Employees were properly provided DBA coverage, Defendants are not liable to the employees, their legal representatives, husbands or wives, parents, dependents, next of kin or anyone else who may be entitled to bring a claim against Defendants.

Even if Section 905(a) of the LHWCA is not applicable to Defendants, Defendants' are still entitled to assert immunity under Section 1651(c) of the DBA.  While a contractor may not be able "to invoke the first sentence of section 905(a), . . . as a shield against liability to employees of a subcontractor unless the subcontractor actually fails to secure compensation[,]

Section 905(a) does not refer to or otherwise implicate immunities granted by other federal or state laws." Vega-Mena v. United States, 990 F.2d 684, 692 (1st Cir. 1993)

Finally, notwithstanding the above arguments, even though the DBA provides immunity to contractors such as Defendants, Defendants would still be entitled to assert the exclusivity of remedies as an affirmative defense under the LHWCA because Defendants in fact paid for DBA coverage for the Employees. See Ex. 12 (Insurance Endorsement adding U.S. Department of State Contract No. S-LMAQM-04-C-0030 for Afghanistan to the DBA Insurance Policy).[7] Because Defendants paid for DBA coverage, they would be deemed the "employer" of the Employees for purposes of DBA benefits. See LHWCA, 33 U.S.C. § 905(a).[8]

3.    Plaintiffs Have Not Pleaded an Intentional Tort.

In another effort to circumvent the exclusivity of remedies under the DBA, Plaintiffs' seem to be alleging that Defendants committed an intentional tort by casting the alleged acts of Defendants as "intentional, willful, wanton, and reckless." Complaint, ¶ 46. As explained more fully below, the pleaded facts are insufficient to establish an intentional tort.

There is some dispute among the courts as to whether there is an exception to the exclusivity of remedies provision in the LHWCA for intentional torts. Compare, e.g., Nations v. W.W. Morris, 483 F.2d 577, 587-588 (5th Cir.), cert. denied, 414 U.S. 1071 (1973) (holding that Section 905(a) of the LHWCA "completely obliterates the rights at common, civil or maritime law against Employer and fellow employee" because "Congress in its unlimited power has determined that the relationship gives rise only to compensation liabilities") with Roy v.

---

[7] As Exhibit 17 shows, Defendant DynCorp International LLC entered into the MNSTC-I Contract, Contract No. S-LMAQM-04 C-0030, with the U.S. Department of State on February 18, 2004. In February 2004, DynCorp International LLC was owned by Computer Sciences Corporation ("CSC") and DynCorp, a wholly owned subsidiary of CSC. See Ex. 19, ¶ 8 (Declaration of H. Montgomery Hougen). In February 2005, CSC's and DynCorp's interests in DynCorp International LLC were sold to another entity. Thus, for purposes of this Motion, during the relevant time period, DynCorp International LLC was owned by CSC and DynCorp and covered under CSC's DBA Insurance Policy.
[8] Section 905(a) provides in pertinent part: "For purposes of this subsection, a contractor shall be deemed the employer of a subcontractor's employees only if the subcontractor fails to secure the payment of compensation as required by section 4 [33 USC § 904]." 33 U.S.C. § 905(a).

Bethlehem Steel Corp., 838 F. Supp. 312, 316 (E.D. Tex. 1993) (holding that an employer may be sued under the LHWCA for an intentional tort"), and Houston v. Bechtel Assoc. Prof. Corp., 522 F. Supp. 1094, 1096 (D.D.C. 1981) (holding that there is an exception to Section 905(a) of the LHWCA for injuries caused by intentional acts). Defendants submit that the language of the exclusivity provisions in both the DBA and LHWCA are all encompassing and do not allow for an exception for intentional torts. Both provisions provide that "liability [under the DBA and LHWCA] shall be exclusive and *in place of all other liability*." DBA, § 1651(c); LHWCA, § 905(c) (emphasis added); see Nations, 483 F.2d at 588 (holding that "the comprehensive scheme known as the Longshoremen's and Harbor Workers' Act is the *whole* source of rights and remedies (emphasis in original)).

In any event, even assuming that there is an exception for intentional torts, and without regard to the choice of law issue (including the choice of law provision in the Employment Agreements), Plaintiffs have failed to plead an intentional tort in their Complaint. To that end, in Houston, the court held that "[n]othing short of a specific intent to injure the employee falls outside the scope of § 905(a)." Houston, 522 F. Supp. at 1096. In addition, "[k]nowledge and appreciation of a risk is not the same as the 'intent' to cause injury." Id. Moreover, "[n]either knowingly permitting a hazardous work condition to exist, . . . nor willfully failing to furnish a safe work place to work, . . . nor even willfully violating a safety statute, . . . constitutes requisite intent." Id. (citations omitted). Thus, the court in Houston held that an allegation that the employer acted "willful[ly], wanton[ly], reckless[ly], and unlawful[ly] . . . is barred by § 905(a) of LHWCA." Id.; see also Roy, 838 F. Supp. at 316 (holding that "gross negligence or recklessness . . . cannot extrapolate [the employer's] actions into intent" and that "[w]illful, wanton, and reckless misconduct is not the equivalent of an intentional tort") (quotations and citations omitted). Consequently, Plaintiffs' claims in this case -- that Defendants acted "negligently, intentionally, willfully, wantonly, and recklessly" -- must also be dismissed.

4.    The Benefits Under the LHWCA Are the "Exclusive Remedy" for Covered "Injuries"

In addition, the LHWCA by its definition of a covered "injury," immunizes Defendants from any intentional tort liability.  Section 902(2) of the LHWCA defines an injury as an "accidental injury or death arising out of and in the course of employment, . . . and includes such injury caused by the willful act of a third person directed against an employee because of his employment."  LHWCA, § 902(2).  A "person" is defined as an "individual, partnership, corporation, or association."  Id. § 902 (1).  Accordingly, because Defendants are corporations, they are "persons" under the LHWCA.  Plaintiffs allege that the "injuries sustained by plaintiff Dickinson, and the deaths of decedents John Deuley and Gerald Gibson, were the direct and proximate result of the negligent, intentional, willful, wanton, and reckless conduct of defendants . . . ."  Complaint, ¶ 46.  Consequently, any injuries caused by Defendants would be included within the definition of a covered injury.  Thus, the benefits provided under the LHWCA are the exclusive remedy for such deaths and injuries, and Plaintiffs are precluded from bringing any action against Defendants.  See Sharp v. Elkins, 616 F. Supp. 1561 (W.D. La. 1985) (holding that Section 902(2) "[c]learly . . . exhibits a Congressional intent to include within the remedies of the LHWCA torts caused by the intentional acts of third persons").

In summary, because the Employees were covered by and entitled to benefits provided by the DBA, Defendants are immune from any tort or other liability asserted by Plaintiffs based on the plain language of the DBA and the LHWCA.  In addition, Plaintiffs have not pleaded any intentional torts that may or may not be an exception to the exclusive remedies of the  DBA.  Accordingly, Plaintiffs fail to state a cause of action upon which relief may be granted, and the Complaint should be dismissed pursuant to Rule 12(b)(6) of the Federal Rules.

E.      PLAINTIFFS' CLAIMS ARE NONJUSTICIABLE DUE TO THE POLITICAL
        QUESTION DOCTRINE AND THUS THE CASE SHOULD BE DISMISSED FOR
        LACK OF SUBJECT MATTER JURISDICTION PURSUANT TO RULE 12(b)(1)

        This Court lacks subject matter jurisdiction under the political question doctrine because

(1) the Executive Branch's foreign policy decisions are implicated in almost every aspect of this

case; (2) there are no judicially discoverable standards by which this Court could determine the

adequacy of security measures in a hostile, conflict-ridden country like Afghanistan while

simultaneously balancing the State Department's policy, numerous government, coalition, and

U.N. interests and authorities; and (3) the Court would essentially be second-guessing the

Executive Branch's commitment to the CIVPOL program.   Accordingly, this case should be

dismissed with prejudice for lack of subject matter jurisdiction.

        1.      Political Question Doctrine

        As held by the Court of Appeals for the Third Circuit, "'[t]he political question doctrine

excludes from judicial review those controversies which revolve around policy choices and value

determinations constitutionally committed for resolution to the halls of Congress or the confines

of the Executive Branch.'"   Gross v. German Foundation Indus. Initiative, 456 F.3d 363, 377 (3d

Cir. 2006) (quoting Japan Whaling Ass'n v. Am. Cetacean Soc'y, 478 U.S. 221, 230 (1986)).  In

Baker v. Carr, 369 U.S. 186 (1962), the Supreme Court articulated six factors to be considered in

determining the presence or absence of a nonjusticiable political question:

        (1)     a textually demonstrable constitutional commitment of the issue
                to a coordinate political department; or

        (2)     a lack of judicial discoverable and manageable standards for
                resolving it; or

        (3)     the impossibility of deciding without an initial policy
                determination of a kind clearly for nonjudicial discretion; or

        (4)     the impossibility of a court's undertaking independent resolution
                without expressing lack of the respect due coordinate branches
                of government; or

        (5)     an unusual need for unquestioning adherence to a political
                decision already made; or

24

(6)    the   potential   for   embarrassment   from   multifarious
       pronouncements by various departments on one question.

Id. at 217, cited and quoted by Gross, 456 F.3d at 377; In re: Nazi Era Cases Against German

Defendants Litig. (Rozenkier v. AG Schering), 2006 U.S. App. LEXIS 19477, at * 12 (3d Cir.

Aug. 2, 2006) (dismissing survivor's claim against foundation created to compensate survivors of

the Holocaust based on the political question doctrine because judicial review would express a

lack of respect for the Executive Branch and its longstanding foreign policy interest in resolving

Nazi-era claims through intergovernmental negotiations) (attached hereto as Ex. 13).  "A finding

of any one of the six factors indicates the presence of a political question."  Gross, 456 F.3d at

377.  See also Fisher v. Halliburton, Inc., 2006 U.S. Dist. LEXIS 68413 (S.D. Tex. Sept. 22,

2006) (dismissing case based on the political question doctrine because the deaths and injuries

suffered by civilian employees in Iraq occurred while under contract with the Army) (attached

hereto as Ex. 14); Smith v. Halliburton Co., 2006 U.S. Dist. LEXIS 61980 (S.D. Tex. Aug. 30,

2006) (dismissing case based on the political question doctrine because negligence claims arose

from a suicide bomb attack on a military based in Iraq) (attached hereto as Ex. 15); Whitaker v.

Kellogg Brown & Root, Inc., 2006 U.S. Dist. LEXIS 45708 (M.D. Ga. Jul. 6, 2006) (dismissing

case based on the political question doctrine because the alleged negligence causing the soldier's

death was based on acts performed by a government contractor's employee pursuant to the

military's planning, orders and regulations) (attached hereto as Ex. 16).

  2.    The Issues Raised by Plaintiffs Are Constitutionally Committed to the Political
             Branches

  As recognized by the courts, "[m]atters intimately related to foreign policy and national

security are rarely proper subjects for judicial intervention."  Bancoult v. McNamara, 445 F.3d

427, 433 (D.C. Cir. 2006).  See also In re: Nazi Era Cases, 2006 U.S. App. LEXIS 19477 at *16

(stating that "we are mindful of the Supreme Court's emphasis on preserving the capacity of the

President to speak for the Nation with one voice in dealing with other governments . . . .")

(citations and quotations omitted).  "The conduct of the foreign relations of our government is committed by the Constitution to the executive and legislative -- the political -- departments of the government, and the propriety of what maybe (sic) done in the exercise of this political power is not subject to judicial inquiry or decision."  Bancoult, 445 F.3d at 433 (quoting Oetjen v. Cent. Leather Co., 246 U.S. 297, 302 (1918)) (quotations omitted).  The Supreme Court also reminds us that foreign policy decisions are:

> wholly confided by our Constitution to the political departments of the government, Executive and Legislative.  They are delicate, complex, and involve large elements of prophecy.  They are and should be undertaken only by those directly responsible to the people whose welfare they advance or imperil.  They are decisions of a kind for which the Judiciary has neither aptitude, facilities nor responsibility and have long been held to belong in the domain of political power not subject to judicial intrusion or inquiry.

Bancoult, 445 F.3d at 433 (quoting Chi. & S. Air Lines, Inc. v. Waterman S.S. Corp., 333 U.S. 103, 111 (1948)) (quotations omitted).  "Thus, 'the fundamental division of authority and power established by the Constitution precludes judges from overseeing the conduct of foreign policy or the use and disposition of military power; these matter are plainly the exclusive province of Congress and the Executive.'"  Bancoult, 445 F.3d at 433 (quoting Luftig v. McNamara, 373 F.2d 664, 665-666 (D.C. Cir.), cert. denied, 387 U.S. 945 (1967)(per curiam)).

The constitutional commitment of foreign policy to the Executive and Legislative Branches can be found in Article I, Section 8, Clause 1 ("the Congress shall have the Power To . . . provide for the Common Defence"), Clause 3 ("To regulate commerce with foreign nations"), and Clause 10 ("To define and punish Piracies and Felonies committed on the High Seas and Offenses against the Law of Nations"), among others.  U.S. Const. art. I, § 8, cls. 1, 3, and 10.  Moreover, Article II, Section 2, of the U.S. Constitution vests the President with authority to conduct foreign affairs, stating that the President "shall have Power, by and with the Advice and Consent of the Senate, to make Treaties, . . . [and] appoint Ambassadors, other public Ministers and Consuls."  U.S. Const. art. II, § 2; Bancoult, 445 F.3d at 433-434 (citing Schneider v.

Kissinger, 412 F.3d 190, 194-195 (D.C. Cir. 2005), cert. denied, __ U.S. __, 126 S. Ct. 1768 (2006)). Accord Gross, 456 F.3d at 387 (holding that "even though the Executive's powers in foreign affairs do not enjoy any textual detail within the Constitution itself, in foreign affairs the President has a degree of independent authority to act" (citations and quotations omitted)).

Foreign policy decisions of the Executive Branch are implicated in nearly every facet of this case. According to the State Department, CIVPOL is a "vital tool of U.S. foreign policy" and "decisions to deploy U.S. CIVPOL are made at the highest levels of the federal government based on consultations among the White House, Department of State, Department of Defense, and other agencies." See Ex. 5; Ex. 4 (Little-Turner Dec.), ¶¶ 6 and 7. Working in conjunction with the United Nations and other international organizations, the purpose of the CIVPOL mission in Afghanistan is "to help the democratic government of Afghanistan develop a modern, indigenous police force to maintain peace and stability." See Ex. 5; Complaint, ¶¶ 9, 18. Thus, there can be no dispute that the award of a contract to Defendants by the State Department was an act of the Executive Branch in furtherance of its foreign policy.

The conduct of U.S. foreign relations is also paramount in the security issues that lie at the heart of Plaintiffs' liability theory. The State Department "manage[d] U.S. policy on . . . civilian security issues" in Kabul, Afghanistan. See Ex. 4 (Little-Turner Dec.), ¶ 10; Ex. 5. Thus, Plaintiffs' allegations necessarily call into question the State Department's conduct, policies, procedures and protocols with respect to security issues and threat assessments. Indeed, Plaintiffs' claims about the lack of appropriate security measured allowed under the contract call into question the policy determinations and decisions of the White House, the Department of Defense, and other government agencies with which the State Department consulted with respect to the CIVPOL program.

Moreover, the State Department was not working independently in Afghanistan. It was part of an international coalition and worked in conjunction with the Government of Afghanistan

and other international organizations, such as the International Security Assistance Force ("ISAF"), NATO, and the United Nations.

Plaintiffs attempt to make this case about cut-and-dry decisions that were being made by Defendants regarding the level of security to be provided at DynHouse with an eye towards the bottom line. That simply is not so. The State Department "manage[d] U.S. policy on . . . civilian security issues" in Kabul, Ex. 4 (Little-Turner Decl., ¶ 10), and "established the necessary security measures that had to be observed at American facilities," Ex. 11 (Cashon Dec., ¶7). The State Department's protocols and standard operating procedures enhanced the security at all U.S. facilities. See Ex. 4 (Little-Turner Dec.), ¶ 10, 21-23; Ex. 11 (Cashon Dec.), ¶ 7, 9-17. The State Department's standard operating procedure regarding American reaction to security threats insured dissemination of the same warnings to the entire American presence and were based on a number of factors, including the relationship of the United States to its host country and its allies in-country. See Ex. 4 (Little-Turner Dec.), ¶ 10, 23; Ex. 11 (Cashon Dec.), ¶ 7, 15. Considerations such as the relationships to host and allied countries are critical to the security measures in Kabul on the day of the incident, and they have been reserved for the political branches. Consequently, dismissal under the first Baker factor is compelling in this case.

     3.    The Issues Raised by Plaintiffs Are Not Susceptible of Resolution by Judicially Discoverable Standards

Dismissal under the second Baker factor is warranted here because there are no judicially discoverable and manageable standards to resolve the issues in this case. For example, Plaintiffs allege, assuming Defendants had the authority to do so, that Defendants should have blocked off the street, provided vehicle barricades, or moved to a different location. However, there are no judicially discoverable standards which could establish what security measures should have been in place in order to avoid the deaths and injuries caused by a suicide bomber in a vehicle under the complex circumstances presented here. More importantly, there is no way for the Court or a factfinder to determine whether the lack of these additional security measures proximately caused

the deaths and injuries in this case.  The Court would have to create its own standards for determining adequate security measures in hostile, conflict-ridden countries like Afghanistan, by balancing numerous government, coalition, and U.N. interests and authorities, and then determine whether the State Department's policy on civilian security measures was adequate.

In addition, if this Court were to adjudicate Plaintiffs' claims, it would have to evaluate, assess, and question, inter alia, the State Department's conduct, policies, procedures and protocols on civilian security issues in Afghanistan; the basis for such conduct, policies, procedures and protocols; whether its conduct, policies, procedures and protocols adequately addressed safety issues in a Kabul, Afghanistan; whether its conduct, policies, procedures and protocols allowed for modifications in response to security warnings; whether its conduct, policies, procedures and protocols are consistent with international standards; and whether its conduct, policies, procedures and protocols are consistent with U.S. standards.  The Court would also have to evaluate, assess and question the conduct, policies, procedures and protocols of the Government of Afghanistan with respect to the presence of international missions, such as CIVPOL, within its borders, as well as the conduct, policies, procedures and protocols of ISAF, NATO and the United Nations regarding threats of violence to multinational coalition targets in Kabul, Afghanistan.

In short, this Court should not to "recast[] foreign policy . . . in tort terms" and "define the standard for the government's" security policies, procedures, and protocols.  Bancoult, 445 F.3d at 434 (quoting Schneider, 412 F.3d at 197)).  Accordingly, this case should be dismissed based on the second Baker factor.

4.    The Issues Raised by Plaintiffs Cannot Be Decided Without an Initial Policy Determination Reserved for the Political Branches

Finally, dismissal pursuant to the third Baker factor is warranted because the Court would have to make a policy determination about the level and types of security measures that should be in place for contractors performing services abroad, especially in hostile and unstable

sovereignties, such as Afghanistan. For instance, the Court might have to consider whether the United States should have withdrawn its CIVPOL mission from a volatile and unstable country such as Afghanistan in the first place or whether the U.S. military should have had direct responsibility for providing security to U.S. government contractor sites in Afghanistan. Such policy decisions were already made "at the highest level of the federal government based on consultations among the White House, Department of State, Department of Defense, and other agencies." Ex. 5. The Court's adjudication of such matters would "impermissibly intrude on the Executive's role in formulating policy." Gross, 456 F.3d at 389.

For all of the foregoing reasons, Defendants respectfully submit that the claims raised by Plaintiffs in their Complaint is nonjusticiable under the political question doctrine and that this case should be dismissed in its entirety pursuant to Rule 12(b)(1) of the Federal Rules for lack of subject matter jurisdiction.

F.    VENUE IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF DELAWARE IS IMPROPER AND THUS THE CASE SHOULD BE DISMISSED FOR IMPROPER VENUE PURSUANT TO RULE 12(b)(3), OR, IN THE ALTERNATIVE, THIS CASE SHOULD BE TRANSFERRED TO THE EASTERN DISTRICT OF VIRGINIA PURSUANT TO 28 U.S.C. § 1404(a)

While Defendants acknowledge that Plaintiffs' lawsuit may be brought in this Court in light of Defendants' incorporation or formation under the laws of the State of Delaware, Defendants respectfully submit that this Court is not the proper forum for this lawsuit because none of the events or actions underlying this lawsuit occurred in Delaware. Accordingly, Defendants submit that this case should be dismissed for improper venue.

1.    Venue Is Improper in This Judicial District and Thus the Case Must Be Dismissed

Venue in a civil action "not founded solely on diversity of citizenship may . . . be brought only in (1) a judicial district where any defendant resides, if all defendants reside in the same State, (2) a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred, . . . or (3) a judicial district in which any defendant may be found, if there is no

district in which the action may otherwise be brought."  28 U.S.C. § 1391(b) (emphasis added).

The intent of the venue statute, 28 U.S.C. § 1391, is to prevent improper forum shopping by a

plaintiff.  See Leroy v. Great Western United Corp., 443 U.S. 173, 185 (1979) (holding that the

venue statute was not intended by Congress "to give [to plaintiff] an unfettered choice among a

host of different districts").  As acknowledged by the Court of Appeals for the Third Circuit, the

venue statute favors the defendant in a venue dispute.    Cottman Transmission Systems v.

Martino, 36 F.3d 291, 294 (3d Cir. 1994).   The statute requires that the facts upon which the

plaintiff predicates venue to be substantial, and "is intended to preserve the element of fairness so

that a defendant is not haled into a remote district having no real relationship to the dispute."  Id.

Thus, "[e]vents or omissions that might only have some tangential connection with the dispute in

litigation are not enough."  Id.

        The test for determining proper venue "is not the defendant's 'contacts' with a particular

district, but rather the location of those 'events or omissions giving rise to the claim' . . . .

Although the statute no longer requires a court to select the 'best' forum, . . . the weighing of

'substantial' may at times seem to take on that flavor."  Id.; St. Clair Intellectual Prop.

Consultants, Inc. v. Mirage Sys., Inc., 419 F. Supp. 2d 620, 623 (D. Del. 2006).   For the

following reasons, Plaintiffs in this case cannot meet their burden of establishing that venue is

proper in this Court.

        Defendants acknowledge that they are incorporated or formed under the laws of the State

of Delaware and that this lawsuit may be filed in this Court.  See Waste Distillation Tech., Inc. v.

Pan Am. Resources, Inc., 775 F. Supp. 759, 766 (D. Del. 1991) (holding that "corporate citizens

of Delaware, both the corporation and its management, must anticipate the possibility of being

hauled into court here").   However, this Court is not the proper forum for adjudication of

Plaintiffs' claims because none of the events or omissions giving rise to Plaintiffs' claims

occurred in Delaware.  See Cottman, 36 F.3d at 294; FS Photo, Inc. v. Picturevision, Inc., 48 F.

Supp. 2d 442, 449-450 (D. Del. 1999) (transferring case to Eastern District of Virginia even

though defendant was Delaware corporation).   Decedents and Dickinson resided in Arkansas,

Virginia, and Missouri when they signed their respective employment agreements with DI FZ, a

Dubai Internet City Free Zone Limited Liability Company -- not Delaware.  See Complaint, ¶¶

11, 23-27.   The Employees were employed in Kabul, Afghanistan -- not Delaware.  Complaint,

¶¶ 2-4.   The Al Qaeda attack that allegedly killed Messrs. Deuley and Gibson and allegedly

seriously wounded Mr. Dickinson occurred in Kabul, Afghanistan -- not Delaware.  Complaint, ¶

1.  Although Defendants are incorporated or formed in Delaware, none of Plaintiffs' allegations

relate to the corporate, financial, or tax issues relevant to the formation of the Defendants in

Delaware.  See Complaint.  At the time of the attack, Defendants had their principal places of

business in Virginia or Texas -- not Delaware.  See Complaint, ¶¶ 6, 7, 8.  To the extent that there

were any decisions regarding contract administration were in the United States, they were made

in Virginia or Texas -- not Delaware.  Discussions and negotiations about the contract between

the State Department and Defendants occurred in Virginia and/or Texas, where Defendants and

the State Department are located.  Finally, Defendants' contract with the State Department was

issued in Virginia -- not Delaware.   See Ex. 17 (Cover Page to CIVPOL Contract with

Department of State).   As these facts clearly demonstrate, except for the Defendants'

incorporation or formation in this state, Plaintiffs have not provided sufficient justification that

this Court is the best forum for their claims.[9]

---

[9]  Indeed, this is not the first time that Plaintiffs have filed this lawsuit in an improper forum.  The
Plaintiffs previously filed an action in the Southern District of New York on or about August 29,
2005, against DynCorp International LLC, DynCorp International Technical Services LLC,
DynCorp International FZ-LLC, and Veritas Capital, L.P.  See Deuley v. DynCorp International
LLC, Case No. 05-CV-7633, SDNY ECF/PACER Docket Report, Document No. 1 (Complaint)
[hereinafter referred to as "Deuley I"].  The defendants in Deuley I filed a Motion to Dismiss for
Lack of Jurisdiction, Improper Service and Improper Venue.  Id., Document No. 7.  Instead of
filing a response to the motion to dismiss, the plaintiffs in Deuley I simply voluntarily dismissed
their Complaint without prejudice on or about February 24, 2006.  Id., Document No. 14.
Plaintiffs then re-filed their action in the Superior Court of the State of Delaware in and for New
Castle County on or about August 22, 2006.  Defendants subsequently removed the action to this
U.S. District Court for the District of Delaware based on several federal question grounds,
including federal officer removal pursuant to 28 U.S.C. § 1442(a).  Plaintiffs' Delaware state

Plaintiffs' forum selection certainly does not reflect the residences of Plaintiffs themselves, as they reside in Arkansas, Virginia and Missouri. See Complaint, ¶¶ 2-4. Perhaps Plaintiffs' forum selections are being made for Plaintiffs' counsel's convenience. Both New York and Delaware are with relatively easy commuting distances, by train or car, from Philadelphia, Pennsylvania. However, it is well established that convenience to counsel is not a factor to be considered for venue purposes. The Plum Tree, Inc. v. Stockment, 488 F.2d 754, 1047 (3d Cir. 1973). Thus, Plaintiffs' improper forum shopping, for whatever reason, is obvious.

In short, because none of the events or omissions giving rise to Plaintiffs' claims in this lawsuit occurred in Delaware, this Court is not the most appropriate forum for adjudication of Plaintiffs' claims. See Cottman, 36 F.3d at 295-296 (holding that venue is improper because the significant events and omissions in another state); St. Clair, 419 F. Supp. 2d at 623 (dismissing Complaint based on improper venue because there were "no events or omission that have transpired in Delaware that are relevant to determining" the issues presented). Consequently, Defendants submit that the Complaint should be dismissed because of improper venue pursuant to Rule 12(b)(3) of the Federal Rules. See FS Photo, 48 F. Supp. 2d at 450 (noting that a transfer would not to "be in the interest of justice . . . if blatant forum shopping led the plaintiff not to bring the action in a proper district in the first instance" (citations and quotations omitted)).

2.     In the Alternative, This Case Should Be Transferred to the Eastern District of Virginia, Alexandria Division

A district court has the discretion "to adjudicate motions to transfer according to an individualized, case-by-case consideration of convenience and the interests of justice." Padcom, Inc. v. Netmotion Wireless, Inc., 2004 U.S. Dist. LEXIS 9658, at * 21-22 (D. Del. May 24, 2004) (attached hereto as Ex. 18). A court may transfer a civil action to a more appropriate forum in

---

court Complaint does not state the basis for jurisdiction in Delaware. Plaintiffs' choice of forum for this action is no more appropriate than its previous selection.

accordance with 28 U.S.C. § 1404(a)[10] if two conditions are satisfied: (1) the action could have been brought in the transferee district; and (2) if the convenience of the parties and witnesses and the interests of justice would be best served in the transferee district.  C.R. Bard Inc. v. Guidant Corp., 997 F. Supp. 556, 561 (D. Del. 1998).  The moving party has the burden of establishing the need for transfer.  Id. (citations omitted).

In determining whether an action should be transferred to another district, the reviewing court must consider the three enumerated factors listed in Section 1404(a) -- convenience of the parties, convenience of the witnesses, or interests of justice -- as well as "the private and public interests protected by the language of § 1404(a)."  Id.  The private interests include:

(1) Plaintiff's forum preference as manifested in the original choice;

(2) Defendant's preference;

(3) Whether the claim arose elsewhere;

(4) The convenience of the parties as indicated by their relative physical and financial condition;

(5) The convenience of the witnesses - but only to the extent that the witnesses may actually be unavailable for trial in one of the fora; and

(6) Location of books and records (similarly limited to the extent that the files could not be produced in the alternative forum).

Padcom, 2004 U.S. Dist. LEXIS 9658 at *23-24 (citing Jumara v. State Farm Ins. Co., 55 F.3d 873, 879 (3d Cir. 1995)).  The public interests include:

(1) The enforceability of the judgment;

(2) Practical consideration that could make the trial easy, expeditious or inexpensive;

(3) The relative administrative difficulty in the two fora resulting from court congestion;

(4) The local interest in deciding local controversies at home;

---

[10] 28 U.S.C. § 1404(a) provides:  "For the convenience of the parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought."

(5) The public policies of the fora; and

(6) The familiarity of the trial judge with the applicable state law in diversity cases.

Id.

During this analysis, the reviewing court affords deference to the plaintiff's choice of forum "as long as a plaintiff has selected the forum for some legitimate reason." Padcom, 2004 U.S. Dist. LEXIS 9658 at *22 (citations omitted). Thus, the court does "not blindly prefer the plaintiff's choice of forum." Waste Distillation, 775 F. Supp. at 764. Less deference is accorded a plaintiff's choice of forum "where the plaintiff has not brought suit on its 'home turf' because the interest in litigating in a convenient forum is reduced." Id.

The determination with respect to the first 1404(a) factor involves a "mechanical analysis of subject matter and personal jurisdiction and proper venue." Id. at 762. This determination is limited to the facts and circumstances existing at the time of the filing of the lawsuit. Id. at 761. To that end, DynCorp International, Inc. and DynCorp International LLC now have their principal place of business and/or conduct business in Virginia. See Ex. 19 (Declaration of H. Montgomery Hougen), ¶¶ 5-6. Defendant CSC Applied Technologies LLC has its principal place of business in Texas and maintains an office in Virginia. See Ex. 20 (Declaration of Cherie Cameron), ¶¶ 6 and 7. Thus, Defendants do not contest that the Eastern District of Virginia would have personal jurisdiction over them. As for subject matter jurisdiction, Defendants have removed the state court action to this federal District Court based on federal officer removal, 28 U.S.C. § 1442(a), and other federal questions. Thus, the Eastern District of Virginia would have the same subject matter jurisdiction as this Court.[11] Moreover, venue is proper in the Eastern District of Virginia to the extent that any of the allegations as argued by Defendants could be based on activity in the United States. See FS Photo, 48 F. Supp.

---

[11] Defendants' statement regarding subject matter jurisdiction is not a waiver of any of its challenges to subject matter jurisdiction, including whether the claims by Plaintiffs are justiciable under the political question doctrine.

2d at 449 (transferring case from District of Delaware to the Eastern District of Virginia even though defendant was Delaware corporation). Thus, Plaintiffs could, and should, have brought this lawsuit in the Eastern District of Virginia.

With regard to the second prong of the venue transfer analysis, Plaintiffs' choice of forum in this case is not entitled to any deference because there is no legitimate or rational basis for bringing this lawsuit in Delaware. As demonstrated above, Plaintiffs have pleaded no facts establishing that any of the events or omissions giving rise to their claims occurred in Delaware. Moreover, as Plaintiffs reside in Arkansas, Virginia, and Missouri, they are not on their "home turf" and they cannot assert that litigating their case in this Court is more convenient than litigating this case in the Eastern District of Virginia.

The private interests and the convenience of the parties weigh in favor of transferring this action to the Eastern District of Virginia. Two of the Plaintiffs, Joseph and Kim Dickinson, reside in Virginia. Defendants now have their principal place of business in Virginia and have regularly conduct business in Virginia. In addition, to the extent that any actions or decisions relevant to Plaintiffs' liability allegations were made in the United States, they were most likely made in Virginia or Texas. The general contract entered into by Defendants was executed and administered by the State Department in Virginia. Moreover, because some of the government (e.g., State Department) witnesses who may be called to testify are located in Washington, D.C., the Eastern District of Virginia provides a much more convenient forum for them. Thus, the necessary and relevant witnesses and documents will be found in Virginia.

The public interests and the interests of justice also weigh in favor of transferring this case to the Eastern District of Virginia. A judgment entered by the Eastern District of Virginia would be enforceable in any federal court. If this matter were to proceed to trial, all of the parties, except Plaintiffs Deuley and Gibson, would already be located in Virginia. In addition, key witnesses and documents will also be probably located in or near Virginia. The Eastern District of Virginia is known as the "Rocket Docket" -- it is known for moving cases quickly

through its docket and not tolerating prolonged, dilatory litigation.  There is no local interest in adjudicating this case in this Court because this is not a local controversy.  None of the Plaintiffs reside in Delaware and none of the events or omissions giving rise to Plaintiffs' claims occurred in Delaware.  On the other hand, two of the Defendants have their principal places of business in Virginia, Plaintiffs Joseph and Kim Dickinson reside in Virginia, and the government contract underlying these events was executed in Virginia.

In short, both the private and public interests weigh heavily in favor of transferring this case to the Eastern District of Virginia.  Consequently, Defendants request that this Court exercise its discretion pursuant to 28 U.S.C. § 1404(a) and transfer this case to the Eastern District of Virginia, Alexandria Division.

## <u>CONCLUSION</u>

In summary, for the foregoing reasons, Defendants respectfully submit that this case should be dismissed in its entirety for lack of subject matter jurisdiction based on the political question doctrine under Rule 12(b)(1).  In the alternative, Defendants respectfully submit that this case should be dismissed for failure to state a claim upon which relief may be granted under Rule 12(b)(6) because Plaintiffs have waived their right to bring this lawsuit, Defendants are immune from this lawsuit because of the exclusivity of remedies provided by the DBA, and Defendants are immune from this lawsuit because of the government contractor defense.  Defendants also respectfully submit that this case should be dismissed in its entirety for improper venue under Rule 12(b)(3), or, in the alternative, that this case should be transferred to the Eastern District of Virginia pursuant to 28 U.S.C. § 1404(a).

In the event that this Court determines that the case should not be dismissed for any of these grounds at this point in the litigation, Defendants respectfully request that the parties be permitted to engage in limited discovery on the issues presented in this Motion to Dismiss.

SMITH, KATZENSTEIN & FURLOW LLP

*Of Counsel*:
Robert B. Wallace
Kevin P. Farrell                                     _____/s/_____Robert K. Beste_____.
Yoora Pak                                            Robert J. Katzenstein (Del. ID No. 378)
WILSON, ELSER, MOSKOWITZ,                            Robert K. Beste, III (Del. ID No. 3931)
EDELMAN & DICKER LLP                                 800 Delaware Avenue, 7th Floor
The Colorado Building                                P.O. Box 410
1341 G Street, N.W., 5th Floor                       Wilmington, DE 19899 (Courier 19801)
Washington, DC 20005                                 Telephone:    302.652.8400
Telephone:    (202) 626-7660                         Facsimile:    302.652.8405
Facsimile:    (202) 628-3606

                                                     *Attorneys for Defendants*
                                                     *CSC Applied Technologies LLC, DynCorp*
                                                     *International, Inc., and DynCorp International*
                                                     *LLC*

October 25, 2006

38

## CERTIFICATE OF SERVICE

I hereby certify that **DEFENDANTS' BRIEF IN SUPPORT OF THEIR MOTION**

**TO DISMISS OR, IN THE ALTERNATIVE, MOTION TO TRANSFER VENUE** was

served on the following via ECF on the 25th day of October, 2006:


      Neilli Mullen Walsh
      Ben T. Castle
      Young Conawat Stargatt & Taylor, LLP
      The Brandywine Building
      1000 West Street, 17th Floor
      P.O. Box 391
      Wilmington, DE 19899-0391



                      /s/     *Robert K. Beste*        .
                            Robert K. Beste, III

39

# EXHIBIT 1

# FOREIGN SERVICE EMPLOYMENT AGREEMENT
## *DynCorp International FZ-LLC*
### A CSC COMPANY

THIS CONTRACT is between DynCorp International FZ-LLC ("Employer") and John Denley ("Employee"). Employer and Employee agree as follows:

### 1.      Position

The Employee accepts the position of **Security** The Employee will also be responsible for performing additional duties as directed by the Employee's supervisor. The Employee represents that he or she has the necessary qualifications for performing the duties required by this position.

### 2.      Salary/Allowances

The Employee will receive **$5,615.38** after each full four (4) week period worked. For computing purposes, the annualized salary for this position is **$73,000.00**

Salary payment will be made every four (4) weeks, calculated in U.S. Dollars. Payment to Employee shall be made in a method determined by Employer. Employer may choose either of the following methods of payment: (1) direct deposit to a bank account selected by Employee and approved by Employer; or (2) direct deposit to an account in Employee's name selected by Employer. If direct deposit is made to a bank account selected by Employer, Employee shall be responsible for all fees associated with such account, except fees associated with establishment of the account, and fees associated with depositing funds into the account by Employer. The Employee will be paid a pro-rated amount for any period worked that is less than a full four (4) week period. No salary will be paid for periods not worked, except pursuant to Paragraph 11, Paid Leave. The Employee will receive Hazardous Duty Pay in accordance with the Department of State Standardized Regulations, currently 25% of the base salary earned, or as determined by the Department of State; and Post Differential Pay (Hardship) allowance in accordance with the Department of State Standardized Regulations, currently 25% of the base salary earned, or as determined by the Department of State. Upon successful completion of one (1) year of employment on this Contract, the Employee will be entitled to receive a Completion Bonus equal to 10% of the base salary earned under this paragraph. In the event Employee is terminated pursuant to Paragraph 17.A., Termination for Cause or 17.B., Voluntary Termination by Employee, Employee will not be entitled to any portion (part or full) of this completion bonus.

Employer will provide food, housing and transportation in accordance with Contract requirements while in the area of operations.

### 3.      Geographic Location of Employment

The geographic location of employment shall be Kabul, or such other location as directed by Employer, or its designee. The term "Host Country" as used in this Contract shall mean Afghanistan, or such other country where the geographic place of performance is located.

### 4.      Term of Contract

This Contract is for the period of one (1) year, unless terminated earlier by either party pursuant to Paragraph 17, Termination. The Contract terms and duration shall commence upon the Employee's arrival in Host Country, and end as of the termination date of this Contract.

### 5.      Tax Obligations

The Employee bears sole responsibility for payment of all taxes, fees, and payments of any nature whatsoever due to governmental entities of any country due by reason of Employee's acceptance of compensation under this Contract. The Employee agrees to make all of the payments described above, and Employee agrees that Employer bears no responsibility for making any withholding from compensation amounts. Employer, at its sole discretion, may make withholdings from Employee's compensation with respect to work performed by Employee in Host Country, in accordance with Paragraph 22, Contracting Parties.

EXHIBIT
1

### 6.    Travel

Employer agrees to provide air transportation from point of hire to Host Country and return air transportation from Host Country to point of hire at the completion of this Contract, unless this Contract is terminated pursuant to Paragraph 17.A. or 17.B. This travel is authorized only for the Employee. If Employee is found not to be capable of performing the required tasks or requests curtailment of his or her one (1) year assignment for any reason, Employee shall be returned to point of hire and reimburse Employer in accordance with Paragraph 17.D., Transportation Expenses. Employer and its affiliates shall not be liable for any injury or death to Employee as a result of air transportation provided to Employee under this paragraph, except as addressed under the DynCorp and Its Subsidiaries and Affiliated Companies Summary Plan Description (Attachment A).

### 7.    Legal Status

The Employee will be performing duties in connection with work Employer is to perform for its Customer in support of the U.S. Department of State operations in Afghanistan. The Employee will receive all working directions from the Employee's supervisor.

### 8.    Work Schedule

This is a salaried position. The standard work schedule shall be twelve (12) hours per day, seven (7) days a week, and on-call when not on scheduled duty. The scheduling of work hours may be more or less than 84 hours per week, at the sole discretion of Employer

### 9.    Working Conditions

The Employee shall be provided in-country housing, transportation, logistics support and a subsistence allowance while in Host Country.

### 10.    Liability

The Employee understands and accepts the fact that he or she may be exposed to dangers due to the nature of the mission. The Employee agrees that neither Employer nor its affiliates will be liable in the event of death, injury, or disability to Employee, except as stated below. Employer will obtain the insurance described in Attachment A on behalf of the Employee. The Employee agrees to accept these insurance benefits as full satisfaction of any claim for death, injury or disability against Employer and its affiliates.

### 11.    Paid Leave

The Employee shall accrue 1.5 days of paid leave per month worked during the term of this Contract; however, this is subject to change at the discretion of the Employer. The Employee shall also be entitled to paid holidays authorized by Employer. Any paid leave, as specified in this paragraph, must be used during the term of this Contract.

### 12.    Benefits

During the term of this Contract, Employer will obtain the insurance described in Attachment A on behalf of the Employee. Should the Employee suffer any medical condition which requires treatment, payment of such treatment will be provided for a period of time, up to the stated policy limits, consistent with the policy terms and conditions outlined in Attachment A. Employee will not be entitled to salary for any time not worked by reason of illness, injury, disability, or any other medical reason with exception of Paragraph 11, above, and the terms and conditions of the coverage provided in Attachment A. If Employee is not capable of returning to work for medical reasons, Employer can terminate without cause pursuant to Paragraph 17.C., Termination Without Cause. Under these circumstances, Employee's sole compensation for loss of work shall be any benefits described in Attachment A, and return transportation to the point of hire pursuant to Paragraph 6.

### 13.    Conduct of Employee

The Employee must comply with all laws and regulations of Host Country including, but not limited to, laws related to currency, black market, and drug use and alcohol abuse. The Employee must comply with applicable laws and regulations of the Dubai Internet City, and applicable laws and regulations of any country where Employee is a citizen or





resident. The Employee must perform effectively in the implementation of this Contract. The Employee must respect local customs and conform to a high standard of moral and ethical conduct. Personal attire and hygiene must be in accordance with local Employer policies. The Employee must abide by Employer security, health and safety regulations, directives, and Employer Standard Operating Procedures and Letter of Agreement (Attachment B). Failure of Employee to abide by any provision of this paragraph, as solely determined by Employer, is grounds for termination for cause pursuant to Paragraph 17. A.vi.

### 14.    Physical Examination

The Employee represents that he or she is in good health and is physically capable of performing his or her obligations under this Contract. The Employee agrees that this Contract is contingent upon obtaining satisfactory drug screen results, and upon Employee remaining in good physical and mental health, as necessary, to fully perform his or her obligations under this Contract.

### 15.    Proprietary and Confidential Information

All reports, technical documents, maps, plans, recommendations and estimates are considered to be confidential information which shall not be disclosed except to authorized personnel of Employer and its customer. All financial and technical information of Employer and its affiliates shall be considered proprietary and shall not be disclosed by Employee. The Employee shall not use any confidential or proprietary information to private advantage. This paragraph survives the termination of this Contract.

### 16.    Safeguarding of Information

The Employee shall exercise the utmost discretion in regard to all matters relating to their duties and functions. The Employee shall not communicate to any person any information known by reason of performance of services under this Contract, that has not been made public, except in the necessary performance of duties. All documents and records (including photographs) generated during the performance of work under this Contract shall be for the sole use of Employer and its customer. Furthermore, no article, book, pamphlet, recording, broadcast, speech, television appearance, film, or photograph concerning any aspect of work performed under this Contract shall be published or disseminated through any media without the prior written authorization of Employer. These obligations do not cease upon the expiration or termination of this Contract.

### 17.    Termination

A.    Termination for Cause

Employer may, during the term of this Contract, discharge the undersigned for cause for any of the following reasons. The undersigned hereby agrees that in the event he or she is so discharged for cause, remuneration shall cease as of the date and hour of such discharge. Additionally, the undersigned shall be responsible for payment of the unearned balance of transportation, allowances, and other costs as described in Paragraph 6.

      i)        Failure to complete a 90-day probationary period;

      ii)       Failure to meet the requirements of Paragraph 14;

      iii)      The Customer requests removal of Employee;

      iv)      Failure to perform duties in a satisfactory manner as accepted in the trade, or those duties as are specified by Employer or the customer;

      v)       Violation of any law, regulation, procedures or directives of Employer, the Department of State, or any country where Employee is a citizen or resident;

      vi)      Violation of any term of this Contract;

      vii)     Insubordination;

      viii)    Violation of any health, safety or security regulation, directive or procedure, or conduct which endangers the safety or well being of others;


   ix)    Abuse of any facility privilege extended to Employee;

   x)    Failure to abide by any Employer, Department of State, Dubai Internet City, or Host Country law, regulation or directive relating to drug use or alcohol abuse, importation, or supply to others;

   xi)    Unexcused absence from work;

   xii)    Failure to submit to, or unsatisfactory results of random drug screen. Drug screen may be administered at the discretion of Employer;

   xiii)    Failure to meet job qualification requirements in the prime Contract.

B.    <u>Voluntary Termination by Employee</u>

The Employee may voluntarily terminate this Contract at any time by providing a 15-day notice to Employer. Transportation costs will be the responsibility of the Employee as outlined in Paragraph 17.D. Employee voluntary termination will result in forfeiture of contract completion bonus.

C.    <u>Termination Without Cause</u>

Employer can, at its sole discretion, terminate this Contract at any time. In the event of such termination, the undersigned shall be entitled to pro-rated end of contract bonus and return transportation. Employer shall be responsible for return transportation costs as provided in Paragraph 17.D.

D.    <u>Transportation Expenses</u>

The Employee shall be responsible for transportation costs (original flight from home of record and the round trip associated with the Host Country) if this Contract is terminated pursuant to Paragraph 17.A. or 17.B. The Employee authorizes Employer to withhold transportation costs from any payment which remains due to Employee in the event of a termination under either Paragraph 17.A. or 17.B. Employer shall be responsible for return transportation costs from Host Country to point of hire if this Contract is terminated pursuant to Paragraph 17.C.

E.    <u>Limitation of Liability</u>

If for any reason a termination under Paragraph 17.A. is later adjudged to have been without valid cause, the termination will be deemed a Termination Without Cause pursuant to Paragraph 17.C. Under these circumstances, the liability of Employer and its affiliates shall be limited to payments specified in Paragraph 17.C.

**18.**    **<u>Customer Intervention</u>**

It is understood by the undersigned that this Contract is conditioned upon continuation of work by Employer in the Host Country under the U.S. Department of State operations in Afghanistan. If at any time subsequent to the execution of this Contract, Employer discontinues work in the Host Country, this Contract is subject to termination under Paragraph 17.C.

**19.**    **<u>Governing Law</u>**

This Contract shall be governed by and interpreted under the laws of the Dubai Internet City in the Dubai Technology, Electronic Commerce and Media City Free Zone.

**20.**    **<u>Formation of Contract</u>**

A binding Contract will be formed only after both Employee and an authorized Employer Representative sign this Contract. It may be signed in one or more counterparts, which shall together constitute the Contract. Employee represents and acknowledges that, in agreeing to the terms of this Contract and that in executing this Contract, Employee does not rely and has not relied upon any representation or statement made by the Company or by any of the Company's agents or representatives other than the terms specifically stated in this written Contract, and that this Contract sets forth the entire agreement between the parties hereto and fully supersedes any and all prior agreements or understandings, written or oral,




between the parties hereto pertaining to the subject matter hereof. This Contract is intended to be the final expression of the agreement between the parties as well as the complete and exclusive statement of the terms of the agreement between the parties.

21.  **Emergency**

In the event of an emergency, Employee requests that notice be provided to:

Name _Michelle ~~Jerry~~ Deuley_          Relation _W. fe_

Address _H30 Hwy 348_          Phone No _479-471-0060_

_Rudy AR 72952_

22.  **Contracting Parties**

The Employee is a citizen of _USA_ ("home country"). Employer is a Dubai Internet City Free Zone Limited Liability Company. Employee recognizes that this Contract is between Employee and a Dubai Internet City Free Zone Limited Liability Company. Employee acknowledges that Employer shall not make withholdings for social insurance or taxes with respect to Employee's home country. Where Host Country laws require Employer to make withholdings for taxes or social insurance, Employee agrees that Employer may make such withholding for the Host Country only. EMPLOYEE SHALL NOT RECEIVE SOCIAL SECURITY, SOCIAL INSURANCE, UNEMPLOYMENT BENEFITS OR SEVERANCE BENEFITS UNDER THE LAWS OF EMPLOYEE'S HOME COUNTRY AS A RESULT OF EMPLOYMENT UNDER THIS CONTRACT. THE ONLY BENEFITS WHICH EMPLOYER IS OBLIGATED TO PAY EMPLOYEE ARE THOSE BENEFITS LISTED IN THIS CONTRACT AND ON ATTACHMENT A HERETO.

_____          _2-13-04_
Employee Signature                  Date

FSA Start Date     _2-12-04_

FSA Completion Date     _2-11-05_

_Jerry Farr_ _____          _21 Feb 04_
Authorized Employer Representative      Date

_SiTe MAnAGer_
Title

I acknowledge that I have been provided the DynCorp and Its Subsidiaries and Affiliated Companies International Employee Benefits Program Summary Plan Description (Attachment A) amended as of June 1, 2002.

Company:    DynCorp International LLC        (DynCorp International FZ LLC)
Please circle one

Program/Site: _____

Employee ID: _____

Employee Name (print): _Jorn Dewley_____

Employee Signature: _John Dul_____

Date Signed: _2/13/04_____

Please place in the employee's personnel file after it has been signed.

```
COMPLETE AND RETURN THIS PAGE ONLY
     TO OUR FORT WORTH OFFICES

   KEEP THE REST OF THIS DOCUMENT FOR
            YOUR RECORDS!!
```

# INTERNATIONAL EMPLOYEE BENEFITS PROGRAM

# FOR

# U.S. EXPATRIATES
## of
# DYNCORP AND ITS SUBSIDIARIES AND AFFILIATED COMPANIES

## SUMMARY PLAN DESCRIPTION
### *Attachment A*

# TABLE OF CONTENTS

Section I – Introduction......................................................... 4

Section II - Summary Plan Description...................................... 4

Section III - Statement of ERISA............................................. 5

Section IV - Discretionary Authority......................................... 6

Section V - Medical Benefits.................................................. 6
A. Eligibility.......................................................................... 6
    1. Employee Eligibility...................................................... 6
    2. Dependent Eligibility..................................................... 6
B. Enrollment ..................................................................... 6
    1. Application................................................................. 6
    2. Terms...................................................................... 6
C. Enrollment Date............................................................... 6
D. Covered Expenses............................................................ 6
E. Annual Maximum Benefit..................................................... 8
F. Maternity Coverage........................................................... 8
G. Special Rights Following Mastectomy..................................... 8
H. COBRA Continuation Rights................................................. 9
    1. Very Important Notice................................................... 9
    2. Qualifying Events for Continuation of Coverage.................... 9
    3. Electing COBRA Continuation Coverage............................ 9
    4. Required Notice to the Company...................................... 9
    5. Duration of COBRA Continuation Coverage......................... 10
    6. Early Termination of COBRA Continuation Coverage.............. 10
    7. Cost of COBRA Continuation Coverage............................. 10
    8. Contact Information...................................................... 10
I. Exclusions....................................................................... 11
J. Pre-Existing Conditions....................................................... 12
K. Termination of Coverage..................................................... 13
L. Conversion...................................................................... 13
M. Coordination of Benefits..................................................... 13
N. Medicare and Your Coverage................................................ 15
O. Subrogation / Reimbursement............................................... 15
P. Claiming Benefits & Appeal Process........................................ 15
    1. When You have a Complaint........................................... 16
    2. When You file a Claim.................................................. 17
    3. Initial Claim Decision.................................................... 18
    4. If Your Claim is Denied................................................. 20
    5. Appealing Your Initial Claim Decision................................ 20
    6. If Your Appealed Claim is Denied.................................... 21
    7. Final Appeal.............................................................. 21

ATTACHMENT A
Amended as of June 1, 2002

8. Denial of Claim on Second Appeal.................................... 22

Section VI - Disability Benefits....................................... 22
A. Eligibility......................................................... 22
   1. Employee Eligibility............................................ 22
   2. Dependent Eligibility........................................... 22
B. Enrollment......................................................... 22
   1. Application..................................................... 22
   2. Terms.......................................................... 22
C. Enrollment Date.................................................... 22
D. Covered Expenses................................................... 23
E. Annual Maximum Benefit............................................. 23
F. Exclusions......................................................... 23
G. Pre-Existing Conditions............................................ 24
H. Termination of Coverage............................................ 24
I. Subrogation / Reimbursement........................................ 24
J. Claiming Benefits & Appeal Process................................. 25
   1. What You Should Do
     and What Your Should Expect If You Have a Claim................. 25
   2. Appeal Procedure for Denied Claim ............................. 27

Section VII - Accidental Death and Dismemberment Benefits............ 28
A. Eligibility......................................................... 28
   1. Employee Eligibility............................................ 28
   2. Dependent Eligibility........................................... 28
B. Enrollment......................................................... 28
   1. Application..................................................... 28
   2. Terms.......................................................... 29
C. Enrollment Date.................................................... 29
D. Covered Expenses................................................... 29
E. Annual Maximum Benefit............................................. 30
F. Exclusions......................................................... 30
G. Pre-Existing Conditions............................................ 31
H. Termination of Coverage............................................ 31
I. Claiming Benefits & Appeal Process................................. 31
   1. Filing Instructions............................................ 31
   2. Where to Send Your Claim....................................... 32
   3. What is Needed with Your Claim................................. 32
   4. Right to Request Additional Information ....................... 32
   5. If your Claim is Denied........................................ 33
   6. Your Right to Appeal........................................... 33

ATTACHMENT A
Amended as of June 1, 2002

# SECTION 1 – INTRODUCTION

In addition to your pay, your benefit Plan (the "Plan") represents an important part of your compensation as a contract employee of DynCorp or a DynCorp subsidiary or affiliated company (the "Plan Sponsor"). The Plan includes:

- a medical Plan to protect you from high medical costs, especially in the event of a catastrophic injury or illness;

- disability insurance to provide continuing income for a specified period of time if you are unable to work due to an accident;

- accident benefits to provide important financial protection for you and for your family in the event of your death, dismemberment, or permanent disability.

This booklet is known as a "Summary Plan Description" ("SPD"), and provides a summary of the key provisions of the Plan. It is a summary of a longer and more detailed Plan document which contains more specific and legal language regarding your benefits. In the event of any ambiguity between this SPD and the Plan document, the Plan document shall control. The Plan Sponsor reserves the right to change, amend, discontinue or terminate the Plan at any time. You may obtain a copy of the complete Plan Document by requesting it from the Plan Administrator. You may be charged for the cost of copying the full document. The Plan Document may also be reviewed during normal business hours at the Personnel Office of the Plan Sponsor or the Plan Administrator.

No actions at law or equity may be taken against the Plan until all appeal rights, as described in this SPD, have been exhausted. In the event that legal papers need to be served regarding this Plan, service may be made on the Plan Sponsor or the Plan Administrator.

General questions regarding benefits and enrollment should be directed to the Plan Sponsor or the Plan Administrator.

# SECTION II – SUMMARY PLAN DESCRIPTION

This SPD is issued to the employees of the Plan Sponsor and replaces all previously issued SPDs.

1.    **PLAN**
      The name of your Plan is Group Personal Accident ("Plan").

2.    **PLAN EFFECTIVE DATE**
      The Effective Date of the Plan is June 1.

3.    **PLAN SPONSOR**
      The Plan Sponsor is DynCorp and its Subsidiaries and Affiliated Companies. The address and telephone number of the Plan Sponsor is:

          DynCorp
          11710 Plaza America Drive
          12th Floor
          Reston, Virginia  20190
          +1 703.264.0330

4.    **PLAN ADMINISTRATOR**
      The Plan Administrator is the DynCorp Risk Management Department. The address and telephone number of the Plan Administrator is the same as the Plan Sponsor.

ATTACHMENT A
Amended as of June 1, 2002

5.    **PLAN YEAR**
       June 1 through May 31

6.    **EMPLOYER IDENTIFICATION NUMBER**
       The Employer Identification Number for your employer is 36-2408747.

7.    **PLAN IDENTIFICATION NUMBER**
       The Plan Number is 504.

8.    **TYPE AND ADMINISTRATION OF PLAN**
       The Plan constitutes a welfare benefit Plan for Personal Accident, Medical and Repatriation/Medical Evacuation Expenses Insurance. The type of administration of the Plan is contract administration.

## SECTION III – STATEMENT OF ERISA RIGHTS

ERISA entitles you as an Enrollee in the Plan to:

A.    Examine, without charge, at the Plan Administrator's office or other specified locations, such as worksites and union halls, all Plan documents, including insurance contracts, collective bargaining agreements and copies of all documents filed by the Plan with the U.S. Department of Labor, such as annual reports.

B.    Obtain copies of all Plan documents and other Plan information upon written request to the Plan Administrator. The Plan Administrator may make a reasonable charge for these copies.

C.    Receive a summary of the Plan's annual financial report. The Plan Administrator is required by law to furnish each Enrollee with a copy of this summary annual report.

In addition to creating rights for Enrollees, ERISA imposes duties upon the people who are responsible for the operation of your employee benefit Plan. The people who operate your Plan, called "fiduciaries" of the Plan, have a duty to do so prudently and in the interest of you and other Enrollees. No one, including your employer, union, or any other person, may fire you or otherwise discriminate against you in any way to prevent you from obtaining a welfare benefit or exercising your rights under ERISA. If your claim for a welfare benefit is denied, in whole or in part, you must receive a written explanation of the reason for the denial. You have the right to have the Plan review and reconsider your claim.

Under ERISA, there are steps you can take to enforce the above rights. For instance, if you request materials from the Plan and do not receive them within 30 calendar days, you may file suit in a federal court. In such a case, the court may require the Plan Administrator to provide the materials and pay up to $110 a day until you receive the materials, unless the materials were not sent because of reasons beyond the control of the Administrator. If you have a claim for benefits which is denied or ignored, in whole or in part, you may file suit in state or federal court. If it should happen that Plan fiduciaries misuse the Plan's money or if you are discriminated against for asserting your rights, you may seek assistance from the U.S. Department of Labor, or you may file suit in a federal court. The court will decide who should pay court costs and legal fees. If you are successful, the court may order the person you have sued to pay these costs and fees. If you lose, the court may order you to pay these costs and fees, for example, if it finds your claim is frivolous. If you have any questions about your Plan, you should contact the Plan Administrator. If you have any questions about this statement or about your rights under ERISA, you should contact the nearest area office of the Pension and Welfare Benefits Administration, U.S. Department of Labor, listed in your telephone directory or the Division of Technical Assistance and Inquiries, Pension and Welfare Benefits Administration, U.S. Department of Labor, 200 Constitution Avenue N.W., Washington, D.C. 20210.

ATTACHMENT A
Amended as of June 1, 2002

# SECTION IV – DISCRETIONARY AUTHORITY

The Plan Administrator shall perform its duties as the Plan Administrator and in its sole discretion shall determine appropriate courses of action in light of the reason and purpose for which this Plan is established and maintained. In particular, the Plan Administrator shall interpret all Plan provisions, and make all determinations (including factual determinations) as to whether any particular Participant or beneficiary is entitled to receive any benefit under the terms of this Plan, which interpretation shall be made by the Plan that is adopted by the Plan Administrators and for which there is a rational basis shall be final and legally binding on all parties.

Any interpretation of the Plan or other action of the Plan Administrator shall be subject to review only if such interpretation or other action is without rational basis. Any review of a final decision or action of the Plan Administrator shall be based solely on such evidence presented to or considered by the Plan Administrator at the time it made the decision that is the subject of review and shall be entitled to the maximum deference permitted by law.

# SECTION V - MEDICAL BENEFITS

## A. Eligibility

### 1. Employee Eligibility
An active, regular, hourly or salaried U.S. Expatriate who is an employee of the Plan Sponsor. To be eligible, you must be actively at work on the date coverage would become effective. Coverage will begin when you arrive at the final destination of your work assignment.

### 2. Dependent Eligibility
Dependents are not eligible for coverage under this Plan.

## B. Enrollment

### 1. Application
The company pays the full cost of your coverage. You must sign a Foreign Service or Employment Agreement with the Plan Sponsor in order to be eligible for the Plan.

### 2. Terms
Once enrolled as described above, an eligible employee is known as an "enrolled employee". An "Enrollee" is a defined term meaning an enrolled employee. Whenever used in this SPD, "you" or "your" means an Enrollee.

## C. Enrollment Date

You will be considered enrolled in the Plan when you reach your final work destination. Prior to your final enrollment, you must have a signed Foreign Service or Employment Agreement with the Plan Sponsor.

## D. Covered Expenses

(1) The Plan generally pays the full cost of all covered expenses except for any care or treatment described in the "Exclusions" section.

ATTACHMENT A
Amended as of June 1, 2002

(2) Medical, repatriation, and medical evacuation expenses following accident occurring or illness manifesting itself during the policy period.

(3) Emergency and non-emergency treatment will be provided in your place of employment, unless your illness or injury cannot be treated there. If you require treatment outside of your place of employment, the Plan also will cover medical evacuation to the closest appropriate licensed facility where you can be treated.

(4) For medical expenses only, there is a $100 deductible for every claim.

(5) All benefits from this Plan are subject to an annual policy maximum of $75,000 (U.S.).

(6) This Plan covers medical expenses which are incurred and arise solely and directly from an illness or accidental injury which occurs while you are covered under the Plan.

(7) Specific covered expenses include:

- medical and surgical expenses and related costs for supplies or treatment required in connection with the surgery or other care;

- the cost of covered hospital care, including nursing care;

- care in a nursing home;

- fees for specialists; and

- costs for physiotherapy, massage and manipulative treatment.

(8) If you cannot receive the required medical care in your place of employment, the Plan also covers repatriation expenses, which are necessary and reasonable traveling expenses incurred for your return to your home country, or costs for evacuation to the nearest appropriate medical facilities. Thereafter, coverage will be provided for eligible Medical Expenses incurred in the home country or at the closest appropriate licensed facility for up to a maximum of three (3) months or the maximum annual benefit of $75,000 (U.S.), whichever comes sooner.

(9) For purposes of this Plan, Eligible Medical Expenses refer to medical, surgical, specialist's fees, hospitals, nursing homes, nursing attendance charges, costs of physiotherapy, massages and manipulative treatments, surgical and medical requisites incurred and arising solely and directly from an illness manifesting itself or accidental bodily injury occurring while covered and treatment received within twenty-four months of the date of the accident.

(10) For purposes of this Plan, repatriation or evacuation will be considered necessary if a qualified medical practitioner:

- certifies that you should be repatriated or evacuated because local facilities are not equipped to treat you or because your recovery will be substantially improved in another locale; and/or

- estimates that you will be totally disabled in excess of four weeks.

(11) In addition, coverage will be provided for medical expenses incurred outside the host country while on business or personal travel, so long as you are still an enrolled employee.

(12) If you should die as the result of a covered injury or illness while working in your place of employment, the Plan's repatriation benefit also covers transportation of your body or ashes to your home country for necessary and reasonable funeral expenses, subject to the Plan's maximum benefit.

(13) The Plan covers eligible medical expenses in your home country or at the closest appropriate licensed facility which are incurred as a result of an illness or injury which occurred in your work location. The maximum coverage is three (3) months from the date of injury, occurrence or illness manifestation or when the Plan annual maximum benefit of $75,000 is reached, whichever comes sooner.

## E. Annual Maximum Benefit

The Plan provides benefits up to an annual maximum for any enrolled employee of $75,000 (U.S.). In the event the Plan Document includes a different annual maximum, the Plan Document will prevail.

## F. Maternity Coverage

Group health Plans and health insurance issuers generally may not, under federal law, restrict benefits for any hospital length of stay in connection with childbirth for the mother or newborn child to less than 48 hours following a vaginal delivery, or less than 96 hours following a cesarean section. However, federal law does not prohibit the mother's or newborn's attending provider, after consulting with the mother, from discharging the mother or her newborn earlier than 48 hours (or 96 hours, if applicable.) In any case, Plans and issuers may not, under federal law, require that a provider obtain authorization from the Plan or the issuer for prescribing length of stay not in excess of 48 hours (or 96 hours, if applicable).

## G. Special Rights Following Mastectomy

A group health Plan generally must, under federal law, make certain benefits available to participants who have undergone a mastectomy. In particular, a Plan must offer mastectomy patients benefits for:

- Reconstruction of the breast on which the mastectomy has been performed;
- Surgery and reconstruction of the other breast to produce a symmetrical appearance;
- Prostheses; and
- Treatment of physical complications of mastectomy.

This Plan complies with these requirements. Benefits for these items generally are comparable to those provided under the Plan for similar types of medical services and supplies. Of course, the extent to which any of these items is appropriate following mastectomy is a matter to be determined by consultation between the attending physician and the patient. The Plan neither imposes penalties (for example, reducing or limiting reimbursements) nor provides incentives to induce attending providers to provide care inconsistent with these requirements.

ATTACHMENT A
Amended as of June 1, 2002

## H. NOTICE OF EMPLOYEE GROUP HEALTH PLAN CONTINUATION COVERAGE

### 1. *VERY IMPORTANT NOTICE*

A Federal law, commonly known as "COBRA," requires that DynCorp ("Company") offer employees the opportunity to extend Company group health plan ("Plan") coverage (called "continuation coverage") at group rates in certain instances when coverage otherwise would end. This notice explains, in summary fashion, your rights and obligations under the continuation coverage provisions of COBRA. You should read this notice carefully.

### 2. Qualifying Events for Continuation Coverage

(1) Loss of Coverage as an Employee:

If you are covered by the Plan as an employee, you have the right to choose continuation coverage if you lose coverage for any of the following reasons:

    (a)  Your hours of employment with the Company are reduced.

    (b) Your employment with the company is terminated (for reasons other than gross misconduct on your part).

    (c)  If you are a retired employee, because your employer has filed for reorganization under Chapter 11 of the Bankruptcy Code.

(2) Termination of Active Employee Benefit Coverage:

Your coverage under the plan will cancel upon termination of employment with the company or the date three (3) months following the occurrence of an accident or illness, because of which you will not be able to return to work, and you are receiving care in your home country or at the nearest appropriate medical facility when such care is required by the Plan, and will remain cancelled until the COBRA coverage is selected and paid for. The coverage becomes retroactive following a proper election and timely payment of premiums.

### 3. Electing COBRA Continuation Coverage

You do not have to show that you are insurable to choose continuation coverage. You may elect COBRA regardless of whether you are also covered by another group health plan or Medicare *at the time* of the qualifying event.

### 4. Required Notice to the Company

You must notify the Company in writing if you want continuation coverage within 60 days of the later of the date of the Company's notice or the date you would lose coverage because of the events described above. Each covered employee must notify the Plan Administrator of the determination that he or she was disabled (as defined in the Social Security Act) at any time during the first 60 days of continuation coverage. You must give this notice within 60 days after the date of such determination. You also must notify the Plan Administrator within 30 days after the date that it is determined that such person is no longer disabled. Your notice will be considered "sent" on the day it is mailed as evidenced by the postmark that appears on the envelope.

**5. Duration of COBRA Continuation Coverage**

If you do not choose continuation coverage, your group health coverage under the Plan will end in accordance with the rule as stated in your Summary Plan Description.

If you choose continuation coverage, your coverage will be identical to the coverage provided under the Plan to similarly situated employees as of the time coverage is being provided. This means that if the coverage for similarly situated employees is modified, your coverage will be modified in the same manner. If you lost coverage because of a termination of employment or reduction in hours of employment the continuation coverage period generally is 18 months. The 18-month coverage period may be extended to 29 months if you are determined to be disabled by the Social Security Administration any time during the first 60 days of continuation coverage, provided you notify the Plan Administrator within 60 days of the date of such determination and within the 18-month period.

Special rules regarding the continuation coverage period apply when the covered employee becomes entitled to Medicare, a retiree loses coverage because of the commencement of a proceeding concerning the Company under Title 11 of the bankruptcy law, or if certain qualifying events occur within 18 or 29 months of a termination or reduction in hours of employment.

**6. Early Termination of COBRA Continuation Coverage**

Your continuation coverage may be cut short for *any* of the following reasons:

(1)     After electing COBRA, you first become covered under any other group health plan (as an employee or otherwise) that does not contain any exclusion or limitation for any preexisting conditions clause that applies to you or a covered dependent (taking into account prior creditable coverage when required by federal law).

(2)     After electing COBRA, you first become entitled to Medicare benefits.

(3)     The premium for your continuation coverage is not paid within 30 days of the due date.

(4)     The Company no longer provides any group health coverage to any employee.

(5)     You are determined to be no longer disabled by the Social Security Administration.

**7. Cost of COBRA Continuation Coverage**

In general, you must pay 102 percent of the Plan premium in order to obtain continuation coverage. In accordance with the applicable Internal Revenue code regulations, the maximum coverage is extended from 18 months to 29 months due to a disability, the required payment is generally 150 percent of the premium for the 19th and all succeeding months. Special rules apply affecting the premium due during the disability extension. Please see the Plan Administrator if you have questions concerning this premium.

**8. Contact Information**

10

If you have any questions about COBRA, please contact:

> Ceridian Benefit Services
>
> 3201 34th Street South
>
> St. Petersburg, FL 33711
>
> (800) 877-7994

## I. Exclusions

The Plan will not pay benefits for medical expenses:

- for treatment provided by medical facilities operated by or on behalf of United Nations personnel (for more information, contact the Plan Sponsor);

- incurred after coverage ends;

- for unnecessary care or treatment, or for any care, services, or supplies not prescribed by a doctor and/or treatment not provided by a doctor;

- for general health examinations or check-ups not required to diagnose illness or accidental injury;

- for services and supplies furnished in connection with rest cures, senatorial or custodial care, or periods of quarantine or isolation;

- for dental examinations, X-rays, extractions, fillings, and general dental care, unless required due to a covered accidental injury;

- for supplying or fitting of eyeglasses or hearing aids unless required due to a covered accidental injury;

- for cosmetic surgery, unless such surgery is required due to an accident which occurred while you were covered under this Plan;

- for physiotherapy or chiropractic treatment unless post injury. Any treatment is limited to a maximum of 5 sessions with an appropriately qualified practitioner;

- for expenses incurred in an insured person's country of domicile (other than in respect of repatriation) except for a maximum period of 3 months following an accident or illness manifesting itself while on a tour of duty overseas;

- for injuries or illnesses incurred as the result of participation in winter sports or mountaineering (normally involving ropes/ guides);

- for treatment of an intentional self-inflicted injury or sickness while sane, or for suicide, attempted suicide, or intentional self-injury;

- for any injury sustained because of your own criminal act, or while you are insane;

ATTACHMENT A
Amended as of June 1, 2002

- for treatment of alcoholism, drug addiction, allergy, nervous or mental disorders, or venereal disease;

- for any condition which is in any way connected to alcohol, substance or drug abuse;

- Any accident or other condition arising out of the use, or any treatment for drugs not prescribed by a licensed physician or drugs used in circumstances other than as prescribed;

- for any accident involving a mechanically propelled vehicle, which is caused or contributed to by the insured person having a Blood/Alcohol reading in excess of the host country's legally permitted level for the driving of a motor vehicle;

- to treat an injury or illness caused or contributed to by war (whether declared or undeclared) or any warlike operations, invasion, acts of foreign enemies, hostilities, mutiny, terrorist activities, civil war, rebellion, revolution, insurrection, conspiracy, military or usurped power, riots, strikes, civil commotion, lockouts or labor disturbances, unless you are not actually taking part in these occurrences;

- to treat an injury or illness resulting from participation in naval, military or air forces services or operations, unless such actions are part of your normal duties for the company;

- to treat an injury or illness resulting from riding or driving in a race car;

- to treat an injury or illness resulting from your being in or boarding an aircraft for the purpose of flying in it, except as required by the company;

- to treat a pre-existing condition until certain requirements are met (see Section J)

- for treatment covered under other types of insurance coverage provided (i.e., Defense Base Act, Foreign Voluntary Workers Compensation).

## J. Pre-Existing Conditions

You have a "Pre-Existing Condition" if you have a physical or mental condition, regardless of the cause, for which medical advice, diagnosis, care, or treatment was recommended or received within the 6 month period ending on your Enrollment Date. Pre-Existing Condition does not include pregnancy. For the purposes of this Paragraph only, "Enrollment Date" means the first day you are covered.

If you have a Pre-Existing Condition, it is excluded from coverage until a period of 180 days has elapsed during which the insured person has neither received nor required any treatment for the condition. The period of exclusion for your Pre-Existing Condition will be reduced by the total time you were covered by prior Creditable Coverage; however, if your coverage otherwise eligible to be counted as prior Creditable Coverage was followed by a Significant Break in Coverage, such coverage will not be counted in determining Creditable Coverage. For the purposes of this Paragraph only, a "Significant Break in Coverage" means a continuous period of 63 calendar days or more without Creditable Coverage.

"Creditable Coverage" means coverage under one or more of the following: an employer or union sponsored health benefit Plan, a health insurer, a health maintenance organization, Medicare, Medicaid, a medical and dental Plan for members (and certain former members) of the uniformed services, a medical program of the Indian Health Service or a tribal

organization, a state health benefits risk pool, the Federal Employees Health Benefits Program, a public health Plan, or a health Plan through the Peace Corps. Creditable Coverage does not include coverage for accidents only, disability income, liability or supplemental liability insurance, workers' compensation insurance, automobile medical payment insurance, credit-only insurance, on-site medical clinics, limited scope dental insurance, limited scope vision insurance, limited scope long term care insurance, benefits that do not coordinate, Medicare supplemental insurance, CHAMPUS supplemental programs, and other supplemental coverage.

Creditable Coverage may be demonstrated by obtaining a certificate from your prior Plan. If necessary, the Plan Administrator will assist you in obtaining the certificate. If you are unable to obtain the certificate, the Plan Administrator will inform you upon your request of alternative methods of demonstrating Creditable Coverage.

## K. Termination of Coverage

Your medical coverage ends on the earliest of the following dates:

- the date you complete your work assignment in your place of employment or terminate employment with the company; or

- the date after three (3) months following the occurrence of an accident or illness, because of which you will not be able to return to work, and you are receiving care in your home country or at the nearest appropriate medical facility when such care is required and approved by the Plan; or

- the date of the enrolled employee's death; or

- the date the company ends this coverage or terminates this Plan.

## L. Conversion

Conversion coverage is not available under this Plan; however, coverage consistent with COBRA requirements can be purchased upon termination, if desired. The cost will be your financial responsibility, and not that of the Company's.

## M. Coordination of Benefits

Coordination of Benefits is the procedure used to pay health care expenses when you are covered by more than one Plan. The following rules determine which Plan pays first and how much the other Plan must pay. The objective is to make sure the combined payments of all Plans are no more than your actual bills.

When you are covered by another group Plan in addition to this one, the following Coordination of Benefit rules will be followed to determine which Plan is primary and which is secondary. You must submit all bills first to the primary Plan. The primary Plan must pay its full benefits as if you had no other coverage. If the primary Plan denies the claim or does not pay the full bill, you may then submit the balance to the secondary Plan.

Health care is only paid for when you follow these rules and procedures. If these rules conflict with those of another Plan it may be impossible to receive benefits from both Plans, and you will be forced to choose which Plan to use.

ATTACHMENT A
Amended as of June 1, 2002

(1)    Plans That Do Not Coordinate

Benefits will be paid without regard to benefits paid by the following kinds of coverage:

- Individual (not group) policies or contracts;

- Medicaid;

- Group Hospital indemnity Plans which pay less than $100 per day;

- School accident coverage; and

- Some supplemental sickness and accident policies.

(2)    Plan As Primary Plan

When the Plan is primary, full benefits will be paid as allowed under the Plan as if you had no other coverage.

(3)    Plan As Secondary Plan

- When the Plan is secondary, payments will be based on the balance left after the primary Plan has paid. No more than that balance will be paid. In no event will more be paid than would have been paid if the Plan was primary.

- Only health care expenses that are covered by the Plan will be paid.

- Payments will only be made if you have followed all of the procedural requirements (e.g., pre-authorization).

- No more will be paid than the Allowable Expense for the health care involved. If the Plan's Allowable Expense is lower than the primary Plan's, the primary Plan's Allowable Expense will be applied. That may be less than the actual bill.

(4)    Determining Which Plan Is Primary

To decide which Plan is primary, the Coordination of Benefits provisions of the other Plan must be considered. The primary Plan will be determined by the first of the following which applies:

(a) Non-coordinating Plan

If you have another Plan which does not coordinate benefits, it will always be primary.

(b) Employee

The Plan which covers you as an employee (neither laid off nor retired), member, insured, or subscriber, other than a dependent, is always primary.

ATTACHMENT A
Amended as of June 1, 2002

## N. Medicare and Your Coverage

You may have coverage under the Plan and under Medicare. Medicare means the benefits offered under Title XVIII of the Social Security Act, and includes all of the benefits provided by Parts A and B of Medicare. In general, when you have coverage under both the Plan and Medicare, the Plan will pay primary benefits for:

(1)    An active employee who is age 65 or over

(2)    An active employee under age 65 entitled to Medicare because of disability;

(3)    Up to 30 months after your treatment for end stage renal disease begins.

If you do not fall into any of the categories 1 through 3 above, the Plan will pay benefits secondary to Medicare. If you do not elect Part B coverage, the payment to be made by the Plan will be made as if you had elected Part B. When the Plan is secondary, you must first submit the claim to Medicare. After Medicare makes payment, you may submit the claim to the Plan for payment.

These rules are based on regulations issued by the Health Care Financing Administration ("HCFA"), and may be amended or changed at any time. It is the intent of the Plan to abide by the Medicare Secondary Payer Rules. If the Plan in any way conflicts with regulations issued by HCFA, the Plan will pay benefits in accordance with HCFA regulations.

## O. Subrogation / Reimbursement

Acceptance of Plan benefits for Covered Services for an illness or injury for which another party may be obligated to pay constitutes your acceptance of the provisions of this Section.

The Plan is subrogated to all your rights of recovery to the extent of the benefits it pays for Covered Services for an illness or injury for which you are entitled to recover payment from any other person, including without limitation, the person who caused the illness or injury, that person's insurer, or your insurer under uninsured motorist coverage, underinsured motorist coverage, medical payment coverage, personal injury protection coverage, and any other like-kind coverage.

Any payment you recover from any other person on account of illness or injury for which the Plan has paid benefits, regardless of how such payment is designated or described, shall be deemed to be a recovery of Plan benefits paid, and you are obligated to reimburse the Plan from such recovery within 14 calendar days of its receipt. You will be responsible for payment of any expenses, including attorney's fees and court costs, incurred by the Plan to enforce its right to reimbursement against you.

The Plan has the right to bring suit and/or file claims in its own name or your name as necessary to enforce any of its rights of recovery under this section. You are obligated to provide such information and assistance as the Plan may reasonably require for the enforcement of its rights under this section, and to refrain from taking any action which would interfere with or prejudice such rights.

## P. Claiming Benefits and Appeal Process

The insurance carrier has the right to request that you have an examination by a qualified medical professional, at the company's expense, before paying any benefits from this Plan.

ATTACHMENT A
Amended as of June 1, 2002

## 1. WHEN YOU HAVE A COMPLAINT

Only employees may submit claims for benefits, and benefits will only be paid to the employee or the actual provider of services. Therefore, under the following complaint and claims appeal sections, the words "you" and "your" will mean an employee of DynCorp. You have the right to elect group health care benefits as offered under the Group Personal Accident Plan (the "Plan"), and your rights will be determined under the Plan's provisions and in conjunction with the complaint and claims procedures outlined below. Claims will also be considered filed by you if communications and requests for benefits come from an individual that you have designated as your authorized representative to act on your behalf with respect to a claim. In the event that you designate an authorized representative to act on your behalf, the Plan will send all notifications, requests for further information, appeal decisions, and all other communications to your authorized representative.

For the purposes of the complaint and claims appeal sections, any reference to "days" will refer to calendar days, not business days.

We are here to listen and help. Because we want you to be completely satisfied with the member services assistance you receive, we have established a process for addressing your concerns and solving your problems. If you have a concern regarding a person, a service, the quality of care, or you want to inquire about what benefits are covered under the Plan, please contact Specialty Assistance Services at one of the following phone numbers and explain your concern to one of the member services representatives.

| 24 Hour Specialty Assistance Services Control Centers | |
|---|---|
| Wickfield House, 18-22 Disney Place London SE1 1HJ | |
| For assistance worldwide, contact: | |
| London, UK | Tel: +44 (0)20 7939 9645 |
| | Fax: +44 (0)20 7407 9206 |
| For assistance in the Americas, contact: | |
| Philadelphia, USA | Tel: +1 215 489 3785 |
| | Fax: +1 215 489 8525 |
| For assistance in the Africa, contact: | |
| Johannesburg, South Africa | Tel: +27 11 452 7272 |
| | Fax: +27 11 452 4473 |
| For assistance in the Asia Pacific, contact: | |
| Bangkok, Thailand | Tel: +662 645 3932 |
| | Fax: +662 645 3732 |

You may also express that concern in writing. We will do our best to resolve the matter on your initial contact. If we need more time to review or investigate your concern, we will get back to you as soon as possible, but in any case within 30 days. We will not consider any of these communications to be a "claim" for benefits. A formal claim for benefits must meet certain other standards which are described in the section titled "When You File a Claim."

ATTACHMENT A
Amended as of June 1, 2002

## 2. WHEN YOU FILE A CLAIM

When you file a "claim," you have the right to a speedy decision. "Claim" status also gives you the option of appealing any adverse decision regarding your claim. You will have filed a "claim" when you submit one of the Plan's Claim Forms or if you take one of the actions listed below.   In the case of the submission of a Claim Form, a "claim" will be considered filed when it is received by the appropriate person/department listed below. The Plan also recognizes the following actions and submission of forms as "claims:"

- A request by you for benefits through preauthorization or a utilization review determination in cases where *use of either preauthorization or utilization review is required in order to obtain a particular benefit*.

- Requests by your formally-designated authorized representative for preauthorization or a utilization review determination in cases where *use of either preauthorization or utilization review is required in order to obtain a particular benefit*. The Plan will take reasonable steps to determine whether an individual claiming to be acting on your behalf is, in fact, validly empowered to do so under the circumstances, and the Plan will require that you complete and file a form identifying any person you authorize to act on your behalf with respect to a claim. However, when inquiries by a health care provider relate to payments due to the provider—rather than due to you—under managed care contracts (where the health care provider has no recourse against you for the amounts) such inquiries by a health care provider will not be considered "claims" by the Plan.

- Requests for benefits (in the case of a claim involving urgent care) by a health care provider with knowledge of your medical condition. For urgent care claims, you are not required to complete a form and formally designate a health care provider as your representative with respect to a claim.

- Submission of a medical bill for reimbursement or payment under the terms of the Plan.

You may request the Plan's Claim Form from the Plan Administrator by contacting DynCorp's Human Resources Office. After you have completed the Claim Form, you must submit it to the following address:

| **24 Hour Specialty Assistance Services Control Centers** |
| --- |
| Wickfield House, 18-22 Disney Place |
| London SE1 1HJ |

All submitted claims and appeals will fall into one of the three categories described below. The handling of your initial claim or later appeal will be governed, in all respects, by the appropriate category of claim or appeal, and each time your claim or appeal is examined, a new determination will be made regarding the category into which the claim or appeal falls at that particular time.

- An **urgent care** claim is one that involves serious jeopardy of life or health of the patient, or the ability of the patient to regain maximum function or, in the opinion of a

17

physician with knowledge of the patient's medical condition, would subject the patient to severe pain that cannot be managed without the treatment at issue. Determination of "urgent care" status requires that the judgment of a prudent layperson with average knowledge of health and medicine be applied, except where a physician with knowledge of the patient's medical condition determines that the claim involves urgent care.

- A **non-urgent pre-service** claim is one that, under the terms of the Plan, requires approval of the particular benefit or procedure prior to obtaining medical care.

- A **post-service** claim is a claim that is neither an urgent care claim nor a non-urgent pre-service claim.

## 3. INITIAL CLAIM DECISION

After you submit a claim, the Plan must make a decision on your claim within a prescribed period of time.

> Urgent Care Claims
> For urgent care claims, the Plan Administrator must notify you of the benefit determination (adverse or favorable) as soon as possible, but not later than 72 hours after receipt of the claim by the Plan. The notification will be given orally, and the Plan will send you written or electronic notification within three (3) days after the oral notification.
>
> If your claim is incomplete but is properly filed, an employee of the Plan Administrator will orally notify you as soon as possible (but not later than 24 hours) after the receipt of the claim, of the specific information necessary to complete the claim. You will have at least **48 hours** to provide the specified information necessary to complete your claim submission. The Plan's time limit for making a determination will be suspended from the time that it provides notice to you of the incomplete claim until the date on which you respond to the request for additional information. You will be notified of the Plan's decision as soon as possible, but no later than 48 hours after the earlier of either the time the Plan receives the specified information or the expiration of the time given to you to provide the specified information.
>
> If you fail to follow the Plan's filing procedures because your request for benefits does not: 1) identify the patient; 2) note a specific medical condition or symptom; 3) describe a specific treatment, service, or product for which approval is requested; 4) arrive in the correct department and is not sent to the correct person, YOU WILL NOT HAVE SUBMITTED A CLAIM. An employee of the Plan Administrator will orally notify you, within 24 hours, that you have failed to follow the filing procedures, and you will be reminded of the proper filing procedures.
>
> *Requests for Extension of Treatment--*
> Your request to extend a course of treatment beyond a particular period of time or number of treatments is a claim, and the Plan will decide your claim as soon as possible, taking into account the medical exigencies (the particular circumstances and requirements). The Plan will notify you of its benefit determination (adverse or favorable) within 24 hours after receipt of the claim by the Plan (as long as the claim is submitted to the Plan at least 24 hours prior to the expiration of the prescribed period of time or number of treatments). But, if your request is not made at least 24 hours prior to the expiration of the prescribed period of time or number of treatments, your request will be treated as a claim involving urgent care and will be decided as soon as possible, taking into

account the medical exigencies (the particular circumstances and requirements), but not later than 72 hours after received by the Plan. The Plan will orally notify you of its decision, and the Plan will send you written or electronic notification within three (3) days after the oral notification.

<u>Non-Urgent Pre-Service Claims</u>
For non-urgent pre-service claims, the Plan Administrator must notify you (in writing or electronically) of the benefit determination (adverse or favorable) as soon as possible, but not later than 15 days after receipt of the claim by the Plan. One 15-day extension of this time period is possible under certain circumstances.

If your claim is incomplete but is properly filed, your attempted claim will be denied by the Plan. You will be notified in writing or electronically of the adverse benefit determination within the time limits that apply to non-urgent pre-service claims, and you will have the right to appeal the Plan's adverse benefit determination.

If you fail to follow the Plan's filing procedures because your request for benefits does not: 1) identify the patient; 2) note a specific medical condition or symptom; 3) describe a specific treatment, service, or product for which approval is requested; 4) arrive in the correct department and is not sent to the correct person, YOU WILL NOT HAVE SUBMITTED A CLAIM. An employee of the Plan Administrator will orally notify you, within five (5) days, that you have failed to follow the filing procedures, and you will be reminded of the proper filing procedures.

*Requests for Extension of Treatment--*
Your request to extend a course of treatment beyond a particular period of time or number of treatments is a claim, and the Plan will decide your claim as soon as possible and within the time limits applicable to non-urgent pre-service claims.

<u>Post-Service Claims</u>
For post-service claims, the Plan Administrator will notify you in writing or electronically of the benefit determination as soon as possible, but not later than 30 days after receipt of the claim by the Plan. One 15-day extension of this time period is possible under certain circumstances.

If your claim is incomplete but is properly filed, your attempted claim will be denied by the Plan. You will be notified in writing or electronically of the adverse benefit determination within the time limits that apply to non-urgent pre-service claims, and you will have the right to appeal the Plan's adverse benefit determination.

*Requests for Extension of Treatment--*
Your request to extend a course of treatment beyond a particular period of time or number of treatments is a claim, and the Plan will decide your claim as soon as possible and within the time limits applicable to post-service claims.

*Submission of a Medical Bill for Payment--*
If your claim is in the form of a medical bill that is submitted to the Plan for payment, the Plan will pay the benefit according to Plan provisions. This may mean that less than 100% of your medical claim is payable by the Plan. In each case where the Plan pays benefits or determines that it is not responsible for your medical claim, you will receive an Explanation of Benefits which will outline the basis for the Plan's payment. You will receive a written or electronic "denial" notification. In addition, the Plan's payment of less than 100% of your submitted

ATTACHMENT A
Amended as of June 1, 2002

claim (under the terms of the Plan) will entitle you to appeal the decision under the rules governing adverse claim determination.

## 4. IF YOUR CLAIM IS DENIED

If your claim is denied, the Plan will notify you in writing or electronically (oral notification followed by written notification in the case of urgent care claims) why your claim was denied, and the plan will provide additional information that will help you pursue your right to appeal the adverse determination. If you choose to appeal the Plan's adverse benefit determination, your appeal will be governed by rules that assure you a "full and fair" review.

If you are denied benefits based upon the Plan's finding that you are/were ineligible for benefits, the denial of benefits gives you the opportunity to appeal the Plan's decision.

*Termination or Reduction of Benefits—*
If the Plan decides to reduce or terminate your previously-approved course of treatment, the Plan's decision will be treated as an adverse benefit determination, and the Plan will provide you reasonable advance notice of the reduction or termination to allow you to appeal the Plan's decision before the benefit reduction or termination takes place. If you decide to appeal the Plan's decision, you must follow the rules for appealing a Plan's decision.

## 5. APPEALING YOUR INITIAL CLAIM DECISION

You must submit a written request (An oral request for review is acceptable for urgent care claims and may be made by calling the appropriate number indicated above asking the Plan to register your oral appeal.) to the Plan **within 180 days** of receipt of a denial notice in order to initiate an appeal.

When you appeal an adverse determination, the Plan will provide a "full and fair review" which will include the following features:

(1) You will have the opportunity to submit written comments, documents, records, and other information related to the claim.

(2) At your request (and free of charge), you will be provided with reasonable access to (and copies of) all documents, records, and other information relevant to your claim for benefits. Included in this category are any documents, records or other information in your claim file, whether or not those materials were relied upon by the Plan in making its adverse determination. You also have the right to review documentation showing that the Plan followed its own internal processes for ensuring appropriate decision making.

(3) The review of your claim will take into account all comments, documents, records, and other information submitted by you relating to the claim, without regard to whether such information was submitted or considered in the initial benefit determination.

(4) Any appeal of an adverse determination will not afford deference to the initial adverse determination, and the review will be conducted by a designated Plan representative who did not make the original determination and does not report to the Plan representative who made the original determination.

(5) In deciding an appeal of any adverse benefit determination that is based on a medical judgment (including determinations with regard to whether a particular

ATTACHMENT A
Amended as of June 1, 2002

treatment, drug, or other item is experimental, investigational, or not medically necessary or appropriate), the appropriate named fiduciary will consult with a health care professional who has appropriate training and experience in the particular field of medicine involved in the medical judgment. This health care professional will not be the same professional who was originally consulted in connection with the adverse determination; neither will this health care professional report to the health care professional who was consulted in connection with the adverse determination.

(6) The Plan will identify medical or vocational experts whose advice was obtained on behalf of the Plan in connection with an adverse benefit determination of your claim, whether or not that advice was relied upon in making the benefit determination.

After you submit the claim for appeal, the Plan must make a decision on your claim within a short period of time.

### Urgent Care Claims

The Plan's expedited appeal process for urgent care claims will allow you to request (orally or in writing) an expedited appeal, after which, all necessary information, including the plan's benefit determination on review, will be transmitted between the Plan and you by telephone, fax, or other expeditious method. The Plan Administrator will notify you (in writing or electronically) of the benefit determination as soon as possible, but not later than 72 hours after the Plan receives the request for review of the prior benefit determination.

### Non-Urgent Pre-Service Claims

For non-urgent pre-service claims, the Plan Administrator must notify you (in writing or electronically) of the benefit determination within a reasonable period of time appropriate to the medical circumstances, but not later than 30 days.

### Post-Service Claims

For post-service claims, the Plan Administrator must notify you (in writing or electronically) of the benefit determination within a reasonable period of time, but not later than 60 days.

## 6. IF YOUR APPEALED CLAIM IS DENIED

If your appealed claim is denied, the Plan will send you written or electronic notification that will tell you why your appealed claim was denied. The Plan will provide additional information that will help you pursue your right to appeal the adverse determination. An adverse benefit determination also includes a denial of benefits based on a finding that you were ineligible for benefits at the time; such adverse benefit determination of your eligibility will allow you the opportunity to appeal the Plan's decision.

## 7. FINAL APPEAL

If you are dissatisfied with the outcome of your first appeal, you may request a second appeal review. To initiate a second appeal review, you should follow the same process required for your first appeal. You must submit a request for appeal **within 180 days**.

### Urgent Care Claims

For urgent care claims, the Plan Administrator must notify you (in writing or electronically) of the benefit determination as soon as possible, but not later than 36 hours after the Plan receives your request for review of the Plan's prior adverse benefit determination.

21

Non-Urgent Pre-Service Claims

For non-urgent pre-service claims, the Plan Administrator must notify you (in writing or electronically) of the benefit determination within a reasonable period of time appropriate to the medical circumstances, but not later than 15 days after the Plan receives your request for review of the Plan's prior adverse benefit determination.

Post-Service Claims

For post-service claims, the Plan Administrator must notify you (in writing or electronically) of the benefit determination within a reasonable period of time, but not later than 30 days after the Plan receives your request for review of the Plan's prior adverse benefit determination.

**8. DENIAL OF CLAIM ON SECOND APPEAL**

If your appealed claim is denied, the Plan will send you written or electronic notification that explains why your appealed claim was denied.

# SECTION VI – DISABILITY BENEFITS

## A. Eligibility

### 1. Employee Eligibility
An active, regular, hourly or salaried U.S. Expatriate who is an employee of the Plan Sponsor. To be eligible, you must be actively at work on the date coverage would become effective. Coverage will begin when you arrive at the final destination of your work assignment.

### 2. Dependent Eligibility
Dependents are not eligible for coverage under this Plan.

## B. Enrollment

### 1. Application
The company pays the full cost of your coverage. You must sign a Foreign Service or Employment Agreement with the Plan Sponsor in order to be eligible for the Plan.

### 2. Terms
Once enrolled as described above, an eligible employee is known as an "enrolled employee". An "Enrollee" is a defined term meaning an enrolled employee. Whenever used in this SPD, "you" or "your" means an Enrollee.

## C. Enrollment Date

You will be considered enrolled in the Plan when you reach your final work destination. Prior to your final enrollment, you must have a signed Foreign Service or Employment Agreement with the Plan Sponsor.

ATTACHMENT A
Amended as of June 1, 2002

## D. Covered Expenses

(1) If you are an eligible employee and you are permanently and totally disabled and absent from work due to illness or injury caused by an accident, you will receive up to 75% of your pay for up to 104 weeks, if your disability lasts for that time period.

(2) To qualify for benefits under this Plan, your disability must begin within 12 months of the accident which caused the illness or injury.

(3) The Plan's maximum benefit is the equivalent of $825 (U.S.) per week.

(4) For purposes of this Plan, your "pay" is your gross weekly pay, including overtime, commissions, and bonuses, if applicable.

(5) You are considered to be "totally disabled" if you have an illness or injury caused by an accident which permanently or temporarily prevents you from attending to a business or occupation of any kind, or, if you have no regular business or occupation, requires that you be confined to the house and prevents you from attending to any of your usual duties.

(6) Benefits begin 14 days after you stop working due to disability, and continue for the period of your disability, up to the Plan's maximum benefit period of 104 weeks.

(7) No benefits are payable during the 14-day waiting period.

## E. Annual Maximum Benefit

The Plan's maximum benefit is the equivalent of $825 (U.S.) per week.

The Plan's maximum benefit period is 104 weeks.

## F. Exclusions

The Plan will not pay benefits for disability expenses:

- the first 14 days of disablement;

- illness or injury incurred before coverage begins or after coverage ends;

- intentional self-inflicted injury or sickness while sane, or for suicide, attempted suicide, or intentional self-injury;

- for injury sustained because of your own criminal act, or while you are insane;

- for injury or illness caused or contributed to by war (whether declared or undeclared) or any warlike operations, invasion, acts of foreign enemies, hostilities, mutiny, terrorist activities, civil war, rebellion, revolution, insurrection, conspiracy, military or usurped power, riots, strikes, civil commotion, lockouts or labor disturbances, unless you are not actually taking part in these occurrences;

- for injury or illness resulting from participation in naval, military or air forces services or operations, unless such actions are part of your normal duties for the company;

ATTACHMENT A
Amended as of June 1, 2002

- for illness or natural causes or medical or surgical treatment (except where such treatment is rendered necessary by bodily injury caused by accident within the scope of this insurance)

- for injury or illness resulting from riding or driving in a race car;

- for injury or illness resulting from your being in or boarding an aircraft for the purpose of flying in it, except as required by the company;

- for treatment which is in anyway connected to alcohol, substance or drug abuse;

- for any accident or other condition arising out of the use, or any treatment for drugs not prescribed by a licensed physician or drugs used in circumstances other than as prescribed;

- for any accident involving a mechanically propelled vehicle, which is caused or contributed to by the insured person having a Blood/Alcohol reading in excess of the host country's legally permitted level for the driving of a motor vehicle;

- for injury or illness resulting from a pre-existing condition (see section G);

- for illness or bodily injury arising out of natural causes or medical or surgical treatment (except where such treatment is rendered necessary by bodily injury caused by a covered accident).

## G. Pre-Existing Conditions

You have a "Pre-Existing Condition" if you have a physical or mental condition, regardless of the cause, for which medical advice, diagnosis, care, or treatment was recommended or received within the 6 month period ending on your Enrollment Date. For the purposes of this Paragraph only, "Enrollment Date" means the first day you are covered.

If you have a Pre-Existing Condition, it is excluded from coverage until a period of 180 days has elapsed during which the insured person has neither received nor required any treatment for the condition.

## H. Termination of Coverage

Your coverage ends on the earliest of the following dates:

- the date you complete your work assignment in your place of employment or terminate employment with the company; or

- the date of the enrolled employee's death; or

- the date the company ends this coverage or terminates this Plan.

## I. Subrogation / Reimbursement

Acceptance of Plan benefits for Covered Services for an illness or injury for which another party may be obligated to pay constitutes your acceptance of the provisions of this Section.

The Plan is subrogated to all your rights of recovery to the extent of the benefits it pays for Covered Services for an illness or injury for which you are entitled to recover payment from

ATTACHMENT A
Amended as of June 1, 2002

any other person, including without limitation, the person who caused the illness or injury, that person's insurer, or your insurer under uninsured motorist coverage, underinsured motorist coverage, medical payment coverage, personal injury protection coverage, and any other like-kind coverage.

Any payment you recover from any other person on account of illness or injury for which the Plan has paid benefits, regardless of how such payment is designated or described, shall be deemed to be a recovery of Plan benefits paid, and you are obligated to reimburse the Plan from such recovery within 14 calendar days of its receipt.   You will be responsible for payment of any expenses, including attorney's fees and court costs, incurred by the Plan to enforce its right to reimbursement against you.

The Plan has the right to bring suit and/or file claims in its own name or your name as necessary to enforce any of its rights of recovery under this section.  You are obligated to provide such information and assistance as the Plan may reasonably require for the enforcement of its rights under this section, and to refrain from taking any action which would interfere with or prejudice such rights.

## J. Claiming Benefits

### 1. What You Should Do and What You Should Expect If You Have A Claim

To claim benefits under the Plan, you must first complete the Insurance Company's claim form according to the Insurance Company's requirements.  You may request the claim form from the Insurance Company by calling the applicable number provided below or from the Plan Administrator by contacting your benefits coordinator.  If the Insurance Company's claim form or instructions for completing it are not available, you must submit to the Insurance Company a written statement of the reasons you are entitled to benefits, and you must include your name, address and contact information, and your employer's name, address and contact information.  After you have completed the claim form or written statement, you must submit it to the Insurance Company at the following address:

| 24 Hour Specialty Assistance Services Control Centers | |
|---|---|
| Wickfield House, 18-22 Disney Place London SE1 1HJ | |
| For assistance worldwide, contact: | |
| London, UK | Tel: +44 (0)20 7939 9645 |
| | Fax: +44 (0)20 7407 9206 |
| For assistance in the Americas, contact: | |
| Philadelphia, USA | Tel: +1 215 489 3785 |
| | Fax: +1 215 489 8525 |
| For assistance in the Africa, contact: | |
| Johannesburg, South Africa | Tel: +27 11 452 7272 |
| | Fax: +27 11 452 4473 |

ATTACHMENT A
Amended as of June 1, 2002

| For assistance in the Asia Pacific, contact: | |
| --- | --- |
| Bangkok, Thailand | Tel: +662 645 3932 |
| | Fax: +662 645 3732 |

For purposes of the Plan's claims procedures, you will be considered to have filed your claim under the Plan when your claim form or written statement is received at this address.

The Plan Administrator has appointed the Insurance Company as a named fiduciary of the Plan for adjudicating claims for benefits under the Plan and for deciding any appeals of denied claims. The Insurance Company shall have the authority, in its discretion, to interpret the terms of the Plan, to decide questions of eligibility for coverage or benefits under the Plan, and to make any related findings of fact. All benefits decisions made by the Insurance Company shall be final and binding to the full extent permitted by law. The Insurance Company has 45 days from the date your claim is filed to determine whether or not benefits are payable to you in accordance with the terms and provisions of the Plan, and, if so, the amount of benefits. If more time is needed to review your claim due to circumstances beyond the Plan's control, the Insurance Company must notify you in writing that the review period has been extended. The extension notice will describe the circumstances requiring the extension, the expected date of a decision, the standards on which entitlement to a benefit is based, the unresolved issues that prevent a decision on your claim, and the additional information needed to resolve those issues. This extension may be for up to 30 days beyond the end of the normal 45-day review period. A second 30-day extension may apply if, for reasons beyond the Plan's control, additional time, beyond the first 30-day extension, is needed to review your claim. In this case, the Insurance Company will notify you in writing that the review period has been further extended. The Insurance Company will provide the same information required in the first notice of extension.

If an extension of the review period is made because you must furnish additional information in order for the Insurance Company to decide your claim, the Insurance Company will specify the additional information that is needed in the extension notice. You will have at least 45 days to return the specified information to the Insurance Company. Until you return that information (or the time to provide the information expires), the review period will be "tolled," further extending the review period beyond the normal 45-day period or the extended 75- or 105-day period. For example, if the Insurance Company advises you on the 20th day after your claim was filed that your claim is incomplete because it lacks a physician's statement regarding your ability to perform various tasks, the number of days from the date of the Insurance Company's request for the physician's statement until you provide the physician's statement will not count as part of the review period. In this example, the day you provided the physician's statement will be treated as the 21st day of the review period.

If needed in order to decide your claim, the Insurance Company may require you to submit to a medical examination, at the Insurance Company's expense. If a medical examination is required, the Insurance Company will notify you of the date and time of the examination and the physician's name and location. This will be treated as a request for additional information, as described above, and the review period will be tolled until the Insurance Company receives the results of the examination. It is important that you keep any appointments made for you by the Company, since rescheduling examinations will delay the claim process.

If your claim is approved, you will receive the appropriate benefit from the Insurance Company.

ATTACHMENT A
Amended as of June 1, 2002

If your claim is denied, in whole or in part, you must receive a written notice from the Insurance Company within the review period (which may have been extended beyond 45 days, as described above). The Insurance Company's written notice of an adverse benefit determination must include the following information:

(1)    The specific reason(s) the claim was denied.
(2)    Specific reference to the Policy provision(s) on which the denial was based.
(3)    A description of any additional material or information necessary to perfect your claim, and the reason this material or information is necessary.
(4)    If an internal rule, guideline, protocol, or other similar criterion was relied upon in making the adverse determination, the written notice will include the specific rule, guideline, protocol, or other similar criterion.
(5)    If the adverse benefit determination is based on a medically-related exclusion or limit, the written notice will include an explanation of the scientific or clinical judgment for the determination and will apply the terms of the Plan to the claimant's medical circumstances.
(6)    A statement informing you of your right to appeal the decision, and an explanation of the appeal procedure, as outlined below.

## 2. Appeal Procedure for Denied Claims

Whenever a claim is denied in whole or in part, you have the right to appeal the decision. You (or your duly authorized representative) must make a written request to appeal the Insurance Company's decision within 180 days from the date you receive the denial. If you do not make this request within that time, you will have waived your right to appeal. This request for review should be directed to the Insurance Company at the address given above for claims submissions. When requesting a review, you should state the reasons you believe the claim denial was improper, and you should submit any additional information, material, or comments which you consider appropriate. You may also review and, upon request, obtain copies of any documents that have a bearing on the claim, including the documents which establish and control the Plan.

Once your request has been received by the Insurance Company, a full and fair review of your claim must take place. This review will give no deference to the original claim decision and will not be made by the person who made the initial claim decision, nor a subordinate of that person. Any medical or vocational experts consulted by the Insurance Company in making the adverse benefit determination will be identified. If the adverse benefit determination was based in whole or in part on a medical judgment, the Insurance Company, in deciding your appeal of that determination, will consult with a health care professional who has appropriate training and experience in the field of medicine involved in the medical judgment. In no case will such health care professional be an individual who was consulted in connection with the prior adverse benefit determination, nor the subordinate of such and individual. You may also submit issues and comments that you feel might affect the outcome of the review. In conducting the review, the Insurance Company will take into account all comments, documents, and other information that you submit, whether or not it was submitted at the time of the initial determination.

The Insurance Company has 45 days from the date it receives your request to review the adverse benefits determination for your claim and notify you of its decision. Under special circumstances, the Insurance Company may require more time to review your claim. If this should happen, the Insurance Company must notify you, in writing, that its appeal review period has been extended for an additional 45 days, noting the special circumstances requiring the extension and the date by which a decision on the appeal is expected.

If an extension of the appeal review period is made because you must furnish additional information in order for the Insurance Company to decide your appeal, the Insurance

ATTACHMENT A
Amended as of June 1, 2002

Company will specify the additional information that is needed in the extension notice. You will have at least 45 days to return the specified information to the Insurance Company. Until you return that information (or the time to provide the information expires), the review period will be "tolled," further extending the review period beyond the normal 45-day period.

Once its review is complete, the Insurance Company must notify you, in writing, of the results of the review and must include in its notice the following information:

(1)     The specific reason(s) the appeal was denied.
(2)     Specific reference to the Policy provision(s) on which the denial was based.
(3)     A statement that you are entitled to receive, upon request and free of charge, all documents, records, and copies of all documents, records, and other information relevant to your claim for benefits under the Plan.
(4)     If an internal rule, guideline, protocol, or other similar criterion was relied upon in deciding the appeal, the written notice will include the specific rule, guideline, protocol, or other similar criterion.
(5)     If the adverse benefit determination is based on a medically-related exclusion or limit, the written notice will include an explanation of the scientific or clinical judgment for the determination and will apply the terms of the Plan to the claimant's medical circumstances.
(6)     The written notice will include a statement regarding a participant's right to file suit in federal or state court to recover benefits due to the participant under the terms of the Plan pursuant to ERISA Section 501(a). The written notice will also include the following statement: "You and the Plan may have other voluntary alternative dispute resolution options such as mediation. One way to find out what may be available is to contact your local U.S. Department of Labor Office and your State insurance regulatory agency."

*You may have an authorized representative, such as a guardian or an individual having a valid power of attorney from you, act on your behalf in pursuing a claim for benefits under this Plan. The Plan will take reasonable steps to determine whether an individual claiming to be acting on your behalf i s, in fact, validly empowered to do so under the circumstances. Throughout this description of the Plan's claims and appeals procedures, the word "you" is used to refer to you/or any representative acting on your behalf in claiming benefits under the Plan.

## SECTION VII - ACCIDENTAL DEATH AND DISMEMBERMENT BENEFITS

### A. Eligibility

**1. Employee Eligibility**
An active, regular, hourly or salaried U.S. Expatriate who is an employee of the Plan Sponsor. To be eligible, you must be actively at work on the date coverage would become effective. Coverage will begin when you arrive at the final destination of your work assignment.

**2. Dependent Eligibility**
Dependents are not eligible for coverage under this Plan.

### B. Enrollment

**1. Application**
*   The company pays the full cost of your coverage.

ATTACHMENT A
Amended as of June 1, 2002

- You are automatically the beneficiary for any dismemberment benefits payable under this Plan.

- When you sign your Foreign Service or Employment Agreement, you will be asked to designate a beneficiary who would be eligible to receive benefits if you should die while covered under this Plan.

- You can name anyone you wish as your beneficiary.

- Since there is the possibility that your named "primary" beneficiary may not survive you, you may also designate a contingent ("secondary") beneficiary.

- In order to change your designated beneficiary(ies), you must complete the appropriate form and submit it to your Human Resource Representative.

**2. Terms**

Once enrolled as described above, an eligible employee is known as an "enrolled employee". An "Enrollee" is a defined term meaning an enrolled employee. Whenever used in this SPD, "you" or "your" means an Enrollee.

## C. Enrollment Date

You will be considered enrolled in the Plan when you reach your final work destination. Prior to your final enrollment, you must have a signed Foreign Service or Employment Agreement with the Plan Sponsor.

## D. Covered Expenses

(1) If you should die, become dismembered, or become permanently and totally disabled as the result of a covered accident or illness, this Plan can provide a benefit for you or your beneficiary to a maximum of $160,000 (U.S.).

(2) To qualify for benefits under this Plan, your death, dismemberment, or total disability must occur no later than twelve (12) months after the accident or incident that caused the death, dismemberment, or total disability.

(3) You will not receive more than $160,000 (U.S.) from this Plan for losses sustained in any single accident.

(4) Any benefits payable under this Plan are offset by any benefits which you may already have received due to the same accident from the Disability Benefits Plan sponsored by this Plan Sponsor.

(5) For the purposes of this Plan, "loss" of a hand or foot means loss by physical separation of a hand at or above the wrist or a foot at or above the ankle.

(6) For purposes of this Plan, "loss" of sight means loss of sight which is certified as being entire and irrevocable by a licensed doctor specializing in ophthalmology.

(7) You will be considered to be "permanently and totally disabled" if you meet the following conditions:

- you have an illness or injury which prevents you from attending to a business or occupation of any kind; AND

ATTACHMENT A
Amended as of June 1, 2002

- your disability lasts for at least twelve (12) months; AND

- your disability appears to be beyond hope of improvement.

## E. Annual Maximum Benefit

In the event of your death, the Plan's maximum benefit is $160,000 (U.S.).

In the event of a qualifying occurrence of dismemberment, the Plan's maximum benefit is $160,000 (U.S.).

- $160,000 (U.S.) for the loss of your life; or

- $160,000 (U.S.) for the loss of two hands or two feet, or the sight in both eyes; or

- $160,000 (U.S.) for the loss of any combination of more than one eye, hand, or foot; or

- $160,000 (U.S.) for permanent and total disablement other than by loss of limbs or sight.

In the event of total and permanent disability, the Plan's maximum benefit is $160,000 (U.S.).

You will not receive more than $160,000 (U.S.) in any case from this Plan for losses sustained in any single accident.

## F. Exclusions

The Plan will not pay benefits for the following expenses:

- dismemberment, disability, or death incurred before coverage begins or after coverage is terminated;

- intentional self-inflicted injury or sickness while sane, or for suicide, attempted suicide, or intentional self-injury;

- injury sustained because of your own criminal act, or while you are insane;

- injury or illness caused or contributed to by war (whether declared or undeclared) or any warlike operations, invasion, acts of foreign enemies, hostilities, mutiny, terrorist activities, civil war, rebellion, revolution, insurrection, conspiracy, military or usurped power, riots, strikes, civil commotion, lockouts or labor disturbances, unless you are not actually taking part in these occurrences;

- injury or illness resulting from participation in naval, military or air forces services or operations, unless such actions are part of your normal duties for the company;

- injury or illness resulting from riding or driving in a race car;

ATTACHMENT A
Amended as of June 1, 2002

- injury or illness resulting from your being in or boarding an aircraft for the purpose of flying in it, except as required by the company;

- for treatment which is in anyway connected to alcohol, substance or drug abuse;

- Any accident or other condition arising out of the use, or any treatment for drugs not prescribed by a licensed physician or drugs used in circumstances other than as prescribed;

- for any accident involving a mechanically propelled vehicle, which is caused or contributed to by the insured person having a Blood/Alcohol reading in excess of the host country's legally permitted level for the driving of a motor vehicle;

- injury or illness resulting from a pre-existing condition (see section G);

- illness or bodily injury arising out of natural causes or medical or surgical treatment (except where such treatment is rendered necessary by bodily injury caused by a covered accident).

## G. Pre-Existing Conditions

You have a "Pre-Existing Condition" if you have a physical or mental condition, regardless of the cause, for which medical advice, diagnosis, care, or treatment was recommended or received within the 6 month period ending on your Enrollment Date. For the purposes of this Paragraph only, "Enrollment Date" means the first day you are covered.

If you have a Pre-Existing Condition, it is excluded from coverage until a period of 180 days has elapsed during which the insured person has neither received nor required any treatment for the condition.

## H. Termination of Coverage

Your coverage ends on the earliest of the following dates:

- the date you complete your work assignment in your place of employment or terminate employment with the company; or

- the date of the enrolled employee's death; or

- the date the company ends this coverage or terminates this Plan

## I. Claiming Benefits

### 1. Filing Instructions

When you or your beneficiary are eligible to receive benefits which are covered by this Plan, you must request an application from your Human Resources office. For a dismemberment or disability claim, you must also submit a physician's certificate verifying your dismemberment or disability. For a death claim, your beneficiary must submit a death certificate and a copy of the beneficiary designation. All of the proper forms should be submitted to Specialty Assistance Services, the third party administrator.

ATTACHMENT A
Amended as of June 1, 2002

**2. Where to Send Your Claim**
You or someone on your behalf must send written notice of claim. The claim must be submitted with an approved application and a physician's notice for dismemberment or disability or a death certificate for a death claim verifying the information to the following:

| | |
|---|---|
| **24 Hour Specialty Assistance Services Control Centers** | |
| Wickfield House, 18-22 Disney Place London SE1 1HJ | |
| For assistance worldwide, contact: | |
| London, UK | Tel: +44 (0)20 7939 9645 |
| | Fax: +44 (0)20 7407 9206 |
| For assistance in the Americas, contact: | |
| Philadelphia, USA | Tel: +1 215 489 3785 |
| | Fax: +1 215 489 8525 |
| For assistance in the Africa, contact: | |
| Johannesburg, South Africa | Tel: +27 11 452 7272 |
| | Fax: +27 11 452 4473 |
| For assistance in the Asia Pacific, contact: | |
| Bangkok, Thailand | Tel: +662 645 3932 |
| Fax: +662 645 3732 | |

**3. What is Needed with Your Claim**
The following important information should be submitted with each claim:

- your name;

- your social security number;

- the name and address of your doctor, surgeon, or other health care provider;

- the date of illness or injury;

- a statement or from the health care provider which lists all services performed, along with a verification of disability;

- for a death claim, beneficiary designation must also be submitted.

- for a death claim, a certified death certificate must also be submitted.

**4. Right to Request Additional Information**
The insurance carrier has the right to request that you have an examination by a qualified medical professional, at the company's expense, before paying any benefits from this Plan.

When reasonably necessary and allowed by law, the Company reserves the right to have an autopsy performed prior to paying a death benefit to your beneficiary.

ATTACHMENT A
Amended as of June 1, 2002

**5. If Your Claim Is Denied**

If your claim for benefits is fully or partially denied, you or your beneficiary will be informed in writing within 90 days. The denial will explain the exact reasons that the claim is not acceptable, including the relevant provisions of the Plan documents, and it will tell you if any additional information is needed to obtain approval for your claim. The notice also will explain the procedure you or your beneficiary must follow to initiate a review of your claim. If you or your beneficiary do not receive a response to your claim within this time limit, your claim will be deemed to be denied.

**6. Your Right to Appeal**

You or your beneficiary will have 60 days from the date of the claim denial in which to submit a written appeal for review. Appeals should be submitted to your Human Resources office.

In most cases, the insurance carrier will make a final decision regarding the appeal within 60 days after the information is received. The final decision generally will be furnished in writing, and will include the reasons for the decision with references to Plan document provisions on which the final decision was based. If you or your beneficiary do not receive a response to your appeal within this time limit, your appeal will be deemed to be denied.

ATTACHMENT A
Amended as of June 1, 2002

**EXHIBIT 2**

SCANNED
3 1 AUG 2004

# FOREIGN SERVICE EMPLOYMENT AGREEMENT
## DynCorp International FZ-LLC
### A CSC COMPANY

THIS CONTRACT is between DynCorp International FZ-LLC ("Employer") and **Gerald Wayne Gibson** ("Employee"). Employer and Employee agree as follows:

### 1.  Position

The Employee accepts the position of **Police Monitor**. The Employee will also be responsible for performing additional duties as directed by the Employee's supervisor. The Employee represents that he or she has the necessary qualifications for performing the duties required by this position.

### 2.  Salary/Allowances

The Employee will receive **$15.40** for each hour worked. For computing purposes, there will be no overtime premium paid during the term of this Contract. In order to receive compensation under this Contract, Employee must complete their timesheet in accordance with the schedule provided by their supervisor. Approved timesheets will be the basis for calculating amounts paid.

Payment will be made every four (4) weeks, calculated in U.S. Dollars. Payment to Employee shall be made in a method determined by Employer. Employer may choose either of the following methods of payment: (1) direct deposit to an account selected by Employee and approved by Employer; or (2) direct deposit to an account in Employee's name selected by Employer. If direct deposit is made to a bank account selected by Employer, Employee shall be responsible for all fees associated with such account, except fees associated with establishment of the account, and fees associated with depositing funds into the account by Employer. No salary will be paid for periods not worked except pursuant to Paragraph 12, Annual Leave Benefit. The Employee will receive Hazardous Duty Pay, and Post Differential when authorized in accordance with the Department of State Standardized Regulations. Upon successful completion of one (1) year of employment on this Contract, the Employee will be entitled to receive a Completion Bonus equal to 20% of the base salary (excluding Hazardous Duty Pay, and Post Differential) earned under this paragraph. In the event Employee is terminated pursuant to Paragraph 18.A., Termination for Cause or 18.B., Voluntary Termination by Employee, Employee shall forfeit all rights or entitlement to the Completion Bonus.

### 3.  Geographic Location of Employment

The geographic location of employment shall be Afghanistan, or such other location as directed by Employer, or its designee. The term "Host Country" as used in this Contract shall mean Afghanistan, or such other country where the geographic place of performance is located.

### 4.  Term of Contract

This Contract is for the period of one (1) year unless terminated earlier by either party pursuant to Paragraph 18, Termination. The Contract terms and duration shall commence upon the Employee's arrival at the place designated for orientation in the United States, and end as of the termination date of this Contract.

### 5.  Tax Obligations

The Employee bears sole responsibility for payment of all taxes, fees, and payments of any nature whatsoever due to governmental entities of any country due by reason of Employee's acceptance of compensation under this Contract. The Employee agrees to make all of the payments described above, and Employee agrees that Employer bears no responsibility for making any withholding from compensation amounts. Employer, at its sole discretion, may make withholdings from Employee's compensation with respect to work performed by Employee in Host Country, in accordance with Paragraph 23, Contracting Parties.

EXHIBIT
2

6. **Travel**

Employer agrees to provide air transportation from point of hire to Host Country and return air transportation from Host Country to point of hire at the completion of this Contract, unless this Contract is terminated pursuant to Paragraph 18.A. or 18.B. This travel is authorized only for the Employee. If Employee is found not to be capable of performing the required tasks or requests curtailment of his or her one (1) year assignment for any reason, Employee shall be returned to the point of hire and reimburse Employer in accordance with Paragraph 18.D., <u>Transportation Expenses</u>. Employer and its affiliates shall not be liable for any injury or death to Employee as a result of air transportation provided to Employee under this paragraph, except as addressed under the DynCorp and Its Subsidiaries and Affiliated Companies Summary Plan Description (Attachment A).

7. **Legal Status**

The Employee will be performing duties in connection with work Employer is to perform for the U.S. Department of State CIVPOL program. The Employee will receive all working directions from the Employee's supervisor.

8. **Work Schedule**

The standard work schedule shall be ten to twelve (10-12) hours per day, six to seven (6-7) days per week. The scheduling of work hours may be more or less than 60 to 72 hours per week, at the sole discretion of the Employer and/or Customer. Employee's work schedule will be determined and provided to the Employee by his or her supervisor.

9. **Working Conditions**

The Employer will provide in country transportation and housing, meals, and logistics support, if necessary, to Employee within the area of operations. The Employer may elect to provide a subsistence allowance in lieu of provided transportation, and/or housing, and/or meals while in the Host Country. Living conditions for those assigned to a Forward Operating Base will be primitive field conditions for an extended period of time. Camp personnel should be aware of moving on short notice and under adverse conditions. Employee should know that these living conditions could be for the duration of the eradication season, which could be up to a period of 6 months or more.

10. **Liability**

The Employee understands and accepts the fact that he or she will be exposed to dangers due to the nature of the mission. The Employee agrees that neither Employer nor its affiliates will be liable in the event of death, injury, or disability to Employee, except as stated below. Employer will obtain the insurance described in Attachment A on behalf of the Employee. The Employee agrees to accept these insurance benefits as full satisfaction of any claim for death, injury or disability against Employer and its affiliates.

11. **Personal Equipment**

Employer will provide equipment and special gear to Employee. In the event Employee fails to return the equipment upon conclusion of Employee's assignment, Employer may withhold pay from the Employee's last paycheck for the equivalent value of the cost to replace the equipment. It is the responsibility of the Employee to properly maintain equipment and special gear.

12. **Annual Leave Benefit**

The Employee will accrue an annual leave benefit at the rate of 4% of the hourly rate indicated in Paragraph 2 for every hour worked. Employee will be eligible to use this benefit as "time off" only after it is accrued, or it may be taken as a lump sum payment in lieu of time off. Employee must successfully complete this contract to be eligible for payment of any unused annual leave benefit. Requests for payment in lieu of time off must be submitted in writing at or

after the contract completion date. No partial or prorated amounts will be authorized unless the employee completes the contract of is terminated under the provisions of Paragraph 18.C.

**13.    Benefits**

During the term of this Contract, Employer will obtain the insurance described in Attachment A on behalf of the Employee. Should the Employee suffer any medical condition which requires treatment, payment of such treatment will be provided for a period of time, up to the stated policy limits, consistent with the policy terms and conditions outlined in Attachment A. Employee will not be entitled to salary for any time not worked by reason of illness, injury, disability, or any other medical reason, and the terms and conditions of the coverage provided in Attachment A. If Employee is not capable of returning to work for medical reasons, Employer can terminate without cause pursuant to Paragraph 18.C., Termination Without Cause. Under these circumstances, Employee's sole compensation for loss of work shall be any benefits described in Attachment A, and return transportation to the point of hire pursuant to Paragraph 6.

**14.    Conduct of Employee**

The Employee must comply with all laws and regulations of Host Country including, but not limited to, laws related to currency, black market, drug use and alcohol abuse. The Employee must comply with applicable laws and regulations of the Dubai Internet City, and applicable laws and regulations of any country where Employee is a citizen or resident. The Employee must perform effectively in the implementation of this Contract. The Employee must respect local customs and conform to a high standard of moral and ethical conduct. Personal attire and hygiene must be in accordance with local Employer policies. The Employee must abide by Employer and United Nations security, health and safety regulations, directives, and Employer Standard Operating Procedures and Letter of Agreement (Attachment B). Failure of Employee to abide by any provision of this paragraph, as solely determined by Employer, is grounds for termination for cause pursuant to Paragraph 18.A.vi.

**15.    Physical Examination**

The Employee represents that he or she is in good health and is physically capable of performing his or her obligations under this Contract. The Employee agrees that this Contract is contingent upon obtaining a satisfactory medical examination, satisfactory drug screen results, satisfactory physical agility test, and upon Employee remaining in good physical and mental health, as necessary, to fully perform his or her obligations under this Contract.

**16.    Proprietary and Confidential Information**

All reports, technical documents, maps, plans, recommendations and estimates are considered to be confidential information which shall not be disclosed except to authorized personnel of Employer and its customer. All financial and technical information of Employer and its affiliates shall be considered proprietary and shall not be disclosed by Employee. The Employee shall not use any confidential or proprietary information to private advantage. This paragraph survives the termination of this Contract.

**17.    Safeguarding of Information**

The Employee shall exercise the utmost discretion in regard to all matters relating to their duties and functions. The Employee shall not communicate to any person any information known to them by reason of their performance of services under this Contract, which has not been made public, except in the necessary performance of their duties or upon written authorization of the Contracting Officer. All documents and records (including photographs) generated during the performance of work under this Contract shall be for the sole use of and become the exclusive property of the U.S. Government. Furthermore, no article, book, pamphlet, e-mail, recording, broadcast, speech, television appearance, film, or photograph concerning any aspect of work performed under this Contract shall be published or disseminated through any media without the prior written authorization of the Contracting Officer. These obligations do not cease upon the expiration or termination of this Contract.

**18.    Termination**

Initials

A.    Termination for Cause

Employer may, during the term of this Contract, discharge the undersigned for cause for any of the following reasons. The undersigned hereby agrees that in the event he or she is so discharged for cause, remuneration shall cease as of the date and hour of such discharge. Additionally, the undersigned shall be responsible for payment of the unearned balance of transportation, allowances, and other costs as described in Paragraph 6 and Paragraph 11.

    i)    Failure to complete a 90-day probationary period;

    ii)    Failure to meet the requirements of Paragraph 15;

    iii)    The Customer requests removal of Employee;

    iv)    Failure to perform duties in a satisfactory manner as accepted in the trade, or those duties as are specified by Employer or the customer;

    v)    Violation of any law, regulation, procedures or directives of Employer, the Department of State, or the United Nations, or any country where Employee is a citizen or resident;

    vi)    Violation of any term of this Contract;

    vii)    Insubordination;

    viii)    Violation of any health, safety or security regulation, directive or procedure, or conduct which endangers the safety or well being of others;

    ix)    Abuse of any United Nations facility privilege extended to Employee;

    x)    Failure to abide by any Employer, Department of State, United Nations, Dubai Internet City, or Host Country law, regulation or directive relating to drug use or alcohol abuse, importation, or supply to others;

    xi)    Unexcused absence from work;

    xii)    Failure to submit to, or unsatisfactory results of random drug screen. Drug screen may be administered at the discretion of Employer.

B.    Voluntary Termination by Employee

The Employee may voluntarily terminate this Contract at any time by providing a 15-day notice to Employer. Transportation costs will be the responsibility of the Employee as outlined in Paragraph 18.D. Employee voluntary termination will result in forfeiture of contract completion bonus.

C.    Termination Without Cause

Employer can, at its sole discretion, terminate this Contract at any time. In the event of such termination, the undersigned shall be entitled to pro-rated completion bonus and return transportation. Employer shall be responsible for return transportation costs as provided in Paragraph 18.D.

D.    Transportation Expenses

The Employee shall be responsible for transportation costs (original flight from home of record and the round trip associated with the Host Country) if this Contract is terminated pursuant to Paragraph 18.A. or 18.B. The Employee authorizes Employer to withhold transportation costs from any payment which remains due to Employee in the event of a termination under either Paragraph 18.A. or 18.B. Employer shall be responsible for return transportation costs from Host Country to point of hire if this Contract is terminated pursuant to Paragraph 18.C.

        E.      Limitation of Liability

        If for any reason a termination under Paragraph 18.A. is later adjudged to have been without valid cause, the termination will be deemed a Termination Without Cause pursuant to Paragraph 18.C. Under these circumstances, the liability of Employer and its affiliates shall be limited to payments specified in Paragraph 18.C.

        19.     **Customer Intervention**

        It is understood by the undersigned that this Contract is conditioned upon continuation of work by Employer in the Host Country under the U.S. Department of State CIVPOL program. If at any time subsequent to the execution of this Contract, Employer discontinues work in the Host Country, this Contract is subject to termination under Paragraph 18.C.

        20.     **Governing Law**

        This Contract shall be governed by and interpreted under the laws of the Dubai Internet City in the Dubai Technology, Electronic Commerce and Media City Free Zone.

        21.     **Formation of Contract**

        A binding Contract will be formed only after both Employee and an authorized Employer Representative sign this Contract. It may be signed in one or more counterparts, which shall together constitute the Contract. Employee represents and acknowledges that, in agreeing to the terms of this Contract and that in executing this Contract, Employee does not rely and has not relied upon any representation or statement made by the Company or by any of the Company's agents or representatives other than the terms specifically stated in this written Contract, and that this Contract sets forth the entire agreement between the parties hereto and fully supersedes any and all prior agreements or understandings, written or oral, between the parties hereto pertaining to the subject matter hereof. This Contract is intended to be the final expression of the agreement between the parties as well as the complete and exclusive statement of the terms of the agreement between the parties.

        22.     **Emergency**

In the event of an emergency, Employee requests that notice be provided to:

Name _Kathy J. Gibson_        Relation _Spouse_

Address _859 New 1661 Rd_      Phone No _816- 697-6614_

_Butes City_

_Missouri 64011_

        23.     **Contracting Parties**

Initials

The Employee is a citizen of _U S A_ ("home country"). Employer is a Dubai Internet City Free Zone Limited Liability Company. Employee recognizes that this Contract is between Employee and a Dubai Internet City Free Zone Limited Liability Company. Employee acknowledges that Employer shall not make withholdings for social insurance or taxes with respect to Employee's home country. Where Host Country laws require Employer to make withholdings for taxes or social insurance, Employee agrees that Employer may make such withholding for the Host Country only. EMPLOYEE SHALL NOT RECEIVE SOCIAL SECURITY, SOCIAL INSURANCE, UNEMPLOYMENT BENEFITS OR SEVERANCE BENEFITS UNDER THE LAWS OF EMPLOYEE'S HOME COUNTRY AS A RESULT OF EMPLOYMENT UNDER THIS CONTRACT. THE ONLY BENEFITS WHICH EMPLOYER IS OBLIGATED TO PAY EMPLOYEE ARE THOSE BENEFITS LISTED IN THIS CONTRACT AND ON ATTACHMENT A HERETO.

_____    _6/26/04_
Employee Signature                              Date

FSA Start Date          _7/2/04_

FSA Completion Date     _7/1/05_

_____    _3 JULY 04_
Authorized Employer Representative               Date

_IPP DEPUTY PROG. MGR._
Title

As an integral part of my Foreign Service Employment Agreement, I hereby acknowledge the receipt of the DynCorp and Its Subsidiaries and Affiliated Companies Summary Plan Description (Attachment A) and Letter of Agreement (Attachment B).

_____    _____
Employee Signature                              Date

I acknowledge that I have been provided the DynCorp and Its Subsidiaries and Affiliated Companies International Employee Benefits Program Summary Plan Description (Attachment A) amended as of June 1, 2002.

Company:    DynCorp International LLC         DynCorp International Global Services FZ LLC
Please circle one

Program/Site:    _AFGHANISTAN_

Employee ID: _B02628_

Employee Name (print): Gerald Wayne Gibson

Employee Signature: _Gerald C. Gibson_

Date Signed: _6/27/04_

Please place in the employee's personnel file after it has been signed.

# INTERNATIONAL EMPLOYEE BENEFITS PROGRAM

# FOR

# U.S. EXPATRIATES
## of
# DYNCORP AND ITS SUBSIDIARIES AND AFFILIATED COMPANIES

## SUMMARY PLAN DESCRIPTION
*Attachment A*

# TABLE OF CONTENTS

Section I – Introduction................................................ 4

Section II - Summary Plan Description............................... 4

Section III - Statement of ERISA.................................... 5

Section IV - Discretionary Authority................................ 6

Section V - Medical Benefits........................................ 6
A. Eligibility........................................................ 6
    1. Employee Eligibility........................................ 6
    2. Dependent Eligibility....................................... 6
B. Enrollment ....................................................... 6
    1. Application................................................. 6
    2. Terms...................................................... 6
C. Enrollment Date................................................... 6
D. Covered Expenses.................................................. 6
E. Annual Maximum Benefit............................................ 8
F. Maternity Coverage................................................ 8
G. Special Rights Following Mastectomy............................... 8
H. COBRA Continuation Rights......................................... 9
    1. Very Important Notice....................................... 9
    2. Qualifying Events for Continuation of Coverage.............. 9
    3. Electing COBRA Continuation Coverage........................ 9
    4. Required Notice to the Company.............................. 9
    5. Duration of COBRA Continuation Coverage..................... 10
    6. Early Termination of COBRA Continuation Coverage............ 10
    7. Cost of COBRA Continuation Coverage......................... 10
    8. Contact Information......................................... 10
I. Exclusions........................................................ 11
J. Pre-Existing Conditions........................................... 12
K. Termination of Coverage.......................................... 13
L. Conversion........................................................ 13
M. Coordination of Benefits......................................... 13
N. Medicare and Your Coverage....................................... 15
O. Subrogation / Reimbursement...................................... 15
P. Claiming Benefits & Appeal Process............................... 15
    1. When You have a Complaint................................... 16
    2. When You file a Claim....................................... 17
    3. Initial Claim Decision...................................... 18
    4. If Your Claim is Denied..................................... 20
    5. Appealing Your Initial Claim Decision....................... 20
    6. If Your Appealed Claim is Denied............................ 21
    7. Final Appeal............................................... 21

ATTACHMENT A
Amended as of June 1, 2002

8. Denial of Claim on Second Appeal…………………………………… 22

Section VI - Disability Benefits……………………………………… 22
A. Eligibility………………………………………………………………… 22
   1. Employee Eligibility……………………………………………… 22
   2. Dependent Eligibility……………………………………………… 22
B. Enrollment……………………………………………………………… 22
   1. Application………………………………………………………… 22
   2. Terms……………………………………………………………… 22
C. Enrollment Date………………………………………………………… 22
D. Covered Expenses……………………………………………………… 23
E. Annual Maximum Benefit……………………………………………… 23
F. Exclusions……………………………………………………………… 23
G. Pre-Existing Conditions……………………………………………… 24
H. Termination of Coverage……………………………………………… 24
I. Subrogation / Reimbursement………………………………………… 24
J. Claiming Benefits & Appeal Process………………………………… 25
   1. What You Should Do
   and What Your Should Expect If You Have a Claim………………… 25
   2. Appeal Procedure for Denied Claim ………………………………… 27

Section VII - Accidental Death and Dismemberment Benefits………… 28
A. Eligibility………………………………………………………………… 28
   1. Employee Eligibility……………………………………………… 28
   2. Dependent Eligibility……………………………………………… 28
B. Enrollment……………………………………………………………… 28
   1. Application………………………………………………………… 28
   2. Terms……………………………………………………………… 29
C. Enrollment Date………………………………………………………… 29
D. Covered Expenses……………………………………………………… 29
E. Annual Maximum Benefit……………………………………………… 30
F. Exclusions……………………………………………………………… 30
G. Pre-Existing Conditions……………………………………………… 31
H. Termination of Coverage……………………………………………… 31
I. Claiming Benefits & Appeal Process………………………………… 31
   1. Filing Instructions………………………………………………… 31
   2. Where to Send Your Claim……………………………………… 32
   3. What is Needed with Your Claim………………………………… 32
   4. Right to Request Additional Information ………………………… 32
   5. If your Claim is Denied…………………………………………… 33
   6. Your Right to Appeal……………………………………………… 33

ATTACHMENT A
Amended as of June 1, 2002

# SECTION 1 – INTRODUCTION

In addition to your pay, your benefit Plan (the "Plan") represents an important part of your compensation as a contract employee of DynCorp or a DynCorp subsidiary or affiliated company (the "Plan Sponsor"). The Plan includes:

- a medical Plan to protect you from high medical costs, especially in the event of a catastrophic injury or illness;

- disability insurance to provide continuing income for a specified period of time if you are unable to work due to an accident;

- accident benefits to provide important financial protection for you and for your family in the event of your death, dismemberment, or permanent disability.

This booklet is known as a "Summary Plan Description" ("SPD"), and provides a summary of the key provisions of the Plan. It is a summary of a longer and more detailed Plan document which contains more specific and legal language regarding your benefits. In the event of any ambiguity between this SPD and the Plan document, the Plan document shall control. The Plan Sponsor reserves the right to change, amend, discontinue or terminate the Plan at any time. You may obtain a copy of the complete Plan Document by requesting it from the Plan Administrator. You may be charged for the cost of copying the full document. The Plan Document may also be reviewed during normal business hours at the Personnel Office of the Plan Sponsor or the Plan Administrator.

No actions at law or equity may be taken against the Plan until all appeal rights, as described in this SPD, have been exhausted. In the event that legal papers need to be served regarding this Plan, service may be made on the Plan Sponsor or the Plan Administrator.

General questions regarding benefits and enrollment should be directed to the Plan Sponsor or the Plan Administrator.

# SECTION II – SUMMARY PLAN DESCRIPTION

This SPD is issued to the employees of the Plan Sponsor and replaces all previously issued SPDs.

1.  **PLAN**
    The name of your Plan is Group Personal Accident ("Plan").

2.  **PLAN EFFECTIVE DATE**
    The Effective Date of the Plan is June 1.

3.  **PLAN SPONSOR**
    The Plan Sponsor is DynCorp and its Subsidiaries and Affiliated Companies. The address and telephone number of the Plan Sponsor is:

    > DynCorp
    > 11710 Plaza America Drive
    > 12th Floor
    > Reston, Virginia 20190
    > +1 703.264.0330

4.  **PLAN ADMINISTRATOR**
    The Plan Administrator is the DynCorp Risk Management Department. The address and telephone number of the Plan Administrator is the same as the Plan Sponsor.

ATTACHMENT A
Amended as of June 1, 2002

5.    **PLAN YEAR**
      June 1 through May 31

6.    **EMPLOYER IDENTIFICATION NUMBER**
      The Employer Identification Number for your employer is 36-2408747.

7.    **PLAN IDENTIFICATION NUMBER**
      The Plan Number is 504.

8.    **TYPE AND ADMINISTRATION OF PLAN**
      The Plan constitutes a welfare benefit Plan for Personal Accident, Medical and Repatriation/Medical Evacuation Expenses Insurance.  The type of administration of the Plan is contract administration.

# SECTION III – STATEMENT OF ERISA RIGHTS

ERISA entitles you as an Enrollee in the Plan to:

A.  Examine, without charge, at the Plan Administrator's office or other specified locations, such as worksites and union halls, all Plan documents, including insurance contracts, collective bargaining agreements and copies of all documents filed by the Plan with the U.S. Department of Labor, such as annual reports.

B.  Obtain copies of all Plan documents and other Plan information upon written request to the Plan Administrator. The Plan Administrator may make a reasonable charge for these copies.

C.  Receive a summary of the Plan's annual financial report.  The Plan Administrator is required by law to furnish each Enrollee with a copy of this summary annual report.

In addition to creating rights for Enrollees, ERISA imposes duties upon the people who are responsible for the operation of your employee benefit Plan.  The people who operate your Plan, called "fiduciaries" of the Plan, have a duty to do so prudently and in the interest of you and other Enrollees.  No one, including your employer, union, or any other person, may fire you or otherwise discriminate against you in any way to prevent you from obtaining a welfare benefit or exercising your rights under ERISA.  If your claim for a welfare benefit is denied, in whole or in part, you must receive a written explanation of the reason for the denial. You have the right to have the Plan review and reconsider your claim.

Under ERISA, there are steps you can take to enforce the above rights.  For instance, if you request materials from the Plan and do not receive them within 30 calendar days, you may file suit in a federal court.  In such a case, the court may require the Plan Administrator to provide the materials and pay up to $110 a day until you receive the materials, unless the materials were not sent because of reasons beyond the control of the Administrator.  If you have a claim for benefits which is denied or ignored, in whole or in part, you may file suit in state or federal court.  If it should happen that Plan fiduciaries misuse the Plan's money or if you are discriminated against for asserting your rights, you may seek assistance from the U.S. Department of Labor, or you may file suit in a federal court.  The court will decide who should pay court costs and legal fees.  If you are successful, the court may order the person you have sued to pay these costs and fees.  If you lose, the court may order you to pay these costs and fees, for example, if it finds your claim is frivolous.  If you have any questions about your Plan, you should contact the Plan Administrator.  If you have any questions about this statement or about your rights under ERISA, you should contact the nearest area office of the Pension and Welfare Benefits Administration, U.S. Department of Labor, listed in your telephone directory or the Division of Technical Assistance and Inquiries, Pension and Welfare Benefits Administration, U.S. Department of Labor, 200 Constitution Avenue N.W., Washington, D.C. 20210.

ATTACHMENT A
Amended as of June 1, 2002

# SECTION IV – DISCRETIONARY AUTHORITY

The Plan Administrator shall perform its duties as the Plan Administrator and in its sole discretion shall determine appropriate courses of action in light of the reason and purpose for which this Plan is established and maintained. In particular, the Plan Administrator shall interpret all Plan provisions, and make all determinations (including factual determinations) as to whether any particular Participant or beneficiary is entitled to receive any benefit under the terms of this Plan, which interpretation shall be made by the Plan that is adopted by the Plan Administrators and for which there is a rational basis shall be final and legally binding on all parties.

Any interpretation of the Plan or other action of the Plan Administrator shall be subject to review only if such interpretation or other action is without rational basis. Any review of a final decision or action of the Plan Administrator shall be based solely on such evidence presented to or considered by the Plan Administrator at the time it made the decision that is the subject of review and shall be entitled to the maximum deference permitted by law.

# SECTION V - MEDICAL BENEFITS

## A. Eligibility

### 1. Employee Eligibility
An active, regular, hourly or salaried U.S. Expatriate who is an employee of the Plan Sponsor. To be eligible, you must be actively at work on the date coverage would become effective. Coverage will begin when you arrive at the final destination of your work assignment.

### 2. Dependent Eligibility
Dependents are not eligible for coverage under this Plan.

## B. Enrollment

### 1. Application
The company pays the full cost of your coverage. You must sign a Foreign Service or Employment Agreement with the Plan Sponsor in order to be eligible for the Plan.

### 2. Terms
Once enrolled as described above, an eligible employee is known as an "enrolled employee". An "Enrollee" is a defined term meaning an enrolled employee. Whenever used in this SPD, "you" or "your" means an Enrollee.

## C. Enrollment Date

You will be considered enrolled in the Plan when you reach your final work destination. Prior to your final enrollment, you must have a signed Foreign Service or Employment Agreement with the Plan Sponsor.

## D. Covered Expenses

(1) The Plan generally pays the full cost of all covered expenses except for any care or treatment described in the "Exclusions" section.

ATTACHMENT A
Amended as of June 1, 2002

(2) Medical, repatriation, and medical evacuation expenses following accident occurring or illness manifesting itself during the policy period.

(3) Emergency and non-emergency treatment will be provided in your place of employment, unless your illness or injury cannot be treated there. If you require treatment outside of your place of employment, the Plan also will cover medical evacuation to the closest appropriate licensed facility where you can be treated.

(4) For medical expenses only, there is a $100 deductible for every claim.

(5) All benefits from this Plan are subject to an annual policy maximum of $75,000 (U.S.).

(6) This Plan covers medical expenses which are incurred and arise solely and directly from an illness or accidental injury which occurs while you are covered under the Plan.

(7) Specific covered expenses include:

- medical and surgical expenses and related costs for supplies or treatment required in connection with the surgery or other care;

- the cost of covered hospital care, including nursing care;

- care in a nursing home;

- fees for specialists; and

- costs for physiotherapy, massage and manipulative treatment.

(8) If you cannot receive the required medical care in your place of employment, the Plan also covers repatriation expenses, which are necessary and reasonable traveling expenses incurred for your return to your home country, or costs for evacuation to the nearest appropriate medical facilities. Thereafter, coverage will be provided for eligible Medical Expenses incurred in the home country or at the closest appropriate licensed facility for up to a maximum of three (3) months or the maximum annual benefit of $75,000 (U.S.), whichever comes sooner.

(9) For purposes of this Plan, Eligible Medical Expenses refer to medical, surgical, specialist's fees, hospitals, nursing homes, nursing attendance charges, costs of physiotherapy, massages and manipulative treatments, surgical and medical requisites incurred and arising solely and directly from an illness manifesting itself or accidental bodily injury occurring while covered and treatment received within twenty-four months of the date of the accident.

(10) For purposes of this Plan, repatriation or evacuation will be considered necessary if a qualified medical practitioner:

- certifies that you should be repatriated or evacuated because local facilities are not equipped to treat you or because your recovery will be substantially improved in another locale; and/or

- estimates that you will be totally disabled in excess of four weeks.

ATTACHMENT A
Amended as of June 1, 2002

(11) In addition, coverage will be provided for medical expenses incurred outside the host country while on business or personal travel, so long as you are still an enrolled employee.

(12) If you should die as the result of a covered injury or illness while working in your place of employment, the Plan's repatriation benefit also covers transportation of your body or ashes to your home country for necessary and reasonable funeral expenses, subject to the Plan's maximum benefit.

(13) The Plan covers eligible medical expenses in your home country or at the closest appropriate licensed facility which are incurred as a result of an illness or injury which occurred in your work location. The maximum coverage is three (3) months from the date of injury, occurrence or illness manifestation or when the Plan annual maximum benefit of $75,000 is reached, whichever comes sooner.

## E. Annual Maximum Benefit

The Plan provides benefits up to an annual maximum for any enrolled employee of $75,000 (U.S.). In the event the Plan Document includes a different annual maximum, the Plan Document will prevail.

## F. Maternity Coverage

Group health Plans and health insurance issuers generally may not, under federal law, restrict benefits for any hospital length of stay in connection with childbirth for the mother or newborn child to less than 48 hours following a vaginal delivery, or less than 96 hours following a cesarean section. However, federal law does not prohibit the mother's or newborn's attending provider, after consulting with the mother, from discharging the mother or her newborn earlier than 48 hours (or 96 hours, if applicable.) In any case, Plans and issuers may not, under federal law, require that a provider obtain authorization from the Plan or the issuer for prescribing length of stay not in excess of 48 hours (or 96 hours, if applicable).

## G. Special Rights Following Mastectomy

A group health Plan generally must, under federal law, make certain benefits available to participants who have undergone a mastectomy. In particular, a Plan must offer mastectomy patients benefits for:

- Reconstruction of the breast on which the mastectomy has been performed;
- Surgery and reconstruction of the other breast to produce a symmetrical appearance;
- Prostheses; and
- Treatment of physical complications of mastectomy.

This Plan complies with these requirements. Benefits for these items generally are comparable to those provided under the Plan for similar types of medical services and supplies. Of course, the extent to which any of these items is appropriate following mastectomy is a matter to be determined by consultation between the attending physician and the patient. The Plan neither imposes penalties (for example, reducing or limiting reimbursements) nor provides incentives to induce attending providers to provide care inconsistent with these requirements.

## H. NOTICE OF EMPLOYEE GROUP HEALTH PLAN CONTINUATION COVERAGE

### 1. *VERY IMPORTANT NOTICE*

A Federal law, commonly known as "COBRA," requires that DynCorp ("Company") offer employees the opportunity to extend Company group health plan ("Plan") coverage (called "continuation coverage") at group rates in certain instances when coverage otherwise would end. This notice explains, in summary fashion, your rights and obligations under the continuation coverage provisions of COBRA. You should read this notice carefully.

### 2. Qualifying Events for Continuation Coverage

(1) Loss of Coverage as an Employee:

If you are covered by the Plan as an employee, you have the right to choose continuation coverage if you lose coverage for any of the following reasons:

    (a)  Your hours of employment with the Company are reduced.

    (b) Your employment with the company is terminated (for reasons other than gross misconduct on your part).

    (c)  If you are a retired employee, because your employer has filed for reorganization under Chapter 11 of the Bankruptcy Code.

(2) Termination of Active Employee Benefit Coverage:

Your coverage under the plan will cancel upon termination of employment with the company or the date three (3) months following the occurrence of an accident or illness, because of which you will not be able to return to work, and you are receiving care in your home country or at the nearest appropriate medical facility when such care is required by the Plan, and will remain cancelled until the COBRA coverage is selected and paid for. The coverage becomes retroactive following a proper election and timely payment of premiums.

### 3. Electing COBRA Continuation Coverage

You do not have to show that you are insurable to choose continuation coverage. You may elect COBRA regardless of whether you are also covered by another group health plan or Medicare *at the time* of the qualifying event.

### 4. Required Notice to the Company

You must notify the Company in writing if you want continuation coverage within 60 days of the later of the date of the Company's notice or the date you would lose coverage because of the events described above. Each covered employee must notify the Plan Administrator of the determination that he or she was disabled (as defined in the Social Security Act) at any time during the first 60 days of continuation coverage. You must give this notice within 60 days after the date of such determination. You also must notify the Plan Administrator within 30 days after the date that it is determined that such person is no longer disabled. Your notice will be considered "sent" on the day it is mailed as evidenced by the postmark that appears on the envelope.

ATTACHMENT A
Amended as of June 1, 2002

**5. Duration of COBRA Continuation Coverage**

If you do not choose continuation coverage, your group health coverage under the Plan will end in accordance with the rule as stated in your Summary Plan Description.

If you choose continuation coverage, your coverage will be identical to the coverage provided under the Plan to similarly situated employees as of the time coverage is being provided. This means that if the coverage for similarly situated employees is modified, your coverage will be modified in the same manner. If you lost coverage because of a termination of employment or reduction in hours of employment the continuation coverage period generally is 18 months. The 18-month coverage period may be extended to 29 months if you are determined to be disabled by the Social Security Administration any time during the first 60 days of continuation coverage, provided you notify the Plan Administrator within 60 days of the date of such determination and within the 18-month period.

Special rules regarding the continuation coverage period apply when the covered employee becomes entitled to Medicare, a retiree loses coverage because of the commencement of a proceeding concerning the Company under Title 11 of the bankruptcy law, or if certain qualifying events occur within 18 or 29 months of a termination or reduction in hours of employment.

**6. Early Termination of COBRA Continuation Coverage**

Your continuation coverage may be cut short for *any* of the following reasons:

(1)     After electing COBRA, you first become covered under any other group health plan (as an employee or otherwise) that does not contain any exclusion or limitation for any preexisting conditions clause that applies to you or a covered dependent (taking into account prior creditable coverage when required by federal law).

(2)     After electing COBRA, you first become entitled to Medicare benefits.

(3)     The premium for your continuation coverage is not paid within 30 days of the due date.

(4)     The Company no longer provides any group health coverage to any employee.

(5)     You are determined to be no longer disabled by the Social Security Administration.

**7. Cost of COBRA Continuation Coverage**

In general, you must pay 102 percent of the Plan premium in order to obtain continuation coverage. In accordance with the applicable Internal Revenue code regulations, the maximum coverage is extended from 18 months to 29 months due to a disability, the required payment is generally 150 percent of the premium for the 19th and all succeeding months. Special rules apply affecting the premium due during the disability extension. Please see the Plan Administrator if you have questions concerning this premium.

**8. Contact Information**

If you have any questions about COBRA, please contact:

> Ceridian Benefit Services
>
> 3201 34th Street South
>
> St. Petersburg, FL 33711
>
> (800) 877-7994

## I. Exclusions

The Plan will not pay benefits for medical expenses:

- for treatment provided by medical facilities operated by or on behalf of United Nations personnel (for more information, contact the Plan Sponsor);

- incurred after coverage ends;

- for unnecessary care or treatment, or for any care, services, or supplies not prescribed by a doctor and/or treatment not provided by a doctor;

- for general health examinations or check-ups not required to diagnose illness or accidental injury;

- for services and supplies furnished in connection with rest cures, senatorial or custodial care, or periods of quarantine or isolation;

- for dental examinations, X-rays, extractions, fillings, and general dental care, unless required due to a covered accidental injury;

- for supplying or fitting of eyeglasses or hearing aids unless required due to a covered accidental injury;

- for cosmetic surgery, unless such surgery is required due to an accident which occurred while you were covered under this Plan;

- for physiotherapy or chiropractic treatment unless post injury. Any treatment is limited to a maximum of 5 sessions with an appropriately qualified practitioner;

- for expenses incurred in an insured person's country of domicile (other than in respect of repatriation) except for a maximum period of 3 months following an accident or illness manifesting itself while on a tour of duty overseas;

- for injuries or illnesses incurred as the result of participation in winter sports or mountaineering (normally involving ropes/ guides);

- for treatment of an intentional self-inflicted injury or sickness while sane, or for suicide, attempted suicide, or intentional self-injury;

- for any injury sustained because of your own criminal act, or while you are insane;

ATTACHMENT A
Amended as of June 1, 2002

- for treatment of alcoholism, drug addiction, allergy, nervous or mental disorders, or venereal disease;

- for any condition which is in any way connected to alcohol, substance or drug abuse;

- Any accident or other condition arising out of the use, or any treatment for drugs not prescribed by a licensed physician or drugs used in circumstances other than as prescribed;

- for any accident involving a mechanically propelled vehicle, which is caused or contributed to by the insured person having a Blood/Alcohol reading in excess of the host country's legally permitted level for the driving of a motor vehicle;

- to treat an injury or illness caused or contributed to by war (whether declared or undeclared) or any warlike operations, invasion, acts of foreign enemies, hostilities, mutiny, terrorist activities, civil war, rebellion, revolution, insurrection, conspiracy, military or usurped power, riots, strikes, civil commotion, lockouts or labor disturbances, unless you are not actually taking part in these occurrences;

- to treat an injury or illness resulting from participation in naval, military or air forces services or operations, unless such actions are part of your normal duties for the company;

- to treat an injury or illness resulting from riding or driving in a race car;

- to treat an injury or illness resulting from your being in or boarding an aircraft for the purpose of flying in it, except as required by the company;

- to treat a pre-existing condition until certain requirements are met (see Section J)

- for treatment covered under other types of insurance coverage provided (i.e., Defense Base Act, Foreign Voluntary Workers Compensation).

## J. Pre-Existing Conditions

You have a "Pre-Existing Condition" if you have a physical or mental condition, regardless of the cause, for which medical advice, diagnosis, care, or treatment was recommended or received within the 6 month period ending on your Enrollment Date. Pre-Existing Condition does not include pregnancy. For the purposes of this Paragraph only, "Enrollment Date" means the first day you are covered.

If you have a Pre-Existing Condition, it is excluded from coverage until a period of 180 days has elapsed during which the insured person has neither received nor required any treatment for the condition. The period of exclusion for your Pre-Existing Condition will be reduced by the total time you were covered by prior Creditable Coverage; however, if your coverage otherwise eligible to be counted as prior Creditable Coverage was followed by a Significant Break in Coverage, such coverage will not be counted in determining Creditable Coverage. For the purposes of this Paragraph only, a "Significant Break in Coverage" means a continuous period of 63 calendar days or more without Creditable Coverage.

"Creditable Coverage" means coverage under one or more of the following: an employer or union sponsored health benefit Plan, a health insurer, a health maintenance organization, Medicare, Medicaid, a medical and dental Plan for members (and certain former members) of the uniformed services, a medical program of the Indian Health Service or a tribal

ATTACHMENT A
Amended as of June 1, 2002

organization, a state health benefits risk pool, the Federal Employees Health Benefits Program, a public health Plan, or a health Plan through the Peace Corps. Creditable Coverage does not include coverage for accidents only, disability income, liability or supplemental liability insurance, workers' compensation insurance, automobile medical payment insurance, credit-only insurance, on-site medical clinics, limited scope dental insurance, limited scope vision insurance, limited scope long term care insurance, benefits that do not coordinate, Medicare supplemental insurance, CHAMPUS supplemental programs, and other supplemental coverage.

Creditable Coverage may be demonstrated by obtaining a certificate from your prior Plan. If necessary, the Plan Administrator will assist you in obtaining the certificate. If you are unable to obtain the certificate, the Plan Administrator will inform you upon your request of alternative methods of demonstrating Creditable Coverage.

## K. Termination of Coverage

Your medical coverage ends on the earliest of the following dates:

- the date you complete your work assignment in your place of employment or terminate employment with the company; or

- the date after three (3) months following the occurrence of an accident or illness, because of which you will not be able to return to work, and you are receiving care in your home country or at the nearest appropriate medical facility when such care is required and approved by the Plan; or

- the date of the enrolled employee's death; or

- the date the company ends this coverage or terminates this Plan.

## L. Conversion

Conversion coverage is not available under this Plan; however, coverage consistent with COBRA requirements can be purchased upon termination, if desired. The cost will be your financial responsibility, and not that of the Company's.

## M. Coordination of Benefits

Coordination of Benefits is the procedure used to pay health care expenses when you are covered by more than one Plan. The following rules determine which Plan pays first and how much the other Plan must pay. The objective is to make sure the combined payments of all Plans are no more than your actual bills.

When you are covered by another group Plan in addition to this one, the following Coordination of Benefit rules will be followed to determine which Plan is primary and which is secondary. You must submit all bills first to the primary Plan. The primary Plan must pay its full benefits as if you had no other coverage. If the primary Plan denies the claim or does not pay the full bill, you may then submit the balance to the secondary Plan.

Health care is only paid for when you follow these rules and procedures. If these rules conflict with those of another Plan it may be impossible to receive benefits from both Plans, and you will be forced to choose which Plan to use.

ATTACHMENT A
Amended as of June 1, 2002

(1)    Plans That Do Not Coordinate

Benefits will be paid without regard to benefits paid by the following kinds of coverage:

- Individual (not group) policies or contracts;

- Medicaid;

- Group Hospital indemnity Plans which pay less than $100 per day;

- School accident coverage; and

- Some supplemental sickness and accident policies.

(2)    Plan As Primary Plan

When the Plan is primary, full benefits will be paid as allowed under the Plan as if you had no other coverage.

(3)    Plan As Secondary Plan

- When the Plan is secondary, payments will be based on the balance left after the primary Plan has paid.  No more than that balance will be paid.  In no event will more be paid than would have been paid if the Plan was primary.

- Only health care expenses that are covered by the Plan will be paid.

- Payments will only be made if you have followed all of the procedural requirements (e.g., pre-authorization).

- No more will be paid than the Allowable Expense for the health care involved.  If the Plan's Allowable Expense is lower than the primary Plan's, the primary Plan's Allowable Expense will be applied.  That may be less than the actual bill.

(4)    Determining Which Plan Is Primary

To decide which Plan is primary, the Coordination of Benefits provisions of the other Plan must be considered.  The primary Plan will be determined by the first of the following which applies:

(a)  Non-coordinating Plan

If you have another Plan which does not coordinate benefits, it will always be primary.

(b)  Employee

The Plan which covers you as an employee (neither laid off nor retired), member, insured, or subscriber, other than a dependent, is always primary.

ATTACHMENT A
Amended as of June 1, 2002

## N. Medicare and Your Coverage

You may have coverage under the Plan and under Medicare. Medicare means the benefits offered under Title XVIII of the Social Security Act, and includes all of the benefits provided by Parts A and B of Medicare. In general, when you have coverage under both the Plan and Medicare, the Plan will pay primary benefits for:

(1)    An active employee who is age 65 or over

(2)    An active employee under age 65 entitled to Medicare because of disability;

(3)    Up to 30 months after your treatment for end stage renal disease begins.

If you do not fall into any of the categories 1 through 3 above, the Plan will pay benefits secondary to Medicare. If you do not elect Part B coverage, the payment to be made by the Plan will be made as if you had elected Part B. When the Plan is secondary, you must first submit the claim to Medicare. After Medicare makes payment, you may submit the claim to the Plan for payment.

These rules are based on regulations issued by the Health Care Financing Administration ("HCFA"), and may be amended or changed at any time. It is the intent of the Plan to abide by the Medicare Secondary Payer Rules. If the Plan in any way conflicts with regulations issued by HCFA, the Plan will pay benefits in accordance with HCFA regulations.

## O. Subrogation / Reimbursement

Acceptance of Plan benefits for Covered Services for an illness or injury for which another party may be obligated to pay constitutes your acceptance of the provisions of this Section.

The Plan is subrogated to all your rights of recovery to the extent of the benefits it pays for Covered Services for an illness or injury for which you are entitled to recover payment from any other person, including without limitation, the person who caused the illness or injury, that person's insurer, or your insurer under uninsured motorist coverage, underinsured motorist coverage, medical payment coverage, personal injury protection coverage, and any other like-kind coverage.

Any payment you recover from any other person on account of illness or injury for which the Plan has paid benefits, regardless of how such payment is designated or described, shall be deemed to be a recovery of Plan benefits paid, and you are obligated to reimburse the Plan from such recovery within 14 calendar days of its receipt. You will be responsible for payment of any expenses, including attorney's fees and court costs, incurred by the Plan to enforce its right to reimbursement against you.

The Plan has the right to bring suit and/or file claims in its own name or your name as necessary to enforce any of its rights of recovery under this section. You are obligated to provide such information and assistance as the Plan may reasonably require for the enforcement of its rights under this section, and to refrain from taking any action which would interfere with or prejudice such rights.

## P. Claiming Benefits and Appeal Process
The insurance carrier has the right to request that you have an examination by a qualified medical professional, at the company's expense, before paying any benefits from this Plan.

ATTACHMENT A
Amended as of June 1, 2002

## 1. WHEN YOU HAVE A COMPLAINT

Only employees may submit claims for benefits, and benefits will only be paid to the employee or the actual provider of services. Therefore, under the following complaint and claims appeal sections, the words "you" and "your" will mean an employee of DynCorp. You have the right to elect group health care benefits as offered under the Group Personal Accident Plan (the "Plan"), and your rights will be determined under the Plan's provisions and in conjunction with the complaint and claims procedures outlined below. Claims will also be considered filed by you if communications and requests for benefits come from an individual that you have designated as your authorized representative to act on your behalf with respect to a claim. In the event that you designate an authorized representative to act on your behalf, the Plan will send all notifications, requests for further information, appeal decisions, and all other communications to your authorized representative.

For the purposes of the complaint and claims appeal sections, any reference to "days" will refer to calendar days, not business days.

We are here to listen and help. Because we want you to be completely satisfied with the member services assistance you receive, we have established a process for addressing your concerns and solving your problems. If you have a concern regarding a person, a service, the quality of care, or you want to inquire about what benefits are covered under the Plan, please contact Specialty Assistance Services at one of the following phone numbers and explain your concern to one of the member services representatives.

---

**24 Hour Specialty Assistance Services Control Centers**

Wickfield House, 18-22 Disney Place
London SE1 1HJ

For assistance worldwide, contact:

| | |
|---|---|
| London, UK | Tel: +44 (0)20 7939 9645 |
| | Fax: +44 (0)20 7407 9206 |

For assistance in the Americas, contact:

| | |
|---|---|
| Philadelphia, USA | Tel: +1 215 489 3785 |
| | Fax: +1 215 489 8525 |

For assistance in the Africa, contact:

| | |
|---|---|
| Johannesburg, South Africa | Tel: +27 11 452 7272 |
| | Fax: +27 11 452 4473 |

For assistance in the Asia Pacific, contact:

| | |
|---|---|
| Bangkok, Thailand | Tel: +662 645 3932 |
| | Fax: +662 645 3732 |

---

You may also express that concern in writing. We will do our best to resolve the matter on your initial contact. If we need more time to review or investigate your concern, we will get back to you as soon as possible, but in any case within 30 days. We will not consider any of these communications to be a "claim" for benefits. A formal claim for benefits must meet certain other standards which are described in the section titled "When You File a Claim."

ATTACHMENT A
Amended as of June 1, 2002

**2. WHEN YOU FILE A CLAIM**

When you file a "claim," you have the right to a speedy decision. "Claim" status also gives you the option of appealing any adverse decision regarding your claim. You will have filed a "claim" when you submit one of the Plan's Claim Forms or if you take one of the actions listed below.   In the case of the submission of a Claim Form, a "claim" will be considered filed when it is received by the appropriate person/department listed below.  The Plan also recognizes the following actions and submission of forms as "claims:"

- A request by you for benefits through preauthorization or a utilization review determination in cases where  *use of either preauthorization or utilization review is required in order to obtain a particular benefit.*

- Requests by your formally-designated authorized representative for preauthorization or a utilization review determination in cases where *use of either preauthorization or utilization review is required in order to obtain a particular benefit.* The Plan will take reasonable steps to determine whether an individual claiming to be acting on your behalf is, in fact, validly empowered to do so under the circumstances, and the Plan will require that you complete and file a form identifying any person you authorize to act on your behalf with respect to a claim.  However, when inquiries by a health care provider relate to payments due to the provider—rather than due to you—under managed care contracts (where the health care provider has no recourse against you for the amounts) such inquiries by a health care provider will not be considered "claims" by the Plan.

- Requests for benefits (in the case of a claim involving urgent care) by a health care provider with knowledge of your medical condition.  For urgent care claims, you are not required to complete a form and formally designate a health care provider as your representative with respect to a claim.

- Submission of a medical bill for reimbursement or payment under the terms of the Plan.

You may request the Plan's Claim Form from the Plan Administrator by contacting DynCorp's Human Resources Office. After you have completed the Claim Form, you must submit it to the following address:

| **24 Hour Specialty Assistance Services Control Centers** |
| Wickfield House, 18-22 Disney Place |
| London SE1 1HJ |

All submitted claims and appeals will fall into one of the three categories described below. The handling of your initial claim or later appeal will be governed, in all respects, by the appropriate category of claim or appeal, and each time your claim or appeal is examined, a new determination will be made regarding the category into which the claim or appeal falls at that particular time.

- An **urgent care** claim is one that involves serious jeopardy of life or health of the patient, or the ability of the patient to regain maximum function or, in the opinion of a

physician with knowledge of the patient's medical condition, would subject the patient to severe pain that cannot be managed without the treatment at issue. Determination of "urgent care" status requires that the judgment of a prudent layperson with average knowledge of health and medicine be applied, except where a physician with knowledge of the patient's medical condition determines that the claim involves urgent care.

- A **non-urgent pre-service** claim is one that, under the terms of the Plan, requires approval of the particular benefit or procedure prior to obtaining medical care.

- A **post-service** claim is a claim that is neither an urgent care claim nor a non-urgent pre-service claim.

## 3. INITIAL CLAIM DECISION

After you submit a claim, the Plan must make a decision on your claim within a prescribed period of time.

### Urgent Care Claims

For urgent care claims, the Plan Administrator must notify you of the benefit determination (adverse or favorable) as soon as possible, but not later than 72 hours after receipt of the claim by the Plan. The notification will be given orally, and the Plan will send you written or electronic notification within three (3) days after the oral notification.

If your claim is incomplete but is properly filed, an employee of the Plan Administrator will orally notify you as soon as possible (but not later than 24 hours) after the receipt of the claim, of the specific information necessary to complete the claim. You will have at least **48 hours** to provide the specified information necessary to complete your claim submission. The Plan's time limit for making a determination will be suspended from the time that it provides notice to you of the incomplete claim until the date on which you respond to the request for additional information. You will be notified of the Plan's decision as soon as possible, but no later than 48 hours after the earlier of either the time the Plan receives the specified information or the expiration of the time given to you to provide the specified information.

If you fail to follow the Plan's filing procedures because your request for benefits does not: 1) identify the patient; 2) note a specific medical condition or symptom; 3) describe a specific treatment, service, or product for which approval is requested; 4) arrive in the correct department and is not sent to the correct person, YOU WILL NOT HAVE SUBMITTED A CLAIM. An employee of the Plan Administrator will orally notify you, within 24 hours, that you have failed to follow the filing procedures, and you will be reminded of the proper filing procedures.

### *Requests for Extension of Treatment--*

Your request to extend a course of treatment beyond a particular period of time or number of treatments is a claim, and the Plan will decide your claim as soon as possible, taking into account the medical exigencies (the particular circumstances and requirements). The Plan will notify you of its benefit determination (adverse or favorable) within 24 hours after receipt of the claim by the Plan (as long as the claim is submitted to the Plan at least 24 hours prior to the expiration of the prescribed period of time or number of treatments). But, if your request is not made at least 24 hours prior to the expiration of the prescribed period of time or number of treatments, your request will be treated as a claim involving urgent care and will be decided as soon as possible, taking into

ATTACHMENT A
Amended as of June 1, 2002

account the medical exigencies (the particular circumstances and requirements), but not later than 72 hours after received by the Plan. The Plan will orally notify you of its decision, and the Plan will send you written or electronic notification within three (3) days after the oral notification.

<u>Non-Urgent Pre-Service Claims</u>
For non-urgent pre-service claims, the Plan Administrator must notify you (in writing or electronically) of the benefit determination (adverse or favorable) as soon as possible, but not later than 15 days after receipt of the claim by the Plan. One 15-day extension of this time period is possible under certain circumstances.

If your claim is incomplete but is properly filed, your attempted claim will be denied by the Plan. You will be notified in writing or electronically of the adverse benefit determination within the time limits that apply to non-urgent pre-service claims, and you will have the right to appeal the Plan's adverse benefit determination.

If you fail to follow the Plan's filing procedures because your request for benefits does not: 1) identify the patient; 2) note a specific medical condition or symptom; 3) describe a specific treatment, service, or product for which approval is requested; 4) arrive in the correct department and is not sent to the correct person, YOU WILL NOT HAVE SUBMITTED A CLAIM. An employee of the Plan Administrator will orally notify you, within five (5) days, that you have failed to follow the filing procedures, and you will be reminded of the proper filing procedures.

*Requests for Extension of Treatment--*
Your request to extend a course of treatment beyond a particular period of time or number of treatments is a claim, and the Plan will decide your claim as soon as possible and within the time limits applicable to non-urgent pre-service claims.

<u>Post-Service Claims</u>
For post-service claims, the Plan Administrator will notify you in writing or electronically of the benefit determination as soon as possible, but not later than 30 days after receipt of the claim by the Plan. One 15-day extension of this time period is possible under certain circumstances.

If your claim is incomplete but is properly filed, your attempted claim will be denied by the Plan. You will be notified in writing or electronically of the adverse benefit determination within the time limits that apply to non-urgent pre-service claims, and you will have the right to appeal the Plan's adverse benefit determination.

*Requests for Extension of Treatment--*
Your request to extend a course of treatment beyond a particular period of time or number of treatments is a claim, and the Plan will decide your claim as soon as possible and within the time limits applicable to post-service claims.

*Submission of a Medical Bill for Payment--*
If your claim is in the form of a medical bill that is submitted to the Plan for payment, the Plan will pay the benefit according to Plan provisions. This may mean that less than 100% of your medical claim is payable by the Plan. In each case where the Plan pays benefits or determines that it is not responsible for your medical claim, you will receive an Explanation of Benefits which will outline the basis for the Plan's payment. You will receive a written or electronic "denial" notification. In addition, the Plan's payment of less than 100% of your submitted

<div align="center">19</div>

claim (under the terms of the Plan) will entitle you to appeal the decision under the rules governing adverse claim determination.

## 4. IF YOUR CLAIM IS DENIED

If your claim is denied, the Plan will notify you in writing or electronically (oral notification followed by written notification in the case of urgent care claims) why your claim was denied, and the plan will provide additional information that will help you pursue your right to appeal the adverse determination. If you choose to appeal the Plan's adverse benefit determination, your appeal will be governed by rules that assure you a "full and fair" review.

If you are denied benefits based upon the Plan's finding that you are/were ineligible for benefits, the denial of benefits gives you the opportunity to appeal the Plan's decision.

*Termination or Reduction of Benefits—*
If the Plan decides to reduce or terminate your previously-approved course of treatment, the Plan's decision will be treated as an adverse benefit determination, and the Plan will provide you reasonable advance notice of the reduction or termination to allow you to appeal the Plan's decision before the benefit reduction or termination takes place. If you decide to appeal the Plan's decision, you must follow the rules for appealing a Plan's decision.

## 5. APPEALING YOUR INITIAL CLAIM DECISION

You must submit a written request (An oral request for review is acceptable for urgent care claims and may be made by calling the appropriate number indicated above asking the Plan to register your oral appeal.) to the Plan **within 180 days** of receipt of a denial notice in order to initiate an appeal.

When you appeal an adverse determination, the Plan will provide a "full and fair review" which will include the following features:

(1) You will have the opportunity to submit written comments, documents, records, and other information related to the claim.

(2) At your request (and free of charge), you will be provided with reasonable access to (and copies of) all documents, records, and other information relevant to your claim for benefits. Included in this category are any documents, records or other information in your claim file, whether or not those materials were relied upon by the Plan in making its adverse determination. You also have the right to review documentation showing that the Plan followed its own internal processes for ensuring appropriate decision making.

(3) The review of your claim will take into account all comments, documents, records, and other information submitted by you relating to the claim, without regard to whether such information was submitted or considered in the initial benefit determination.

(4) Any appeal of an adverse determination will not afford deference to the initial adverse determination, and the review will be conducted by a designated Plan representative who did not make the original determination and does not report to the Plan representative who made the original determination.

(5) In deciding an appeal of any adverse benefit determination that is based on a medical judgment (including determinations with regard to whether a particular

ATTACHMENT A
Amended as of June 1, 2002

treatment, drug, or other item is experimental, investigational, or not medically necessary or appropriate), the appropriate named fiduciary will consult with a health care professional who has appropriate training and experience in the particular field of medicine involved in the medical judgment. This health care professional will not be the same professional who was originally consulted in connection with the adverse determination; neither will this health care professional report to the health care professional who was consulted in connection with the adverse determination.

(6) The Plan will identify medical or vocational experts whose advice was obtained on behalf of the Plan in connection with an adverse benefit determination of your claim, whether or not that advice was relied upon in making the benefit determination.

After you submit the claim for appeal, the Plan must make a decision on your claim within a short period of time.

### Urgent Care Claims

The Plan's expedited appeal process for urgent care claims will allow you to request (orally or in writing) an expedited appeal, after which, all necessary information, including the plan's benefit determination on review, will be transmitted between the Plan and you by telephone, fax, or other expeditious method. The Plan Administrator will notify you (in writing or electronically) of the benefit determination as soon as possible, but not later than 72 hours after the Plan receives the request for review of the prior benefit determination.

### Non-Urgent Pre-Service Claims

For non-urgent pre-service claims, the Plan Administrator must notify you (in writing or electronically) of the benefit determination within a reasonable period of time appropriate to the medical circumstances, but not later than 30 days.

### Post-Service Claims
For post-service claims, the Plan Administrator must notify you (in writing or electronically) of the benefit determination within a reasonable period of time, but not later than 60 days.

## 6. IF YOUR APPEALED CLAIM IS DENIED

If your appealed claim is denied, the Plan will send you written or electronic notification that will tell you why your appealed claim was denied. The Plan will provide additional information that will help you pursue your right to appeal the adverse determination. An adverse benefit determination also includes a denial of benefits based on a finding that you were ineligible for benefits at the time; such adverse benefit determination of your eligibility will allow you the opportunity to appeal the Plan's decision.

## 7. FINAL APPEAL

If you are dissatisfied with the outcome of your first appeal, you may request a second appeal review. To initiate a second appeal review, you should follow the same process required for your first appeal. You must submit a request for appeal **within 180 days**.

### Urgent Care Claims

For urgent care claims, the Plan Administrator must notify you (in writing or electronically) of the benefit determination as soon as possible, but not later than 36 hours after the Plan receives your request for review of the Plan's prior adverse benefit determination.

ATTACHMENT A
Amended as of June 1, 2002

<u>Non-Urgent Pre-Service Claims</u>

For non-urgent pre-service claims, the Plan Administrator must notify you (in writing or electronically) of the benefit determination within a reasonable period of time appropriate to the medical circumstances, but not later than 15 days after the Plan receives your request for review of the Plan's prior adverse benefit determination.

<u>Post-Service Claims</u>

For post-service claims, the Plan Administrator must notify you (in writing or electronically) of the benefit determination within a reasonable period of time, but not later than 30 days after the Plan receives your request for review of the Plan's prior adverse benefit determination.

**8. DENIAL OF CLAIM ON SECOND APPEAL**

If your appealed claim is denied, the Plan will send you written or electronic notification that explains why your appealed claim was denied.

# SECTION VI – DISABILITY BENEFITS

## A. Eligibility

**1. Employee Eligibility**
An active, regular, hourly or salaried U.S. Expatriate who is an employee of the Plan Sponsor. To be eligible, you must be actively at work on the date coverage would become effective. Coverage will begin when you arrive at the final destination of your work assignment.

**2. Dependent Eligibility**
Dependents are not eligible for coverage under this Plan.

## B. Enrollment

**1. Application**
The company pays the full cost of your coverage. You must sign a Foreign Service or Employment Agreement with the Plan Sponsor in order to be eligible for the Plan.

**2. Terms**
Once enrolled as described above, an eligible employee is known as an "enrolled employee". An "Enrollee" is a defined term meaning an enrolled employee. Whenever used in this SPD, "you" or "your" means an Enrollee.

## C. Enrollment Date

You will be considered enrolled in the Plan when you reach your final work destination. Prior to your final enrollment, you must have a signed Foreign Service or Employment Agreement with the Plan Sponsor.

## D. Covered Expenses

(1) If you are an eligible employee and you are permanently and totally disabled and absent from work due to illness or injury caused by an accident, you will receive up to 75% of your pay for up to 104 weeks, if your disability lasts for that time period.

(2) To qualify for benefits under this Plan, your disability must begin within 12 months of the accident which caused the illness or injury.

(3) The Plan's maximum benefit is the equivalent of $825 (U.S.) per week.

(4) For purposes of this Plan, your "pay" is your gross weekly pay, including overtime, commissions, and bonuses, if applicable.

(5) You are considered to be "totally disabled" if you have an illness or injury caused by an accident which permanently or temporarily prevents you from attending to a business or occupation of any kind, or, if you have no regular business or occupation, requires that you be confined to the house and prevents you from attending to any of your usual duties.

(6) Benefits begin 14 days after you stop working due to disability, and continue for the period of your disability, up to the Plan's maximum benefit period of 104 weeks.

(7) No benefits are payable during the 14-day waiting period.

## E. Annual Maximum Benefit

The Plan's maximum benefit is the equivalent of $825 (U.S.) per week.

The Plan's maximum benefit period is 104 weeks.

## F. Exclusions

The Plan will not pay benefits for disability expenses:

- the first 14 days of disablement;

- illness or injury incurred before coverage begins or after coverage ends;

- intentional self-inflicted injury or sickness while sane, or for suicide, attempted suicide, or intentional self-injury;

- for injury sustained because of your own criminal act, or while you are insane;

- for injury or illness caused or contributed to by war (whether declared or undeclared) or any warlike operations, invasion, acts of foreign enemies, hostilities, mutiny, terrorist activities, civil war, rebellion, revolution, insurrection, conspiracy, military or usurped power, riots, strikes, civil commotion, lockouts or labor disturbances, unless you are not actually taking part in these occurrences;

- for injury or illness resulting from participation in naval, military or air forces services or operations, unless such actions are part of your normal duties for the company;

ATTACHMENT A
Amended as of June 1, 2002

- for illness or natural causes or medical or surgical treatment (except where such treatment is rendered necessary by bodily injury caused by accident within the scope of this insurance)

- for injury or illness resulting from riding or driving in a race car;

- for injury or illness resulting from your being in or boarding an aircraft for the purpose of flying in it, except as required by the company;

- for treatment which is in anyway connected to alcohol, substance or drug abuse;

- for any accident or other condition arising out of the use, or any treatment for drugs not prescribed by a licensed physician or drugs used in circumstances other than as prescribed;

- for any accident involving a mechanically propelled vehicle, which is caused or contributed to by the insured person having a Blood/Alcohol reading in excess of the host country's legally permitted level for the driving of a motor vehicle;

- for injury or illness resulting from a pre-existing condition (see section G);

- for illness or bodily injury arising out of natural causes or medical or surgical treatment (except where such treatment is rendered necessary by bodily injury caused by a covered accident).

## G. Pre-Existing Conditions

You have a "Pre-Existing Condition" if you have a physical or mental condition, regardless of the cause, for which medical advice, diagnosis, care, or treatment was recommended or received within the 6 month period ending on your Enrollment Date. For the purposes of this Paragraph only, "Enrollment Date" means the first day you are covered.

If you have a Pre-Existing Condition, it is excluded from coverage until a period of 180 days has elapsed during which the insured person has neither received nor required any treatment for the condition.

## H. Termination of Coverage

Your coverage ends on the earliest of the following dates:

- the date you complete your work assignment in your place of employment or terminate employment with the company; or

- the date of the enrolled employee's death; or

- the date the company ends this coverage or terminates this Plan.

## I. Subrogation / Reimbursement

Acceptance of Plan benefits for Covered Services for an illness or injury for which another party may be obligated to pay constitutes your acceptance of the provisions of this Section.

The Plan is subrogated to all your rights of recovery to the extent of the benefits it pays for Covered Services for an illness or injury for which you are entitled to recover payment from

ATTACHMENT A
Amended as of June 1, 2002

any other person, including without limitation, the person who caused the illness or injury, that person's insurer, or your insurer under uninsured motorist coverage, underinsured motorist coverage, medical payment coverage, personal injury protection coverage, and any other like-kind coverage.

Any payment you recover from any other person on account of illness or injury for which the Plan has paid benefits, regardless of how such payment is designated or described, shall be deemed to be a recovery of Plan benefits paid, and you are obligated to reimburse the Plan from such recovery within 14 calendar days of its receipt. You will be responsible for payment of any expenses, including attorney's fees and court costs, incurred by the Plan to enforce its right to reimbursement against you.

The Plan has the right to bring suit and/or file claims in its own name or your name as necessary to enforce any of its rights of recovery under this section. You are obligated to provide such information and assistance as the Plan may reasonably require for the enforcement of its rights under this section, and to refrain from taking any action which would interfere with or prejudice such rights.

## J. Claiming Benefits

### 1. What You Should Do and What You Should Expect If You Have A Claim

To claim benefits under the Plan, you must first complete the Insurance Company's claim form according to the Insurance Company's requirements. You may request the claim form from the Insurance Company by calling the applicable number provided below or from the Plan Administrator by contacting your benefits coordinator. If the Insurance Company's claim form or instructions for completing it are not available, you must submit to the Insurance Company a written statement of the reasons you are entitled to benefits, and you must include your name, address and contact information, and your employer's name, address and contact information. After you have completed the claim form or written statement, you must submit it to the Insurance Company at the following address:

| 24 Hour Specialty Assistance Services Control Centers | |
|---|---|
| Wickfield House, 18-22 Disney Place London SE1 1HJ | |
| For assistance worldwide, contact: | |
| London, UK | Tel: +44 (0)20 7939 9645 |
| | Fax: +44 (0)20 7407 9206 |
| For assistance in the Americas, contact: | |
| Philadelphia, USA | Tel: +1 215 489 3785 |
| | Fax: +1 215 489 8525 |
| For assistance in the Africa, contact: | |
| Johannesburg, South Africa | Tel: +27 11 452 7272 |
| | Fax: +27 11 452 4473 |

ATTACHMENT A
Amended as of June 1, 2002

| For assistance in the Asia Pacific, contact: | |
|---|---|
| Bangkok, Thailand | Tel: +662 645 3932 |
| | Fax: +662 645 3732 |

For purposes of the Plan's claims procedures, you will be considered to have filed your claim under the Plan when your claim form or written statement is received at this address.

The Plan Administrator has appointed the Insurance Company as a named fiduciary of the Plan for adjudicating claims for benefits under the Plan and for deciding any appeals of denied claims. The Insurance Company shall have the authority, in its discretion, to interpret the terms of the Plan, to decide questions of eligibility for coverage or benefits under the Plan, and to make any related findings of fact. All benefits decisions made by the Insurance Company shall be final and binding to the full extent permitted by law. The Insurance Company has 45 days from the date your claim is filed to determine whether or not benefits are payable to you in accordance with the terms and provisions of the Plan, and, if so, the amount of benefits. If more time is needed to review your claim due to circumstances beyond the Plan's control, the Insurance Company must notify you in writing that the review period has been extended. The extension notice will describe the circumstances requiring the extension, the expected date of a decision, the standards on which entitlement to a benefit is based, the unresolved issues that prevent a decision on your claim, and the additional information needed to resolve those issues. This extension may be for up to 30 days beyond the end of the normal 45-day review period. A second 30-day extension may apply if, for reasons beyond the Plan's control, additional time, beyond the first 30-day extension, is needed to review your claim. In this case, the Insurance Company will notify you in writing that the review period has been further extended. The Insurance Company will provide the same information required in the first notice of extension.

If an extension of the review period is made because you must furnish additional information in order for the Insurance Company to decide your claim, the Insurance Company will specify the additional information that is needed in the extension notice. You will have at least 45 days to return the specified information to the Insurance Company. Until you return that information (or the time to provide the information expires), the review period will be "tolled," further extending the review period beyond the normal 45-day period or the extended 75- or 105-day period. For example, if the Insurance Company advises you on the 20th day after your claim was filed that your claim is incomplete because it lacks a physician's statement regarding your ability to perform various tasks, the number of days from the date of the Insurance Company's request for the physician's statement until you provide the physician's statement will not count as part of the review period. In this example, the day you provided the physician's statement will be treated as the 21st day of the review period.

If needed in order to decide your claim, the Insurance Company may require you to submit to a medical examination, at the Insurance Company's expense. If a medical examination is required, the Insurance Company will notify you of the date and time of the examination and the physician's name and location. This will be treated as a request for additional information, as described above, and the review period will be tolled until the Insurance Company receives the results of the examination. It is important that you keep any appointments made for you by the Company, since rescheduling examinations will delay the claim process.

If your claim is approved, you will receive the appropriate benefit from the Insurance Company.

ATTACHMENT A
Amended as of June 1, 2002

If your claim is denied, in whole or in part, you must receive a written notice from the Insurance Company within the review period (which may have been extended beyond 45 days, as described above). The Insurance Company's written notice of an adverse benefit determination must include the following information:

(1)    The specific reason(s) the claim was denied.
(2)    Specific reference to the Policy provision(s) on which the denial was
       based.
(3)    A description of any additional material or information necessary to perfect your
       claim, and the reason this material or information is necessary.
(4)    If an internal rule, guideline, protocol, or other similar criterion was relied upon in
       making the adverse determination, the written notice will include the specific rule,
       guideline, protocol, or other similar criterion.
(5)    If the adverse benefit determination is based on a medically-related exclusion or
       limit, the written notice will include an explanation of the scientific or clinical
       judgment for the determination and will apply the terms of the Plan to the claimant's
       medical circumstances.
(6)    A statement informing you of your right to appeal the decision, and an explanation
       of the appeal procedure, as outlined below.

**2. Appeal Procedure for Denied Claims**
Whenever a claim is denied in whole or in part, you have the right to appeal the decision. You (or your duly authorized representative) must make a written request to appeal the Insurance Company's decision within 180 days from the date you receive the denial. If you do not make this request within that time, you will have waived your right to appeal. This request for review should be directed to the Insurance Company at the address given above for claims submissions. When requesting a review, you should state the reasons you believe the claim denial was improper, and you should submit any additional information, material, or comments which you consider appropriate. You may also review and, upon request, obtain copies of any documents that have a bearing on the claim, including the documents which establish and control the Plan.

Once your request has been received by the Insurance Company, a full and fair review of your claim must take place. This review will give no deference to the original claim decision and will not be made by the person who made the initial claim decision, nor a subordinate of that person. Any medical or vocational experts consulted by the Insurance Company in making the adverse benefit determination will be identified. If the adverse benefit determination was based in whole or in part on a medical judgment, the Insurance Company, in deciding your appeal of that determination, will consult with a health care professional who has appropriate training and experience in the field of medicine involved in the medical judgment. In no case will such health care professional be an individual who was consulted in connection with the prior adverse benefit determination, nor the subordinate of such and individual. You may also submit issues and comments that you feel might affect the outcome of the review. In conducting the review, the Insurance Company will take into account all comments, documents, and dher information that you submit, whether or not it was submitted at the time of the initial determination.

The Insurance Company has 45 days from the date it receives your request to review the adverse benefits determination for your claim and notify you of its decision. Under special circumstances, the Insurance Company may require more time to review your claim. If this should happen, the Insurance Company must notify you, in writing, that its appeal review period has been extended for an additional 45 days, noting the special circumstances requiring the extension and the date by which a decision on the appeal is expected.

If an extension of the appeal review period is made because you must furnish additional information in order for the Insurance Company to decide your appeal, the Insurance

ATTACHMENT A
Amended as of June 1, 2002

Company will specify the additional information that is needed in the extension notice. You will have at least 45 days to return the specified information to the Insurance Company. Until you return that information (or the time to provide the information expires), the review period will be "tolled," further extending the review period beyond the normal 45-day period.

Once its review is complete, the Insurance Company must notify you, in writing, of the results of the review and must include in its notice the following information:

(1)    The specific reason(s) the appeal was denied.

(2)    Specific reference to the Policy provision(s) on which the denial was based.

(3)    A statement that you are entitled to receive, upon request and free of charge, all documents, records, and copies of all documents, records, and other information relevant to your claim for benefits under the Plan.

(4)    If an internal rule, guideline, protocol, or other similar criterion was relied upon in deciding the appeal, the written notice will include the specific rule, guideline, protocol, or other similar criterion.

(5)    If the adverse benefit determination is based on a medically-related exclusion or limit, the written notice will include an explanation of the scientific or clinical judgment for the determination and will apply the terms of the Plan to the claimant's medical circumstances.

(6)    The written notice will include a statement regarding a participant's right to file suit in federal or state court to recover benefits due to the participant under the terms of the Plan pursuant to ERISA Section 501(a). The written notice will also include the following statement: "You and the Plan may have other voluntary alternative dispute resolution options such as mediation. One way to find out what may be available is to contact your local U.S. Department of Labor Office and your State insurance regulatory agency."

*You may have an authorized representative, such as a guardian or an individual having a valid power of attorney from you, act on your behalf in pursuing a claim for benefits under this Plan. The Plan will take reasonable steps to determine whether an individual claiming to be acting on your behalf is, in fact, validly empowered to do so under the circumstances. Throughout this description of the Plan's claims and appeals procedures, the word "you" is used to refer to you/or any representative acting on your behalf in claiming benefits under the Plan.

# SECTION VII - ACCIDENTAL DEATH AND DISMEMBERMENT BENEFITS

## A. Eligibility

### 1. Employee Eligibility
An active, regular, hourly or salaried U.S. Expatriate who is an employee of the Plan Sponsor. To be eligible, you must be actively at work on the date coverage would become effective. Coverage will begin when you arrive at the final destination of your work assignment.

### 2. Dependent Eligibility
Dependents are not eligible for coverage under this Plan.

## B. Enrollment

### 1. Application
• The company pays the full cost of your coverage.

ATTACHMENT A
Amended as of June 1, 2002

- You are automatically the beneficiary for any dismemberment benefits payable under this Plan.

- When you sign your Foreign Service or Employment Agreement, you will be asked to designate a beneficiary who would be eligible to receive benefits if you should die while covered under this Plan.

- You can name anyone you wish as your beneficiary.

- Since there is the possibility that your named "primary" beneficiary may not survive you, you may also designate a contingent ("secondary") beneficiary.

- In order to change your designated beneficiary(ies), you must complete the appropriate form and submit it to your Human Resource Representative.

**2. Terms**

Once enrolled as described above, an eligible employee is known as an "enrolled employee". An "Enrollee" is a defined term meaning an enrolled employee. Whenever used in this SPD, "you" or "your" means an Enrollee.

## C. Enrollment Date

You will be considered enrolled in the Plan when you reach your final work destination. Prior to your final enrollment, you must have a signed Foreign Service or Employment Agreement with the Plan Sponsor.

## D. Covered Expenses

(1) If you should die, become dismembered, or become permanently and totally disabled as the result of a covered accident or illness, this Plan can provide a benefit for you or your beneficiary to a maximum of $160,000 (U.S.).

(2) To qualify for benefits under this Plan, your death, dismemberment, or total disability must occur no later than twelve (12) months after the accident or incident that caused the death, dismemberment, or total disability.

(3) You will not receive more than $160,000 (U.S.) from this Plan for losses sustained in any single accident.

(4) Any benefits payable under this Plan are offset by any benefits which you may already have received due to the same accident from the Disability Benefits Plan sponsored by this Plan Sponsor.

(5) For the purposes of this Plan, "loss" of a hand or foot means loss by physical separation of a hand at or above the wrist or a foot at or above the ankle.

(6) For purposes of this Plan, "loss" of sight means loss of sight which is certified as being entire and irrevocable by a licensed doctor specializing in ophthalmology.

(7) You will be considered to be "permanently and totally disabled" if you meet the following conditions:

- you have an illness or injury which prevents you from attending to a business or occupation of any kind; AND

ATTACHMENT A
Amended as of June 1, 2002

- your disability lasts for at least twelve (12) months; AND

- your disability appears to be beyond hope of improvement.

## E. Annual Maximum Benefit

In the event of your death, the Plan's maximum benefit is $160,000 (U.S.).

In the event of a qualifying occurrence of dismemberment, the Plan's maximum benefit is $160,000 (U.S.).

- $160,000 (U.S.) for the loss of your life; or

- $160,000 (U.S.) for the loss of two hands or two feet, or the sight in both eyes; or

- $160,000 (U.S.) for the loss of any combination of more than one eye, hand, or foot; or

- $160,000 (U.S.) for permanent and total disablement other than by loss of limbs or sight.

In the event of total and permanent disability, the Plan's maximum benefit is $160,000 (U.S.).

You will not receive more than $160,000 (U.S.) in any case from this Plan for losses sustained in any single accident.

## F. Exclusions

The Plan will not pay benefits for the following expenses:

- dismemberment, disability, or death incurred before coverage begins or after coverage is terminated;

- intentional self-inflicted injury or sickness while sane, or for suicide, attempted suicide, or intentional self-injury;

- injury sustained because of your own criminal act, or while you are insane;

- injury or illness caused or contributed to by war (whether declared or undeclared) or any warlike operations, invasion, acts of foreign enemies, hostilities, mutiny, terrorist activities, civil war, rebellion, revolution, insurrection, conspiracy, military or usurped power, riots, strikes, civil commotion, lockouts or labor disturbances, unless you are not actually taking part in these occurrences;

- injury or illness resulting from participation in naval, military or air forces services or operations, unless such actions are part of your normal duties for the company;

- injury or illness resulting from riding or driving in a race car;

ATTACHMENT A
Amended as of June 1, 2002

- injury or illness resulting from your being in or boarding an aircraft for the purpose of flying in it, except as required by the company;

- for treatment which is in anyway connected to alcohol, substance or drug abuse;

- Any accident or other condition arising out of the use, or any treatment for drugs not prescribed by a licensed physician or drugs used in circumstances other than as prescribed;

- for any accident involving a mechanically propelled vehicle, which is caused or contributed to by the insured person having a Blood/Alcohol reading in excess of the host country's legally permitted level for the driving of a motor vehicle;

- injury or illness resulting from a pre-existing condition (see section G);

- illness or bodily injury arising out of natural causes or medical or surgical treatment (except where such treatment is rendered necessary by bodily injury caused by a covered accident).

## G. Pre-Existing Conditions

You have a "Pre-Existing Condition" if you have a physical or mental condition, regardless of the cause, for which medical advice, diagnosis, care, or treatment was recommended or received within the 6 month period ending on your Enrollment Date. For the purposes of this Paragraph only, "Enrollment Date" means the first day you are covered.

If you have a Pre-Existing Condition, it is excluded from coverage until a period of 180 days has elapsed during which the insured person has neither received nor required any treatment for the condition.

## H. Termination of Coverage

Your coverage ends on the earliest of the following dates:

- the date you complete your work assignment in your place of employment or terminate employment with the company; or

- the date of the enrolled employee's death; or

- the date the company ends this coverage or terminates this Plan

## I. Claiming Benefits

### 1. Filing Instructions

When you or your beneficiary are eligible to receive benefits which are covered by this Plan, you must request an application from your Human Resources office. For a dismemberment or disability claim, you must also submit a physician's certificate verifying your dismemberment or disability. For a death claim, your beneficiary must submit a death certificate and a copy of the beneficiary designation. All of the proper forms should be submitted to Specialty Assistance Services, the third party administrator.

ATTACHMENT A
Amended as of June 1, 2002

**2. Where to Send Your Claim**

You or someone on your behalf must send written notice of claim. The claim must be submitted with an approved application and a physician's notice for dismemberment or disability or a death certificate for a death claim verifying the information to the following:

---

**24 Hour Specialty Assistance Services Control Centers**

Wickfield House, 18-22 Disney Place
London SE1 1HJ

For assistance worldwide, contact:

| | |
|---|---|
| London, UK | Tel: +44 (0)20 7939 9645 |
| | Fax: +44 (0)20 7407 9206 |

For assistance in the Americas, contact:

| | |
|---|---|
| Philadelphia, USA | Tel: +1 215 489 3785 |
| | Fax: +1 215 489 8525 |

For assistance in the Africa, contact:

| | |
|---|---|
| Johannesburg, South Africa | Tel: +27 11 452 7272 |
| | Fax: +27 11 452 4473 |

For assistance in the Asia Pacific, contact:

| | |
|---|---|
| Bangkok, Thailand | Tel: +662 645 3932 |
| Fax: +662 645 3732 | |

---

**3. What is Needed with Your Claim**

The following important information should be submitted with each claim:

- your name;

- your social security number;

- the name and address of your doctor, surgeon, or other health care provider;

- the date of illness or injury;

- a statement or from the health care provider which lists all services performed, along with a verification of disability;

- for a death claim, beneficiary designation must also be submitted.

- for a death claim, a certified death certificate must also be submitted.

**4. Right to Request Additional Information**

The insurance carrier has the right to request that you have an examination by a qualified medical professional, at the company's expense, before paying any benefits from this Plan.

When reasonably necessary and allowed by law, the Company reserves the right to have an autopsy performed prior to paying a death benefit to your beneficiary.

ATTACHMENT A
Amended as of June 1, 2002

**5. If Your Claim Is Denied**

If your claim for benefits is fully or partially denied, you or your beneficiary will be informed in writing within 90 days. The denial will explain the exact reasons that the claim is not acceptable, including the relevant provisions of the Plan documents, and it will tell you if any additional information is needed to obtain approval for your claim. The notice also will explain the procedure you or your beneficiary must follow to initiate a review of your claim. If you or your beneficiary do not receive a response to your claim within this time limit, your claim will be deemed to be denied.

**6. Your Right to Appeal**

You or your beneficiary will have 60 days from the date of the claim denial in which to submit a written appeal for review. Appeals should be submitted to your Human Resources office.

In most cases, the insurance carrier will make a final decision regarding the appeal within 60 days after the information is received. The final decision generally will be furnished in writing, and will include the reasons for the decision with references to Plan document provisions on which the final decision was based. If you or your beneficiary do not receive a response to your appeal within this time limit, your appeal will be deemed to be denied.

ATTACHMENT A
Amended as of June 1, 2002

**EXHIBIT 3**



### FOREIGN SERVICE EMPLOYMENT AGREEMENT
**DynCorp International FZ-LLC**
A CSC COMPANY

B01164

THIS CONTRACT is between DynCorp International FZ-LLC ("Employer") and Joesph Dickinson ("Employee"). Employer and Employee agree as follows:

### 1.    Position

The Employee accepts the position of **Security Supervisor**. The Employee will also be responsible for performing additional duties as directed by the Employee's supervisor. The Employee represents that he or she has the necessary qualifications for performing the duties required by this position.

### 2.    Salary/Allowances

The Employee will receive **$3,999.69** after each full four (4) week period worked. For computing purposes, the annualized salary for this position is **$51,996.00**

Salary payment will be made every four (4) weeks, calculated in U.S. Dollars. Payment to Employee shall be made in a method determined by Employer. Employer may choose either of the following methods of payment: (1) direct deposit to a bank account selected by Employee and approved by Employer; or (2) direct deposit to an account in Employee's name selected by Employer. If direct deposit is made to a bank account selected by Employer, Employee shall be responsible for all fees associated with such account, except fees associated with establishment of the account, and fees associated with depositing funds into the account by Employer. The Employee will be paid a pro-rated amount for any period worked that is less than a full four (4) week period. No salary will be paid for periods not worked, except pursuant to Paragraph 11, Paid Leave. The Employee will receive Hazardous Duty Pay in accordance with the Department of State Standardized Regulations, currently 25% of the base salary earned, or as determined by the Department of State; and Post Differential Pay (Hardship) allowance in accordance with the Department of State Standardized Regulations, currently 25% of the base salary earned, or as determined by the Department of State. Upon successful completion of one (1) year of employment on this Contract, the Employee will be entitled to receive a Completion Bonus equal to 10% of the base salary earned under this paragraph. In the event Employee is terminated pursuant to Paragraph 17.A., Termination for Cause or 17.B., Voluntary Termination by Employee, Employee will not be entitled to any portion (part or full) of this completion bonus.

Employer will provide food, housing and transportation in accordance with Contract requirements while in the area of operations.

### 3.    Geographic Location of Employment

The geographic location of employment shall be Kabul, or such other location as directed by Employer, or its designee. The term "Host Country" as used in this Contract shall mean Afghanistan, or such other country where the geographic place of performance is located.

### 4.    Term of Contract

This Contract is for the period of one (1) year, unless terminated earlier by either party pursuant to Paragraph 17, Termination. The Contract terms and duration shall commence upon the Employee's arrival in Host Country, and end as of the termination date of this Contract.

### 5.    Tax Obligations

The Employee bears sole responsibility for payment of all taxes, fees, and payments of any nature whatsoever due to governmental entities of any country due by reason of Employee's acceptance of compensation under this Contract. The Employee agrees to make all of the payments described above, and Employee agrees that Employer bears no responsibility for making any withholding from compensation amounts. Employer, at its sole discretion, may make withholdings from Employee's compensation with respect to work performed by Employee in Host Country, in accordance with Paragraph 22, Contracting Parties.

Initials



EXHIBIT
3

### 6.   Travel

Employer agrees to provide air transportation from point of hire to Host Country and return air transportation from Host Country to point of hire at the completion of this Contract, unless this Contract is terminated pursuant to Paragraph 17.A. or 17.B. This travel is authorized only for the Employee. If Employee is found not to be capable of performing the required tasks or requests curtailment of his or her one (1) year assignment for any reason, Employee shall be returned to point of hire and reimburse Employer in accordance with Paragraph 17.D., Transportation Expenses. Employer and its affiliates shall not be liable for any injury or death to Employee as a result of air transportation provided to Employee under this paragraph, except as addressed under the DynCorp and Its Subsidiaries and Affiliated Companies Summary Plan Description (Attachment A).

### 7.   Legal Status

The Employee will be performing duties in connection with work Employer is to perform for its Customer in support of the U.S. Department of State operations in Afghanistan. The Employee will receive all working directions from the Employee's supervisor.

### 8.   Work Schedule

This is a salaried position. The standard work schedule shall be twelve (12) hours per day, seven (7) days a week, and on-call when not on scheduled duty. The scheduling of work hours may be more or less than 84 hours per week, at the sole discretion of Employer

### 9.   Working Conditions

The Employee shall be provided in-country housing, transportation, logistics support and a subsistence allowance while in Host Country.

### 10.   Liability

The Employee understands and accepts the fact that he or she may be exposed to dangers due to the nature of the mission. The Employee agrees that neither Employer nor its affiliates will be liable in the event of death, injury, or disability to Employee, except as stated below. Employer will obtain the insurance described in Attachment A on behalf of the Employee. The Employee agrees to accept these insurance benefits as full satisfaction of any claim for death, injury or disability against Employer and its affiliates.

### 11.   Paid Leave

The Employee shall accrue 1.5 days of paid leave per month worked during the term of this Contract; however, this is subject to change at the discretion of the Employer. The Employee shall also be entitled to paid holidays authorized by Employer. Any paid leave, as specified in this paragraph, must be used during the term of this Contract.

### 12.   Benefits

During the term of this Contract, Employer will obtain the insurance described in Attachment A on behalf of the Employee. Should the Employee suffer any medical condition which requires treatment, payment of such treatment will be provided for a period of time, up to the stated policy limits, consistent with the policy terms and conditions outlined in Attachment A. Employee will not be entitled to salary for any time not worked by reason of illness, injury, disability, or any other medical reason with exception of Paragraph 11, above, and the terms and conditions of the coverage provided in Attachment A. If Employee is not capable of returning to work for medical reasons, Employer can terminate without cause pursuant to Paragraph 17.C., Termination Without Cause. Under these circumstances, Employee's sole compensation for loss of work shall be any benefits described in Attachment A, and return transportation to the point of hire pursuant to Paragraph 6.

### 13.   Conduct of Employee

The Employee must comply with all laws and regulations of Host Country including, but not limited to, laws related to currency, black market, and drug use and alcohol abuse. The Employee must comply with applicable laws and regulations of the Dubai Internet City, and applicable laws and regulations of any country where Employee is a citizen or

~ sident. The Employee must per..... .....ctively in the implementation of this Contract. ~he Employee must respect local customs and conform to a high standard of moral and ethical conduct. Personal attire and hygiene must be in accordance with local Employer policies. The Employee must abide by Employer security, health and safety regulations, directives, and Employer Standard Operating Procedures and Letter of Agreement (Attachment B). Failure of Employee to abide by any provision of this paragraph, as solely determined by Employer, is grounds for termination for cause pursuant to Paragraph 17. A.vi.

### 14.  Physical Examination

The Employee represents that he or she is in good health and is physically capable of performing his or her obligations under this Contract. The Employee agrees that this Contract is contingent upon obtaining satisfactory drug screen results, and upon Employee remaining in good physical and mental health, as necessary, to fully perform his or her obligations under this Contract.

### 15.  Proprietary and Confidential Information

All reports, technical documents, maps, plans, recommendations and estimates are considered to be confidential information which shall not be disclosed except to authorized personnel of Employer and its customer. All financial and technical information of Employer and its affiliates shall be considered proprietary and shall not be disclosed by Employee. The Employee shall not use any confidential or proprietary information to private advantage. This paragraph survives the termination of this Contract.

### 16.  Safeguarding of Information

The Employee shall exercise the utmost discretion in regard to all matters relating to their duties and functions. The Employee shall not communicate to any person any information known by reason of performance of services under this Contract, that has not been made public, except in the necessary performance of duties. All documents and records (including photographs) generated during the performance of work under this Contract shall be for the sole use of Employer and its customer. Furthermore, no article, book, pamphlet, recording, broadcast, speech, television appearance, film, or photograph concerning any aspect of work performed under this Contract shall be published or disseminated through any media without the prior written authorization of Employer. These obligations do not cease upon the expiration or termination of this Contract.

### 17.  Termination

#### A.  Termination for Cause

Employer may, during the term of this Contract, discharge the undersigned for cause for any of the following reasons. The undersigned hereby agrees that in the event he or she is so discharged for cause, remuneration shall cease as of the date and hour of such discharge. Additionally, the undersigned shall be responsible for payment of the unearned balance of transportation, allowances, and other costs as described in Paragraph 6.

     i)    Failure to complete a 90-day probationary period;

     ii)    Failure to meet the requirements of Paragraph 14;

     iii)    The Customer requests removal of Employee;

     iv)    Failure to perform duties in a satisfactory manner as accepted in the trade, or those duties as are specified by Employer or the customer;

     v)    Violation of any law, regulation, procedures or directives of Employer, the Department of State, or any country where Employee is a citizen or resident;

     vi)    Violation of any term of this Contract;

     vii)    Insubordination;

     viii)    Violation of any health, safety or security regulation, directive or procedure, or conduct which endangers the safety or well being of others;

ix)   Abuse of any facility privilege extended to Employee;

x)   Failure to abide by any Employer, Department of State, Dubai Internet City, or Host Country law, regulation or directive relating to drug use or alcohol abuse, importation, or supply to others;

xi)   Unexcused absence from work;

xii)   Failure to submit to, or unsatisfactory results of random drug screen. Drug screen may be administered at the discretion of Employer;

xiii)   Failure to meet job qualification requirements in the prime Contract.

B.   **Voluntary Termination by Employee**

The Employee may voluntarily terminate this Contract at any time by providing a 15-day notice to Employer. Transportation costs will be the responsibility of the Employee as outlined in Paragraph 17.D. Employee voluntary termination will result in forfeiture of contract completion bonus.

C.   **Termination Without Cause**

Employer can, at its sole discretion, terminate this Contract at any time. In the event of such termination, the undersigned shall be entitled to pro-rated end of contract bonus and return transportation. Employer shall be responsible for return transportation costs as provided in Paragraph 17.D.

D.   **Transportation Expenses**

The Employee shall be responsible for transportation costs (original flight from home of record and the round trip associated with the Host Country) if this Contract is terminated pursuant to Paragraph 17.A. or 17.B. The Employee authorizes Employer to withhold transportation costs from any payment which remains due to Employee in the event of a termination under either Paragraph 17.A. or 17.B. Employer shall be responsible for return transportation costs from Host Country to point of hire if this Contract is terminated pursuant to Paragraph 17.C.

E.   **Limitation of Liability**

If for any reason a termination under Paragraph 17.A. is later adjudged to have been without valid cause, the termination will be deemed a Termination Without Cause pursuant to Paragraph 17.C. Under these circumstances, the liability of Employer and its affiliates shall be limited to payments specified in Paragraph 17.C.

**18.   Customer Intervention**

It is understood by the undersigned that this Contract is conditioned upon continuation of work by Employer in the Host Country under the U.S. Department of State operations in Afghanistan. If at any time subsequent to the execution of this Contract, Employer discontinues work in the Host Country, this Contract is subject to termination under Paragraph 17.C.

**19.   Governing Law**

This Contract shall be governed by and interpreted under the laws of the Dubai Internet City in the Dubai Technology, Electronic Commerce and Media City Free Zone.

**20.   Formation of Contract**

A binding Contract will be formed only after both Employee and an authorized Employer Representative sign this Contract. It may be signed in one or more counterparts, which shall together constitute the Contract. Employee represents and acknowledges that, in agreeing to the terms of this Contract and that in executing this Contract, Employee does not rely and has not relied upon any representation or statement made by the Company or by any of the Company's agents or representatives other than the terms specifically stated in this written Contract, and that this Contract sets forth the entire agreement between the parties hereto and fully supersedes any and all prior agreements or understandings, written or oral,

between the parties hereto pertain ⬤ to the subject matter hereof. This Contract is intended ⬤ be the final expression of the agreement between the parties as well as the complete and exclusive statement of the terms of the agreement between the parties.

**21.  Emergency**

In the event of an emergency, Employee requests that notice be provided to:

Name _Kimberly Dickinson_                    Relation _Spouse_

Address _203 Dillwyn Drive_                   Phone No _757)410-8400 / 757)714-9737_

_Chesapeake VA 23322_

**22.  Contracting Parties**

The Employee is a citizen of _USA_ ("home country").  Employer is a Dubai Internet City Free Zone Limited Liability Company.  Employee recognizes that this Contract is between Employee and a Dubai Internet City Free Zone Limited Liability Company.  Employee acknowledges that Employer shall not make withholdings for social insurance or taxes with respect to Employee's home country.  Where Host Country laws require Employer to make withholdings for taxes or social insurance, Employee agrees that Employer may make such withholding for the Host Country only.  EMPLOYEE SHALL NOT RECEIVE SOCIAL SECURITY, SOCIAL INSURANCE, UNEMPLOYMENT BENEFITS OR SEVERANCE BENEFITS UNDER THE LAWS OF EMPLOYEE'S HOME COUNTRY AS A RESULT OF EMPLOYMENT UNDER THIS CONTRACT.  THE ONLY BENEFITS WHICH EMPLOYER IS OBLIGATED TO PAY EMPLOYEE ARE THOSE BENEFITS LISTED IN THIS CONTRACT AND ON ATTACHMENT A HERETO.

_(signature)_                                  _11 December 2003_
Employee Signature                             Date

FSA Start Date       _11-12-03_               _12/11/03_

FSA Completion Date   _10-12-04_              _3/14/04_

_(signature)_                                  _12-14-04_
Authorized Employer Representative             Date

_(signature)_  _Manager_
Title

## MODIFICATION 2
## To Foreign Service Agreement

The purpose of this document is to modify the Foreign Service Agreement between DynCorp International FZ - LLC and **Dickinson, Joe** ("Employee") **effective 07 February 2004**.

All terms and conditions from your previous Foreign Service Agreement remain the same with the exception of the following:

1. Change Paragraph 2 **Salary**:

"The Employee will receive **$3,999.69** after each full four (4) week period worked. For computing purposes, the annualized salary for this position is **$51,996.00.** "

**Change sub paragraph two as follows**:
The Employee will receive **$5,615.38** after each full four (4) week period worked. For computing purposes, the annualized salary for this position is **$73,000.00.**

2. Change paragraph 21 **Formation of Contract**:

Original FSA Start Date :          11 December 2003

Effective date of this Modification:     07 February 2004

FSA Completion Date          10 December 2004

I hereby accept the above changes to the Foreign Service Agreement.

_____          01 March 2004
Employee Signature                Date

_____          01 March 04
Authorized DynCorp International FZ LLC          Date
Representative

SCANNED
31 AUG 2004

1

Initial_____

# MODIFICATION 3
## To Foreign Service Agreement

The purpose of this document is to modify the Foreign Service Agreement between DynCorp International FZ - LLC and **Joe Dickinson** "Employee") **effective 9 July 2004**.

All terms and conditions from your previous Foreign Service Agreement remain the same with the exception of the following:

**1. Change Paragraph 1 Position:**

**Delete from Paragraph 1:**
The Employee accepts the position of "**Security Lead**"

**Insert in Paragraph 1:**
The Employee accepts the position of "**Security Manager**"

**2. Change Paragraph 2 Salary/Allowances:**

**Delete from Pararagraph 2:**
The employee will receive **$5,615.38** after each full four week (4) period worked. For computing purposes the annualized salary for this position is **$73,000**.

**Insert in paragraph 2:**
The employee will receive **$6769.23** after each full four week (4) period worked. For computing purposes the annualized salary for this position is **$88,000**.

Effective date of this Modification: **9 July 2004**

I hereby accept the above changes to the Foreign Service Agreement.

_____          _17 Aug 2004_
Employee Signature                                Date

_____          _17 AUG 2004_
Herb Lloyd                                             Date
Vice President of DynCorp Operations
DynCorp International-FZ
Kabul, Afghanistan

1                                        Initial_____

# INTERNATIONAL EMPLOYEE BENEFITS PROGRAM

# FOR

# U.S. EXPATRIATES
## of
# DYNCORP AND ITS SUBSIDIARIES AND AFFILIATED COMPANIES

## SUMMARY PLAN DESCRIPTION
### *Attachment A*

## TABLE OF CONTENTS

Section I – Introduction................................................................    4

Section II - Summary Plan Description.........................................    4

Section III - Statement of ERISA................................................    5

Section IV - Discretionary Authority............................................    6

Section V - Medical Benefits......................................................    6
A. Eligibility.............................................................................    6
   1. Employee Eligibility........................................................    6
   2. Dependent Eligibility.......................................................    6
B. Enrollment .........................................................................    6
   1. Application....................................................................    6
   2. Terms.........................................................................    6
C. Enrollment Date..................................................................    6
D. Covered Expenses..............................................................    6
E. Annual Maximum Benefit......................................................    8
F. Maternity Coverage.............................................................    8
G. Special Rights Following Mastectomy.....................................    8
H. COBRA Continuation Rights.................................................    9
   1. Very Important Notice....................................................    9
   2. Qualifying Events for Continuation of Coverage....................    9
   3. Electing COBRA Continuation Coverage............................    9
   4. Required Notice to the Company......................................    9
   5. Duration of COBRA Continuation Coverage........................    10
   6. Early Termination of COBRA Continuation Coverage.............    10
   7. Cost of COBRA Continuation Coverage.............................    10
   8. Contact Information.......................................................    10
I. Exclusions..........................................................................    11
J. Pre-Existing Conditions........................................................    12
K. Termination of Coverage......................................................    13
L. Conversion.........................................................................    13
M. Coordination of Benefits......................................................    13
N. Medicare and Your Coverage................................................    15
O. Subrogation / Reimbursement...............................................    15
P. Claiming Benefits & Appeal Process.......................................    15
   1. When You have a Complaint...........................................    16
   2. When You file a Claim...................................................    17
   3. Initial Claim Decision....................................................    18
   4. If Your Claim is Denied.................................................    20
   5. Appealing Your Initial Claim Decision...............................    20
   6. If Your Appealed Claim is Denied....................................    21
   7. Final Appeal...............................................................    21

ATTACHMENT A
Amended as of June 1, 2002

8. Denial of Claim on Second Appeal……………………………………… 22

Section VI - Disability Benefits…………………………………………… 22
A. Eligibility…………………………………………………………………… 22
    1. Employee Eligibility………………………………………………… 22
    2. Dependent Eligibility………………………………………………… 22
B. Enrollment………………………………………………………………… 22
    1. Application…………………………………………………………… 22
    2. Terms………………………………………………………………… 22
C. Enrollment Date…………………………………………………………… 22
D. Covered Expenses………………………………………………………… 23
E. Annual Maximum Benefit………………………………………………… 23
F. Exclusions………………………………………………………………… 23
G. Pre-Existing Conditions………………………………………………… 24
H. Termination of Coverage………………………………………………… 24
I. Subrogation / Reimbursement…………………………………………… 24
J. Claiming Benefits & Appeal Process…………………………………… 25
    1. What You Should Do
    and What Your Should Expect If You Have a Claim………………… 25
    2. Appeal Procedure for Denied Claim ……………………………… 27

Section VII - Accidental Death and Dismemberment Benefits………… 28
A. Eligibility…………………………………………………………………… 28
    1. Employee Eligibility………………………………………………… 28
    2. Dependent Eligibility………………………………………………… 28
B. Enrollment………………………………………………………………… 28
    1. Application…………………………………………………………… 28
    2. Terms………………………………………………………………… 29
C. Enrollment Date…………………………………………………………… 29
D. Covered Expenses………………………………………………………… 29
E. Annual Maximum Benefit………………………………………………… 30
F. Exclusions………………………………………………………………… 30
G. Pre-Existing Conditions………………………………………………… 31
H. Termination of Coverage………………………………………………… 31
I. Claiming Benefits & Appeal Process…………………………………… 31
    1. Filing Instructions…………………………………………………… 31
    2. Where to Send Your Claim………………………………………… 32
    3. What is Needed with Your Claim…………………………………… 32
    4. Right to Request Additional Information ………………………… 32
    5. If your Claim is Denied……………………………………………… 33
    6. Your Right to Appeal………………………………………………… 33

ATTACHMENT A
Amended as of June 1, 2002

# SECTION 1 – INTRODUCTION

In addition to your pay, your benefit Plan (the "Plan") represents an important part of your compensation as a contract employee of DynCorp or a DynCorp subsidiary or affiliated company (the "Plan Sponsor"). The Plan includes:

- a medical Plan to protect you from high medical costs, especially in the event of a catastrophic injury or illness;

- disability insurance to provide continuing income for a specified period of time if you are unable to work due to an accident;

- accident benefits to provide important financial protection for you and for your family in the event of your death, dismemberment, or permanent disability.

This booklet is known as a "Summary Plan Description" ("SPD"), and provides a summary of the key provisions of the Plan. It is a summary of a longer and more detailed Plan document which contains more specific and legal language regarding your benefits. In the event of any ambiguity between this SPD and the Plan document, the Plan document shall control. The Plan Sponsor reserves the right to change, amend, discontinue or terminate the Plan at any time. You may obtain a copy of the complete Plan Document by requesting it from the Plan Administrator. You may be charged for the cost of copying the full document. The Plan Document may also be reviewed during normal business hours at the Personnel Office of the Plan Sponsor or the Plan Administrator.

No actions at law or equity may be taken against the Plan until all appeal rights, as described in this SPD, have been exhausted. In the event that legal papers need to be served regarding this Plan, service may be made on the Plan Sponsor or the Plan Administrator.

General questions regarding benefits and enrollment should be directed to the Plan Sponsor or the Plan Administrator.

# SECTION II – SUMMARY PLAN DESCRIPTION

This SPD is issued to the employees of the Plan Sponsor and replaces all previously issued SPDs.

1.    **PLAN**
      The name of your Plan is Group Personal Accident ("Plan").

2.    **PLAN EFFECTIVE DATE**
      The Effective Date of the Plan is June 1.

3.    **PLAN SPONSOR**
      The Plan Sponsor is DynCorp and its Subsidiaries and Affiliated Companies. The address and telephone number of the Plan Sponsor is:

           DynCorp
           11710 Plaza America Drive
           12th Floor
           Reston, Virginia 20190
           +1 703.264.0330

4.    **PLAN ADMINISTRATOR**
      The Plan Administrator is the DynCorp Risk Management Department. The address and telephone number of the Plan Administrator is the same as the Plan Sponsor.

5. **PLAN YEAR**
June 1 through May 31

6. **EMPLOYER IDENTIFICATION NUMBER**
The Employer Identification Number for your employer is 36-2408747.

7. **PLAN IDENTIFICATION NUMBER**
The Plan Number is 504.

8. **TYPE AND ADMINISTRATION OF PLAN**
The Plan constitutes a welfare benefit Plan for Personal Accident, Medical and Repatriation/Medical Evacuation Expenses Insurance.  The type of administration of the Plan is contract administration.

## SECTION III – STATEMENT OF ERISA RIGHTS

ERISA entitles you as an Enrollee in the Plan to:

A.  Examine, without charge, at the Plan Administrator's office or other specified locations, such as worksites and union halls, all Plan documents, including insurance contracts, collective bargaining agreements and copies of all documents filed by the Plan with the U.S. Department of Labor, such as annual reports.

B.  Obtain copies of all Plan documents and other Plan information upon written request to the Plan Administrator. The Plan Administrator may make a reasonable charge for these copies.

C.  Receive a summary of the Plan's annual financial report.  The Plan Administrator is required by law to furnish each Enrollee with a copy of this summary annual report.

In addition to creating rights for Enrollees, ERISA imposes duties upon the people who are responsible for the operation of your employee benefit Plan.  The people who operate your Plan, called "fiduciaries" of the Plan, have a duty to do so prudently and in the interest of you and other Enrollees.  No one, including your employer, union, or any other person, may fire you or otherwise discriminate against you in any way to prevent you from obtaining a welfare benefit or exercising your rights under ERISA.  If your claim for a welfare benefit is denied, in whole or in part, you must receive a written explanation of the reason for the denial. You have the right to have the Plan review and reconsider your claim.

Under ERISA, there are steps you can take to enforce the above rights.  For instance, if you request materials from the Plan and do not receive them within 30 calendar days, you may file suit in a federal court.  In such a case, the court may require the Plan Administrator to provide the materials and pay up to $110 a day until you receive the materials, unless the materials were not sent because of reasons beyond the control of the Administrator.  If you have a claim for benefits which is denied or ignored, in whole or in part, you may file suit in state or federal court.  If it should happen that Plan fiduciaries misuse the Plan's money or if you are discriminated against for asserting your rights, you may seek assistance from the U.S. Department of Labor, or you may file suit in a federal court.  The court will decide who should pay court costs and legal fees.  If you are successful, the court may order the person you have sued to pay these costs and fees.  If you lose, the court may order you to pay these costs and fees, for example, if it finds your claim is frivolous.  If you have any questions about your Plan, you should contact the Plan Administrator.  If you have any questions about this statement or about your rights under ERISA, you should contact the nearest area office of the Pension and Welfare Benefits Administration, U.S. Department of Labor, listed in your telephone directory or the Division of Technical Assistance and Inquiries, Pension and Welfare Benefits Administration, U.S. Department of Labor, 200 Constitution Avenue N.W., Washington, D.C. 20210.

ATTACHMENT A
Amended as of June 1, 2002

## SECTION IV – DISCRETIONARY AUTHORITY

The Plan Administrator shall perform its duties as the Plan Administrator and in its sole discretion shall determine appropriate courses of action in light of the reason and purpose for which this Plan is established and maintained. In particular, the Plan Administrator shall interpret all Plan provisions, and make all determinations (including factual determinations) as to whether any particular Participant or beneficiary is entitled to receive any benefit under the terms of this Plan, which interpretation shall be made by the Plan that is adopted by the Plan Administrators and for which there is a rational basis shall be final and legally binding on all parties.

Any interpretation of the Plan or other action of the Plan Administrator shall be subject to review only if such interpretation or other action is without rational basis. Any review of a final decision or action of the Plan Administrator shall be based solely on such evidence presented to or considered by the Plan Administrator at the time it made the decision that is the subject of review and shall be entitled to the maximum deference permitted by law.

## SECTION V - MEDICAL BENEFITS

### A. Eligibility

**1. Employee Eligibility**
An active, regular, hourly or salaried U.S. Expatriate who is an employee of the Plan Sponsor. To be eligible, you must be actively at work on the date coverage would become effective. Coverage will begin when you arrive at the final destination of your work assignment.

**2. Dependent Eligibility**
Dependents are not eligible for coverage under this Plan.

### B. Enrollment

**1. Application**
The company pays the full cost of your coverage. You must sign a Foreign Service or Employment Agreement with the Plan Sponsor in order to be eligible for the Plan.

**2. Terms**
Once enrolled as described above, an eligible employee is known as an "enrolled employee". An "Enrollee" is a defined term meaning an enrolled employee. Whenever used in this SPD, "you" or "your" means an Enrollee.

### C. Enrollment Date

You will be considered enrolled in the Plan when you reach your final work destination. Prior to your final enrollment, you must have a signed Foreign Service or Employment Agreement with the Plan Sponsor.

### D. Covered Expenses

(1) The Plan generally pays the full cost of all covered expenses except for any care or treatment described in the "Exclusions" section.

(2) Medical, repatriation, and medical evacuation expenses following accident occurring or illness manifesting itself during the policy period.

(3) Emergency and non-emergency treatment will be provided in your place of employment, unless your illness or injury cannot be treated there. If you require treatment outside of your place of employment, the Plan also will cover medical evacuation to the closest appropriate licensed facility where you can be treated.

(4) For medical expenses only, there is a $100 deductible for every claim.

(5) All benefits from this Plan are subject to an annual policy maximum of $75,000 (U.S.).

(6) This Plan covers medical expenses which are incurred and arise solely and directly from an illness or accidental injury which occurs while you are covered under the Plan.

(7) Specific covered expenses include:

- medical and surgical expenses and related costs for supplies or treatment required in connection with the surgery or other care;

- the cost of covered hospital care, including nursing care;

- care in a nursing home;

- fees for specialists; and

- costs for physiotherapy, massage and manipulative treatment.

(8) If you cannot receive the required medical care in your place of employment, the Plan also covers repatriation expenses, which are necessary and reasonable traveling expenses incurred for your return to your home country, or costs for evacuation to the nearest appropriate medical facilities. Thereafter, coverage will be provided for eligible Medical Expenses incurred in the home country or at the closest appropriate licensed facility for up to a maximum of three (3) months or the maximum annual benefit of $75,000 (U.S.), whichever comes sooner.

(9) For purposes of this Plan, Eligible Medical Expenses refer to medical, surgical, specialist's fees, hospitals, nursing homes, nursing attendance charges, costs of physiotherapy, massages and manipulative treatments, surgical and medical requisites incurred and arising solely and directly from an illness manifesting itself or accidental bodily injury occurring while covered and treatment received within twenty-four months of the date of the accident.

(10) For purposes of this Plan, repatriation or evacuation will be considered necessary if a qualified medical practitioner:

- certifies that you should be repatriated or evacuated because local facilities are not equipped to treat you or because your recovery will be substantially improved in another locale; and/or

- estimates that you will be totally disabled in excess of four weeks.

ATTACHMENT A
Amended as of June 1, 2002

(11) In addition, coverage will be provided for medical expenses incurred outside the host country while on business or personal travel, so long as you are still an enrolled employee.

(12) If you should die as the result of a covered injury or illness while working in your place of employment, the Plan's repatriation benefit also covers transportation of your body or ashes to your home country for necessary and reasonable funeral expenses, subject to the Plan's maximum benefit.

(13) The Plan covers eligible medical expenses in your home country or at the closest appropriate licensed facility which are incurred as a result of an illness or injury which occurred in your work location. The maximum coverage is three (3) months from the date of injury, occurrence or illness manifestation or when the Plan annual maximum benefit of $75,000 is reached, whichever comes sooner.

## E. Annual Maximum Benefit

The Plan provides benefits up to an annual maximum for any enrolled employee of $75,000 (U.S.). In the event the Plan Document includes a different annual maximum, the Plan Document will prevail.

## F. Maternity Coverage

Group health Plans and health insurance issuers generally may not, under federal law, restrict benefits for any hospital length of stay in connection with childbirth for the mother or newborn child to less than 48 hours following a vaginal delivery, or less than 96 hours following a cesarean section. However, federal law does not prohibit the mother's or newborn's attending provider, after consulting with the mother, from discharging the mother or her newborn earlier than 48 hours (or 96 hours, if applicable.) In any case, Plans and issuers may not, under federal law, require that a provider obtain authorization from the Plan or the issuer for prescribing length of stay not in excess of 48 hours (or 96 hours, if applicable).

## G. Special Rights Following Mastectomy

A group health Plan generally must, under federal law, make certain benefits available to participants who have undergone a mastectomy. In particular, a Plan must offer mastectomy patients benefits for:

- Reconstruction of the breast on which the mastectomy has been performed;
- Surgery and reconstruction of the other breast to produce a symmetrical appearance;
- Prostheses; and
- Treatment of physical complications of mastectomy.

This Plan complies with these requirements. Benefits for these items generally are comparable to those provided under the Plan for similar types of medical services and supplies. Of course, the extent to which any of these items is appropriate following mastectomy is a matter to be determined by consultation between the attending physician and the patient. The Plan neither imposes penalties (for example, reducing or limiting reimbursements) nor provides incentives to induce attending providers to provide care inconsistent with these requirements.

ATTACHMENT A
Amended as of June 1, 2002

## H. NOTICE OF EMPLOYEE GROUP HEALTH PLAN CONTINUATION COVERAGE

### 1. *VERY IMPORTANT NOTICE*

A Federal law, commonly known as "COBRA," requires that DynCorp ("Company") offer employees the opportunity to extend Company group health plan ("Plan") coverage (called "continuation coverage") at group rates in certain instances when coverage otherwise would end. This notice explains, in summary fashion, your rights and obligations under the continuation coverage provisions of COBRA. You should read this notice carefully.

### 2. Qualifying Events for Continuation Coverage

(1) Loss of Coverage as an Employee:

If you are covered by the Plan as an employee, you have the right to choose continuation coverage if you lose coverage for any of the following reasons:

   (a)  Your hours of employment with the Company are reduced.

   (b) Your employment with the company is terminated (for reasons other than gross misconduct on your part).

   (c)  If you are a retired employee, because your employer has filed for reorganization under Chapter 11 of the Bankruptcy Code.

(2) Termination of Active Employee Benefit Coverage:

Your coverage under the plan will cancel upon termination of employment with the company or the date three (3) months following the occurrence of an accident or illness, because of which you will not be able to return to work, and you are receiving care in your home country or at the nearest appropriate medical facility when such care is required by the Plan, and will remain cancelled until the COBRA coverage is selected and paid for. The coverage becomes retroactive following a proper election and timely payment of premiums.

### 3. Electing COBRA Continuation Coverage

You do not have to show that you are insurable to choose continuation coverage. You may elect COBRA regardless of whether you are also covered by another group health plan or Medicare *at the time* of the qualifying event.

### 4. Required Notice to the Company

You must notify the Company in writing if you want continuation coverage within 60 days of the later of the date of the Company's notice or the date you would lose coverage because of the events described above. Each covered employee must notify the Plan Administrator of the determination that he or she was disabled (as defined in the Social Security Act) at any time during the first 60 days of continuation coverage. You must give this notice within 60 days after the date of such determination. You also must notify the Plan Administrator within 30 days after the date that it is determined that such person is no longer disabled. Your notice will be considered "sent" on the day it is mailed as evidenced by the postmark that appears on the envelope.

ATTACHMENT A
Amended as of June 1, 2002

### 5. Duration of COBRA Continuation Coverage

If you do not choose continuation coverage, your group health coverage under the Plan will end in accordance with the rule as stated in your Summary Plan Description.

If you choose continuation coverage, your coverage will be identical to the coverage provided under the Plan to similarly situated employees as of the time coverage is being provided. This means that if the coverage for similarly situated employees is modified, your coverage will be modified in the same manner. If you lost coverage because of a termination of employment or reduction in hours of employment the continuation coverage period generally is 18 months. The 18-month coverage period may be extended to 29 months if you are determined to be disabled by the Social Security Administration any time during the first 60 days of continuation coverage, provided you notify the Plan Administrator within 60 days of the date of such determination and within the 18-month period.

Special rules regarding the continuation coverage period apply when the covered employee becomes entitled to Medicare, a retiree loses coverage because of the commencement of a proceeding concerning the Company under Title 11 of the bankruptcy law, or if certain qualifying events occur within 18 or 29 months of a termination or reduction in hours of employment.

### 6. Early Termination of COBRA Continuation Coverage

Your continuation coverage may be cut short for *any* of the following reasons:

(1)    After electing COBRA, you first become covered under any other group health plan (as an employee or otherwise) that does not contain any exclusion or limitation for any preexisting conditions clause that applies to you or a covered dependent (taking into account prior creditable coverage when required by federal law).

(2)    After electing COBRA, you first become entitled to Medicare benefits.

(3)    The premium for your continuation coverage is not paid within 30 days of the due date.

(4)    The Company no longer provides any group health coverage to any employee.

(5)    You are determined to be no longer disabled by the Social Security Administration.

### 7. Cost of COBRA Continuation Coverage

In general, you must pay 102 percent of the Plan premium in order to obtain continuation coverage. In accordance with the applicable Internal Revenue code regulations, the maximum coverage is extended from 18 months to 29 months due to a disability, the required payment is generally 150 percent of the premium for the 19th and all succeeding months. Special rules apply affecting the premium due during the disability extension. Please see the Plan Administrator if you have questions concerning this premium.

### 8. Contact Information

ATTACHMENT A
Amended as of June 1, 2002

If you have any questions about COBRA, please contact:

> Ceridian Benefit Services
>
> 3201 34[th] Street South
>
> St. Petersburg, FL 33711
>
> (800) 877-7994

## I. Exclusions

The Plan will not pay benefits for medical expenses:

- for treatment provided by medical facilities operated by or on behalf of United Nations personnel (for more information, contact the Plan Sponsor);

- incurred after coverage ends;

- for unnecessary care or treatment, or for any care, services, or supplies not prescribed by a doctor and/or treatment not provided by a doctor;

- for general health examinations or check-ups not required to diagnose illness or accidental injury;

- for services and supplies furnished in connection with rest cures, senatorial or custodial care, or periods of quarantine or isolation;

- for dental examinations, X-rays, extractions, fillings, and general dental care, unless required due to a covered accidental injury;

- for supplying or fitting of eyeglasses or hearing aids unless required due to a covered accidental injury;

- for cosmetic surgery, unless such surgery is required due to an accident which occurred while you were covered under this Plan;

- for physiotherapy or chiropractic treatment unless post injury. Any treatment is limited to a maximum of 5 sessions with an appropriately qualified practitioner;

- for expenses incurred in an insured person's country of domicile (other than in respect of repatriation) except for a maximum period of 3 months following an accident or illness manifesting itself while on a tour of duty overseas;

- for injuries or illnesses incurred as the result of participation in winter sports or mountaineering (normally involving ropes/ guides);

- for treatment of an intentional self-inflicted injury or sickness while sane, or for suicide, attempted suicide, or intentional self-injury;

- for any injury sustained because of your own criminal act, or while you are insane;

- for treatment of alcoholism, drug addiction, allergy, nervous or mental disorders, or venereal disease;

- for any condition which is in any way connected to alcohol, substance or drug abuse;

- Any accident or other condition arising out of the use, or any treatment for drugs not prescribed by a licensed physician or drugs used in circumstances other than as prescribed;

- for any accident involving a mechanically propelled vehicle, which is caused or contributed to by the insured person having a Blood/Alcohol reading in excess of the host country's legally permitted level for the driving of a motor vehicle;

- to treat an injury or illness caused or contributed to by war (whether declared or undeclared) or any warlike operations, invasion, acts of foreign enemies, hostilities, mutiny, terrorist activities, civil war, rebellion, revolution, insurrection, conspiracy, military or usurped power, riots, strikes, civil commotion, lockouts or labor disturbances, unless you are not actually taking part in these occurrences;

- to treat an injury or illness resulting from participation in naval, military or air forces services or operations, unless such actions are part of your normal duties for the company;

- to treat an injury or illness resulting from riding or driving in a race car;

- to treat an injury or illness resulting from your being in or boarding an aircraft for the purpose of flying in it, except as required by the company;

- to treat a pre-existing condition until certain requirements are met (see Section J)

- for treatment covered under other types of insurance coverage provided (i.e., Defense Base Act, Foreign Voluntary Workers Compensation).

## J. Pre-Existing Conditions

You have a "Pre-Existing Condition" if you have a physical or mental condition, regardless of the cause, for which medical advice, diagnosis, care, or treatment was recommended or received within the 6 month period ending on your Enrollment Date. Pre-Existing Condition does not include pregnancy. For the purposes of this Paragraph only, "Enrollment Date" means the first day you are covered.

If you have a Pre-Existing Condition, it is excluded from coverage until a period of 180 days has elapsed during which the insured person has neither received nor required any treatment for the condition. The period of exclusion for your Pre-Existing Condition will be reduced by the total time you were covered by prior Creditable Coverage; however, if your coverage otherwise eligible to be counted as prior Creditable Coverage was followed by a Significant Break in Coverage, such coverage will not be counted in determining Creditable Coverage. For the purposes of this Paragraph only, a "Significant Break in Coverage" means a continuous period of 63 calendar days or more without Creditable Coverage.

"Creditable Coverage" means coverage under one or more of the following: an employer or union sponsored health benefit Plan, a health insurer, a health maintenance organization, Medicare, Medicaid, a medical and dental Plan for members (and certain former members) of the uniformed services, a medical program of the Indian Health Service or a tribal

ATTACHMENT A
                                                                 Amended as of June 1, 2002

organization, a state health benefits risk pool, the Federal Employees Health Benefits Program, a public health Plan, or a health Plan through the Peace Corps. Creditable Coverage does not include coverage for accidents only, disability income, liability or supplemental liability insurance, workers' compensation insurance, automobile medical payment insurance, credit-only insurance, on-site medical clinics, limited scope dental insurance, limited scope vision insurance, limited scope long term care insurance, benefits that do not coordinate, Medicare supplemental insurance, CHAMPUS supplemental programs, and other supplemental coverage.

Creditable Coverage may be demonstrated by obtaining a certificate from your prior Plan. If necessary, the Plan Administrator will assist you in obtaining the certificate. If you are unable to obtain the certificate, the Plan Administrator will inform you upon your request of alternative methods of demonstrating Creditable Coverage.

## K. Termination of Coverage

Your medical coverage ends on the earliest of the following dates:

- the date you complete your work assignment in your place of employment or terminate employment with the company; or

- the date after three (3) months following the occurrence of an accident or illness, because of which you will not be able to return to work, and you are receiving care in your home country or at the nearest appropriate medical facility when such care is required and approved by the Plan; or

- the date of the enrolled employee's death; or

- the date the company ends this coverage or terminates this Plan.

## L. Conversion

Conversion coverage is not available under this Plan; however, coverage consistent with COBRA requirements can be purchased upon termination, if desired. The cost will be your financial responsibility, and not that of the Company's.

## M. Coordination of Benefits

Coordination of Benefits is the procedure used to pay health care expenses when you are covered by more than one Plan. The following rules determine which Plan pays first and how much the other Plan must pay. The objective is to make sure the combined payments of all Plans are no more than your actual bills.

When you are covered by another group Plan in addition to this one, the following Coordination of Benefit rules will be followed to determine which Plan is primary and which is secondary. You must submit all bills first to the primary Plan. The primary Plan must pay its full benefits as if you had no other coverage. If the primary Plan denies the claim or does not pay the full bill, you may then submit the balance to the secondary Plan.

Health care is only paid for when you follow these rules and procedures. If these rules conflict with those of another Plan it may be impossible to receive benefits from both Plans, and you will be forced to choose which Plan to use.

(1)     Plans That Do Not Coordinate

Benefits will be paid without regard to benefits paid by the following kinds of coverage:

- Individual (not group) policies or contracts;

- Medicaid;

- Group Hospital indemnity Plans which pay less than $100 per day;

- School accident coverage; and

- Some supplemental sickness and accident policies.

(2)     Plan As Primary Plan

When the Plan is primary, full benefits will be paid as allowed under the Plan as if you had no other coverage.

(3)     Plan As Secondary Plan

- When the Plan is secondary, payments will be based on the balance left after the primary Plan has paid. No more than that balance will be paid. In no event will more be paid than would have been paid if the Plan was primary.

- Only health care expenses that are covered by the Plan will be paid.

- Payments will only be made if you have followed all of the procedural requirements (e.g., pre-authorization).

- No more will be paid than the Allowable Expense for the health care involved. If the Plan's Allowable Expense is lower than the primary Plan's, the primary Plan's Allowable Expense will be applied. That may be less than the actual bill.

(4)     Determining Which Plan Is Primary

To decide which Plan is primary, the Coordination of Benefits provisions of the other Plan must be considered. The primary Plan will be determined by the first of the following which applies:

(a)  Non-coordinating Plan

If you have another Plan which does not coordinate benefits, it will always be primary.

(b)  Employee

The Plan which covers you as an employee (neither laid off nor retired), member, insured, or subscriber, other than a dependent, is always primary.

ATTACHMENT A
Amended as of June 1, 2002

### N. Medicare and Your Coverage

You may have coverage under the Plan and under Medicare. Medicare means the benefits offered under Title XVIII of the Social Security Act, and includes all of the benefits provided by Parts A and B of Medicare. In general, when you have coverage under both the Plan and Medicare, the Plan will pay primary benefits for:

(1)    An active employee who is age 65 or over

(2)    An active employee under age 65 entitled to Medicare because of disability;

(3)    Up to 30 months after your treatment for end stage renal disease begins.

If you do not fall into any of the categories 1 through 3 above, the Plan will pay benefits secondary to Medicare. If you do not elect Part B coverage, the payment to be made by the Plan will be made as if you had elected Part B. When the Plan is secondary, you must first submit the claim to Medicare. After Medicare makes payment, you may submit the claim to the Plan for payment.

These rules are based on regulations issued by the Health Care Financing Administration ("HCFA"), and may be amended or changed at any time. It is the intent of the Plan to abide by the Medicare Secondary Payer Rules. If the Plan in any way conflicts with regulations issued by HCFA, the Plan will pay benefits in accordance with HCFA regulations.

## O. Subrogation / Reimbursement

Acceptance of Plan benefits for Covered Services for an illness or injury for which another party may be obligated to pay constitutes your acceptance of the provisions of this Section.

The Plan is subrogated to all your rights of recovery to the extent of the benefits it pays for Covered Services for an illness or injury for which you are entitled to recover payment from any other person, including without limitation, the person who caused the illness or injury, that person's insurer, or your insurer under uninsured motorist coverage, underinsured motorist coverage, medical payment coverage, personal injury protection coverage, and any other like-kind coverage.

Any payment you recover from any other person on account of illness or injury for which the Plan has paid benefits, regardless of how such payment is designated or described, shall be deemed to be a recovery of Plan benefits paid, and you are obligated to reimburse the Plan from such recovery within 14 calendar days of its receipt. You will be responsible for payment of any expenses, including attorney's fees and court costs, incurred by the Plan to enforce its right to reimbursement against you.

The Plan has the right to bring suit and/or file claims in its own name or your name as necessary to enforce any of its rights of recovery under this section. You are obligated to provide such information and assistance as the Plan may reasonably require for the enforcement of its rights under this section, and to refrain from taking any action which would interfere with or prejudice such rights.

## P. Claiming Benefits and Appeal Process

The insurance carrier has the right to request that you have an examination by a qualified medical professional, at the company's expense, before paying any benefits from this Plan.

ATTACHMENT A
Amended as of June 1, 2002

## 1. WHEN YOU HAVE A COMPLAINT

Only employees may submit claims for benefits, and benefits will only be paid to the employee or the actual provider of services. Therefore, under the following complaint and claims appeal sections, the words "you" and "your" will mean an employee of DynCorp. You have the right to elect group health care benefits as offered under the Group Personal Accident Plan (the "Plan"), and your rights will be determined under the Plan's provisions and in conjunction with the complaint and claims procedures outlined below. Claims will also be considered filed by you if communications and requests for benefits come from an individual that you have designated as your authorized representative to act on your behalf with respect to a claim. In the event that you designate an authorized representative to act on your behalf, the Plan will send all notifications, requests for further information, appeal decisions, and all other communications to your authorized representative.

For the purposes of the complaint and claims appeal sections, any reference to "days" will refer to calendar days, not business days.

We are here to listen and help. Because we want you to be completely satisfied with the member services assistance you receive, we have established a process for addressing your concerns and solving your problems. If you have a concern regarding a person, a service, the quality of care, or you want to inquire about what benefits are covered under the Plan, please contact Specialty Assistance Services at one of the following phone numbers and explain your concern to one of the member services representatives.

| 24 Hour Specialty Assistance Services Control Centers | |
|---|---|
| Wickfield House, 18-22 Disney Place<br>London SE1 1HJ | |
| For assistance worldwide, contact: | |
| London, UK | Tel: +44 (0)20 7939 9645 |
| | Fax: +44 (0)20 7407 9206 |
| For assistance in the Americas, contact: | |
| Philadelphia, USA | Tel: +1 215 489 3785 |
| | Fax: +1 215 489 8525 |
| For assistance in the Africa, contact: | |
| Johannesburg, South Africa | Tel: +27 11 452 7272 |
| | Fax: +27 11 452 4473 |
| For assistance in the Asia Pacific, contact: | |
| Bangkok, Thailand | Tel: +662 645 3932 |
| | Fax: +662 645 3732 |

You may also express that concern in writing. We will do our best to resolve the matter on your initial contact. If we need more time to review or investigate your concern, we will get back to you as soon as possible, but in any case within 30 days. We will not consider any of these communications to be a "claim" for benefits. A formal claim for benefits must meet certain other standards which are described in the section titled "When You File a Claim."

ATTACHMENT A
Amended as of June 1, 2002

**2. WHEN YOU FILE A CLAIM**

When you file a "claim," you have the right to a speedy decision. "Claim" status also gives you the option of appealing any adverse decision regarding your claim. You will have filed a "claim" when you submit one of the Plan's Claim Forms or if you take one of the actions listed below.   In the case of the submission of a Claim Form, a "claim" will be considered filed when it is received by the appropriate person/department listed below.  The Plan also recognizes the following actions and submission of forms as "claims:"

- A request by you for benefits through preauthorization or a utilization review determination in cases where *use of either preauthorization or utilization review is required in order to obtain a particular benefit.*

- Requests by your formally-designated authorized representative for preauthorization or a utilization review determination in cases where *use of either preauthorization or utilization review is required in order to obtain a particular benefit.* The Plan will take reasonable steps to determine whether an individual claiming to be acting on your behalf is, in fact, validly empowered to do so under the circumstances, and the Plan will require that you complete and file a form identifying any person you authorize to act on your behalf with respect to a claim.  However, when inquiries by a health care provider relate to payments due to the provider—rather than due to you—under managed care contracts (where the health care provider has no recourse against you for the amounts) such inquiries by a health care provider will not be considered "claims" by the Plan.

- Requests for benefits (in the case of a claim involving urgent care) by a health care provider with knowledge of your medical condition.  For urgent care claims, you are not required to complete a form and formally designate a health care provider as your representative with respect to a claim.

- Submission of a medical bill for reimbursement or payment under the terms of the Plan.

You may request the Plan's Claim Form from the Plan Administrator by contacting DynCorp's Human Resources Office. After you have completed the Claim Form, you must submit it to the following address:

| **24 Hour Specialty Assistance Services Control Centers** |
| --- |
| Wickfield House, 18-22 Disney Place |
| London SE1 1HJ |

All submitted claims and appeals will fall into one of the three categories described below. The handling of your initial claim or later appeal will be governed, in all respects, by the appropriate category of claim or appeal, and each time your claim or appeal is examined, a new determination will be made regarding the category into which the claim or appeal falls at that particular time.

- An **urgent care** claim is one that involves serious jeopardy of life or health of the patient, or the ability of the patient to regain maximum function or, in the opinion of a

physician with knowledge of the patient's medical condition, would subject the patient to severe pain that cannot be managed without the treatment at issue. Determination of "urgent care" status requires that the judgment of a prudent layperson with average knowledge of health and medicine be applied, except where a physician with knowledge of the patient's medical condition determines that the claim involves urgent care.

- A **non-urgent pre-service** claim is one that, under the terms of the Plan, requires approval of the particular benefit or procedure prior to obtaining medical care.

- A **post-service** claim is a claim that is neither an urgent care claim nor a non-urgent pre-service claim.

## 3. INITIAL CLAIM DECISION

After you submit a claim, the Plan must make a decision on your claim within a prescribed period of time.

> Urgent Care Claims
> For urgent care claims, the Plan Administrator must notify you of the benefit determination (adverse or favorable) as soon as possible, but not later than 72 hours after receipt of the claim by the Plan. The notification will be given orally, and the Plan will send you written or electronic notification within three (3) days after the oral notification.
>
> If your claim is incomplete but is properly filed, an employee of the Plan Administrator will orally notify you as soon as possible (but not later than 24 hours) after the receipt of the claim, of the specific information necessary to complete the claim. You will have at least **48 hours** to provide the specified information necessary to complete your claim submission. The Plan's time limit for making a determination will be suspended from the time that it provides notice to you of the incomplete claim until the date on which you respond to the request for additional information. You will be notified of the Plan's decision as soon as possible, but no later than 48 hours after the earlier of either the time the Plan receives the specified information or the expiration of the time given to you to provide the specified information.
>
> If you fail to follow the Plan's filing procedures because your request for benefits does not: 1) identify the patient; 2) note a specific medical condition or symptom; 3) describe a specific treatment, service, or product for which approval is requested; 4) arrive in the correct department and is not sent to the correct person, YOU WILL NOT HAVE SUBMITTED A CLAIM. An employee of the Plan Administrator will orally notify you, within 24 hours, that you have failed to follow the filing procedures, and you will be reminded of the proper filing procedures.
>
> *Requests for Extension of Treatment--*
> Your request to extend a course of treatment beyond a particular period of time or number of treatments is a claim, and the Plan will decide your claim as soon as possible, taking into account the medical exigencies (the particular circumstances and requirements). The Plan will notify you of its benefit determination (adverse or favorable) within 24 hours after receipt of the claim by the Plan (as long as the claim is submitted to the Plan at least 24 hours prior to the expiration of the prescribed period of time or number of treatments). But, if your request is not made at least 24 hours prior to the expiration of the prescribed period of time or number of treatments, your request will be treated as a claim involving urgent care and will be decided as soon as possible, taking into

ATTACHMENT A
Amended as of June 1, 2002

account the medical exigencies (the particular circumstances and requirements), but not later than 72 hours after received by the Plan. The Plan will orally notify you of its decision, and the Plan will send you written or electronic notification within three (3) days after the oral notification.

<u>Non-Urgent Pre-Service Claims</u>
For non-urgent pre-service claims, the Plan Administrator must notify you (in writing or electronically) of the benefit determination (adverse or favorable) as soon as possible, but not later than 15 days after receipt of the claim by the Plan. One 15-day extension of this time period is possible under certain circumstances.

If your claim is incomplete but is properly filed, your attempted claim will be denied by the Plan. You will be notified in writing or electronically of the adverse benefit determination within the time limits that apply to non-urgent pre-service claims, and you will have the right to appeal the Plan's adverse benefit determination.

If you fail to follow the Plan's filing procedures because your request for benefits does not: 1) identify the patient; 2) note a specific medical condition or symptom; 3) describe a specific treatment, service, or product for which approval is requested; 4) arrive in the correct department and is not sent to the correct person, YOU WILL NOT HAVE SUBMITTED A CLAIM. An employee of the Plan Administrator will orally notify you, within five (5) days, that you have failed to follow the filing procedures, and you will be reminded of the proper filing procedures.

*Requests for Extension of Treatment--*
Your request to extend a course of treatment beyond a particular period of time or number of treatments is a claim, and the Plan will decide your claim as soon as possible and within the time limits applicable to non-urgent pre-service claims.

<u>Post-Service Claims</u>
For post-service claims, the Plan Administrator will notify you in writing or electronically of the benefit determination as soon as possible, but not later than 30 days after receipt of the claim by the Plan. One 15-day extension of this time period is possible under certain circumstances.

If your claim is incomplete but is properly filed, your attempted claim will be denied by the Plan. You will be notified in writing or electronically of the adverse benefit determination within the time limits that apply to non-urgent pre-service claims, and you will have the right to appeal the Plan's adverse benefit determination.

*Requests for Extension of Treatment--*
Your request to extend a course of treatment beyond a particular period of time or number of treatments is a claim, and the Plan will decide your claim as soon as possible and within the time limits applicable to post-service claims.

*Submission of a Medical Bill for Payment--*
If your claim is in the form of a medical bill that is submitted to the Plan for payment, the Plan will pay the benefit according to Plan provisions. This may mean that less than 100% of your medical claim is payable by the Plan. In each case where the Plan pays benefits or determines that it is not responsible for your medical claim, you will receive an Explanation of Benefits which will outline the basis for the Plan's payment. You will receive a written or electronic "denial" notification. In addition, the Plan's payment of less than 100% of your submitted

ATTACHMENT A
Amended as of June 1, 2002

claim (under the terms of the Plan) will entitle you to appeal the decision under the rules governing adverse claim determination.

## 4. IF YOUR CLAIM IS DENIED

If your claim is denied, the Plan will notify you in writing or electronically (oral notification followed by written notification in the case of urgent care claims) why your claim was denied, and the plan will provide additional information that will help you pursue your right to appeal the adverse determination. If you choose to appeal the Plan's adverse benefit determination, your appeal will be governed by rules that assure you a "full and fair" review.

If you are denied benefits based upon the Plan's finding that you are/were ineligible for benefits, the denial of benefits gives you the opportunity to appeal the Plan's decision.

*Termination or Reduction of Benefits—*
If the Plan decides to reduce or terminate your previously-approved course of treatment, the Plan's decision will be treated as an adverse benefit determination, and the Plan will provide you reasonable advance notice of the reduction or termination to allow you to appeal the Plan's decision before the benefit reduction or termination takes place. If you decide to appeal the Plan's decision, you must follow the rules for appealing a Plan's decision.

## 5. APPEALING YOUR INITIAL CLAIM DECISION

You must submit a written request (An oral request for review is acceptable for urgent care claims and may be made by calling the appropriate number indicated above asking the Plan to register your oral appeal.) to the Plan **within 180 days** of receipt of a denial notice in order to initiate an appeal.

When you appeal an adverse determination, the Plan will provide a "full and fair review" which will include the following features:

(1) You will have the opportunity to submit written comments, documents, records, and other information related to the claim.

(2) At your request (and free of charge), you will be provided with reasonable access to (and copies of) all documents, records, and other information relevant to your claim for benefits. Included in this category are any documents, records or other information in your claim file, whether or not those materials were relied upon by the Plan in making its adverse determination. You also have the right to review documentation showing that the Plan followed its own internal processes for ensuring appropriate decision making.

(3) The review of your claim will take into account all comments, documents, records, and other information submitted by you relating to the claim, without regard to whether such information was submitted or considered in the initial benefit determination.

(4) Any appeal of an adverse determination will not afford deference to the initial adverse determination, and the review will be conducted by a designated Plan representative who did not make the original determination and does not report to the Plan representative who made the original determination.

(5) In deciding an appeal of any adverse benefit determination that is based on a medical judgment (including determinations with regard to whether a particular

ATTACHMENT A
Amended as of June 1, 2002

treatment, drug, or other item is experimental, investigational, or not medically necessary or appropriate), the appropriate named fiduciary will consult with a health care professional who has appropriate training and experience in the particular field of medicine involved in the medical judgment. This health care professional will not be the same professional who was originally consulted in connection with the adverse determination; neither will this health care professional report to the health care professional who was consulted in connection with the adverse determination.

(6) The Plan will identify medical or vocational experts whose advice was obtained on behalf of the Plan in connection with an adverse benefit determination of your claim, whether or not that advice was relied upon in making the benefit determination.

After you submit the claim for appeal, the Plan must make a decision on your claim within a short period of time.

### Urgent Care Claims

The Plan's expedited appeal process for urgent care claims will allow you to request (orally or in writing) an expedited appeal, after which, all necessary information, including the plan's benefit determination on review, will be transmitted between the Plan and you by telephone, fax, or other expeditious method. The Plan Administrator will notify you (in writing or electronically) of the benefit determination as soon as possible, but not later than 72 hours after the Plan receives the request for review of the prior benefit determination.

### Non-Urgent Pre-Service Claims

For non-urgent pre-service claims, the Plan Administrator must notify you (in writing or electronically) of the benefit determination within a reasonable period of time appropriate to the medical circumstances, but not later than 30 days.

### Post-Service Claims

For post-service claims, the Plan Administrator must notify you (in writing or electronically) of the benefit determination within a reasonable period of time, but not later than 60 days.

## 6. IF YOUR APPEALED CLAIM IS DENIED

If your appealed claim is denied, the Plan will send you written or electronic notification that will tell you why your appealed claim was denied. The Plan will provide additional information that will help you pursue your right to appeal the adverse determination. An adverse benefit determination also includes a denial of benefits based on a finding that you were ineligible for benefits at the time; such adverse benefit determination of your eligibility will allow you the opportunity to appeal the Plan's decision.

## 7. FINAL APPEAL

If you are dissatisfied with the outcome of your first appeal, you may request a second appeal review. To initiate a second appeal review, you should follow the same process required for your first appeal. You must submit a request for appeal **within 180 days**.

### Urgent Care Claims

For urgent care claims, the Plan Administrator must notify you (in writing or electronically) of the benefit determination as soon as possible, but not later than 36 hours after the Plan receives your request for review of the Plan's prior adverse benefit determination.

<u>Non-Urgent Pre-Service Claims</u>

For non-urgent pre-service claims, the Plan Administrator must notify you (in writing or electronically) of the benefit determination within a reasonable period of time appropriate to the medical circumstances, but not later than 15 days after the Plan receives your request for review of the Plan's prior adverse benefit determination.

<u>Post-Service Claims</u>

For post-service claims, the Plan Administrator must notify you (in writing or electronically) of the benefit determination within a reasonable period of time, but not later than 30 days after the Plan receives your request for review of the Plan's prior adverse benefit determination.

## 8. DENIAL OF CLAIM ON SECOND APPEAL

If your appealed claim is denied, the Plan will send you written or electronic notification that explains why your appealed claim was denied.

# <u>SECTION VI – DISABILITY BENEFITS</u>

## A. Eligibility

### 1. Employee Eligibility
An active, regular, hourly or salaried U.S. Expatriate who is an employee of the Plan Sponsor. To be eligible, you must be actively at work on the date coverage would become effective. Coverage will begin when you arrive at the final destination of your work assignment.

### 2. Dependent Eligibility
Dependents are not eligible for coverage under this Plan.

## B. Enrollment

### 1. Application
The company pays the full cost of your coverage. You must sign a Foreign Service or Employment Agreement with the Plan Sponsor in order to be eligible for the Plan.

### 2. Terms
Once enrolled as described above, an eligible employee is known as an "enrolled employee". An "Enrollee" is a defined term meaning an enrolled employee. Whenever used in this SPD, "you" or "your" means an Enrollee.

## C. Enrollment Date

You will be considered enrolled in the Plan when you reach your final work destination. Prior to your final enrollment, you must have a signed Foreign Service or Employment Agreement with the Plan Sponsor.

ATTACHMENT A
Amended as of June 1, 2002

## D. Covered Expenses

(1) If you are an eligible employee and you are permanently and totally disabled and absent from work due to illness or injury caused by an accident, you will receive up to 75% of your pay for up to 104 weeks, if your disability lasts for that time period.

(2) To qualify for benefits under this Plan, your disability must begin within 12 months of the accident which caused the illness or injury.

(3) The Plan's maximum benefit is the equivalent of $825 (U.S.) per week.

(4) For purposes of this Plan, your "pay" is your gross weekly pay, including overtime, commissions, and bonuses, if applicable.

(5) You are considered to be "totally disabled" if you have an illness or injury caused by an accident which permanently or temporarily prevents you from attending to a business or occupation of any kind, or, if you have no regular business or occupation, requires that you be confined to the house and prevents you from attending to any of your usual duties.

(6) Benefits begin 14 days after you stop working due to disability, and continue for the period of your disability, up to the Plan's maximum benefit period of 104 weeks.

(7) No benefits are payable during the 14-day waiting period.

## E. Annual Maximum Benefit

The Plan's maximum benefit is the equivalent of $825 (U.S.) per week.

The Plan's maximum benefit period is 104 weeks.

## F. Exclusions

The Plan will not pay benefits for disability expenses:

- the first 14 days of disablement;

- illness or injury incurred before coverage begins or after coverage ends;

- intentional self-inflicted injury or sickness while sane, or for suicide, attempted suicide, or intentional self-injury;

- for injury sustained because of your own criminal act, or while you are insane;

- for injury or illness caused or contributed to by war (whether declared or undeclared) or any warlike operations, invasion, acts of foreign enemies, hostilities, mutiny, terrorist activities, civil war, rebellion, revolution, insurrection, conspiracy, military or usurped power, riots, strikes, civil commotion, lockouts or labor disturbances, unless you are not actually taking part in these occurrences;

- for injury or illness resulting from participation in naval, military or air forces services or operations, unless such actions are part of your normal duties for the company;

ATTACHMENT A
Amended as of June 1, 2002

- for illness or natural causes or medical or surgical treatment (except where such treatment is rendered necessary by bodily injury caused by accident within the scope of this insurance)

- for injury or illness resulting from riding or driving in a race car;

- for injury or illness resulting from your being in or boarding an aircraft for the purpose of flying in it, except as required by the company;

- for treatment which is in anyway connected to alcohol, substance or drug abuse;

- for any accident or other condition arising out of the use, or any treatment for drugs not prescribed by a licensed physician or drugs used in circumstances other than as prescribed;

- for any accident involving a mechanically propelled vehicle, which is caused or contributed to by the insured person having a Blood/Alcohol reading in excess of the host country's legally permitted level for the driving of a motor vehicle;

- for injury or illness resulting from a pre-existing condition (see section G);

- for illness or bodily injury arising out of natural causes or medical or surgical treatment (except where such treatment is rendered necessary by bodily injury caused by a covered accident).

## G. Pre-Existing Conditions

You have a "Pre-Existing Condition" if you have a physical or mental condition, regardless of the cause, for which medical advice, diagnosis, care, or treatment was recommended or received within the 6 month period ending on your Enrollment Date. For the purposes of this Paragraph only, "Enrollment Date" means the first day you are covered.

If you have a Pre-Existing Condition, it is excluded from coverage until a period of 180 days has elapsed during which the insured person has neither received nor required any treatment for the condition.

## H. Termination of Coverage

Your coverage ends on the earliest of the following dates:

- the date you complete your work assignment in your place of employment or terminate employment with the company; or

- the date of the enrolled employee's death; or

- the date the company ends this coverage or terminates this Plan.

## I. Subrogation / Reimbursement

Acceptance of Plan benefits for Covered Services for an illness or injury for which another party may be obligated to pay constitutes your acceptance of the provisions of this Section.

The Plan is subrogated to all your rights of recovery to the extent of the benefits it pays for Covered Services for an illness or injury for which you are entitled to recover payment from

ATTACHMENT A
Amended as of June 1, 2002

any other person, including without limitation, the person who caused the illness or injury, that person's insurer, or your insurer under uninsured motorist coverage, underinsured motorist coverage, medical payment coverage, personal injury protection coverage, and any other like-kind coverage.

Any payment you recover from any other person on account of illness or injury for which the Plan has paid benefits, regardless of how such payment is designated or described, shall be deemed to be a recovery of Plan benefits paid, and you are obligated to reimburse the Plan from such recovery within 14 calendar days of its receipt.  You will be responsible for payment of any expenses, including attorney's fees and court costs, incurred by the Plan to enforce its right to reimbursement against you.

The Plan has the right to bring suit and/or file claims in its own name or your name as necessary to enforce any of its rights of recovery under this section.  You are obligated to provide such information and assistance as the Plan may reasonably require for the enforcement of its rights under this section, and to refrain from taking any action which would interfere with or prejudice such rights.

## J. Claiming Benefits

### 1. What You Should Do and What You Should Expect If You Have A Claim

To claim benefits under the Plan, you must first complete the Insurance Company's claim form according to the Insurance Company's requirements.  You may request the claim form from the Insurance Company by calling the applicable number provided below or from the Plan Administrator by contacting your benefits coordinator.  If the Insurance Company's claim form or instructions for completing it are not available, you must submit to the Insurance Company a written statement of the reasons you are entitled to benefits, and you must include your name, address and contact information, and your employer's name, address and contact information.  After you have completed the claim form or written statement, you must submit it to the Insurance Company at the following address:

| 24 Hour Specialty Assistance Services Control Centers | |
|---|---|
| Wickfield House, 18-22 Disney Place London SE1 1HJ | |
| For assistance worldwide, contact: | |
| London, UK | Tel: +44 (0)20 7939 9645 |
| | Fax: +44 (0)20 7407 9206 |
| For assistance in the Americas, contact: | |
| Philadelphia, USA | Tel: +1 215 489 3785 |
| | Fax: +1 215 489 8525 |
| For assistance in the Africa, contact: | |
| Johannesburg, South Africa | Tel: +27 11 452 7272 |
| | Fax: +27 11 452 4473 |

ATTACHMENT A
Amended as of June 1, 2002

| For assistance in the Asia Pacific, contact: | |
|---|---|
| Bangkok, Thailand | Tel: +662 645 3932 |
| | Fax: +662 645 3732 |

For purposes of the Plan's claims procedures, you will be considered to have filed your claim under the Plan when your claim form or written statement is received at this address.

The Plan Administrator has appointed the Insurance Company as a named fiduciary of the Plan for adjudicating claims for benefits under the Plan and for deciding any appeals of denied claims. The Insurance Company shall have the authority, in its discretion, to interpret the terms of the Plan, to decide questions of eligibility for coverage or benefits under the Plan, and to make any related findings of fact. All benefits decisions made by the Insurance Company shall be final and binding to the full extent permitted by law. The Insurance Company has 45 days from the date your claim is filed to determine whether or not benefits are payable to you in accordance with the terms and provisions of the Plan, and, if so, the amount of benefits. If more time is needed to review your claim due to circumstances beyond the Plan's control, the Insurance Company must notify you in writing that the review period has been extended. The extension notice will describe the circumstances requiring the extension, the expected date of a decision, the standards on which entitlement to a benefit is based, the unresolved issues that prevent a decision on your claim, and the additional information needed to resolve those issues. This extension may be for up to 30 days beyond the end of the normal 45-day review period. A second 30-day extension may apply if, for reasons beyond the Plan's control, additional time, beyond the first 30-day extension, is needed to review your claim. In this case, the Insurance Company will notify you in writing that the review period has been further extended. The Insurance Company will provide the same information required in the first notice of extension.

If an extension of the review period is made because you must furnish additional information in order for the Insurance Company to decide your claim, the Insurance Company will specify the additional information that is needed in the extension notice. You will have at least 45 days to return the specified information to the Insurance Company. Until you return that information (or the time to provide the information expires), the review period will be "tolled," further extending the review period beyond the normal 45-day period or the extended 75- or 105-day period. For example, if the Insurance Company advises you on the 20th day after your claim was filed that your claim is incomplete because it lacks a physician's statement regarding your ability to perform various tasks, the number of days from the date of the Insurance Company's request for the physician's statement until you provide the physician's statement will not count as part of the review period. In this example, the day you provided the physician's statement will be treated as the 21st day of the review period.

If needed in order to decide your claim, the Insurance Company may require you to submit to a medical examination, at the Insurance Company's expense. If a medical examination is required, the Insurance Company will notify you of the date and time of the examination and the physician's name and location. This will be treated as a request for additional information, as described above, and the review period will be tolled until the Insurance Company receives the results of the examination. It is important that you keep any appointments made for you by the Company, since rescheduling examinations will delay the claim process.

If your claim is approved, you will receive the appropriate benefit from the Insurance Company.

ATTACHMENT A
Amended as of June 1, 2002

If your claim is denied, in whole or in part, you must receive a written notice from the Insurance Company within the review period (which may have been extended beyond 45 days, as described above). The Insurance Company's written notice of an adverse benefit determination must include the following information:

(1)    The specific reason(s) the claim was denied.
(2)    Specific reference to the Policy provision(s) on which the denial was based.
(3)    A description of any additional material or information necessary to perfect your claim, and the reason this material or information is necessary.
(4)    If an internal rule, guideline, protocol, or other similar criterion was relied upon in making the adverse determination, the written notice will include the specific rule, guideline, protocol, or other similar criterion.
(5)    If the adverse benefit determination is based on a medically-related exclusion or limit, the written notice will include an explanation of the scientific or clinical judgment for the determination and will apply the terms of the Plan to the claimant's medical circumstances.
(6)    A statement informing you of your right to appeal the decision, and an explanation of the appeal procedure, as outlined below.

**2. Appeal Procedure for Denied Claims**
Whenever a claim is denied in whole or in part, you have the right to appeal the decision. You (or your duly authorized representative) must make a written request to appeal the Insurance Company's decision within 180 days from the date you receive the denial. If you do not make this request within that time, you will have waived your right to appeal. This request for review should be directed to the Insurance Company at the address given above for claims submissions. When requesting a review, you should state the reasons you believe the claim denial was improper, and you should submit any additional information, material, or comments which you consider appropriate. You may also review and, upon request, obtain copies of any documents that have a bearing on the claim, including the documents which establish and control the Plan.

Once your request has been received by the Insurance Company, a full and fair review of your claim must take place. This review will give no deference to the original claim decision and will not be made by the person who made the initial claim decision, nor a subordinate of that person. Any medical or vocational experts consulted by the Insurance Company in making the adverse benefit determination will be identified. If the adverse benefit determination was based in whole or in part on a medical judgment, the Insurance Company, in deciding your appeal of that determination, will consult with a health care professional who has appropriate training and experience in the field of medicine involved in the medical judgment. In no case will such health care professional be an individual who was consulted in connection with the prior adverse benefit determination, nor the subordinate of such and individual. You may also submit issues and comments that you feel might affect the outcome of the review. In conducting the review, the Insurance Company will take into account all comments, documents, and other information that you submit, whether or not it was submitted at the time of the initial determination.

The Insurance Company has 45 days from the date it receives your request to review the adverse benefits determination for your claim and notify you of its decision. Under special circumstances, the Insurance Company may require more time to review your claim. If this should happen, the Insurance Company must notify you, in writing, that its appeal review period has been extended for an additional 45 days, noting the special circumstances requiring the extension and the date by which a decision on the appeal is expected.

If an extension of the appeal review period is made because you must furnish additional information in order for the Insurance Company to decide your appeal, the Insurance

ATTACHMENT A
Amended as of June 1, 2002

Company will specify the additional information that is needed in the extension notice. You will have at least 45 days to return the specified information to the Insurance Company. Until you return that information (or the time to provide the information expires), the review period will be "tolled," further extending the review period beyond the normal 45-day period.

Once its review is complete, the Insurance Company must notify you, in writing, of the results of the review and must include in its notice the following information:

(1)    The specific reason(s) the appeal was denied.
(2)    Specific reference to the Policy provision(s) on which the denial was based.
(3)    A statement that you are entitled to receive, upon request and free of charge, all documents, records, and copies of all documents, records, and other information relevant to your claim for benefits under the Plan.
(4)    If an internal rule, guideline, protocol, or other similar criterion was relied upon in deciding the appeal, the written notice will include the specific rule, guideline, protocol, or other similar criterion.
(5)    If the adverse benefit determination is based on a medically-related exclusion or limit, the written notice will include an explanation of the scientific or clinical judgment for the determination and will apply the terms of the Plan to the claimant's medical circumstances.
(6)    The written notice will include a statement regarding a participant's right to file suit in federal or state court to recover benefits due to the participant under the terms of the Plan pursuant to ERISA Section 501(a). The written notice will also include the following statement: "You and the Plan may have other voluntary alternative dispute resolution options such as mediation. One way to find out what may be available is to contact your local U.S. Department of Labor Office and your State insurance regulatory agency."

*You may have an authorized representative, such as a guardian or an individual having a valid power of attorney from you, act on your behalf in pursuing a claim for benefits under this Plan. The Plan will take reasonable steps to determine whether an individual claiming to be acting on your behalf is, in fact, validly empowered to do so under the circumstances. Throughout this description of the Plan's claims and appeals procedures, the word "you" is used to refer to you/or any representative acting on your behalf in claiming benefits under the Plan.

# SECTION VII - ACCIDENTAL DEATH AND DISMEMBERMENT BENEFITS

## A. Eligibility

### 1. Employee Eligibility
An active, regular, hourly or salaried U.S. Expatriate who is an employee of the Plan Sponsor. To be eligible, you must be actively at work on the date coverage would become effective. Coverage will begin when you arrive at the final destination of your work assignment.

### 2. Dependent Eligibility
Dependents are not eligible for coverage under this Plan.

## B. Enrollment

### 1. Application
- The company pays the full cost of your coverage.

ATTACHMENT A
Amended as of June 1, 2002

- You are automatically the beneficiary for any dismemberment benefits payable under this Plan.

- When you sign your Foreign Service or Employment Agreement, you will be asked to designate a beneficiary who would be eligible to receive benefits if you should die while covered under this Plan.

- You can name anyone you wish as your beneficiary.

- Since there is the possibility that your named "primary" beneficiary may not survive you, you may also designate a contingent ("secondary") beneficiary.

- In order to change your designated beneficiary(ies), you must complete the appropriate form and submit it to your Human Resource Representative.

**2. Terms**

Once enrolled as described above, an eligible employee is known as an "enrolled employee". An "Enrollee" is a defined term meaning an enrolled employee. Whenever used in this SPD, "you" or "your" means an Enrollee.

## C. Enrollment Date

You will be considered enrolled in the Plan when you reach your final work destination. Prior to your final enrollment, you must have a signed Foreign Service or Employment Agreement with the Plan Sponsor.

## D. Covered Expenses

(1) If you should die, become dismembered, or become permanently and totally disabled as the result of a covered accident or illness, this Plan can provide a benefit for you or your beneficiary to a maximum of $160,000 (U.S.).

(2) To qualify for benefits under this Plan, your death, dismemberment, or total disability must occur no later than twelve (12) months after the accident or incident that caused the death, dismemberment, or total disability.

(3) You will not receive more than $160,000 (U.S.) from this Plan for losses sustained in any single accident.

(4) Any benefits payable under this Plan are offset by any benefits which you may already have received due to the same accident from the Disability Benefits Plan sponsored by this Plan Sponsor.

(5) For the purposes of this Plan, "loss" of a hand or foot means loss by physical separation of a hand at or above the wrist or a foot at or above the ankle.

(6) For purposes of this Plan, "loss" of sight means loss of sight which is certified as being entire and irrevocable by a licensed doctor specializing in ophthalmology.

(7) You will be considered to be "permanently and totally disabled" if you meet the following conditions:

- you have an illness or injury which prevents you from attending to a business or occupation of any kind; AND

ATTACHMENT A
Amended as of June 1, 2002

- your disability lasts for at least twelve (12) months; AND

- your disability appears to be beyond hope of improvement.

## E. Annual Maximum Benefit

In the event of your death, the Plan's maximum benefit is $160,000 (U.S.).

In the event of a qualifying occurrence of dismemberment, the Plan's maximum benefit is $160,000 (U.S.).

- $160,000 (U.S.) for the loss of your life; or

- $160,000 (U.S.) for the loss of two hands or two feet, or the sight in both eyes; or

- $160,000 (U.S.) for the loss of any combination of more than one eye, hand, or foot; or

- $160,000 (U.S.) for permanent and total disablement other than by loss of limbs or sight.

In the event of total and permanent disability, the Plan's maximum benefit is $160,000 (U.S.).

You will not receive more than $160,000 (U.S.) in any case from this Plan for losses sustained in any single accident.

## F. Exclusions

The Plan will not pay benefits for the following expenses:

- dismemberment, disability, or death incurred before coverage begins or after coverage is terminated;

- intentional self-inflicted injury or sickness while sane, or for suicide, attempted suicide, or intentional self-injury;

- injury sustained because of your own criminal act, or while you are insane;

- injury or illness caused or contributed to by war (whether declared or undeclared) or any warlike operations, invasion, acts of foreign enemies, hostilities, mutiny, terrorist activities, civil war, rebellion, revolution, insurrection, conspiracy, military or usurped power, riots, strikes, civil commotion, lockouts or labor disturbances, unless you are not actually taking part in these occurrences;

- injury or illness resulting from participation in naval, military or air forces services or operations, unless such actions are part of your normal duties for the company;

- injury or illness resulting from riding or driving in a race car;

- injury or illness resulting from your being in or boarding an aircraft for the purpose of flying in it, except as required by the company;

- for treatment which is in anyway connected to alcohol, substance or drug abuse;

- Any accident or other condition arising out of the use, or any treatment for drugs not prescribed by a licensed physician or drugs used in circumstances other than as prescribed;

- for any accident involving a mechanically propelled vehicle, which is caused or contributed to by the insured person having a Blood/Alcohol reading in excess of the host country's legally permitted level for the driving of a motor vehicle;

- injury or illness resulting from a pre-existing condition (see section G);

- illness or bodily injury arising out of natural causes or medical or surgical treatment (except where such treatment is rendered necessary by bodily injury caused by a covered accident).

## G. Pre-Existing Conditions

You have a "Pre-Existing Condition" if you have a physical or mental condition, regardless of the cause, for which medical advice, diagnosis, care, or treatment was recommended or received within the 6 month period ending on your Enrollment Date. For the purposes of this Paragraph only, "Enrollment Date" means the first day you are covered.

If you have a Pre-Existing Condition, it is excluded from coverage until a period of 180 days has elapsed during which the insured person has neither received nor required any treatment for the condition.

## H. Termination of Coverage

Your coverage ends on the earliest of the following dates:

- the date you complete your work assignment in your place of employment or terminate employment with the company; or

- the date of the enrolled employee's death; or

- the date the company ends this coverage or terminates this Plan

## I. Claiming Benefits

### 1. Filing Instructions

When you or your beneficiary are eligible to receive benefits which are covered by this Plan, you must request an application from your Human Resources office. For a dismemberment or disability claim, you must also submit a physician's certificate verifying your dismemberment or disability. For a death claim, your beneficiary must submit a death certificate and a copy of the beneficiary designation. All of the proper forms should be submitted to Specialty Assistance Services, the third party administrator.

ATTACHMENT A
Amended as of June 1, 2002

**2. Where to Send Your Claim**
You or someone on your behalf must send written notice of claim. The claim must be submitted with an approved application and a physician's notice for dismemberment or disability or a death certificate for a death claim verifying the information to the following:

| 24 Hour Specialty Assistance Services Control Centers | |
| --- | --- |
| Wickfield House, 18-22 Disney Place<br>London SE1 1HJ | |
| For assistance worldwide, contact: | |
| London, UK | Tel: +44 (0)20 7939 9645 |
| | Fax: +44 (0)20 7407 9206 |
| For assistance in the Americas, contact: | |
| Philadelphia, USA | Tel: +1 215 489 3785 |
| | Fax: +1 215 489 8525 |
| For assistance in the Africa, contact: | |
| Johannesburg, South Africa | Tel: +27 11 452 7272 |
| | Fax: +27 11 452 4473 |
| For assistance in the Asia Pacific, contact: | |
| Bangkok, Thailand | Tel: +662 645 3932 |
| Fax: +662 645 3732 | |

**3. What is Needed with Your Claim**
The following important information should be submitted with each claim:

- your name;

- your social security number;

- the name and address of your doctor, surgeon, or other health care provider;

- the date of illness or injury;

- a statement or from the health care provider which lists all services performed, along with a verification of disability;

- for a death claim, beneficiary designation must also be submitted.

- for a death claim, a certified death certificate must also be submitted.

**4. Right to Request Additional Information**
The insurance carrier has the right to request that you have an examination by a qualified medical professional, at the company's expense, before paying any benefits from this Plan.

When reasonably necessary and allowed by law, the Company reserves the right to have an autopsy performed prior to paying a death benefit to your beneficiary.

ATTACHMENT A
Amended as of June 1, 2002

**5. If Your Claim Is Denied**

If your claim for benefits is fully or partially denied, you or your beneficiary will be informed in writing within 90 days. The denial will explain the exact reasons that the claim is not acceptable, including the relevant provisions of the Plan documents, and it will tell you if any additional information is needed to obtain approval for your claim. The notice also will explain the procedure you or your beneficiary must follow to initiate a review of your claim. If you or your beneficiary do not receive a response to your claim within this time limit, your claim will be deemed to be denied.

**6. Your Right to Appeal**

You or your beneficiary will have 60 days from the date of the claim denial in which to submit a written appeal for review. Appeals should be submitted to your Human Resources office.

In most cases, the insurance carrier will make a final decision regarding the appeal within 60 days after the information is received. The final decision generally will be furnished in writing, and will include the reasons for the decision with references to Plan document provisions on which the final decision was based. If you or your beneficiary do not receive a response to your appeal within this time limit, your appeal will be deemed to be denied.

# EXHIBIT 4

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

MICHELLE DEULEY, *et al.*        )
                              )

     Plaintiffs,              )

     v.                       )     C.A. No. 06-cv-605 (GMS)

                              )

DYNCORP INTERNATIONAL, INC.,  )
*et al.*                               )

                              )

     Defendants.          )

## DECLARATION OF ANGELIC LITTLE-TURNER

I, Angelic Little-Turner, certify that I am over the age of eighteen (18) years and that I have personal knowledge of the matters set forth herein.

1.     I am currently a Foreign Affairs Officer assigned to manage the Afghan Police Program in the Bureau of International Narcotics and Law Enforcement Affairs ("INL") in the U.S. Department of State. I have been in my current position for 5 years.

2.     In 2004, I was the Program Manager stationed in Washington, D.C. I was assigned on Temporary Duty (TDY) to the U.S. Embassy in Kabul, Afghanistan from August 29, 2004 to September 1, 2004.

3.     I am familiar with the State Department's Civilian Police ("CIVPOL") missions.

4.     INL oversees the participation of the United States in CIVPOL missions in various countries.

5.     CIVPOL missions are sponsored by the United Nations and/or regional security organizations.



EXHIBIT
4

244701.1

6.    CIVPOL missions are regarded as a vital tool in U.S. foreign policy and important as peacekeeping missions.

7.    Decisions to deploy CIVPOL missions are made after consultation with the White House, Department of State, Department of Defense, and other agencies.

8.    Upon deployment, CIVPOL personnel are under the operational control of the sponsoring organization.

9.    The private contractor maintains an office in the mission area to provide administrative and support services to their personnel.

10.    During the life of the CIVPOL mission, the State Department, among other things, provides funding and oversight for mission operations, and manages U.S. policy on CIVPOL operations, other related law enforcement, and civilian security issues.

11.    CIVPOL missions are deployed through government contracts with private companies.

12.    The State Department participated in a CIVPOL mission in Afghanistan.

13.    The United States' assistance in Afghanistan is based on a Letter of Agreement between the Government of Afghanistan and the United Nations.

14.    DynCorp International LLC was selected as the general contractor(s) for the CIVPOL mission in Afghanistan.

15.    As a CIVPOL government contractor, Defendants are required to abide by State Department regulations and requirements.

16.    As the contractor, Defendants were responsible for recruiting, selecting and deploying civilian police officers for the CIVPOL mission. Defendants are permitted to subcontract these responsibilities to another entity.

2

17.    State Department regulations and requirements dictate the contractor's recruitment, selection, equipment, and deployment of civilian police officers for a CIVPOL mission.

18.    If the State Department's Contracting Officer responsible for CIVPOL contract oversight determines that continued performance under the CIVPOL contract by any Contractor or subcontractor personnel is contrary to the public interest, the Contracting Officer may require the Contractor shall remove the employee from all work under the CIVPOL contract.

19.    The State Department required contractors, such as Defendants, to lease facilities in Kabul and to provide security for those facilities.

20.    I am familiar with the International Security Assistance Force ("ISAF"), an international force of about 30,000 troops mandated by the United Nations and commanded by the North Atlantic Treaty Organization ("NATO").

21.    Pursuant to standard operating procedure and established protocol, warnings issued by ISAF are relayed to the U.S. Embassy's Resident Security Officer ("RSO") in Kabul. The RSO then disseminates the warning to all American personnel in Kabul, including government contractors, with orders to implement appropriate security measures that may include orders to "lockdown" all American facilities.

22.    On August 29, 2004, I am not aware of any directive by the RSO to lock down "DynHouse" or of any efforts to seek approval from the Government of Afghanistan to close off streets or otherwise restrict vehicular traffic.

23.    Before a contractor could close streets adjacent to their offices or buildings in Kabul or deploy vehicle barricades, the contractor would have had to make that request to the RSO, who would have been responsible for evaluating the request and if the RSO deemed it

3

appropriate of discussing this security measure with the Afghan Government. Permission to close a street or deploy vehicle barricades could only have been granted by the Afghan Government.

24.    I am familiar with the car bombing that occurred on August 29, 2004, at a location in Kabul known as "DynHouse." In fact, I was on my way to DynHouse for a meeting when the bombing occurred.

**I DECLARE UNDER PENALTY OF PERJURY THAT THE FOREGOING IS TRUE AND CORRECT.**

Executed on October 24, 2006.

Angelie Little-Turner
Foreign Affairs Officer
International Narcotics and Law Enforcement Affairs
U.S. Department of State
Washington, D.C.

4

244701.1

# EXHIBIT 5



Daily Press Briefing | Other News...

SEARCH [____] GO
Subject Index

Home | Issues & Press | Travel & Business | Youth & Education | About State Department

**Bureau for International Narcotics and Law Enforcement Affairs**

**International Civilian Police Program (CivPol)**

- Fact Sheets
- Archive

# International Civilian Police Program (CivPol)

In addition to its anti-narcotics and anti-crime programs, the Bureau for International Narcotics and Law Enforcement Affairs recruits U.S. police officers from all over the country to participate in international civilian police activities and local police development programs in countries around the world.

Civilian police officers from over 50 countries are deployed around the globe in support of international peacekeeping operations. CIVPOL programs most often are sponsored by the United Nations but also can be sponsored by regional security organizations such as the Organization for Security and Cooperation in Europe (OSCE). The U.S. participated in its first CIVPOL mission in 1994 in Haiti. Today, more than 700 U.S. police officers are contributing to public safety in areas recovering from conflict.

Recruitment information for International Police Programs can be found at these websites:

- www.civilianpolice.com
- www.PoliceMission.com
- www.paecivpol.com

For more information about the CIVPOL program, please see the State Department fact sheet on international civilian police.

**What's New | Frequent Questions | Contact Us | Email this Page | Subject Index | Search**
The Office of Electronic Information, Bureau of Public Affairs, manages this site as a portal for information from the U.S. State Department. External links to other Internet sites should not be construed as an endorsement of the views or privacy policies contained therein.
**FOIA | Privacy Notice | Copyright Information | Other U.S. Government Information**

FIRSTGOV



EXHIBIT
5



U.S. DEPARTMENT *of* STATE

Fact Sheet
Bureau for International Narcotics and Law Enforcement Affairs
Washington, DC
May 18, 2005

# The United States and International Civilian Policing (CIVPOL)

*[For more information on the CIVPOL program, please contact CIVPOL@state.gov]*

**The CIVPOL Mission**

Civilian police (CIVPOL) from over 50 countries are deployed around the globe in support of international peacekeeping operations. Their presence promotes peace and stability in areas recovering from conflict and their efforts to develop modern, democratic indigenous police forces help to ensure that peace and stability can be sustained, even after international peacekeepers depart.

Most CIVPOL programs are sponsored by the United Nations (UN), but they are also sponsored by regional security organizations such as the Organization for Security and Cooperation in Europe (OSCE) or by coalitions of interested countries. Today, more than 7,500 international police are deployed in UN CIVPOL missions alone.

The UN launched its first CIVPOL mission in the Congo in 1960, but CIVPOL did not become a major component of peacekeeping operations until the end of the Cold War. Since then, they have become an integral component of what were traditionally military peacekeeping operations.

CIVPOL missions vary. In some missions, officers perform typical law enforcement functions (patrol, investigation, etc.) in the absence of professional indigenous police forces. In other cases, CIVPOL may be responsible for restructuring, monitoring, and/or advising local police who are making the transition to democratic policing. They also may be directly involved in the training and development of local police.

**The United States and CIVPOL**

The United States participated in its first CIVPOL operation in 1994 in Haiti. The United States led the multinational military intervention to restore the elected government of Haiti and sponsored a 20-country International Police Monitor (IPM) mission to help provide public security, maintain the rule of law, and establish a new Haitian National Police Service. The IPM mission transitioned to the UN in March 1995.

CIVPOL have become a vital tool of U.S. foreign policy. Only 50 American police participated in the Haiti CIVPOL mission in 1994. Since then, over 4,000 experienced U.S. police officers and law enforcement experts have participated in CIVPOL missions in Bosnia-Herzegovina (1996-2002); the Eastern Slavonia region of Croatia (1996-2003); Jericho (2002); Palestinian Authority (2003); Sierra Leone (2003-2004); East Timor (1999-2005); OSCE Head Quarters in Vienna (2002-2004); Haiti (1996-2000; 2004-present); Kosovo (1999-present); Serbia & Montenegro (2001-present); Macedonia (2002-present); Afghanistan (2002-present); Iraq (2003-present); and Liberia (2003-present). Currently, more than 1,000 American officers are deployed to CIVPOL missions. This dramatic climb in U.S. participation in CIVPOL missions reflects the U.S. Government's recognition of its importance to peacekeeping missions in the post-cold war world. While international military forces often are necessary to restore a secure environment following a major conflict, they generally are not, in themselves, sufficient for the long-term reestablishment of civil order where local institutions have broken down. CIVPOL not only assist international military forces in the short term by addressing civilian law enforcement matters, but also help to develop the local democratic policing institutions

that ultimately will be responsible for all law and order functions once the military and CIVPOL depart.

Decisions to deploy U.S. CIVPOL in a specific mission are made at the highest levels of the federal government based on consultations among the White House, Department of State, Department of Defense, and other agencies. The responsibility for managing U.S. CIVPOL and related issues rests with the Department of State.

**The Mechanics of U.S. CIVPOL**

Most other countries that provide CIVPOL have national police forces and related personnel mechanisms to deploy officers for overseas service. Because the United States does not maintain a national police force, we must seek volunteers on an individual basis. To handle such a large task, the State Department contracts with private companies, currently DynCorp International, Civilian Police International LLC, and PAE Government Services, Inc. The contractors implement requirements provided by the State Department to recruit, select, equip, and deploy police from all over the country. After conducting a rigorous screening process, the companies contract with individual officers to provide their salary and benefits for one year.

Following pre-deployment training in the United States, officers are sent to the mission area and are "seconded" to the UN (or other sponsoring organization -- such as the OSCE). In mission, officers are under the operational control of the sponsoring organization, which also provides officers with an allowance to cover food, lodging, and incidental expenses. The contractors maintain offices in the mission areas to handle administrative and support (e.g. medical) issues, and assist with programs designed to improve quality of life (i.e., video libraries, fitness equipment).

Throughout the life of a mission, the State Department provides funding and oversight for mission operations, manages U.S. policy on CIVPOL operations and other related law enforcement and civilian security issues, provides bilateral assistance to local police forces, engages with the UN and other CIVPOL contributing countries on mission priorities and challenges, and keeps Congress, other U.S. Government agencies, and the White House informed of progress.

# EXHIBIT 6

LEXSEE 2006 US BANKR LEXIS 2117

### IN RE: JEAN FOWLER, Debtor.

### Chapter 7, Case No. 06-10207 (MFW)

### UNITED STATES BANKRUPTCY COURT FOR THE DISTRICT OF DELAWARE

*2006 Bankr. LEXIS 2117; Bankr. L. Rep. (CCH) P80,722*

### September 11, 2006, Decided

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Debtor filed a Chapter 7 bankruptcy complaint, and the United States Trustee (UST) filed a motion to dismiss the case pursuant to *11 U.S.C.S. § 707(b)(2)* and (b)(3). The issue was whether debtor, for purposes of § 707(b)(2)(A)(ii)(I), could take the ownership deduction specified in the Internal Revenue Service (IRS) Local Transportation Expense Standards for a car she owned, which was not collateral for any debt.

**OVERVIEW:** Debtor demonstrated that she did not have sufficient net monthly income for the presumption of abuse to arise under § 707(b)(2). The UST asserted, that the submitted form was erroneous because it included a deduction for owning a car even though debtor did not have a monthly car payment. Debtor argued that she was entitled to the deduction under the plain language of § 707(b)(2)(A)(ii)(I), which stated that the monthly expenses would be debtor's applicable monthly expenses under the National and Local Standards, which the IRS used to determine a taxpayer's ability to pay delinquent taxes. The court found that based on the plain language of the statute, debtor was entitled to take a car ownership deduction in the amount set forth in the Local Standards for her ownership of one car, even though she had no car payment. The plain language of § 707(b)(2)(A)(ii)(I) provided that debtor's monthly expenses were the debtor's applicable monthly expense amount specified under the Local Standards, which did not require an actual car expense. As a result, there was no presumption of abuse under § 707(b)(3).

**OUTCOME:** The court held that debtor could take the deduction.

**LexisNexis(R) Headnotes**

*Bankruptcy Law > Conversion & Dismissal > Liquidations*
[HN1] *11 U.S.C.S. § 707(b)(1)* provides that a court may dismiss a case filed by an individual debtor under the chapter whose debts are primarily consumer debts, or with the debtor's consent, convert such a case to a case under chapter 11 or 13 of the title if it finds that the granting of relief would be an abuse of the provisions of the chapter.

*Bankruptcy Law > Conversion & Dismissal > Liquidations*
*Bankruptcy Law > Discharge & Dischargeability > Liquidations > Eligible Debts*
[HN2] See *11 U.S.C.S. § 707(b)(2)(A)(i)*.

*Bankruptcy Law > Conversion & Dismissal > Liquidations*
*Bankruptcy Law > Discharge & Dischargeability > Liquidations > Eligible Debts*
[HN3] See *11 U.S.C.S. § 707(b)(2)(A)(ii)(I)*.

*Bankruptcy Law > Conversion & Dismissal > Liquidations*
*Bankruptcy Law > Discharge & Dischargeability > Liquidations > Eligible Debts*
*Tax Law > Federal Tax Administration & Procedure > Settlements > Closing Agreements & Compromises (IRC secs. 7121-7124) > Closing Agreements*
[HN4] The National and Local Standards, to which *11 U.S.C.S. § 707(b)(2)(A)(ii)(I)* refers, are the Collection Financial Standards used by the Internal Revenue Service to determine a taxpayer's ability to pay a delinquent tax liability. Based primarily on data from the United States Census Bureau and the Bureau of Labor Statistics

EXHIBIT
6
tabbies

Consumer Expenditure Survey, the "National Standards" set, as objectively reasonable, amounts for five expenses: (1) food, (2) housekeeping supplies, (3) apparel and services, (4) personal care products and services, and (5) miscellaneous. The National Standards are based on the taxpayer's gross income and family size.

*Tax Law > Federal Tax Administration & Procedure > Settlements > Closing Agreements & Compromises (IRC secs. 7121-7124) > Closing Agreements*
[HN5] The Local Standards set, as objectively reasonable, separate amounts for (1) housing and utilities, and (2) transportation. The former are based on the taxpayer's family size and location. The transportation standards include two distinct components: (1) "Ownership Costs," which are based only on the number of cars owned by the taxpayer; and (2) "Operating Costs and Public Transportation Costs," which are based on the number of cars owned by the taxpayer and on the taxpayer's location.

*Tax Law > Federal Tax Administration & Procedure > Settlements > Closing Agreements & Compromises (IRC secs. 7121-7124) > Closing Agreements*
[HN6] The Financial Analysis Handbook contains instructions for analyzing the taxpayer's financial condition to help Internal Revenue Service field agents determine appropriate case resolution (e.g., collect, compromise, or report as uncollectible). To determine what portion of the taxpayer's income should be available for repayment of delinquent taxes, the Handbook allows deductions from the taxpayer's gross income in the amounts specified in the National and Local Standards, as well as deductions for reasonable amounts of other expenses that are necessary to provide for a taxpayer's and his or her family's health and welfare and/or production of income.

*Tax Law > Federal Tax Administration & Procedure > Settlements > Closing Agreements & Compromises (IRC secs. 7121-7124) > Closing Agreements*
[HN7] Under the Financial Analysis Handbook, a taxpayer is allowed the full amount of the National Standards deductions, regardless of his actual expenses. The total applicable expense allowance of the National Standards is to be given to each taxpayer, regardless of the taxpayer's actual expenditures in any of the individual National Standards categories or the taxpayer's actual total expenditures in the combined categories. Thus, even hypothetical taxpayers living in a Garden of Eden, with cost-free satisfaction of all their basic needs, would still be allowed a deduction from income in the total amount set out in the National Standards. For the Local Stan-

dards, however, the taxpayer is allowed the local standard or the amount actually paid, whichever is less.

*Bankruptcy Law > Conversion & Dismissal > Liquidations*
*Bankruptcy Law > Discharge & Dischargeability > Liquidations > Eligible Debts*
*Tax Law > Federal Tax Administration & Procedure > Settlements > Closing Agreements & Compromises (IRC secs. 7121-7124) > Closing Agreements*
[HN8] In interpreting the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005, a court begins, as always, with the language of the statute. The plain language of *11 U.S.C.S. § 707(b)(2)(A)(ii)(I)* provides that the debtor's monthly expenses shall be the debtor's applicable monthly expense amount specified under the Local Standards. *11 U.S.C.S. § 707(b)(2)(A)(ii)(I)*. There is no reference in that language to the use of the Local Standards as a cap. In contrast, the IRM expressly provides that the taxpayer is allowed the local standard or the amount actually paid, whichever is less. The fact that Congress did not use language similar to the IRM evidences that it did not intend the Local Standards to apply as a cap.

*Bankruptcy Law > Conversion & Dismissal > Liquidations*
*Bankruptcy Law > Discharge & Dischargeability > Liquidations > Eligible Debts*
*Governments > Legislation > Interpretation*
*Tax Law > Federal Tax Administration & Procedure > Settlements > Closing Agreements & Compromises (IRC secs. 7121-7124) > Closing Agreements*
[HN9] In the same sentence of *11 U.S.C.S. § 707(b)(2)(A)(ii)(I)*, Congress expressly states that a debtor would be entitled to "actual monthly expenses" for Other Necessary Expenses. The use of "actual" with respect to Other Necessary Expenses and "applicable" with respect to the National and Local Standards must mean that Congress intends two different applications. Where Congress includes particular language in one section of a statute but omits it in another section of the same act, it is generally presumed that Congress acted intentionally and purposely in the disparate inclusion or exclusion. In order to give effect to every word in § 707(b)(2)(A)(ii)(I), the term "actual monthly expenses" cannot be interpreted to mean the same as "applicable monthly expenses." The use of a particular phrase in one statute but not in another merely highlights the fact that Congress knows how to include such a limitation when it wants to.

Case 1:06-cv-00605-GMS    Document 14-5    Filed 10/25/2006    Page 13 of 35

Page 3

2006 Bankr. LEXIS 2117, *; Bankr. L. Rep. (CCH) P80,722

*Governments > Legislation > Interpretation*
[HN10] Silence or lack of clarity at the point where crucial language is finally inserted can sometimes be clarified by legislative history, even though bills which did not pass in prior years.

*Bankruptcy Law > Conversion & Dismissal > Liquidations*
*Bankruptcy Law > Discharge & Dischargeability > Liquidations > Eligible Debts*
*Governments > Legislation > Interpretation*
*Tax Law > Federal Tax Administration & Procedure > Settlements > Closing Agreements & Compromises (IRC secs. 7121-7124) > Closing Agreements*
[HN11] Congress has intended that there be an easily applied formula for determining when a court should presume that a debtor is abusing the system by filing a chapter 7 petition. Presumptions are typically created to avoid litigation. By reference to the National and Local Standards, Congress has intended the court to use a chart of standard expenses for all debtors which could be easily and uniformly applied: the court simply takes the expense amount from the applicable column based on the debtor's income, family size, number of cars and/or locale. This easy application should avoid litigation.

*Bankruptcy Law > Conversion & Dismissal > Liquidations*
*Bankruptcy Law > Discharge & Dischargeability > Liquidations > Eligible Debts*
*Evidence > Inferences & Presumptions > Presumptions*
[HN12] Allowing a debtor a deduction under the means test does not insulate her case from dismissal. Instead, it simply means that there is not a presumption of abuse.

**COUNSEL:** [*1] For the Debtor: Vivian A. Houghton, Esquire, Wilmington, DE.

Montague S. Claybrook, Chapter 7 Trustee, Wilmington, DE.

**JUDGES:** Mary F. Walrath, United States Bankruptcy Judge.

**OPINION BY:** Mary F. Walrath

**OPINION:**

**MEMORANDUM OPINION** n1

n1 This Opinion constitutes the findings of fact and conclusions of law of the Court pursuant to *Federal Rule of Bankruptcy Procedure 7052,*

which is made applicable to contested matters by *Federal Rule of Bankruptcy Procedure 9014.*

Before the Court is the Motion of the United States Trustee (the "UST") to Dismiss the chapter 7 case of Jean Fowler (the "Debtor") pursuant to *section 707(b)(2)* and *(b)(3).* The Debtor opposes the Motion. At the hearing on the Motion, the parties asked the Court to address the following discrete issue: whether the Debtor, for purposes of *section 707(b)(2)(A)(ii)(I),* may take the ownership deduction specified in the IRS Local Transportation Expense Standards for a car she owns which is [*2] not collateral for any debt. For the reasons stated below, the Court concludes that the Debtor may take the deduction.

## I. BACKGROUND

The Debtor filed her voluntary petition under chapter 7 on March 8, 2006. The Debtor filed her Schedules and Statement of Financial Affairs on that same date. Amended Schedules B and C were filed March 16, 2006. The Debtor's Schedules demonstrate that she has general unsecured debt of $ 48,776.72. The Debtor admits her debt is primarily consumer debt.

On May 12, 2006, the UST filed a Motion to dismiss the case. The Debtor filed an Amended Form B 22A (Statement of Current Monthly Income and Means Test Calculation) on May 16, 2006, and responded to the UST's Motion on May 17, 2006.

A hearing was held on the Motion on June 16, 2006, at which time the parties advised that, although there were other disputes regarding the Debtor's claimed expenses, there would be no presumption of abuse under *section 707(b)(2)* if the Court determines the Debtor may take the deduction for ownership of her car. Therefore, the parties presented oral argument and post-hearing briefs on that issue. The matter is ripe for decision.

## II. JURISDICTION

The Court [*3] has jurisdiction over this matter pursuant to *28 U.S.C. § § 1334 & 157(b)(2)(A) & (O).*

## III. DISCUSSION

The UST seeks dismissal of the Debtor's case under *section 707(b) of the Bankruptcy Code.* [HN1] *Section 707(b)(1)* provides that the Court "may dismiss a case filed by an individual debtor under this chapter whose debts are primarily consumer debts, or with the debtor's consent, convert such a case to a case under chapter 11 or 13 of this title if it finds that the granting of relief would be an abuse of the provisions of this chapter." Id.

*Section 707(b)(2),* commonly known as the "means test," was added by Congress in the Bankruptcy Abuse

2006 Bankr. LEXIS 2117, *; Bankr. L. Rep. (CCH) P80,722

Prevention and Consumer Protection Act of 2005 ("BAPCPA"). It provides, in pertinent part:

> (2)(A)(i) [HN2] In considering under paragraph (1) whether the granting of relief would be an abuse of the provisions of this chapter, the court shall presume abuse exists if the debtor's current monthly income reduced by the amounts determined under clauses (ii), (iii), and (iv), and multiplied by 60 is not less than the lesser of -
>
>> (I) 25 percent of the debtor's nonpriority [*4] unsecured claims in the case, or $ 6,000, whichever is greater; or
>>
>> (II) $ 10,000.

*11 U.S.C. § 707(b)(2)(A)(i).*

The Debtor's Amended Form B 22A demonstrates that the Debtor does not have sufficient net monthly income for the presumption of abuse to arise under *section 707(b)(2)*. The UST asserts, however, that the Form is erroneous because it includes a deduction of $ 471 for owning a car even though the Debtor does not have a monthly car payment.

The Debtor argues that she is entitled to the deduction under the plain language of *section 707(b)(2)(A)(ii)(I)*, which provides in relevant part that:

> [HN3] The debtor's monthly expenses shall be the debtor's applicable monthly expense amounts specified under the National Standards and Local Standards, and the debtor's actual monthly expenses for the categories specified as Other Necessary Expenses issued by the Internal Revenue Service for the area in which the debtor resides, as in effect on the date of the order for relief . . . .

Id. (emphasis added).

A. The National and Local Standards

[HN4] The National and Local Standards, to which *section 707(b)(2)(A)(ii)(I)* refers, are the [*5] Collection Financial Standards used by the Internal Revenue Service (the "IRS") to determine a taxpayer's ability to pay a delinquent tax liability. n2 Based primarily on data from the United States Census Bureau and the Bureau of Labor Statistics Consumer Expenditure Survey, the "National Standards" set, as objectively reasonable, amounts for five expenses: (1) food, (2) housekeeping supplies, (3) apparel and services, (4) personal care products and services, and (5) miscellaneous. n3 The National Standards are based on the taxpayer's gross income and family size.

> n2 The Court takes judicial notice of the description of the Collection Financial Standards on the IRS website, available at http://www.irs.gov/individuals/index.html ("Collection Financial Standards" hyperlink), as well as the contents of the "Financial Analysis Handbook" located at part 5, chapter 15, section 1 of the Internal Revenue Manual ("IRM"), available at http://www.irs.gov/irm/part5/ch15s01.html.

> n3 The IRS has promulgated separate "National Standards" for some items in Alaska and Hawaii, because of their unique location and higher cost of living.

[*6]

[HN5] The "Local Standards" set, as objectively reasonable, separate amounts for (1) housing and utilities, and (2) transportation. The former are based on the taxpayer's family size and location. The transportation Standards include two distinct components: (1) "Ownership Costs," which are based only on the number of cars owned by the taxpayer; and (2) "Operating Costs & Public Transportation Costs," which are based on the number of cars owned by the taxpayer and on the taxpayer's location.

[HN6] The Financial Analysis Handbook contains "instructions for analyzing the taxpayer's financial condition" to help IRS field agents "determine appropriate case resolution" (e.g., collect, compromise, or report as uncollectible). IRM at 5.15.1.1 PP 1-3. To determine what portion of the taxpayer's income should be available for repayment of delinquent taxes, the Handbook allows deductions from the taxpayer's gross income in the amounts specified in the National and Local Standards, as well as deductions for reasonable amounts of "Other Expenses" that are "necessary to provide for a taxpayer's and his or her family's health and welfare and/or production of income." Id. at 5.15.1.7 PP 1, 2, & 5.

Case 1:06-cv-00605-GMS    Document 14-5    Filed 10/25/2006    Page 15 of 35

Page 5

2006 Bankr. LEXIS 2117, *; Bankr. L. Rep. (CCH) P80,722

[HN7] Under [*7] the Financial Analysis Handbook, the taxpayer is allowed the full amount of the National Standards deductions, regardless of his actual expenses. Id. at 5.15.1.67 Cal. 451, 8 P 2.

> The IRM makes it clear that the total applicable expense allowance of the National Standards is to be given to each taxpayer, regardless of the taxpayer's actual expenditures in any of the individual National Standards categories or the taxpayer's actual total expenditures in the combined categories. Thus, even hypothetical taxpayers living in a Garden of Eden, with cost-free satisfaction of all their basic needs, would still be allowed a deduction from income in the total amount set out in the National Standards.

Hon. Eugene R. Wedoff, Means Testing in the New World, 79 Am. Bankr. L.J. 231, 254 (Spring 2006) (footnote omitted).

For the Local Standards, however, under the IRM "[t]he taxpayer is allowed the local standard or the amount actually paid, whichever is less." IRM at 5.15.1.67 Cal. 27, 7 P 4 (emphasis added).

B. Plain Language of the Statute

The Debtor argues that the plain language of section 707(b)(2)(A)(ii)(I) which allows the "debtor's applicable [*8] monthly expense amounts specified under the National Standards and Local Standards" permits the Debtor to take the Local Standards deduction for ownership of one car, or $ 471 per month. 11 U.S.C. § 707(b)(2)(A)(ii)(I).

The UST argues that, while the Debtor owns a car, she has no car payment. n4 Therefore, the UST contends that under the plain language of the statute, she has no "applicable" monthly expense for car ownership and is not entitled to take the Local Standards deduction. The Debtor counters that the term "applicable" simply means the number of vehicles owned by a Debtor, the Local Standards allowing different deductions depending on the number of vehicles owned.

> n4 The Debtor owns a car but has no car payment because she refinanced her home three years ago and repaid the car loan.

The UST refers to the IRM to support its interpretation that the Debtor is entitled to a deduction only if she has a car payment. The Debtor responds that the IRM is not applicable to the Bankruptcy [*9] Code. Under section 707(b)(2)(A), the Local Standards are used not as a cap, but as the actual deductions to which the Debtor is entitled. In contrast, for IRS purposes, the Local Standards are used as a cap for expenses to which the taxpayer may be entitled. Id. at 5.15.1.67 Cal. 27, 7 P 4.

The Court agrees with the Debtor. [HN8] In interpreting BAPCPA, "we begin, as always, with the language of the statute." Duncan v. Walker, 533 U.S. 167, 172, 121 S. Ct. 2120, 150 L. Ed. 2d 251 (2001). The plain language of section 707(b)(2)(A)(ii)(I) provides that "[t]he debtor's monthly expenses shall be the debtor's applicable monthly expense amount specified under the . . . Local Standards." 11 U.S.C. § 707(b)(2)(A)(ii)(I). There is no reference in that language to the use of the Local Standards as a cap. In contrast, the IRM expressly provides that "The taxpayer is allowed the local standard or the amount actually paid, whichever is less." IRM at 5.15.1.67 Cal. 27, 7 P 4 (emphasis added). The fact that Congress did not use language similar to the IRM evidences that it did not intend the Local Standards to apply as a cap.

Further evidence of Congress' intent is seen [*10] from the fact that [HN9] in the same sentence of section 707(b) (2) (A) (ii) (I), Congress expressly stated that a debtor would be entitled to "actual monthly expenses" for Other Necessary Expenses. The use of "actual" with respect to Other Necessary Expenses and "applicable" with respect to the National and Local Standards must mean that Congress intended two different applications. See Duncan, 533 U.S. at 173 (citation omitted) (noting that "where Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acted intentionally and purposely in the disparate inclusion or exclusion"); In re Demonica, 345 B.R. 895, 902 (Bankr. N.D. Ill. 2006) (concluding that "[i]n order to give effect to every word in [section 707(b)(2)(A)(ii) (I)], the term 'actual monthly expenses' cannot be interpreted to mean the same as 'applicable monthly expenses'."); In re Donald, 343 B.R. 524, 537 (Bankr. E.D.N.C. 2006) (stating that "the use of a particular phrase in one statute but not in another 'merely highlights the fact that Congress knew how to include such [*11] a limitation when it wanted to'" (quoting In re Coleman, 426 F.3d 719, 725 (4th Cir. 2005))).

The UST does not actually argue that the Local Standards should be applied exactly as the IRM would require, i.e., as a cap. Instead the UST argues only that a debtor must have a car payment in order to use the deduction. The test articulated by the UST is not supported

by the language of the statute and would create unfair results. For example, it would allow a debtor who had any car payment (even $ 1) to take the full Local Standards deduction of $ 471 but would not allow a debtor who had no car payment to take the deduction. Because Congress did not establish the Local Standards deduction as a cap under *section 707(b)(2)(A)(ii)(I)*, but instead made it the actual deduction, the Court concludes that the UST's interpretation is not sound. Judge Wedoff agrees:

> [A] plain reading of the statute would allow a deduction of the amounts listed in the Local Standards even where the debtor's actual expenses are less. Thus, as with the allowances of the National Standards, even if the debtor's transportation and housing needs were actually satisfied without cost to the debtor, [*12] *[section] 707(b)(2)(A)(ii)(I)* would allow the debtor a deduction in the amounts specified in the IRM's Local Standards. . . . The . . . IRM states that if the debtor makes no car payments, the ownership expense amount may not be claimed. Indeed this result follows necessarily from the IRM's treatment of the Local Standards as caps on actual expenditures: if a taxpayer has no car payments, the taxpayer obviously cannot claim a Local Standard amount intended to cap actual car payment expenses. However, since the means test treats the Local Standards not as caps but as fixed allowances, it is more reasonable to permit a debtor to claim the Local Standards ownership expense based on the number of vehicles the debtor owns or leases, rather than on the number for which the debtor makes payments. This approach reflects the reality that a car for which the debtor no longer makes payments may soon need to be replaced (so that the debtor will actually have ownership expenses), and it avoids arbitrary distinctions between debtors who have only a few car payments left at the time of their bankruptcy filing and those who finished making their car payments just before the filing.

Wedoff, [*13] *Means Testing in the New World, 79 Am. Bankr. L.J. at 255-57* (footnotes omitted).

As a result, the Court concludes that based on the plain language of the statute, the Debtor is entitled to take a car ownership deduction in the amount set forth in the Local Standards for her ownership of one car, even though she has no car payment.

## C. Legislative History

Even if the statute were not clear, the legislative history supports the Debtor's interpretation of the Code. A prior version of the BAPCPA which was never passed defined "projected monthly net income" for the means test to require a calculation of expenses as follows:

> (A) the expense allowances under the applicable National Standards, Local Standards, and Other Necessary Expenses allowance (excluding payments for debts) for the debtor . . . in the area in which the debtor resides as determined under the Internal Revenue Service financial analysis for expenses in effect as of the date of the order for relief.

H.R. 3150, 105th Congress (1998) (emphasis added). The reference to the Internal Revenue Service financial analysis was replaced by the language currently in *section 707(b)(2)(A)* which [*14] simply states that a debtor gets the "applicable monthly expense amounts specified under the National and Local Standards." *11 U.S.C. § 707(b)(2)(A)(ii)(I)*.

The change from the prior version evidences Congress' intent that the Courts not be bound by the financial analysis contained in the IRM and lends credence to the Court's conclusion that it should look only to the amounts set forth in the Local Standards. See, e.g., *Transcontinental & Western Air, Inc. v. Civil Aeronautics Bd., 336 U.S. 601, 606, 69 S. Ct. 756, 93 L. Ed. 911 (1949)* (relying on legislative history to prior unenacted bill for clarification of language used in bill that was ultimately enacted); *Springfield Indus. Corp. v. United States, 663 F. Supp. 128, 11 Ct. Int'l Trade 331, 338 (1987)*, rev'd on other grounds, *842 F.2d 1284 (1988)* (acknowledging that [HN10] "[s]ilence or lack of clarity at the point where crucial language is finally inserted can sometimes be clarified by [legislative] history, even from bills which did not pass in prior years" but ultimately holding that the legislative history was not helpful to illuminate the term because the enacted bill was too different from the [*15] prior version).

## D. Conflicting Case Law

Several courts agree, however, with the UST's argument that where a debtor has no car payment, no expense deduction should be allowed. See, e.g., *In re McGuire, 342 B.R. 608, 613 (Bankr. W.D. Mo. 2006)*; In

Case 1:06-cv-00605-GMS    Document 14-5    Filed 10/25/2006    Page 17 of 35

Page 7

2006 Bankr. LEXIS 2117, *; Bankr. L. Rep. (CCH) P80,722

*re Hardacre, 338 B.R. 718, 728 (Bankr. N.D. Tex. 2006).* But see *Demonica, 345 B.R. at 903-05* (concluding that debtor was entitled to take the Local Standards deduction for house and car even though he was not liable on the debts secured by the house and car). n5

> n5 Although all of the cases cited dealt with confirmation of a plan under chapter 13, they are instructive because for those purposes *section 1325* utilizes the means test under *section 707(b)(2)(A)* to determine the debtor's projected disposable income.

The Court respectfully disagrees with the decisions in McGuire and Hardacre and agrees with the decision of the Demonica Court. The Court in McGuire correctly noted that the Local [*16] Standards for transportation applied to vehicles owned by a debtor and stated that "[i]f a debtor does not own or lease a vehicle, the ownership expense is not 'applicable' to that debtor." *342 B.R. at 613.* The McGuire Court then concluded, however, that "if a debtor is not incurring expenses for the purchase or lease of a vehicle, the debtor cannot claim a vehicle ownership expense under the IRS Standards. This conforms with the IRS's application of the Standards." Id. It appears that the McGuire Court was equating "ownership" with "liability for debt." Further, the McGuire Court acknowledged that during the life of the debtor's plan, he probably would need to purchase a new car. *Id. at 614.* The Court stated that, if that happened, the debtor would be able to seek an adjustment of his plan payments to account for that. Id. Obviously, this Court, in determining a motion to dismiss a chapter 7 case, cannot do that.

The Court in Hardacre also relied on the IRM, not the Bankruptcy Code, to conclude that the deduction is allowable only for cars that are subject to a lease or purchase obligation. *Hardacre, 338 B.R. at 728.* [*17]

The Demonica Court, in discussing the housing deduction, correctly noted that "[t]he Local Standard deduction for housing categorizes the expense as mortgage/rent and specifies only one amount. Therefore, whether or not a debtor is liable on the mortgage is not relevant to determining the proper deduction for the housing expense." *345 B.R. at 903.* Similarly, the Demonica Court stated that with respect to the car, "[w]hile the Debtor is not obligated under the note, she does incur the expense to use the vehicle. Therefore, the Debtor can claim the Local Standard [deduction] for transportation ownership/lease expense . . . ." *Id. at 905.* n6

> n6 Though the debtor in Demonica was not liable on the car loan, the Court noted that he was making the payment. *345 B.R. at 902.*

For the reasons stated above, the Court declines to follow the decisions of the Courts in McGuire and Hardacre, and follows the decision in Demonica. Consequently, the Court [*18] concludes that *section 707(b)(2)(A)(ii)(I)* permits the Debtor to take the Local Standards deduction for ownership of a car even though she has no car payment.

E. Policy Considerations

The policy behind the means test also supports the Court's decision. [HN11] Congress intended that there be an easily applied formula for determining when the Court should presume that a debtor is abusing the system by filing a chapter 7 petition. Presumptions are typically created to avoid litigation. See, e.g., *General Motors Acceptance Corp. v. Jones, 999 F.2d 63, 70-71 (3d Cir. 1993)* (to avoid litigation expense, the Third Circuit created a rebuttable presumption that the contract rate of interest is the appropriate rate for payment of secured claim under chapter 13 plan). By reference to the National and Local Standards, Congress intended the Court to use a chart of standard expenses for all debtors which could be easily and uniformly applied: the Court simply takes the expense amount from the applicable column based on the debtor's income, family size, number of cars and/or locale. This easy application should avoid litigation.

In addition, it is important to keep in mind [*19] that [HN12] allowing the Debtor a deduction under the means test does not insulate her case from dismissal. Instead, it simply means that there is not a presumption of abuse. The UST can argue, and the Court can consider, the fact that the Debtor does not have any secured car debt to pay in determining whether the case should be dismissed under *section 707(b)(3)*. See, e.g., *In re Pennington, 2006 Bankr. LEXIS 2025, No. 06-10066, 2006 WL 2505942 (Bankr. D. Del. Aug. 30, 2006)* (holding that, in considering whether case was an abuse under *section 707(b)(3)*, court must consider debtor's current car payment rather than higher car payment he had at commencement of the case). See also, Wedoff, Means Testing in the New World, *79 Am. Bankr. L.J. at 257* ("Moreover, in a situation where a debtor owns a valuable car free of liens and is allowed by applicable exemption law to retain the car in Chapter 7, conversion or dismissal could still be obtained under the totality of financial circumstances standard that *[section] 707(b)(3)* applies in the absence of a means-test presumption.").

IV. CONCLUSION

2006 Bankr. LEXIS 2117, *; Bankr. L. Rep. (CCH) P80,722

For the foregoing reasons, the Court concludes that the Debtor may take the [*20] Local Standards deduction for ownership of a car. As a result, the UST concedes that there is no presumption of abuse under *section 707(b)(3)*. The Court will reschedule a hearing to consider the evidence and argument that may be presented on the issue of whether the Debtor's chapter 7 case should nonetheless be dismissed under *section 707(b)(3)*.

An appropriate Order is attached.

BY THE COURT:

Mary F. Walrath

United States Bankruptcy Judge

Dated: September 11, 2006

### ORDER

**AND NOW**, this **11th** day of, **SEPTEMBER, 2006,** upon consideration of the UST's Motion to Dismiss Debtor's Case pursuant to *sections 707(b)(2) & (3)* and the Debtor's response thereto, it is hereby

**ORDERED** that the Motion is hereby **DENIED** as to *section 707(b)(2)*; and it is further

**ORDERED** that a hearing to consider the UST's allegations under *section 707(b)(3)* will be held on September 20, 2006, at 2:00 p.m.

BY THE COURT:

Mary F. Walrath

United States Bankruptcy Judge

cc: William K. Harrington, Esquire n1

n1 Counsel shall serve a copy of this Order and related Memorandum Opinion on all interested parties and file a Certificate of Service with the Court.

[*21]

# EXHIBIT 7

LEXSEE 2005 US DIST LEXIS 34899

**NOKIA CORPORATION and NOKIA, INC., Plaintiffs, v. INTERDIGITAL COMMUNICATIONS and INTERDIGITAL TECHNOLOGY CORPORATION, Defendants.**

**Civil Action No. 05-16-JJF**

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF DELAWARE**

*2005 U.S. Dist. LEXIS 34899; 2006-1 Trade Cas. (CCH) P75,106*

**December 21, 2005, Decided**

**COUNSEL:** [*1] Jack B. Blumenfeld, Esquire of MORRIS, NICHOLS, ARSHT & TUNNELL, Wilmington, Delaware, for Plaintiffs.

Richard L. Horowitz, Esquire and David Ellis Moore, Esquire of POTTER ANDERSON & CORROON, LLP, Wilmington, Delaware. Of Counsel: D. Dudley Oldham, Esquire, Robert S. Harrell, Esquire, and Richard S. Zembek, Esquire of FULBRIGHT & JAWORSKI, LLP, Houston, Texas. Of Counsel: Dan D. Davison, Esquire of FULBRIGHT & JAWORSKI, LLP, Dallas, Texas, for Defendants.

**JUDGES:** Farnan, District Judge.

**OPINION BY:** Joseph J. Farnan Jr.

**OPINION:**

**MEMORANDUM OPINION**

December 21, 2005
Wilmington, Delaware

Joseph J. Farnan Jr.
**Farnan, District Judge.**

Pending before the Court is Defendants' Motion To Dismiss For Lack Of Jurisdiction Over The Subject Matter Pursuant To *Federal Rules Of Civil Procedure 12(b)(1), 12(b)(6), and 12(h)(3)* (D.I. 10). For the reasons discussed, the Motion will be granted in part and denied in part.

**I. Background**

On January 12, 2005, Plaintiffs filed a Complaint seeking a declaratory judgment that several of Defendants' third generation [*2] wireless technology patents ("3G patents") are either invalid or not infringed by Plaintiffs' products. The patents at issue are the subject of three licensing agreements, whereby Plaintiffs are licensed to practice all of Defendants' patents until the end of 2006. Plaintiffs brought the instant action, alleging reasonable apprehension that Defendants would bring suit at the end of the licensing agreements. Additionally, Plaintiffs alleged that Defendants violated *Section 43* of the Lanham Act by using false or misleading information in bad faith, thereby inhibiting Plaintiffs' ability to develop technology and damaging Plaintiffs' reputation in the market. Defendants filed the instant Motion, requesting that the Court dismiss Plaintiffs' claims pursuant to *Federal Rules of Civil Procedure 12(b)(1), 12(b)(6), and 12(h)(3)*.

**II. Parties' Contentions**

By their Motion, Defendants contend that Plaintiffs' Complaint should be dismissed pursuant to *Rules 12(b)(1)* and *12(h)(3)* for failure to plead and prove an actual controversy. Defendants contend that there is [*3] no actual controversy because Plaintiffs could not be in reasonable apprehension of a lawsuit when there is a licensing agreement between the parties. Alternatively, Defendants request that the Court exercise its "unique and substantial" discretion and refuse to hear the case because Plaintiffs brought the case for improper purposes. Finally, Defendants contend that Plaintiffs' Lanham Act claim should be dismissed pursuant to *Rule 12(b)(6)*, because Plaintiffs have failed to state a claim under *Section 43(a)*.

In response, Plaintiffs contend that reasonable apprehension of suit exists because the parties' licensing agreement expires at the end of 2006, Defendants have a history of threatening other wireless technology manufacturers with litigation, and Defendants have threatened to sue Plaintiffs. Alternatively, Plaintiffs contend that the Court should consider a ripeness test or that the Court should exercise its discretion to resolve the dispute be-

EXHIBIT
7
tabbies

Case 1:06-cv-00605-GMS    Document 14-5    Filed 10/25/2006    Page 21 of 35

Page 2

2005 U.S. Dist. LEXIS 34899, *; 2006-1 Trade Cas. (CCH) P75,106

cause the case is fit for resolution and a declaratory judgment would be useful. Finally, Plaintiffs contend that they have sufficiently stated a claim under *Section 43 of the Lanham Act* to survive Defendants' motion to dismiss.

### [*4] III. Discussion

A. Whether Plaintiffs' Claims For Declaratory Judgment Should Be Dismissed Pursuant To *Federal Rules Of Civil Procedure 12(b)(1)* and *12(h)(3)*

#### 1. *Standard of Review*

A motion to dismiss under *Rule 12(b)(1)* challenges the jurisdiction of a court to address the merits of a plaintiff's complaint. The motion should be granted where the asserted claim is "insubstantial, implausible, foreclosed by prior decisions of [the] Court, or otherwise completely devoid of merit as not to involve a federal controversy." *Coxson v. Commonwealth of Pennsylvania, 935 F.Supp. 624, 626 (W.D. Pa. 1996)* (citations omitted).

A motion to dismiss under 12(b)(1) may present either a facial or a factual challenge to subject matter jurisdiction. See *Mortensen v. First Fed. Sav. and Loan Ass'n, 549 F.2d 884, 891 (3d Cir. 1977).* A factual challenge to subject matter jurisdiction exists where there is an attack on "the existence of subject matter jurisdiction in fact, quite apart from any pleadings." Id.

When a Court considers a factual challenge to jurisdiction, it [*5] does not presume the truth of the plaintiff's allegations, and the existence of disputed material facts will not preclude the court from evaluating for itself the merits of jurisdictional claims. Id. Moreover, the plaintiff has the burden of proof that jurisdiction does in fact exist. Id.

The Court concludes that the instant case presents a factual challenge because Defendants dispute the existence of the jurisdictional facts alleged in the Complaint. Thus, the Court is not required to presume the truth of Plaintiffs' allegations, and Plaintiffs bear the burden of proving that jurisdiction exists.

#### 2. *Analysis*

The Declaratory Judgment Act "requires an actual controversy between the parties before a federal court may exercise jurisdiction." *28 U.S.C. § 2201(a); EMC Corp. v. Norand Corp., 89 F.3d 807, 810 (Fed. Cir. 2004).* An actual controversy exists when there is both "(1) an explicit threat or other action by the patentee, which creates a reasonable apprehension on the part of the declaratory judgment plaintiff that it will face an infringement suit and (2) present activity which could constitute infringement or concrete steps [*6] taken with the

intent to conduct such activity." *Gen-Probe, Inc. v. Vysis, Inc., 359 F.3d 1376, 1380 (Fed. Cir. 2004)* (quoting *BP Chems. Ltd. v. Union Carbide Corp., 4 F.3d 975, 978 (Fed. Cir. 1993)).* A court must look to the circumstances and facts at the time the complaint is filed to determine whether there is an actual controversy. *MedImmune, Inc. v. Centocor, Inc., 409 F.3d 1376, 1381 (Fed. Cir. 2005).*

The parties do not dispute that the second prong, present infringing activity, of the two-part test is satisfied. Rather, the motion turns on the first prong, reasonable apprehension of suit. "When the defendant's conduct, including its statements, falls short of an express charge, one must consider the 'totality of the circumstances' in determining whether that conduct meets the first prong of the test." *Arrowhead Indus. Water, Inc. v. Ecolochem, Inc., 846 F.2d 731, 736 (Fed. Cir. 1988)* (quoting *Goodyear Tire & Rubber Co. v. Releasomers, Inc., 824 F.2d 953, 955 (Fed. Cir. 1987)).*

The Court concludes that, under the totality of the circumstances, Plaintiffs have not demonstrated reasonable apprehension [*7] of suit. First, and most damaging to Plaintiffs, is the existence of a licensing agreement that does not expire until the end of 2006. While the existence of a licensing agreement is not conclusive as to the Court's jurisdiction, *C.R. Bard, Inc. v. Schwartz, 716 F.2d 874, 880 (Fed. Cir. 1983),* the Federal Circuit has been reluctant to find reasonable apprehension where a licensing agreement exists. See *Gen-Probe, 359 F.3d 1376; MedImmune, 409 F.3d 1376.* Furthermore, the Federal Circuit has recently distinguished those cases finding reasonable apprehension despite a licensing agreement from the type of case at bar; in the cases finding reasonable apprehension, there was a breach of the licensing agreement or the plaintiff sought to prevent such a breach. See *Gen-Probe, 359 F.3d at 1380* (finding no reasonable apprehension of suit due to the existence of a licensing agreement and the absence of two "critical circumstances" from C.R. Bard: a material breach of the licensing agreement and a suit brought by the defendant); *MedImmune, 409 F.3d at 1381* (distinguishing the case from *Cordis Corp. v. Medtronic, Inc., 835 F.2d 859 (Fed. Cir. 1987)* [*8] in which the licensee also "sought to pay royalties into escrow pendente lite, and to enjoin the licensor from canceling the license agreement"). In this case, there is a licensing agreement between Plaintiffs and Defendants, there has been no breach or threat of breach, and Defendants have not brought any lawsuits against Plaintiffs.

Second, where a licensing agreement has been formed, a court must only consider a defendant's actions occurring after formation of the licensing agreement. *Gen-Probe, 359 F.3d at 1381.* Thus, the Court will examine whether the following facts alleged by Plaintiffs,

Case 1:06-cv-00605-GMS    Document 14-5    Filed 10/25/2006    Page 22 of 35

Page 3

2005 U.S. Dist. LEXIS 34899, *; 2006-1 Trade Cas. (CCH) P75,106

occurring after formation, give rise to reasonable apprehension:

. "Since the early 1990s, InterDigital has been accusing *every* mobile telephone equipment manufacturer of patent infringement." (D.I. 14 at 17).

. "InterDigital was the cause of *all* of the patent proceedings to which it has been a party." (Id.).

. "InterDigital also directly filed suit against OKI America and Qualcomm in 1993 and against Lucent this past year." (Id.).

. "After Nokia initiated the arbitration proceeding to obtain information, InterDigital escalated the proceedings [*9] by counterclaiming against Nokia for the massive royalties it promised its shareholders in its press release." (Id. at 9).

. "For at least ten years, through correspondence, licensing presentations, meetings, and public statements, InterDigital has been claiming that Nokia's products infringed its patents." (Id. at 17).

. "In its licensing negotiations, InterDigital has repeatedly referenced its suits against other mobile telephone equipment manufacturers." (Id. at 17-18).

. "InterDigital's CEO, Howard Goldberg, recently threatened Nokia with suit, stating that InterDigital was considering litigation as a means of obtaining 'leverage' in the negotiations with Nokia." (Id. at 18).

The Court concludes that, under the totality of the circumstances, the facts alleged do not give rise to a reasonable apprehension of a lawsuit. As to Defendants' litigation tactics, in the past twelve years, Defendants have brought only three actions to defend their patents. The fact that two of them were brought in 1993, "against two other parties unconnected with [Plaintiffs, is] too remote to make [Plaintiffs'] apprehension of further litigation in [2005] reasonable. [*10] " *Indium Corp. of Am. v. Semi-Alloys, Inc., 781 F.2d 879, 883 (Fed. Cir. 1985)* (finding that a seven-year difference was too remote). Furthermore, even if Defendants have claimed for

ten years that Plaintiffs are infringing their patents, Plaintiffs' reasonableness is belied by the fact that not once in those ten years have Defendants sued Plaintiffs. To the contrary, Plaintiffs have filed lawsuits against Defendants, most notably, the arbitration Plaintiffs initiated "regarding Nokia's royalty payment obligations ... under the existing patent license agreement." (D.I. 15, Ex. G, p. 54). It was hardly escalation of the proceedings for Defendants to counterclaim on their right to receive those royalties. (Id. at 55).

Additionally, as to Defendants' conduct in negotiations for a potential 2006 license, "the Federal Circuit has concluded that the objective test for determining declaratory justiciability is not met 'when a patentee does nothing more than exercise its lawful commercial prerogatives....'" *DuPont Dow Elastomers, LLC v. Greene Tweed of Del., Inc., 148 F. Supp. 2d 412, 415 (D. Del. 2001)* (quoting *Cygnus Therapeutic Sys. v. Alza Corp., 92 F.3d 1153, 1160 (Fed. Cir. 1996)).* [*11] Mere "'jawboning,' which typically occurs in licensing negotiations," is not sufficient to give rise to reasonable apprehension. *Shell Oil Co. v. Amoco Corp., 970 F.2d 885, 889 (Fed. Cir. 1992).*

Finally, Plaintiffs' argument is not furthered by its allegation that InterDigital's CEO, Howard Goldberg, recently threatened it with a lawsuit. In the allegedly threatening conversation, Mr. Goldberg was responding to a question in a conference call from an analyst regarding whether Defendants had any leverage in the arbitration that had been initiated by Plaintiffs:

FRANK MARSALA: Then just a Nokia question on that issue. Is there any leverage that you guys have today? Is there anything you can do to influence Nokia to bring this matter to a close--here I'm talking about things like bringing injunctions against them--shipping handsets--things of that sort of [sic]. So, I'm curious about that.

HOWARD GOLDBERG: Let me first say that we certainly will look at every point of leverage. The dynamics in a situation such as this are very important. We will look--and have been looking--at how we can drive this to a successful resolution. Through internal and external [*12] resources. One of the ways that leverage is best used is as a surprise or-certainly you don't want to create an anticipation of anything that you may do. So the answer is yes. But I would be very reluctant to

2005 U.S. Dist. LEXIS 34899, *; 2006-1 Trade Cas. (CCH) P75,106

talk about it and layout our plan for deal-
ing with this particular matter.

(D.I. 1, Ex. T, p. 14). In the Court's view, Mr. Goldberg
is discussing the leverage that Defendants will use to
defend their rights in the arbitration initiated by Plain-
tiffs. It would be illogical to require patent owners to
state that they have no leverage in legal proceedings ini-
tiated by a competitor in order to avoid giving rise to that
competitor's reasonable apprehension. Thus, the Court
finds that the answer by Mr. Goldberg was "reflexive and
obligatory." *Shell, 970 F.2d at 889.*

The Federal Circuit has stated that satisfaction of the
two-part test is not a requirement for every declaratory
judgment action. *Fina Oil & Chem. Co. v. Ewen, 123
F.3d 1466, 1470 (Fed. Cir. 2003).* Plaintiffs, therefore,
contend that the Court should also consider a ripeness
test to determine whether there is a sufficient contro-
versy. Plaintiffs cite several cases in support [*13] of
this standard, but in each of those cases, the court still
applied the two-prong test. See *Teva Pharms. USA, Inc.
v. Pfizer Inc., 395 F.3d 1324 (Fed. Cir. 2005); Fina Oil,
123 F.3d 1466; GAF Bldg. Materials Corp. v. Elk Corp.,
90 F.3d 479 (Fed. Cir. 1996); EMC Corp., 89 F.3d 807.*
Other cases cited in Plaintiffs' analysis either did not
discuss the Declaratory Judgment Act or did not discuss
whether an actual controversy existed. See *Dow Chem.
Co. v. Exxon Corp., 30 F. Supp. 2d 673 (D. Del. 1998);
Cedars-Sinai Med. Ctr. v. Watkins, 11 F.3d 1573 (Fed.
Cir. 1993). Nat'l Org. of Veterans' Advocates, Inc. v.
Sec'y of Veterans Affairs, 330 F.3d 1345 (Fed. Cir. 2003)*
Moreover, even if the case were ripe for review, the
Court still could not hear the case unless an actual con-
troversy existed, which the Court has concluded does
not. Accordingly, the Court declines to apply a test dif-
ferent from the two-prong test applied above.

In sum, the Court concludes that Plaintiffs did not
have a reasonable apprehension of litigation at the time
the Complaint was filed. Therefore, [*14] there is no
actual controversy to support the Court's jurisdiction over
the declaratory judgment claims under the Declaratory
Judgment Act. Accordingly, the Court will dismiss Plain-
tiffs' declaratory judgment claims for lack of subject mat-
ter jurisdiction.

B. Whether Plaintiffs' Claim Under *Section 43* Of
the Lanham Act Should Be Dismissed Pursuant to *Rule
12(b)(6)* For Failure To State A Claim

1. *Legal Standard*

Defendants also request that the Court dismiss Plain-
tiffs' claim under *Section 43* of the Lanham Act pursuant
to *Rule 12(b)(6)* for failure to state a claim upon which
relief may be granted. *Fed. R. Civ. P. 12(b)(6).* The pur-

pose of a motion to dismiss is to test the sufficiency of a
complaint, not to resolve disputed facts or decide the
merits of the case. *Kost v. Kozakiewicz, 1 F.3d 176, 183
(3d Cir. 1993).* Dismissal is only appropriate when "it
appears beyond doubt that the plaintiff can prove no set
of facts in support of his claim which would entitle him
to relief." *Conley v. Gibson, 355 U.S. 41, 45-46, 78 S. Ct.
99, 2 L. Ed. 2d 80 (1957).*

2. *Analysis*

To state a claim under *§ 43(a)* of the Lanham Act, a
plaintiff [*15] must allege that: (1) defendant made false
or misleading statements as to its products, or those of
the plaintiff; (2) there was actual deception or at least a
tendency to deceive a substantial portion of the intended
audience; (3) the deception was material in that it is
likely to influence purchasing decisions; (4) the adver-
tised goods traveled in interstate commerce; and (5) there
is a likelihood of injury to the plaintiff in terms of declin-
ing sales, loss of good will, etc. *Johnson & Johnson-
Merck Consumer Pharms. Co. v. Rhone-Poulenc Rorer
Pharms., Inc., 19 F.3d 125, 129 (3d Cir. 1994).* Addi-
tionally, a plaintiff must demonstrate that the patent
holder acted in bad faith. *Zenith Elecs. Corp. v. Exzec,
Inc., 182 F.3d 1340, 1353 (Fed. Cir. 1999).*

Accepting as true all allegations in Plaintiffs' Com-
plaint and drawing all reasonable inferences therefrom,
the Court concludes that, at this juncture, Plaintiff has
stated a claim under *Section 43* of the Lanham Act suffi-
cient to survive Defendants' motion to dismiss. Plaintiffs
allege that Defendants made false or misleading state-
ments in bad faith to the effect that Defendants' patents
cover Plaintiffs' [*16] 3G products. Plaintiffs further
allege that these statements are material and "have
caused actual deception or have a tendency to deceive."
(D.I. 1 at 35). Additionally, Plaintiffs have alleged that
the misrepresentations have injured Plaintiffs in their
business and have damaged their reputations.

The requirement that the advertised goods have
traveled in interstate commerce is not as clearly alleged
as the other requirements. Drawing all reasonable infer-
ences in the light most favorable to Plaintiffs, however,
the Court concludes that the statement "Nokia is cur-
rently designing, rolling out and further developing 3G
products in the United States that will be manufactured
and sold by Nokia after 2006" means that at least some
3G products have already been developed and entered
interstate commerce. n1 (D.I. 1 at 6). Accordingly, the
Court will deny Defendants' motion to dismiss pursuant
to *Rule 12(b)(6).*

n1 Defendants quote this statement to dem-
onstrate that Plaintiffs are suing on future prod-

2005 U.S. Dist. LEXIS 34899, *; 2006-1 Trade Cas. (CCH) P75,106

ucts. Read in the context of the entire paragraph and in the light most favorable to Plaintiffs, however, the Court concludes the statement means that some 3G products have already been made ("rolled out") and will continue to be made after the licensing agreement expires ("further developed").

[*17]

**IV. Conclusion**

For the reasons discussed, Defendants' Motion To Dismiss For Lack Of Jurisdiction Over The Subject Matter Pursuant To *Federal Rules Of Civil Procedure 12(b)(1)*, *12(b)(6)*, and *12(h)(3)* (D.I. 10) will be granted in part and denied in part.

An appropriate Order will be entered.

**ORDER**

At Wilmington, the 21 day of December 2005, for the reasons set forth in the Memorandum Opinion issued this date;

IT IS HEREBY ORDERED that Defendants' Motion To Dismiss For Lack Of Jurisdiction Over The Subject Matter Pursuant To *Federal Rules Of Civil Procedure 12(b)(1)*, *12(b)(6)*, and *12(h)(3)* (D.I. 10) is **GRANTED** as to Plaintiffs' declaratory judgment claims and **DENIED** as to Plaintiffs' claim under *Section 43* of the Lanham Act.

Joseph J. Farnan Jr.

UNITED STATES DISTRICT JUDGE

# EXHIBIT 8

LEXSEE 2005 US DIST LEXIS 30353

**FRANK E. ACIERNO, CHRISTIANA TOWN CENTER, LLC, a Delaware limited liability company, 395 ASSOCIATES, LLC, a Delaware limited liability company, ESTATE HOMES, INC., a Delaware corporation, Plaintiffs, v. GEORGE O. HAGGERTY, individually and in his official capacity as Assistant General Manager of the New Castle County Department of Land Use, TIMOTHY P. MULLANEY, individually and in his capacity as New Castle County Attorney, CHARLES L. BAKER, individually and in hi capacity as General Manager of the New Castle County Department of Land Use, JAMES H. EDWARDS, individually and in his capacity as Inspections Manager and Licensing Division Manager of the New Castle County Department of Land Use, and SHERRY L. FREEBERY, in her individual capacity as Chief Administrative Office of New Castle County and NEW CASTLE COUNTY, a political subdivision of the State of Delaware, Defendants.**

**Civil Action No. 04-1376-KAJ**

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF DELAWARE**

*2005 U.S. Dist. LEXIS 30353*

**November 23, 2005, Decided**

**PRIOR HISTORY:** null*Sterling Prop. Holdings, Inc. v. New Castle County, 2004 Del. Ch. LEXIS 65 (Del. Ch., May 6, 2004)*
*Christiana Town Ctr., LLC v. New Castle County, 2004 Del. LEXIS 576 (Del., Dec. 16, 2004)*
*Christiana Town Ctr., LLC v. New Castle County, 2004 Del. LEXIS 26 (Del., Jan. 16, 2004)*
*New Castle County v. Sterling Properties, Inc., 379 A.2d 1125, 1977 Del. LEXIS 528 (Del., 1977)*
*Acierno v. Mitchell, 6 F.3d 970, 1993 U.S. App. LEXIS 25126 (3d Cir. Del., 1993)*

**COUNSEL:** [*1] Richard L. Abbott, Esq., Abbott Law Firm, LLC, Hockessin, DE, Counsel for Plaintiffs.

Dennis J. Siebold, Esq., New Castle County Department of Law, New Castle, Delaware, Counsel for Defendant New Castle County, Of Counsel; Hamilton P. Fox, III, Esq., Gregory S. Smith, Esq., Carter L. Williams, Esq., Sutherland Asbill & Brennan LLP, Washington, D.C.

Collins J. Seitz, Jr., Esq., Matthew F. Boyer, Esq., Max B. Walton, Esq., Connolly Bove Lodge & Hutz LLP, Wilmington, Delaware, Counsel for Defendant Scott G. Wilcox.

Michael P. Kelly, Esq., Paul A. Bradley, Esq., McCarter & English, Wilmington, Delaware, Counsel for Defendant Charles L. Baker.

Claire M. DeMatteis, Esq., Stradley, Ronon, Stevens & Young, LLP, Wilmington, Delaware, Counsel for Defendant Sherry L. Freebery, Of Counsel: C. Clark Hodgson, Jr., Esq., Sean R. Adams, Esq., Stradley, Ronon, Stevens & Young, LLP, Philadelphia, Pennsylvania.

Joseph R. Biden, III, Esq., Ian Connor Bifferato, Esq., Joseph K. Koury, Esq., Bifferato, Gentilotti Biden & Balick P.A., Wilmington, Delaware, Counsel for Defendant Timothy P. Mullaney.

David A. Felice, Esq., Cozen O'Connor, Chase Manhattan Center, Wilmington, Delaware, [*2] Counsel for Defendants George O. Haggerty and James H. Edwards, Of Counsel: Jeffery I. Pasek, Esq., Cozen O'Connor, Philadelphia, Pennsylvania.

**JUDGES:** Kent Jordan, UNITED STATES DISTRICT JUDGE.

**OPINION BY:** Kent Jordan

**OPINION:**

   **MEMORANDUM OPINION**

**JORDAN, District Judge**

**I. INTRODUCTION**



2005 U.S. Dist. LEXIS 30353, *

The Amended Complaint (Docket Item ["D.I."] 9) filed in this case by plaintiffs Frank E. Acierno, Christiana Town Center, LLC ("CTC"), 395 Associates, LLC ("395"), and Estate Homes, Inc. ("EHI") (collectively, "Acierno") alleges that the defendants violated Acierno's constitutional rights and the Racketeer Influenced and Corrupt Organizations Act, *18 U.S.C. § 1961 et. seq.* ("RICO"), through various actions affecting the commercial development of Acierno's land. (D.I. 9 at PP51-71.) Acierno also alleges state law claims denominated as "civil conspiracy" and "tortious aiding and abetting." (*Id.* at PP72-82.)

Before me now is a Motion to Dismiss the Amended Complaint (D.I. 37) filed by defendant New Castle County (the "County"). Also before me is a Motion to Dismiss the Amended Complaint or Stay the Proceedings (D.I. 40) filed by defendants George O. Haggerty [*3] ("Haggerty"), Scott G. Wilcox ("Wilcox"), Timothy P. Mullaney ("Mullaney"), Charles L. Baker ("Baker"), James H. Edwards ("Edwards") and Sherry L. Freebery ("Freebery") (collectively, the "Individual Defendants"). In addition to those motions, I also have before me a Motion for Leave to File a Second Amended Complaint (D.I. 50), filed by Acierno. The County and the Individual Defendants (collectively, "Defendants") countered with a jointly submitted Motion for Briefing Schedule on Plaintiffs' Motion for Leave to File a Second Amended Complaint. (D.I. 61.)

Jurisdiction over this case exists under *28 U.S.C. § 1331* and *§ 1367.* For the reasons that follow, the Motions to Dismiss filed by the County and the Individual Defendants will be granted to the extent that the Amended Complaint will be dismissed without prejudice. Acierno's Motion for Leave to Amend and the joint Motion for Briefing Schedule on the Motion for Leave to Amend will be denied as moot.

## II. BACKGROUND n1

n1 The following information is drawn from the parties' submissions and is viewed in the light most favorable to the plaintiffs. Materials beyond the pleadings are being considered in accordance with my determination that I may take judicial notice of prior judicial and administrative proceedings. *See infra* at 11-12.

[*4]

Frank E. Acierno owns CTC, 395, and EHI. (D.I. 9 at PP2-4.) Acierno alleges that starting in 2002, defendants Freebery, Haggerty, and Wilcox, n2 acting in their positions in the government of New Castle County, "decided to act in concert to plan and carry out a scheme and

conspiracy to deny Acierno his legal right to use and develop properties owned by him" in New Castle County. (*Id.* at P19.) In his Complaint, Acierno sets out seven different land development disputes between Acierno and the County, disputes which have led to numerous proceedings in the Delaware state courts and local administrative agencies. (*Id.* at PP20-49.) Acierno also alleges additional wrongs beyond those seven disputes, which have also led to proceedings in Delaware state courts. (*Id.*)

n2 Freebery served as Chief Administrative Officer of New Castle County in the administration of County Executive Thomas P. Gordon (Mr. Gordon individually is referred to as "Gordon," and his administration as the "Gordon Administration"). (D.I. 9 at P10.) Haggerty was employed by the Gordon Administration as the Assistant General Manager of the New Castle County Department of Land Use. (*Id.* at P5.) Wilcox acted during the time in question either as First Assistant County Attorney or as private counsel on behalf of the County in dealing with legal issues between the County and Acierno. (*Id.* at P6.)

[*5]

1. Dispute over Red Lion Village by Sterling Properties

Acierno alleges that on December 31, 2002, Haggerty and Wilcox n3 cancelled a pre-construction meeting regarding a property known as Red Lion Village, which was owned by another Acierno company, Sterling Property Holdings, Inc. (D.I. 9 at P20.) Wilcox sent letters to Acierno on December 31, 2002 and January 2, 2003, stating that the County could not grant any application to Acierno because he was not in good standing with the County based on unresolved violations at other sites. (*Id.* at P21, D.I. 42 at A377, A379.) On February 4, 2003, Baker n4 sent a letter on behalf of the New Castle County Department of Land Use (the "Department of Land Use" or the "Department") to Acierno stating that, because Acierno had not started building on Red Lion Village within five years of adoption of the Unified Development Code (the "Sunsetting Provision"), his plan had to be resubmitted before he would be permitted to begin building. (D.I. 42 at A387.)

n3 Acierno alleges that Baker and Mullaney, as supervisors of Haggerty and Wilcox, respectively, are liable for violations of Acierno's rights committed by their subordinates. (D.I. 9 at PP44-

45.) Furthermore, Acierno claims that Freebery, as supervisor of Baker and Mullaney, is liable both for her failure to supervise and for directing the "unconstitutional actions . . . taken against Acierno." (*Id.* at P46.)

[*6]

> n4 Baker was employed as the General Manager of the New Castle County Department of Land Use, and was Haggerty's direct supervisor. (D.I. 9 at P8.)

Acierno appealed the February 4th decision to the New Castle County Planning Board (the "Planning Board"), which affirmed the decision of the Department of Land Use in cancelling the meeting, finding that the Department had properly interpreted the provisions at issue. (D.I. 42 at A436-38.) Acierno, through Sterling, filed a Complaint in the Delaware Court of Chancery, No. 20408NC, against the County, the Department of Land Use, and the Planning Board. (D.I. 42 at A361-75.) The Court of Chancery granted judgment on the pleadings to the County as to the challenge to the legality of the Sunsetting Provision, but allegations as to the unconstitutional conduct of the Individual Defendants in cancelling the December 31 meeting are still pending in the Court of Chancery. *Sterling Prop. Holdings, Inc. v. New Castle County, 2004 Del. Ch. LEXIS 65, C.A. No. 20408, 2004 WL 1087366, at *3 (Del. Ch. May 6, 2004).*

**2. Drainage Violation Notice to Christiana Town [*7] Center**

Acierno next alleges that on January 15, 2003, Haggerty and Wilcox issued a Violation Notice under the County Drainage Code to CTC. (D.I. 9 at P23.) Acierno claims that certain Plaintiffs were given less that 24 hours notice of the hearing, which was scheduled by Haggerty and Wilcox. (*Id.*) Acierno alleges that at the hearing, Haggerty and Wilcox found CTC to be in violation of "numerous non-existent provisions of the County Drainage Code." (*Id.*) CTC appealed this decision to the County Board of License Inspection & Review (the "Review Board"), which affirmed the decision made at the hearing. (D.I. 42 at A109-10.) CTC filed a petition for a writ of certiorari in the Superior Court; that court denied the writ and dismissed the action, noting that CTC had waived normal service by failing to object to the timing at the hearing. *Christiana Town Ctr. v. New Castle County, 2004 Del. Super. LEXIS 209, C.A. 03A-07-008 (RSG), 2004 WL 1551457, at *1-4 (Del. Super. Ct. July 7, 2004).* Acierno and CTC appealed to the Delaware Supreme Court, which affirmed the judgment. *Christiana Town Ctr., LLC v. New Castle County, 2004 Del. LEXIS 576, C.A. No. 3342004, 2004 WL 2921830 [*8] (Del. Dec. 16, 2004).*

**3. Christiana Town Center Buildings 4 and 5**

Acierno next alleges that Defendants issued a "factually incorrect and legally unsupported Violation Notice [to CTC] regarding the alleged failure to obtain a Certificate of Occupancy for Building Nos. 4 and 5." (D.I. 9 at P24.) Acierno alleges that CTC had Certificates of Occupancy for the occupied buildings, and was in full compliance with the County Code. (*Id.*) After a decision against him at a Rule to Show Cause hearing before the Department of Land Use, Acierno appealed to the Review Board, which affirmed the decision below. (D.I. 42 at A286-87; A104-06.) Acierno again filed a petition for a writ of certiorari in the Superior Court (D.I. 42 at A95-103), and that court entered a stipulation of dismissal on March 8, 2004. (D.I. 44 at A942.)

**4. Christiana Town Center Bertucci's**

Acierno alleges that Haggerty and Wilcox next deprived him of his constitutional rights "by improperly and unlawfully denying Christiana and one of its tenants, Bertucci's Restaurant Corp., the ability to obtain building permits." (D.I. 9 at P25.) Acierno asserts that Wilcox acted outside his role as First Assistant County [*9] Attorney and acted as an administrative decision maker. (*Id.*) Acierno filed an action in the Court of Chancery contesting the denial, but that court found that Acierno had an adequate remedy at law and had failed to exhaust all administrative remedies. *Christiana Town Ctr. LLC v. New Castle County, 2003 Del. Ch. LEXIS 60, C.A. No. 20214, 2003 WL 21314499, at *4 (Del. Ch. June 6, 2003).* After the Supreme Court affirmed the decision of the Court of Chancery, *2004 Del. LEXIS 26, No. 3182003, 2004 WL 77868 (Del. Jan. 16, 2004),* Acierno filed a complaint in the Superior Court on the same issues. (D.I. 42 at A251-58.) A stipulation of dismissal was entered in that action on February 20, 2004. (D.I. 44 at A941.)

**5. Home Warranties**

Acierno next claims that Haggerty and Wilcox deprived him of his constitutional rights by refusing to issue Letters of Compliance after Acierno had submitted documentation showing that he had cured prior home warranty violations. (D.I. 9 at P27.) Acierno filed an action in the Delaware Superior Court for New Castle County seeking a writ of mandamus to force the issuance of the Letters of Compliance. (*Id.*) When that court indicated that it would likely issue the [*10] writ, the Letters of Compliance were issued. (*Id.* at P28.)

**6. Christiana Town Center Drainage Code Violation**

According to Acierno, on June 11, 2003, Wilcox and Haggerty issued "a Violation Notice . . . regarding certain bogus charges under the County Drainage Code" to CTC. (D.I. 9 at P29.) A Rule to Show Cause Hearing was held on July 8, 2003, during which, Acierno alleges, Haggerty and Wilcox committed "half a dozen or more violations of Acierno's Constitutional Due Process Rights" at a "'kangaroo court' session." (*Id.* at P30.) After a decision against him at the hearing, and after Acierno's petition for a writ of certiorari in the Superior Court was dismissed as premature, *2003 Del. Super. LEXIS 318, Civ. A. No. 03A-08-007 (RSG), 2003 WL 22120857, at *1 (Del. Super. Ct. Sept. 10, 2003)*, CTC appealed to the Review Board, which affirmed the decision made at the hearing. (D.I. 44 at A878-83.) Acierno then filed another action in the Delaware Superior Court, challenging the actions of the Department of Land Use and the Review Board, and alleging that CTC's due process rights were violated by the failure to provide sufficient notice of the violations. (D.I. 44 at A822-34.) That action [*11] is currently pending.

7. Denial of Phase 4 Building Permit at Christiana Town Center

Acierno also alleges that Haggerty and Wilcox, in August 2003, ordered County personnel not to issue a building permit for Phase Four of CTC. (D.I. 9 at P33.) Acierno alleges that one of the reasons cited by Haggerty and Wilcox for denying the permit, namely the failure to receive a letter from DelDOT regarding road improvements, was impossible to comply with because "DelDOT had refused to permit the road work and had dubbed it unnecessary in June of 2002." (*Id.*) Acierno further alleges that all of the other reasons cited for denying the permit were either not required by the County Building Code or were manufactured by Haggerty and Wilcox. (*Id.*)

Acierno sought a writ of mandamus in the Delaware Superior Court to overturn the action of the Department of Land Use. (D.I. 43 at A463-70.) The Superior Court denied relief, finding that a writ of mandamus was not appropriate based on the facts presented. *Christiana Town Ctr. v. New Castle County, 2004 Del. Super. LEXIS 302, No. Civ. A. 03M-08-072 (RSG), 2004 WL 2088032, at *1 (Del.Super. 2004)*. Acierno then filed a Complaint in the Delaware Court [*12] of Chancery based on the same dispute. (D.I. 44 at A969-77.) That case is still pending.

8. Other Alleged Wrongs n5

n5 The Individual Defendants allege that these remaining allegations relate to five separate proceedings arising out of a dispute over so-

called "stop work" orders issued to address violations at CTC. With respect to the first stop work order, the proceedings include a petition for a writ of certiorari to the Delaware Superior Court filed by Acierno that was dismissed for failure to appeal to the Review Board, *Christiana Town Center, LLC v. New Castle County, 2003 Del. Super. LEXIS 318, 2003 WL 22120857 (Del. Super. Sept. 10, 2003)*, and a complaint filed by the County in the Court of Chancery that was dismissed by stipulation without prejudice (D.I. 44 at A943). A second stop work order was issued, and three proceedings followed: an appeal to the Review Board by Acierno, in which the Board upheld the stop work order (D.I. 44 at A929-33); a suit filed by the County in the Court of Chancery, in which the County alleged that CTC had violated the stop work order (D.I. 43 at A510-32) and Acierno claimed that the Code provisions at issue were unconstitutional (*id.* at A897-99); and a petition for a writ of certiorari filed by Acierno alleging that the stop work order violated his federal and state due process rights. (D.I. 44 at A902-08.) The latter two actions remain pending.

[*13]

In addition to the seven disputes outlined above, Acierno also alleges various additional wrongs committed against him by the County and the Individual Defendants. Acierno alleges that in 2003 and 2004, Freebery used County resources to "issue multiple inaccurate press releases or written statements[,] falsely painting Acierno as a lawbreaking developer." (D.I. 9 at P34.) Furthermore, Acierno alleges that, through "uneven and selective application of the law," the Individual Defendants treated him differently than other developers who were similarly situated. (*Id.* at P35.) Acierno alleges that this unequal treatment is evidenced by Baker's personal visits to two development projects owned by another developer, which projects were then placed on the public hearing agenda despite having been "submitted late and/or incomplete." (*Id.* at PP36-37.) Acierno also notes that "Freebery for County Executive" signs were displayed on the property at those two projects. (*Id.* at P37.) Acierno claims that Gordon and Freebery gave preferential treatment to developer Verino Pettinaro, in return for favorable business deals for Gordon and Freebery. (*Id.* at PP40-41.) Furthermore, Acierno [*14] claims that developer Louis Capano has also received preferential treatment from the Individual Defendants. (*Id.* at P42.)

Acierno further alleges that he was treated unfairly by Edwards. He alleges that Edwards held a Rule to Show Cause hearing, which was improperly convened, and that Edwards issued a decision adverse to Acierno

2005 U.S. Dist. LEXIS 30353, *

six months after the hearing. (D.I. 9 at P38.) Acierno claims that when dealing with another developer on another project, Edwards found the developer in violation but fined him only $ 200 and refused to require him to fix the problem that led to the fine. (*Id.* at P39.)

## III. STANDARD OF REVIEW

A. Motion to Dismiss for Lack of Subject Matter Jurisdiction Under 12(b)(1)

Once jurisdiction is challenged, the party asserting subject matter jurisdiction has the burden of proving its existence. *See Carpet Group Int'l v. Oriental Rug Importers Ass'n, Inc., 227 F.3d 62, 69 (3d Cir. 2000)*. Under *Rule 12(b)(1)*, the court's jurisdiction may be challenged either facially, based on the legal sufficiency of the claim, or factually, based on the sufficiency of jurisdictional facts. *See 2 James W. Moore, Moore's Federal Practice § 12.30* [*15] *[4] (3d ed. 1997)*. Under a facial challenge to jurisdiction, the court must accept as true the allegations contained in the complaint. *See id.* Dismissal for a facial challenge to jurisdiction is "proper only when the claim 'clearly appears to be immaterial and made solely for the purpose of obtaining jurisdiction or . . . is wholly insubstantial and frivolous.'" *Kehr Packages, Inc. v. Fidelcor, Inc., 926 F.2d 1406, 1408-1409 (3d Cir. 1991) (quoting Bell v. Hood, 327 U.S. 678, 682, 66 S. Ct. 773, 90 L. Ed. 939 (1946))*.

Under a factual attack, however, the court is not "confined to allegations in the . . . complaint, but [can] consider affidavits, depositions, and testimony to resolve factual issues bearing on jurisdiction." *Gotha v. United States, 115 F.3d 176, 179, 36 V.I. 392 (3d Cir. 1997). See also Mortensen v. First Fed. Sav. & Loan Ass'n, 549 F.2d 884, 891-892 (3d Cir. 1977)*. In such a situation, "no presumptive truthfulness attaches to plaintiff's allegations, and the existence of disputed material facts will not preclude the trial court from evaluating for itself the merits of jurisdictional claims." *Carpet Group, 227 F.3d at 69* [*16] *(quoting Mortensen, 549 F.2d at 891)*. Although the court should determine subject matter jurisdiction at the outset of a case, "the truth of jurisdictional allegations need not always be determined with finality at the threshold of litigation." *Moore at § 12.30[1]*. Rather, a party may first establish jurisdiction "by means of a nonfrivolous assertion of jurisdictional elements and any litigation of a contested subject-matter jurisdictional fact issue occurs in comparatively summary procedure before a judge alone (as distinct from litigation of the same fact issue as an element of the cause of action, if the claim survives the jurisdictional objection)." *Jerome B. Grubart, Inc. v. Great Lakes Dredge & Dock Co., 513 U.S. 527, 537-38, 115 S. Ct. 1043, 130 L. Ed. 2d 1024 (1995) (citations omitted)*.

B. Motion to Dismiss Under 12(b)(6)

In analyzing a motion to dismiss pursuant to *Rule 12(b)(6)*, the court must accept as true all material allegations of the complaint and it must construe the complaint in favor of the plaintiff. *See Trump Hotels & Casino Resorts, Inc. v. Mirage Resorts, Inc., 140 F.3d 478, 483 (3d Cir. 1998)*. "A complaint should [*17] be dismissed only if, after accepting as true all of the facts alleged in the complaint, and drawing all reasonable inferences in the plaintiff's favor, no relief could be granted under any set of facts consistent with the allegations of the complaint." *Id.* The moving party has the burden of persuasion. *See Kehr Packages, Inc. v. Fidelcor, Inc., 926 F.2d 1406, 1409 (3d Cir. 1991)*.

## IV. DISCUSSION

As a threshold issue, Acierno and Defendants dispute what material may be considered in deciding a motion to dismiss under *Federal Rule of Civil Procedure 12(b)*. Along with their motion to dismiss, the Individual Defendants submitted extensive appendices containing violation notices, decisions of County administrative boards, Delaware state court complaints and attachments, answers to those complaints, decisions of Delaware state courts, and stipulations of dismissal of Delaware state court actions. (D.I. 42, 43, and 44.) Acierno claims that these materials cannot be considered at this stage because only the pleadings and materials attached to the Complaint may be considered in the context of a 12(b) motion to dismiss. [*18] n6 (D.I. 53 at 15.) The Defendants, on the other hand, contend that I can take judicial notice of prior proceedings and public records when considering a 12(b) motion. (D.I. 59 at 2.)

> n6 Acierno correctly cites the law stating that different materials can be considered in a facial and a factual attack on subject matter jurisdiction under *Federal Rule of Civil Procedure 12(b)(1)*. (D.I. 53 at 16.) However, because I determine here that the materials submitted by the Individual Defendants fall within the categories of information of which I may take judicial notice, that distinction is irrelevant here.

In the Third Circuit, "on a motion . . . to dismiss pursuant to *Rule 12(b)*, the Court is not strictly limited to the facts addressed in the pleadings; the Court may take judicial notice of additional facts where appropriate." *Southmark Prime Plus, L.P. v. Falzone, 776 F. Supp. 888, 892 (D. Del. 1991)* (finding that a court could take judicial notice of proceedings [*19] in other courts, and the contents of court records); *see also In re NAHC Sec.*

*Litig.*, 306 F.3d 1314, 1331 (3d Cir. 2002) (taking judicial notice of SEC filings).

Therefore, to the extent that the documents submitted by the Individual Defendants are public documents or the decisions of other courts, I take judicial notice of those documents and will consider them here in deciding this motion to dismiss. Contrary to Acierno's assertions, this does not turn the pending motions into ones for summary judgment.

A. The Rooker-Feldman Doctrine

Defendants first argue that the Rooker-Feldman doctrine prevents this court from hearing this action and, therefore, that this action should be dismissed under *Federal Rule of Civil Procedure 12(b)(1)*. Until recently, the Rooker-Feldman doctrine had been given a relatively expansive reading. *See, e.g., Exxon Mobil Corp. v. Saudi Basic Industries Corp.*, 364 F.3d 102 (3d Cir. 2004), *rev'd*, 544 U.S. 280, 125 S. Ct. 1517, 161 L. Ed. 2d 454 (2005). However, a recent decision of the Supreme Court limited the Rooker-Feldman doctrine, stating that it is "confined to . . . cases brought by state-court [*20] losers complaining of injuries caused by state-court judgments rendered before the district court proceedings commenced and inviting district court review and rejection of those judgments." *Exxon Mobil Corp.*, 125 S. Ct. at 1521-22. The court went on to add that a federal court is not precluded by Rooker-Feldman from exercising subject matter jurisdiction "simply because a party attempts to litigate in federal court a matter previously litigated in state court." *Id. at 1527*. "If a federal plaintiff presents some independent claim, albeit one that denies a legal conclusion that a state court has reached in a case to which he was a party, then there is jurisdiction and state law determines whether the defendant prevails under principles of preclusion." *Id. at 1527* (internal quotations and citations omitted).

Here, several state court decisions reviewed administrative board decisions and decided issues of county zoning and land use law. *See, e.g., Sterling Prop. Holdings, Inc. v. New Castle County, 2004 Del. Ch. LEXIS 65, C.A. No. 20408, 2004 WL 1087366, at *3 (Del. Ch. May 6, 2004); Christiana Town Ctr. v. New Castle County, 2004 Del. Super. LEXIS 209, C. [*21] A. 03A-07-008 (RSG), 2004 WL 1551457, at *1-4 (Del. Super. Ct. July 7, 2004); Christiana Town Ctr., LLC v. New Castle County, 2004 Del. LEXIS 26, C.A. No. 3342004, 2004 WL 2921830 (Del. Dec. 16, 2004).* Acierno challenges not the state court decisions themselves but the behavior of county officials in allegedly treating him unfairly and violating various constitutional rights. (D.I. 9 at PP21-49.) This case therefore does not fit within the paradigm of *Rooker* and *Feldman*, as explained by the Supreme Court. Accordingly, Defendants' challenge to

subject matter jurisdiction fails, and principles of preclusion under Delaware state law will apply to determine whether this court can hear this action under *12(b)(6)*.

B. Claim Preclusion and Issue Preclusion

Defendants argue that this court lacks jurisdiction to hear this case because prior litigation in state court and in administrative agencies must result in claim preclusion or issue preclusion. (D.I. 41 at 19-25.) Again, as a preliminary matter, principles of preclusion may operate to bar a claim or issue from being relitigated, but they do not deprive the court of jurisdiction. *See Exxon, 125 S. Ct. at 1527* [*22] ("Preclusion, of course, is not a jurisdictional matter."). The question, then, becomes what preclusive effect, if any, the state cases have on this case.

With respect to both claim and issue preclusion, it is clear that the decisions of state courts are given preclusive effect in later actions in federal court. n7 *See 28 U.S.C. § 1738* ("Such Acts, records and judicial proceedings or copies thereof, so authenticated, shall have the same full faith and credit in every court within the United States and its Territories and Possessions as they have by law or usage in the courts of such State, Territory or Possession from which they are taken."). Whether a final judgment by a state court precludes federal court adjudication under either res judicata or collateral estoppel n8 is a question of state law. *Migra v. Warren City School District Board of Education, 465 U.S. 75, 81, 104 S. Ct. 892, 79 L. Ed. 2d 56 (1984)*.

> n7 Although there are many decisions by administrative agencies on the disputes that Acierno attempts to litigate here, only the decisions of state courts are given preclusive effect here.

[*23]

> n8 "Res judicata" is simply another name for the doctrine of claim preclusion; similarly, "collateral estoppel" is synonymous with issue preclusion. BLACK'S LAW DICTIONARY 1312, 256 (7th Ed. 1999).

When a state court has entered final judgment in a proceeding, res judicata operates to bar a federal claim that could have been brought in that state court proceeding. *Migra, 465 U.S. at 84-85*. Under Delaware law, a party claiming preclusion under res judicata must show:

> (1) the court making the prior adjudication had jurisdiction, (2) the parties in the

present action are either the same parties or in privity with the parties from the prior adjudication, (3) the cause of action must be the same in both cases or the issues decided in the prior action must be the same as those raised in the present case, (4) the issues in the prior action must be decided adversely to the plaintiff's contentions in the instant case, and (5) the prior adjudication must be final

*Bailey v. City of Wilmington, 766 A.2d 477, 481 (Del. 2001).* n9 The determination of whether [*24] claim preclusion operates to bar a claim is "based on the underlying transaction and not on the substantive legal theories or types of relief which are sought. Under the modern rule, ordinarily a transaction gives rise to only one claim regardless of the number of ways that the claim can be asserted." *Maldonado v. Flynn, 417 A.2d 378, 381 (Del. Ch. 1980).*

    n9 In neither his complaint nor his briefs does Acierno challenge the jurisdiction of the Delaware courts or local administrative agencies that decided the relevant disputes before them. (D.I. 9, 52, 53). Furthermore, it is clear that the County, a party in all of the state court and administrative actions, is in privity with the Individual Defendants, as the Individual Defendants were employees of the County and acting within the scope of their employment in committing the alleged violations. They are therefore bound by any prior judgments against the County for actions taken in their official capacities. *See, e.g. Fox v. Christina Square Assoc., L.P., 1994 Del. Super. LEXIS 267, 1994 WL 146023, at *3 (Del.Super. 1994)* ("The concept of privity pertains to the relationship between a party to a suit and a person who was not a party but whose interest in the action was such that he or she will be bound by the final judgment as if he or she were a party.")

[*25]

    Collateral estoppel, or issue preclusion, operates to bar parties from relitigating the factual issues litigated in a prior case. *Columbia Cas. Co. v. Playtex FP, Inc., 584 A.2d 1214, 1216 (Del. 1991)* ("where a question of fact essential to the judgment is litigated and determined by a valid and final judgment, the determination is conclusive between the same parties in a subsequent case on a different cause of action"). A party alleging that a particular issue is barred by collateral estoppel must show that "(1)

a question of fact essential to the judgment, (2) [was] litigated and (3) determined (4) by a valid and final judgment." *Messick v. Star Enterprise, 655 A.2d 1209, 1211 (Del. 1995)* (internal citations and quotations omitted).

    Here, Acierno has essentially attempted to repackage the same claims that he has already pursued in state courts and before local administrative agencies. He seeks, in short, a second bite at the apple. Actually, given the number of lawsuits he has brought on these disputes, that metaphor significantly understates the apple's risk. Under the factors outlined above, it is clear that many of Acierno's claims are barred [*26] by res judicata and collateral estoppel, as those claims spring from disputes that have already been finally resolved in state courts.

    First, with respect to the dispute over Red Lion Village by Sterling Properties, the New Castle County Planning Board found that the pre-construction meeting on that property had been properly cancelled. (D.I. 42 at A436-38.) Acierno attempts to assert here, again, that this cancellation was improper. (D.I. 9 at PP19-22.) Although the Planning Board decided the same issues that are presented here, and its decision was adverse to Acierno, its decision was not final. (D.I. 42 at A436-38). Acierno brought a case in the Court of Chancery challenging those same actions by the County. (D.I. 42 at A361-75.) The Court of Chancery granted judgment on the pleadings to the County as to the legality of the Sunsetting Provision. *Sterling Prop. Holdings, Inc. v. New Castle County, 2004 Del. Ch. LEXIS 65, C.A. No. 20408, 2004 WL 1087366, at *3 (Del. Ch. May 6, 2004).* That decision precludes Acierno, under principles of collateral estoppel, from challenging the legality of the Sunsetting Provision here. However, the case in the Court of Chancery is still pending regarding [*27] constitutional claims brought by Acierno against the County, and those claims are not precluded.

    Second, with respect to the dispute over the drainage violation notice to CTC, Acierno's claims against the County and the Individual Defendants are barred by the doctrine of res judicata. In his complaint, Acierno claims that he was denied procedural due process through improper notice of the Rule to Show Cause hearing regarding that violation. (D.I. 9 at P23.) However, the Supreme Court of Delaware found that "the record shows that Christiana voluntarily, knowing and intelligently waived its due process rights to adequate notice of the RTC [Rule to Show Cause] hearing by failing to object to the inadequate notice at the actual hearing." *Christiana Town Ctr., LLC v. New Castle County, 2004 Del. LEXIS 576, No. 3342004, 2004 WL 2921830, at *3 (Del. Dec. 16, 2004).* That judicial decision was final and adverse to Acierno, and therefore the claims involving those facts are precluded.

Third, Acierno brings claims against the County and the Individual Defendants based on a dispute over a violation notice issued to CTC for failure to obtain a Certificate of Occupancy for Buildings 4 and 5. (D. [*28] I. 9 at P24.) Acierno's claims based on this dispute are also precluded by res judicata. Acierno challenged the decision of the Review Board, affirming a decision of the Department of Land Use against Acierno, by filing a petition for a writ of certiorari in the Superior Court. (D.I. 42 at A95-103.) The Review Board's decision found that CTC was not in compliance with the County Code at the time that the Violation Notice was issued. (D.I. 42 at A104-06.) The Superior Court entered a stipulation of dismissal with prejudice in that action on March 8, 2004. (D.I. 44 at A942.) That final resolution by the Delaware Superior Court precludes Acierno from bringing this claim here.

Fourth, Acierno makes claims based on the denial of building permits to CTC and its tenant, Bertucci's Restaurant Corp. (D.I. 9 at P25.) The Delaware Court of Chancery previously dismissed a case over that dispute, based partially on a finding that CTC had not exhausted all of its administrative remedies. *Christiana Town Ctr. LLC v. New Castle County, 2003 Del. Ch. LEXIS 60, C.A. No. 20214, 2003 WL 21314499, at *4 (Del.Ch. 2003)* ("appeals to a court of law cannot occur until after the Planning Board has rendered a decision. [*29] Therefore, a statutory remedy at law exists by which Christiana can appeal the County's decision to deny its application to the Planning Board, and thereafter, to a court of law.") That decision was affirmed by the Delaware Supreme Court. *Christiana Town Ctr. LLC v. New Castle County, 841 A.2d 307, 2004 WL 77868, at *1 (Del. 2004).* Acierno then filed a complaint in the Superior Court on the same issues (D.I. 42 at A251-58), but a stipulation of dismissal with prejudice of that case was entered on February 20, 2004. (D.I. 44 at A941.) As a result, Acierno cannot now assert these claims, as the final rulings of the Delaware courts requiring Acierno to exhaust his administrative remedies bar his bringing them.

Fifth, Acierno filed an action in the Delaware Superior Court, seeking a writ of mandamus that would force the County to issue Letters of Compliance in connection with home warranty violations. (D.I. 9 at P27.) Those letters were ultimately issued by the County. (*Id.* at P28.) Acierno now asserts claims for attorneys' fees and litigation costs, as well as losses based on the loss of use of his land. (*Id.*) However, as was stated above, res judicata bars [*30] not only claims that were brought in prior proceedings, but also claims that could have been brought. *See, e.g., Migra, 465 U.S. at 84-85.* Acierno's claims of violations of his constitutional rights, as well as his claims for attorney's fees, costs, and losses could

have been brought in front of the Delaware Superior Court in connection with his motion for a writ of mandamus. *See, e.g, New Castle County v. Sterling Properties, Inc., 379 A.2d 1125, 1129 (Del. 1977)* ("The County is barred, in our opinion, by rules of privity and res judicata from litigating in this action an issue which the members of the County Council could have litigated on behalf of the County in the mandamus action."). Therefore, these claims are now barred by principles of claim preclusion.

Sixth, Acierno alleges that the County and the Individual Defendants violated his constitutional rights by issuing a "bogus" violation notice of charges under the County Drainage Code. (D.I. 9 at P29.) An action regarding this violation is currently pending in the Superior Court, and there has yet to be a final decision. (D.I. 44 at A822-34.) Therefore, the principles of res judicata and collateral [*31] estoppel do not apply to this dispute.

Seventh, Acierno claims that the County and the Individual Defendants violated his rights by refusing to issue a building permit for Phase 4 of CTC. (D.I. 9 at P33.) Acierno has brought suit alleging this violation in the Court of Chancery, but there has not been a final decision. (D.I. 44 at A969-77.) Therefore, this claim too is not precluded.

Finally, two cases, one in the Court of Chancery and one in the Superior Court, remain pending based on two separate stop work orders issued to CTC by the County. Acierno bases his claims here in part on the issuance of these stop work orders. (D.I. 9 at P35.) Because there is no final decision in the pending state cases, the underlying disputes are not barred by principles of res judicata or collateral estoppel.

C. Abstention

As was described earlier, there are five pending state court proceedings that arise out of the same factual scenarios that Acierno alleges here. Four of those were filed by Acierno, and in them he has alleged violations of his constitutional rights. (See, e.g., D.I. 42 at A373, PP50-51; D.I. 44 at A824, P9; D.I. 44 at A972, P14; D.I. 44 at A904, P12). In the fifth proceeding, [*32] which was filed by the County in the Court of Chancery, (D.I. 43 at A510-32), Acierno alleged constitutional violations in his counterclaim and answer. (D.I. 44 at A897-98, PP111-112.) Where an action in federal court essentially duplicates an action currently pending in state court, the federal court may abstain from exercising jurisdiction, as explained in *Colorado River Water Conservation District v. United States. 424 U.S. 800, 96 S. Ct. 1236, 47 L. Ed. 2d 483 (1976).* While the Supreme Court held in *Colorado River* that abstention is warranted only in exceptional, limited circumstances, *id. at 813,* such circumstances exist here.

When determining whether to abstain under *Colorado River*, a court should consider six factors: "(1) which court first assumed jurisdiction over property; (2) the inconvenience of the federal forum; (3) the desirability of avoiding piecemeal litigation; (4) the order in which jurisdiction was obtained; (5) whether federal or state law controls; and (6) whether the state court will adequately protect the interests of the parties." n10 *Spring City Corp. v. American Bldgs. Co., 193 F.3d 165, 171 (3d Cir. 1999).* Here, as to the first [*33] factor, although no specific piece of property is at issue, Acierno is litigating his right to use and develop land in New Castle County in five separate proceedings in the Delaware courts. Even though this does not directly fit into the first *Colorado River* factor, it is clear that the Delaware state courts and local administrative agencies are the desired fora for addressing land use rights. *Acierno v. Mitchell, 6 F.3d 970, 975 (3d Cir. 1993)* ("land-use regulation generally affects a broad spectrum of persons and social interests, and ... local political bodies are better able than federal courts to assess the benefits and burdens of such legislation") (citation omitted). Therefore, because the state courts in Delaware first assumed jurisdiction over Acierno's land use disputes, the first factor of *Colorado River* weighs in favor of abstention.

n10 The Supreme Court originally delineated only the first four factors. *Colorado River Water Conservation Dist. v. U. S., 424 U.S. 800, 818, 96 S. Ct. 1236, 47 L. Ed. 2d 483 (1976)* ("the court first assuming jurisdiction over property may exercise that jurisdiction to the exclusion of other courts . . . [and] may also consider such factors as the inconvenience of the federal forum, the desirability of avoiding piecemeal litigation, and the order in which jurisdiction was obtained by the concurrent forums") (internal citations omitted). The final two factors were articulated by the Supreme Court in *Moses H. Cone Memorial Hospital v. Mercury Construction Corp. 460 U.S. 1, 23, 26, 103 S. Ct. 927, 74 L. Ed. 2d 765 (1983)* ("Besides the four factors expressly discussed in Colorado River, there is another that emerges . . . the fact that federal law provides the rule of decision on the merits"; "an important reason against allowing a stay is the probable inadequacy of the state-court proceeding to protect Mercury's rights").

[*34]

The second factor of *Colorado River* weighs against abstention: the state court is no more convenient than the federal court, as the two courts are located just blocks from one another. However, the third factor, avoiding piecemeal litigation, weighs heavily in favor of abstention. As has been stated several times, Acierno already has five different suits pending in Delaware courts. (See, e.g., D.I. 42 at A361-75; D.I. 44 at A822-34; D.I. 44 at A902-08; D.I. 44 at A969-77; D.I. 43 at A510-32.) All five of these suits contain claims that the actions of the Individual Defendants and the County violated his constitutional rights. (See D.I. 42 at A373, PP50-51; D.I. 44 at A824, P9; D.I. 44 at A972, P14; D.I. 44 at A904, P12; D.I. 44 at A897-98, PP111-112.) Adding a sixth case would only further fragment the dispute resolution processes that are underway.

The fourth *Colorado River* factor also weighs in favor of abstention. The five state court proceedings that are currently pending are at different stages of completion. The present case was filed on October 21, 2004. Four of the five state court proceedings were filed in 2003, and the fifth was filed by Acierno in early [*35] October of 2004. (See D.I. 42 at A361-75; D.I. 44 at A822-34; D.I. 44 at A902-08; D.I. 44 at A969-77; D.I. 43 at A510-32.) Moreover, each of those state court cases is based on administrative proceedings that began long before this case was filed. Therefore, under the fourth *Colorado River* factor, this court should abstain and allow cases first filed in the state courts to run their course.

The next factor to be considered, whether federal or state law controls, weighs somewhat in favor of abstention. Acierno here attempts to assert claims under § 1983 and RICO, both of which are vehicles for vindicating federal rights. (D.I. 9 at PP51-71.) However, the outcome of those claims depends in large measure on the determination of whether the County and the Individual Defendants properly followed state law and regulations in their dealings with Acierno.

The final factor, whether the state court will adequately protect the interests of the parties, clearly weighs in favor of abstention. Each of the pending state proceedings presents one or more of the constitutional claims presented here. (See D.I. 42 at A361-75; D.I. 44 at A822-34; D.I. 44 at A902-08; D.I. 44 at A969-77; D. [*36] I. 44 at A897-899.) Because the Delaware courts are fully capable of addressing those claims, abstention under *Colorado River* is appropriate.

Having determined that abstention is appropriate, the next question is whether this case should be stayed or dismissed. The United States Courts of Appeal for the First, Second, Seventh, and Ninth Circuits have found that a plaintiff's decision to file overlapping suits in both state and federal court is a relevant factor to consider when determining whether a district court should dismiss the federal case. *See, e.g., American Int'l Underwriters (Philippines), Inc. v. Continental Ins. Co., 843 F.2d*

2005 U.S. Dist. LEXIS 30353, *

*1253, 1260-61 (9th Cir. 1988)*; *Villa Marina Yacht Sales, Inc. v. Hatteras Yachts, 915 F.2d 7, (1st Cir. 1990)*; *La-Duke v. Burlington Northern R.R. Co., 879 F.2d 1556, 1561 (7th Cir. 1989)*; *Telesco v. Telesco Fuel and Masons, 765 F.2d 356, 363 (2d Cir. 1985)*. As the Ninth Circuit stated, "it is clear that the rationale that prohibits plaintiffs from removing cases to federal court under *28 U.S.C. § 1441* also bars [a plaintiff] from bringing . . . [a] repetitive [*37] lawsuit in federal court." *American Int'l Underwriters, 843 F.2d at 1260*. "The district court was justified in dismissing [the plaintiff's] complaint for this reason as well as for abstention reasons." *Id. at 1261*.

Acierno has filed four of the five Delaware state suits that overlap this suit. He now recasts his state court claims in an attempt to get this court to examine what he has already litigated or is already litigating elsewhere. Acierno's claims will be dismissed without prejudice as opposed to being stayed, because the claims he brings here overlap totally with factual scenarios that he is litigating in Delaware state courts, such that, after the state cases are finally decided, it is unlikely that there will be issues left to litigate. n11 *See, e.g., Lui v. Comm'n on Adult Entm't Establishments, 369 F.3d 319, 327 (3d Cir. 2004)* ("where 'a stay of the federal suit pending resolution of the state suit meant that there would be no further litigation in the federal forum; [then] the state court's judgment on the issue would be res judicata ... [and the] stay order amounts to a dismissal of the suit.'" (*quoting Moses H. Cone Mem. Hosp., 460 U.S. at 10*)). [*38] However, in the unlikely event that some claims remain, the dismissal is without prejudice, so that Acierno may refile claims if appropriate at a later time.

n11 Whether or not state law would provide a remedy for Acierno's alleged state law claims, denominated as "civil conspiracy" and "tortious aiding and abetting," they too are subject to res judicata and abstention. As was stated above, "ordinarily a transaction gives rise to only one claim regardless of the number of ways that the claim can be asserted." *Maldonado v. Flynn, 417 A.2d 378, 381 (Del. Ch. 1980)*. Therefore, Acierno's state law claims are subject to the same preclusion as his constitutional claims and claims under RICO. Furthermore, as to those disputes which have not yet been resolved in the Delaware courts, it appears that they will turn on questions of state law, and that is yet another reason for this court to abstain. *Spring City Corp., 193 F.3d at 171 (3d Cir. 1999)* (stating that the fifth factor

under the Colorado River analysis is "whether federal or state law controls").

[*39]

D. Motion for Leave to Amend

Because I have here determined that all of the claims at issue are either barred by res judicata and collateral estoppel, or should be dismissed on grounds of abstention, I decline to reach any of the other arguments made by the parties. The current motion for leave to file a Second Amended Complaint (D.I. 50) will be denied as moot, and the joint motion filed by the County and the Individual Defendants for a Briefing Schedule on Plaintiffs' Motion for Leave to File a Second Amended Complaint (D.I. 61) will also be denied as moot.

V. CONCLUSION

Accordingly, the County's Motion to Dismiss the Amended Complaint (D.I. 37) and the Individual Defendants' Motion to Dismiss the Amended Complaint or Stay the Proceedings (D.I. 40) are granted to the extent that this case is dismissed without prejudice. Acierno's Motion for Leave to File a Second Amended Complaint (D.I. 50) and Defendants' Motion for a Briefing Schedule on the Motion for Leave to File a Second Amended Compliant (D.I. 61) are denied as moot. An appropriate order will follow.

ORDER

For the reasons set forth in the Memorandum Opinion of today's date in this matter,

IT IS HEREBY [*40] ORDERED that Motions to Dismiss the Amended Complaint filed by the County (Docket Item ["D.I."] 37), and by defendants George O. Haggerty, Scott G. Wilcox, Timothy P. Mullaney, Charles L. Baker, James H. Edwards, and Sherry L. Freebery (D.I. 40) are GRANTED to the extent that the Amended Complaint is dismissed without prejudice. Acierno's Motion for Leave to Amend the Complaint (D.I. 50) is DENIED as moot. Furthermore, the collective Defendants' Motion for Briefing Schedule on Plaintiffs' Motion for Leave to File a Second Amended Complaint (D.I. 61) is DENIED as moot.

Kent Jordan

UNITED STATES DISTRICT JUDGE

November 23, 2005
Wilmington, Delaware

# EXHIBIT 9

LEXSEE 1999 U.S. DIST. LEXIS 12246

**MAURA FOX, a citizen of the Commonwealth of Virginia, Plaintiff, v. RODEL, INC, a Delaware corporation, and WILLIAM D. BUDINGER, a citizen of the State of Delaware, Defendants. RODEL, INC, a Delaware corporation, and WILLIAM D. BUDINGER, a citizen of the State of Delaware, Counterclaim-Plaintiffs, v. MAURA FOX, a citizen of the Commonwealth of Virginia, Counterclaim-Defendant.**

**C.A. No. 98-531-SLR**

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF DELAWARE**

*1999 U.S. Dist. LEXIS 12246*

**July 14, 1999, Decided**

**NOTICE:** [*1]  FOR ELECTRONIC PUBLICATION ONLY

**SUBSEQUENT HISTORY:** As Corrected July 22, 1999.

**DISPOSITION:** Defendants' motion for partial summary judgment granted in part and denied in part.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Defendants moved for partial summary judgment as to their counterclaim against plaintiff for breach of contract, specific performance, and unjust enrichment resulting from plaintiff's alleged breach of a release agreement executed by the parties. The dispute involved claims arising from plaintiff's employment and her entitlement to certain stock options.

**OVERVIEW:** After defendant employer discharged plaintiff employee, the parties entered into a settlement agreement that released all claims except a breach of contract claim relating to certain stock options. Plaintiff's complaint sought to enforce the stock option contract and included allegations concerning plaintiff's employment and termination. Defendants (corporate employer and its president) filed a counterclaim for breach of the release agreement and filed a motion for summary judgment on the counterclaim. The court granted defendants' motion in part, holding that the release was valid and that plaintiff breached it by making allegations in her complaint concerning the employment relationship. The court held that the release was unambiguous and that plaintiff was precluded from raising claims contesting the factual circumstances of her employment and termination. The court held that the release was supported by legally sufficient consideration because plaintiff received something of value that defendants were not otherwise legally obligated to provide. Legal sufficiency of consideration was a valid question for the court, but adequacy of the consideration was not.

**OUTCOME:** The court granted defendants' motion for partial summary judgment in part because the release agreement was valid and supported by sufficient consideration because it gave plaintiff something of value to which she had no previous right. The court dismissed those counts of plaintiff's complaint that breached the terms of the release agreement but denied the motion as to defendants' claims for specific performance and unjust enrichment.

**LexisNexis(R) Headnotes**

*Civil Procedure > Summary Judgment > Evidence*
*Civil Procedure > Summary Judgment > Standards > General Overview*
*Evidence > Procedural Considerations > Burdens of Proof > Allocation*
[HN1] A court shall grant summary judgment only when the admissible evidence fails to demonstrate a genuine issue of material fact, and the moving party is entitled to judgment as a matter of law. The moving party bears the burden of proving that no genuine issue of material fact exists. Facts that could alter the outcome are material and disputes are genuine if evidence exists from which a rational person could conclude that the position of the person with the burden of proof on the disputed issue is correct.

EXHIBIT
9

*Civil Procedure > Summary Judgment > Burdens of Production & Proof > General Overview*
[HN2] If the moving party has demonstrated an absence of material fact, the nonmoving party then must come forward with specific facts showing that there is a genuine issue for trial. The court will view the underlying facts and all reasonable inferences therefrom in the light most favorable to the party opposing the motion.

*Civil Procedure > Summary Judgment > Burdens of Production & Proof > General Overview*
*Civil Procedure > Summary Judgment > Evidence*
[HN3] The mere existence of some evidence in support of the nonmoving party, however, will not be sufficient for denial of a motion for summary judgment; there must be enough evidence to enable a jury reasonably to find for the nonmoving party on that issue. If the nonmoving party fails to make a sufficient showing on an essential element of its case with respect to which it has the burden of proof, the moving party is entitled to judgment as a matter of law.

*Civil Procedure > Federal & State Interrelationships > Choice of Law > Significant Relationships*
[HN4] In Delaware, courts apply the most significant relationship test for choice of law questions in contract cases. Delaware law also permits a court to forgo an independent analysis if the contracting parties agree on what law governs.

*Civil Procedure > Settlements > Releases From Liability > Interpretation of Releases*
*Contracts Law > Contract Interpretation > General Overview*
*Contracts Law > Types of Contracts > Releases*
[HN5] Construction of contract language is a question of law. The primary consideration in interpreting a release is to give effect to the intent of the parties at the time they contracted, and the court will attempt to determine intent from the overall language of the release.

*Contracts Law > Contract Interpretation > General Overview*
*Contracts Law > Third Parties > General Overview*
[HN6] In ascertaining intent, Delaware courts adhere to the objective theory of contracts. Under this approach, a contract's construction should be that which would be understood by an objective reasonable third party.

*Contracts Law > Contract Interpretation > General Overview*
*Contracts Law > Third Parties > General Overview*
[HN7] Where the parties have entered into an unambiguous integrated written contract, the contract's construction should be that which would be understood by an objective reasonable third party. An inquiry into the subjective unexpressed intent or understanding of the individual parties to the contract is neither necessary nor appropriate where the words of the contract are sufficiently clear to prevent reasonable persons from disagreeing as to their meaning.

*Contracts Law > Contract Interpretation > Ambiguities & Contra Proferentem > General Overview*
*Contracts Law > Defenses > Ambiguity & Mistake > General Overview*
*Contracts Law > Formation > Ambiguity & Mistake > General Overview*
[HN8] The court must first determine whether the contractual language in dispute, when read in the context of the entire contract, is ambiguous. Ambiguity exists only when a contractual provision is reasonably or fairly susceptible of different interpretations or may have two or more different meanings.

*Contracts Law > Contract Interpretation > Ambiguities & Contra Proferentem > General Overview*
*Contracts Law > Defenses > Ambiguity & Mistake > General Overview*
*Contracts Law > Formation > Ambiguity & Mistake > General Overview*
[HN9] Ambiguity does not exist where the court can determine the meaning of a contract without any other guide than a knowledge of the simple facts on which, from the nature of language in general, its meaning depends.

*Civil Procedure > Summary Judgment > Standards > Appropriateness*
*Contracts Law > Defenses > Ambiguity & Mistake > General Overview*
*Contracts Law > Formation > Ambiguity & Mistake > General Overview*
[HN10] Contractual language is not rendered ambiguous simply because the parties do not agree upon its proper construction. Nor is it ambiguous simply because the parties in litigation differ concerning its meaning. The mere assertion that ambiguity or divergent intent exists will not prevent summary judgment from being entered.

1999 U.S. Dist. LEXIS 12246, *

*Contracts Law > Contract Interpretation > General Overview*
*Contracts Law > Defenses > General Overview*
*Contracts Law > Formation > Ambiguity & Mistake > General Overview*
[HN11] In the absence of ambiguity in the contract, the writing itself is the sole source for gaining an understanding of intent.

*Civil Procedure > Pleading & Practice > Pleadings > Counterclaims > General Overview*
*Civil Procedure > Settlements > Releases From Liability > General Releases*
*Contracts Law > Types of Contracts > General Overview*
[HN12] Under Delaware law, a release is valid and binding when there has been a meeting of the minds of the parties, when the release is supported by consideration, and when there has been no fraud, misrepresentation, mistake, duress, or undue influence.

*Contracts Law > Consideration > Adequate Consideration*
*Contracts Law > Consideration > Sufficient Consideration*
[HN13] Consideration for a contract can consist of either a benefit to the promisor or a detriment to the promisee. The detriment is legally sufficient if it is an act the promisee is not obligated to perform so long as it was done at the request of the promisor and in exchange for the promise. Likewise, a benefit is legally sufficient if it means receiving as the exchange for a promise some performance which the promisor was not already entitled to receive. Although the legal sufficiency of consideration is a question for judicial determination, the adequacy of consideration is not.

*Contracts Law > Consideration > Sufficient Consideration*
[HN14] If the consideration has any value whatsoever, it is sufficient to support the promise and render it enforceable.

**COUNSEL:** Thomas P. Preston, Esquire and Michael W. Teichman, Esquire, Duane, Morris & Heckscher LLP, Wilmington, Delaware, for plaintiff.

David S. Eagle, Esquire, Klehr, Harrison, Harvey, Branzburg & Ellers, Wilmington, Delaware, for defendants.

Steven R. Wall, Esquire and Jill E. Jachera, Esquire, Of Counsel, Morgan, Lewis & Bockius LLP, Philadelphia, Pennsylvania, for defendants.

**JUDGES:** Sue L. Robinson, District Judge.

**OPINION BY:** Sue L. Robinson

**OPINION:**

**MEMORANDUM OPINION**

Dated: July 14, 1999
Wilmington, Delaware

Sue L. Robinson
**District Judge**

**I. INTRODUCTION**

On September 8, 1998, plaintiff Maura Fox, a citizen of Virginia, filed this action against defendants Rodel, Inc. ("Rodel"), a Delaware corporation, and William D. Budinger, a citizen of Delaware and the President of Rodel, asserting claims for breach of contract, breach of the obligation of good faith and fair dealing, promissory estoppel, and specific performance arising out plaintiff's employment at Rodel. (D.I. 1) Specifically, plaintiff alleges that defendants breached the terms [*2] of her compensation package by failing to make available to her options to acquire common stock of Rodel. (D.I. 1) She seeks relief in excess of $ 75,000. (D.I. 1) Because there is complete diversity between the parties and the amount in controversy exceeds the statutory minimum, the court has jurisdiction over this matter pursuant to *28 U.S.C. § 1332*.

On October 12, 1998, defendants filed their answer as well as their counterclaims against plaintiff for breach of contract, specific performance, and unjust enrichment. n1 (D.I. 5) Defendants allege that counts I, II, III, IV, and V of the complaint seek recovery for claims which relate to the termination of plaintiff's employment by Rodel, the reasons for the termination, and/or the factual circumstances of the termination in contravention of plaintiff's obligations as set forth in her separation agreement and general release.

          n1 On June 17, 1999, defendants filed an amended answer. (D.I. 55)

Presently before the court is defendants' motion [*3] for partial summary judgment on all claims set forth in their counterclaims. (D.I. 19) For the reasons that follow,

the court will grant in part and deny in part defendants' motion.

## II. BACKGROUND

### A. Plaintiff's Employment History with Rodel

The following facts regarding plaintiff's employment history are undisputed. On November 15, 1996, Rodel offered plaintiff employment as its Senior Vice President for Corporate Development. (D.I. 1, P 9) The initial terms of the offer were set forth in a letter to plaintiff dated November 15, 1996 and signed by Rodel's President. (D.I. 1, PP 10-12) With regard to stock options, the offer provided as follows:

> So that you can participate in the financial growth that you enable, Rodel will issue you an option to purchase 80 shares of stock at $ 4,000 per share. The purchase rights will vest over a seven year period. The option will entitle you to purchase 10 shares immediately following your acceptance of this employment offer and, during the next seven years of your employment, 10 shares on each anniversary of your employment. The option itself will be prepared by [Rodel's] attorneys and ratified by the Board. [Rodel] will [*4] attempt to have it qualified for tax purposes. Entitlement to purchase will last until end of employment.

(D.I. 1, Ex. A) (last sentence inserted in handwriting). Also on November 15, Rodel's President sent plaintiff a facsimile transmission on his personal letterhead that stated

> an important part of your compensation will be an opportunity to participate via equity in the value you create for Rodel. The company offer includes an option to buy shares over a seven year period.
>
> In addition to that option, and in anticipation of the burden you will take from me, I will invite you to buy (at a very nominal price) a call on 400 shares of my personal Rodel stock exercisable at the rate of 40 shares per year for every year you are with [Rodel]. I intend that the strike price will be the lowest justifiable fair market value so there are no tax implications

when you buy the call. The call and option combined represent almost 5% of the company's outstanding shares. I would like the call to remain confidential between us and our attorneys.

> * * * *
>
> . . . Although this letter expresses my intention, it is possible that the final terms may not exactly follow the form [*5] outlined here.

(D.I. 1, P 13, Ex. B)

On December 11, 1996, Rodel transmitted to plaintiff a letter signed by its President which modified the terms of the November 15 offer. (D.I. 1, PP 14-15, Ex. C) With respect to the options, the letter provided that

> the stock option is currently being prepared by counsel. It will be an option to purchase 80 shares of stock at $ 4,000 per share. The purchase rights will vest over a seven year period. The option will entitle you to purchase 10 shares immediately following your acceptance of this employment offer and, during the next seven years of your employment, 10 shares on each anniversary of your employment. The option itself will be prepared by our attorneys and ratified by the Board. We will attempt to have it qualified for tax purposes. There is no requirement to purchase, and except for shares made part of a future bonus arrangement, your eligibility to purchase will remain as long as you are employed by the company (Instead of the usual expiration of purchase eligibility, part of a future bonus plan may be paid in stock from this option.).
>
> In the event the company remains private and there is no market or buyer for [*6] the stock at the time you leave the company, the company will redeem shares purchased or eligible under the option . . .
>
> * * * *
>
> In our effort to have the option be qualified, its final form may differ slightly from what I have outlined here, but we'll stay as close as possible. Obviously, the most advantageous opportunity for re-

deeming your shares will occur if there is
a ready market. That is the direction in
which I want to take the company.

(D.I. 1, P 14, Ex. C)

Both the November 15, 1996 offer of employment
and the December 11, 1996 facsimile modifying the offer
provided that

> in the unlikely event that you are termi-
> nated during your first year for some rea-
> son other than cause, the company will
> continue your salary for a period of six
> months or until you begin another job,
> whichever comes first. In the event that
> your other job is at a lower salary, the
> company will, during the six month pe-
> riod, make up the difference in compensa-
> tion.

(D.I. 22, Exs. 8, 9)

The offer was further modified by facsimile trans-
mission dated December 12, 1996:

> 2. On page two, at the end of the first
> paragraph (line four of page two), add this
> sentence: "Rodel will [*7]    provide,
> through internal financing or other suit-
> able sponsored borrowing, the funds you
> may need to purchase this and other Rodel
> stock, at interest rates no higher than mar-
> ket."
>
> * * * *
>
> You and I were and are in complete
> agreement on these points. These changes
> were necessary as a result of oversight
> and the speed with which I pulled this all
> together, rather than any effort to 'modify'
> our previously agreed terms.

(D.I. 1, P 16) n2

> n2 Plaintiff did not submit a copy of this let-
> ter to the court; defendants, however, do not con-
> test plaintiff's recitation of its contents.

Plaintiff ultimately accepted employment with
Rodel. (D.I. 1, P 17) She moved to Wilmington, Dela-
ware; contracted to sell her residence in the Washington,
D.C. area; and committed to purchasing a new residence
in Delaware.

Effective June 11, 1997, plaintiff's employment with
Rodel was terminated. n3

> n3 Plaintiff alleges that on June 5, 1997,
> prior to her termination, Rodel's President de-
> manded that she execute documents terminating
> his personal contract with her granting her the op-
> tion to purchase a call on his 400 shares of Rodel
> stock. (D.I. 1, P 19) She further alleges that on or
> about June 5, 1997, Rodel sold shares of its stock
> to Rohm and Haas, Inc. for approximately $
> 26,000 per share. (D.I. 1, P 20)

[*8]

**B. The Separation Agreement**

Following the termination of her employment, plain-
tiff and Rodel entered into negotiations regarding the
terms of a partial settlement. In a letter from her counsel
dated September 4, 1997, plaintiff stated that she was
"willing to release all of her claims against Rodel, with
the exception of claims relating to the equity position she
was promised, in exchange for the payment of approxi-
mately $ 125,000." (D.I. 22, Ex. 1) A subsequently
drafted Separation Agreement and General Release re-
flected

> the offer which Rodel is willing to make
> to resolve all matters with the explicit ex-
> ception of a claim in the nature of breach
> of contract for money damages arising out
> of the options to purchase the 400 shares
> of Mr. Budinger's personal stock in Rodel
> and the 80 shares of Rodel stock.

(D.I. 22, Ex. 2) In a letter from counsel dated September
23, 1997, plaintiff stated that she was

> prepared to agree to the scope of release
> Rodel wishes to secure. As discussed pre-
> viously, the settlement of this portion of
> [plaintiff's] claim should certainly put to
> rest all claims other than those revolving
> around the promise of equity in the com-
> pany. [*9]

Second, [plaintiff] is willing to confine her claim to the 400 shares and 80 shares to which she contends she is entitled, as a result of promises made by Rodel when she was initially employed. She is willing to agree that her claim will be confined to a contract claim, but is not willing to agree that her damages will be money damages only. As you must concede, she is entitled either to money damages based on the value of the shares or to the shares themselves.

(D.I. 22, Ex. 3) In addition, the letter discussed the amount plaintiff was to be paid "in exchange for releasing all claims other than the claim based on the equity share of Rodel." (D.I. 22, Ex. 3)

Defendants' response, dated October 1, 1997, stated that their intent with respect to the release, waiver, and covenant not to sue was

that all claims, other than a breach of contract claim(s) for the contested shares will be waived, and that [plaintiff] specifically acknowledge and agree that she voluntarily resigned from Rodel, and that the circumstances surrounding her departure from Rodel will not be the subject of any claim or challenge by her.

(D.I. 22, Ex. 4) Defendants' understanding [*10] was "that [plaintiff] retains the right to seek specific performance of the alleged agreements on the contested shares, in addition to money damages." (D.I. 22, Ex. 4)

On November 6, 1997, plaintiff executed the Separation Agreement and General Release ("Release"). (D.I. 20, Ex. A) The Release provides in part that plaintiff,

for and in consideration of the undertakings of Rodel, Inc. set forth in paragraph 2 herein, n4 and intending to be legally bound, does hereby REMISE, RELEASE AND FOREVER DISCHARGE Rodel, Inc., its subsidiaries, officers, directors, employees, agents, successors, predecessors and assigns, (collectively "the Releasees") of and from any and all manner of actions and causes of action, suits, debts, claims and demands whatsoever in law or in equity, which she ever had, now

has, or hereafter may have, or which her heirs, executors or administrators hereafter may have, by reason of any matter, cause or thing whatsoever, from the beginning of her employment with any of the Releasees to the date of this Separation Agreement and General Release, and particularly, but without limitation of the foregoing general terms, any claims arising from or relating in any [*11] way to her employment relationship with any or all of the Releasees, the terms and conditions of that employment relationship, and the termination of that relationship including but not limited to, any claims under the Age Discrimination In Employment Act, *29 U.S.C. § § 621*, et seq., Title VII of the Civil Rights Act of 1964, as amended, *42 U.S.C. § § 2000*-e et seq., and any and all other federal, state or local statutory or common law claims, now or hereafter recognized, including any claims for attorneys' fees and costs; **provided however, that the foregoing waiver and release shall not apply to a putative breach of contract claim for money damages or specific performance involving the terms of an option to purchase 400 shares of the personal Rodel stock of William Budinger, or involving the terms of an option to purchase 80 shares of Rodel stock. It is the parties' express intent that [plaintiff] is waiving and releasing any and all claims which relate to the separation of her employment from Rodel, the reasons for such separation, or the factual circumstances of such separation.**

4. In further consideration of the undertaking [*12] of Rodel, Inc. as set forth in paragraph 2 above, [plaintiff] agrees that she will not file, charge, claim or sue or cause or permit to be filed, charged, or claimed any action seeking personal legal or equitable relief (including damages, injunctive, declaratory, monetary and other relief) against any or all of the Releasees, involving any matter occurring at any time in the past up to and including the date of the execution of this Separation Agreement and General Release or involving any continuing effects of any acts or practices which may have arisen or occurred up to and including the date of the execution of this Separation Agreement

and General Release, including any matters relating to [plaintiff's] employment relationship with the Releasees; the terms and conditions of her employment, or the termination of her employment; provided however, that the foregoing covenants shall not apply to a putative breach of contract claim for money damages or specific performance involving the terms of an option to purchase 400 shares of the personal Rodel stock of William Budinger, or involving the terms of an option to purchase 80 shares of Rodel stock.

(D.I. 20, Ex. A) [*13] (Emphasis added) In return for her execution of the Release, plaintiff was to receive bi-weekly payments for the period of June 11, 1997 through December 12, 1997 at her annual salary of $ 175,000 as well as reimbursement for medical, future medical, relocation, and business expenses. (D.I. 20, Ex. A)

n4 Paragraph 2 set forth the consideration plaintiff was to receive in return for her execution of the Release. See discussion, infra.

## III. STANDARD OF REVIEW

[HN1] A court shall grant summary judgment only "when the admissible evidence fails to demonstrate a genuine issue of material fact, and the moving party is entitled to judgment as a matter of law." *Wetzel v. Tucker, 139 F.3d 380, 383 n.2 (3d Cir. 1998)* (citing *Fed.R.Civ.P. 56(c)*). The moving party bears the burden of proving that no genuine issue of material fact exists. See *Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 n.10, 89 L. Ed. 2d 538, 106 S. Ct. 1348 (1986).* "Facts that could alter [*14] the outcome are 'material,' and disputes are 'genuine' if evidence exists from which a rational person could conclude that the position of the person with the burden of proof on the disputed issue is correct." *Horowitz v. Federal Kemper Life Assurance Co., 57 F.3d 300, 302 n.1 (3d Cir. 1995)* (internal citations omitted). [HN2] If the moving party has demonstrated an absence of material fact, the nonmoving party then "must come forward with 'specific facts showing that there is a genuine issue for trial.'" *Matsushita, 475 U.S. at 587* (quoting *Fed.R.Civ.P. 56(e)*). The court will "view the underlying facts and all reasonable inferences therefrom in the light most favorable to the party opposing the motion." *Pennsylvania Coal Ass'n v. Babbitt, 63 F.3d 231, 236 (3d Cir. 1995).* [HN3] The mere existence of some evidence in support

of the nonmoving party, however, will not be sufficient for denial of a motion for summary judgment; there must be enough evidence to enable a jury reasonably to find for the nonmoving party on that issue. See *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249, 91 L. Ed. 2d 202, 106 S. Ct. 2505 (1986).* If the [*15] nonmoving party fails to make a sufficient showing on an essential element of its case with respect to which it has the burden of proof, the moving party is entitled to judgment as a matter of law. See *Celotex Corp. v. Catrett, 477 U.S. 317, 322, 91 L. Ed. 2d 265, 106 S. Ct. 2548 (1986).*

## IV. DISCUSSION

### A. Choice of Law

The parties do not dispute that Delaware law governs the claims at bar. [HN4] In Delaware, courts apply the "most significant relationship test" for choice of law questions in contract cases. See *Townsends of Arkansas, Inc. v. Millers Mut. Ins. Co., 823 F. Supp. 233, 237 (D. Del. 1993).* The court finds that Delaware is the state with the most significant relationship to claims regarding the scope of the Release as well as claims concerning the enforcement of the putative stock option agreements. Delaware law also permits a court to forgo an independent analysis if the contracting parties agree on what law governs. See *Oglesby v. Penn Mut. Life Ins. Co., 877 F. Supp. 872, 878 (D. Del. 1994)* (citations omitted). Since the parties do not dispute that Delaware law applies to defendants' counterclaims, the substantive [*16] law of Delaware shall apply to this case. See id.

### B. Ambiguity in the Separation Agreement and General Release

[HN5] Construction of contract language is a question of law. See *Pellaton v. Bank of New York, 592 A.2d 473, 478 (Del. 1991).* The primary consideration in interpreting a release is to give effect to the intent of the parties at the time they contracted, and the court will attempt to determine intent from the overall language of the release. See *Adams v. Jankouskas, 452 A.2d 148, 155-56 (Del. 1982);* see also *Chakov v. Outboard Marine Corp., 429 A.2d 984, 985 (citing Raughley v. Delaware Coach Co., 47 Del. 343, 91 A.2d 245, 248 (Del. 1952)).* [HN6] In ascertaining intent, Delaware courts adhere to the "objective" theory of contracts. See *Cantera v. Marriott Senior Living Servs., Inc., 1999 Del. Ch. LEXIS 26, No. 16498, 1999 WL 118823,* at *4 (Del. Ch. Feb. 18, 1999).* Under this approach, a contract's "construction should be that which would be understood by an objective reasonable third party." *R.E. Haight & Assocs. v. W.B. Venables & Sons, Inc., 1996 Del. Super. LEXIS 445, C.A. No. 94 C-11-023, 1996 WL 658969,* at *3 (Del. Super. [*17] Ct. Oct. 30, 1996)* (quoting *Demetree v. Commonwealth Trust Co., 1996 Del. Ch. LEXIS 112, No.*

*14354, 1996 WL 494910,* at *4 (Del. Ch. Aug. 27, 1996)). Thus,

> [HN7]
> where the parties have entered into an un-
> ambiguous integrated written contract, the
> contract[']s construction should be that
> which would be understood by an objec-
> tive reasonable third party. An inquiry
> into the subjective unexpressed intent or
> understanding of the individual parties [to
> the contract] is neither necessary nor ap-
> propriate where the words of the contract
> are sufficiently clear to prevent reasonable
> persons from disagreeing as to their
> meaning.

*Demetree,* 1996 WL 494910, at *4; accord *Eagle Indus., Inc. v. DeVilbiss Health Care, Inc., 702 A.2d 1228, 1232 (Del. 1997)* ("Contract terms themselves will be control-
ling when they establish the parties' common meaning so
that a reasonable person in the position of either party
would have no expectations inconsistent with the con-
tract language."). [HN8] The court must first determine
whether the contractual language in dispute, when read
in the context of the entire contract, is ambiguous.

Ambiguity exists only when a contractual provision
[*18] is "reasonably or fairly susceptible of different
interpretations or may have two or more different mean-
ings." *Rhone-Poulenc Basic Chems. Co. v. American
Motorists Ins. Co., 616 A.2d 1192, 1196 (Del. 1992);*
accord *SI Mgmt. L.P. v. Wininger, 707 A.2d 37, 42 (Del.
1998)* (same).

> [HN9]
> Ambiguity does not exist where the court
> can determine the meaning of a contract
> "without any other guide than a knowl-
> edge of the simple facts on which, from
> the nature of language in general, its
> meaning depends."

*Rhone-Poulenc, 616 A.2d at 1196* (quoting *Holland v.
Hannan, 456 A.2d 807, 815 (D.C. 1983)).* [HN10] Con-
tractual language "is not rendered ambiguous simply
because the parties do not agree upon its proper construc-
tion." Id. Nor is it ambiguous "simply because the parties
in litigation differ concerning its meaning." *City Invest-
ing Co. Liquidating Trust v. Continental Cas. Co., 624
A.2d 1191, 1198 (Del. 1993).* "The mere assertion that
ambiguity or divergent intent exists will not prevent
summary judgment from being entered." Charles Alan

Wright et al., Federal Practice and Procedure, § 2730.1,
at 65 (1998). [*19]

In the instant action, the disagreement about the
proper interpretation of the Release is limited to the
scope of the narrow exception found in paragraphs 3 and
4. n5 What divides the parties is whether the broad lan-
guage of the Release regarding claims based on the ter-
mination of plaintiff's employment is applicable to
claims involving the stock options. Defendants contend
that the Release precludes plaintiff from raising claims
contesting the factual circumstances underlying her em-
ployment and/or termination. (D.I. 20 at 5-8) Conse-
quently, they argue, plaintiff has breached her obliga-
tions under the Release by alleging in her complaint facts
concerning her employment and separation. n6 (D.I. 20
at 5-8) According to plaintiff, defendants' interpretation
of the Release is contrary to the language of the contract
"when read as a whole because it ignores the placement
of the Carve-Out n7 as coming after the stated language
of release, and ignores the fact that the Carve-Out spe-
cifically states that the 'foregoing waiver and release'
shall 'not apply to a putative breach of contract claim . .
.'". (D.I. 22 at 8) (emphasis in original). Moreover, plain-
tiff maintains that, although [*20] relevant thereto, the
facts surrounding her employment and termination are
not the "subject" of any of the claims at issue and, there-
fore, the claims fall within the Carve-Out. (D.I. 22 at 11-
14)

n5 The parties agree that the language of the
Release is clear on its face; they differ only as to
its interpretation.

n6 Specifically, defendants look to counts I,
II, IV, and V of plaintiff's complaint. (D.I. 20 at
5-6) In support of these claims, plaintiff has al-
leged:

> 25. Rodel breached the contract
> when it prevented [plaintiff] from
> completing the vesting schedule
> outlined in its letter of November
> 15, 1996 by terminating her.

> 29. Budinger breached the contract
> when he demanded that [plaintiff]
> agree to relinquish her right to buy
> the 400 share call as a condition of
> continuing employment with
> Rodel.

42. Rodel also made performance of the parties' contract impossible by terminating [plaintiff].

50. Budinger breached the contract's covenant of good faith and fair dealing by attempting to force [plaintiff] to relinquish her right to purchase a call on 400 shares of Rodel stock from Budinger as a condition of her continued employment with Rodel.

(D.I. 1, PP 25, 29, 42, 50)
[*21]

n7 By "Carve-Out" plaintiff refers to the following language in the Release:

provided however, that the foregoing waiver and release shall not apply to a putative breach of contract claim for money damages or specific performance involving the terms of an option to purchase 400 shares of the personal Rodel stock of William Budinger, or involving the terms of an option to purchase 80 shares of Rodel stock.

The court concludes that the provision in question is not "reasonably or fairly susceptible" of differing interpretations or meanings and thus is unambiguous. n8 The Carve-Out manifests the parties' clear intent to limit the scope of future litigation to "a putative breach of contract claim" involving **only** "the terms" of the option agreements. Such wording explicitly indicates the parties' intent that in any future litigation plaintiff be precluded from relying on events surrounding her employment and/or termination in order to prove a breach of contract action. In fact, plaintiff expressly relinquished her right to pursue any claims "**relating** to the separation of [*22] her employment from Rodel, the reasons for such separation, or the factual circumstances of such separation." (Emphasis added) Any construction of the contract that would require the parties to litigate these very issues would abrogate the clear intentions of the contracting parties.

n8 [HN11] In the absence of ambiguity in the contract, "the writing itself is the sole source for gaining an understanding of intent." *E.I. duPont de Nemours & Company v. Admiral Ins. Co., 711 A.2d 45, 56 (Del. 1995);* accord *Northwestern Nat'l Ins. Co. v. Esmark, Inc., 672 A.2d 41, 43 (Del. 1996)* ("Courts consider extrinsic evidence to interpret the agreement only if there is an ambiguity in the contract."); *Citadel Holding Corp. v. Roven, 603 A.2d 818, 822 (Del. 1992)* ("It is an elementary canon of contract construction that the intent of the parties must be ascertained from the language of the contract. Only when there are ambiguities may a court look to collateral circumstances.") (citations omitted). Because the court finds no ambiguity in the construction or interpretation of the language of the Release, it has no occasion to consider the offers of extrinsic evidence on which plaintiff relies in support of her rejected interpretation. See *Eagle Indus., 702 A.2d at 1232* ("If a contract is unambiguous, extrinsic evidence may not be used to interpret the intent of the parties, to vary the terms of the contract or to create ambiguity."). The court notes, however, that the extrinsic evidence of record is consistent with the above construction.

[*23]

Consistent with the above construction, plaintiff is limited to those causes of action involving the **terms** of the option agreements that can be established without proof of the facts surrounding her employment and/or separation. She may not circumvent the express language of the Release by bringing claims that, although not based upon breach of her employment contract circumvent the express language of the Release by bringing claims that, although not based upon breach of her employment contract with Rodel, would require litigation of the events surrounding her employment and/or termination in order to prove her action. Consequently, by raising claims that rely upon allegations concerning the factual circumstances underlying her employment and the separation of her employment in the complaint, plaintiff has breached her obligations under the Release.

**C. Enforceability of the Release**

Having concluded that defendants have proved a breach of contract counterclaim against plaintiff, the court must now consider whether the Release executed by plaintiff is legally enforceable. Delaware has a long history of recognizing the validity of general releases. See *Nottingham Partners v. Dana, 564 A.2d 1089, 1105 (Del. 1989);* [*24] *Adams, 452 A.2d at 155-56.* [HN12] Under Delaware law, a release is valid and binding when there has been a meeting of the minds of the parties,

Case 1:06-cv-00605-GMS    Document 14-6    Filed 10/25/2006    Page 11 of 12

Page 10

1999 U.S. Dist. LEXIS 12246, *

when the release is supported by consideration, and when there has been no fraud, misrepresentation, mistake, duress, or undue influence. See *Delaware Lumber & Millwork, Inc. v. Anecon Constr. Co., 1996 Del. Super. LEXIS 172, Civ. A. No. 93 L-06-011, 1996 WL 280781,* at *2 (Del. Super. Ct. April 19, 1996) (citing *Egan & Sons Air Conditioning v. General Motors, 1988 Del. Super. LEXIS 166, Civ. A. No. 86 L-MY-18, 1988 WL 47314,* at *3, (Del. Super. Ct. Apr. 27, 1988)).

In the case at bar, plaintiff contests the Release on the ground that she did not receive "significant" consideration. The crux of plaintiff's argument is that she received "no significant consideration" other than that to which she was entitled as a result of her employment contract with Rodel. (D.I. 22 at 14-15) The court notes that plaintiff does not argue that the Release is invalid for lack of consideration but rather that "whatever consideration was received was insufficient to effectuate a release that goes so far (as Defendants would have it) as to preclude [plaintiff] from presenting [*25] relevant evidence at trial." (D.I. 22 at 14-15)

[HN13] Consideration for a contract can consist of either a benefit to the promisor or a detriment to the promisee. See *First Mortgage Co. v. Federal Leasing Corp., 456 A.2d 794, 795-6 (Del. 1982);* 3 Williston on Contracts § 7.3, at 36-37 (4th ed. 1992). The detriment is legally sufficient if it is an act the promisee is not obligated to perform so long as it was done at the request of the promisor and in exchange for the promise. See 3 Williston on Contracts § 7.4, at 41, 45-47. Likewise, a benefit is legally sufficient if it means receiving as the exchange for a promise some performance which the promisor was not already entitled to receive. See id. at 47-48. Although the legal sufficiency of consideration is a question for judicial determination, the adequacy of consideration is not. See id. at 24; *Affiliated Enters. v. Waller, 40 Del. 28, 5 A.2d 257, 260 (Del. Super. Ct. 1939).*

Pursuant to the terms of both the November 15, 1996 offer of employment and the December 11, 1996 facsimile modifying the offer, plaintiff was entitled to much of what she received in consideration for her [*26] execution of the Release. However, as plaintiff concedes, a percentage of the consideration did not correspond to terms appearing in her offer of employment. n9 Notwithstanding the fact that this additional consideration was "nothing more than reimbursements for some of the actual expenses [plaintiff] incurred in moving to Delaware," there is no indication in the record at bar that Rodel was either legally or contractually obligated to reimburse plaintiff for these expenditures. Therefore, this is not a case where no benefit was received by the promisee except that to which she was entitled and the promisor parted with nothing except that to which he was

already bound. In the instant action, plaintiff did, in fact, in exchange for her execution of the Release, acquire "something of value" to which she "had no previous right." *Maynard v. Durham & Southern Ry. Co., 365 U.S. 160, 163, 5 L. Ed. 2d 486, 81 S. Ct. 561 (1961)* ("'In order that there may be consideration, there must be mutual concessions. A release is not supported by sufficient consideration unless something of value is received to which the creditor had no previous right.' If, in other words, an employee [*27] receives wages to which he had an absolute right, the fact that the amount is called consideration for a release does not make the release valid.") (citations omitted). Hence, the requirement of a bargained-for benefit or detriment is satisfied. n10 That plaintiff regards the consideration she received "insignificant" is irrelevant; whether the consideration is commensurate with the promise is immaterial. [HN14] If the consideration has any value whatsoever, it is sufficient to support the promise and render it enforceable. See *Richmond Eng'g & Mfg. Corp. v. Loth, 115 S.E. 774, 787, 135 Va. 110 (Va. 1923)* (stating that where a promisor receives in exchange for his promise something to which he was not previously entitled, it is adequate consideration to support the promise "though it had been but a peppercorn").

---

n9 Paragraph 2 of the Release set forth the consideration plaintiff was to receive in return for her execution of the Release. This paragraph provided that Rodel "in full consideration of the execution of this Separation Agreement and General Release" agreed to make to plaintiff bi-weekly payments for the six-month period following her separation at her annual salary as well as to reimburse plaintiff for medical, future medical, relocation, and business expenses. (D.I. 20, Ex. A) Under the terms of both the November 15, 1996 offer of employment and the December 11, 1996 facsimile modifying the offer, plaintiff was entitled to payment of her salary for the six month period following the termination of employment if termination occurred during her first year of employment "for some reason other than cause." (D.I. 22, Exs. 8, 9) With the exception of those benefits covered by its medical/dental insurance, neither document obligated Rodel at separation to reimburse plaintiff for any expenditures she incurred as a result of her employment.

[*28]

n10 Plaintiff does not argue that she was denied the opportunity to negotiate the terms of the release; therefore, the court assumes that the

1999 U.S. Dist. LEXIS 12246, *

benefit she received was bargained-for. The objective evidence of record supports this conclusion.

## V. CONCLUSION

For the reasons stated above the court concludes that there are no genuine issues of material fact relating to defendants' counterclaim for breach of contract. The court finds that the extent counts I, II, IV, and V n11 of the complaint incorporate allegations concerning the separation of her employment from Rodel, the reasons for such separation, and/or the factual circumstances surrounding her separation (specifically, PP 25, 29, 42, 50), plaintiff has breached her obligations under the Separation Agreement and General Release. Consistent with this finding, counts I, II, IV, and V of the complaint shall be dismissed. A hearing concerning the relief, if any, that should be accorded defendants shall be scheduled. With respect to defendants' counterclaims for spe-

cific performance and unjust enrichment, [*29] the court finds that summary judgment in defendants' favor is not warranted at this time. Accordingly, the court will grant in part and deny in part defendants' motion for partial summary judgment. An appropriate order shall issue.

n11 In count I of their counterclaims to plaintiff's complaint, defendants claim that plaintiff has breached the Release through her assertion of counts I, II, III, IV, and V of the complaint. (D.I. 5, P 16) Defendants' brief in support of their motion for partial summary judgment omits reference to count III, arguing only that counts I, II, IV, and V contain allegations relating to plaintiff's separation from employment with Rodel. (D.I. 20 at 5-6) Independent review of count III reveals that none of the allegations set forth therein violate the terms of the Release.

# EXHIBIT 10

LEXSEE 2006 US DIST LEXIS 75020

**IN RE WORLD TRADE CENTER DISASTER SITE LITIGATION**

**21 MC 100 (AKH), 03 Civ. 00007 et al. (AKH)**

**UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF
NEW YORK**

*2006 U.S. Dist. LEXIS 75020*

**October 17, 2006, Decided**

**JUDGES:** [*1] ALVIN K. HELLERSTEIN, United
States District Judge.

**OPINION BY:** ALVIN K. HELLERSTEIN

**OPINION: OPINION DENYING AND GRANTING
MOTIONS FOR JUDGMENT ON THE
PLEADINGS AND FOR SUMMARY JUDGMENT**

ALVIN K. HELLERSTEIN, U.S.D.J.:

It took ten months to remove the debris that resulted
when the terrorists crashed their hijacked airplanes into
the Twin Towers of the World Trade Center on Septem-
ber 11, 2001. Thousands of workers converged on the
site, toiling day and night, seven days a week until they
completed their jobs. They risked their lives from shift-
ing debris, fires, smoke, and acrid and polluted air to
complete their work in record time, in an extraordinary
effort to close the gaping hole caused by the terrorists to
the landscape and psyche of New York and the nation.

I consider in this Opinion the claims of approxi-
mately 3,000 of these workers, claiming permanent in-
jury to their respiratory systems and their health and vi-
tality, and a shortening of their lives. They claim that the
City and its contractors, and other Defendants, were neg-
ligent in monitoring the air and assuring appropriate
safety in the workplace, particularly in not providing

adequate respiratory equipment, and assuring [*2]
proper use thereof.

Defendants now move to dismiss these claims, con-
tending that they are immune from suit pursuant to state
and federal laws providing immunity for actions under-
taken in response to a disaster created by an enemy at-
tack on the state and nation. Plaintiffs argue that Defen-
dants are not immune, particularly in light of Congress'
clear contemplation, in the Air Transportation Safety and
System Stabilization Act of 2001, that the City was ex-
posed to numerous claims resulting from or relating to
the terrorist-related aircraft crashes of September 11,
2001, and granting to the City a cap to limit its potential
liability stemming from such claims. Furthermore, Plain-
tiffs argue, Congress again recognized the City's expo-
sure to suits such as those at bar by granting a one billion
dollar fund to the City to pay for the City's losses, liabili-
ties and expenses, enabling the City to create a captive
insurance fund to insure its exposure.

I discuss the various motions of the City and other
Defendants in this Opinion and hold that the Defendants
are benefited by limited immunity, limited according to
time and activity, and that the issues are fact-intensive
and cannot be decided [*3] on motion at this juncture.
My conclusion also expresses some suggestions for the
future progression of these cases, to enable the parties to
begin discussions of settlements and to prepare for trial.

---

TABLE OF CONTENTS

I. INTRODUCTION
II. THE FACTUAL BACKGROUND
A. The Declarations of Emergency: The Immediate Government Response
B. The City Asserts Control and the Recovery Operation Commences
C. The Development of Health and Safety Standards at the Site
D. The Implementation and Enforcement of Health and Safety Standards
E. The Role of Federal Agencies
1. The Activation of Federal Assistance



EXHIBIT
10
tabbies

2006 U.S. Dist. LEXIS 75020, *

## TABLE OF CONTENTS

2. The Role of the Occupational Safety and Health Administration
3. The Role of the Environmental Protection Agency
4. The Role of the Army Corps of Engineers
F. The Rescue and Recovery Effort Comes to a Close
G. The Continuing Vitality of Applicable Safety Standards and
Labor Laws
III. THE PROCEDURAL BACKGROUND AND THE PENDING MOTIONS
A. The Procedural Background
B. The Pending Motions
IV. THE PREEMPTIVE EFFECT OF THE ATSSSA
A. The Doctrine of Preemption
B. The Alleged Preemptive Effect of the ATSSSA and the Captive
Insurance Fund
C. Discussion
V. THE MOTIONS FOR JUDGMENT ON THE PLEADINGS--STATE IMMUNITY
A. The Standard of Review
B. The New York State Defense Emergency Act
1. The Immunity Provision of the SDEA
2. The Continued Vitality of the SDEA
3. Qualifying Laws under the SDEA
4. Civil Defense Activities and the Requirement of Good Faith
a. Civil Defense Activities
b. The Requirement of Good Faith
c. Discussion
C. The Argument of Immunity Under the New York Disaster Act
1. The Limited Scope of the Disaster Act's Application
2. The Extension of Disaster Act Immunity to Non-Government Actors
D. New York State Common Law Immunity
VI. THE MOTIONS FOR SUMMARY JUDGMENT--FEDERAL IMMUNITY
A. Standard of Review
B. Derivative Federal Immunity
1. The Relevant Case Law
2. Application to the Rescue and Recovery Efforts at Ground Zero
C. Stafford Act Immunity
D. Other Bases for Federal Immunity
VII. THE MOTIONS BY THE LESSEES
A. The Work Performed by the Lessee Defendants
1. The Work Performed by Con Edison
2. The Work Performed by the Silverstein Defendants
B. Plaintiffs' Supplemental Submissions
C. Alleged Grounds of Liability
1. Dismissal of Claims Pursuant to New York Labor Law for Failure
to Show the Necessary Degree of Ownership or Control
2. Dismissal of Claims Sounding in Negligence in the Absence of Any
Duty Owed
3. Dismissal of all Remaining Claims for Failure to Show any
Underlying Claim
VIII. CONCLUSION

---

[*4]

## I. INTRODUCTION

The terrorist attacks of September 11, 2001 inflicted a gaping wound on the structure and spirit of New York City. But it did not defeat the City, nor its population. As the nation began to absorb the enormity of the devasta-

tion and loss of lives that resulted from the terrorist at-tacks, an army of responders--instrumentalities of fed-eral, state and city governments, private contractors, and thousands of firemen, policemen, paramedics, and con-struction workers--descended on the site of the devasta-tion in New York City, initially to participate in the des-perate search for survivors and, after all hope of life had faded, to assist in the recovery of remains and the clear-ing of debris. Working night and day, seven days a week, overcoming intense heat, persistent fires, and noxious fumes, the work was done and the site was cleared, in just under ten months--record time.

The extraordinary efforts of the men and women who worked on the site took a toll. A few have died, with at least one of their deaths having been attributed to the poisons they breathed while looking for survivors and clearing the debris. Anthony DePalma, Debate Revives as 9/11 Dust is Called [*5] Fatal, N.Y. Times, April 14, 2006, at B2. Many others allege serious respiratory inju-ries, threatening to shorten their lives and afflict their remaining years. Anthony DePalma, Illness Persisting in 9/11 Workers, Big Study Finds, N.Y. Times, Sept. 5, 2006, at A6. A study released by doctors at Mount Sinai Medical Center shows that approximately 70 percent of the 10,000 workers who were tested reported that they suffer from new or substantially increased respiratory problems since September 11. Id. In all, more than 3,000 of these men and women have filed suit in this Court, and even more suits are likely as respiratory injuries con-tinue to manifest themselves. Under procedures outlined in the *New York General Municipal Law section 50-e*, allowing for leave to serve notice of claims upon the City of New York outside of the prescribed 90-day period, hundreds of additional persons have gained leave by the New York Supreme Court also to file suits, adding to the lawsuits consolidated before me. *Abdelrehim v. City of New York, 2006 WL 2193044 (S.D.N.Y. Aug. 3, 2006).*

The main Defendant in these lawsuits is the City of New York. [*6] The City's Department of Design and Construction coordinated all the work on the site, draw-ing on the expertise of other City agencies, for example, the City Office of Emergency Management, and of the federal and state governments. The Port Authority of the States of New York and New Jersey, the owner of the World Trade Center site, also had a role, and it, too, is named as a Defendant. The site was divided into quad-rants, and in each, a general contractor and numerous subcontractors undertook the work; they also are Defen-dants. Finally, various entities with a property interest in buildings at and around the World Trade Center site, namely Verizon Communications, Consolidated Edison, the Silverstein Entities and the Westfield Entities, are named as Defendants.

## II. THE FACTUAL BACKGROUND n1

n1 Defendants move for judgment on the pleadings, *Fed. R. Civ. P.12(c)*, and for summary judgment, *Fed. R. Civ. P. 56*. In determining mo-tions for judgment on the pleadings, I am limited to consideration of the facts as alleged in the par-ties' pleadings and thus may not consider matters outside of the pleadings. For the limited purposes of this Opinion, however, and in the interest of providing as fully-developed a factual record as possible, I refer to the exhibits submitted in sup-port of and in opposition to the motions for sum-mary judgment on the basis of federal immunity in setting out the facts that are generally applica-ble to this decision. I recognize that this is not the ordinary course, but believe that such a complete record is warranted in a case such as this that car-ries with it unique and important public policy considerations. Reliance on documents and mat-ters outside of the pleadings should not be con-sidered as a conversion of the motions for judg-ment on the pleadings to motions for summary judgment.

[*7]

The devastation wrought by the terrorist attacks of September 11, 2001 was unimaginable. One and Two World Trade Center, once great symbols of the City's economic strength and vitality, came crashing down, consuming and entombing the remains of almost 3,000 people who were caught inside the buildings. Three World Trade Center, Four World Trade Center, and Six World Trade Center sustained extensive fire damage. Seven World Trade Center caught fire from the falling debris of the Twin Towers and, after burning unimpeded for several hours, also collapsed. See In re September 11 Property Damage and Bus. Loss Litig. (Aegis Ins. Serv. v. The Port Authority), *2006 WL 62019* at *1 (S.D.N.Y. Jan. 12, 2006) (hereinafter 7WTC). The shopping malls and parking lots beneath the World Trade Center com-plex sustained massive structural damage and partial collapse. The World Financial Center and the glassen closure of its "Winter Garden," the Verizon Building at West and Vesey Streets, the Deutsche Bank Building at 90 West Street, the St. Nicholas Church at Barclay and West streets, and 125 Cedar Street also sustained exten-sive damage.

Rescue and recovery workers, and the contractors [*8] and government agencies overseeing their efforts, were faced with the daunting task of conducting an emergency response in a hellish setting: a smoldering pile of twisted and entangled shapes of rods and beams towering over twelve stories high and weighing more

than one and half million tons, harboring fires within and emanating clouds of noxious dust and vapors. The fires took three months to go out, until December 2001. Conditions were further exasperated by the nature of the various substances present at the site. Thousands of tons of hazardous materials were released into the air of lower Manhattan, including asbestos, lead, mercury, cadmium, polychlorinated biphenyls ("PCBs"), benzene, and chromium, among others, creating a mixture of toxic gases and ultra-fine particles never before experienced on such a scale. As Plaintiffs' Master Complaint alleges:

> asbestos, lead, and mercury from such items as personal computers, main frame computers, and copy machines; mercury from florescent lights; plastics, polyvinyl chloride insulations of cables, nylon carpeting, and other materials containing and/or producing dioxins and other harmful materials when burned; benzene from the [*9] jet fuel and other petroleum products stored in the towers; lead ammunition from the on-site Secret Service shooting range; and arsenic, lead, mercury and chromium stored in the U.S. Customs Laboratory.

(Pls.' Master Compl. P376, dated Aug. 19, 2005.)

In the initial days following the attacks of September 11, the primary focus of all at the site was rescuing any potential survivors. In re World Trade Center Disaster Site Litig. (Hickey v. Port Authority of N.Y. & N.J.), *270 F. Supp. 2d 357, 372 (S.D.N.Y. 2003);* aff'd in part, dismissed in part by *McNally v. The Port Authority, 414 F.3d 352 (2d Cir. 2005)* (hereinafter Hickey). Unfortunately, there were too few and, by September 29, 2001, all hope of finding lives having faded, the search for survivors closed, and efforts turned to "demolition of the ruined structures of the Towers, removal of thousands of tons of debris, and cleanup of the World Trade Center site[.]" *Hickey, 270 F. Supp. at 372.*

### A. The Declarations of Emergency: The Immediate Government Response

In the aftermath of the attacks, government leaders at the local, state and federal levels [*10] took immediate action to secure physical assistance and funding for the recovery effort at the World Trade Center site. The Mayor of the City of New York, the Governor of the State of New York, and the President of the United States all declared states of emergency, authorizing and directing government agencies and officials to undertake

those measures necessary to assist the City of New York in its process of recovery.

Pursuant to the authority granted him under the Executive Law of New York, *N.Y. Exec. Law § 24* (McKinney 2006), the Mayor of the City of New York, Rudolph W. Giuliani, issued a Mayoral Order on September 11, 2001, proclaiming a local state of emergency based on the danger to public safety posed by the attacks. In declaring a state of emergency, the Mayor directed "the Police, Fire and Health Commissioners and the Director of Emergency Management to take whatever steps are necessary to preserve the public safety and to render all required and available assistance to protect the security, well-being and health of the residents of the City." Proclamation of a State of Emergency, Mayor Rudolph W. Giuliani (September 11, 2001). In subsequent proclamations, [*11] and pursuant to Executive Law section 24(1)(g) allowing for suspension of local laws and regulations during states of emergency, the Mayor directed that local regulations governing the leasing of real property to the City be suspended so as to "permit the immediate leasing of office and other space for use by City agencies in order to continue to provide essential services and critical functions of the City." Proclamation of State of Emergency, Mayor Rudolph Giuliani (Sept. 14, 2001). The Proclamation of Emergency was renewed by Mayoral Order every five days, as mandated by the Executive Law, throughout the duration of the recovery and cleanup efforts at the World Trade Center site, through the end of June 2002. See e.g., Proclamation of a State of Emergency, Mayor Rudolph W. Giuliani (Sept. 11, 2001); Proclamation of State of Emergency, Mayor Michael R. Bloomberg (June 29, 2002).

A disaster emergency was also declared for the State of New York by Executive Order of Governor George E. Pataki on September 11, 2001, pursuant to the authority granted him under the New York State and Local Natural Disaster and Man-Made Disaster Preparedness Law ("Disaster Act"). N.Y. Exec. Law § § [*12] 20-29-g (McKinney 2006). Noting the "unspeakable atrocities" that occurred in New York City, Washington D.C., and Pennsylvania, Governor Pataki "direct[ed] the implementation of the State Disaster Preparedness Plan and authorize[d]," various state agencies to take "all appropriate actions to assist in every way all persons killed or injured and their families, and protect state property and to assist those affected local governments and individuals in responding to and recovering from this disaster, and to provide such other assistance as necessary to protect the public health and safety[.]" Exec. Order No. 113 of Governor George E. Pataki (Sept. 11, 2001), N.Y. Comp. Codes R. & Regs. tit. 9, § 5.113 (2005).

On September 14, 2001, President George W. Bush, acting pursuant to the National Emergencies Act, *50*

*U.S.C. § § 1601-1651* (2006), declared the existence of a national state of emergency "by reason of the terrorist attacks at the World Trade Center ... and the Pentagon, and the continuing and immediate threat of further attacks on the United States." Proclamation No. 7463, *66 Fed. Reg. 48, 199* (Sept. 14, 2001). The [*13] declaration was deemed effective as of September 11, 2001. The declaration served also to activate the provisions of the Stafford Disaster Relief and Emergency Assistance Act ("Stafford Act"). *42 U.S.C. § § 5121-5206* (2006). Pursuant to the Presidential declaration of a national emergency, the Director of the Federal Emergency Management Agency ("FEMA"), Joe M. Allbaugh, declared that a national emergency existed in the State of New York and, in the interest of ensuring the provision of federal assistance, authorized FEMA "to allocate from funds available for these purposes, such amounts as [are] necessary for Federal disaster assistance and administrative expenses." *66 Fed. Reg. 48,682* (Sept. 21, 2001).

*B. The City Asserts Control and the Recovery Operation Commences*

The City response began mere moments after the terrorist attacks on New York City. American Airlines Flight 11 crashed into One World Trade Center at 8:40 a.m. By 8:50 a.m. on September 11, the City, initially through the Fire Department, had established its Incident Command Post and had asserted control over the World Trade Center complex and the surrounding [*14] areas. The rescue and recovery efforts at the site were thereafter coordinated through the City Office of Emergency Management ("OEM"), with the Fire Department designated as the incident commander for the site, and with the City Department of Design and Construction ("DDC") assuming total control over all aspects of safety, construction, demolition, and cleanup activities at the site.

On September 12, 2001, the DDC set up a temporary command center at Public School IS 89 in lower Manhattan, immediately to the North of the World Trade Center site, and commenced daily meetings to organize rescue and recovery efforts. Of utmost concern to the DDC was securing the World Trade Center site and limiting access to the area. Together with other City agencies, including the OEM, the DDC established stringent protocols determining "not only who would have access to the site, but also how that access would take place and under what constraints." (Pls.' Decl. at 11.) The City further enlisted the Port Authority of New York and New Jersey (the "Port Authority") to assist in maintaining the security of the perimeter and to report observed safety protocol discrepancies. (Pls.' J.A., Vol. 1, Ex. [*15] 8.)

The City also engaged private contractors for the recovery effort. On September 15, 2001, FEMA confirmed that contracts could be awarded without need for competitive bidding under the emergency conditions existing after September 11. (Pls.' J.A. Vol. 4, Ex. 53.) Requirements for competitive bidding having been waived, and pursuant to the Declarations of Emergency issued at the City, State and Federal levels, the DDC engaged Bovis Lend Lease, AMEC Construction Management, Tully Construction Company, and Turner Construction Company to "provide the work necessary for removal and demolition services." n2 (Pls.' Decl. at 6.) These four contractors were designated as the City's Primary Contractors and assumed lead roles in the recovery and cleanup efforts at the site. n3 (Pls.' J.A. Vol. 8, Ex. 149 (WTC Environmental Health and Safety Plan dated Oct. 15, 2001).) The efforts of the Primary Contractors were coordinated, and supervised, through the DDC at twice daily meetings held at the temporary command center, and by numerous visits to the worksite. By September 14, 2001, the DDC had divided the site into four quadrants with a Primary Contractor assigned as a "construction manager" [*16] for each individual quadrant. n4 The Primary Contractors acted as supervisors for their individual quadrants, with responsibility for enforcing applicable regulations and ensuring compliance.

> n2 The work of the Contractors was financed by the City. At the close of the rescue and recovery efforts, total payments to the Primary Contractors were in excess of $ 200 million.

> n3 The Primary Contractors in turn entered into subcontracts with dozens of specialty subcontractors needed to provide all services necessary to completion of the recovery effort.

> n4 The Primary Contractors were assigned to the four zones as follows: Tully Construction (Zone 1), Bovis Lend Lease (Zone 2), AMEC (Zone 3), Turner Construction (Zone 4). Two additional quadrants were also established, covering Piers 6 and 26 and the barging and marine operations (Zone 5) as well as Fresh Kills (Zone 6).

Cognizant also of the need for additional space outside of the World Trade Center complex to which all debris from the site could be [*17] removed and where searches for evidence and human remains could be conducted, the City re-opened the Fresh Kills Landfill ("Fresh Kills") on Staten Island. As debris was cleared from the site, it was loaded onto barges and transferred by the Department of Sanitation ("DOS") to Fresh Kills for sorting and further inspection.

The DDC, with the assistance of the Port Authority engineers, regulated and controlled the removal of debris from the site, and all issues pertaining thereto. Global Positioning System devices were installed in all vehicles carrying debris from the site, allowing the City to improve the efficiency of the debris removal process. All trucks leaving the site were issued "Load Debris Tickets" containing information about the destination of the truck and its cargo. As debris was removed from the site, the DDC tracked and coordinated the following: "(a) FDNY/Rescue operations; (b) Structural concerns; (c) Progress of work; (d) Weather; (e) Trucking/Traffic operations-Manifests; (f) Safety concerns; (g) Manpower (contractor/CM Staff-site & home office); (h) Equipment on site; (i) Idle equipment; (j) Material deliveries/usage; and (k) Crane issues." (Pls.' J.A. Vol. 1, [*18] Ex. 7.) The DDC further controlled all aspects relating to persons working at the site, from regulating shift changes and meal allowances, to payment and payroll.

In the initial days and weeks following September 11, the City and its Contractors, together with public utilities, worked also to restore essential services to the City. The September 11 attacks resulted in the immediate loss of power to all of lower Manhattan and in the destruction of critical components of the gas and steam infrastructure. The Con Edison substations, which had been located directly beneath World Trade Center Seven, were destroyed by fire and by the building's ultimate collapse, resulting in a critical disruption of services to Lower Manhattan. See 7WTC, 2006 WL 62019 at *7-10. Con Edison assumed sole responsibility for restoring electric, gas and steam services and related facilities that were damaged or destroyed due to the events of September 11. The Verizon Building, located at 140 West Street, also sustained severe structural damage, crippling the phone system. Other critical services, such as the transportation system running through the World Trade Center site, were also destroyed [*19] and disrupted.

*C. The Development of Health and Safety Standards at the Site*

Conditions at the World Trade Center site, particularly the hazards posed by the dust and contaminants that enveloped lower Manhattan for weeks following the attacks, posed significant dangers to the rescue and recovery workers. (Pls.' Decl. at 4.) In the months following September 11, and continuing to the close of operations at the site in June of 2002, the Occupational Safety and Health Administration ("OSHA") reported levels of various contaminants, including dioxin and asbestos, in excess of OSHA's permissible exposure limits. n5 The debris pile itself, containing what remained of two 110-story towers of concrete and steel, created its own volatile, unstable, and inherently dangerous worksite. Imple-

mentation and enforcement of viable and responsive health and safety standards was therefore essential. The workers at the site were presented with a dangerous environment, below and surrounding their work activities, threatening their health and safety.

n5 A report dated April 12, 2002 indicates that only a fraction of the total 1286 samples showed elevated level of asbestos on the debris field. (Pls.' J.A. Vol. 4, Ex. 47 ("OSHA Sampling Results Summary as of 4/12/02) at BOVCM3-000002942.) Other samples, however, showed elevated levels of silica and other compounds, including dioxins. (Id. at 000002943.) Nevertheless, as early as October 17,2001, OSHA assured the DDC that "[a]ll DDC personnel should feel confident that they are not being exposed to unhealthy levels of chemicals and that air quality around the WTC is generally good." (Pls.' J.A. Vol. 4, Ex. 67.) OSHA continued to recommend the use of respirators. (Id.)

[*20]

By September 12, 2001, the City had established itself as the lead entity charged with the development and enforcement of health and safety standards at the site, and had instituted daily meetings with representatives of the Primary Contractors as well as with the FDNY, NYPD, OEM, and OSHA, to organize the rescue and recovery operation. These meetings would continue throughout the duration of the recovery effort. At the request of the DDC, Bechtel Environmental Safety & Health ("Bechtel") also began work at the site on September 12, 2001, assisting the City with monitoring compliance with health and safety standards.

Critical to any health and safety plan was the development of appropriate standards for the use of personal protective equipment ("PPE"), including respirators. Within hours of the collapse, the FDNY advised its employees that respirators should be worn at the site and placed an order for over 5,000 respirators and 10,000 cartridges to provide its employees with the necessary respiratory protection. n6 The FDNY also ordered adapters to convert 15,000 "Scott" facemasks, designed for use with self-contained breathing equipment, to be used instead with filter cartridges. [*21] The City was also focused on establishing appropriate PPE standards at the site and, by September 21, 2001, plans were in place to:

Develop the job and site specific PPE requirements (DDC); Develop and distribute a list of required PPE to all site emer-

gency response and workers, including posters for staging areas (DDC); Provide respirator fit-testing, maintenance and use information, and comprehensive technical support (NYCDOH); Aggressively promote minimum PPE use in all areas where highest exposures may occur (NYCDOH, NYPD, FDNY, National Guard).

(Pls.' Timeline at 2.)

> n6 However, it was not until September 28, 2001 that a written order was prepared and it was not until November 26, 2001 that all necessary bureaucratic authorization was given. On September 22, 2001, the FDNY complained of the delay, and admonished officials "OEM must develop a plan ... to address overall use & respirator issue[s]." (Pls.' Decl. at 4.)

The DDC, together with the New York City Department of Health ("City [*22] DOH"), assumed primary responsibility for developing and enforcing PPE requirements, with each agency at various times proclaiming itself as the lead agency in charge of worker health and safety. As a general matter, the DDC assumed responsibility for City and contractor personnel, while the City DOH assumed responsibility for FDNY and NYPD personnel.

On September 20 and 22, the City DOH issued criteria for minimum safety gear to be worn at the site. Similarly, on September 21, and again on October 19, the City DOH issued orders mandating the use of specific protective actions to be taken as personnel and vehicles left the site:

> It is hereby ordered that all persons leaving the WTC site shall follow personal hygiene protocols, including but not limited to ... removal or HEPA vacuuming of work clothes ...
>
> It is further ordered that all vehicles leaving the WTC site be spray washed[.]

(Pls.' J.A. Vol. 5, Ex. 64 (City DOH Order dated Sept. 21, 2001).) On October 22, 2001, the City DOH issued a directive specifically addressing the use of safety equipment and respirators:

> Personal Protective Equipment Required in Debris Area
>
> - Hardhat or helmet
>
>      ***
>
> - [*23] Respirator (half-face reusable) with P100/organic vapor/acid gas (OVAG) filter cartridges

(Pls.' J.A. Vol. 6, Ex. 97 (Health Bulletin dated Oct. 22, 2001).)

The DDC, together with Bechtel, also played an important role in establishing health and safety protocols, periodically issuing Environmental Health and Safety Bulletins outlining the applicable safety standards in force at the site. In a Bulletin issued in February 2002, the DDC, after consultation with OSHA representatives, announced its concurrence with the City DOH determination as to minimum respiratory protective equipment:

> A half-face respirator with P-100, organic vapor, acid gas filters/cartridges is required within the confines of the slurry wall and for any activity or area outside the slurry wall that generates dust, fumes or vapors[.]

(Pls.' J.A. Vol. 6, Ex. 93 (February 2002 Environmental Health and Safety Bulletin).)

*D. The Implementation and Enforcement of Health and Safety Standards*

From as early as September 12, 2001, the DDC, working primarily with Bechtel, the lead contractor in charge of health and safety concerns at the site, and with the assistance of the Port Authority [*24] and the Primary Contractors, began conducting inspections in order to enforce compliance with applicable PPE requirements. Federal agencies, including the Environmental Protection Agency ("EPA") and OSHA, also participated in safety monitoring and assumed a leading role with respect to certain tasks relevant to health and safety monitoring.

By October of 2001, the City had distributed an initial version of its comprehensive Environmental Safety and Health Plan (the "ES&H Plan"), addressing all aspects of worker safety at the site. (See Pls.' J.A. Vol. 6, Ex. 99, 100, 109; Vol. 8, Ex. 149.) Numerous revisions to the Plan would follow. The ES&H Plan operated to define the "minimum acceptable requirements for ensur-

ing workers' safety and health at the World Trade Center (WTC) Emergency Project" and established the hierarchy of responsibility and enforcement. Setting forth its general purpose and the DDC's lead role in its enforcement, the Plan expressly provided as follows:

> This ES&H Plan is directly applicable to all work conducted by agency and prime contractor/subcontractor personnel engaged in any activity associated with the cleanup and recovery efforts on the WTC Emergency [*25] Project. The DDC has overall responsibility for the site's ES&H program.

(Pls.' J.A. Vol. 8, Ex. 149.)

The ES&H Plan provided that the DDC had lead responsibility for "Environmental Health and Safety Services," with the City's Primary Contractors also assuming responsibility for enforcing the terms of the Plan. Specifically, the Plan provided that "each prime contractor and their subcontractors are responsible for implementation, enforcement and compliance with all aspects of this plan." (Pls.' J.A. Vol. 8, Ex. 149.) Site monitoring was also performed by other city, state and federal agencies. The results of such monitoring, and all tests setting forth rates of exposure were to be provided to the City DOH for presentation of a final report to the DDC. Further, the DDC alone had the authority to stop work in the event of workplace hazards.

Separately from the ES&H Plan, the DDC and FDNY, as co-incident commanders at the site, together with the Primary Contractors, four separate employer/employee associations, and OSHA entered into the WTC Emergency Project Partnership Agreement (the "Partnership Agreement") on November 20, 2001, and which was subsequently revised on April 10, 2002. ( [*26] See Defs.' J.A. Vol. 3, Ex. AO (WTC Project Partnership Agreement, dated April 10, 2002).) The Partnership Agreement affirmed "the value of working in a cooperative, focused and voluntary effort to ensure a safe and healthful environment for everyone involved," and memorialized the parties' commitment to "advance the goal of environmental health and safety" and to "share safety hazard data."

In accordance with the ES&H Plan and the Partnership Agreement, reports documenting the results of these safety compliance inspections were prepared throughout the duration of the recovery effort at the direction of the DDC. The reports prepared by the DDC, and reports and documents prepared by the Primary Contractors and other agencies at the site, highlight ongoing and persistent problems with enforcing compliance with applicable PPE requirements. n7 Within the first month of initiating operations at the site, the Primary Contractors, AMEC, Tully, Bovis, and Turner, had all documented problems with PPE compliance and particularly with respirator use. Indeed, problems with respirator usage would pervade the entirety of the recovery operation at the site, with estimates prepared in January [*27] of 2002 showing compliance rates below twenty-nine percent.

> n7 Plaintiffs' timeline indicates numerous problems with enforcing compliance. (See Pls.' Timeline at 8, 11, 13, 14, 19, 20, 27, 28, 29, 30, 31, 33, 34, 35, 36, 37.) Such problems are also highlighted in the various exhibits submitted by Plaintiffs in opposition to Defendants' motions for summary judgment. Within a week of the attacks, Bechtel had noted that "[m]any workers are either not wearing or wearing inappropriate respiratory protection." (Pls.' J.A. Vol. 6, Ex. 77 (WTC Site Evaluation, Sept. 19, 2001).) An October 18, 2001 report by Bechtel summarized observed safety discrepancies. (Pls.' J.A. Vol. 6, Ex. 80 (Memo from Mike Burton, dated Oct. 18, 2001).) Also in October of 2001, the EPA notified the City Department of Health that it had observed "very inconsistent compliance with our recommendations[.]" (Pls. J.A. Vol. 4, Ex. 62 (Letter from Bruce Sprague, EPA, dated Oct. 5, 2001).) By January 2002, the DDC reported compliance rates with respirator requirements below thirty-percent. (Pls.' J.A. Vol. 6, Ex. 103, DDC Memo dated Jan. 3, 2002).) By February, compliance rates were believed to be at an all time low. (Pls.' J.A. Vol. 6, Ex. 106 (Labor Management Site Meeting dated Feb. 20, 2002).)

[*28]

*E. The Role of Federal Agencies*

The enormity of the task necessitated the involvement of, and cooperation with, federal agencies. Although the City, through the DDC, assumed primary control over the site, several federal agencies, including FEMA, OSHA, the EPA and the United States Army Corps of Engineers ("Army Corps"), participated in the rescue and recovery effort. (Pls.' J.A. Vol. 4, Ex. 49, FEMA Debris Monitoring Plan ("The City has primary responsibility for oversight and monitoring.").) These various agencies would ultimately play an active role in the efforts at the World Trade Center, most particularly through their attendance at meetings addressing overall concerns of worker health and safety and through their

assistance in developing and enforcing appropriate health and safety protocols responsive to such concerns.

1. The Activation of Federal Assistance

On September 14, 2001, President George W. Bush declared a National State of Emergency, thereby activating the Stafford Disaster Relief and Emergency Assistance Act ("Stafford Act"), *42 U.S.C. § § 5121-5206* (2006). Activation of the Stafford Act by Declaration [*29] of National Emergency allowed for implementation of the course of federal assistance provided pursuant to the framework outlined in the Federal Response Plan ("FRP"). (Defs.' J.A., Vol. 1, Ex. L (the "FRP").)

The FRP, an agreement among twenty-seven federal agencies, "establishes a process and structure for the systematic, coordinated, and effective delivery of federal assistance to address the consequences of any major disaster or emergency declared under the [Stafford Act]." (FRP, Ex. L at 1.) Specifically, the FRP sets forth a "Basic Plan," presenting "the policies and concept of operations that guide how the Federal Government will assist disaster-stricken State and local governments." (Id. at 4.) The Basic Plan provides that, upon exhaustion of local resources and at the request of the affected local government, FEMA shall operate as the lead federal agency for coordinating an appropriate federal response, providing for both technical and financial assistance. (Id. at 7-8, 12.)

The FRP further coordinates the structure and nature of federal assistance by grouping the types of federal assistance most likely to be utilized by overwhelmed state and local governments into [*30] twelve separate Emergency Support Functions ("ESFs"). n8 (Id. at 13.) Each individual ESF is headed by a primary agency "designated on the basis of its authorities, resources, and capabilities in the particular functional area," and assisted by one or more other federal agencies acting in a supporting capacity. (Id.) As the lead agency in charge of coordinating any federal response pursuant to a declaration of emergency, FEMA is authorized to activate "some or all of the ESFs, as necessary." (Id.)

n8 The twelve ESFs established pursuant to the FRP are as follows: ESF 1 (Transportation); ESF 2 (Communications); ESF 3 (Public Works and Engineering); ESF 4 (Firefighting); ESF 5 (Information and Planning); ESF 6 (Mass Care); ESF 7 (Resource Support); ESF 8 (Health and Medical Services); ESF 9 (Urban Search and Rescue); ESF 10 (Hazardous Materials); ESF 11 (Food); ESF 12 (Energy). (FRP, Ex. L at 14.)

Pursuant to activation of the FRP, and FEMA's subsequent activation of the relevant ESFs, OSHA, the EPA [*31] and the Army Corps each provided technical and physical assistance to the City of New York in their respective areas of expertise and authority. Federal financial assistance was also provided throughout the duration of the recovery effort with FEMA promising to cover the cost of all operations at the World Trade Center Site as well as at Fresh Kills Landfill. (Defs.' J.A., Vol. 2, Ex. S (Press Release, The White House, dated Sept. 18, 2001).)

2. The Role of the Occupational Safety and Health Administration

In keeping with its designation under the FRP, OSHA assumed the lead role for developing and enforcing respirator requirements at the site. Within a few days of the attacks, OSHA had begun working with the City and other local agencies to develop comprehensive and effective PPE requirements and overall worker health and safety protocols. (Defs.' J.A., Vol. 3, Ex. AC (email from Bob Adams).) OSHA advised the City that the use of P-100 filters, rather than standard combination filter/cartridges, would provide workers with adequate protections against the respiratory dangers presented at the site. OSHA also performed atmospheric monitoring throughout the rescue and recovery effort [*32] to establish the geographical boundaries within which respirator use would be required and in order to determine the level of respiratory protection needed to protect workers against contamination by the surrounding atmosphere. (Def. J.A. Vol. 3, Ex. AE (Ryan Dep.) at 144:5-25.)

On approximately September 20, 2001, at the request of the City DOH, OSHA assumed a role as the "lead agency for distributing, fitting, and training for respirators for the recovery of workers." (Defs.' J.A., Vol. 2, Ex. Q (Clark Dep.) at 87:19-88:6; Pls.' J.A. Vol. 4, Ex. 56.) OSHA took over the operation of the FDNY's respirator distribution staging area, ultimately becoming the "sole provider of respiratory protection equipment, fit-testing and training for new shift FDNY personnel." (Clark Dep., Ex. Q at 89:5-25.) OSHA also distributed respirators to NYPD personnel. (Id. at 89:5-25.)

Distribution of respirators and other safety equipment at the site was coordinated through plywood huts set up by OSHA at various points surrounding the World Trade Center project. (Defs.' J.A., Vol. 3, Ex. AE (Ryan Dep.), at 66:14-67:13.) OSHA ultimately distributed over 131,000 respirators. (Clark Dep., Ex. Q at 66: [*33] 7-17.) All individuals to whom OSHA distributed respirators received qualitative and quantitative fit-checks, and training for the proper use, storage, and maintenance of respiratory equipment. (Id. at 87:19-88:6; 93:19-94:5.) OSHA also developed a 10-hour health and safety course focusing on the proper use of respirators. All individuals

who worked in a supervisory role at the site, including employees of the Primary Contractors, were required to attend the course prior to being admitted to the site. (Defs.' J.A. Vol. 3, Ex. AA ("OSHA's role in Response"); Ex. AJ ("Workers Safety Bulletin # 13"); Ex. AK (Weekly EHS Meeting Minutes).)

OSHA, however, did not assume direct supervisory power to assure that workers used respiratory equipment consistently and efficiently. (Pls.' J.A. Vol. 3, Ex. 39, Public Hearing, 326:19-23; Ex. 40, DOH email ("Unfortunately, OSHA has taken an 'advisory' role to date.'").) OSHA's role was thus one of "assistance and consultation, **not** enforcement." (Pls.' J.A. Vol. 4, Ex. 42, OSHA Talking Points (emphasis in original).) Even though OSHA deployed over 1,000 inspectors to the site to report safety violations to the various contractors and to document [*34] observed safety violations in weekly reports, the prevalence of violations supported by anecdotal evidence of substantial non-use of PPE suggests that safety standards were not uniformly and consistently enforced. (Ryan Dep., Ex. AE at 70:5-72:7, 73:8-25, 143:2-6, 191:22-192:25.) Furthermore, it is not clear if OSHA inspectors had the authority to stop work at the site upon observing critical safety violations. Per the express terms of the ES&H Plan, the DDC retained exclusive stop work authority. Nevertheless, Walter Murray of Turner Construction testified that he believed that OSHA also had authority to stop work at the site. (Defs.' J.A. Vol. 2, Ex. W (Walter Dep.), 229:21-230:10.) By the close of operations at the World Trade Center site, OSHA had identified more than 9,000 hazards as needing correction. Defendants ask me to presume that employers had corrected the problems pointed out to them, but it would be improper for me to do so on a Rule 12(c) motion. (Def.'s J.A. Vol. 3, Ex. AH (OSHA, Inside the Green Line).) Clearly, problems with enforcing PPE requirements persisted and not OSHA, but the DDC and the private Contractors, were responsible to ensure that compliance at the [*35] site would be enforced.

3. The Role of the Environmental Protection Agency

Under the FRP, the EPA is designated as the lead agency responsible for the cleanup of sites contaminated by "hazardous materials release[s] caused by a catastrophic event." (Defs.' J.A. Vol. 4, Ex. AS (Hearing Before U.S. Senate Appropriations Committee, Nov. 28, 2001); FRP, Ex. L at TI-13; Vol. 3, Ex. AM (National Contingency Plan, *40 C.F.R. § 300.130(i)*).) As such, the EPA, in conjunction with the City Department of Environmental Protection ("City DEP"), assumed the lead role for "hazardous waste disposal" at the World Trade Center site. (Defs.' J.A. Vol. 4, Ex. AU (Hearing Before U.S. Senate Committee on Environment and Public Works, Feb. 11, 2001); Vol. 2, Ex. O (Touw Dep.) at 123:13-16,

131:25-132:11; Vol. 4, Ex. AT ("EPA Response to September 11: Oh My God, Look at that Plane.").) The EPA further assumed "primary responsibility for monitoring the ambient air, water and drinking water and coordinating the sampling data for all the response agencies." (Defs.' J.A. Vol. 4, Ex. AU (Hearing Before U.S. Senate Committee on Environment and Public Works, Feb. 11, 2001).) In [*36] accordance with its lead role in environmental monitoring at the site, the EPA also assumed responsibility for public dissemination of the results of environmental monitoring tests conducted at the site, regularly publishing such results on its website and at the tented area where workers ate their meals. (Defs.' J.A. Vol. 4, Ex. AQ (New York City Council, Transcript, Nov. 1, 2001) at 24:22-23. ("EPA has taken the lead in making the data available to the public through our website.").)

Environmental testing by the EPA was coordinated with OSHA and other City agencies through the use of multiple ambient air monitors at locations in and around the World Trade Center site and through the collection of data from pre-existing air monitors in the area. (Defs.' J.A. Vol. 4, Ex. AY (WTC Response Activity Situation Report # 5).) At the close of operations in June of 2002, OSHA had taken over 6,100 air samples and had turned over the results of these tests to the EPA for further evaluation and examination. (Defs.' J.A., Vol. 3, Ex. AA (OSHA's Role in Response and Recovery Operations).) Although other City agencies, including the City DOH and the City DEP, also conducted environmental monitoring [*37] at the site, the results of such monitoring were coordinated through the EPA and shared with the Environmental Assessment Group, a inter-agency group comprised of federal, state and City agency representatives. On the basis of these tests, both the EPA and the Environmental Assessment Group determined to adopt the rule that all workers be required to wear respirators at all times while working on the pile. (Pls.' J.A. Vol. 4, Ex. 62 ("EPA has recommended, and continues to recommend, that workers at the Site wear respiratory protection.").)

The EPA thus worked with City and federal agencies to develop adequate health and safety protocols, but limited its role to monitoring of air quality and removal of hazardous materials. Indeed, the EPA expressly acknowledged that it lacked "authority to enforce the worker health and safety policies for non-EPA/USCG employees." (Pls.' J.A. Vol. 4, Ex. 62 ("We have observed very inconsistent compliance with our recommendations, however, we do not have the authority to enforce the worker health and safety policies[.]").)

4. The Role of the Army Corps of Engineers

On October 1, 2001, at the request of the City under ESF 3 (Public Works and Engineering) [*38] of the FRP, the Army Corps assumed control over the coordination, implementation, structure and enforcement of safety and health procedures and protocols at Fresh Kills. (Defs.' J.A. Vol. 5, Ex. BH (Office of History, U.S. Army Corps of Engineers, Fact Sheet).) Although the Army Corps' role at Fresh Kills was limited as an initial matter to the development and implementation of health and safety standards for contractor personnel only, as of October 10, 2001, the scope of its role at Fresh Kills was expanded to include "the implementation of a comprehensive health and safety plan for all personnel working at the landfill site." (Defs.' J.A. Vol. 5, Ex. BJ (Amendment to 3-COE, Oct. 10, 2001).)

In accordance with its expanded role at the Fresh Kills Landfill, the Army Corps identified the following areas for inclusion in a comprehensive health and safety plan: "Establish baseline worker exposure levels for each job site activity; Develop job and site specific PPE requirements; Establish an ongoing worker exposure monitoring program; Issue daily work site air quality updates; Implement dust control measures; Establish the presence of health and safety team monitors." (Defs.' J.A. [*39] Vol. 5, Ex. BJ (Memo Re. Amendment to 30COE NAD-39).) To assist in the development and enforcement of such a comprehensive plan, the Army Corps contracted with a private contractor, Phillips & Jordan, to act as the Construction Manager for the Fresh Kills site. Specifically, Phillips & Jordan assumed responsibility for the management of the forensic recovery operation at the site and for the enforcement of the site safety and health plan. (Defs.' J.A. Vol. 5, Ex. BK (Phillips & Jordan Disaster Recovery Group: Experience).) The Army Corps further enlisted the assistance of a subcontractor, Evans Environmental & Geosciences, to develop an Environmental Safety and Health Plan tailored to the concerns presented by the recovery operations at Fresh Kills and to develop and implement necessary training and monitoring programs.

### F. The Rescue and Recovery Effort Comes to a Close

From the time that the rescue and recovery operation began at the World Trade Center site in the moments following the September 11 attacks, to the close of operations in June of 2002, work at the site never ceased, continuing twenty-four hours a day, seven days a week, including holidays, with the exception [*40] only of Veteran's Day 2001. Despite the enormity of the task, however, work progressed at a rate that many could not have imagined and, as early as April of 2002, the transition of control over the site from the DDC to the Port Authority was being designed and implemented.

On May 10, 2002, control over Seven World Trade Center was returned to the Port Authority. The turnover of control as to the remainder of the World Trade Center complex followed shortly thereafter, on June 30, 2002, with the Port Authority once again assuming complete responsibility for the site. Although control has officially been returned to the Port Authority, work at the site continues to this day with efforts now turned to the completion of all steps necessary to rebuilding.

### G. The Continuing Vitality of Applicable Safety Standards and Labor Laws

Throughout the duration of the rescue and recovery effort, the City agencies and Primary Contractors remained obligated to abide by applicable safety standards and labor laws.

Pursuant to the authority granted under Executive Law section 24, both the Governor of the State of New York and the Mayor of the City of New York had the capacity to suspend, or [*41] direct the suspension of, "any of its local laws, ordinances or regulations, or parts thereof subject to federal and state constitutional, statutory and regulatory limitations, which may prevent, hinder, or delay necessary action in coping with a disaster or recovery therefrom[.]" *N.Y. Exec. Law § 24* (McKinney 2006). Both declined, however, to authorize wholesale suspension of applicable laws and regulations, instead authorizing only the suspension of the sign-in/sign-out procedures required by New York State Labor Law for the period from September 11, 2001 to October 14, 2001. (Pls.' Decl. at 31.)

In the absence of any such suspension of applicable labor laws, the City expressly mandated that its Primary Contractors abide by and enforce all relevant laws, ordinances, and regulations. Specifically, draft contracts between the DDC and the contractors show that compliance with applicable safety standards was required. The DDS mandated compliance with the following:

> a. New York State Uniform Fire Prevention and Building Code;
> b. National Fire Prevention Association (NFPA) requirements;
> c. National Electrical Code (NEC);
> d. American National Standard [*42] -- ANSI, A117.1 1986 or current edition (Accessibility and Usability by the Handicapped);
> e. Occupational Safety and Health Administration (OSHA);
> f. New York State Department of Labor Rules and Regulations;
> g. New York State Energy Code;

h. Local Codes and Ordinances;
i. New York State Department of Health Requirements; and
j. New York State Department of Environmental Conservation

(Pls.' Decl. at 30-31; see also Pls.' J.A. Vol. 6, Ex. 110, Revised Draft Contracts with Primary Contractors, dated Oct. 11, 2001.)

By their pleadings, however, Plaintiffs allege that "non-compliance with relevant statutes, regulations and ordinances was rampant," with workers being encouraged in a least some instances to forego filing of complaints for safety violations so as not to interfere with the recovery operation. Plaintiffs contend that this failure to enforce applicable safety standards and the failure to provide adequate and appropriate respiratory protection resulted in unprecedented exposure to various contaminants and toxins, and thus gave rise to the respiratory injuries that now plague so many of the rescue workers.

## III. THE PROCEDURAL BACKGROUND AND THE PENDING [*43] MOTIONS

### A. The Procedural Background

Indeed, just as the process of recovery and rebuilding began, those who participated in the efforts that made such recovery possible began to suffer from a host of respiratory ailments. In the months following September 11, and continuing until today, thousands of suits alleging respiratory injuries sustained as a result of violations of various state and federal safety laws and regulations were filed in New York State Court. To date, more than 3,000 cases alleging respiratory injuries have been filed, with thousands more in the offing. In their Master Complaint dated August 19, 2005, Plaintiffs asserted ten separate claims for recovery. Counts One and Two asserted claims pursuant to New York Labor Law. Counts Three and Four asserted claims pursuant to those provisions of the General Municipal Law allowing suits by injured and deceased firefighters and police officers and their representatives. Count Five stated a claim sounding in common law negligence. Counts Six and Seven asserted claims for medical monitoring and fear of cancer, respectively. Count Eight asserted a claim for fraud and misrepresentation. Count Nine asserted a claim [*44] for wrongful death. Finally, Count Ten asserted a claim on behalf of all derivative plaintiffs.

The Defendants removed the actions to federal court asserting jurisdiction under the Air Transportation Safety and System Stabilization Act ("ATSSSA" or "the Act"), 49 U.S.C. § 40101 note (2006). The Act provides a federal cause of action for actions for damages "arising out

of" the terrorist-related aircraft crashes of September 11 and vests the District Court for the Southern District of New York with "original and exclusive jurisdiction over all actions brought for any claim (including any claim for loss of property, personal injury, or death) resulting from or relating to the terrorist-related aircraft crashes of September 11, 2001." ATSSSA § 408(b)(3). Motions to remand followed.

In determining the scope of federal jurisdiction provided under the Act, and noting the important concerns of federalism counseling against the imputation of a congressional intent to preempt an entire panoply of state law without a clearly expressed intent to provide such preemption, I held "that claims alleging respiratory injuries suffered at the World Trade Center site, up to [*45] and including September 29, 2001, [were] preempted by section 408 of the Act, and that claims incurred after that date or at different sites [were] not preempted." Hickey, 270 F. Supp. 2d at 374. Cognizant, however, of the importance of a final determination as to the scope of my jurisdiction under the Act, I certified the order providing for federal jurisdiction for interlocutory appeal, 28 U.S.C. § 1292(b), and stayed the remand of cases not subject to federal jurisdiction pending review by the Court of Appeals. Id. at 381.

Proceeding on the assumption that federal jurisdiction existed as to all cases coordinated under 21 MC 100 absent a decision to the contrary by the Court of Appeals, I directed that the parties proceed on a limited, albeit extensive, course of discovery, focusing on Defendants' anticipated dispositive defense of immunity under state and federal law and with the aim of establishing a joint offer of proof, alleviating Plaintiffs of the burden of proving all factual averments. (See Case Management Order No. 3 ("CMO 3"), dated Feb. 7. 2005.) I ordered further that Plaintiffs file separate claims for [*46] each individual claimant, holding that the individual issues relevant to each claimant predominated over common issues. Thus, as the parties awaited decision by the Court of Appeals, the litigation continued to move forward.

As discovery relevant to the asserted defenses continued, the Court of Appeals delivered its decision. Although the Court concurred with my finding of jurisdiction as to respiratory injuries sustained at the World Trade site in the period between September 11 and September 29, 2001, and with my general proposition that, by enactment of the Act, Congress did not in fact intend to "displace the entire panoply of state law 'regulat[ing] the health and safety of the workplace,'" McNally v. The Port Authority, 414 F.3d 352, 379 (2d Cir. 2005), the Court expressed in dicta its disagreement with that portion of my Opinion remanding those actions asserting injuries arising at sites other than the World Trade Center and subsequent to September 29. See Id. at

*380* ("We need not take the phrase 'relating to' to any metaphysical extreme in order to conclude that it encompasses the claims brought before the district court . [*47] .., i.e., that airborne toxins and other contaminants emanating from the debris created by the crashes caused respiratory injuries to plaintiffs employed to sift, remove, transport, or dispose of that debris."). By Order of July 22, 2005, I adopted the reasoning of the Court of Appeals in McNally without prejudice to future submissions as to the extent of my jurisdiction pursuant to the Act. (See Amended Order Following Appellate Remand, Extending Jurisdiction, dated July 22, 2005.)

Having adopted the reasoning of McNally, I turned to furthering the progress of the litigation. The parties appeared before me for a status conference on November 7, 2005 to address the status of limited discovery pursuant to CMO 3 and to address the practicability of adopting a joint offer of proof. At the conference it became readily apparent that any hope for a joint offer of proof had been dashed and I conceded that any further efforts in this regard would be futile. Although abandoning efforts to arrive at a joint offer of proof, I nevertheless acknowledged the dispositive nature of the immunity defenses and directed the parties to proceed, after completion of discovery, by motion. The [*48] parties subsequently completed the mandated course of discovery pursuant to CMO 3 in early 2006, with Defendants then proceeding to make motions for judgment on the pleadings and motions for summary judgment on the basis of state and federal immunity.

*B. The Pending Motions*

The motions now pending before me concern whether Plaintiffs may proceed with their claims alleging respiratory injuries sustained at the World Trade Center site n9 during the recovery and cleanup efforts following September 11 against the City and its Contractors (the "City Defendants"), n10 the Port Authority of New York and New Jersey (the "Port Authority"), Consolidated Edison ("Con Ed"), n11 the Silverstein Defendants, n12 and the Westfield Defendants. n13 The various Defendants assert immunity on the basis of state and federal statutory and common law immunity. Separately, Con Ed, the Silverstein Defendants, and the Westfield Defendants (collectively the "Lessee Defendants") seek dismissal of all claims against them on the ground that they were divested of their leasehold interests during the duration of the recovery and cleanup efforts at the World Trade Center and thus may not be held liable for [*49] injuries sustained during the course of such efforts. The papers filed on behalf of the City Defendants represent the lead papers in this litigation, with the other Defendants filing motions joining, in whole or in part, the defenses asserted by the City Defendants and providing supplemental arguments in favor of dismissal.

n9 Pursuant to CMO 3, the World Trade Center site is defined as "the 16-acre site including the sites of the buildings known as 1 World Trade Center, 2 World Trade Center, 3 World Trade Center (a/k/a the Marriott World Trade Center Hotel), 4 World Trade Center, 5 World Trade Center and 7 World Trade Center, as well as the surrounding plaza and underground shopping, parking, and public transit facilities." (See CMO 3 at 1.)

n10 The following contractors join in the City's motions asserting immunity: AMEC Construction Management, Inc.; AMEC Earth & Environmental, Inc.; Bechtel Associates, P.C.; Bechtel Construction, Inc.; Bechtel Corp.; Bechtel Environmental, Inc.; Bovis Lend Lease, Inc.; Bovis Lend Lease LMB, Inc.; Bovis Lend Lease Interiors, Inc.; Bovis Holdings Ltd.; Bovis Int'l, Inc.; Evergreen Recycling of Corona; Plaza Construction Corp.; Plaza Construction Management Corp.; Tully Construction Co., Inc.; Tully Industries, Inc.; Tully Environmental, Inc.; Tully Consulting Corp.; Tully Construction Company; Turner Construction Company; Turner Construction Co.; Turner Construction Int'l, LLC; Turner/Plaza A Joint Venture.

[*50]

n11 At the time of oral argument, claims were asserted against the following Consolidated Edison entities: Consolidated Edison Company of New York, Inc., Consolidated Edison, Inc., Consolidated Edison Energy, Inc., Consolidated Edison Solutions, Inc., and Consolidated Edison Development, Inc. However, by their supplemental submission of July 12, 2006, Plaintiffs submit that they have reached agreement in principal to dismiss without prejudice claims against all Consolidated Edison Defendants with the exception of Consolidated Edison Company of New York, Inc. For purposes of this motion, I refer to Consolidated Edison Company of New York, Inc. interchangeably either as Consolidated Edison or Con Ed. A separate order will issue dismissing all cross-claims against incorrectly named Consolidated Edison Defendants.

n12 The Silverstein Defendants, also referred to as the World Trade Center ("WTC") Defendants, include the following entities: World Trade Center Properties LLC, 1 World Trade Center LLC, 2 World Trade Center LLC, 4 World Trade Center LLC, 5 World Trade Center LLC, 1 WTC Holdings LLC, 2 WTC Holdings LLC, 4 WTC Holdings LLC, 5 WTC Holdings LLC, Silverstein WTC Properties LLC, Silverstein WTC LLC, Silverstein WTC Mgmt. Co. LLC, Silverstein WTC Facility Manager LLC, Silverstein Properties [sic], and Silverstein Properties LLC.

[*51]

n13 The Westfield Defendants include: Westfield America, Inc., Westfield WTC Holding LLC, Westfield WTC LLC a/k/a WTC Retail LLC, and Westfield Corp.

The City Defendants move for judgment on the pleadings and summary judgment. By their motion for judgment on the pleadings, the City Defendants assert immunity pursuant to the New York State Defense Emergency Act ("SDEA"), the New York Disaster Act ("Disaster Act"), and under state common law. By their motion for summary judgment, the City Defendants assert immunity pursuant to federal law.

The Port Authority together with the Silverstein Defendants join in part the motions filed by the City Defendants and have filed further, supplemental papers. The Port Authority moves both for dismissal and for summary judgment on the basis of immunity pursuant to the SDEA and moves also for judgment on the pleadings asserting immunity under state common law. Separately, the Silverstein Defendants move for summary judgment pursuant to the SDEA. Both the Port Authority and the Silverstein Defendants move for summary judgment on the ground of federal immunity. [*52] The Silverstein Defendants assert further the separate defense that they were divested of their leasehold interest at the time that Plaintiffs sustained their alleged injuries and thus may not be liable for damages resulting from such injuries and move for summary judgment on this basis. n14

n14 Although the Silverstein Defendants join in the pending motions, they assert separately that many of the separate entities named in Plaintiffs' complaint have never had any interest in any part of the World Trade Center and thus were improperly sued. The Silverstein Defendants reserve the right of these separate defendants to move to dismiss the actions against them on those grounds.

The Westfield Defendants move for summary judgment asserting that, as lessees out of possession with no control over the operations at the World Trade Center, that they may not be liable for damages resulting from conditions at the site. The Westfield Defendants move also on the basis of immunity under the SDEA and, to the extent applicable [*53] to non-government actors, pursuant to the Disaster Act, state common law, and federal law.

Con Ed moves for summary judgment on the ground of immunity pursuant to the SDEA and on the basis of federal derivative immunity. Con Ed joins in the motions of the other Lessee Defendants, namely the Silverstein and Westfield Defendants, seeking dismissal on the ground that as a lessee out of possession it lacked control over the operations at the World Trade Center site. Separately, Con Ed seeks dismissal of Plaintiffs' claims alleging fraud and misrepresentation, medical monitoring, fear of cancer and wrongful death, and all derivative claims of spouses and children.

The parties appeared before me for oral argument on June 22 and 26, 2006. By Summary Order of June 23, 2006, in the absence of any showing by Plaintiffs that the claims against them should be allowed to proceed, I granted the Westfield Defendants' motion for summary judgment and dismissed all claims against them currently pending under 21 MC 100. (See Summary Order, dated June 23, 2006.) Concerned that Plaintiffs had failed to state viable claims against various of the other Defendants as well, I directed that they re-plead [*54] certain of their claims. By separate Summary Order of June 27, 2006, I dismissed the claims against the Port Authority without prejudice to re-pleading. I further directed Plaintiffs to re-plead the claims asserted against Verizon and Tishman Construction, as well as various of the contractor defendants. (Id.) As to the individual counts set forth in Plaintiffs' Master Complaint, I ordered Plaintiffs to remove those counts alleging claims for medical monitoring and fear of cancer, as these counts are remedies that follow the success of Plaintiffs' substantive claims, and further advised Plaintiffs to reconsider their claim of fraud and misrepresentation. Plaintiffs also were directed to complete all individual check-off complaints by October 20, 2006. (Id.) Finally, I directed Plaintiffs to file supplemental briefing as to the veracity of claims pending against the Silverstein Defendants and Con Ed. (See Transcript, dated June 22, 2006, 117:4-16; 125:7-9.) Judgment was reserved as to all other matters.

The parties have now fully complied with all of the foregoing. Plaintiffs have submitted newly amended

Master Complaints as to the separate categories of Defendants with [*55] separate complaints filed as to the City, the Port Authority, the World Trade Center Defendants, Con Ed, the Construction Defendants, the Contractor Defendants, Verizon Communications, and the Tishman Defendants. n15 By their newly amended complaints, Plaintiffs have dropped all claims sounding in medical monitoring and fear of cancer as well as all claims of fraud and misrepresentation. Thus, Plaintiffs now assert claims for negligence, wrongful death, derivative plaintiffs, and for violations of New York Labor and General Municipal Law.

n15 The cases against the Verizon and Tishman Defendants are proceeding separately. Motions will follow as to these Defendants following the completion of discovery pursuant to CMO 3.

## IV. THE PREEMPTIVE EFFECT OF THE ATSSSA

The Air Transportation Safety and System Stabilization Act, 49 U.S.C. § 40101 note, sets forth the essential statutory framework for the consideration and treatment of claims arising from the terrorist attacks of September 11, 2001. Enacted [*56] following September 11, the Act was aimed at protecting the airline industry from potential economic collapse while simultaneously providing a simplified avenue for recovery by those immediate victims of the attacks who wished to take advantage of that method, and an exclusive federal remedy for all others having a cause of action. See *Colaio v. Feinberg, 262 F. Supp. 2d 273 (S.D.N.Y. 2003); see also Hickey, 270 F. Supp. 2d at 362.*

By amendments, the protections of the Act were extended to additional parties--of relevance here, the City of New York and the Port Authority of New York and New Jersey. ATSSSA § § 408(a)(1), (3). The Act, as originally enacted, limited the liabilities of the airline industry defendants to the defendants' insurance coverages. The liability of the Port Authority in relation to its property interest in the World Trade Center was also limited to the aggregate of its liability insurance. ATSSSA § 408(a)(1). Separately, the liability of the City was limited to the higher of its liability insurance coverage or $ 350,000,000. ATSSSA § 408(a)(3).

As to plaintiffs, those who sustained injury as a direct result of the attacks, [*57] were given a special means of redress, in a specially authorized and appropriated Victim Compensation Fund ("VCF") or, alternatively, through litigation in the federal courts, specifically the United States District Court for the Southern District of New York. ATSSSA § § 408(a), 408(b).

Other plaintiffs, including those in the lawsuits which are the subject of this Opinion, were also granted rights of action arising from the ATSSSA but, since they incurred their injuries in the days and months following September 11, could not take advantage of the VCF and were limited to suit in the United States District Court for the Southern District of New York.

Plaintiffs argue that granting immunity to the Defendants, pursuant either to state or federal immunity doctrines, would contradict Congressional intent as expressed in the Act. Particularly, Plaintiffs argue, Congress appropriated one billion dollars to the City, enabling the City to establish a Captive Insurance Fund. Consolidated Appropriations Resolution, Pub. L. No. 108-7 (2003). Plaintiffs argue that Congress could not have legislated a $ 350 million ceiling on the City's aggregate liability and a $ 1 billion special litigation authorization [*58] without recognizing the City's exposure to the claims of those who engaged in the debris removal and cleanup work, for any other source of significant exposure is not apparent. This legislative purpose, Plaintiffs argue, preempts pre-existing state and federal law providing immunity to the City and its contractors, as well as to the other Defendants.

### A. The Doctrine of Preemption

Determinations as to whether a particular federal law operates to preempt state law are "fundamentally a matter of Congress' intent." *McNally, 414 F.3d at 371* (citing *English v. General Elec. Co., 496 U.S. 72, 78-79, 110 L. Ed. 2d 65 (1990); Hillsborough County v. Automated Med. Labs., Inc., 471 U.S. 707, 713, 85 L. Ed. 2d 714 (1985)).* The doctrine of preemption, rooted in the Supremacy Clause of the United States Constitution, U.S. Const. art. VI, cl. 2, provides that to the extent a state law conflicts with federal law, the contradictory state law is "without effect." *Hickey, 270 F. Supp. 2d at 366.* The Supreme Court has recognized two general types of preemption, express and implied.

Congress can expressly preempt [*59] state law by explicitly providing for the displacement of state law. See *Hillsborough County v. Automated Med. Labs., Inc., 471 U.S. 707, 713, 105 S. Ct. 2371, 85 L. Ed. 2d 714 (1985).* Even if Congress does not expressly preempt state law, state law may be impliedly preempted if Congress either 1) has legislated in a particular field so pervasively that no room is left for concurrent state legislation, see *id.;* or 2) has enacted federal laws that conflict with state laws, see *Geier v. American*

*Honda Motor Co., 529 U.S. 861, 873-74, 120 S. Ct. 1913, 146 L. Ed. 2d 914 (2000).*

Id.

There are "no fixed meanings or shorthand rules to demarcate just where the traditional jurisdiction of state courts and application of state law must be ousted." Id. at 367. Courts are to adopt a fluid approach to setting the scope of a particular statute's preemptive effect.

> Beginning with the presumption that Congress does not intend to displace state law, especially in traditional areas of state control, ..., courts go on to weigh whether the central motivations behind the federal law favor preemption--in other words, whether allowing [*60] state law to govern would undermine federal control or weaken the protections Congress intended to provide.

Id. As a general rule, preemption of areas traditionally subject to state regulation will not be found unless it is the "clear and manifest purpose of Congress." *CSX Transp. Inc. v. Easterwood, 507 U.S. 658, 664, 123 L. Ed. 2d 387 (1993)* (quoting *Rice v. Santa Fe Elevator Corp., 331 U.S. 218, 91 L. Ed. 1447 (1947)*).

If, however, traditional state law principles contradict the purpose of a federal statute, preemption will be applied. In *Burnett v. Grattan, 468 U.S. 42, 82 L. Ed. 2d 36 (1984)*, the Supreme Court held that application of a restrictive administrative statute of limitations to bar litigation under the Civil Rights Act "ignore[d] the dominant characteristic of civil rights actions: they belong in court." *Id. at 50* (citing *McDonald v. West Branch, 466 U.S. 284, 80 L. Ed. 2d 302 (1984)*). Thus, the Court approved application of a more liberal statute of limitations. Id. at 55. The Court of Appeals for the Second Circuit reached a similar conclusion regarding the application [*61] of restrictive state statutes in a section 1983 action by a former university professor, noting that "[i]t would be anomalous for a federal court to apply a state policy restricting remedies against public officials to a federal statute that is designed to augment remedies against those officials, especially a federal statute that affords remedies for the protection of constitutional rights." *Pauk v. Board of Trustees of City Univ. of New York, 654 F.2d 856, 862 (1981).*

*B. The Alleged Preemptive Effect of the ATSSSA and the Captive Insurance Fund*

The Act expressly provides that those who sustained injury as a result of the September 11 attacks may gain redress from the VCF or, alternatively, seek it in traditional litigation, but only in the federal court for the Southern District of New York. Both manners of relief are, however, limited in several important respects. As an initial matter, eligibility for the VCF is limited to those who suffered physical injury or death as a result of the terrorist-related aircraft crashes and who were "on the planes or at the World Trade Center, the Pentagon, or the crash site at Shanksville, Pennsylvania at the time, [*62] or in the immediate aftermath, of September 11, 2001." *Hickey, 270 F. Supp. 2d at 362* (quoting ATSSSA § 405(c)). Further, upon the submission of a claim under the VCF, individuals "waive the right to file a civil action ... in any Federal or State court for damages sustained as a result of" the September 11 attacks. ATSSSA § 405.

To the extent persons who were injured as a result of September 11 chose not to participate in, or were not eligible for, the VCF, section 408 of the Act, as amended in November of 2001, establishes a "federal cause of action" as the "exclusive remedy for damages arising out of" the September 11 attacks. ATSSSA § 408(b)(1). The section further vests the United States District Court for the Southern District of New York "with original and exclusive jurisdiction" over all claims "resulting from or relating to the terrorist-related aircraft crashes[.]" ATSSSA § 408(b)(3). Creation of a federal cause of action, however, did not serve to preclude application of state law. Instead, Congress expressly provided that, in actions brought pursuant to the Act, the "substantive law for decision ... shall be derived from the law ... of the state [*63] in which the crash occurred unless such law is inconsistent with or preempted by federal law." ATSSSA § 408(b)(2).

Section 408(a) operates also to limit the potential liability of defendants likely to be named in actions resulting from or relating to the September 11 attacks (other than the terrorists themselves or those who conspired with, or aided and abetted them). Thus, the liability of any "air carrier, aircraft manufacturer, airport sponsor, or person with a property interest in the World Trade Center" may not exceed "the limits of [their] liability insurance coverage." ATSSSA § 408(a)(1). The potential liability of the City of New York is also limited. By amendment to the Act, passed at the urging of the City, the Act expressly provides that "[l]iability for all claims ... against the City of New York shall not exceed the greater of the City's insurance coverage or $ 350,000,000." ATSSSA § 408(a)(2). In addition, further to provide financial protection to the City of New York and its Contractors, another Act of Congress, passed one year later, appropriated 1 billion dollars in federal fund-

ing to "establish a captive insurance company ... for claims arising from debris [*64] removal[.]" Consolidated Appropriations Resolution, 2003, Pub. L. No. 108-7 (2003). The Captive Policy insures the City and its Contractors against potential liability, as well as associated costs and expenses, and affords the City and its Contractors fully-funded financial protection against all potential claims. WTC Captive Insurance Company Liability Insurance Policy, § 2.04 ("Defense of Suits and Related Defense Costs") (the "Captive Insurance Fund").

*C. Discussion*

As noted earlier, I begin "with the presumption that Congress does not intend to displace state law[.]" *Hickey, 270 F. Supp. 2d at 366* (citing New York State *Conf. of Blue Cross & Blue Shield Plans v. Travelers Ins. Co., 514 U.S. 645, 661, 131 L. Ed. 2d 695 (1995)).* Preemption will not be found unless it is the "clear and manifest purpose of Congress." *CSX Transp. Inc., 507 U.S. at 664* (quoting *Rice v. Santa Fe Elevator Corp., 331 U.S. 218, 91 L. Ed. 1447 (1947)).*

Here, neither the plain language of the statute, nor its purpose, evince a Congressional intent to supplant the application of state law principles. To the contrary, Congress [*65] expressly provided that the "substantive law for decision" in any suit relating to the September 11 attacks "shall be derived from the law ... of the state in which the crash occurred," unless "inconsistent with or preempted by federal law." ATSSSA § 408(b)(2). Application of such state substantive law is not "inconsistent" with federal law as embodied in the Act. See *7WTC, 2006 WL 62019* at *6-8 (granting immunity to the City of New York pursuant to the New York State Defense Emergency Act as to claims asserted by Consolidated Edison's insurers for damage resulting from the collapse of Seven World Trade Center). Nothing in the Act or its legislative history suggests that defenses against potential lawsuits are prohibited. It is Plaintiffs' burden to show that Congress intended to remove reliance on such defenses insofar as they directly contradict Congressional intent, see *Silkwood v. Kerr-McGee Corp., 464 U.S. 238, 255, 78 L. Ed. 2d 443 (1984),* and Plaintiffs are unable to meet such a burden.

The limited purpose of section 408 was to provide an efficient and rational means for the adjudication of claims relating to or resulting from September 11. [*66] It was not intended to guarantee compensation to those injured by the September 11 attacks. The possibility that compensation might ultimately be denied to those who declined to, or were ineligible to, participate in the Fund was contemplated by Congress and expressed by Senator John McCain during the Congressional debate: "To ensure that the victims and families of victims who were physically injured or killed on September 11th are com-

pensated even if courts determine that the airlines and any other potential corporate defendants are not liable for the harm ... the [Act] also creates a victims' compensation fund." 147 Cong. Rec. S9589091 at S9594 (Sept. 21, 2001 (statement of Sen. McCain); see also *Colaio, 262 F. Supp. 2d 273.*

Thus, I decline to extend the scope of federal preemption under the Act to preclude application of otherwise available state law immunity defenses. I further decline to bar application of federal immunity doctrines as contradictory to the alleged compensatory purpose of the Act. The preemptive effect of the Act serves to displace, "not the substantive standards governing liability, but only the state-law damages remedies," *McNally, 414 F.3d at 380,* [*67] in the sense of placing a monetary limit to those remedies. Risks are inherent in the very nature of litigation, even where claims are brought pursuant to express Act of Congress. *In re September 11 Litig., Opinion and Order Regulating Testimony at Depositions, 2006 WL 846346,* * 10 (S.D.N.Y. March 31, 2006). Although "[i]t would be anomalous for a federal court to apply a state policy restricting remedies," *Pauk, 654 F.2d at 862,* to a statute designed to expand remedies, the ATSSSA is not such a statute. Nor is it the role of the federal courts to eliminate entirely the risks inherent to litigation. By enactment of the ATSSSA, Congress intended to create a federal forum for the adjudication of claims arising out of the September 11 attacks, to consolidate and rationalize all such suits in a single forum, and to protect defendants against a multiplicity of actions in multiple forums. To infer from the Act that all Plaintiffs should be entitled to compensation would run counter to the otherwise clearly expressed intent of Congress. It is an inference that I decline to make.

Having thus ruled, I concede a sense of disquiet. I have not come across [*68] federal legislation of the type we have here--providing a limit to how much aggregate liability the City can incur--except in bankruptcy or insolvency practice, and there is no suggestion of that here. Nor, except perhaps in the case of atomic energy disasters, have I encountered a contribution from the federal fisc to create a litigation defense fund, and even in that case there is a significant difference. Here, the City was given one billion dollars to assure against liability, loss or expense, while in the case of atomic energy disaster, there is a provision only of federal insurance. *42 U.S.C. § 2210* (2005).

What, one may ask, was the City, and Congress, contemplating if not the kinds of suits as those over which I preside? Clearly, provisions of insurance do not concede liability, as Defendants stress, but never have we seen provisions as those we have here.

Provisionally, and subject to further consideration as these cases progress, the case for preemption has not been made. But neither is there to be a blank check to enrich lawyers with endless stratagems of motions and delays. Congress legislated for the public welfare, and that translates in this [*69] instance to speedy proceedings towards the merits, to distinguish between cases proving injuries arising from the terrorist-related aircraft crashes and from the conditions resulting from those crashes, and cases lacking proof of such a right to recover, and to fashion remedies appropriate to those showing a right to relief. These are the goals that I set for the parties, and for myself in presiding over these cases, to bring these cases to a place where they can be settled or tried as speedily as the interest of justice allows.

## V. THE MOTIONS FOR JUDGMENT ON THE PLEADINGS--STATE IMMUNITY

The various Defendants move for judgment on the pleadings on the basis of various state statutes and doctrines of common law providing for immunity, and assert that liability may not attach for actions taken in response to the terrorist attacks of September 11. Specifically, the Defendants, in various groupings, assert immunity under the New York State Defense Emergency Act, the New York State and Local Natural Disaster and Man-Made Disaster Preparedness Law, and New York common law.

### A. The Standard of Review

The standard employed in reviewing a motion for judgment on the pleadings [*70] pursuant to *Rule 12(c), Fed. R. Civ. P.*, is the same as that employed for motions brought pursuant to *Rule 12(b)(6), Fed. R. Civ. P.*

A Rule 12(b)(6) motion requires the court to determine if the plaintiff has stated a legally sufficient claim. A motion to dismiss under Rule 12(b)(6) may be granted only if "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson, 355 U.S. 41, 45-46, 2 L. Ed. 2d 80 (1957); Branum v. Clark, 927 F.2d 698, 705 (2d Cir. 1991)*. The court's function is "not to assay the weight of the evidence which might be offered in support" of the complaint, but "merely to assess the legal feasibility" of the complaint. *Geisler v. Petrocelli, 616 F.2d 636, 639 (2d Cir. 1980)*. In evaluating whether plaintiff may ultimately prevail, the court must take the facts alleged in the complaint as true and draw all reasonable inferences in favor of the plaintiff. See *Jackson Nat'l Life Ins. Co. v. Merrill Lynch & Co., 32 F.3d 697, 699-700 (2d Cir. 1994)*. [*71] If matters outside of the pleadings are considered by the court, the motion shall be treated as motion for summary judgment, *Fed. R. Civ. P. 56*, and all parties should be given opportunity to submit relevant materials. *Fed. R. Civ. P. 12(c)*.

### B. The New York State Defense Emergency Act

Enacted in 1951, at the height of the Cold War, the New York State Defense Emergency Act (the "SDEA") provides for a comprehensive response to attacks upon the United States, and the State of New York, by coordinating the private and public sectors to "make possible the recovery of the people and the rehabilitation of the economic and social life of the state following any such attack." N.Y. Unconsol. Law SDEA § 9102-a (McKinney 2006). See also *7WTC, 2006 WL 62019* at *6; *Daly v. The Port Authority, 7 Misc. 3d 299, 793 N.Y.S.2d 712 (N.Y. Sup. Ct. 2005)*. In the interest of ensuring that public and private entities will work aggressively to prepare for and to respond to attacks, the SDEA provides immunity for actions taken "in good faith carrying out, complying with or attempting [*72] to comply with" any law or order requiring such a unified response and relating to "civil defense." SDEA § 9193. See also *7WTC, 2006 WL 62019* at *6.

The City Defendants, the Port Authority, the Silverstein Defendants, and Con Ed, join in asserting immunity pursuant to the SDEA for actions taken in the wake of the September 11 attacks. Defendants assert that all actions they took in response to the attacks were taken in good faith, to comply with the Declarations of Emergency issued by the President, the Governor, and the Mayor, that all actions related to the "civil defense," and that their actions thus fall within the express grant of immunity provided by the SDEA.

#### 1. The Immunity Provision of the SDEA

The immunity provision of the SDEA provides for protection to various entities--government, individuals, partnerships, and corporations--who, in good faith, are engaged in activities in preparation for and responsive to attacks on the State, pursuant to the law or to duly promulgated rules, regulations or orders. The protection extends to preparations against attacks, see *7WTC, 2006 WL 62019* at *6 - *8, and to "activities . . . following attacks, [*73] " including, as part of the definition of "civil defense," essential debris clearance, immediately essential repairs of damaged facilities, and the restoration of essential services. SDEA § 9103(5). The SDEA provides that parties engaged in such civil defense activities "shall not be liable for any injury or death to persons or damage to property as the result thereof."

> The state, any political subdivision, municipal or volunteer agency, or another state or a civil defense force thereof or of the federal government or of another country or province or subdivision

thereof, performing civil defense services in this state pursuant to an arrangement, agreement or compact for mutual aid and assistance, or any agency, member, agent or representative of any of them, or any individual, partnership, corporation, association, trustee, receiver or any of the agents thereof, in good faith carrying out, complying with or attempting to comply with any law, any rule, regulation or order duly promulgated or issued pursuant to this act, any federal law, or any arrangement, agreement or compact for mutual aid and assistance or any order issued by federal or state military authorities, relating [*74] to civil defense, including but not limited to activities pursuant thereto, in preparation for anticipated attack, during attack, or following attack or false warning thereof, or in connection with an authorized drill or test, shall not be liable for any injury or death to persons or damage to property as the result thereof.

SDEA § 9193(1).

2. The Continued Vitality of the SDEA

Plaintiffs argue that the SDEA was enacted during the height of the Cold War as the nation braced for what seemed to be inevitable nuclear attack, and is no longer viable. Plaintiffs assert further that the SDEA was effectively repealed by subsequent passage of the New York State and Local Natural Disaster and Man-Made Disaster Act, N.Y. Exec. Law § § 20-29-g (McKinney 2006) (the "Disaster Act"). Plaintiffs' arguments are without merit and run counter to the plain language and express purpose of both the SDEA and the Disaster Act. The dangers to our nation, state and city that led to the passage of the SDEA are dangers that exist today. In 1947, we were concerned with the warlike stance of the Soviet Union and international communism. Today, we are concerned with international terrorism. Prime [*75] Minister Nikita S. Khruschev at the United Nations threatened to bury us, pounding his shoe on the lectern for emphasis. The terrorists who sent their bombers into the World Trade Center buried almost three thousand of us, and there are too many threats from too many sources to allow us to forget our concerns in sanguine obliviousness.

Enactment of the SDEA was responsive to a perceived threat "of atomic conflict with communist nations and the concomitant need for a comprehensive plan to ensure the survival of the State's citizens in the event of foreign attack." *Fitzgibbon v. County of Nassau, 147 A.D.2d 40, 541 N.Y.S.2d 845, 847* (2d Dep't 1989). As I

observed in an earlier decision, the statute "is not limited to a particular time or a particular threat." 7 WTC, 2006 WL 62019, at *6. I ruled that the legislative history and plain language of the statute show that it was based upon "a broad notion of 'enemy attack' using any kind of weapon capable of inflicting mass injury." Id. Thus, the statute gives broad meaning to the term "attack," defining it as:

> [a]ny attack, actual or imminent, or series of attacks by an enemy or a foreign nation upon [*76] the United States causing, or which may cause, substantial damage or injury to civilian property or persons in the United States in any manner by sabotage or by the use of bombs, shellfire, or nuclear, radiological, chemical, bacteriological, or biological means or other weapons or processes.

SDEA § 9103(2). By its plain language the SDEA "is not limited to a nuclear attack or particular enemy." *Daly, 793 N.Y.S.2d at 716.* Here, it is clear that the hijacking and subsequent crashes of American Airlines Flight 11 and United Airlines Flight 175 into the Twin Towers, resulting in the destruction of a once great financial and business center and in the loss of thousands of lives, constitute an "attack" as contemplated under the SDEA. The SDEA remains viable legislation.

With regard to the Disaster Act, as enacted in 1951, its application was limited to natural disasters such as "flood, drought, tidal wave, fire, hurricane, earthquake, windstorm, or other storm, landslide, or other catastrophe," and not disasters resulting from "an enemy attack as defined in the New York state defense emergency act." N.Y. Executive Laws Art. 2 § 10 (repealed). Almost thirty years [*77] later, in 1978, the definitions were expanded to include disasters resulting from "man-made causes." N.Y. Cons. Laws, Executive Laws Art. 2(b) § 20(2)(a). But nothing in the plain language of the statute or in its legislative history suggests an intent to override the immunities provided by the SDEA. The two statutes must be read together, harmoniously. See *J.E.M. AG Supply, Inc. v. Pioneer Hi-Bred Int'l, Inc., 534 U.S. 124, 143-44, 151 L. Ed. 2d 508 (2001)* ("[W]hen two statutes are capable of coexistence, it is the duty of the courts, absent a clearly expressed congressional intention to the contrary, to regard each as effective.") (quoting *Morton v. Mancari, 417 U.S. 535, 551, 41 L. Ed. 2d 290 (1974))* (internal quotation marks omitted).) See also *Rodriguez v. United States, 480 U.S. 522, 524, 94 L. Ed. 2d 533 (1987)* ("[R]epeals by implication are not favored, and will not be found unless an intent to repeal is

'clear and manifest.'") (quoting *United States v. Borden, 308 U.S. 188, 198, 84 L. Ed. 181 (1939)*) (internal quotation marks and citations omitted). Thus, I hold that the SDEA remains a valid basis [*78] for asserting immunity. See 7 WTC, 2006 WL 62019, at *6; *Daly, 793 N.Y.S.2d at 716.*

3. Qualifying Laws under the SDEA

The grant of immunity provided by the SDEA is limited to actions taken "in good faith carrying out, complying with, or attempting to comply with" "any law, any rule, regulation or order duly promulgated or issued pursuant to [the SDEA]" and "relating to civil defense[.]" SDEA § 9193(1). All agree that neither the Mayor nor the Governor of New York invoked any provisions of the SDEA in their various declarations of emergency following September 11. But that does not mean that the governmental entities, and the persons, firms and corporations that were engaged in debris removal and cleanup of the World Trade Center site did not act pursuant to the laws, regulations and orders issued by the President, Governor and Mayor to organize the carrying out of such activities.

The SDEA defines "law" broadly to include "[a] general or special statute, law, city, or village charter, local law, ordinance, resolution, rule, regulation, order or rule of common law." SDEA § 9103(17). The Executive Orders issued by the Mayor of the City of New York [*79] and the Governor of the State of New York are precisely such laws. By their executive orders, the Mayor and the Governor ordered the City and State civil defense agencies to engage in civil defense activities. "Civil Defense Activities" are defined by the statute to include immediately essential repairs and restoration of essential services. The City and State agencies acted also pursuant to the common law, for when an emergent disaster threatens society as a whole, the doctrine of *salus populi supreme lex* (the welfare of the people is the highest law) requires the government to act, enlisting persons, firms and corporations in the private sector to eliminate the threat to society and restore society's ability to function. See *Matter of Cheesebrough, 78 N.Y. 232 (1879). Salus populi* means "that society has a right that corresponds to the right of self-preservation in the individual, and it rests upon necessity because there can be no effective government without it." *Daly, 793 N.Y.S.2d at 721-22* (quoting 20 N.Y. Jur. 2d. Const. Law § 192). *Salus Populi* and the SDEA coincide, for both encourage immediate action to preserve society. [*80] See id. at 718.

Plaintiffs argue that the Contractor Defendants, since they were engaged by private contracts and since they acted, not pursuant to the Mayor's and Governor's Executive Orders, but pursuant to their contracts, were not "carrying out, complying with or attempting to com-

ply with any law, any rule, regulation or order duly promulgated or issued pursuant to [the SDEA]." SDEA § 9193(1). Plaintiffs cite *Abbott v. Page Airways, 23 N.Y.2d 502, 245 N.E.2d 388 (N.Y. 1969)*, where the New York Court of Appeals declined to extend SDEA immunity to a helicopter company that was engaged by the Director of the Civil Defense Office of Monroe County, New York, pursuant to contract, to hover over a riotous demonstration in the City of Rochester to enable the Director to survey the disorder. The chartered helicopter crashed, killing four people, injuring several others, and causing extensive property damage. Id. The helicopter company claimed immunity pursuant to the SDEA. The New York Court of Appeals held, however, that the helicopter company was not entitled to immunity from suit pursuant to the SDEA, as the defendant was "doing nothing more ... than engaging [*81] in its regular course of business of providing air transportation for hire." Id. at 391. "[T]he policy of New York State," the Court of Appeals held, "has been to reduce rather than increase the obstacles to recovery of damages for negligently caused injury or death." Id.

Plaintiffs contend that the Contractor Defendants were paid for their services, and thus were "doing nothing more ... than engaging in [the] regular course" of their respective businesses. Id. However, one cannot compare the havoc caused by the September 11 attacks, and the concomitant need for private assistance with the riot in Rochester in the mid-1960s. The declarations of emergency following the September 11 attacks authorized the City's remedial actions and its call for the assistance and cooperation of scores of private entities and thousands of workers. In contrast, the helicopter company in Abbott was involved in the emergency response in the most limited and peripheral sense. To deny immunity here based on the mere fact of payment for services rendered, without considering the circumstances presented by the September 11 attacks, would run counter to the plain language of the SDEA, expressly [*82] contemplating participation by private actors and providing an intentionally expansive definition of legal authorities. Plaintiffs' argument is more properly addressed to the question whether Defendants were undertaking civil defense activities in good faith, and it is to this argument that I now turn.

4. Civil Defense Activities and the Requirement of Good Faith

a. Civil Defense Activities

The grant of immunity under the SDEA is limited to "civil defense" "activities and measures designed or undertaken ... to minimize the effects upon the civil population caused or which would be caused by an attack." SDEA § 9193. Where the activities are taken in response

to an attack, civil defense measures are defined to include, among a wide range of measures, "essential debris clearance," "immediately essential emergency repair or restoration of damaged vital facilities," "means and methods for the recovery and rehabilitation of the state," and "the restoration of essential community services, industrial and manufacturing capacity, and commercial and financial activities in the state." n16 Specifically, civil defense activities responsive to an attack include:

> activities for [*83] fire fighting; rescue, emergency medical, health and sanitation services; monitoring for radiation and other specific hazards of special weapons; decontamination procedures; unexploded bomb reconnaissance; essential debris clearance; emergency welfare measures; immediately essential emergency repair or restoration of damaged vital facilities; the implementation of the means and methods for the recovery and rehabilitation of the state; effective utilization of all persons and materials; care and shelter for those made homeless; distribution of stockpiled food, water, medical supplies, machinery and other equipment; the preservation of raw materials; the restoration of essential community services, industrial and manufacturing capacity, and commercial and financial activities in the state; and the resumption of educational programs[].

SDEA § 9103(5).

   n16 Civil defense is also defined to include activities in preparation for an attack. Such measures include: "the establishment of appropriate organizations, operational plans, and the supporting agreements; the recruitment and training of personnel; the conduct of research; the procurement and stockpiling of materials necessary to the survival, recovery and rehabilitation of the state and of its inhabitants; the provision of suitable warning systems; the construction or preparation of shelters and control centers; provisions for the continuity of state and local governments; and, when appropriate, the non military evacuation of the civil population[.]" SDEA § 9013(5). See also 7 WTC, 2006 WL 62019, at *6 (granting immunity to the City of New York for claims arising from the construction and management of the City's Office of Emergency Management).

[*84]

   "[T]he framers [of the SDEA] undoubtedly anticipated that the various civil defense functions contemplated by the Act would be undertaken *during the rush of emergency*." *Fitzgibbon, 541 N.Y.S.2d at 849* (emphasis added). Thus, in Fitzgibbon, the court excluded routine patrol functions from the immunity provisions of the Act. The court held that although directing traffic in the event of an attack would be covered by SDEA immunity, the SDEA would not grant immunity to the actions of an auxiliary police officer engaged in otherwise routine patrol functions. Id. at 849-50. The court reasoned that if a defendant was engaged in conduct otherwise ordinary and routine to its business, the mere presence of an emergency condition would not operate to mandate the extension of SDEA immunity to otherwise routine conduct. See *Abbott, 23 N.Y.2d 502, 245 N.E.2d 388*; see also 7 WTC, 2006 WL 62019, at *6 (distinguishing between "routine conduct for which there is no immunity under the [S]DEA, and conduct that a municipality performed while engaged in a civil defense function"). Thus, the statute defines as a civil defense activity, not all debris [*85] clearance, but only "essential" debris clearance; not all repair or restoration of damaged vital facilities, but only that which is "immediately essential" and which constitutes "emergency" repair or restoration; and not the restoration of all community services, but only those which are "essential."

### *b. The Requirement of Good Faith*

   Civil defense actions pursuant to the SDEA must also be taken in "good faith carrying out, complying with or attempting to comply with" the legal authorities enumerated therein in order for immunity to attach. SDEA § 9193(1). In this respect, Defendants again urge that the relevant inquiry is not *how* the Defendants acted, but rather *why* the Defendants acted. According to Defendants, the good faith requirement refers only to Defendants' compliance, or attempted compliance, with a civil defense law within the meaning of the SDEA. Moreover, Defendants assert that, regardless of the proper form of inquiry, Plaintiffs have in any event failed to make a showing of bad faith sufficient to defeat the pending motion for judgment on the pleadings.

   To date, no cases, either federal or state, have directly addressed the nature of the SDEA's good faith [*86] requirement. The courts have, however, interpreted the parallel good faith provision of the SDEA's precursor statute, the War Emergency Act ("WEA"), in a series of cases addressing claims arising from injuries sustained during the mandatory blackouts of the 1940s. Defining good faith as "an honesty of intention," *Smith v. Town of Orangetown, 57 F. Supp. 52, 55-57 (S.D.N.Y. 1944),* the courts have focused their inquiry on whether

the individual defendant's alleged negligence resulted from a good faith attempt to comply with an order or regulation cognizable under the WEA.

Thus, in Smith, the District Court affirmed the jury's grant of immunity to a police officer who, while driving during a blackout, drove into a group of soldiers, killing one and wounding several. *Id. at 53.* The analysis adopted by the trial court required a two part inquiry: first, whether the defendant had acted negligently, and, if so, whether the defendant had been pursuing his duties in good faith at the time of the alleged negligence. *Id. at 54.* So long as the defendant was acting in a good faith attempt to comply with his duties, liability for negligence [*87] would not attach. Id. Similarly, in *Gaglio v. the City of New York, 143 F.2d 904 (2d Cir. 1944),* the Second Circuit affirmed the District Court's setting aside of a jury verdict in favor of a plaintiff who sustained injuries after falling onto a railroad track allegedly as a result of dim lighting necessitated by the mandated blackouts. Id. The Gaglio court noted that the proper inquiry was not how the City acted but, rather, whether the City's actions constituted a "it bonafide attempt to comply with ... army regulations." Id.

The grant of immunity under the WEA, however, was not absolute. In *Jones v. Gray, 267 A.D. 242, 45 N.Y.S.2d 519 (App. Div. 1943),* a case factually similar to Smith, an air raid warden, while allegedly responding to a blackout, crashed his car into another vehicle, killing several people. Id. at 520. The defendant argued that he was immune from liability pursuant to the WEA. The court rejected this defense finding that the warden was not "in good faith ... attempting to perform his duties as an air warden at the time of the collision," but instead was on what could only be characterized as a fateful "joy [*88] ride." Id. at 523.

Good faith thus may not be inferred simply from the fact that, at the time of the allegedly negligent acts, the Defendants were acting in a manner responsive to a declaration of emergency. Nor may cases granting immunity for isolated incidents of negligence be extended as to allow for the wholesale grant of immunity to incidents of negligence that occurred, not at isolated intervals, but rather continually over a period of several months. Although the question of why the Defendants acted may ultimately prove critical to determining immunity under the SDEA, the interests of justice mandate also a consideration of *how* the Defendants acted. Special consideration must also be given where the obligation of good faith runs, not to third parties potentially injured by the attacks, but instead to those directly engaged, for all intents and purposes as employees, in the recovery effort. Those who engage others in their service owe definite and specific obligations which may not easily be abandoned.

### c. Discussion

Defendants argue that as long as they were attempting to comply with a legal authority "relating to civil defense" and doing so "in good faith," they [*89] should be entitled to SDEA immunity, and should not be accountable for any deficiencies or negligence in how they carried out their activities, even to the workmen to whom they would otherwise owe a duty. Under this interpretation of the SDEA, immunity should extend to all of Defendants' activities that were responsive to the civil defense emergency created by the attacks, from beginning to end, as they concerned the implementation of "means and methods for the recovery and rehabilitation" of the City. SDEA § 9103(5). Thus, there should not be an inquiry into whether or when an emergency condition existed or ceased to exist, or whether the specific actions undertaken were themselves in good faith. The plain language of the statute, however, considered together with the unique and important public policies implicated by the instant litigation, counsel against adoption of Defendants' arguments. The proper analysis requires consideration of potential temporal limitations on the grant of immunity as well as a consideration of the obligation of good faith that extends beyond mere implementation.

Critically, the statute extends immunity, not to all activities following an emergency, but [*90] limits immunity only to those activities that are, in themselves, "essential," or "immediately essential," and "emergency" in nature. The few cases are in accord, limiting the statute and generally finding liability. See e.g., *Abbott, 23 N.Y.2d 502, 245 N.E.2d 388.* Thus, the statute's text limits its immunity to activities that must be done immediately to resolve pressing needs, in order to enable society to prepare for an attack, and to begin to function following an attack.

The limitation of immunity to acts undertaken in the context of an emergency is essential to ensure "the least possible interference with the existing division of the powers of the government and the least possible infringement of the liberties of the people[.]" SDEA § 9102. Limitations on the right to seek redress for injuries sustained must be strictly limited, extended only where necessary to restore the ability of society again to begin functioning. Defendants argue that immunity is necessary to encourage companies to volunteer their efforts; the fear of lawsuits, Defendants argue, otherwise will cause them to hold back. But individual workers also are essential to the response effort, and [*91] those who claim injury are the very individuals who, without thought of self, rushed to the aid of the City and their fallen comrades. Their efforts also must be encouraged, for their fear of injury without redress can cause such volunteers also to hold back. A delicate balance has to be struck, one that encourages both companies and indi-

viduals to come forward to clear the effects of the blows to society.

These two competing interests, namely the need to allow for an immediate and effective response to an attack on the state as against the need to ensure persons injured the right of redress, may be considered as existing along a spectrum. Where the emergency condition predominates, the interest of protecting those engaged to assist in the emergency response must necessarily be of less concern. In the rush of an emergency, the ability and capacity to adequately implement and effect necessary safety procedures is greatly reduced. The SDEA's immunity provision operates to ensure that fear of liability will not operate to dissuade government and private entities from responding to a disaster, even in the absence of otherwise mandated safety protocols and procedures. However, as the emergency [*92] condition fades, as the rights and obligations of persons and entities engaged in the response effort become regulated by contract, n17 as procedures and protocols are implemented to protect against potential dangers, the need for immunity diminishes and the obligations and duties otherwise imposed once again must be protected.

n17 Draft contracts between the City and the Primary Contractors show that continued compliance with applicable safety regulations was required. (Pls.' J.A. Vol. 6, Ex. 110.)

There is no bright-line demarcation between that which is emergent and that which is done in the more normal course. In a jurisdictional setting, I proposed to create a two-week period after September 11, to September 29, 2001, at which time, pursuant to order of the Mayor, efforts turned from rescue of victims to clearance of debris. See *Hickey, 270 F. Supp. 2d at 374* (holding that causes of action of workers claiming respiratory injury arose under the Air Transportation Safety and System Stabilization [*93] Act before September 29, 2001, and under New York State law thereafter). The Court of Appeals, however, disapproved of any such bright-line and ruled that claims throughout the period of the rescue and recovery effort were covered by the Act. See *McNally, 414 F.3d at 380-81*. The New York Supreme Court applied the bright-line rule of Hickey to claims under the SDEA, but the questionable efficacy of Hickey casts doubt also on the decision of the New York Supreme Court. *Daly, 793 N.Y.S.2d at 719.*

That an emergency existed for some time following September 11 is without question. n18 But whether the emergency lasted for days, or weeks, or months, and in connection with which precise activities, are fact-intensive questions, not possible to answer in connection

with a Rule 12 motion addressed to the pleadings. Clearly, the desperate search for survivors constituted an unprecedented setting, and nothing about what took place in connection with such a search could be considered ordinary or routine--at least, so it would seem. But at some point after the attacks, the emergency conditions subsided, the extraordinary settled into a routine, and [*94] the Defendants' argument for immunity loses cogency under the teachings of the New York cases.

n18 Defendants point to the fact that the State of Emergency within the City of New York was renewed by Mayoral Order every five days, from September 11, 2001 through June 29, 2002, as proof that the emergency condition existed throughout the duration of the rescue and recovery effort. The renewed Proclamations of Emergency, however, served as a general authority for City agencies to take "whatever steps necessary" to respond to the September 11 attacks. The Proclamations do not serve to define "emergency" for purposes of determining the extent and scope of immunity under the SDEA.

The difficulty of discerning the precise point at which the emergency condition ceased to exist is further complicated by the SDEA's parallel requirement of good faith. The SDEA mandates that all actions pursuant to the Act be undertaken "in good faith carrying out, complying with or attempting to comply with" relevant legal authorities. [*95] SDEA § 9193(1). The factual record before me shows clearly that, in responding to the September 11 attacks, Defendants endeavored to develop a viable health and safety plan for workers at the site. As Defendants put it, the efforts to ensure worker health and safety were extensive and included:

(1) employing health and safety experts; (2) participating in daily health and safety meetings; (3) implementing health and safety protocols, plans, and agreements; (4) adopting a clear and consistent respiratory protection policy, devised by experts and based on proven monitoring and analytical techniques; (5) sharing environmental information with intergovernmental agencies; (6) consulting with top experts in the selection of respirators; (7) overcoming Herculean challenges in acquiring and distributing respirators to workers from the outset; and (8) consistently making an effort to ensure worker compliance with respirator use directives.

(Defs.' Reply Mem. at 30). The pleadings, however, show also that there were critical lapses in the enforcement of safety standards and in the dissemination of vital information about the safety of the air at Ground Zero to those most affected, [*96] the workers themselves. (See Pls.' Timeline at 8, 11, 13, 14, 19, 20, 27, 28, 29, 30, 31, 33, 34, 35, 36, 37.) As of January 2002, compliance rates for respirator usage fell below twenty-nine percent, and Plaintiffs allege that "[r]espirator fit testing done at and around the WTC site was illusory, at best," and, in any event, "did not meet OSHA standards." (Pls.' Master Compl. at P383.)

Accepting all allegations alleged in the complaint as true, as I am required to do on a motion pursuant to *Rule 12(c), Fed. R. Civ. P.*, I cannot determine at this stage that Defendants' actions all were in good faith, nor which acts might have been, and which appear not to have been, conducted in good faith. There is no standard in case law to help me determine if good faith should be considered according to the motives with which actions were undertaken, in which case good faith likely would be found, or if good faith should be considered in the context of the particular acts as to which the Defendants allegedly were negligent, in which case standards of good faith would tend to merge into standards of negligence. Regardless of Defendants' efforts and [*97] motives to develop safety standards, if the standards were not implemented or enforced in a systematic and reasonable manner, liability well may attach. It may not be sufficient for Defendants to assert simply that they were acting in a good faith attempt to comply with the various declarations of emergency, without considering also what they did, and did not, do. The cases over which I preside involve, not third parties claiming injury because of conduct of an emergency provider, but by the emergency providers themselves, based on allegations that those in charge of their respective workplaces did not provide the training and equipment available and necessary and appropriate to allow them to do their work and to protect them against the dangers incident to their workplaces. Whether Plaintiffs will be able to make a showing of bad faith is a question of fact for the jury that may not be summarily determined at this stage in the litigation. See *Smith, 57 F. Supp. at 55* ("[T]he existence of good faith is an issue for the jury to decide in any case[.]"). n19

n19 Outside of the applicability of the SDEA's general immunity provision, the Plaintiffs assert further that section 9193(2) of the SDEA bars application of immunity in this in-

stance. Section 9193(2) provides that the immunity provisions of the SDEA may not operate to:

> affect the right of any person to receive benefits to which he may be entitled under the workers' compensation law, volunteer firefighters' benefit law, volunteer ambulance workers' benefit law, any pension law or the general municipal law, nor the right of any person to receive any benefits or compensation under any act of congress or under any law of this state.

SDEA § 9193(2). Plaintiffs assert that enactment of the ATSSSA establishes a system of benefits and compensation analogous to a state workers' compensation system and thus precludes application of immunity insofar as it might operate to bar the rights of the Plaintiffs to receive such benefits.

For the reasons stated in my earlier discussion of the preemptive effect of the ATSSSA, Plaintiffs argument is without merit. The ATSSSA was intended to create a federal forum for the adjudication of claims arising out of September 11 and to provide certain defendants with the protections necessary to avoid financial ruin. Its enactment did not serve to establish any form of guaranteed compensation to anyone other than those eligible to obtain relief through the Victim Compensation Fund. In the absence of such a guaranteed scheme for compensation, section 9193(2) is inapplicable.

[*98]

All of this teaches that one has to be cautious in considering a Rule 12(c) motion for judgment on the pleadings on the basis of a fact-laden defense. Defendants' motion accepts Plaintiffs' allegations of respiratory injury as fully proved, and so they must be in the context of a Rule 12(c) motion for judgment on the pleadings. *Fed. R. Civ. P. 12(c)*. A valid affirmative defense defeats even a well-pleaded claim, and the SDEA certainly is a valid defense, but the scope and extent of applicability of the defense is unclear, and a judge must be hesitant to apply such a defense beyond its narrow parameters to a valid claim of injury.

*C. The Argument of Immunity Under the New York Disaster Act*

The New York State and Local Natural Disaster and Man-Made Disaster Preparedness Law (the "Disaster Act"), N.Y. Exec. Law § § 20-19-g (McKinney 2006), provides another basis for the City Defendants' arguments of immunity.

1. The Limited Scope of the Disaster Act's Application

The Disaster Act provides that, upon the "occurrence or imminent threat of widespread or severe damage, injury, or loss of life or property, resulting from any man-made or [*99] natural causes," Disaster Act § 20(2)(a), the "chief executive of any political subdivision is ... authorized and empowered to and shall use any and all facilities, equipment, supplies, personnel and other resources of his political subdivision in such manner as may be necessary or appropriate to cope with the disaster or any emergency resulting therefrom." Disaster Act § 25(1). The Disaster Act provides also for immunity for discretionary functions performed by a political subdivision's officers and employees: "A political subdivision shall not be liable for any claim based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of any officer or employee in carrying out" its provisions. Disaster Act § 25(5). Political subdivisions are given immunity for those of its acts responding to a disaster that: (1) constitute discretionary functions or duties; and (2) are performed by its officers or employees.

Thus the Disaster Act protects political subdivisions, and immunizes then against lawsuits based on discretionary acts of their political officers and employees. There also are additional limitations relating to the Governor's [*100] powers to suspend laws, but not to suspend those laws that safeguard the public health and welfare. Section 29-a of the Disaster Act grants the Governor of the State of New York the authority to "suspend specific provisions of any statute, local law, ordinance, or orders, rules or regulations ... during a state disaster emergency, if compliance with such provisions would prevent, hinder, or delay action necessary to cope with the disaster." Disaster Act § 29-a(1). By implication, the obligations of the government to act consistently with statutory or regulatory duties remain in effect unless the Governor orders the suspension of such laws. Furthermore, the Governor may not suspend a law which safeguards public health and welfare and which is not "reasonably necessary" to the responsive effort.

No suspension [of law] shall be made which does not safeguard the health and welfare of the public and which is not reasonably necessary to the disaster effort.

Disaster Act § 29-a(2)(b).

The rationale of the Disaster Act is clear. Political subdivisions of the State are to act to preserve the health and welfare of the public, but not at the expense of the public's health [*101] and welfare. The firemen, policemen and construction workers worked at the site to further the health and welfare of the public, but the political subdivisions that regulated their work were not at liberty to sacrifice their health and welfare, except possibly if there was no other way to combat the emergency effects of the disaster. And, significantly, Governor Pataki did not exercise his authority under section 29-a of the Disaster Act to suspend the protections of the New York Labor Law governing the health and welfare of workers at construction sites, presumably because "compliance with such provisions [did not] prevent, hinder, or delay action necessary to cope with the disaster." Disaster Act § 29-a(1). It follows that the provisions of the New York Labor Law relevant to worker safety remained in effect throughout the duration of the rescue and recovery effort, and that it was incumbent on those responsible for supervising the site to comply with those laws.

Thus, the City Defendants cannot argue cogently that they should be immunized for their decisions and conduct in putting out the fires and removing the debris from the rubble of Towers One, Two and Seven no matter what [*102] they did. As I ruled in relation to the SDEA, specific actions have to be evaluated according to time, place and necessity. There is likely to be a setting where immunity should be upheld, but the decisions cannot be made on motion, without a complete record. There is nothing in the Disaster Act that extends immunity beyond that provided by the SDEA, except perhaps if the Governor had found the need to suspend the New York Labor Law and other regulatory protections of the workplace.

The City Defendants argue that a liberal extension of immunity is important to encourage public actors to respond fully to a public disaster, for "[a] public officer, haunted by the specter of a lawsuit, may well be subject to the twin tendencies of procrastination and compromise to the detriment of the proper performance of his duties." *Rottkamp v. Young, 21 A.D.2d 373, 249 N.Y.S.2d 330,* PIN (App. Div. 1964). But large numbers of working people, as well as City officials, must work together to restore a society struggling to recover from a disaster. Extending too large an immunity to official actions, at the expense of the health and welfare of working people, will discourage one group [*103] of people while encouraging another group of people. "Neither the City nor any other entity has discretion to violate an applicable statute," *Daly, 793 N.Y.S.2d at 721,* least of all the strong policy of New York protective of worker safety. *Hickey,*

*270 F. Supp. 2d 357.* The Disaster Act should not be read to create blanket immunity.

Like the SDEA, the Disaster Act's grant of immunity is limited to actions that are emergent in their own quality, and not only because those actions were intended to alleviate a previous emergency condition. The Disaster Act authorizes actions upon the "occurrence or imminent threat of" a disaster, Disaster Act § 20(2)(a), and which are "necessary or appropriate to cope with the disaster or any emergency resulting therefrom." Disaster Act § 25(1). Immunity is thus provided, not necessarily to any actions taken in consequence of a disaster, but instead only to those actions which are necessary to cope with the disaster. Immunity is to be conferred sparingly, and is not to be a cloak excusing all accountability. *Abbott, 23 N.Y.2d 502, 245 N.E.2d 388.* The issue is fact intensive, and fixing the precise point [*104] when emergency efforts became routine is difficult. A proper resolution of the issue requires a properly developed factual record. See *McNally, 424 F.3d 352.*

For all these reasons, I decline to grant immunity under the Disaster Act beyond that which is available under the SDEA.

2. The Extension of Disaster Act Immunity to Non-Government Actors

The Disaster Act expressly limits its grant of immunity to actions taken by political subdivisions and their employees and officers. The City Defendants argue, however, that the grant of immunity should be extended to the private contractors whom the City engaged, and that doing so would be consistent with the policy of the Disaster Act and basic principles of common law. The argument, insofar as it argues for an immunity wider than that available under the SDEA, is without merit.

The immunity provision of the Disaster Act, section 25(5), offers protection only to "political subdivision[s]," and only when their officers or employees "exercise or perform" discretionary functions or duties." See also Disaster Act § 29-b(2), (3) (granting immunity to local civil defense forces operating under the direction and [*105] command of the city civil defense director as authorized by the governor). Had the legislature intended for immunity to extend to private actors, it could easily have so provided. I decline to legislate that which the legislature did not provide.

*D. New York State Common Law Immunity*

The City Defendants, together with the Port Authority and Con Edison, seek immunity also on the basis of state common law, arguing that they performed uniquely governmental functions in the aftermath of the September 11 attacks. In general, although the common law does provide immunity for acts that are "completely sov-

ereign in nature and completely foreign to any activity which could be carried out by a private person," n20 *Williams v. State, 90 A.D.2d 861, 456 N.Y.S.2d 491, 493 (App. Div. 1982),* there are important limitations. Common law immunity is limited to governmental acts that are discretionary in nature. Furthermore, the common law does not extend immunity to private entities that are sued for negligent or willful behavior. See *Haddock v. City of New York, 75 N.Y.2d 478, 553 N.E.2d 987, 991 (1990);* see also *Royal Ins. Co. v. Ru-Val Elec. Corp., 918 F. Supp. 647, 659 (E.D.N.Y. 1996).* [*106] Important public policy considerations require that the immunity granted to private entities acting at the behest of government entities be limited. *Royal Ins. Co., 918 F. Supp. at 659-60.*

> n20 The immunity is a common law exception to the waiver of sovereign immunity pursuant to passage, in 1929, of the New York Court of Claims Act, N.Y.S. Ct. Cl. Act § 8. See *Royal Ins. Co. v. Ru-Val Elec. Corp, 918 F. Supp. 647, 659-60* (citing *Florence v. Goldberg, 44 N.Y.2d 189, 375 N.E.2d 763, 766 (1978)).*

The City and Port Authority argue that all acts performed in response to the September 11 attacks were discretionary and unique to governmental entities, including the exercise of traditional police powers in the interest of public health and safety. My task, however, is not to evaluate claims in their generality, but to "scrutinize specific claims," for "[i]t is the specific act or omission out of which the injury is claimed to have arisen and the capacity in [*107] which that act or failure to act occurred" that determines governmental immunity. In re September *11 Litigation, 280 F. Supp. 2d at 303* (quoting *Weiner v. Metro. Transp. Auth., 55 N.Y.2d 175, 433 N.E.2d 124, 127 (1982).* The issue cannot be decided in the context of a motion for judgment on the pleadings. It requires a proper, and fully developed, factual record. n21

> n21 To the extent that immunity is in fact found to apply to government actions taken in the aftermath of the September 11 attacks, the Contractor Defendants and Con Edison assert that they are entitled to derivative governmental immunity. The Contractor Defendants and Con Edison assert that the extension of immunity is proper to the extent that they: (1) were at all times working under the direction of the City; and (2) that the actions of which Plaintiffs complain were undertaken pursuant to City directives. See *Yearsley v. W.A. Ross Construction, 309 U.S.*

*18 at 19, 84 L. Ed. 554 (1940).* Because the grant of immunity pursuant to common law would at this stage be premature in light of the potential grant of statutory immunity, I decline to reach this argument here.

[*108]

## VI. THE MOTIONS FOR SUMMARY JUDGMENT--FEDERAL IMMUNITY

Defendants argue that they are entitled to immunity also under federal law, pursuant to the Stafford Act and under principles of federal derivative immunity. The Defendants assert that their actions after September 11 mainly were at the express direction of federal government agencies and that immunity should therefore extend to them insofar as they acted at the behest of the federal government. The Defendants assert further that to impose liability would run counter to basic principles of law to the extent that the federal government is the real party in interest. Defendants move for summary judgment, after full discovery relevant to their defense of federal immunity.

### A. Standard of Review

Summary judgment is warranted if the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits . . . show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Fed. R. Civ. P. 56(c).* A "genuine issue" of "material fact" exists "if the evidence is such that a reasonable [*109] jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 91 L. Ed. 2d 202 (1986).* Although all facts and inferences therefrom are to be construed in favor of the party opposing the motion, see *Harlen Assocs. v. Village of Mineola, 273 F.3d 494, 498 (2d Cir. 2001),* the non-moving party must raise more than just "metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586, 89 L. Ed. 2d 538 (1986).* "[M]ere speculation and conjecture is insufficient to preclude the granting of the motion." *Harlen, 273 F.3d at 499.* "If the evidence is merely colorable or is not significantly probative, summary judgment may be granted." *Anderson, 477 U.S. at 249-50* (citations omitted).

### B. Derivative Federal Immunity

The practicalities of modern governance have led courts, over the past sixty years, to extend the immunity traditionally afforded to the federal government for actions taken in furtherance of its government functions to private entities hired to facilitate the government in the implementation of its [*110] programs and goals. See

*Yearsley v. W.A. Ross Const. Co., 309 U.S. 18, 84 L. Ed. 554 (1940).* The extension of such immunity stems from the premise that, "[t]o insulate the United States from its discretionary decisions, but not to do likewise when the United States enters into contracts with others to execute the will of the United States 'makes little sense.'" *Richland-Lexington Airport District v. Atlas Properties, Inc., 854 F. Supp. 400 (D.S.C. 1994)* (quoting *Boyle v. United Techs. Corp., 487 U.S. 500, 511-512, 101 L. Ed. 2d 442 (1988)).* Indeed, the primary purpose of the defense "is to prevent the contractor from being held liable when the government is actually at fault" but is otherwise immune from liability. *Trevino v. General Dynamics Corp., 865 F.2d 1474, 1478 (5th Cir. 1989).*

Defendants, the City of New York and its Contractors as well as the Port Authority and the WTC Defendants, urge that under the principles first enunciated in *Yearsley, 309 U.S. 18, 84 L. Ed. 554,* and further developed in *Boyle, 487 U.S. at 505,* and *Richland-Lexington, 854 F. Supp. 400,* [*111] they are entitled to immunity for actions taken in the aftermath of the September 11 attacks to the limited extent that such actions were controlled by and undertaken pursuant to the direction of federal agencies, namely the Army Corps, OSHA and the EPA. They contend that to impose liability on Defendants for actions that were undertaken at the direction of federal agencies would work a manifest injustice and would severely hinder the ability of the government to provide an effective and immediate response to future disasters.

### 1. The Relevant Case Law

The Supreme Court first recognized the doctrine of derivative immunity for private contractors, the so-called government contractor defense, in *Yearsley, 309 U.S. 18, 84 L. Ed. 554,* dismissing a suit by landowners for damage to their property arising from work performed by a private contractor pursuant to a contract with the federal government. The landowners alleged that the contractor's negligence in constructing dikes in the Missouri River at the direction of the federal government led to the erosion of ninety-five acres of private property. Id. The Court held that the interests of justice required that federal [*112] immunity be extended to private contractors where: (1) the contractor was working pursuant to the authorization and direction of the federal government; and (2) the acts complained of fell within the scope of such government directives. *Id. at 21.* Under the rule set forth in Yearsley, so long as, "[the] authority to carry out the project was validly conferred, that is, if what was done was within the constitutional power of Congress, there is no liability on the part of the contractor for executing" the will of the federal government. Id. Thus, liability may attach only where the contractor exceeded

the scope of his authorization, or where the authority itself was not validly conferred. Id.

The purpose and scope of the government contractor defense was clarified and expanded in *Boyle. 487 U.S. 500, 101 L. Ed. 2d 442*. There, pursuant to specifications provided by the United States, a private manufacturer had constructed a military helicopter with an allegedly defective escape hatch. *Id. at 502-503*. As a result of the defective hatch, the co-pilot was killed when he was unable to open the hatch after the helicopter crashed [*113] into the water. Id. A jury had returned a verdict in favor of the executor of the co-pilot's estate on the basis of state law. Although remanding for further consideration, the Supreme Court held that principles of government immunity applied with equal force to the case of a private manufacturer acting pursuant to precise government specifications. Id. Rejecting the argument that federal immunity is necessarily limited to actions taken by an official in the course of performing his or her duties as a federal employee, the Court instead framed the essential issue as the "uniquely federal interest" "in getting the Government's work done." *Id. at 505*. Such unique federal interest, in turn, mandated the displacement of state law to the extent that application of state law principles would give rise to a "significant conflict" with an "identifiable 'federal policy or interest.'" *Id. at 507* (quoting *Wallis v. Pan American Petroleum Corp., 384 U.S. 63, 69, 16 L. Ed. 2d 369 (1966))*.

The Court made clear, however, that a federal interest alone is insufficient to displace state law. Id. at 507. State law is instead displaced only [*114] where it presents a significant conflict with federal policy, such that "the application of state law would 'frustrate specific objectives' of 'federal legislation.'" Id. (quoting *United States v. Kimbell Foods, Inc., 440 U.S. 715, 728, 59 L. Ed. 2d 711 (1979))*. Although the conflict need not be as absolute as that which is required under ordinary pre-emption analysis where Congress has legislated in an area traditionally governed by state law, "conflict there must be." Id. at 508. In the absence of a conflict, state law obligations remain in effect. Thus, if:

> the United States contracts for the purchase and installation of an air-conditioning unit, specifying the cooling capacity but not the precise manner of construction, a state law imposing upon the manufacturer of such units a duty to include a certain safety feature would not be a duty identical to anything promised the Government, but neither would it be contrary. The contractor could comply with both its contractual obligations and

the state-prescribed duty of care. No one suggests that state law would generally be pre-empted in this context.

Id. at 509.

In the case presented in [*115] Boyle, however, the Court recognized the potential for the finding of a "significant conflict." Id. at 511. Neither the federal government nor its officers could be sued for designing an unsafe and defective helicopter because of an inadequate escape hatch, for the Federal Tort Claims Act ("FTCA") precluded the imposition of liability for "the exercise or performance or the failure to exercise or perform a discretionary function or duty." *28 U.S.C. § 2680(a)*. The Court in Boyle therefore reasoned that, if the federal government could not be sued for performing discretionary acts, neither could a private contractor, and any state law providing for such liability would necessarily give rise to an inherent conflict. On the basis of such a significant conflict, Boyle held, the imposition of liability pursuant to state law must fail where: "(1) the United States approved reasonably precise specifications; (2) the equipment conformed to those specifications; and (3) the supplier warned the United States about the dangers in the use of the equipment that were known to the supplier but not to the United States." *Boyle, 487 U.S. at 512*. [*116]

Boyle ruled that there was a unique federal interest implicated in the securing of military procurement contracts. The rule of Boyle, however, is more expansive and extends to other fields of strong federal interest. The dispositive issue is "whether there is a uniquely federal interest in the subject matter of the contract." *Richland-Lexington, 854 F. Supp. at 422*. Thus, in Richland-Lexington, the District Court for South Carolina extended federal immunity to a private contractor hired by the Environmental Protection Agency to cleanup and stockpile contaminated soil. *Id. 423-24*. Applying Boyle, the court ruled that the actions of the EPA were discretionary in nature, and that the discretionary function exception of the FTCA operated to prevent it and its employees and officials from being sued. *Id. at 423*. The court then applied Boyle's three-prong test, and concluded that state law conflicted insofar as it operated to impose liability on a private contractor hired by the EPA and therefore was displaced. First, the court found that the EPA had approved the site for cleanup, had determined the best method for cleanup, [*117] and had hired the defendant contractor to excavate and remove contaminated soil from the site according to that method. Second, the court found that the defendant contractor had performed pursuant to performance specifications issued by the EPA and under the EPA's supervision. Third, the

court found that the defendant contractor had not been aware of any dangers with respect to the cleanup activity as to which the EPA was not also aware. *Id. at 423-24.* The court concluded that state tort law was displaced and the defendant contractor was therefore immune from suit, sharing in the immunity traditionally granted the federal government. *Id. at 424.*

The crucial element is that the government contractor acted in compliance with "reasonably precise specifications" approved by the United States. *Boyle, 487 U.S. at 512.* The very essence of the defense is to "prevent the contractor from being held liable when the government is actually at fault," *Trevino, 865 F.2d at 1478,* for "[w]hen a contractor acts under the authority and direction of the United States, it shares in the immunity enjoyed by the Government." *Zinck, 690 F. Supp. at 1333* [*118] (citing *Yearsley, 309 U.S. 18, 84 L. Ed. 554).* If, however, the private actor was acting independently of precise government directions and approvals, the defense does not apply. *Trevino, 865 F.2d at 1480; see also Tate v. Boeing Helicopters, 55 F.3d 1150 (6th Cir. 1995).* Furthermore, the government must supervise and control the contractor's actions, for if it does not, or if it fails to exercise supervisory judgment as to the particularities of the project, state law allowing lawsuits for negligence and federal policy providing for immunity are not in conflict and displacement of state law may not be warranted. *Tate, 55 F.3d at 1154.* In the latter case, the discretionary functions of the government are not implicated and the government contractor defense as enunciated in Yearsley and *Boyle may not apply. Trevino, 865 F.2d at 1480.*

> When the government merely accepts, without any substantive review or evaluation, decisions made by a government contractor, then the contractor, not the government, is exercising discretion. A rubber stamp is not a discretionary function; therefore, a rubber [*119] stamp is not 'approval' under Boyle.

Id. Thus, derivative immunity arises where the government: (a) approves in its discretion reasonably precise specifications, (b) supervises and controls the implementation of those specifications, and (c) the contractor is not aware of reasons not known to the government why the application is unsafe or unreasonable. Id. Immunity will not attach, however, where the private contractor acts, or knows material facts, independently of the federal agency.

2. Application to the Rescue and Recovery Efforts at Ground Zero

Defendants claim that federal agencies assumed exclusive control over three distinct areas of the rescue and recovery effort following September 11, and that they are therefore entitled to share in the immunity enjoyed by the federal government with respect to all claims arising from those areas. Specifically, Defendants claim federal control as follows: (1) the Army Corps assumed control over the design, implementation and enforcement of environmental health and safety monitoring at Fresh Kills; (2) OSHA assumed the lead role for respirator distribution, fit-testing, training and use at and around Ground Zero; [*120] and (3) the EPA assumed lead responsibility for environmental monitoring and hazardous waste removal. The Defendants thus argue that they are entitled to derivative immunity from all claims relating to the health and safety protocols in effect at Fresh Kills; claims relating to respirator distribution, fit-testing and training at and around Ground Zero; and all claims arising from air quality monitoring and hazardous materials removal conducted at the World Trade Center site.

The first step in the Boyle analysis is to identify the unique federal interest. That lies in the Federal Response Plan ("FRP") which expressly provides for "a process and structure for the systematic, coordinated, and effective delivery of Federal assistance to address the consequences of any major disaster or emergency[.]" (FRP, Ex. L at 1.) The Presidential Declaration of a National State of Emergency on September 14, 2001 activated the FRP, leading the Army Corps of Engineers, OSHA and the EPA to become involved in the recovery efforts at Ground Zero.

The next step is to identify if a substantial conflict exists between federal policy and application of state law, as "[c]onflict there must be." [*121] *Boyle, 487 U.S. at 508.* Pursuant to the Stafford Act, a federal agency or employee acting in accordance with the FRP "shall not be liable for any claim based upon the exercise or performance of or the failure to exercise or perform a discretionary function or duty[.]" FRP at 8; *42 U.S.C. § 5148.* To the extent the actions challenged were discretionary in nature, allowing for "'second-guessing' of these judgments ... through state tort suits ... would produce the same effect sought to be avoided" by the Stafford Act and FRP exemption. *Boyle, 487 U.S. at 511.* It would make little sense to immunize the federal agencies and officers from liability for decisions made as to protocols to be followed at the site while at the same time imposing liability on the City and other Defendants simply for abiding by such federally-determined protocols.

The question, however, is whether the same or different conduct is implicated, that is, whether the contractor is merely carrying out that which federal officers chose to do in the exercise of their discretion, under the supervision and control of federal officers, or whether

the contractor did [*122] something materially different or additional for which they are being sued. Here, to the extent that the relevant federal agencies did not exercise oversight over Defendants' actions, federal immunity will not operate to protect Defendants from liability by suspending application of state law. *Tate, 55 F.3d at 1154.*

On October 1, 2001, and at the request of the City, the Army Corps assumed limited control over operations at Fresh Kills Landfill and, on October 10, 2001, assumed responsibility for "the implementation of a comprehensive health and safety plan for all personnel working at the landfill site." (Defs.' J.A. Vol. 5, Ex. BJ (Amendment to 3-COE, Oct. 10, 2001).) It engaged Phillips & Jordan to develop and implement the various protocols and procedures for a comprehensive scheme for managing health and safety at the landfill, including dust control measures and monitoring compliance with protocols by workers. (Defs.' J.A. Vol. 5, Ex. BK (Phillips & Jordan Disaster Recovery Group: Experience).)

However, there has been no showing that the Army Corps exercised a level of control and supervision over the operations at the Fresh Kills worksite sufficient to [*123] warrant the extension of federal immunity to the City and other Defendants. To the contrary, the record suggests that the City continued to exercise an independent degree of supervisory control over operations. It was the DDC, and not the Army Corps, that designated Fresh Kills as one of the zones of the rescue and recovery effort. It was the City, not the Army Corps, that commissioned the Environmental Health and Safety Plan ("ES&H"), first distributed in October of 2001, to address the implementation of health and safety protocols within the four primary zones constituting the former site of the World Trade Center and surrounding areas, and which addressed itself to the issues of worker safety at Fresh Kills, incorporating the more extensive recommendations by Phillips & Jordan and placing such recommendations on file with the DDC.

The mere fact that a federal agency, rather than a private contractor, assumed responsibility for operations within the Fresh Kills zone does not require that immunity automatically attach. Although the Plaintiffs cannot "second-guess" the reasonableness of the Army Corps' recommendations, the Plaintiffs are not precluded from attacking other aspects [*124] of the operations which were outside the direction of the Army Corps, directly or through Phillips & Jordan, or which were not part of the work that the Army Corps supervised and controlled. n22 Indeed, the clear understanding was that the Army Corps, far from assuming authoritative control over operations at Fresh Kills, worked "on an as required basis" as the City of New York requested its assistance. (Pls.' J.A. Vol. 4, Ex. 49.)

n22 It should be noted that nothing in the FRP, pursuant to which the Army Corps assumed its role at Fresh Kills, supposes that reliance on federal assistance and resources serves to divest a local authority of control. (See FRP, Ex I ("The combined emergency management authorities, policies, procedures, and resources of local, State, and Federal governments as well as voluntary disaster relief organizations ... constitute a national disaster response framework for providing assistance following a major disaster or emergency.").)

As to OHSA, within days of the September 11 attacks, [*125] and at the request of the City DOH, OSHA became the "lead agency for distributing, fitting, and training for respirators for the recovery of workers." (Defs.' J.A., Vol. 2, Ex. Q (Clark Dep.) at 87:19-88:6; Pls.' J.A. Vol. 4, Ex. 56.) OSHA selected the type of respirators to be distributed, and coordinated the distribution of respirators at huts set up throughout the World Trade Center site, providing respirator-fit and -use training, including a mandatory 10-hour health and safety course for all individuals working in a supervisory role at the site. Further, to ensure compliance with established standards, OSHA deployed over 1,000 inspectors to the site to supervise the work of the Primary Contractors and to document violations.

And yet, despite its designated position as the lead agency for respirator training and use, the record clearly shows that OHSA continued to work in an advisory capacity, providing assistance only as needed and requested by the City. Throughout the recovery effort, the City DOH continued to act as the agency responsible for the development of job and site-specific PPE requirements, including establishing relevant respiratory requirements. The ES&H Plan clearly [*126] sets out the DDC, with the assistance of other City agencies and the Primary Contractors, as having primary responsibility for environmental safety and health at the site. Moreover, OSHA expressly declined to assume an enforcement role at the site, instead limiting its inspectors to reporting any observed violations to the relevant Primary Contractor. Enforcement was thus left to City agencies and the Primary Contractors. The cooperative relationship between OSHA and City agencies was memorialized in the WTC Emergency Project Partnership Agreement, affirming "the value of working in a cooperative, focused and voluntary effort to ensure a safe and healthful environment for everyone involved[.]" (Defs.' J.A. Vol. 3, Ex. AO.)

The EPA also played an important and vital role in the rescue and recovery efforts at Ground Zero. Like

OSHA, the EPA assumed its role at the site pursuant to a direct request by the City and pursuant to the authority granted the agency under the FRP. Specifically, the EPA assumed lead responsibility for the removal of hazardous materials at the site and for monitoring and reporting on atmospheric conditions. Air monitoring at the site was coordinated with OSHA [*127] and relevant City agencies through the use of air monitors stationed at locations in and around the World Trade Center site. At the same time, the City, through its own agencies, continued to conduct its own tests, independent of federal air quality monitoring. Both the City and the EPA shared their data with the inter-agency Environmental Assessment Group. Determinations as to respirator requirements on the basis of test results, in turn, were made, not by the EPA separately, but rather by the Environmental Assessment Group as a collective group.

The record thus shows that the City never abandoned its overall responsibility for worker health and safety. The EPA expressly acknowledged that it lacked the authority to enforce the worker health and safety policies for non-EPA employees. Moreover, even though the EPA had assumed lead responsibility for the removal of toxic waste at the site, it in fact exercised its authority in conjunction with the City DEP. (Pls.' J.A. Vol. 4, Ex. 49 ("The Environmental Protection Agency (EPA), in conjunction wit the City Department of Environmental Conservation, (DEP) is responsible for recovering, handling and disposing hazardous wastes at the disaster [*128] site.").) Thus, like the Army Corps and OSHA, the EPA operated at the site in an advisory capacity only, never divesting the City of its authority or its duty to protect those working at its behest.

Defendants urge that active participation of the federal agencies in developing protocols for health and safety suffices to extend immunity. But this is not so. The essential purpose of the derivative immunity doctrine is to "prevent the contractor from being held liable when the government is actually at fault[.]" *Trevino, 865 F.2d at 1478.* If the private actor acted in compliance with "reasonably precise specifications" established by the federal agency, and under the supervision and control of the federal agency, immunity is extended. *Boyle, 487 U.S. at 512.* But immunity is not extended where the private actor acts independently, or outside of, or in addition to, the government's specifications. Moreover, the safety of the workplace is heavily regulated by New York state labor law, a subject that I developed in Hickey, and to which I return in the next section. Unless adherence to the requirements of the labor law conflicts with federally-developed [*129] protocols, the state regulation is not ousted by the federal interest. *Id. at 509.*

Here, the record does not show exclusive federal control. The record instead presents a picture of coopera-

tion and collaboration, with federal agencies providing assistance pursuant to the request of the City and expressly declining to assume an enforcement role, deferring instead to the City agencies and the Primary Contractors. The City and the Primary Contractors it engaged exercised supervisory responsibility for worker health and safety at the site and for ensuring compliance with applicable safety standards. The exercise of discretionary functions by the federal agencies did not conflict with a continuing obligation by Defendants to abide by the mandatory laws regulating the health and safety of the workplace.

It is beyond any doubt that the City and other Defendants relied upon the assistance and expertise of the federal agencies. To the extent that reliance, and adoption of federal standards and protocols is shown, and the Defendants' conduct is tantamount to actions by the federal authority, the Defendants enjoy the same immunity as would be conferred on discretionary acts [*130] and decisions of federal officers and employees. At this point, however, the record is not sufficiently clear to enable the court to demark the boundary between federally instructed discretionary decisions, and those made by the various Defendants. There are material, triable issues of fact that will have to be resolved. At his point in the pre-trial proceedings, the Motions for Summary Judgment are denied.

*C. Stafford Act Immunity*

The various Defendants separately assert immunity pursuant to the Stafford Act. *42 U.S.C. § 5148 (2006).* The Stafford Act provides that the federal government, "shall not be liable for any claim based upon the exercise or performance of or the failure to exercise or perform a discretionary function on the part of a Federal agency or an employee of the Federal Government in carrying out the provisions" of the FRP. *42 U.S.C. § 5148.* I decline, however, to extend the grant of immunity provided by the Stafford Act to non-federal actors beyond the limits of federal common law, for to do so would extend the Act beyond its plain terms.

Nothing in the plain language of the Stafford Act provides that immunity [*131] should be extended to non-federal actors. The mere fact that non-federal actors may participate in response and recovery efforts does not in and of itself require that immunity be extended to actors not included in the statutory provision of immunity. Indeed, "this court is not at liberty, because it thinks the provisions [of a statute] inconsistent or illogical, to rewrite them in order to bring them into harmony with its views as to the underlying purpose of Congress." *Helvering v. New York Trust Co., 292 U.S. 455, 472, 78 L. Ed. 1361 (1934).* That the Stafford Act's immunity provision should not be judicially rewritten is further underscored

by the doctrine of derivative federal immunity otherwise available (and previously discussed).

Immunity provisions are to be interpreted narrowly. *Abbott, 23 N.Y.2d 502, 245 N.E.2d 388.* Our system of justice is premised on accountability, save for specific exceptions based on statute or fundamental common law principles of necessity. Defendants urge that courts should encourage private actors to enlist in recovery efforts from mass disasters, but the same policy has to be sensitive to the individual workers [*132] who risk their lives. The job of restoring society cannot be based on a system rewarding businesses, but being indifferent to the health and welfare of working people.

### D. Other Bases for Federal Immunity

The Port Authority and the World Trade Center Defendants, as well as Con Ed, present additional arguments for immunity under federal law.

The Port Authority and the World Trade Center (Silverstein) Defendants argue that the federal government's promise to pay 100 percent of all costs associated with the rescue and recovery efforts at Ground Zero makes the federal government the real party in interest, thus mandating the dismissal of all claims as against them. They cite to the Presidential Declaration of National Emergency on September 14, 2001, by which President Bush ordered FEMA to pay all costs associated with the efforts taken in response to the September 11 attacks. Such promise of payment, however, does not operate to suspend ordinary rules of rights and obligations running between a tortfeasor and his alleged victim. The question properly before me by these pending motions is whether Defendants are in some manner entitled to immunity for acts undertaken in response to [*133] the September 11 attacks. That Defendants may ultimately seek indemnification from the federal government on the basis of FEMA's alleged obligation to pay 100 percent of costs is irrelevant to this larger question.

Con Ed's additional argument, additional to arguments of derivative governmental immunity and the Stafford Act, is based on its legal responsibility to restore energy to lower Manhattan. As a public utility, Con Ed argues that it performs a vital function of government, and it should be immune. Since the claims against Con Ed are dismissed on other grounds, as discussed in the next section, I decline to rule on its argument of immunity.

### VII. THE MOTIONS BY THE LESSEES

Con Ed and the Silverstein Defendants (collectively the "Lessee Defendants") move for summary judgment, *Fed. R. Civ. P. 56(c)*, dismissing all claims against them on the ground that they were divested of their leasehold interests during the duration of the recovery and cleanup efforts at the World Trade Center and thus may not be held liable for injuries sustained during the course of such efforts.

As the City established control over the World Trade Center [*134] site and surrounding areas in the moments following the September 11 attacks, those entities holding an interest in properties at the site found themselves displaced, barred from reentry absent express approval by the City. Plaintiffs seek now to impose liability on two former entities holding an interest in properties at the World Trade Center, Con Ed which operated substations beneath Seven World Trade Center and the Silverstein, or World Trade Center, Defendants, lessees of various properties at the World Trade Center, including One, Two, Four, Five, and Seven World Trade Center. At oral argument on June 22, 2006, I ordered Plaintiffs to submit further briefing as to the veracity of claims pending against the Lessee Defendants. In particular, I directed that Plaintiffs should specifically name and identify individual Plaintiffs who worked under the control of the World Trade Center Defendants or Con Ed during the rescue and recovery efforts at the World Trade Center site and surrounding areas.

By their supplemental submissions, Plaintiffs continue to urge that the claims pending against the Lessee Defendants should be allowed to continue, that these Defendants exercised the degree [*135] of control required under applicable law and owed Plaintiffs a duty to provide adequate protective equipment and enforce appropriate safety standards. Specifically, Plaintiffs assert claims under *New York Labor Law sections 200* and 241(6), General Municipal Laws section 205-a and 205-e, and on the basis of common law negligence.

### A. The Work Performed by the Lessee Defendants

1. The Work Performed by Con Edison

Pursuant to a lease with the Port Authority, Con Edison operated two electronic substations adjacent to and beneath what would ultimately become Seven World Trade Center. *7WTC, 2006 WL 62019.* These two substations were essential to the electrical supply of the City, providing the sole source of electricity for approximately two-thirds of lower Manhattan. (See Donahue Aff. P10, Mem. of Consolidated Edison Supp. M. for SJ, dated Feb. 17, 2006 at 6.) On September 11, 2001 Seven World Trade Center collapsed, after burning unimpeded for several hours, destroying the Con Ed substations. 7WTC, at * 1.

Following the collapse of the first tower, at approximately 10:25 a.m., Con Ed evacuated its personnel from the World Trade Center [*136] site. (Rysavy Aff., Ex. DK.) When the substations were subsequently de-

stroyed, Con Ed immediately set about notifying all relevant authorities that the destruction may have resulted in the release of potentially toxic substances. n23 (See Rysavy Aff., Ex. DZ, EA.) However, essentially from the time of the collapse until the turnover of control of Seven World Trade Center to the Port Authority in May of 2002, access to the site by Con Ed personnel was highly restricted. Indeed, within mere moments of the attacks, the World Trade Center site, including Seven World Trade Center, was placed under the control of the City and access was denied to all but authorized persons. (See Louie Aff. P15; Donohue Aff. P29; Rysavy Aff., Ex. DQ.) Con Edison could not access the site for any purpose whatever without first obtaining the written approval of the Port Authority and the DDC. (See Louie Aff. P16.)

> n23 Con Ed notified, among other government entities, the New York City Office of Emergency Management, the National Response Center, the New York City Department of Environmental Protection, the New York State Department of Environmental Conservation, the New York City Fire Department, Marine Division and Bureau of Operations, the New York City Department of Environmental Protection Right to Know, the New York Public Service Commission, and the United States Coast Guard Post of New York. (See Louie Aff., PP8, 9, 10 and 11; Rysavy Aff., Ex. DZ.)

[*137]

Access was granted to the site and the surrounding area for limited purposes. On November 30, 2001, the Port Authority allowed Con Edison to enter the site for the purpose of conducting an environmental impact assessment at the order of the New York Department of Environmental Conservation ("NYDEC"). (Louie Aff. P; Rysavy Aff., Ex. EB.) None of the Plaintiffs worked for the subcontractors who conducted the assessment, and thus no claim is alleged against Con Ed with respect to that activity.

By law, Con Ed was responsible to restore electric, gas, and steam services to lower Manhattan. *N.Y. Pub. Serv. Law § § 65*, 79 (McKinney 2006) ("Every gas corporation, every electric corporation, [every steam corporation] and every municipality shall furnish and provide such service, instrumentalities and facilities as shall be safe and adequate and in all respects just and reasonable."); N.Y. Comp. Codes R. & Regs. tit. 16, § 13.13 (2006) (public utilities "shall act promptly to restore service as soon as possible after [emergency] disconnection..."); Public Utility Regulatory Policies Act of 1978

("PURPA"), *16 U.S.C. § 2621(d)(6)* (2005). [*138] In order to discharge its responsibility, Con Ed had to build a new substation at the site of what was once Seven World Trade Center. (Donahue Aff. P23; Rysavy Aff., Ex. DT, DR, DS, DU, DV, DP.) Rebuilding of the structure, along with the office building at that site began shortly after the return of control to the Port Authority on May 10, 2002, and was completed on April 3, 2003. (Louie Aff. P25; Rysavy Aff., Ex. DX.) The new substation went back online May 26, 2004, fully restoring power to lower Manhattan. Work at the site was performed by Tishman Construction through subcontracts with Seasons Contracting and Urban Foundation Engineering. (See Pls.' Supp. J.A., Ex. 188 (contract between Tishman and Seasons dated May 6, 2006)). Langan Engineering and Environmental Services performed environmental monitoring for the project through separate subcontracts with Silverstein Properties, as the managing agent of 7WTC, and Con Edison. (Louie Aff. P25; Rysavy Aff., Ex. DX.) Nevertheless, Con Ed's contract with Langan for environmental services was not executed until March 11, 2005, well after work relevant to Con Ed had been completed at Seven World Trade Center. (Donahue Aff. P36; Louie [*139] Aff. P27.)

2. The Work Performed by the Silverstein Defendants

The Silverstein Defendants--the lessees, managers and operating agents of several properties at the World Trade Center site--were also excluded from these property interests following the September 11 attacks. Their personnel were allowed to enter the area only upon express authorization from the City. (See WTC Defs.' Mot. S.J., dated Feb. 17, 2006, at 3.) Limited access was first granted to the Seven World Trade Center site in May 2002, when control was returned to the Port Authority. Access to the areas of the site where One, Two, Four and Five World Trade Center had once stood was not granted until July 1, 2002. See *Diversified Carting, Inc. v. The City of New York, 2006 WL 147584*, at *1 (S.D.N.Y. Jan. 20, 2006). The Silverstein Defendants exercised no control or authority over the general conduct of rescue and recovery operations at the World Trade Center. See *id.* ("The Silverstein Entities had no control over the debris-removal activities, nor did they fund the clean up.").

In November 2001, when debris removal operations at Seven World Trade Center had been completed, the NYDEC gave [*140] permission to the Silverstein Defendants to remove the two diesel fuel tanks that formerly were part of Seven World Trade Center and the surrounding contaminated soil, in order to begin construction of a new office tower. The Silverstein Defendants, in turn, contracted with contractors Turner and Plaza for the removal of the tanks and soil. (See Levy Aff. P7; J.A., Ex. DE.) The work was subsequently com-

pleted in March and April 2002, prior to the turnover of control from the City to the Port Authority. (See Levy Aff. PP7, 8; J.A. Ex. DE.)

### B. Plaintiffs' Supplemental Submissions

Plaintiffs challenge the showings by Con Ed and Silverstein, and contend that they remained in control of the World Trade Center premises. Plaintiffs rely on seven supplemental affidavits. I granted leave to Plaintiffs to file such supplemental affidavits even though they gave no excuse why they had neglected during the deposition proceedings to identify these individuals as potential witnesses, or why their affidavits had not been submitted as part of their opposition papers.

Of the seven, Dean Curti states that he worked as a laborer at the World Trade Center site from late October 2001 through [*141] early December 2001, primarily at Seven World Trade Center, that he was employed by Seasons Construction Company, a subcontractor to contractors Plaza and Turner, and that he observed Con Ed personnel at the Seven World Trade Center site in early December 2001 and Silverstein personnel at the site every day of his employment. Michael Clarke states that he worked at the Seven World Trade Center site as a crane operating engineer for Seasons from September 12, 2001 through mid-November 2001, and does not mention seeing any personnel of Con Ed or of Silverstein. Peter Vincent states that he worked as a supervisor of trucking at the World Trade Center site from September 12, 2001 until December 2001, primarily at Seven World Trade Center, and that in his second week at work (approximately the end of September) he observed Con Ed personnel dressed in hazard suits with full respiratory protection working on removing Con Ed's transformers. Robert Von See states that he worked at the World Trade Center site for approximately two months, beginning September 18, 2001, initially for Bovis and subsequently for Canron Steel Erectors at the South Tower, that he worked for Seasons Construction at [*142] the Seven World Trade Center site on September 25, 2001 and that he observed Con Ed Personnel at the site. Patrick D'Allegro states that he worked for Seasons as a labor-mechanic at the Seven World Trade Center site from September 14, 2001 until early July 2002, and that he saw Con Ed personnel at the site during the first three months after September 11. He does not mention seeing any Silverstein personnel. Michael Moscato, Sr. states that he worked as an operating engineer for Seasons at the Seven World Trade Center site from September 13, 2001 until November 2001, that Seasons was a subcontractor for N.Y. Crane to remove the burned and destroyed Con Ed transformers from the site, and fails to mention seeing either Con Ed personnel or Silverstein personnel at the site. William Moscato states that he worked at the Seven World Trade Center site as an oper-

ating engineer for Seasons from September 11, 2001 until the first week of December 2001 and that he observed Con Ed personnel at the site, but makes no mention of seeing any Silverstein personnel.

Plaintiffs' allegations, that some of them observed Con Ed and Silverstein personnel at the site are conclusory, and without evidentiary [*143] effect in relation to Defendants' motions. No Plaintiff offers any testimony that Con Ed or Silverstein assumed any operational control of the workforce at the site. There is no evidence that either enjoyed any aspect of the use of the premises that would be characteristic of a landholding, either as a landlord or as a tenant. In contradiction to their affidavits, Dean Curti and Robert Von See have not included Con Ed as a defendant in their individual complaints, even though they now claim that they saw Con Ed personnel at the job site. None of the seven affiants alleged in their complaints that they had worked at the Seven World Trade Center site, also contradicting their supplemental affidavits. Indeed, Plaintiff Patrick D'Allegro filed three prior complaints, and only now, in his supplemental affidavit, does he allege that he worked at the Seven World Trade Center site after November 2001.

I hold that there is no credible evidence to show that Con Ed or Silverstein had use of their respective premises, or even general access to them, during the relevant periods of time claimed by any Plaintiff. Nevertheless, I address below Plaintiffs' asserted bases for liability, finding that, [*144] regardless of the veracity of the allegations against Defendants, claims against Con Ed and Silverstein may not stand.

### C. Alleged Grounds of Liability

Plaintiffs assert claims against Con Ed and the Silverstein Defendants under sections 200 and 241(6) of New York Labor Law, sections 205-a and 205-e of the New York General Municipal Law, and state common law. (See Amended Master Complaint Against Consolidated Edison, dated Aug. 18, 2006, PP103-138; Amended Master Complaint Against World Trade Center Defendants, dated Aug. 18, 2006, PP94-127.) Plaintiffs fail, however, to establish that the Lessee Defendants, in their capacity as lessees, owed any duty towards Plaintiffs, and their claims therefore must be dismissed.

1. Dismissal of Claims Pursuant to New York Labor Law for Failure to Show the Necessary Degree of Ownership or Control

Counts One and Two of Plaintiffs' Amended Complaints allege violations of *New York Labor Law sections 200* and 241(6).

The common law duties traditionally owed by landowners, general contractors, and in very limited circumstances, lessees, to maintain and provide a safe work-

place are codified in *New York Labor Law section 200* [*145] . *N.Y. Lab. Law § 200* (2006). See *Ross v. Curtis-Palmer Hydro Elec. Co., 81 N.Y.2d 494, 618 N.E.2d 82, 87 (N.Y. 1993)*. Section 200 provides, in relevant part, as follows:

> All places to which this chapter applies shall be so constructed, equipped, arranged, operated and conducted as to provide *reasonable and adequate protection to the lives, health and safety* of all persons employed therein or lawfully frequenting such places. All machinery, equipment, and devices in such places shall be so placed, operated, guarded, and lighted as to *provide reasonable and adequate protection* to all such persons.

*N.Y. Lab. Law § 200(1)* (emphases added).

However, liability under this provision is dependent on a showing that the person or entity to be charged has exercised supervisory control, whether as an owner, lessee or contractor. See id. at 88. Recovery may not be had "unless it is shown that the party to be charged exercised some supervisory control over the operation." *Ross, 618 N.E.2d at 88* (citing *Lombardi v. Stout, 80 N.Y.2d 290, 604 N.E.2d 117, 119 (N.Y. 1992); Kappel v. Fisher Bros., 6th Ave. Corp., 39 N.Y.2d 1039, 355 N.E.2d 305, 306 (N.Y. 1976))*. [*146] Such limitation of liability stems from "the basic common-law principle that 'an owner or general contractor [sh]ould not be held responsible for the negligent acts of others over whom [the owner or general contractor] had no direction or control.'" *Ross, 618 N.E.2d at 88* (quoting *Allen v. Cloutier Constr. Corp., 44 N.Y.2d 290, 376 N.E.2d 1276, 1278 (N.Y. 1978))*. Liability in the absence of direction or control over the worksite may attach only where the person to be charged in fact caused the defective condition giving rise to injury. See *Murphy v. Columbia Univ., 4 A.D.3d 200, 773 N.Y.S.2d 10, 13 (N.Y. App. Div. 2004)* (holding that proof of control was not required where the "injury arose from the condition of the work place created by or known to the contractor[.]").

Here, the record demonstrates clearly that Con Ed and the Silverstein Defendants exercised no control over those aspects of the rescue and recovery efforts at the World Trade Center that gave rise to the injuries claimed by the Plaintiffs. Both Con Ed and the Silverstein Defendants had been divested of control over their leasehold interests immediately [*147] following the September 11 attacks, reentering the site only with the City's permission and for limited purposes.

The Silverstein Defendants, as the managing agent for the lessee of Seven World Trade Center, contracted with Turner and Plaza for the removal of two diesel fuel tanks and soil at the site between March and April of 2002. (See Levy Aff. P7; J.A., Ex. DE.) But there has been no showing that the Silverstein Defendants in fact exercised control over the work performed by Turner and Plaza. The evidence in the record is that the DDC exercised that supervisory control. Although Patrick D'Allegro asserts in his supplemental affidavit that he "often saw Silverstein personnel in hard hats walking in and around the worksite," (Pls.' Supp. J.A., Ex. 195 at P9) that bare assertion is not enough to establish liability under section 200. See *Ross, 618 N.E.2d at 88* (quoting *Allen, 376 N.E.2d at 1278)*.

Con Ed's role at the site following September 11 was limited to its participation in a mandated environmental impact assessment and its role in the rebuilding of the substation at Seven World Trade Center. Plaintiffs concede that no claims arise [*148] from the conduct of the environmental assessment. As to the rebuilding of the substation, all work was performed pursuant to a contract between Tishman and Seasons dated May 2006. Aside from deposition statements by Eddy Louie, section manager in Con Ed's Environmental Health and Safety Department, providing generally that Con Ed at some point distributed respirators to Con Ed employees and others at the site, (see Pls.' J.A., Ex. 154 at 104-108) there is simply no evidence whatsoever that Con Ed exercised any control over the work performed by Tishman, Seasons, or any other contractors working at the site, and no Plaintiff cited that alleged distribution as the basis of any claim. Only affiant D'Allegro claims to have worked at Seven World Trade Center during the time in which Tishman and Seasons performed work pursuant to a contract with Con Ed, and D'Allegro's assertion that he "saw Con Edison personnel on and off within the first three months after September 11, 2001," (Pls.' Supp. J.A., Ex. 195) fails to establish the requisite involvement needed to impose liability under section 200.

Plaintiffs argue that, because Con Ed was aware of the dangerous conditions at the worksite [*149] arising from the release of potentially toxic materials when the substation was destroyed, and gave notice thereof to all responsible agencies, liability must attach even in the absence of a showing of control. See *Murphy, 773 N.Y.S.2d at 13*. Plaintiffs' argument is without merit. The record clearly demonstrates that Con Ed immediately warned all relevant authorities of the potential dangers resulting from the destruction of the substation, and that it was thereafter divested of any control over the conduct of the rescue and recovery efforts. To impose liability here would go beyond the requirements of the Labor Law.

Plaintiffs' claims under section 241 of the New York Labor Law must fail also. Section 241 further codifies the obligations of owners and contractors to ensure workers' safety. Section 241(6) specifically provides that:

> All contractors and owners and their agents ... when constructing or demolishing buildings or doing any excavating in connection therewith, shall comply with the following requirements:
>
> ***
>
> 6. All areas in which construction, excavation or demolition work is being performed shall be so constructed, shored, equipped, guarded, [*150] arranged, operated and conducted as to *provide reasonable and adequate protection and safety to persons employed therein* or lawfully frequenting such places. The commissioner may make rules to carry into effect the provisions of this subdivision, and the owners and contractors and their agents for such work ... shall comply therewith.

*N.Y. Lab. Law § 241(6)* (2006) (emphasis added).

The duty imposed under section 241(6) may not be delegated. See *Ross, 618 N.E.2d at 87*. Thus, consideration of whether the defendant exercised control or supervision over the worksite is irrelevant. See id. However, because section 241(6) essentially provides for strict liability, courts are reluctant to extend such liability to mere lessees of property. Indeed, although lessees may be subject to liability under section 241(6), liability may not attach when the lessee is out of possession, does not contract for or supervise the work, and lacks any authority to control or direct the work which caused the injury. See *Crespo v. Triad, Inc., 294 A.D.2d 145, 742 N.Y.S.2d 25, 29 (N.Y. App. Div. 2002)* (holding that out-of-possession lessee [*151] was not liable under section 241(6) where it neither contracted for nor supervised the work) (citing *Saaverda v. East Fordham Rd. Real Estate Corp., 233 A.D.2d 125, 649 N.Y.S.2d 416, 417 (N.Y. App. Div. 1996)* (affirming grant of out-of-possession lessee's motion for summary judgment on basis that lessee did not contract for or supervise the challenged work and had no authority to exercise control over the worksite)). A lessee may be considered the equivalent of an owner for purposes of section 241(6) only where it was the lessee, and not the owner, who engaged a contractor to undertake construction work for the lessee's benefit. *Copertino*

*v. Ward, 100 A.D.2d 565, 473 N.Y.S.2d 494, 496-97 (N.Y. App. Div. 1984)*. Section 241(6) requires a finding "that the party to be cast in the role of 'owner' had the 'right to insist that proper safety practices were followed and it is the right to control the work that is significant.'" *Bateman v. Susquehanna Valley Cent. Sch. Dist., 289 A.D.2d 852, 734 N.Y.S.2d 704, 705-06 (N.Y. App. Div. 2001)*.

The record here shows clearly that neither Con Ed nor the Silverstein Defendants, as lessees [*152] of property interests at the World Trade Center site, possessed the control necessary to impose liability under section 241(6). Although both contracted for work to be performed at Seven World Trade Center in the Spring of 2002, a lessee may not be held liable merely on the basis of a contract running between it and a general contractor. Clear proof must be provided that the lessee in fact had the "right to control the work." *Bateman, 734 N.Y.S.2d at 705-06*. Here, no such proof was presented. Indeed, the only affiant who even claims to have worked at Seven World Trade Center in the period during which Con Ed and the Silverstein Defendants contracted for work to be performed, Patrick D'Allegro, states only that he observed Con Ed and Silverstein personnel at the site. This is an insufficient basis for liability under section 241(6). As such, the claims against Con Ed and the Silverstein Defendants pursuant to section 241(6) are dismissed.

**2. Dismissal of Claims Sounding in Negligence in the Absence of Any Duty Owed**

Plaintiffs assert liability also on the basis of statutory and common law negligence. Counts Three and Four of the Amended Complaints assert negligence [*153] claims on behalf of firefighters, *N.Y. Gen. Mun. L. § 205(a)*, and police officers, *N.Y. Gen. Mun. L. § 205(e)*. Count Five is premised on common law negligence.

In the absence of a duty of care, liability in negligence may not attach. See *Palsgraf v. Long Island R.R. Co., 162 N.E.2d 99 (1928)*. The scope of the duty owed, in turn, is a "legal issue for the court to resolve." *7WTC, 2006 WL 62019*, at * 14 (citing *Waters v. New York City Housing Authority, 69 N.Y.2d 225, 505 N.E.2d 922, 923 (N.Y. 1987)*). Whether a duty in fact exists is determined by consideration of several factors including: (a) whether the relationship is such that it gives rise to a duty of care; (b) whether the plaintiff is within the zone of foreseeable harm; and (c) whether the accident was within the zone of reasonably foreseeable risks. See *7WTC, 2006 WL 62019*, at * 14. Critical for the purposes of this analysis is whether the relationship running between the Lessee Defendants and the Plaintiffs is sufficient to give rise to a duty of care. It is well established that landowners, and persons [*154] with an interest in property, "owe a duty to persons on their property to protect them from harm

arising from conditions on the property." Id. at *15 (citations omitted). The duty owed by the landowner, however, is not absolute. Where the landowner or person with a property interest has been divested of control over the property, liability may not be found. See *Kilmer v. White, 254 N.Y. 64, 171 N.E. 908, 909 (N.Y. 1930)* ("One's liability in negligence for the condition of land ceases when the premises pass out of one's control before injury results.").

Here, as the discussion above demonstrates, the Lessee Defendants were immediately divested of control over their leasehold interests and were entirely denied access to their properties absent express authorization by the City and Port Authority. Moreover, any work performed in the months following the September 11 attacks was not performed under the direct control or approval of the Lessee Defendants. Having been so divested of control, liability may not now attach.

In the absence of such a duty of care running between the Lessee Defendants and the Plaintiffs, the claims asserted under *New York General Municipal Law, sections 205(a)* [*155] and 205(e), must also fail. Sections 205(a) and (e) of the General Municipal Law impose liability for a plaintiff firefighter's or police officer's injury or death which is caused, either directly or indirectly, by the defendant's "neglect, omission, willful or culpable negligence" in failing to comply with applicable "statutes, ordinances, rules and requirements[.]" *N.Y. Gen. Mun. L. § § 205(a)*,(e). In order to defeat a motion for summary judgment, a plaintiff asserting claims under these provisions of the General Municipal law must: (1) identify the statute which the defendant allegedly violated; (2) detail the manner in which the plaintiff sustained injury; and (3) set out the facts from which it may be inferred that the defendant's negligence directly or indirectly caused the plaintiff's injury. See *Zvinys v. Richfield Investment Co., 2006 WL 20805*, at *1 (N.Y. App. Jan. 5, 2006). Here, in the clear absence of any duty owed by the Lessee Defendants to Plaintiffs, a claim in negligence under these sections may not stand. As such, Plaintiffs' claims against the Lessee Defendants under General Municipal Law sections 205(a) and (e) must be [*156] dismissed.

3. Dismissal of all Remaining Claims for Failure to Show any Underlying Claim

Counts Six and Seven of Plaintiffs' Amended Complaints against the Lessee Defendants assert derivative claims sounding in wrongful death and loss of consortium. In the absence of any viable form of recovery as against the Lessee Defendants, these claims must also be dismissed.

In accordance with the foregoing, the claims against the Lessee Defendants are dismissed with prejudice.

## VIII. CONCLUSION

For the reasons discussed in the Opinion, the motions by the City and by the Port Authority to dismiss the complaints against them, and against the contractors engaged by the City are denied; the motions by Con Ed and the World Trade Center Defendants are granted, and the complaints against them are dismissed.

The state and federal statutes that provide immunity protect the remaining Defendants against suit, but the precise scope and extent of the immunity varies according to date, place and activity. As I indicated in the prior sections of this Opinion, the fact-intensive nature of the issue makes its resolution unsuitable for resolution by motion. Discovery, additional proceedings, [*157] and a more extensive factual record, and perhaps a trial, will be required.

The number of these cases present unusual complexities in these pre-trial proceedings. Plaintiffs, we have been told, worked for various contractors, on various dates, and in different portions of the World Trade Center site. Many contracting companies worked at the site, performing varying functions, each under separate contract, and each subject to varying supervision by different government inspectors, working for different federal, state and City agencies, and by the primary contractors and higher-level subcontractors. Although a considerable amount of discovery has taken place in connection with the pending motions, there is much more to come-- much, much more.

The needs of the parties, and the public interest, do not permit the leisurely and expensive progression of proceedings that are often characteristic of complex litigation. If even a minority of the Plaintiffs suffered serious injuries to their respiratory tracts arising from the acrid air of September 11, their claims deserve to be heard when a recovery could make a difference to their lives. Conversely, if complaints lack merit, or if defenses [*158] prove to be valid, defendants are entitled to the earliest possible release. The availability of a one billion dollar fund authorized by Congress should not serve as encouragement to lengthen and complicate these proceedings. The scar to the public interest needs to be cleansed, speedily, in good time.

By separate Order, I order various dates for proceeding: when Plaintiffs are to disclose the details of their alleged injuries and where and how they suffered their injuries; where contractors performed their operations, and under what contracts and with whom; and other such matters. The number of parties, both Plaintiffs and Defendants, make even these basic tasks arduous. To ease the tasks, develop efficiencies, and begin to prepare a plan for early dispositions of numbers of these cases by

2006 U.S. Dist. LEXIS 75020, *

settlement or by trials, my Order asks the parties to con-
sider the utility of appointing a Special Master to assist
the court and the parties to accomplish these goals. All of
this will be considered in a conference to be held No-
vember 3, 2006, at 2:00 P.M., in Courtroom 14D, United
States Courthouse, Southern District of New York.

    SO ORDERED.

Dated: New York, New York

    October 17, 2006 [*159]

    ALVIN K. HELLERSTEIN

    United States District Judge

# EXHIBIT 11

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| MICHELLE DEULEY, *et al.* | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | C.A. No. 06-cv-605 (GMS) |
| v. | ) | |
| | ) | |
| DYNCORP INTERNATIONAL, INC., *et al.* | ) | |
| | ) | |
| Defendants. | ) | |

## DECLARATION OF RICHARD CASHON

I, Richard Cashon, certify that I am over the age of eighteen (18) years and that I have personal knowledge of the matters set forth herein.

1.      I am an employee of DynCorp International LLC (DI LLC).  My current position is Vice President/Program Manager for the Civilian Police Program.

2.      In September 2004, I was the Program Manager and in charge of DI LLC's contract with the U.S. Department of State ("DOS") in support of the United States' participation in the CIVPOL program in Afghanistan ("Afghan CIVPOL Contract").  During that time, I was working in Fort Worth, Texas.

3.      Under the Afghan CIVPOL Contract, DI LLC was responsible for recruiting, selecting and deploying civilian police officers for the Afghan CIVPOL mission.

4.      DOS directives and requirements dictated how we were to recruit, select, equip and deploy the civilian police officers for the Afghan CIVPOL mission.

5.      If DOS's contracting officer responsible for CIVPOL contract oversight determines that continued performance under the CIVPOL contract by any contractor or

244742.1



EXHIBIT

11

subcontractor personnel is contrary to the public interest, the contracting officer may require the contractor to remove the employee from all work under the CIVPOL contract.

6.       DOS required DI LLC to lease facilities in Kabul, Afghanistan and to provide security for those facilities.

7.       DOS established the necessary security measures that had to be observed at American facilities. Any changes to securities measures were dictated by DOS.

8.       I am familiar with the International Security Assistance Force ("ISAF"), an international force of about 30,000 troops mandated by the United Nations and commanded by the North Atlantic Treaty Organization ("NATO").

9.       Pursuant to standard operating procedure and established protocol, warnings issued by ISAF are relayed to the U.S. Embassy's Resident Security Officer ("RSO") in Kabul. The RSO then disseminates the warning to all American personnel in Kabul, including government contractors, with orders to implement appropriate security measures that may include orders to "lockdown" all American facilities.

10.      On or about August 29, 2004, I am not aware of any warnings issued by ISAF about a possible bombing or other threat against coalition targets in Kabul.

11.      The RSO would have received notice of an ISAF warning before the warning was disseminated to all American contractors in Kabul, including DI LLC.

12.      If a warning had been issued by ISAF, the RSO would have disseminated the warning and would have determined and dictated the appropriate level of security measures to implement. On or about August 29, I am not aware that the RSO had instructed U.S. government and contractor facilities to close the streets or install vehicle barricades around their

facilities. Moreover, I am not aware of any directives from the RSO at that time to "lockdown" facilities because of a security threat.

13.     It is my understanding that if the RSO had determined that appropriate security measures in response to a threat included closing the streets or installing vehicle barricades, the RSO would have had to request permission from the Afghan Government to do so.

14.     If we wanted to close the streets adjacent to DynHouse or install vehicle barricades in front or around DynHouse, we would have had to ask the RSO, who would have had to ask the Afghan Government.

15.     Because the RSO did not direct us to close adjacent streets or install vehicle barricades in response to an alleged ISAF warning on or about August 29, 2004, we did not do so.

16.     I am not aware of any requests from DynHouse security personnel about closing the street or installing vehicle barricades in and around DynHouse.

17.     The blast from the explosion damaged property more than 300 yards away from the point of detonation the explosion.

18.     DI LLC's contract with DOS was on a "cost plus reimbursable" basis. Thus, DI LLC would have been reimbursed for expenses incurred for the provision of security measures.

**I DECLARE UNDER PENALTY OF PERJURY THAT THE FOREGOING IS TRUE AND CORRECT.**

Executed on October ___, 2006.

*lee*

Richard Cashon
Vice President/Program Manager
   for the Civilian Police Program
DynCorp International LLC

# EXHIBIT 12

# International General Change Endorsement.

Endorsement No. 6

This endorsement forms a part of the designated policy and applies, unless otherwise stated herein, as of the effective time and date of such policy.

**Policy Issued By**

The Fidelity & Casualty Co. of New York
(A New Hampshire Corporation) A Stock Company **(15)**
General Offices   40 Wall Street, 7th Floor NY, NY  10005

**Producer's Name**
Rutherfoord International, Inc.
5500 Cherokee Avenue, Suite 300
Alexandria, VA  22312

**Producer's Code**
98703911

**Named Insured**

Computer Sciences Corporation, etal
2100 East Grand Avenue
El Segundo, CA 90245

**Policy No.**  DOS 22 390 7481
**Policy Period:** 7/1/04-05

**Effective:** 7/1/04

In consideration of the additional premium shown, it is hereby understood and agreed that payroll for the U.S. Department of State contract #S-LMAQM-04-C-0030 is added to the policy.

Total remuneration for said contract reads $▮▮▮▮▮▮

Country: Afghanistan

**ADDITIONAL PREMIUM   $** ▮▮▮▮▮

COUNTERSIGNED ___9/27/2004___      BY _____
                    (Date)                          (Authorized Representative)
This endorsement shall not be binding upon the company unless countersigned by a duly authorized representative of the company.

EXHIBIT
12

*Counted as Endt. 4 but not endt, renewal dec Per T. Mack*

 **Defense Base Act Common Policy Declaration**

## Common Policy Declarations

| | | |
|---|---|---|
| Policy Issued By | The Fidelity and Casualty Company of New York (A New Hampshire Corporation)  A Stock Company (15) General Offices: 40 Wall Street – 9th Floor, New York, NY  10005 | Policy Number..... DOS 22 390 7481    (Renewal) |
| Producer's Name and Address | Rutherfoord International, Inc. 5500 Cherokee Avenue, Suite 300 Alexandria, VA  22312 703-813-6500 | Producer Code: 98703911 |
| Named Insured Mailing Address | Computer Science Corporation 2100 East Grand Avenue El Segundo, CA 90245 UNITED STATES | POC: Dean Uyeda 310-615-1408 |
| Policy Period | From July 1, 2004  to July 1, 2005 12:01 A.M. Standard time at Named Insured's mailing address shown above. | |

## Coverage

In return for the payment of the premium, and subject to all the terms of this policy, we agree with you to provide the insurance as stated in this policy.  This policy consists of the following coverage forms for which a premium is indicated.  This premium may be subject to adjustment.

| Coverage Form | Premium |
|---|---|
| International Commercial Property Coverage Form | Excluded |
| International Business Income Coverage Form | Excluded |
| International Boiler and Machinery Coverage Form | Excluded |
| International Employee Dishonesty and/or Crime Coverage | Excluded |
| International Commercial General Liability Coverage Form | Excluded |
| International Automobile DIC/Excess Liability Coverage Form | Excluded |
| International Voluntary Workers' Compensation and Employers' Liability Coverage Form | Included |
| International Kidnap and Ransom / Wrongful Detention Coverage Form | Excluded |
| International Confiscation, Expropriation and Nationalization Coverage Form | Excluded |

Total Advance Premium:  ████████

**Parts of this policy auditable?** Yes

## Notes

Form(s) and Endorsement(s) applicable to all Coverage Forms and made a part of this policy at time of issue: WP 0001 02 01, WP 0010 02 01

THESE DECLARATIONS TOGETHER WITH THE COMMON POLICY CONDITIONS, COVERAGE FORM DECLARATIONS, COVERAGE FORM(S) AND OTHER FORMS AND ENDORSEMENTS, IF ANY, ISSUED TO FORM A PART THEREOF, COMPLETE THE ABOVE NUMBERED POLICY.

NO PREMIUM CHARGE HAS BEEN MADE FOR THE WAR-RISK HAZARD, IT BEING UNDERSTOOD THAT THE UNITED STATES GOVERNMENT SELF-INSURES THE EXPOSURES FALLING UNDER THE PROVISIONS OF THE WAR-HAZARD COMPENSATION ACT.

COUNTERSIGNED:  _6/16/2004_    BY  _____
                     Date                        Signature

 **International Voluntary Workers' Compensation and Employers' Liability Coverage Form**

## Declarations

**NAMED INSURED:**     Computer Science Corporation

2100 East Grand Avenue

El Segundo, CA 90245

*POC:*

Dean Uyeda, 310-615-1408,

**EFFECTIVE DATE:**     From July 1, 2004  to July 1, 2005

**Policy Number**

DOS 22 390 7481  (Renewal)

## Limits of Insurance

**Workers' Compensation Insurance:**

Part One of this Coverage Form applies to the Workers' Compensation Law of the states, territories and countries listed here:

U.S. Employees: Defense Base Act

**Employers Liability Insurance:**

Part Two of this Coverage Form applies to Employers' Liability, with Limits of Insurance as follows:

Bodily Injury by Accident $500,000 each accident

Bodily Injury by Disease $500,000 policy limit

## Sublimits/Additional Coverages/Coverage Extensions

**Excess Repatriation:**   $75,000 per employee

## Premium

| Contract Number | Payroll | Rate Type | Premium |
|---|---|---|---|
|  |  | Service |  |
|  | $ | Service | $ |
|  | $ | Service | $ |
|  | $ | Service | $ |
|  | $ | Service | $ |
|  | $ | Service | $ |
|  | $ | Service | $ |
|  | $ | Service | $ |
|  |  | Total: | $ |

All information required for calculation of premium is subject to verification and change by audit.

## Notes

Form(s) and Endorsement(s) applicable to all Coverage Forms and made a part of this policy at time of issue:

WP 0001 02 01, WP 0010 02 01

# EXHIBIT 13

LEXSEE 2006 U.S. APP. LEXIS 19477

IN RE: NAZI ERA CASES AGAINST GERMAN DEFENDANTS LITIGATION,
SIMON ROZENKIER, Appellant v. AG SCHERING; BAYER AG

No. 04-3934

UNITED STATES COURT OF APPEALS FOR THE THIRD CIRCUIT

*2006 U.S. App. LEXIS 19477*

September 26, 2005, Argued
August 2, 2006, Opinion Filed

**NOTICE:** RULES OF THE THIRD CIRCUIT COURT OF APPEALS MAY LIMIT CITATION TO UNPUBLISHED OPINIONS. PLEASE REFER TO THE RULES OF THE UNITED STATES COURT OF APPEALS FOR THIS CIRCUIT.

**PRIOR HISTORY:** [*1] On Appeal from the United States District Court for the District of New Jersey. (D.C. Civ. No. 03-cv-03413). District Judge: Honorable William G. Bassler. *Rozenkier v. Schering AG (In re Nazi Era Cases Against German Defendants Litig.), 334 F. Supp. 2d 690, 2004 U.S. Dist. LEXIS 18391 (D.N.J., 2004)*

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Appellant Holocaust survivor appealed from the United States District Court for the District of New Jersey which granted appellees, German corporations, motion to dismiss the survivor's complaint for failure to state a claim pursuant to *Fed. R. Civ. P. 12(b)(6).*

**OVERVIEW:** The federal governments of the United States and Germany, German corporations, and attorneys for various Holocaust survivors agreed that the survivors would voluntarily dismiss their lawsuits in exchange for the creation of a foundation, which would make payments to Nazi victims. Notwithstanding his foundation application, the survivor filed suit against the corporations. On appeal, the survivor argued that the political question doctrine did not apply to his case because his claims neither threatened the operation of the foundation nor implicated the conduct of the United States or the post-war German government. The appellate court, however, agreed with the corporations that the district court correctly dismissed the survivor's claims as raising a nonjusticiable political question. The survivor's claims

presented a nonjusticiable political question because, inter alia, the adjudication of Nazi-era claims by United States federal courts would express a lack of respect for the executive branch because of the executive branch's longstanding foreign policy interest that issues relating to World War II and Nazi-era claims be resolved through intergovernmental negotiation.

**OUTCOME:** The appellate court affirmed the decision of the district court.

**LexisNexis(R) Headnotes**

*Civil Procedure > Justiciability > Political Questions > General Overview*
*Civil Procedure > Pleading & Practice > Defenses, Demurrers, & Objections > Failures to State Claims*
*Civil Procedure > Appeals > Standards of Review > De Novo Review*
[HN1] An appellate court's review of a dismissal under *Fed. R. Civ. P. 12(b)(6)* on the basis of the political question doctrine is plenary.

*Civil Procedure > Justiciability > Political Questions > Separation of Powers*
[HN2] The political question doctrine is a judicially created theory that limits the power of the federal courts to adjudicate certain types of claims. The nonjusticiability of a political question is primarily a function of the separation of powers.

*Civil Procedure > Justiciability > Political Questions > General Overview*
[HN3] Certain political issues are left to the executive, whose decisions on those matters are conclusive. By the


EXHIBIT
13

constitution of the United States, the president is invested with certain important political powers, in the exercise of which he is to use his own discretion, and is accountable only to his country in his political character, and to his own conscience. In such cases, their acts are his acts, and whatever opinion may be entertained of the manner in which executive discretion may be used, still there exists, and can exist, no power to control that discretion. The subjects are political. They respect the nation, not individual rights, and being entrusted to the executive, the decision of the executive is conclusive. Thus, when a court concludes that an issue presents a nonjusticiable political question, it declines to address the merits of that issue.

*Civil Procedure > Justiciability > Political Questions > Foreign Affairs*
[HN4] While cautioning that it is error to suppose that every case or controversy which touches foreign relations lies beyond judicial cognizance, the United States Supreme Court has identified six factors, any one of which indicates the presence of a nonjusticiable political question: Prominent on the surface of any case held to involve a political question is found (1) a textually demonstrable constitutional commitment of the issue to a coordinate political department; or (2) a lack of judicially discoverable and manageable standards for resolving it; or (3) the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion; or (4) the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government; or (5) an unusual need for unquestioning adherence to a political decision already made; or (6) the potentiality of embarrassment from multifarious pronouncements by various departments on one question.

*Civil Procedure > Justiciability > Political Questions > Foreign Affairs*
*Insurance Law > Industry Regulation > Holocaust Victims*
[HN5] Resolving Holocaust-era insurance claims that may be held by residents of the United States is a matter well within the executive's responsibility for foreign affairs. Since claims remaining in the aftermath of hostilities may be "sources of friction" acting as an "impediment to resumption of friendly relations" between the countries involved, there is a "longstanding practice" of the national executive to settle them in discharging its responsibility to maintain the nation's relationships with other countries. The issue of restitution for Nazi crimes has in fact been addressed in executive branch diplomacy and formalized in treaties and executive agreements over

the last half century, and although resolution of private claims was postponed by the Cold War, securing private interests is an express object of diplomacy today, just as it was addressed in agreements soon after the Second World War. Vindicating victims injured by acts and omissions of enemy corporations in wartime is thus within the traditional subject matter of foreign policy in which national, not state, interests are overriding, and which the national government has addressed.

*Civil Procedure > Justiciability > Political Questions > Foreign Affairs*
[HN6] The executive branch has expressed a longstanding foreign policy interest in resolving Nazi-era claims at the intergovernmental level, and that interest did not terminate with the creation of the German Foundation for "Remembrance, Responsibility and the Future".

**COUNSEL:** Carey R. D'Avino, Esquire, Stephen A. Whinston, Esquire (Argued), Berger & Montague, P.C., Philadelphia, PA, Counsel for Appellant.

John J. Gibbons, Esquire, Thomas R. Valen, Esquire Gibbons, Del Deo, Dolan, Griffinger & Vecchione, A Professional Corporation, Newark, NJ.; Roger M. Witten, Esquire (Argued), Wilmer Cutler Pickering Hale and Dorr LLP, New York, Counsel for Appellees.

**JUDGES:** BEFORE: ALITO,* AMBRO, and LOURIE,** Circuit Judges

> *ThenJudge, now Justice, Alito heard oral argument in this case but was elevated to the United States Supreme Court on January 31, 2006. The opinion is filed by a quorum of the panel. 28 U.S.C. § 46(d).

> **Honorable Alan D. Lourie,Circuit Judge for the United States Court of Appeals for the Federal Circuit, sitting by designation.

**OPINION BY:** LOURIE

**OPINION:** LOURIE, Circuit Judge

Simon Rozenkier appeals from the decision of the United States District Court for the District of New Jersey granting Schering AG's and Bayer AG's (the "Appellees") motion to dismiss Rozenkier's [*2] complaint for failure to state a claim pursuant to *Federal Rule of Civil Procedure 12(b)(6)*. *In re Nazi Era Cases Against German Defendants Litigation, 334 F. Supp. 2d 690 (D.N.J. 2004)* ("Decision"). Because Rozenkier's claims are non-

justiciable under the political question doctrine, we af-
firm.

## I. BACKGROUND

This case arises from the horrific, widespread crimes
perpetrated by the Nazi government during World War
II. Rozenkier, a Holocaust survivor, was subjected to
inhumane Nazi medical experimentation while he was
imprisoned at the Auschwitz-Birkenau concentration
camps. *Decision, 334 F. Supp. 2d at 691.* During his
internment in 1944, he was forced to undergo injections
of unknown chemical substances into his testicles caus-
ing swelling and bleeding of his genitalia. Id. After his
liberation from Auschwitz-Birkenau, Rozenkier emi-
grated from Poland to the United States. Id. In 1952, he
married but was unable to have children. Id. The cause of
his sterility remained unknown until 1999, when
Rozenkier learned definitively that his 'infertility was
the result of a Nazi 'medical experiment. [*3] "' Id.

Rozenkier's case does not arise in isolation. In the
late 1990's, Holocaust survivors filed a number of class
action lawsuits seeking compensation from German cor-
porations who allegedly participated in Nazi-era crimes
arising from slave and forced labor during World War II.
In 1998, at the request of the German government, the
United States government agreed to facilitate the resolu-
tion of those lawsuits. Following the personal involve-
ment of the President of the United States and German
Chancellor Schroeder, the federal governments of the
United States and Germany, German corporations, and
attorneys for various plaintiffs agreed that the plaintiffs
would voluntarily dismiss their lawsuits in exchange for
the creation of the German Foundation "Remembrance,
Responsibility and the Future" (the "Foundation"), which
would make payments to Nazi victims from a DM 10
billion pool.

On July 17, 2000, the United States and German
governments signed an agreement (the "Joint Statement")
expressing their support for the Foundation. Joint State-
ment, at 3. Concurrently, the two governments signed an
executive agreement (the "Executive Agreement") rec-
ognizing the desire of the two governments [*4] for an
"all embracing and enduring legal peace to advance their
foreign policy interests" and reflecting their commit-
ments to the Foundation as "the exclusive remedy and
forum for the resolution of . . . all claims that have been
or may be asserted against German companies arising
from the National Socialist era and World War II," Ex-
ecutive Agreement, Art. 1(1) (emphasis added), includ-
ing specifically medical experimentation claims. Id. at
Annex A, P4. The Executive Agreement also stated that
the "United States shall . . . inform its courts through a
Statement of Interest . . . that it would be in the foreign
policy interests of the United States for the Foundation to

be the exclusive remedy and forum for resolution" of
those claims. Id. at Art. 2(1). Specifically, the Executive
Agreement provided:

> [T]he United States will timely file a
> Statement of Interest and accompanying
> foreign policy statement of the Secretary
> of State and Declaration of Deputy Treas-
> ury Secretary Stuart E. Eizenstat in all
> pending and future cases, regardless of
> whether the plaintiff(s) consent(s) to dis-
> missal, in which the United States is noti-
> fied that a claim has been asserted against
> [*5] German companies arising from the
> National Socialist era and World War II.

Id. at Annex B, at 1.

On August 12, 2000, after the Joint Statement and
Executive Agreement were executed, the German gov-
ernment enacted laws for implementing the Foundation
("Foundation Law"). The Foundation Law allocated DM
50 million for the compensation of "other personal inju-
ries," including injuries to victims of medical experimen-
tation, and capped individual awards for those injuries at
DM 15,000. Foundation Law, at § § 9(1), 9(3). In a se-
ries of letters from the lead German negotiator, Otto Graf
Lambsdorff, to the lead United States negotiator, Stuart
Eizenstat, the German government reaffirmed that the
"DM 50 million allocation [for other personal injury]
will be distributed to each partner organization so that
each approved applicant is provided a pro-rata amount of
the total amount of all approved 'other personal injury'
applicants" and that the "Foundation will give victims of
medical experimentation and Kinderheim cases priority
over other non-labor personal injury wrongs." Letter
from Lambsdorff to Eizenstat, July 11, 2000. On October
19, 2000, the United States and Germany exchanged [*6]
diplomatic notes declaring the Foundation Law, as clari-
fied by the Lambsdorff-Eizenstat letters, to be "fully
consistent" with the Executive Agreement, causing the
Executive Agreement to enter into force as of that date.
Exchange of Notes between the Embassy of the United
States and the Federal Foreign Office of Germany, Oct.
19, 2000.

In March 2001, Rozenkier applied for compensation
from the Foundation for his injuries. In submitting his
application, Rozenkier executed a waiver against "all
German companies for claims in connection to National
Socialist injustices." The Foundation approved
Rozenkier's application by letter dated February 6, 2004,
and issued him two compensation checks for $ 4,645.09
and $ 5,348.36. Decision, *334 F. Supp. 2d at 694.*

Notwithstanding his Foundation application, Rozenkier filed suit in the Eastern District of New York against Schering AG and Bayer AG (the "Appellees") on March 25, 2003, alleging that the Appellees had cooperated with the Nazi regime in causing his sterilization, and claiming damages under a number of tort theories, including negligence, infliction of emotional distress, assault and battery, conspiracy, fraud, and breach [*7] of the manufacturer's duty to warn, as well as violations of international law. Rozenkier also alleged that the waiver he had submitted with his Foundation application was void because the Foundation had unilaterally altered the compensation scheme and eliminated the right to file an appeal with the Independent Appeals Authority. In August 2003, the Judicial Panel on Multidistrict Litigation transferred the action to the United States District Court for the District of New Jersey pursuant to *28 U.S.C. § 1407*, on the ground that the case raised common questions of fact with 35 previously transferred Nazi-era cases filed by American plaintiffs against German corporations.

The Appellees moved to dismiss Rozenkier's complaint for failure to state a claim under *Federal Rule of Civil Procedure 12(b)(6)*, and the United States filed a statement of interest (the "Statement of Interest") recommending that the action be dismissed. On September 10, 2004, the district court granted the Appellees' motion, holding that Rozenkier's claims presented a nonjusticiable political question. The court explained that if it were to adjudicate [*8] the merits of the complaint, it would be acting against the recommendation of the Executive Branch on an issue of foreign policy. The court thus concluded that Rozenkier's claims were nonjusticiable and that the proper forum for restitution or compensation was the Foundation. In a footnote, the court remarked that it did not need to address Rozenkier's allegations concerning the Foundation's compensation scheme and the right of appeal in detail because those allegations did not involve acts by the Appellants. Finally, the court did not address whether Rozenkier's claim was nonjusticiable on the grounds of the act of state doctrine or international comity. Rozenkier timely appealed, and we have jurisdiction pursuant to *28 U.S.C. § 1291*.

## II. DISCUSSION

[HN1] Our review of a dismissal under *Federal Rule of Civil Procedure 12(b)(6)* on the basis of the political question doctrine is plenary. *State of New Jersey v. United States, 91 F.3d 463, 466 (3d Cir. 1996)*.

On appeal, Rozenkier argues that the political question doctrine does not apply to this case because his claims neither threaten the operation of [*9] the Foundation nor implicate the conduct of the United States or the post-war German government. According to Rozenkier,

the foreign policy interest of the United States was the creation of the Foundation, and that interest has been fulfilled. Rozenkier also asserts that the German Parliament ("Bundestag") unilaterally altered the compensation calculation for victims of medical experiments to be per capita payments rather than a pro rata distribution; he contends that because the United States did not get what it bargained for in the Executive Agreement, no foreign policy interest exists that would require dismissal of his action.

The Appellees respond that the political question doctrine applies to this case. According to Appellees, adjudicating this case would require United States courts to second-guess 60 years of exclusive intergovernmental resolution of Nazi-era claims, and in particular, the United States foreign policy decision articulated in the Statement of Interest that the Foundation should be the exclusive forum for resolution of the claims of Rozenkier and similarly situated individuals. Appellees also contend that the additional defenses of the act of state [*10] doctrine and international comity require dismissal as well.

We agree with the Appellees that the district court correctly dismissed Rozenkier's claims as raising a nonjusticiable political question. [HN2] The political question doctrine is a judicially created theory that limits the power of the federal courts to adjudicate certain types of claims. The "nonjusticiability of a political question is primarily a function of the separation of powers." *Baker v. Carr, 369 U.S. 186, 210, 82 S. Ct. 691, 7 L. Ed. 2d 663 (1962)*. As the Supreme Court held in the landmark case of *Marbury v. Madison, 5 U.S. 137, 1 Cranch 137, 2 L. Ed. 60 (1803)*, [HN3] certain political issues are left to the executive, whose decisions on those matters are conclusive:

> By the constitution of the United States, the President is invested with certain important political powers, in the exercise of which he is to use his own discretion, and is accountable only to his country in his political character, and to his own conscience. . . . In such cases, their acts are his acts; and whatever opinion may be entertained of the manner in which executive discretion may be used, still there exists, and can exist, [*11] no power to control that discretion. The subjects are political. They respect the nation, not individual rights, and being entrusted to the executive, the decision of the executive is conclusive.

*Id. at 165-66.* Thus, "[w]hen a court concludes that an issue presents a nonjusticiable political question, it declines to address the merits of that issue." *Department of Commerce v. Montana, 503 U.S. 442, 457-58, 112 S. Ct. 1415, 118 L. Ed. 2d 87 (1992).*

In Baker, the Supreme Court in dictum addressed political questions involving foreign relations, noting that judicial scrutiny of foreign relations decisions involves a "discriminating analysis of the particular question posed, in terms of the history of its management by the political branches, of its susceptibility to judicial handling in the light of its nature and posture in the specific case, and of the possible consequences of judicial action." *369 U.S. at 211-12.* [HN4] While cautioning that "it is error to suppose that every case or controversy which touches foreign relations lies beyond judicial cognizance," the Supreme Court identified six factors, any one of which indicates the presence [*12] of a nonjusticiable political question:

> Prominent on the surface of any case held to involve a political question is found [1] a textually demonstrable constitutional commitment of the issue to a coordinate political department; or [2] a lack of judicially discoverable and manageable standards for resolving it; or [3] the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion; or [4] the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government; or [5] an unusual need for unquestioning adherence to a political decision already made; or [6] the potentiality of embarrassment from multifarious pronouncements by various departments on one question.

*Id. at 211, 217.* Here, we conclude that Rozenkier's claims present a nonjusticiable political question because the fourth Baker factor is clearly implicated: the adjudication of Nazi-era claims by United States federal courts would express a lack of respect for the Executive Branch because of the Executive Branch's longstanding foreign policy interest that issues [*13] relating to World War II and Nazi-eraclaims be resolved through intergovernmental negotiation.

As the Executive Agreement notes, the United States and German governments worked for 55 years to address the consequences of the National Socialist era and World War II through political and governmental acts between the two governments, and "the agreement and the establishment of the Foundation represent a fulfillment of these efforts." Executive Agreement, at 4. The first intergovernmental agreement to address Nazi-era wrongdoing by the German government and German companies was the 1945 Potsdam Agreement, in which the United States, Great Britain, and the Soviet Union agreed to remove German industrial assets as war reparations. See *American Ins. Ass'n v. Garamendi, 539 U.S. 396, 403, 123 S. Ct. 2374, 156 L. Ed. 2d 376 (2003).* That policy continued with the Paris Agreement, which provided that the signatory nations would share the seized German assets as settlement of "all [their] claims and those of [their] nationals against the former [German] Government and its Agencies, of a governmental or private nature, arising out of the war." Id. (quoting the Paris Agreement). The [*14] effect of the Paris Agreement was curtailed, however, and attention to reparations intentionally deferred, when the western Allies moved to end their occupation and reestablish a sovereign Germany as a buffer against Soviet expansion. Concerned that continued reparations would cripple the new Federal Republic of Germany economically, the Allies decided in the 1953 London Debt Agreement to put off "[c]onsideration of claims arising out of the second World War by countries which were at war with or were occupied by Germany during that war, and by nationals of such countries, against the Reich and agencies of the Reich. . . until the final settlement of the problem of reparation." *Id. at 403-04* (quoting the Agreement on German External Debts). Those terms were construed by German courts as postponing the resolution of foreign claims against both the German government and German industry until the terms of an ultimate postwar treaty were resolved. See *id. at 405.*

In the meantime, the Allies assigned the responsibility of providing restitution to victims of Nazi persecution to the new German government. See id. (citing the Convention of the Settlement [*15] of Matters Arising Out of the War and the Occupation, May 26, 1952). Pursuant to this treaty obligation, Germany enacted domestic legislation and entered into a number of bilateral agreements with other nations and non-governmental organizations. See id. By 2000, Germany had paid more than DM 100 billion in compensation to Nazi-era victims. See id. A number of victims, however, have attempted to pursue litigation in United States courts. Those suits generated much protest by the defendant companies and the German government, to the point that the United States government took action to try to resolve "the last great compensation related negotiation arising out of World War II." *Garamendi, 539 U.S. at 405* (quoting a press briefing by Deputy Secretary of Treasury Eizenstat). The

ensuing negotiations at the intergovernmental level culminated in the creation of the Foundation and the signing of the Executive Agreement. See id.

The history of the Foundation and the Executive Agreement make clear that the Executive and Legislative branches have exclusively managed the resolution of Nazi-era reparations claims for 55 years. The longstanding history of negotiations [*16] at the intergovernmental level represents a foreign policy interest that Nazi-era claims be resolved through the political branch. Here, we are mindful of the Supreme Court's emphasis on preserving the "'capacity of the President to speak for the Nation with one voice in dealing with other governments' to resolve claims . . . arising out of World War II." *Garamendi, 539 U.S. at 424.*

In *Garamendi*, the Supreme Court discussed the same set of agreements for Holocaust compensation that are at issue here, holding that California's Holocaust Victim Insurance Relief Act (HVIRA), and in particular a provision of the HVIRA requiring any insurer that did business in California and that sold insurance policies in Europe which were in effect during the Holocaust-era to disclose certain information about those policies to the California Insurance Commissioner or risk losing its license, impermissibly interfered with the Executive Branch's foreign policy, and was preempted on that basis. *Id., 539 U.S. at 421.* The Court observed:

> [HN5] [R]esolving Holocaust-era insurance claims that may be held by residents of this country is a matter well within the Executive's [*17] responsibility for foreign affairs. Since claims remaining in the aftermath of hostilities may be "sources of friction" acting as an "impediment to resumption of friendly relations" between the countries involved, there is a "longstanding practice" of the national Executive to settle them in discharging its responsibility to maintain the Nation's relationships with other countries. The issue of restitution for Nazi crimes has in fact been addressed in Executive Branch diplomacy and formalized in treaties and executive agreements over the last half century, and although resolution of private claims was postponed by the Cold War, securing private interests is an express object of diplomacy today, just as it was addressed in agreements soon after the Second World War. Vindicating victims injured by acts and omissions of enemy corporations in wartime is thus

> within the traditional subject matter of foreign policy in which national, not state, interests are overriding, and which the National Government has addressed.

*Id. at 420-21.* Although *Garamendi* was not a political question case, the same reasoning applies here. The Executive Branch engaged in a decades-long [*18] negotiation with the German government to resolve Nazi-era reparations claims. That process culminated with the signing of the Executive Agreement, which enunciated a foreign policy that the Foundation be the exclusive forum for claims by Nazi-era victims of medical experimentation against German companies. The Statement of Interest confirms that understanding. In this context, judicial review of Rozenkier's claims would express a lack of respect for the Executive Branch's longstanding foreign policy interest in resolving Nazi-era claims through intergovernmental negotiation. We therefore conclude that his case presents a nonjusticiable political question that requires dismissal.

We reject Rozenkier's argument that United States foreign policy interests were limited to the act of "creating" the Foundation. As discussed, [HN6] the Executive Branch has expressed a longstanding foreign policy interest in resolving Nazi-era claims at the intergovernmental level, and that interest did not terminate with the creation of the Foundation. Indeed, the Statement of Interest provides that, four years after the creation of the Foundation, the "United States maintains [the] policy in the current [*19] administration" that "all asserted claims should be pursued through the Foundation instead of the courts." Statement of Interest, at 11.

In so holding, we reach the same result as the Second Circuit and New Jersey district courts that have dismissed claims arising out of the Nazi-era on political question grounds. See *Whiteman v. Dorotheum GmbH & Co.KG, 431 F.3d 57 (2d Cir. 2005)* (affirming the dismissal of Nazi-era claims against Austria on political question grounds); *In re Nazi Era Cases Against German Defendants Litig., 129 F. Supp. 2d 370, 383 (D.N.J. 2001)* (dismissing on political question and international comity grounds); *Burger v. Fischer. DeGussa AG, 65 F. Supp. 2d 248 (D.N.J. 1999)* (dismissing on political question grounds); *Iwanowa v. Ford Motor Co., 67 F. Supp. 2d 424 (D.N.J. 1999)* (dismissing on political question and international comity grounds).

In *Whiteman*, the Second Circuit dismissed a putative class action against Austria for Nazi-era wrongdoing as a nonjusticiable political question. *431 F.3d at 59-60.* The court held:

We conclude that we cannot "undertak[e] independent [*20] resolution without expressing lack of respect due" the Executive Branch because (1) the Executive Branch has exercised its authority to enter into executive agreements respecting the resolution of the claims in question; (2) the United States Government (a) has established through an executive agreement an alternative international forum for considering the claims in question, and (b) has indicated that, as a matter of foreign policy, the alternative forum is superior to litigation; and (3) the United States foreign policy advanced by the executive agreement is substantially undermined by the continuing pendency of this case.

*Id. at 73-74* (quoting *Baker, 369 U.S. at 217*). The Second Circuit's analysis is thus consistent with our holding that the claims of Rozenkier and similarly situated individuals present a nonjusticiable political question. We note, however, that our conclusion rests not only on the foreign policy interests expressed in the Executive Agreement and the Statement of Interest, but also on the United States' long-standing foreign policy commitment to resolving reparations claims arising out of World War II and the Holocaust [*21] at the governmental level.

We are aware that the Ninth Circuit has rendered a decision in *Alperin v. Vatican Bank, 410 F.3d 532 (9th Cir. 2005)*, in which it arrived at the same conclusion that we do concerning slave labor claims against the Vatican Bank, but not with regard to property claims against the Vatican Bank. In Alperin, Holocaust survivors asserted property claims alleging that the Vatican Bank had profited from looted assets and slave labor during the Croatian Ustasha political regime, which was supported throughout World War II by Nazi forces. The Holocaust survivors also asserted slave labor claims alleging that the Vatican Bank had actively assisted the war objectives of the Utasha Regime in violation of international law. The Ninth Circuit allowed the property claims to proceed, but noted that the case was "distinguishable from those involving the Foundation in that there is no analogous executive agreement covering claims to the Ustasha treasury." *Id. at 550* (emphasis added) (referring to *Decision, 334 F. Supp. 2d at 696-97*). Thus, Alperin is not persuasive to the resolution of this case involving the Foundation. [*22] However, the court held that the slave labor claims were nonjusticiable because they raised a political question. *Id. at 562*. Thus, the holding of Alperin in its analysis of the slave labor

claims is consistent with our resolution here concerning tort claims.

Finally, we respectfully find the Eleventh Circuit's reasoning in *Ungaro-Benages v. Dresdner Bank AG, 379 F.3d 1227 (11th Cir. 2004)*, to be unpersuasive. In that case, the Eleventh Circuit declined to dismiss a Holocaust-related claim against German banks based on the political doctrine, instead dismissing the claim on the grounds of international comity. *379 F.3d at 1236, 1239*. The court reasoned that because the Executive Agreement, which is the same as that at issue here, stated that it did not provide an independent legal basis for dismissal, the "President has purposely chosen not to settle [the] claims directly" and therefore adjudication of the claims does not "interfere with American foreign relations." *Id. at 1237, 1236*.

We disagree with the Eleventh Circuit's interpretation of the Executive Agreement. The provision in the Executive Agreement that the court relied [*23] on for its holding that the political question doctrine was inapplicable is set forth in the section entitled "Elements of U.S. Government Statement of Interest," and provides: "The United States does not suggest that its policy interests concerning the Foundation in themselves provide an independent legal basis for dismissal, but will reinforce the point that U.S. policy interests favor dismissal on any valid legal ground." Executive Agreement, Annex B, P7.

However, that language does not preclude United States federal courts from dismissing claims arising under the Executive Agreement as raising a nonjusticiable political question. Indeed, in its Statement of Interest in this case, the United States recommends dismissal based on foreign policy interests. Thus, while the United States has not asserted that the foreign policy interests expressed in the Executive Agreement and the Statement of Interest n1 provide an independent legal basis for dismissal, such interests are especially compelling here, and the United States government's long-standing foreign policy commitment to resolving reparations claims arising out of World War II and the Holocaust at the governmental level, coupled [*24] with the more recent creation of the Foundation, the signing of the Executive Agreement, and the filing of the Statement of Interest in this case, together provide such a basis.

n1 The Executive Agreement states that "it would be in the foreign policy interests of the United States to be the exclusive remedy and forum for resolving . . . claims asserted against German companies . . . and that dismissal of such cases would be in its foreign policy interest." Executive Agreement, Art. 2(1). The Executive Agreement also explains that the foreign policy

interest at issue was resolving Nazi-era cases outside of litigation and creating an all-embracing and enduring peace. Executive Agreement, at 3. Further, the Statement of Interest asserts that [t]he President of the United States concluded that it would be in the foreign policy interests of the United States for the Foundation to be the exclusive forum and remedy for the resolution of all asserted claims against German companies arising from their involvement in the Nazi era and World War II, including without limitation those relating to compensation for slave and forced labor, "aryanization" or other confiscation of, damage to, or loss of property (including banking assets and insurance policies), subjection to medical experimentation, placement in children's homes, and other cases of personal injury. Statement of Interest, at 11 (citing Letter of President Clinton to Chancellor Schroeder, Dec. 13, 1999).

[*25]

Because we conclude that the claims of Rozenkier and similarly situated individuals present a nonjusticiable political question, we do not address whether the act of state doctrine and international comity are alternative grounds for dismissal. In addition, we have considered Rozenkier's remaining arguments and find them unpersuasive or unnecessary for our decision. Because Rozenkier's claims present a nonjusticiable political question, we affirm the district court's judgment granting the Appellees' motion to dismiss Rozenkier's complaint.

**III. CONCLUSION**

For the foregoing reasons, we affirm the decision of the district court.

**EXHIBIT 14**

LEXSEE 2006 U.S. DIST. LEXIS 68413

**INGRID FISHER, INDIVIDUALLY AND AS SUCCESSOR IN INTEREST TO
DECEDENT, STEVEN FISHER, ET AL, Plaintiff, v. HALLIBURTON, INC., ET
AL, Defendants.**

**[REDACTED VERSION FOR CM/ECF FILING], CIVIL ACTION H-05-1731**

**UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF
TEXAS, HOUSTON DIVISION**

*2006 U.S. Dist. LEXIS 68413*

**September 22, 2006, Decided
September 22, 2006, Filed**

**SUBSEQUENT HISTORY:** Motion granted by, Complaint dismissed at *Fisher v. Halliburton, Inc., 2006 U.S. Dist. LEXIS 70048 (S.D. Tex., Sept. 27, 2006)*

**PRIOR HISTORY:** *Fisher v. Halliburton, 2006 U.S. Dist. LEXIS 26971 (S.D. Tex., May 8, 2006)*

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Plaintiffs, injured truck drivers and the families and personal representatives of deceased truck drivers, filed suit against defendant civilian contractors, seeking to recover damages in connection with an anti-American attack on two convoys that the truck drivers were operating in Iraq as part of a U.S. Army mission to deliver fuel. The contractors moved for dismissal.

**OVERVIEW:** Plaintiffs alleged that the contractors misrepresented the safety risks of working in Iraq and that the contractors exercised complete control over the decisions concerning the convoys' departures and routes. The contractors argued that the court lacked jurisdiction to entertain the suit because it presented a non-justiciable political question. The court agreed, reasoning that (1) the prominent issues of the case dealt with the Army's decisions in directing the convoy and providing security for it, and the authority for directing military decisions had been constitutionally committed to the President under U.S. Const. art. II, § 2, cl. 1; (2) there was a lack of judicially discoverable and manageable standards for resolving the issues of the case because it was impossible for the court to extricate the contractors' acts from the Army's acts where the contracts and Army regulations showed that the Army was responsible for the security of the convoys and chose routes for the convoys; and (3) in

order to hear the case, the court would have to substitute its judgment for that of the Army, and the Army's wartime decisions presented an inappropriate question for judicial examination.

**OUTCOME:** The court granted the contractors' motion to dismiss and dismissed the suit with prejudice.

**LexisNexis(R) Headnotes**

*Civil Procedure > Justiciability > Political Questions > Separation of Powers*
*Constitutional Law > The Judiciary > Case or Controversy > Political Questions*
[HN1] A case may meet every other jurisdictional and justiciability hurdle and still be barred by the presence of a political question. Sometimes, the law is that the judicial department has no business entertaining the claim of unlawfulness. The political question doctrine excludes from judicial review those controversies which revolve around policy choices and value determinations constitutionally committed for resolution to the halls of Congress or the confines of the Executive Branch. Based on the concept of the separation of powers, political questions are addressed and redressed by the people through the political process.

*Civil Procedure > Justiciability > Political Questions > General Overview*
*Constitutional Law > The Judiciary > Case or Controversy > Political Questions*
[HN2] With regard to the presence of a political question, the United States Supreme Court has set out a list of six formulations to aid courts in a discriminating inquiry

EXHIBIT 14

into the precise facts and posture of a particular case. (1) Prominent on the surface of any case held to involve a political question is found a textually demonstrable constitutional commitment of the issue to a coordinate political department; (2) or a lack of judicially discoverable and manageable standards for resolving it; (3) or the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion; (4) or the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government; (5) or an unusual need for unquestioning adherence to a political decision already made; (6) or the potentiality of embarrassment from multifarious pronouncements by various departments on one question. One of these formulations must be inextricable from the case at bar.

*Civil Procedure > Justiciability > Political Questions > Foreign Affairs*
*Civil Procedure > Justiciability > Political Questions > National Security*
*Constitutional Law > Congressional Duties & Powers > Raising Revenue*
*Constitutional Law > The Presidency > Commander in Chief*
*Constitutional Law > The Judiciary > Case or Controversy > Political Questions*
[HN3] The Constitution allocates the power of Commander in Chief of the United States Army and Navy to the executive branch. U.S. Const. art II, § 2, cl. 1. Additionally, the Constitution gives the power to raise and support Armies, provide and support a Navy, and to make Rules for the Government and Regulation of the land and naval Forces to Congress. U.S. Const. art. 1, § 8, cls. 12-14. Of the legion of governmental endeavors, perhaps the most clearly marked for judicial deference are provisions for national security and defense. Moreover, making war in a foreign land also implicates another equally compelling executive branch power, foreign policy. Not only does resolution of foreign policy issues frequently turn on standards that defy judicial application, or involve the exercise of a discretion demonstrably committed to the executive or legislature; but many such questions uniquely demand a single-voiced statement of the Government's views. In the realm of foreign relations, policy considerations render issues incompetent for a decision by the court.

*Civil Procedure > Justiciability > Political Questions > Foreign Affairs*
*Civil Procedure > Justiciability > Political Questions > National Security*

*Constitutional Law > The Presidency > Commander in Chief*
*Constitutional Law > The Presidency > Foreign Affairs*
*Constitutional Law > The Judiciary > Case or Controversy > Political Questions*
[HN4] The Constitution mandates that war and foreign policy are the provenance of the Executive. In recognition of this, courts have consistently held that issues involving war, and actions taken during war, are beyond judicial competence. Judicial intrusion into military matters is to be most cautiously and charily approached. The strategy and tactics employed on the battlefield are clearly not subject to judicial review.

*Civil Procedure > Justiciability > Political Questions > Separation of Powers*
*Constitutional Law > The Judiciary > Case or Controversy > Political Questions*
[HN5] Whether an issue presents a non-justiciable political question cannot be determined by a precise formula. The inquiry requires a court to posit whether a political question will arise during the course of the trial, not whether it is evident from the face of the complaint. The political question doctrine is designed to restrain the judiciary from inappropriate interference in the business of the other branches of government; the identity of the litigant is immaterial to the presence of these concerns in a particular case.

*Civil Procedure > Justiciability > Political Questions > National Security*
*Constitutional Law > The Judiciary > Case or Controversy > Political Questions*
[HN6] With regard to whether a case presents a non-justiciable political question, one of the most obvious limitations on a court is that judicial action must be governed by standard, by rule. Army decisions are an area not subject to judicial second-guessing.

*Military & Veterans Law > Civilian Employees*
[HN7] An Army publication entitled "Contractors on the Battlefield" states that: Contractor Management in the Military Environment. The regional combatant commander is responsible for accomplishing the mission and ensuring the safety of all deployed military, government civilian, and contractor employees in support of U.S. military operations. To fully integrate contractor support into the theater operational support structure, proper military oversight is imperative.

*Military & Veterans Law > Civilian Employees*

Case 1:06-cv-00605-GMS    Document 14-9    Filed 10/25/2006    Page 22 of 38

Page 3
2006 U.S. Dist. LEXIS 68413, *

[HN8] Under the Force Protection chapter, an Army publication entitled "Contractors on the Battlefield" states: Roles and Responsibilities. 6-4. Protecting contractors and their employees on the battlefield is the commander's responsibility. When contractors perform in potentially hostile or hazardous areas, the supported military forces must assure the protection of their operations and employees. The responsibility for assuring that contractors receive adequate force protection starts with the combatant commander, extends downward, and includes the contractor. 6-6. Protection for contractors involves active use of armed military forces to provide escort or perimeter security, and passive measures that include protective military equipment, training, and equipping of contractor employees in self-protection.

*Military & Veterans Law > Civilian Employees*
[HN9] Army Reg. 715-9 provides that contracted support service personnel shall not be supervised or directed by military or Department of the Army civilian personnel. A closer examination of the regulations demonstrates that the Army is, at the very least, significantly involved in transportation and force protection decisions. The regulations state: The Commander, AMC will coordinate transportation (i.e., to, from and within the theater), quality of life issues and force protection of deployed AMC contractors with the Army Service Component Command. Contractor employees will be expected to adhere to all guidance and obey all instructions and general orders issued by the Theater Commander.

*Civil Procedure > Justiciability > Political Questions > National Security*
*Civil Procedure > Justiciability > Political Questions > Separation of Powers*
*Constitutional Law > The Judiciary > Case or Controversy > Political Questions*
[HN10] The U.S. Army's decisions during a time of war present a particularly inappropriate question for judicial examination. It would be unseemly for a democracy's most serious decisions, those providing for common survival and defense, to be made by its least accountable branch of government.

*Civil Procedure > Justiciability > Political Questions > Separation of Powers*
*Constitutional Law > The Presidency > Commander in Chief*
*Constitutional Law > The Judiciary > Case or Controversy > Political Questions*
[HN11] The textual commitment of military decisions to coordinate branches has an inverse relationship to the

lack of judicially discoverable and manageable standards for resolving the case. The more a decision is committed to another branch or branches of government, the less likely a court will find judicially discoverable and manageable standards to apply. The Constitution specifically gives the Executive Branch the role of Commander in Chief of the Army. U.S. Const. art II, § 2, cl. 1.

*Governments > Courts > Authority to Adjudicate*
[HN12] Courts are not tribal wisemen dispensing divinely or theoretically inspired judgments, but are limited to the application of predetermined law.

COUNSEL: [*1] For Ingrid Fisher, individually and as successor in interest to decedent Steven Fisher, Kristen Fisher, individually and as successor in interest to decedent Steven Fisher, S.F. Jr, a minor, individually and as successors in interest to decedent Steven Fisher by and through newt friend Ingrid Fisher, K.F., a minor individually and as successors in interest to decedent, Steven Fisher, by and through Next Friend Ingrid Fisher, Marjorie Bell-Smith, individually and as successor in interest to decedent Timothy Bell, C.S.T., a minor, individually and as successor in interest to decedent Timothy Bell by and through her Next Friend Jacqueline Tunstall, Andrew Jackson Bradley, individually and as successor in interest to decedent William Bradley, Hollie Hulett, individually and as successor in interest to decedent, Steven Hulett, Alexandrina Slingerland, individually and as successor in interest to decedent Steven Hulett, Jack Slingerland, individually and as successor in interest to decedent, Steven Hulett, Lois Parker, individually and as successor in interest to decedent, Jeffrey Parker, Michael Brezovay, Nelson Howell, Betsy Montegue, individually and as successor in interest to decedent, [*2] Jack Montegue, J M, a minor, individually and as successor in interest to decedent Jack Montegue, by and through her Next Friend, Betsy Montegue, Donna Howell, Jackie Lester, Naomi Lester, William J Peterson, Edward Sanchez, Jr, Dana Sanchez, Calvin Keith Stanley, Raymond T Stannard, Ricky L Tollison, Danny R Wood, Lisa Hulett, individually and as successor in interest to decedent Steven Hulett, April Johnson, individually and as successor in interest to decedent Tony Johnson, James Blackwood, Joann Blackwood, N. T. C., a minor, individually and as successor in interest to decedent Timothy Bell by and through his next friend Karen Caffey, Timothy E Caffey, individually and as successor in interest to decedent Timothy Bell, Plaintiffs: Christina Anne Fountain, Newport Beach, CA; Jennifer R Johnson, Vincent D Howard, Lopez, Hodes et al -, Newport Beach, CA; Jennifer Lee Thompson, Ramon Rossi Lopez, Lopez, Hodes, Restaino, Milman & Skikos, Newport Beach, CA; Samuel Ainsworth Houston, Jennifer Bickham Swick,

2006 U.S. Dist. LEXIS 68413, *

Cruse Scott et al, Houston, TX; Tobias A Cole, Midani Hinkle Cole, Houston, TX; Kenneth T Fibich, W Michael Leebron, II, Fibich Hampton, Houston, TX; Mary Katherine Bedard.

For [*3] Halliburton, a Corporation, Defendant: David Kasanow, McKenna Long et al, Washington, DC; Herbert Lawrence Fenster, Raymond B Biagini, McKenna Long & Aldridge, Washington, DC; James Stanley Teater, Katie J Colopy, Jones Day, Dallas, TX; Thomas A Rector, Jones Day, San Francisco, CA; James H Hall, Jones Day, Houston, TX.

For Kellogg Brown & Root Inc, a Corporation and Wholly Owned Subsidiary of Halliburton and KBR Holdings LLC, Service Employees International Inc., a Foreign Corporation and Wholly Owned Subsidiary of Halliburton and Kellogg Brown & Root International Inc, Defendants: Herbert Lawrence Fenster, Raymond B Biagini, McKenna Long et al, Washington, DC; James Stanley Teater, Katie J Colopy, Jones Day, Dallas, Tx; Thomas A Rector, Jones Day, San Francisco, CA; James H Hall, Jones Day, Houston, TX.

Does 4 through 10, Defendant, Pro se.

For Kellogg Brown & Root Services Inc, a Corporation and a Wholly Owned Subsidiary of Kellogg Brown & Root Inc, Kellogg Brown & Root International Inc, a Corporation and a Wholly Owned Subsidiary of Kellogg Brown & Root Inc, a Corporation, Defendants: James H Hall, Jones Day, Houston, TX.

For DII Industries LLC, a Wholly Owned [*4] Subsidiary of Halliburton Energy Services Inc, a Corporation, Defendant: Herbert Lawrence Fenster , Raymond B Biagini, McKenna Long et al, Washington, DC; James H Hall, Jones Day, Houston, TX.

Strategic Ecomm Inc, Defendant, Pro se.

Webrecruiter, Defendant, Pro se.

For KBR Holdings LLC, Halliburton Energy Services Inc, a corporation, Brown & Root Services, a Division of Kellogg Brown & Root Inc, a Corporation, Defendants: Katie J Colopy, Jones Day, Dallas, Tx.

For Reginald Cecil Lane, Linda Marlene Lane, Intervenor Plaintiff: Kenneth T Fibich, W Michael Leebron, II, Fibich Hampton, Houston, TX.

For Keith Richard, Non-Party, Movant: Robin P Hartmann, A Michael Warnecke, Haynes & Boone, Dallas, TX.

For United States of America, Amicus: Daniel David Hu, US Attorneys Office, Houston, TX.

For Los Angeles Times, T. Christian Miller, Interested Partys: Charles L Babcock, Jackson Walker LLP, Houston, TX.

**JUDGES:** Gray H. Miller, United States District Judge.

**OPINION BY:** Gray H. Miller

**OPINION:**

### MEMORANDUM AND ORDER

Pending before the court is defendants' motion to dismiss. n1 Dkt. 135. n2 After considering the parties' arguments, exhibits, and the applicable law, the [*5] court concludes that the case presents a non-justiciable political question. Accordingly, the court lacks jurisdiction to hear this case. As such the defendants' motion to dismiss is GRANTED.

> n1 The defendants filing the motion are Halliburton Company; Kellogg, Brown & Root, Inc., Service Employees International, Inc.; Kellogg, Brown & Root Services, Inc.; DII Industries, LLC; and Kellogg, Brown & Root International, Inc.

> n2 The memoranda in support and in opposition to the motion are filed with the court under seal. Dkts. 139, 140, 141, 149, 153, 155, 156, and 159. Additionally, the defendants filed a notice of supplemental authority, and plaintiffs responded, both not under seal. Dkts. 160 and 161.

### BACKGROUND

In 1985, as part of a program to augment Army forces, the United States Army implemented the Logistics Civil Augmentation Program or LOGCAP. n3 Under LOGCAP, n4 the Army awarded Brown & Root Services (KBR) contract No. DAAA09-02-D-0007 to provide essential services in support of the military [*6] in Iraq. n5 Military Task Orders 43 and 59 defined KBR's specific tasks, including the transportation services at issue in this case. To fill the jobs created by the contract, KBR recruited civilian personnel. KBR hired the plaintiffs n6 as part of a group to provide transportation services. After terminating their current employment, the plaintiffs were transported to Iraq and assigned to Camp Anaconda. n7

n3 Dkt. 141, Exhibit B, at 1-1. The purpose of LOGCAP was to replace some services currently performed by Army personnel with civilian contractors. *Id.* Those Army personnel would then be available for other missions. *Id.*

n4 The court used definitions of Army terms and acronyms from the Records Management and Declassification Agency website. This database is available to the public at http://www2.arims.army.mil/abbreviation/MainM enu.asp.

n5 Dkt. 141, Exhibit C.

n6 The plaintiffs are the personal representatives of the deceased drivers, Steven Fisher, Timothy Bell, William Bradley, Steven Hulett, Jack Montegue, Jeffrey Parker and Tony Johnson; the injured drivers, Michael Brezovay, Nelson Howell, Jackie Lester, William Peterson, Edwards Sanchez Jr., Calvin Keith Stanley, Raymond T. Stannard, Ricky L. Tollison, Danny R. Wood, and James Blackwood; and their families. Although not all of the plaintiffs were truck drivers in Iraq, the court will use the term "the plaintiffs" throughout to mean either the truck drivers or those bringing the action according to context.

[*7]

n7 *See*, Dkt. 74.

On the morning of April 9, 2004, upon arriving at the convoy staging area, the plaintiffs learned the planned route for that day had been changed. The new route called for the convoys to deliver fuel to Baghdad International Airport (BIAP). BIAP was an unfamiliar destination for the drivers. n8 Many drivers merely followed the vehicle directly in front of them, who in turn, followed the Army's local Iraqi guide. n9 According to the Army report of the incident, military personnel, including six gunners, accompanied the plaintiffs' convoy. n10 Even so, the plaintiffs were the majority of the KBR manpower for the first of two convoys. The first convoy was attacked by anti-American forces and sustained heavy casualties. Six men were killed, eleven more were seriously wounded, and one man is still missing and presumed dead. n11

n8 Dkt. 141, Exhibit A-A, at 3-9.

n9 *Id.*

n10 *Id.*

n11 Dkt. 74, at 26.

[*8]

The plaintiffs originally filed their claim in Harris County District Court in April, 2005. Dkt. 1, Tab 2. The defendants timely removed the case to federal court on May 13, 2005. The plaintiffs' most recent complaint alleges, among other things, that (1) the defendants' recruitment activities included knowing fraudulent statements regarding the safety and nature of the civilian work in Iraq in order to induce plaintiffs to accept employment, (2) the defendants knowingly and intentionally deployed the first April 9th civilian convoy as a decoy into an area they knew to be under attack to ensure the safe passage of the second convoy, and (3) the defendants had complete control over the decisions of when, where and how to deploy civilian convoys. n12 Their causes of action include state law fraud claims, wrongful death, intentional infliction of physical and emotional distress, violations of civil rights under *§ 1983*, R.I.C.O., conspiracy, survivorship, and common law civil conspiracy. As a result they seek compensatory and exemplary damages.

n12 Dkt. 74, at 26.

[*9]

The defendants respond that the Army had control over the deployment and protection of convoys. n13 They argue that since their decisions are so interwoven with Army decisions, the court lacks jurisdiction over the case under the political question doctrine. n14 The court agrees.

n13 Dkt. 140.

n14 *Id.* They also argue that they are entitled to official immunity, and alternatively that the plaintiffs' only legal recourse is defined under the Defense Base Act, *42 U.S.C. § 1651 (a)*. *Id.* The court does not reach those issues, since its determination that it lacks jurisdiction renders them moot.

## POLITICAL QUESTION

[HN1] A case may meet every other jurisdictional and justiciability hurdle and still be barred by the presence of a political question. *Vieth v. Jubelirer, 541 U.S. 267, 277, 124 S.Ct. 1769, 1776, 158 L. Ed. 2d 546 (2004).* "Sometimes, [] the law is that the judicial department has no business entertaining the claim of unlawfulness." *Id.* "The political question doctrine [*10] excludes from judicial review those controversies which revolve around policy choices and value determinations constitutionally committed for resolution to the halls of Congress or the confines of the Executive Branch." *Japan Whaling Ass'n v. American Cetacean Society, 478 U.S. 221, 230, 106 S.Ct. 2860, 2866, 92 L. Ed. 2d 166 (1986).* Based on the concept of the separation of powers, political questions are addressed and redressed by the people through the political process. n15 *See Occidental of Umm Al Qaywayn v. Certain Cargo of Petroleum, 577 F.2d 1196, 1203 (5th Cir. 1978).* [HN2] The Supreme Court has set out a list of six formulations to aid courts in a "discriminating inquiry into the precise facts and posture of the particular case." *Baker v. Carr, 369 U.S. 186, 217, 82 S.Ct. 691, 710, 7 L. Ed. 2d 663 (1962).*

n15 The court notes that the political process has begun to address the very issues raised in this case. Congress has shown interest in contractor safety in Iraq. The Senate Democratic Policy Committee has just recently conducted "a hearing about contracting abuses." *See, e.g.,* David Ivanovich, *Halliburton Ignored Dangers, Drivers Say,* Houston Chronicle, Sep. 18, 2006, *available at* http://www.chron.com/disp/story.mpl/headline/biz/4196908.html.

[*11]

(1) Prominent on the surface of any case held to involve a political question is found a textually demonstrable constitutional commitment of the issue to a coordinate political department;

(2) or a lack of judicially discoverable and manageable standards for resolving it;

(3) or the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion;

(4) or the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government;

(5) or an unusual need for unquestioning adherence to a political decision already made;

(6) or the potentiality of embarrassment from multifarious pronouncements by various departments on one question.

*Id.* "[O]ne of these formulations [must be] inextricable from the case at bar." *Id.* Here the nature of the litigation implicates several of the *Baker* formulations.

## 1. Textual Constitutional Commitment to a Coordinate Branch.

The first and arguably most important formulation is a "textually demonstrable constitutional commitment of the issue to a coordinate political department." [*12] *Id.* [HN3] The Constitution allocates the power of Commander in Chief of the United States Army and Navy to the executive branch. U.S. CONST. art II, § 2, cl. 1. Additionally, the Constitution gives the power "[t]o raise and support Armies . . . provide and support a Navy [and to] make Rules for the Government and Regulation of the land and naval Forces" to Congress. *Id.* at § 1, cls. 12-14. "Of the legion of governmental endeavors, perhaps the most clearly marked for judicial deference are provisions for national security and defense." *Tiffany v. United States, 931 F.2d 271, 277 (2d. Cir. 1991).* Moreover, making war in a foreign land also implicates another equally compelling executive branch power, foreign policy. *Baker, 369 U.S. at 211, 82 S.Ct. at 707.* "Not only does resolution of [foreign policy] issues frequently turn on standards that defy judicial application, or involve the exercise of a discretion demonstrably committed to the executive or legislature; but many such questions uniquely demand [a] single-voiced statement of the Government's views." *Id. See also Occidental, 577 F.2d at 1203* ("[I]n the realm of foreign [*13] relations, policy considerations render issues incompetent for a decision by the court."); *Dickson v. Ford, 521 F.2d 234, 236 (5th Cir. 1975)* (per curium) (finding conduct of foreign relations to be constitutionally committed to the executive and legislative branches.). [HN4] The Constitution mandates that war and foreign policy are the provenance of the Executive.

In recognition of this, courts have consistently held that issues involving war, and actions taken during war, are beyond judicial competence. *See, e.g., Rostker v.*

*Goldberg, 453 U.S. 57, 66, 101 S.Ct. 2646, 2652, 69 L. Ed. 2d 478 (1981)* (selective service registration for men, but not women) ("The operation of a healthy deference to legislative and executive judgments in the area of military affairs is evident in several recent decisions of this Court."); *Gilligan v. Morgan, 413 U.S. 1, 10, 93 S.Ct. 2440, 2446, 37 L. Ed. 2d 407 (1973)* (training of National Guard troops) ("[I]t is difficult to conceive of an area of governmental activity in which the courts have less competence."); *Farmer v. Mabus, 940 F.2d 921, 923 (5th Cir. 1991)* (adjutant general's discharge after court-martial) ("[J]udicial [*14] intrusion into military matters is to be most cautiously and charily approached. . . . [T]he judicial process is manifestly ill-suited for the resolution of most of the myriad disputes which arise in that field."); *Bynum v. FMC Corp., 770 F. 2d 556, 562 (5th Cir. 1985)* (government contractor defense) ("It has long been recognized that interference by civilian courts with military authority inevitably raises both questions about judicial competency in this area and separation of powers concerns."); *Tiffany, 931 F.2d at 277* (military decision to shoot down potentially hostile aircraft) ("The strategy and tactics employed on the battlefield are clearly not subject to judicial review.").

If the Army were the defendant, then the commitment to a coordinate branch would be reasonably clear. However, the plaintiffs argue that the defendants may not shelter under the political question doctrine, because the plaintiffs' complaint (1) "involves claims by civilians, not military personnel," (2) "questions Defendants' actions as civilian contractors, not the Army's execution of a mission;" and (3) alleges that "Defendants, not the Army, [] deployed, directed, [*15] and controlled the civilian members of the Hamill Convoy, n16 thereby making inquiry into military decisions and rules of engagement unnecessary." n17 Even assuming the court found this statement to be true, the private character of the actions do not preclude the application of the political question doctrine. [HN5] "Whether an issue presents a nonjusticiable political question cannot be determined by a precise formula." *Saldano v. O'Connell, 322 F.3d 365, 368 (5th Cir. 2003)*. The inquiry as laid out in *Baker* requires the court to posit whether a political question will arise during the course of the trial, not whether it is evident from the face of the complaint. *Occidental, 577 F.2d at 1202*. The political question "doctrine is designed to restrain the Judiciary from inappropriate interference in the business of the other branches of Government; the identity of the *litigant* is immaterial to the presence of these concerns in a particular case." *United States v. Munoz-Flores, 495 U.S. 385, 394, 110 S. Ct. 1964, 1970, 109 L. Ed. 2d 384 (1990)*. Here, the court finds that it cannot try a case set on a battlefield during war-time without an impermissible [*16] intrusion into powers expressly granted to the Executive by the Constitution.

n16 Mr. Hammill was the lead KBR civilian truck driver for the first convoy on April 9th. He is not a party to this suit. Dkt. 74, at 26.

n17 Dkt. 149, at 34-35.

## 2. Lack of Judicially Discoverable and Manageable Standards.

The second *Baker* formulation is equally implicated. [HN6] "One of the most obvious limitations [on the court] is that judicial action must be governed by *standard, by rule*." *Vieth, 541 U.S. at 278, 124 S.Ct. at 1777*. Those standards are particularly elusive in the case at bar, where the court cannot escape an examination of Army decisions, an area "not subject to judicial second-guessing." *In re "Agent Orange" Prod. Liab. Litig., 818 F.2d 204, 206 (2d. Cir. 1987)*. In the case at bar, the question becomes whether the court could extricate the defendants' acts from the Army's acts.

A review of the evidence submitted by the plaintiffs and the defendants shows [*17] the actions taken on April 9, 2004 were, at best, the result of a joint effort between the defendants and the Army. The contracts show that the Army, not the defendants, was responsible for the security of the convoys, up to and including the force protection for the trucks, n18 the intelligence regarding the possible routes, n19 the decision regarding which route to take, n20 and the manner in which the drivers were to operate. n21 The Army's investigative report regarding the incident amply demonstrates the Army's significant actual involvement in the events at issue. n22 Moreover, in a deposition taken by the plaintiffs, (

EXT REDACTED BY COURT], confirms that the Army chose the routes for the convoys and requested that they be sent. n23 Also, email among KBR employees during the time before, during and after the April 9th incident indicate that the Army had a significant role in the deployment of convoys. n24 Regardless of whether the evidence may show that KBR had any ability to deploy or recall convoys, it most certainly demonstrates that the Army was involved at each step in the process.

n18 LOGCAP Contract # DAAA09-02-D-0007 governing the relationship between the defendants and the Army states in relevant part: (

EXT REDACTED BY COURT],

Dkt. 141, Exhibit C, at 00004. For an identical provision under Task order 59, *see* Dkt. 141, Exhibit C, at 00076.

[*18]

n19 Task Order 59 dictates with regards to the transportation mission that (

EXT REDACTED BY COURT], Task Order 59, Dkt. 141, Exhibit C, at 00066.

n20 Under the Logistics Support Element of Task Order 59, the contract states that (

EXT REDACTED BY COURT] Task Order 59, Dkt. 141, Exhibit C, at 00075.

n21 (

EXT REDACTED BY COURT] Task Order 59, Dkt. 141, Exhibit C, at 00081.

n22 Dkt. 141, Exhibit A, at 3-9. (

EXT REDACTED BY COURT] *Id.* at 4. (

EXT REDACTED BY COURT] *Id.* at 5.

n23 Dkt. 147, Exhibit U, at 17-18. (

EXT REDACTED BY COURT] *Id.*

n24 *Id.*, Exhibit O, at 1. (

EXT REDACTED BY COURT] *Id.*

The plaintiffs argue that the contract language required the defendants "to manage and direct their own convoys." n25 They point to the Army publication, "Contractors on the Battlefield" and quote it as follows:

Management of contractor activities is accomplished through the responsible contracting organization, not the chain of command. Commanders do not have direct control over contractors or their employees (contractor employees are not [*19] the same as government employees); only contractors manage, supervise, and give directions to their employees. n26

However, this quote is malapropos. It was taken from the Overview section of the manual in a subsection entitled Contractor and Military Distinctions. n27 A review of the manual reveals other, more applicable passages.

n25 Dkt. 149, at 33.

n26 *Id.*

n27 Dkt. 149, Exhibit W, at 1-7.

[HN7] Contractor Management in the Military Environment

[T]he regional combatant commander . . . is responsible for accomplishing the mission and ensuring the safety of all deployed military, government civilian, *and contractor employees* in support of US military operations. . . . To fully integrate contractor support into the theater operational support structure, proper military oversight is imperative. n28

n28 *Id.* (emphasis added).

[*20]

And later [HN8] under the Force Protection chapter, the manual states:

Roles and Responsibilities

6-4. Protecting contractors and their employees on the battlefield is the commander's responsibility. When contractors perform in potentially hostile or hazardous areas, the supported military forces must assure the protection of their operations and employees. The responsibility for assuring that contractors receive adequate force protection starts with the combatant commander, extends downward, and includes the contractor.

* * *

6-6. Protection for contractors involves active use of armed military forces to pro-

vide escort or perimeter security, and passive measures that include protective military equipment, training, and equipping of contractor employees in self-protection. n29

n29 *Id.* at 6-2.

Far from supporting the contention that KBR had sole control over the safety of its convoys, the manual offers express proof that security started with the Army. The plaintiffs also quote from [*21] Army Regulation 715-9 to support the argument that under the governing contracts the Army was not allowed to direct KBR employees. n30 [HN9] "Contracted support service personnel shall not be supervised or directed by military or Department of the Army (DA) civilian personnel." n31 Again, a closer examination of the regulations demonstrates instead that the Army was, at the very least, significantly involved in transportation and force protection decisions.

n30 Dkt. 149, at 33.

n31 *Id.*

The Commander, AMC will . . . [c]oordinate transportation (i.e., to, from and within the theater), quality of life issues and force protection of deployed AMC contractors with the ASCC [Army Service Component Command].

* * *

[C]ontractor employees will be expected to adhere to all guidance and obey all instructions and general orders issued by the Theater Commander. n32

The evidence shows overwhelmingly that the Army was an integral part of any decision to deploy and protect convoys.

n32 Dkt. 149. Exhibit X, at 14.

[*22]

In order to hear this case, the court would have to substitute its judgment for that of the Army. For example, the court would need to determine what intelligence the Army gave to KBR about the route, whether that intelligence was sufficient, what forces were deployed with the convoys, whether they were sufficient, and whether they performed properly. n33 Even if KBR had authority to deploy or recall the convoys, the court would still need to determine whether the Army could or should have countermanded that order. No judicial standards exist for making these determinations. To accept the plaintiffs' contentions that the defendants were in complete control of military vehicles transporting military supplies through a combat zone would require the court both to suspend disbelief and to disregard the governing contracts and the army incident report. This feat the court is simply not prepared to attempt.

n33 *See*, Dkt. 74.

Even if the plaintiffs limited their arguments, to what KBR did or did not do, eventually [*23] the court would be forced to distinguish between KBR's actions and the Army's actions. Because the defendants present a colorable argument based precisely on this distinction, the court would inexorably be drawn into an examination of Army decisions. And, [HN10] the Army's decisions during a time of war present a particularly inappropriate question for judicial examination. *Tiffany, 931 F.2d at 276* ("It would [be] unseemly for a democracy's most serious decisions, those providing for common survival and defense, [to] be made by its least accountable branch of government.").

Finally, [HN11] the textual commitment of military decisions to coordinate branches, as discussed earlier, has an inverse relationship to the lack of judicially discoverable and manageable standards for resolving the case. *Nixon v. United States, 506 U.S. 224, 228-29, 113 S.Ct. 732, 735, 122 L. Ed. 2d 1 (1993).* The more a decision is committed to another branch or branches of government, the less likely a court will find judicially discoverable and manageable standards to apply. *Id.* The Constitution specifically gives the Executive Branch the role of Commander in Chief of the Army. *U.S. CONST. art II,* [*24] *§ 2, cl. 1.* The Army's actions and decisions in Iraq set the stage for this case. Every issue, every claim the plaintiffs make must be examined against the backdrop of battle. They are inextricably intertwined. Accordingly, the court finds that it lacks the standards to hear this case.

**3. Nonjudicial Policy Determination and Lack of Respect.**

If the second formulation asks the court to determine what happened on April 9, 2004, then the third formulation requires an examination of why it happened. In the broadest sense, the Executive Branch policy of using civilian contractors to free up military personnel for military missions would be under scrutiny. In the narrowest sense, the question would become why the defendants and the military sent two convoys on the road to BIAP on that fateful day. Is it wise to use civilian contractors in a war zone? Was it wise to send the convoy along the route to BIAP on April 9, 2004? Answering either question and the many questions in between would require the court to examine the policies of the Executive Branch during wartime, a step the court declines to take. [HN12] Courts are "not tribal wisemen dispensing divinely or theoretically inspired [*25] judgments, but [are] limited to the application of predetermined law." *Occidental, 577 F.2d at 1203.*

### CONCLUSION

The court concludes that this case presents a non-justiciable political question. The case at bar meets not one, but three of the formulations described in *Baker v. Carr. See Baker, 369 U.S. at 217, 82 S.Ct. at 710.* Nor is the court alone in this conclusion. Two recent federal court cases involving suits against civilian contractors in Iraq were dismissed on similar grounds. In a case involving the bombing of a dining facility managed by KBR for the Army in Iraq, Judge Sim Lake dismissed the case for want of jurisdiction based on political question. *Smith v. Halliburton, 2006 U.S. Dist. LEXIS 61980, No. 4:06CV0462, 2006 WL 2521326, (S.D. Tex Aug. 30, 2006).* Also, in a Georgia case, the district court dismissed as non-justiciable a negligence case brought by

the family of a U.S. soldier killed by a suicide bomber while escorting a KBR convoy. *Whitaker v. Kellogg Brown & Root, 2006 U.S. Dist. LEXIS 45708, No. 4:05-CV-78, 2006 WL 1876922, (M.D. Ga. July 6, 2006).*

For the foregoing reasons the court finds that it lacks jurisdiction to hear the above-styled [*26] case, because it presents a non-justiciable political question. Accordingly, the defendants' motion to dismiss is GRANTED. Dkt. 135. The case is DISMISSED for want of jurisdiction.

It is so ORDERED.

Signed at Houston, Texas on September 22, 2006.

Gray H. Miller

United States District Judge

### FINAL JUDGMENT

In accordance with the court's memorandum and order signed this date, the court now believes that final judgment should be entered. Therefore it is ORDERED that the plaintiffs' claims and causes of action are hereby DISMISSED with prejudice. Additionally non-party Keith Richard's motion for protective order, (Dkt. 129) and the defendants' motion to dismiss plaintiffs' R.I.C.O. claims, *section 1983* claims, and exemplary damage claims (Dkt. 137) are DENIED AS MOOT.

This is a FINAL JUDGMENT.

Signed at Houston, Texas on September 22, 2006.

Gray H. Miller

United States District Judge

# EXHIBIT 15

LEXSEE 2006 U.S. DIST. LEXIS 61980

**SAVANAH ILISE SMITH, BRANDY LEIGH WILKISON, and PAMELA GENE KARM, Individually and as Representatives of the ESTATE OF ALLAN KEITH SMITH, Deceased, Plaintiffs, v. HALLIBURTON COMPANY, KELLOGG, BROWN & ROOT SERVICES, INC., and KELLOGG, BROWN AND ROOT, INC., Defendants.**

CIVIL ACTION NO. H-06-0462

**UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF TEXAS, HOUSTON DIVISION**

*2006 U.S. Dist. LEXIS 61980*

**August 30, 2006, Decided**
**August 30, 2006, Filed**

**PRIOR HISTORY:** *Smith v. Halliburton Co., 2006 U.S. Dist. LEXIS 30530 (S.D. Tex., May 16, 2006)*

**COUNSEL:** [*1] For Savanah Ilise Smith, Brandy Leigh Wilkinson, Pamela Gene Karm, Individually and as Representatives of the Esate of Allan Keith Smith, Deceased, Plaintiffs: Jim L Culpepper, Jim L Culpepper & Associates, Houston, TX.

For Halliburton Company, Kellogg, Brown & Root Services Inc, Kellogg, Brown & Root Inc., Defendants: David Kasanow, Herbert Lawrence Fenster, Raymond B Biagini, McKenna Long et al, Washington, DC; Robert Ellison Meadows, King and Spalding, Houston, TX.

**JUDGES:** SIM LAKE, UNITED STATES DISTRICT JUDGE.

**OPINION BY:** SIM LAKE

**OPINION:**

### MEMORANDUM OPINION AND ORDER

Plaintiffs, Savanah Ilise Smith, Brandy Leigh Wilkison, and Pamela Gene Karm, individually and as representatives of the Estate of Allan Keith Smith, deceased, filed this action in Texas state court against defendants, Halliburton Company, Kellogg, Brown & Root Services, Inc., and Kellogg, Brown & Root, Inc., n1 alleging negligence stemming from a suicide bomb attack on a base in Iraq. n2 Defendants timely removed the action to this court asserting federal question and federal officer jurisdiction under *28 U.S.C. § § 1441* and *1442*. n3 Pending before the court are Defendants' [*2] Renewed Motion to Dismiss Pursuant to *Rule 12(b)(1) of the Federal Rules of Civil Procedure* (Docket Entry No. 31), Plaintiffs' Response (Docket Entry No. 34), and Defendants' Reply to Plaintiffs' Response to Defendants' Renewed Motion to Dismiss (Docket Entry No. 37). For the reasons explained below, Defendants' Renewed Motion to Dismiss will be granted.

n1 Defendants' pleadings state that on December 31, 2005, the principal business and related operations, assets and liabilities, rights, obligations, and contracts of Kellogg Brown & Root, Inc. were transferred to Kellogg Brown & Root LLC, a Delaware entity.

n2 Plaintiffs' Original Petition, Exhibit A2 to defendants' Notice of Removal, Docket Entry No. 1.

n3 Defendants' Notice of Removal, Docket Entry No. 1.

### I. Factual and Procedural History

Only a brief factual summary of this case is required because the court's previous Memorandum Order and Opinion recited the factual background in detail. n4 On [*3] or about December 21, 2004, a suicide bomber walked into the dining facility n5 ("DFAC") at Forward Operating Base ("FOB") Marez in Mosul, Iraq, and detonated explosives packed with ball bearings and other shrapnel. n6 Allen Keith Smith was killed, along with twenty-one other people.

EXHIBIT
15

2006 U.S. Dist. LEXIS 61980, *

n4 Memorandum Opinion and Order, pp. 2-3, Docket Entry No. 13.

n5 Plaintiffs' Original Petition refers to the dining facility as the "mess tent" but the court will refer to it as the dining facility, or DFAC, because this is the terminology used in the relevant contracts.

n6 Plaintiffs' Original Petition, P 10, Exhibit A2 to defendants' Notice of Removal, Docket Entry No. 1.

A division of defendant Kellogg Brown & Root, Inc. was operating in Iraq pursuant to Contract No. DAAA09-02-D-0007 (the "LOGCAP Contract"), under which defendants provided numerous services to the United States military throughout the world. n7 LOGCAP Contract requirements are listed as Task Orders, and Task Order 59 pertains to FOB Marez and governs [*4] the food services defendants provided at FOB Marez. n8

n7 The LOGCAP Contract, Exhibit A to Defendants' Renewed Motion to Dismiss Pursuant to *Rule 12(b)(1) of the Federal Rules of Civil Procedure*. LOGCAP stands for Logistics Civil Augmentation Program. Army Regulation 700-137, Logistics Civil Augmentation Program (16 December 1985). Portions of the LOGCAP Contract are attached as Exhibit A to Defendants' Renewed Motion to Dismiss, Docket Entry No. 34. This is actually the third LOGCAP contract, covering from December 2001 to the present.

n8 Task Order 59 is attached as Exhibit A to Defendants' Renewed Motion to Dismiss, Docket Entry No. 32. Plaintiffs complain that the contracts attached to Defendants' Renewed Motion to Dismiss are not the same documents produced by defendants in response to plaintiffs' discovery request. Plaintiffs' Response to Defendants' Renewed Motion to Dismiss, P 9, Docket Entry No. 34. This is immaterial because plaintiffs have had adequate time to read and respond to the contracts and to all of the other documents attached to Defendants' Renewed Motion to Dismiss.

[*5]

Plaintiffs allege that defendants were negligent in (1) failing to properly secure the DFAC, (2) failing to properly monitor the DFAC, (3) allowing a large number of people to gather at the mess tent at the same time, (4) not providing a search of the people who entered into the DFAC, (5) failing to have a secure perimeter around the DFAC, (6) failing to warn people that came into the DFAC that defendants had provided no security, and (7) failing to take reasonable precautions to make the DFAC safe from attacks and explosions of the type that killed Smith. As a result of this negligence, plaintiffs allege that the suicide bomber was able to enter and detonate explosives, killing Smith. n9

n9 Plaintiffs' Original Petition, PP 12-13, Exhibit A2 to defendants' Notice of Removal, Docket Entry No. 1.

On February 17, 2006, defendants filed a motion to dismiss the case for lack of subject matter jurisdiction pursuant to *Federal Rule of Civil Procedure 12(b)(1)*. n10 Defendants [*6] argued that the case should be dismissed as nonjusticiable under the political question doctrine, or, alternatively, dismissed under the Federal Tort Claims Act. The court declined to dismiss the case, concluding that the Federal Tort Claims Act combatant activities exception does not preempt the state tort law action, and that there was not a sufficient factual predicate to determine whether the case presents a nonjusticiable political question. n11 The court granted plaintiffs' request for discovery on the jurisdictional issue, and invited defendants to refile their motion for dismissal after completion of discovery. n12 Defendants have done so, filing a renewed motion to dismiss for lack of subject matter jurisdiction on political question grounds. n13

n10 Defendants' Motion to Dismiss Pursuant to *Rule 12(b)(1) of the Federal Rules of Civil Procedure*, Docket Entry No. 4.

n11 Memorandum Opinion and Order, Docket Entry No. 13.

n12 Id. at pp. 13-14.

n13 Defendants' Renewed Motion to Dismiss Pursuant to *Rule 12(b)(1) of the Federal Rules of Civil Procedure*.

[*7]

**II. Political Question**

The political question doctrine is an aspect of "the concept of justiciability, which expresses the jurisdictional limitations imposed on the federal courts by the 'case or controversy' requirement" of Article III of the Constitution. *Schlesinger v. Reservists Comm. to Stop the War, 418 U.S. 208, 94 S.Ct. 2925, 2929, 41 L. Ed. 2d 706 (1974)*. Courts lack jurisdiction over political questions that are by their nature committed to the political branches. *Bancoult v. McNamara, 445 F.3d 427, 432 (D.C. Cir. 2006)* (quoting *Schneider v. Kissinger, 366 U.S. App. D.C. 408, 412 F.3d 190, 193 (D.C. Cir. 2005))*. See also *Occidental of UMM al Qaywayn, Inc. v. Certain Cargo of Petroleum, 577 F.2d 1196, 1203 (5th Cir. 1978)*.

"The political question doctrine excludes from judicial review those controversies which revolve around policy choices and value determinations constitutionally committed for resolution to the halls of Congress or the confines of the Executive Branch." *Japan Whaling Ass'n v. American Cetacean Society, 478 U.S. 221, 106 S.Ct. 2860, 2866, 92 L. Ed. 2d 166 (1986)*. The following six tests determine the existence of a political question:

> (1) [*8] a textually demonstrable commitment of the issue to a coordinate political department;
>
> (2) a lack of judicially discoverable and manageable standards;
>
> (3) the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion;
>
> (4) the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government;
>
> (5) an unusual need for unquestioning adherence to a political decision already made; and
>
> (6) the potentiality of embarrassment from multifarious pronouncements by various departments on one question.

*Baker v. Carr, 369 U.S. 186, 82 S.Ct. 691, 710, 7 L. Ed. 2d 663 (1962)*. These six tests "are probably listed in descending order of both importance and certainty." *Vieth v. Jubelirer, 541 U.S. 267, 124 S.Ct. 1769, 1776, 158 L. Ed. 2d 546 (2004)*. The political question doctrine

is not applied unless one of the six factors is "inextricable from the case at bar[.]" *Baker, 82 S.Ct. at 710*. In determining if a political question exists the court analyzes the claim "as it would be tried, to determine whether a political question will emerge." *Occidental, 577 F.2d at 1202.* [*9] n14

> n14 The court may consider matters outside the complaint to resolve the jurisdictional issue. See *Barrett Computer Servs., Inc. v. PDA, Inc., 884 F.2d 214, 220 (5th Cir. 1989)* (stating that subject matter jurisdiction determinations may be made using any one of the following bases: (1) the complaint alone; (2) the complaint supplemented by undisputed facts evidenced in the record; or (3) the complaint supplemented by undisputed facts plus the court's resolution of disputed facts).

In its previous opinion the court concluded that the central inquiry in the political question determination was who had responsibility for security at the DFAC, defendants or the United States military? n15 Defendants argue that the evidence produced demonstrates that the United States military was solely responsible for force protection at FOB Marez. n16 Plaintiffs respond that defendants have not submitted any new evidence in their Renewed Motion to Dismiss and therefore revisiting the court's previous opinion [*10] is unnecessary. n17 But a review of the pleadings reveals that defendants have submitted new evidence in the form of several sworn declarations and the relevant contract. The contract provides a factual framework with which the court can analyze the legal question. n18

> n15 Memorandum Opinion and Order, pp. 9-10, Docket Entry No. 13.

> n16 Defendants' Renewed Motion to Dismiss Pursuant to *Rule 12(b) (1) of the Federal Rules of Civil Procedure*, p. 8, Docket Entry No. 31.

> n17 Plaintiffs' Response to Defendants' Renewed Motion to Dismiss, P 37, Docket Entry No. 34.

> n18 Many of defendants' subpoena requests were denied by the Army and the Department of Defense, generally because the requested materials were classified. Exhibits N & O to Defendants' Renewed Motion to Dismiss Pursuant to *Federal Rule of Civil Procedure 12(b)(1)*. De-

spite this, the court is satisfied that the evidence obtained by defendants and submitted in their Renewed Motion to Dismiss is sufficient to determine whether or not this case constitutes a political question.

[*11]

The LOGCAP Contract and Task Order 59 serve as the principal legal bases for the relationship between the Department of Defense and the contractor. n19 No provisions of the LOGCAP Contract or Task Order 59 give defendants responsibility for providing force protection in the FOB Marez DFAC to defendants. Force protection is defined as "[s]ecurity programs designed to protect Service members, civilian employees, family members, facilities, information, and equipment in all locations and situations, accomplished through the planned and integrated application of combating terrorism, physical security, operations security, personal protective services, and supported by intelligence, counterintelligence, and security programs." n20

> n19 Department of Defense Instruction 3020.41, Contractor Personnel Authorized to Accompany the U.S. Armed Forces, P 6.1.4 (October 3, 2005).

> n20 Department of Defense Instruction 2000.16, DoD Antiterrorism Standards, Enclosure 2 P E2.1.7 (June 14, 2001).

Defendants have submitted [*12] a sworn declaration from the Administrative Contracting Officer responsible for oversight of the relevant contract stating that "[t]he Army retained the authority and responsibility for the 'security' and 'force protection' functions at FOB Marez and the Marez DFAC at all times under this contract; KBR was never entrusted with such 'security' or 'force protection' functions." n21 Instead, defendants' responsibility was to provide food services at the FOB Marez DFAC. Not only are defendants without force protection responsibilities, but the contract provides that the Service Theater Commander will provide force protection to defendants and their employees. n22

> n21 Declaration of Major Judy P. Anderson, P 7, Exhibit G to Defendants' Renewed Motion to Dismiss Pursuant to *Federal Rule of Civil Procedure 12(b)(1)*. Plaintiffs object to the declaration, arguing that it constitutes an opinion as to the legal effect of a contract. Although it may contain a legal opinion, the court can determine the effect

of the contract by reading it, and will consider the declaration because it is relevant insofar as it addresses the military's understanding of defendants' lack of force protection responsibilities.

[*13]

> n22 LOGCAP Contract, P H-16, and Task Order 59, Statement of Work P 1.10, Exhibit A to Defendants' Renewed Motion to Dismiss Pursuant to *Federal Rule of Civil Procedure 12(b) (1)*.

In the absence of any contractual directive to provide security, the Army assigns responsibility for force protection, including security, to the military, not to civilian contractors. n23 As contractors, defendants are required to adhere to military guidance, instructions, and general orders issued by the Theater Commander including "any and all guidance and instructions issued based upon the need to ensure mission accomplishment, force protection, and safety[.]" n24 In addition, as contractors, defendants cannot "command, supervise, administer or control Army or Department of the Army Civilian (DAC) personnel." n25 Although contractors may be armed, they may only be armed for the purpose of individual self-defense. n26 The LOGCAP contract provides that the Theater Commander has discretion to allow contractors to carry government-issue firearms. n27 Defendants state that no [*14] such authorization was given to defendants at FOB Marez. n28

> n23 See DoD Instruction 2000.16, P E3.1.1.14.1 (June 14, 2001) ("Commanders shall maintain a comprehensive AT [anti-terrorism] program for those personnel and assets for which they have AT responsibilities"); Field Manual 100-21, Contractors on the Battlefield, P 6-3 (January 2003) ("Contractor employees cannot be required to perform force protection functions . . . and cannot take an active role in hostilities").

> n24 LOGCAP Contract, P H-13, Exhibit A to Defendants' Renewed Motion to Dismiss Pursuant to *Federal Rule of Civil Procedure 12(b)(1)*.

> n25 Army Regulation 715-9, Contractors Accompanying the Force P 3-3(a) (29 October 1999).

n26 DoD Instruction 3020.41, Contractor Personnel Authorized to Accompany the U.S. Forces, P 4.4.1 (October 3, 2005).

n27 LOGCAP Contract, P H-21, Exhibit A to Defendants' Renewed Motion to Dismiss Pursuant to *Federal Rule of Civil Procedure 12(b)(1)*.

n28 Defendants' Renewed Motion to Dismiss Pursuant to *Rule 12(b)(1) of the Federal Rules of Civil Procedure*, p. 12, Docket Entry No. 31.

[*15]

Defendants' evidence also demonstrates that as a practical matter the military, not defendants, actually provided security at the DFAC. n29 This security took the form of periodically stationing soldiers to check identification of personnel entering the DFAC and ensuring that loaded weapons were not brought into the DFAC. n30 There were apparently no soldiers performing these functions on December 21, 2004, when the DFAC was bombed, or for the several days preceding the bombing. n31 Nor did the military provide defendants with any warning that the DFAC might be targeted for attack by a suicide bomber, or targeted for any attack at all on December 21, 2004. n32

n29 Declaration of Mark C. Hall, PP 5 & 6, Exhibit I to Defendants' Renewed Motion to Dismiss Pursuant to *Federal Rule of Civil Procedure 12(b)(1)*.

n30 Id. at P 5.

n31 Id.

n32 Id. at P 7.

The evidence submitted establishes that defendants had no responsibility for force protection, notwithstanding [*16] plaintiffs' arguments to the contrary. The linchpin of plaintiffs' argument that defendants have force protection responsibilities as contractors is paragraph 6-4 of Field Manual 100-21, Contractors on the Battlefield, which states that "[t]he responsibility for assuring that contractors receive adequate force protection starts with the combatant commander, extends downward, and includes the contractor." n33 Plaintiffs attempt to characterize this as establishing a chain of command for force protection, starting with the combat-

ant commander and extending downward to the contractors. But the full text of the cited paragraph does not support plaintiffs' argument. The entire paragraph states as follows:

n33 Field Manual 100-21, Contractors on the Battlefield, P 6-4 (January 2003), Exhibit F to Defendants' Renewed Motion to Dismiss Pursuant to *Federal Rule of Civil Procedure 12(b)(1)*.

Protecting contractors and their employees on the battlefield is the commander's [*17] responsibility. When contractors perform in potentially hostile or hazardous areas, the supported military forces must assure the protection of their operations and employees. The responsibility for assuring that contractors receive adequate force protection starts with the combatant commander, extends downward, and includes the contractor. n34

n34 Id.

The first sentence of this document makes it clear that the intent is not to delegate force protection responsibilities to the contractor. Furthermore, the cited paragraph deals with protecting the contractors by military forces, not with requiring contractors to provide force protection to other parties. The last sentence ensures that contractors comply with force protection measures ordered by the commanders for their own benefit, such as using personal protective equipment and does not, as plaintiffs argue, demonstrate that the military delegated some of its force protection responsibility to defendants.

Plaintiffs also cite to a provision of Task [*18] Order 59 related to fire fighting services.

Task Order 59 of the LOGCAP contract requires that defendants

provide fire fighting protection services for U.S. Government owned or leased property, personnel and equipment on all Enduring Base Camps . . . The contractor shall provide fire department and fire protection functions according to DoD, local,

state, federal and industry standards. These functions include fire protection support, emergency response, equipment and vehicle management, fire prevention and education, and training. n35

n35 Task Order 59, Statement of Work, PP 8.18-8.18.1, Exhibit A to Defendants' Renewed Motion to Dismiss Pursuant to *Federal Rule of Civil Procedure 12(b)(1)*.

Plaintiffs argue that fire fighting and prevention services include preventing a fire caused by a bomb explosion. n36 Reading fire prevention as broadly as plaintiffs suggest would bring this portion of Task Order 59 in unnecessary conflict with the contractual provisions [*19] requiring the United States government to provide force protection to contractor personnel. n37 In addition, the plain language of the contract belies plaintiffs' argument. The term "fire prevention" cannot reasonably be read to encompass prevention of infiltration or explosions caused by suicide bombers. Preventing suicide bomb attacks is more appropriately characterized as a force protection measure, contractually entrusted to the United States government and the military. Plaintiffs' arguments regarding the contractual provision that defendants shall be "responsible for the safety of employees and base camp residents during all operations in accordance with the Army and OSHA safety regulations and guidance" is similarly unavailing. n38 The reference to OSHA safety regulations indicates that "safety" in this provision is safety in the workplace, not security measures related to hostile forces.

n36 Plaintiffs' Response to Defendants' Renewed Motion to Dismiss, PP 60-62, Docket Entry No. 34.

n37 LOGCAP Contract, P H-16, and Task Order 59, Statement of Work, P 1.10, Exhibit A to Defendants' Renewed Motion to Dismiss Pursuant to *Federal Rule of Civil Procedure 12(b)(1)*.

[*20]

n38 Plaintiffs' Response to Defendants' Renewed Motion to Dismiss, and Response to Defendants' Motion in the Alternative for Summary

Judgment, PP 53-58, Docket Entry No. 34 (quoting Task Order 59, Statement of Work, P 1.2).

Plaintiffs couch this lawsuit in terms of simple premises liability by arguing that the court need only determine what duties defendants, as possessor, occupier, and operator of the DFAC, owed to Allen Keith Smith as the invitee. n39 This formulation fails to recognize that were the case to proceed, this court would have to second-guess the decisions of the United States military, even though the suit is ostensibly against only military contractors. Although the military contracted out the logistical aspects of FOB Marez's DFAC operations to defendants, it did not delegate the force protection responsibilities to defendants.

n39 Id. at P 65.

Another district court recently addressed the issue of [*21] how government contractors affect the political question doctrine. In *Whitaker v. Kellogg Brown & Root, Inc.,* -- F.Supp.2d --, *2006 U.S. Dist. LEXIS 45708, 2006 WL 1876922 (M.D. Ga. July 6, 2006)*, the surviving parents of a soldier serving in Iraq sued the government contractor after their son was killed while escorting a military supply convoy operated by the government contractor. *2006 U.S. Dist. LEXIS 45708, [WL] at *1*. Plaintiffs alleged that the defendant's drivers were negligent and that the defendant was negligent in hiring, training, and supervising those drivers. Id. The court dismissed the case on political question grounds despite the fact that the plaintiffs' allegations were against the civilian contractor. *2006 U.S. Dist. LEXIS 45708, [WL] at *3*. "When the military seeks to accomplish its mission by partnering with government contractors who are subject to the military's orders . . . the use of those civilian contractors to accomplish the military objective does not lessen the deference due to the political branches in this area." Id.

In this case the negligence allegations in plaintiffs' complaint directly address the security of the DFAC. Plaintiffs repeatedly argue that their complaint questions only the conduct of defendants [*22] in failing to provide security, not the military's force protection policies. But this argument fails because the evidence shows that defendants had no security responsibilities for the DFAC. By alleging that defendants were negligent in providing security for the DFAC at FOB Marez plaintiffs are, in effect, alleging that the military was negligent in providing security for the DFAC at FOB Marez.

Even assuming, arguendo, that the military and defendants had concomitant responsibility for security,

defendants were still operating pursuant to the military's orders, instructions, and regulations. The Whitaker court held that an injury "at the hands of a contractor which is performing military functions subject to the military's orders and regulations also raises . . . political questions." *Whitaker, 2006 U.S. Dist. LEXIS 45708, 2006 WL 1876922 at *3*. This court agrees. Even if defendants had some responsibility for implementing force protection measures promulgated by the military, the court would still be called upon to examine the military's decision-making in many respects, including determining whether the military gathered adequate intelligence regarding the threat of terror attacks, [*23] whether it conveyed this threat to defendants, how the military planned for and implemented base access measures, and whether the implementation of force protection measures was reasonable when measured against the risk assessment level.

Examining plaintiffs' complaint in this light, the court concludes that the first three *Baker v. Carr* tests are inextricable from the case at bar. The Constitution textually commits the issues in this case to the political branches. Article II, § 2 of the United States Constitution appoints the President Commander in Chief of the armed forces. Article I, § 8 grants to Congress authority to raise and support Armies, to provide and maintain a Navy, and to make rules for the governing and regulation of the land and naval forces. Courts have found that "the political branches of government are accorded a particularly high degree of deference in the area of military affairs." *Aktepe v. United States, 105 F.3d 1400, 1403 (11th Cir. 1997)*. Allowing this action to proceed would require the court to substitute its judgment on military decision-making for that of the branches of government entrusted with this task. To determine whether [*24] the force protection in place was adequate the intelligence gathering, risk assessment, and security measures implemented by the military at FOB Marez would have to be examined. Because the suicide bomber managed to enter the base, the court would also have to examine base perimeter security. "The control of access to a military base is clearly within the constitutional powers granted to both Congress and the President." *Cafeteria & Rest. Workers Union v. McElroy, 367 U.S. 886, 81 S. Ct. 1743, 1746, 6 L. Ed. 2d 1230 (1961)*. Judicial review of such decisions would intrude onto critical areas reserved to the Legislative and Executive Branches of government by the Constitution.

Moreover, there exists a lack of judicially discoverable and manageable standards to resolve this case. In order to determine if defendants acted reasonably as possessor, occupier, and operator of the DFAC, the court would have to decide what constitutes reasonable security measures at a military base located in an area of Iraq subject to threats from hostile forces. The court would have to assess what intelligence had been gathered regarding potential threats and evaluate whether the security measures implemented [*25] were reasonable in light of the potential threats. Security measures on military bases balance the need for functionality and access with the need for force protection. In striking this balance the military must also allocate limited personnel and resources, with the need for security on base competing with mission requirements off base in Iraq as well as throughout the world. The court would have to determine if the military was reasonable in striking this balance. Courts lack the facts, expertise, and standards necessary to evaluate whether reasonable care was taken in these circumstances.

Finally, the issues in this case could not be resolved without an initial policy determination of a kind clearly for nonjudicial discretion. The court would substitute its judgment for that of the military on the issue of whether adequate force protection measures were in place. The court would also have to examine the military's policy of feeding soldiers by gathering them in one centralized location. Since the suicide bomber was apparently wearing an Iraqi uniform, the decision to allow Iraqi troops to dine in the DFAC would also be at issue. These are just a few examples of the many policy [*26] determinations that were involved in implementing force protection measures at the FOB Marez DFAC. "The complex subtle, and professional decisions as to the composition, training, equipping, and control of a military force are essentially professional military judgments, subject always to civilian control of the Legislative and Executive Branches." *Gilligan v. Morgan, 413 U.S. 1, 93 S.Ct. 2440, 2446, 37 L. Ed. 2d 407 (1973)*. Policy determinations involving force protection measures in a hostile area of Iraq are clearly not appropriate for judicial determination.

For the foregoing reasons, the court concludes that it lacks jurisdiction to hear this case because it constitutes a nonjusticiable political question.

### III. Plaintiffs' Motions to Compel Discovery and for Leave to Amend

Plaintiffs have requested that defendants be ordered to respond to plaintiffs' discovery request. n40 This request is **DENIED**. Plaintiffs received defendants' responses to their discovery requests on July 10, 2006, but waited until filing their response to Defendants' Renewed Motion to Dismiss on August 22, 2006, to complain about defendants' discovery production. n41 Plaintiffs had more than adequate time [*27] to file a motion to compel production prior to filing their response. Furthermore, the evidence adduced by defendants was sufficient to determine that this case is nonjusticiable on political question grounds.

n40 Plaintiffs' Response to Defendants' Renewed Motion to Dismiss, p. 25, Docket Entry No. 34.

n41 Exhibits A & B to Plaintiffs' Response to Defendants' Renewed Motion to Dismiss, Docket Entry No. 34.

Plaintiffs also request leave to amend their complaint after receipt of defendants' response. n42 *Federal Rule of Civil Procedure 15(a)* states that "leave to amend should be freely given when justice so requires." However, a district court can deny leave to amend when allowing the amendment would be futile. *Jamieson v. Shaw, 772 F.2d 1205, 1208 (5th Cir. 1985)*. See also *Martin's Herend Imports, Inc. v. Diamond & Gem Trading United States of America Co., 195 F.3d 765, 771 (5th Cir. 1999)* ("A district court acts within its discretion [*28] when dismissing a motion to amend that is frivolous or futile."). The evidence clearly establishes that the military had primary responsibility for force protection. Furthermore, the court has already examined the case as

if the military and defendants had concomitant force protection responsibilities and determined that the case would still present a nonjusticiable political question. Allowing further discovery or amendment in this case would be futile because amending the complaint would not alter the basic nature of the instant case and the nonjusticiable political questions involved. Plaintiffs' motion for leave to amend their complaint is therefore **DENIED.**

n42 Id.

### IV. Conclusions and Order

For the foregoing reasons, Defendants' Renewed Motion to Dismiss Pursuant to *Rule 12(b)(1) of the Federal Rules of Civil Procedure* (Docket Entry No. 31) is **GRANTED.**

**SIGNED** at Houston, Texas, on this 30th day of August, 2006.

SIM LAKE

UNITED STATES [*29] DISTRICT JUDGE

**EXHIBIT 16**

LEXSEE 2006 U.S. DIST. LEXIS 45708

**ANTHONY WHITAKER and JACQUELINE, WILLIAMS, as Surviving Parents of Marquis A. Whitaker, Deceased, and ANTHONY WHITAKER, as Administrator of the Estate of Marquis A. Whitaker, Plaintiffs, vs. KELLOGG BROWN & ROOT, INC., ESTATE OF QUAISAR KAHN, and HUSSAIN KIZHIKKINAM, Defendants.**

**CASE NO. 4:05-CV-78 (CDL)**

**UNITED STATES DISTRICT COURT FOR THE MIDDLE DISTRICT OF GEORGIA, COLUMBUS DIVISION**

*2006 U.S. Dist. LEXIS 45708*

**July 5, 2006, Decided**
**July 6, 2006, Filed**

**SUBSEQUENT HISTORY:** Judgment entered by *Whitaker v. Kellogg Brown & Root, Inc., 2006 U.S. Dist. LEXIS 45717 (M.D. Ga., July 6, 2006)*

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** In a negligence case, plaintiff surviving parents sued defendant defense contractor following the death of their son, a soldier in Iraq. The soldier was killed while escorting a military supply convoy operated by the contractor. The contractor moved to dismiss arguing that the case presented a non-justiciable political question because the case turned on strategic and tactical military decisions made in a combat zone.

**OVERVIEW:** In support of its motion, the contractor pointed to regulations regarding convoy operations and the use of civilian contractors. At the time of his death, the soldier was working in cooperation with government contractor employees to achieve military objectives in a wartime convoy operation that was planned and executed by the military. He was killed due to the alleged negligence of the government contractor's employees, which were performing their duties subject to the military's planning, orders, and regulations. The court rejected plaintiffs' contention that there were judicially discoverable and manageable standards for resolving the questions in the suit. While their simplistic labeling of the case as a garden variety road wreck was superficially appealing, it ignored the true nature of the circumstances giving rise to the tragedy. The question was not just what a reasonable driver would do--it was what a reasonable driver in a combat zone, subject to military regulations and orders, would do. That question necessarily implicated the wisdom of the military's strategic and tactical decisions, a classic political question over which the court had no jurisdiction.

**OUTCOME:** The contractor's motion to dismiss was granted. The entire complaint was dismissed for lack of subject matter jurisdiction.

**LexisNexis(R) Headnotes**

*Military & Veterans Law > Warfare*
[HN1] Army regulations authorize the use of civilian contractors to perform selected services in wartime to augment Army forces. Army Reg. 700-137, at 1-1.

*Military & Veterans Law > Warfare*
[HN2] The purpose of the Logistics Civil Augmentation Program (LOGCAP) is to release military units for other missions or to fill shortfalls. Army Reg. 700-137, at 2-4 and 3-1. Contract employees are not under the direct supervision of the military. Army Reg. 700-137, at 3-2(d)(2) and Army Reg. 715-9, at 3-2(f). However, contractor employees are expected to work closely with military personnel. The Army will fight as part of a joint team. Motor transport units must be prepared to support the inland surface movement requirements of other services or nations and to integrate HN, LOGCAP, or other contract support. The Army will fight as a total force-active and reserve components and civilians. Army transportation headquarters units must be able to integrate all deployed mode operating units. The objective is

EXHIBIT
16

a seamless transportation system that supports the movement requirements of the joint force and the Army. Army Motor Transport Units and Operations, Army Field Manual 55-30, at 1-1 (Sept. 15, 1999) Contractor employees are expected to adhere to all guidance and obey all instructions and general orders issued by the Theater Commander. Army Reg. 715-9, at 3-2(f). Furthermore, if a contractor employee violates the Theater Commander's orders, the Army may demand that the contractor replace that individual. Army Reg. 715-9, at 3-2(f).

***Civil Procedure > Pleading & Practice > Defenses, Demurrers, & Objections > Motions to Dismiss***
[HN3] A court may review matters outside pleadings in deciding a *Fed. R. Civ. P. 12(b)(1)* motion.

***Military & Veterans Law > Warfare***
[HN4] The Army regulates all aspects of control, organization, and planning of Army convoy operations. Army Motor Transport Units and Operations, Army Field Manual (FM) 55-30. Army regulations provide that Logistics Civil Augmentation Program may be used for Army motor transport operations when contractor support is determined to be the most effective, expeditious, or cost effective. FM 55-30, at 1-11. A convoy commander oversees the preparation and planning of convoy operations, and convoy plans are made by military personnel pursuant to standing operating procedures, also developed by military personnel. FM 55-30, at 5-4 and 5-5. The convoy plans made by military personnel include, inter alia, placement of vehicles in the convoy, distance between vehicles in the convoy, rate of speed of the convoy, and convoy escort and security. FM 55-30, at 5-3 and 5-4. In preparing the convoy, the convoy commander must inspect convoy personnel and vehicles. FM 55-30, at 5-3 and 5-4.

***Civil Procedure > Justiciability > Political Questions > Separation of Powers***
[HN5] The political question doctrine is a function of the separation of powers, and it excludes from judicial review those controversies which revolve around policy choices and value determinations constitutionally committed for resolution to the halls of Congress or the confines of the Executive Branch.

***Civil Procedure > Justiciability > Political Questions > General Overview***
[HN6] In the Baker case, the United States Supreme Court has identified six hallmarks of political questions:

(1) a textually demonstrable constitutional commitment of the issue to a coordinate political department, (2) a lack of judicially discoverable and manageable standards for resolving it, (3) the impossibility of deciding without an initial policy determination of a kind clearly for non-judicial discretion, (4) the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government, (5) an unusual need for unquestioning adherence to a political decision already made, or (6) the potentiality of embarrassment from multifarious pronouncements by various departments on one question. At least one of those characteristics is required to invoke the political question doctrine.

***Civil Procedure > Justiciability > Political Questions > Separation of Powers***
[HN7] It is well accepted that, in general, soldiers injured at the hands of the military raise political questions. The United States District Court for the Middle District of Georgia, Columbus Division holds that a soldier injured at the hands of a contractor which is performing military functions subject to the military's orders and regulations also raises the same political questions.

***Civil Procedure > Justiciability > Political Questions > Separation of Powers***
[HN8] One important function of the political question doctrine is to prevent the courts from deciding questions that were intended by the Constitution to be left to the political branches. There is a textually demonstrable constitutional commitment of oversight and control of military force to the legislative and executive branches, and those political branches receive deference in the area of military affairs. When the military seeks to accomplish its mission by partnering with government contractors who are subject to the military's orders, regulations, and convoy plan, the use of those civilian contractors to accomplish the military objective does not lessen the deference due to the political branches in this area.

***Civil Procedure > Justiciability > Political Questions > General Overview***
[HN9] One purpose of the political question doctrine is to prevent courts from attempting to resolve questions where there are no judicially discoverable and manageable standards for resolving the questions.

**COUNSEL:** [*1] For Anthony Whitaker, as Surviving Parent of Marquis A. Whitaker, Deceased, Jacqueline Williams, as Surviving Parent of Marquis A. Whitaker, Deceased, Anthony Whitaker, as Administrator of the

Estate of Marquis A. Whitaker, Plaintiffs: Charles Frederick Overby, Columbus, GA.

For Kellogg Brown & Root, Inc., Defendant: Jonathan R. Friedman, Atlanta, GA; Kurt J. Hamrock, Lisa M. Norrett, Raymond Biagini, McKenna Long & Aldridge LLP, Washington, DC.

**JUDGES:** Clay D. Land, UNITED STATES DISTRICT JUDGE.

**OPINION BY:** Clay D. Land

**OPINION:**

ORDER

Presently pending before the Court is Defendant Kellogg Brown & Root, Inc.'s ("KBR") Motion to Dismiss (Doc. 7). For the reasons set forth below, KBR's Motion to Dismiss is granted.

BACKGROUND ALLEGATIONS

Plaintiffs are the surviving parents of a U.S. soldier ("Whitaker") who served in Iraq as a member of a Supply and Transport Troop that provided armed escorts for military supply convoys operated by KBR. On April 27, 2004, Whitaker was killed while escorting a military supply convoy operated by KBR. Plaintiffs allege that, while the convoy was returning to Scania, Iraq after completing a delivery in Al Kut, Iraq, one of KBR's drivers hit the guard rail [*2] of a bridge over the Tigris River and went off the bridge. Whitaker, who was driving an Army escort vehicle following that KBR rig, stopped his vehicle on the bridge. Then, another KBR driver struck Whitaker's vehicle from behind, knocking it close to the edge of the bridge where the guard rail had been destroyed. When Whitaker tried to extricate himself from his vehicle, he fell off the bridge and into the Tigris River. Rescue attempts failed, and Whitaker drowned. Plaintiffs seek to hold KBR liable under the doctrine of *respondeat superior* for the negligence of its drivers. Plaintiffs also contend that KBR should be held liable for its negligence in hiring, training, and supervising those drivers.

KBR responds that this case presents a nonjusticiable political question because the case turns on strategic and tactical military decisions made in a combat zone. n1 In support of its argument, KBR points to Army regulations regarding convoy operations and the use of civilian contractors. n2 U.S. [HN1] Army regulations authorize the use of "civilian contractors to perform selected services in wartime to augment Army forces." Logistics Civil Augmentation Program, U.S. Army Reg. 700-137, at [*3] 1-1 (Dec. 16, 1985) [hereinafter LOGCAP]. [HN2] The purpose of LOGCAP is to "re-

lease military units for other missions or [to] fill shortfalls." *Id.* at 2-4, 3-1. Contract employees are not under the direct supervision of the military. *Id.* at 3-2(d)(2); Contractors Accompanying the Force, U.S. Army Reg. 715-9, at 3-2(f) (Oct. 29, 1999) [hereinafter Army Reg. 715-9]. However, contractor employees are expected to work closely with military personnel:

> The Army will fight as part of a joint team. Motor transport units must be prepared to support the inland surface movement requirements of other services or nations and to integrate HN, LOGCAP, or other contract support. The Army will fight as a total force-active and reserve components and civilians. Army transportation headquarters units must be able to integrate all deployed mode operating units. The objective is a seamless transportation system that supports the movement requirements of the joint force and the Army.

Army Motor Transport Units and Operations, Army Field Manual 55-30, at 1-1 (Sept. 15, 1999) [hereinafter F.M. 55-30]. Contractor employees are "expected to adhere to all guidance and obey all instructions [*4] and general orders issued by the Theater Commander." Army Reg. 715-9, at 3-2(f). Furthermore, if a contractor employee violates the Theater Commander's orders, the Army may demand that the contractor replace that individual. *Id.*

> n1 KBR also argues that Plaintiffs' claims are preempted by the combatant activities exception of the Federal Tort Claims Act. Because the Court finds that this case presents a nonjusticiable political question, it is not necessary to reach this issue.

> n2 The Court discerns no factual dispute regarding the authenticity of these regulations or their application to this case. The Court recognizes that the Army regulations are not referenced in or attached to Plaintiffs' Complaint. The key question presently before the Court is whether the case involves a political question beyond the subject matter jurisdiction of the Court. Therefore, the Court may review the Army regulations in determining whether it has the power to hear this case. *Cf. Lawrence v. Dunbar, 919 F.2d 1525, 1529 (11th Cir. 1990)* (noting that [HN3] court

may review matters outside pleadings in deciding *12(b)(1)* motion).

[*5]

[HN4] The Army regulates all aspects of control, organization, and planning of Army convoy operations. *See generally* F.M. 55-30. Army regulations provide that LOGCAP may be used for Army motor transport operations "when contractor support is determined to be the most effective, expeditious, or cost effective." *Id.* at 1-11. A convoy commander oversees the preparation and planning of convoy operations, and convoy plans are made by military personnel pursuant to standing operating procedures, also developed by military personnel. *Id.* at 5-4, 5-5. The convoy plans made by military personnel include, *inter alia*, placement of vehicles in the convoy, distance between vehicles in the convoy, rate of speed of the convoy, and convoy escort and security. *Id.* at 5-3, 5-4. In preparing the convoy, the convoy commander must inspect convoy personnel and vehicles. n3 *Id.*

> n3 The parties agree that the KBR driver who drove off the bridge was observed having difficulty operating his truck shortly before the convoy mission began. The convoy commander permitted him to drive anyway.

[*6]

DISCUSSION

The central question in this case is whether the political question doctrine applies to bar wrongful death and survivor claims by the family of a U.S. soldier killed during the war in Iraq due to the alleged negligence of a government contractor. [HN5] The political question doctrine is "a function of the separation of powers," *Baker v. Carr,* 369 U.S. 186, 210, 82 S. Ct. 691, 7 L. Ed. 2d 663 (1962), and it "excludes from judicial review those controversies which revolve around policy choices and value determinations constitutionally committed for resolution to the halls of Congress or the confines of the Executive Branch." *Japan Whaling Asso. v. American Cetacean Soc., 478 U.S. 221, 230, 106 S. Ct. 2860, 92 L. Ed. 2d 166 (1986).*[HN6] In *Baker,* the Supreme Court identified six hallmarks of political questions:

> [1] a textually demonstrable constitutional commitment of the issue to a coordinate political department;
>
> [2] a lack of judicially discoverable and manageable standards for resolving it;

> [3] the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion;
>
> [4] the impossibility of a court's undertaking independent resolution [*7] without expressing lack of the respect due coordinate branches of government;
>
> [5] an unusual need for unquestioning adherence to a political decision already made; or
>
> [6] the potentiality of embarrassment from multifarious pronouncements by various departments on one question.

*Baker, 369 U.S. at 217.* At least one of these characteristics is required to invoke the political question doctrine. *Aktepe v. United States, 105 F.3d 1400, 1403 (11th Cir. 1997).*

The Eleventh Circuit applied the *Baker v. Carr* analysis in *Aktepe.* In *Aktepe,* two live missiles from a U.S. ship struck a Turkish ship during a NATO training exercise, and the Turkish Navy sailors sued the United States for damages. The training exercise was under the command of a U.S. Navy Admiral, and the U.S. ship was under the command of a U.S. Navy Vice Admiral. The complaint alleged negligence relating to Navy communication, training, and drill procedures. The Eleventh Circuit found that most, if not all, of *Baker's* indicia of political questions were met. *Aktepe, 105 F.3d at 1403.* First, the court found that the legislative and executive [*8] branches have responsibility for military training procedures because there is a "textually demonstrable constitutional commitment" of military strategy to the political branches of the government: the Constitution confers upon the legislative and executive branches responsibility for oversight and control of military force. *Id.; accord* U.S. Const. art. I, § 8, cls. 11-16; U.S. Const. art. II, § 2; *Gilligan v. Morgan, 413 U.S. 1, 10, 93 S. Ct. 2440, 37 L. Ed. 2d 407 (1973).* As noted by the Eleventh Circuit, the political branches are accorded "a particularly high degree of deference in the area of military affairs." *Aktepe, 105 F.3d at 1403.* Second, the court in *Aktepe* found that there were no judicially discoverable and manageable standards for resolving the questions raised by the suit because the court would have to determine how a reasonable military force would have conducted the training exercise. *Id. at 1404.* Third, the court found that it would have to make policy decisions "of a kind appropriately reserved for military discretion." *Id.* Fourth, the court found that adjudicating the case would

express a lack of respect for the political branches [*9] of the government. *Id.* n4

n4 *Cf. Gilligan v. Morgan, 413 U.S. 1, 3, 93 S. Ct. 2440, 37 L. Ed. 2d 407 (1973).* The situation in *Gilligan* is somewhat distinguishable from the instant case because the plaintiffs, students of Kent State University, were seeking *injunctive* relief against the governor of Ohio and the Ohio National Guard. The case is nonetheless instructive. Because Congress and the President had responsibility for oversight of various aspects of the National Guard, the *Gilligan* court found that the plaintiffs' "broad call on judicial power to assume continuing regulatory jurisdiction over the activities of the Ohio National Guard" would "embrace critical areas of responsibility vested by the Constitution in the Legislative and Executive Branches of the Government." *Id. at 6-7.* The Supreme Court also found that there was a lack of judicially discoverable and manageable standards for resolving the issue because it would require a judicial evaluation of military procedures and policies. *Id. at 8.* The Court recognizes that *Gilligan* and later cases suggest that a damages suit against the United States for unlawful conduct by military personnel would not be barred by political question doctrine in some circumstances, but these cases focus on injury to *civilians-*"injury resulting from military intrusion into the *civilian* sector." *Koohi v. United States, 976 F.2d 1328, 1332-33 (9th Cir. 1992)* (emphasis added); *see also Gilligan, 413 U.S. at 11-12.* None of these cases suggest that political question doctrine does not apply in cases such as the instant case, where a member of the military was injured in the course of military operations.

[*10]

The Court recognizes that the claims in *Aktepe* were against the United States and not a government contractor. The Court nonetheless finds that the same principles apply in this case and that the same indicia of a political question exist here. At the time of his death, Plaintiffs' son was working in cooperation with government contractor employees to achieve military objectives in a wartime convoy operation that was planned and executed by the military. He was killed due to the alleged negligence of the government contractor's employees, which were performing their duties subject to the military's planning, orders, and regulations. [HN7] It is well accepted that, in general, soldiers injured at the hands of the military raise political questions. *See Bentzlin v. Hughes Aircraft Co., 833 F. Supp. 1486, 1498 (C.D. Cal. 1993).* The Court

finds that a soldier injured at the hands of a contractor which is performing military functions subject to the military's orders and regulations also raises the same political questions. An examination of the purposes of the political question doctrine supports this conclusion.

As discussed *supra*, [HN8] one important function of the political [*11] question doctrine is to prevent the courts from deciding questions that were intended by the Constitution to be left to the political branches. *See Gilligan, 413 U.S. at 10-11.* There is a textually demonstrable constitutional commitment of oversight and control of military force to the legislative and executive branches, and those political branches receive deference in the area of military affairs. *See Aktepe, 105 F.3d at 1403.* n5 When the military seeks to accomplish its mission by partnering with government contractors who are subject to the military's orders, regulations, and convoy plan, the use of those civilian contractors to accomplish the military objective does not lessen the deference due to the political branches in this area.

n5 *See also Gilligan, 413 U.S. at 10* ("The complex, subtle, and professional decisions as to the composition, training, equipping, and control of a military force are essentially professional military judgments, subject *always* to civilian control of the Legislative and Executive Branches.").

[*12]

[HN9] Another purpose of the political question doctrine is to prevent courts from attempting to resolve questions where there are no judicially discoverable and manageable standards for resolving the questions. Plaintiffs contend that there are judicially discoverable and manageable standards for resolving the questions in this suit. The Court does not agree. While Plaintiffs' simplistic labeling of this case as a "garden variety road wreck" is superficially appealing, it ignores the true nature of the circumstances giving rise to this tragedy. This wreck occurred in a combat zone during wartime while Plaintiffs' son, along with his Supply and Transport Troop and a group of civilian contractors, transported supplies from one military camp to another. The convoy operation was planned by the military, which determined the placement of vehicles in the convoy, the speed of the convoy, and the distance between vehicles in the convoy. Clearly, these circumstances differ dramatically from driving on an interstate highway or county road in the United States without any constraints other than ordinary skill, judgment, and prudence. The question here is not just what a reasonable driver would do-it [*13] is what a reasonable driver in a combat zone, subject to military regulations

and orders, would do. That question necessarily implicates the wisdom of the military's strategic and tactical decisions, a classic political question over which this Court has no jurisdiction.

For all of these reasons, the Court finds that this case presents a non-justiciable political question. Accordingly, KBR's Motion to Dismiss is granted based upon lack of subject matter jurisdiction. n6

n6 For the same reasons described in this Order, the Court also finds that it does not have subject matter jurisdiction over Plaintiffs' claims against the remaining individual Defendants. Accordingly, Plaintiffs' entire Complaint is dismissed for lack of subject matter jurisdiction.

IT IS SO ORDERED, this 5th day of July, 2006.

S/ Clay D. Land

UNITED STATES DISTRICT JUDGE

# EXHIBIT 17

| SOLICITATION, OFFER AND AWARD | 1 THIS CONTRACT IS A RATED ORDER UNDER DPAS (15 CFR 350) | RATING | PAGE OF PAGES 1 : 55 |
|---|---|---|---|

| 2 CONTRACT (Proc Inst Ident) NO | 3 SOLICITATION NO | 4 TYPE OF SOLICITATION | 5 DATE ISSUED | 6 REQUISITION/PURCHASE NO |
|---|---|---|---|---|
| S-LMAQM-04 C-0030 | | [ ] SEALED BID (IFB)<br>[ ] NEGOTIATED (RFP) | See Block 28 | |

| 7 ISSUED BY | CODE | | 8 ADDRESS OFFER TO (If other than Item 7) |
|---|---|---|---|

U.S. DEPARTMENT OF STATE
OFFICE OF ACQUISITION, A/LM/AQM RM  206 SA-6
PO BOX 9115 ROSSLYN STATION
ARLINGTON, VA 22219
Phone  703-875-5238          Fax  703-875-5272

NOTE  In sealed bid solicitation "offer" and "offeror" mean "bid" and "bidder"

## SOLICITATION

9  Sealed offers in original and ___ copies for furnishing the supplies or services in the Schedule will be received at the place specified, in the depository located in ___ until ___ local time

CAUTION  LATE Submissions Modifications, and Withdrawals See Section L Provision No 52 215 1  All offers are subject to all terms and conditions contained in this solicitation.

| 10  FOR INFORMATION CALL | A  NAME<br>Brian M Carper | B  TELEPHONE (NO COLLECT CALLS)<br>703-875-5238 | C  E-MAIL ADDRESS<br>CarperBM@state.gov |
|---|---|---|---|

### 11  TABLE OF CONTENTS

| (x) | SEC | DESCRIPTION | PAGE(S) | (x) | SEC | DESCRIPTION | PAGE(S) |
|---|---|---|---|---|---|---|---|
| | | PART I  THE SCHEDULE | | | | PART II  CONTRACT CLAUSES | |
| X | A | SOLICITATION/CONTRACT FORM | 1 | X | I | CONTRACT CLAUSES | 44 |
| X | B | SUPPLIES OR SERVICE AND PRICES/COSTS | 2 | | | PART III  LIST OF DOCUMENTS, EXHIBITS AND OTHER ATTACH | |
| X | C | DESCRIPTION/SPECS/WORK STATEMENT | 10 | X | J | LIST OF ATTACHMENTS | 55 |
| X | D | PACKAGING AND MARKETING | 30 | | | PART IV  REPRESENTATIONS AND INSTRUCTIONS | |
| X | E | INSPECTION AND ACCEPTANCE | 31 | | K | REPRESENTATIONS, CERTIFICATIONS AND | |
| X | F | DELIVERIES OR PERFORMANCE | 32 | | | OTHER STATEMENTS OF OFFERORS | |
| X | G | CONTRACT ADMINISTRATION | 34 | | L | INSTRS, COND AND NOTICES TO OFFERORS | |
| X | H | SPECIAL CONTRACT REQUIREMENTS | 37 | | M | EVALUATION FACTORS FOR AWARD | |

### OFFER (Must be fully completed by offeror)

NOTE  ITEM 12 does not apply if the solicitation includes the provisions at 52 214 16, Minimum Bid Acceptance Period

12  In compliance with the above the undersigned agrees  if this offer is accepted within ___ calendar days (120 calendar days unless a different period is inserted by the offer)  from the date for receipt of offers specified above, to furnish any or all items upon which prices are offered at the price set opposite each item, delivered at the designated point(s), within the time specified in the schedule

| 13  DISCOUNT FOR PROMPT PAYMENT  SEE 14 (See section I, Clause No 52 232 8) | 10 CALENDAR DAYS % | 20 CALENDAR DAYS % | 30 CALENDAR DAYS % | CALENDAR DAYS % |
|---|---|---|---|---|

| 14  ACKNOWLEDGMENT OF AMENDMENTS (The offeror acknowledges receipt of amendments to the solicitation and related documents ) numbered and dated | AMENDMENT NO | DATE | AMENDMENT NO | DATE |
|---|---|---|---|---|
| | 0001 | 10-28 2003 | 0005 | 11 25 2003 |
| | 0002 | 11 04-2003 | 0006 | 11 26 2003 |
| | 0003 | 11-07-2003 | 0007 | 1-13 2004 |
| | 0004 | 11-14 2003 | 0008 | 1-26-2004 |
| | | | 0009 | 2-10-2004 |

| 15A NAME AND ADDRESS OF OFFEROR | CODE | FACILITY | 16  NAME AND TITLE OF PERSON AUTHORIZED TO SIGN OFFER (Type or print) |
|---|---|---|---|
| Dyncorp International LLC<br>One Ridgmar Place<br>6500 West Freeway Suite 600<br>Fort Worth TX 76116 | | | John W Burns<br>Sr VICE PRESIDENT, CONTRACT<br>ADMINISTRATION |

| 15B TELEPHONE NO (Include area code) 972 - 871 - 6710 | 15C CHECK IF REMITTANCE ADDRESS IS DIFFERENT FROM ABOVE  ENTER SUCH ADDRESS [X] | 17 SIGNATURE | 18  OFFER DATE 18 FEBRUARY 2004 |
|---|---|---|---|

### AWARD (To be completed by Government)

| 19  ACCEPTED AS TO ITEM NUMBERED Contract S LMAQM 04-C-0030 and amendments 0001 to 0008 | 20  AMOUNT $1,751,076 575 00 | 21  ACCOUNTING AND APPROPRIATION N/A Funding to be provided Incrementally | |
|---|---|---|---|

| 22  AUTHORITY FOR USING OTHER THAN FULL AND OPEN COMPETITION [ ] 10 U S C  2304(c)(   )     [ ] 41 U S C  253(c)(   ) | 23  SUBMIT INVOICES TO ADDRESS SHOWN IN (4 copies unless otherwise specified) | ITEM |
|---|---|---|

| 24  ADMINISTRATION BY (If other than Item 7) | CODE | 25  PAYMENT WILL BE MADE BY | CODE |
|---|---|---|---|

| 26  NAME OF CONTRACTING OFFICER (Type or print) Ann H Truitt | 27  UNITED STATES OF AMERICA (Signature of Contracting Officer) | 28  AWARD DATE 2/18/04 |
|---|---|---|

IMPORTANT - Award will be made on this form  or on the Standard Form 26  or by other authorized official written notice

NSN 7540-01 152 8064                                                          STANDARD FORM 33 (REV 9 97)

EXHIBIT
17

# EXHIBIT 18

LEXSEE 2004 U.S. DIST. LEXIS 9658

**PADCOM, INC., Plaintiff, v. NETMOTION WIRELESS, INC. and DATABASE
SOLUTIONS, INC., Defendants.**

**Civ. No. 03-983-SLR**

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF DELAWARE**

*2004 U.S. Dist. LEXIS 9658*

**May 24, 2004, Decided**

**SUBSEQUENT HISTORY:** Summary judgment denied
by *Padcom, Inc. v. Netmotion Wireless, Inc.,* 2006 U.S.
Dist. LEXIS 6548 (D. Del., Feb. 22, 2006)

**DISPOSITION:**  [*1]  Defendants' motion to dismiss
and to transfer denied.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Plaintiff patent holder
sued defendant alleged patent infringers, claiming in-
fringement of two patents and intentional and wrongful
interference with contractual and business relations with
potential customers. One infringer moved to dismiss the
lawsuit for lack of personal jurisdiction pursuant to Fed.
R. Civ. P. 12(b)(2). The other infringer moved to transfer
the lawsuit under 28 U.S.C.S. § 1404(a).

**OVERVIEW:** The holder developed, made, licensed,
sold, and serviced software and hardware products to
enhance connectivity for wireless network users. One
infringer had its principal place of business in Washing-
ton and the other infringer had its principal place of
business in New Jersey. The court denied both motions.
The infringers had sufficient contacts for personal juris-
diction under the Delaware long-arm statute, Del. Code
Ann. tit. 10, § 3104. The infringers repeatedly transacted
and solicited business in Delaware. Trial versions of
products were available. A computer company included
the infringers' marketing information and a free trial ver-
sion of its software with its products. The infringers also
contacted Delaware businesses by a telemarketer and
they mailed promotional materials to businesses in the
state. Further, the exercise of jurisdiction comported with
due process. Due to the web site and marketing, the in-
fringers reasonably anticipated suit in this forum. The
court also denied the motion to transfer. In
addition to deferring to the holder's forum choice, the

court held that the infringers failed to show that conven-
ience or public interest warranted transfer.

**OUTCOME:** The court denied the motion to dismiss
and the motion to transfer.

**LexisNexis(R) Headnotes**

*Civil Procedure > Jurisdiction > Jurisdictional Sources
> General Overview*
*Civil Procedure > Jurisdiction > Personal Jurisdiction
& In Rem Actions > In Personam Actions > General
Overview*
*Civil Procedure > Pleading & Practice > Defenses,
Demurrers, & Objections > Motions to Dismiss*
[HN1] Pursuant to Fed. R. Civ. P. 12(b)(2), a court may
dismiss a suit for lack of jurisdiction over the person.
According to the United States Supreme Court, before a
court may exercise personal jurisdiction over a defen-
dant, there must be more than notice to the defendant and
a constitutionally sufficient relationship between the de-
fendant and the forum. There must also be a basis for the
defendant's amenability to service of summons. Absent
consent, this means there must be authorization for ser-
vice of summons on the defendant. The principle pro-
nounced above is traditionally described as a two-step
analysis: First, whether there is amenability to service
and, second, whether the exercise of jurisdiction offends
the defendant's right to due process.

*Civil Procedure > Pleading & Practice > Service of
Process > Methods > General Overview*
[HN2] Fed. R. Civ. P. 4(e)(1) states that service of a
summons may be effected pursuant to the law of the state
in which the district court is located.


EXHIBIT
18

*Civil Procedure > Jurisdiction > Personal Jurisdiction & In Rem Actions > In Personam Actions > General Overview*
[HN3] The Delaware long-arm statute, Del. Code Ann. tit. 10, § 3104(c), has been construed broadly to confer jurisdiction to the maximum extent possible under the due process clause.

*Civil Procedure > Jurisdiction > Personal Jurisdiction & In Rem Actions > In Personam Actions > General Overview*
*Civil Procedure > Federal & State Interrelationships > Choice of Law > General Overview*
[HN4] According to the Federal Circuit Court of Appeals, when the question before a court is the exercise of personal jurisdiction over an out-of-state accused infringer, the law of the federal circuit, rather than that of the regional circuit in which the case arose, is applicable. The Federal Circuit Court of Appeals has instructed that, in interpreting the meaning of state long-arm statutes, it defers to the interpretations of the relevant state and federal courts, including their determinations regarding whether or not such statutes are intended to reach to the limit of federal due process.

*Civil Procedure > Jurisdiction > Personal Jurisdiction & In Rem Actions > In Personam Actions > Minimum Contacts*
*Evidence > Procedural Considerations > Burdens of Proof > General Overview*
[HN5] Once a jurisdictional defense is raised, the burden is on the plaintiff to demonstrate with reasonable particularity that sufficient minimum contacts have occurred with between the forum state and defendant to support jurisdiction. To meet this burden, the plaintiff must demonstrate either specific or general jurisdiction. Specific jurisdiction arises when the particular cause of action arose from the defendant's activities within the forum state. In contrast, general jurisdiction does not require that the defendant's connections be related to the particular cause of action, but that the defendant has continuous or systematic contacts with the forum state.

*Civil Procedure > Jurisdiction > Personal Jurisdiction & In Rem Actions > In Personam Actions > General Overview*
*Insurance Law > Property Insurance > Coverage > Real Property > General Overview*
[HN6] The Delaware long-arm statute provides that personal jurisdiction is proper over any nonresident who, in person or through an agent: (1) Transacts any business or performs any character of work or service in the State;

(2) Contracts to supply services or things in this State; (3) Causes tortious injury in the State by an act or omission in this State; (4) Causes tortious injury in the State or outside of the State by an act or omission outside the State if the person regularly does or solicits business, engages in any other persistent course of conduct in the State or derives substantial revenue from services, or things used or consumed in the State; (5) Has an interest in, uses or possesses real property in the State; or (6) Contracts to insure or act as surety for, or on, any person, property, risk, contract, obligation or agreement located, executed or to be performed within the State at the time the contract is made, unless the parties otherwise provide in writing. Del. Code Ann. tit. 10, § 3104(c). These provisions have been construed liberally so as to provide jurisdiction to the maximum extent possible in order to provide residents a means of redress against those not subject to personal service within the state.

*Civil Procedure > Jurisdiction > Personal Jurisdiction & In Rem Actions > In Personam Actions > Minimum Contacts*
*Civil Procedure > Appeals > Appellate Jurisdiction > State Court Review*
[HN7] The Delaware Supreme Court has interpreted Del. Code Ann. tit. 10, § 3104(c)(1) as a specific jurisdiction provision that requires a nexus between the cause of action and the conduct used as a basis for jurisdiction. Section 3104(c)(4) is a general jurisdiction provision that allows a defendant's contacts with a forum state to be unrelated to the cause of action. The Federal Circuit Court of Appeals has found that when a defendant has purposefully shipped the accused product into the forum state through an established distribution channel no more is usually required to establish specific jurisdiction.

*Civil Procedure > Jurisdiction > Personal Jurisdiction & In Rem Actions > Constitutional Limits*
*Civil Procedure > Jurisdiction > Personal Jurisdiction & In Rem Actions > In Personam Actions > Minimum Contacts*
*Computer & Internet Law > Civil Actions > General Overview*
[HN8] The traditional jurisdictional rules have to be adjusted to account for new factual scenarios created by the Internet. Under traditional jurisdictional analysis, the exercise of specific personal jurisdiction requires that the plaintiff's cause of action is related to or arises out of the defendant's contacts with the forum. Beyond this basic nexus, for a finding of specific personal jurisdiction, the Due Process Clause of the Fifth Amendment requires (1) that the defendant have constitutionally sufficient minimum contacts with the forum, and (2) that subjecting the

2004 U.S. Dist. LEXIS 9658, *

defendant to the court's jurisdiction comports with traditional notions of fair play and substantial justice.

**Computer & Internet Law > Internet Business > General Overview**
**Trademark Law > Conveyances > Franchises**
**Trademark Law > Infringement Actions > General Overview**
[HN9] The United States Court of Appeals for the Third Circuit's test is whether the defendant intentionally and knowingly transacted business with residents of the forum state, and had significant other contacts with the forum besides those generated by its web site.

**Civil Procedure > Jurisdiction > General Overview**
**Computer & Internet Law > Internet Business > General Overview**
**Computer & Internet Law > Online Advertising > General Overview**
[HN10] Non-Internet factors that a district court should consider in determining if contacts are sufficient to support an exercise of personal jurisdiction are: business trips to the forum state, telephone and fax communications directed to the forum state, purchase contracts with forum state residents, contracts that apply the law of the forum state, and advertisements in local newspapers. Other relevant evidence that might support the exercise of personal jurisdiction is that the defendant purposely and knowingly conducted business in the forum state by directly targeting its web site to the state.

**Civil Procedure > Jurisdiction > Personal Jurisdiction & In Rem Actions > Constitutional Limits**
[HN11] Due process mandates that the defendant have certain minimum contacts with the forum state to ensure that the lawsuit does not offend traditional notions of fair play and substantial justice. In Burger King v. Rudzewicz, the United States Supreme Court added the further requirement that the minimum contacts be "purposeful" contacts, noting that even a single act can support jurisdiction so long as it creates a "substantial connection" with the forum, in contrast to an "attenuated affiliation." Further, the Supreme Court has directed that courts consider: (1) whether the defendant reasonably could have anticipated being haled into the forum state's court, (2) the burden imposed on the defendant by litigating in that forum, and (3) plaintiff's interest in the forum state.

**Civil Procedure > Venue > Federal Venue Transfers > General Overview**
[HN12] See 28 U.S.C.S. § 1404(a).

**Civil Procedure > Venue > Federal Venue Transfers > Convenience Transfers**
**Evidence > Procedural Considerations > Burdens of Proof > General Overview**
[HN13] Congress intended through 28 U.S.C.S. § 1404 to place discretion in the district court to adjudicate motions to transfer according to an individualized, case-by-case consideration of convenience and the interests of justice. The burden of establishing the need to transfer rests with the movant to establish that the balance of convenience of the parties and witnesses strongly favors the defendants. Unless the balance is strongly in favor of a transfer, the plaintiff's choice of forum should prevail. The deference afforded plaintiff's choice of forum will apply as long as a plaintiff has selected the forum for some legitimate reason. Although transfer of an action is usually considered as less convenient to a plaintiff if the plaintiff has not chosen its "home turf" or a forum where the alleged wrongful activity occurred, the plaintiff's choice of forum is still of paramount consideration, and the burden remains at all times on the defendants to show that the balance of convenience and the interests of justice weigh strongly in favor of transfer.

**Civil Procedure > Venue > Forum Non Conveniens**
**Civil Procedure > Federal & State Interrelationships > Erie Doctrine**
**Civil Procedure > Judgments > Entry of Judgments > Enforcement & Execution > General Overview**
[HN14] The United States Court of Appeals for the Third Circuit has indicated the analysis for transfer is very broad. Although emphasizing that there is no definitive formula or list of factors to consider, the court has identified potential factors it characterized as either private or public interest. The private interests include: (1) plaintiff's forum preference as manifested in the original choice, (2) defendant's preference, (3) whether the claim arose elsewhere, (4) the convenience of the parties as indicated by their relative physical and financial condition, (5) the convenience of the witnesses--but only to the extent that the witnesses may actually be unavailable for trial in one of the fora, and (6) location of books and records, similarly limited to the extent that the files could not be produced in the alternative forum. The public interests include: (1) the enforceability of the judgment, (2) practical considerations that could make the trial easy, expeditious, or inexpensive, (3) the relative administrative difficulty in the two fora resulting from court congestion, (4) the local interest in deciding local controversies at home, (5) the public policies of the fora, and (6) the familiarity of the trial judge with the applicable state law in diversity cases.

2004 U.S. Dist. LEXIS 9658, *

**COUNSEL:** Josy W. Ingersoll, Esquire, John W. Shaw, Esquire, and Adam W. Poff, Esquire of Young Conaway Stargatt & Taylor, LLP, Wilmington, Delaware. Of Counsel: Neil F. Greenblum, Esquire, Van C. Ernest, Esquire and Jill M. Browning, Esquire of Greenblum & Bernstein, P.L.C., Reston, Virginia.

Mary B. Graham, Esquire and James W. Parrett, Jr. of Morris, Nichols, Arsht & Tunnell, Wilmington, Delaware. Of Counsel: John Allcock, Esquire, M. Elizabeth Day, Esquire, William G. Goldman, Esquire and Michael G. Schwartz, Esquire of Gray, Cary Ware & Freidenrich, LLP, Palo Alto, California.

**JUDGES:** Sue L. Robinson, United States District Judge.

**OPINION BY:** Sue L. Robinson

**OPINION:**

MEMORANDUM OPINION

Wilmington, Delaware

**ROBINSON, Chief Judge**

**I. INTRODUCTION**

On October 26, 2003, plaintiff Padcom Inc. ("Padcom") filed this patent action alleging infringement of its *United States Patent Nos. 6,418,324* ("the '*324 patent*") and 6,198,920 ("the '920 patent") by defendants NetMotion Wireless, Inc. ("NetMotion") and Database Solutions, Inc. ("DSI"). (D.I. 1) Padcom also contends that NetMotion intentionally and wrongfully interfered with [*2] contractual and business relations with potential customers.

NetMotion has moved to dismiss based on lack of personal jurisdiction pursuant to *Fed.R.Civ.P. 12(b)(2)* and improper venue under *Fed. R. 12(b)(3).* (D.I. 9) DSI has moved to transfer the remaining portion of the litigation to the Northern District of California pursuant to *28 U.S.C. § 1404(a).* n1 Alternatively, if the court dismisses NetMotion and declines to transfer the case against DSI, defendants move to stay this action pending resolution of the California case. Padcom opposes the motion (D.I. 23, 24) and defendants' have filed their reply. (D.I. 27, 28)

n1 On November 7, 2003, NetMotion and DSI filed a declaratory action in the Northern District of California mirroring the issues raised in this action. By order and stipulation dated December 10, 2003, the California action was stayed pending resolution of this first-filed action. Net-Motion Wireless, Inc. v. Padcom, Inc., 03-cv-04963-MMC, (N.D. Ca. 2003)(D.I. 12). A case management conference is scheduled for June 18, 2004. (Id., D.I. 19)

[*3]

**II. BACKGROUND**

**A. The parties**

Padcom is a Pennsylvania corporation with its principal place of business in Bethlehem, Pennsylvania. Founded in 1989, Padcom is in the business of developing, making, licensing, selling and servicing software and hardware products that enhance connectivity for wireless network uses. (D.I. 1) The patent-in-suit relate to wireless communications and data transfers between remote devises and host systems. (D.I. 10)

NetMotion is a corporation organized under the laws of Washington with a principal place of business in Seattle, Washington. (D.I. 11) NetMotion is in the business of designing, developing and selling mobility software. Mobility software is client/server based software that extends the enterprise network to the mobile environment and allows mobile users on both wide area and local area networks secure access to the enterprise application and information. (D.I. 10) NetMotion's corporate office, research and development facility, and engineering, sales, marketing and manufacturing facilities are all located in Seattle. Of NetMotion's 53 employees, 46 reside in Washington. The other seven employees reside in Ohio, Pennsylvania, Florida, [*4] Georgia, Texas, California and Illinois. (D.I. 11) NetMotion maintains and supports a web site in Washington. The web site provides: 1) company and product information; 2) partner information; and 3) download information. None of NetMotion's products are available for purchase through its website; however, free trial versions of NetMotion's software are available for download from the web site. (D.I. 12)

On February 2, 2001, a predecessor of NetMotion, WRQ, Inc., entered into a Value Added Reseller ("VAR") agreement with DSI. (D.I. 11, Ex. A) DSI is a Delaware corporation with its principal place of business in Cherry Hill, New Jersey. (D.I. 13) DSI does not have an office in Delaware. DSI is in the business of providing integrated enterprise applications, databases and network solutions. DSI is a reseller of NetMotion products, however, DSI has never used, manufactured, sold or offered for sale any NetMotion product in Delaware or elsewhere. D.I. 13 P 6) Pursuant to the VAR agreement, NetMotion has agreed to indemnify DSI.

## III. STANDARD OF REVIEW

[HN1] Pursuant to *Rule 12(b)(2) of the Federal Rules of Civil Procedure*, a court [*5] may dismiss a suit for lack of jurisdiction over the person. According to the United States Supreme Court,

> before a court may exercise personal jurisdiction over a defendant, there must be more than notice to the defendant and a constitutionally sufficient relationship between the defendant and the forum. There must also be a basis for the defendant's amenability to service of summons. Absent consent, this means there must be authorization for service of summons on the defendant.

*Omni Capital Int'l v. Rudolf Wolff & Co., 484 U.S. 97, 104, 98 L. Ed. 2d 415, 108 S. Ct. 404 (1987)*. The principle pronounced above is traditionally described as a two-step analysis: First, whether there is amenability to service and, second, whether the exercise of jurisdiction offends the defendant's right to due process.

*Rule 4(e)(1) of the Federal Rules of Civil Procedure* [HN2] states that service of a summons may be effected "pursuant to the law of the state in which the district court is located." [HN3] The Delaware long-arm statute, *10 Del. C. § 3104(c)*, has been construed broadly to confer jurisdiction to the maximum extent possible under the due [*6] process clause. n2 *LaNuova D & B S.p.A. v. Bowe Co. Inc., 513 A.2d 764, 768 (Del. 1986)*.

> n2 [HN4] According to the Federal Circuit, when the question before the court is the exercise of personal jurisdiction over an out-of-state accused infringer, the law of the Federal Circuit, "rather than that of the regional circuit in which the case arose," is applicable. *Akro Corp. v. Luker, 45 F.3d 1541, 1543 (Fed. Cir. 1995)*. The Court has instructed that, "in interpreting the meaning of state long-arm statutes, we defer to the interpretations of the relevant state and federal courts, including their determinations regarding whether or not such statutes are intended to reach to the limit of federal due process." *Graphic Controls Corp. v. Utah Med. Prods., Inc., 149 F.3d 1382, 1386 (Fed. Cir. 1998)*. The court acknowledges that the Delaware Supreme Court has not collapsed the analysis under the

Delaware long-arm statute into the constitutional due process analysis, as some courts have done.

[*7]

However, since the Delaware Supreme Court has not determined that *§ 3104(c)* is coextensive with federal due process, the court must determine whether the exercise of personal jurisdiction is compatible with both the specific requirements of the Delaware long-arm statute and with defendant's constitutional rights to due process. *Intel Corp. v. Silicon Storage Tech., Inc., 20 F. Supp. 2d 690, 694 (D. Del. 1998)*; see generally, *Int'l Shoe Co. v. Washington, 326 U.S. 310, 90 L. Ed. 95, 66 S. Ct. 154 (1945)*.

[HN5] Once a jurisdictional defense is raised, the burden is on the plaintiff to demonstrate with reasonable particularity that sufficient minimum contacts have occurred with between the forum state and defendant to support jurisdiction. n3 *Provident National Bank v. California Federal Savings & Loan Assoc., 819 F.2d 434, 437 (3d Cir. 1987)*. To meet this burden, the plaintiff must demonstrate either specific or general jurisdiction. Specific jurisdiction arises when the particular cause of action arose from the defendant's activities within the forum state. In contrast, general jurisdiction does not require that the defendant's connections be related [*8] to the particular cause of action, but that the defendant has continuous or systematic contacts with the forum state. *American Bio Medica Corp. v. Peninsula Drug Analysis Co., 1999 U.S. Dist. LEXIS 12455, Civ. No. 99-218-SLR, 1999 WL 615175 (D. Del. 1999)*.

> n3 The record reflects that the parties have engaged in limited jurisdictional discovery. (D.I. 24, Ex. A, Ex. B)

[HN6] The Delaware long-arm statute provides that personal jurisdiction is proper over any nonresident who, in person or through an agent:

> (1) Transacts any business or performs any character of work or service in the State;
> (2) Contracts to supply services or things in this State;
> (3) Causes tortious injury in the State by an act or omission in this State;
> (4) Causes tortious injury in the State or outside of the State by an act or omission outside the State if the person regularly does or solicits business, engages in any

other persistent course of conduct in the State or derives substantial revenue from services, or things used or consumed in the [*9] State;

(5) Has an interest in, uses or possesses real property in the State; or

(6) Contracts to insure or act as surety for, or on, any person, property, risk, contract, obligation or agreement located, executed or to be performed within the State at the time the contract is made, unless the parties otherwise provide in writing.

*10 Del. C. § 3104(c).* The above provisions have been construed "liberally so as to provide jurisdiction to the maximum extent possible" in order "to provide residents a means of redress against those not subject to personal service within the State." *Boone v. Oy Partek Ab, 724 A.2d 1150, 1156-57 (Del. Super. 1997).*

## IV. DISCUSSION

NetMotion argues that its contacts with Delaware are too attenuated to establish either specific or general jurisdiction under Delaware's long-arm statute. (D.I. 10)

Padcom asserts that NetMotion is subject to jurisdiction under three sections of the Delaware long-arm statute: *§ 3104(c)(1), (c)(4)and (c)(3).* Padcom argues that *§ 3104(c)(1)and (c)(4),* confer jurisdiction because NetMotion has repeatedly transacted and solicited business in Delaware. Specifically: (1) NetMotion shipped an [*10] infringing product to the Wilmington Police Department to enable them to evaluate the product in anticipation of a sale; (2) NetMotion has contacted Delaware residents by mail, email and telemarketing, either cold calling or in response to inquiries about the product; and (3) NetMotion operates a national interactive web site.

In opposition, NetMotion presents the affidavit of its CFO, Bob Colliton. (D.I. 12, 28) Colliton avers:

NetMotion maintains and supports a web site in the state of Washington, but none of NetMotion's products are available for purchase through NetMotion's web site. NetMotion's web site offers free trial down-loads of its software, as well as white papers that outline the capabilities of NetMotion's software products. NetMotion has not contacted or otherwise engaged any company in Delaware to download a free trial version of NetMotion's software. NetMotion is aware of one trial download of its software from an en-

tity in Delaware - the Wilmington Police Department. This download was not the result of any targeted or direct marketing on the part of NetMotion. Instead, the Wilmington Police Department was directed to NetMotion's web site through an offer [*11] that Hewlett-Packard included in the purchase of certain models of their iPAQ products. In particular, Hewlett-Packard included marketing information on a number of third party products on the installation CD for the iPAC. NetMotion was one of the wireless companies that Hewlett-Packard chose to include product information about, with a link to NetMotion's web site for a free trial version of the software. At no time prior to or after this download has any employee contacted the Wilmington Police Department. NetMotion's advertising strategy is national in nature. It is not directed to any particular region, state or company. On occasion, NetMotion has utilized the services of a third party telemarketing organization to obtain information regarding potential customers. Prospective customers in Delaware may have been contacted by this third party organization.

(D.I. 12) He states further that NetMotion has never used, sold, manufactured or offered for sale an accused product in Delaware. In his reply declaration, however, Colliton does acknowledge that in January 2004, NetMotion electronically transmitted its Mobility Connection Newsletter nationwide. Over 12,000 received this [*12] material, including 23 entities in Delaware. Nonetheless, Colliton indicates that no revenue was received from the 23 emails. Padcom responds that it is unnecessary to consummate a sale for jurisdictional purposes.*American Bio Medica Corp. v. Peninsula Drug Analysis Co., Inc., 1999 U.S. Dist. LEXIS 12455, Civ. No. 99-218-SLR, 1999 WL 615175 (D. Del. 1999).* Padcom maintains that NetMotion's activities are part of a general business plan to solicit business in Delaware.

[HN7] The Delaware Supreme Court has interpreted *§ 3104(c)(1)* as a specific jurisdiction provision that requires a nexus between the cause of action and the conduct used as a basis for jurisdiction. *LaNuova D & B S.p.A. v. Bowe Co., 513 A.2d at 768. Section 3104(c)(4)* is a general jurisdiction provision that allows the defendants contacts with the forum state to be unrelated to the cause of action. The Federal Circuit has found that when a defendant has "purposefully shipped the accused [product] into [the forum state] through an established

distribution channel no more is usually required to establish specific jurisdiction." *Beverly Hills Fan Co. v. Royal Sovereign Corp., 21 F.3d 1558, 1564 (Fed. Cir. 1994).* [*13]

The record reflects that NetMotion made trial versions of products available on its web site for downloading by consumers located anywhere. There is no evidence of any restrictions on location of the download. NetMotion likewise placed its products into the stream of commerce by allowing Hewlett-Packard to include marketing information about NetMotion with a link to a free trial version of its software and a link NetMotion couches the relationship with Hewlett-Packard as one-sided, i.e., "Hewlett-Packard chose to include product information", the court interprets this as a mutually beneficial agreement.

The Third Circuit Court of Appeals recently explored the contacts necessary for a court to have specific jurisdiction over a defendant based on the operation of a web site. *Toys "R" Us, Inc., v. Step Two, S.A., 318 F.3d 446 (3d Cir. 2003).* In so doing, the Court acknowledged [HN8] the traditional jurisdictional rules have to be adjusted to account for new factual scenarios created by the Internet.

> Under traditional jurisdictional analysis, the exercise of specific personal jurisdiction requires that the "plaintiff's cause of action is related to or arises out [*14] of the defendant's contacts with the forum." Beyond this basic nexus, for a finding of specific personal jurisdiction, the *Due Process Clause of the Fifth Amendment* requires (1) that the "defendant have constitutionally sufficient minimum contacts with the forum," and (2) that "subjecting the defendant to the court's jurisdiction comports with traditional notions of fair play and substantial justice,"

*Id. at 451* (citations omitted); see also, *Zippo Mfg. Co. v. Zippo Dot Com, Inc., 952 F. Supp. 1119 (W.D. Pa. 1997)* (sliding scale analysis for personal jurisdictional issues in web site cases).

[HN9] The Third Circuit's test is whether the defendant "intentionally and knowingly transacted business with residents of the forum state, and had significant other contacts with the forum besides those generated by its web site." *Toys "R" Us, 318 F.3d at 453.* There, the Court considered a trademark infringement and unfair competition action filed pursuant to the Lanham Act, *15*

*U.S.C. § 1501 et seq.,* and New Jersey state law. The defendant was a Spanish corporation that owns or franchises toy stores in Spain and [*15] nine other countries but none in the United States. The defendant lacked any offices, bank accounts or employees in the United States. Further, the defendant did not direct any advertising or marketing efforts in the United States. The record did reflect that some merchandise for defendant's stores was purchased in the United States. From defendant's Internet web site, consumers could make online purchases; however, the site clearly was intended for users outside of the United States. For example, the price of items was noted in Spanish pesetas and Buros and goods ordered from the site could only be shipped within Spain. The electronic newsletter could be received by anyone with the only requirement being name and email address. In reversing and remanding to the district court on the issue of jurisdictional discovery, n4 the Third Circuit recognized that the record was too limited to provide an "occasion to spell out the exact mix of Internet and non-Internet contacts required to support an exercise of personal jurisdiction [,instead,] that determination should be made on a case-by-case basis by assessing the 'nature and quality of the contacts.'" *Id. at 453*; (quoting [*16] *Zippo, 952 F. Supp. at 1127*). [HN10] Non-Internet factors that a district court should consider are: business trips to the forum state; telephone and fax communications directed to the forum state; purchase contracts with forum state residents; contracts that apply the law of the forum state; and advertisements in local newspapers. *Toys "R" Us, 318 F.3d at 453-454.* Other relevant evidence that might support the exercise of personal jurisdiction is that the defendant purposely and knowingly conducted business in the forum state by directly targeting its web site to the state. *Id. at 454.*

> n4 The district court denied plaintiff the opportunity to conduct jurisdictional discovery to address the defendant's motion attacking jurisdiction.

In light of this authority, the court finds that NetMotion knowingly conducted business with Delaware residents. Discovery has revealed that the Wilmington Police Department at least tried to use the free trial download of NetMotion's mobility [*17] software. (D.I. 24, Ex. G) The emails between the Wilmington Police Department reflect correspondence directed to correct problems associated with the use of the trial program in order to persuade the user to purchase the alleged infringing product. (Id.)

Using a third party telemarketer, NetMotion contacted Delaware businesses to solicit business and pur-

chases. NetMotion selected seven Delaware entities n5 for contact by a third party telemarketer in the summer of 2003. (D.I. 24, Ex. A, pgs. 61-64) Additionally, NetMotion specifically targeted Delaware health care facilities. n6 NetMotion also mailed promotional materials to a targeted market of public safety organizations. n7 The documents were mailed to provide information about the products to encourage purchase. (D.I. 24, Ex. A, pgs. 44-45) If NetMotion did not intend to have Delaware residents as clients, it could have specifically excluded them from tele-marketers and their direct calling list. The fact that the marketing program did not generate sales belie the fact that attempts were made in Delaware, with knowledge and purpose, to do business.

n5 The entities were: Dover Police Department, Industrial Affairs Division, Laurel Volunteer Fire Department, New Castle County Police Department, Newark Police-Traffic Division, Delaware State Police, Wilmington Police Department. (D.I. 24, Ex. A p. 61, Ex. K)

[*18]

n6 Alfred I. Dupont Hospital, Bayhealth Medical Center at Kent, Beebe Medical Center, Christiana Hospital, Delaware Hospital-Chronically Ill, Delaware Psychiatric Center, Milford Memorial Hospital, Nanticoke Memorial Hospital, Riverside Health Care Center, Saint Francis Hospital, Stockley Center, and the Wilmington VA Medical Center. (D.I. 24, Ex. A, pgs. 89, Ex. M)

n7 These agencies were identified as: Delaware State Police (Dover), Kent County Emergency Communications, Sussex County Emergency Medical Services, New Castle County Police Department, Wilmington Public Safety, Wilmington Police Department, Delaware State Police (Odessa), Delaware State Police (Wilmington), Newark Police Department. (D.I. 24, Ex. A)

Having found jurisdiction proper under the Delaware long-arm statute, the analysis becomes whether the exercise of jurisdiction comports with the *Due Process Clause of the United States Constitution. See Int'l Shoe Co. v. Washington, 326 U.S. at 310.* [HN11] Due process mandates that the defendant have certain minimum contacts with the forum state to ensure that the lawsuit [*19] does not offend "traditional notions of fair play and substantial justice." *Id. at 316.* In *Burger King Corp. v.*

*Rudzewicz, 471 U.S. 462, 85 L. Ed. 2d 528, 105 S. Ct. 2174 (1985),* the Supreme Court added the further requirement that the minimum contacts be "purposeful" contacts, noting that "even a single act can support jurisdiction" so long as it creates a "substantial connection" with the forum, in contrast to an "attenuated affiliation." *Id. at 475 n.18.* Further, the Court has directed that courts consider: 1) whether the defendant reasonably could have anticipated being haled into the forum state's court, *World-Wide Volkswagen Corp. v. Woodson, 444 U.S. 286, 291-293, 62 L. Ed. 2d 490, 100 S. Ct. 559 (1980);* 2) the burden imposed on the defendant by litigating in that forum, *Asahi Metal Industry Co. v. Superior Court of California, 480 U.S. 102, 94 L. Ed. 2d 92, 107 S. Ct. 1026 (1987);* and 3) plaintiff's interest in the forum state, id.; see also, *Provident National Bank v. California Federal Savings & Loan Assoc., 819 F.2d at 437* (Third Circuit held that plaintiff must show significantly more than mere minimum contacts to establish [*20] general jurisdiction).

As discussed above, the record reflects NetMotion's web site and the marketing promotion by Hewlett-Packard enabled users to download the accused products anywhere, but importantly in Delaware. By targeting businesses in the state, NetMotion knew that its conduct and connections with Delaware were such that they reasonably should have anticipated being brought to this forum.

**V. MOTION TO TRANSFER**

DSI has moved to transfer venue from this district to the United States District Court for the Northern District of California pursuant to *28 U.S.C. § 1404(a),* n8 arguing that the declaratory judgment action there provides a more convenient forum for the litigation. Padcom counters that a plaintiff's choice of forum is the paramount consideration in determining a transfer request. *Wesley-Jessen Corp. v. Pilkington Visioncare Inc., 157 F.R.D. 215 (D. Del. 1993).* NetMotion n9 argues that the court should transfer the case to the United States District Court for the District of Washington.

n8 Title 28, Section § 1404(a) provides:

[HN12] For the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought.

[*21]

n9 NetMotion filed a third action in the Superior Court of the State of Washington, King County, alleging that Padcom has tortiously interfered with NetMotion's contracts and business expectancies. NetMotion Wireless Inc. v. Padcom, Inc., 04-cv-622-JCC (W.D. Wa 2004). Padcom removed the matter to the United States District Court for the Western District of Washington on March 24, 2004. (Id., D.I. 1) On April 27, 2004, Padcom moved to transfer to the case to the United States District Court for the District of Delaware or to stay pending resolution of the instant case. (Id., D.I. 8) NetMotion has filed opposition to the transfer motion, to which Padcom has filed a reply. (Id., D.I. 11, 12) On May 4, 2004, Padcom, in the instant action, moved to enjoin prosecution of the subsequently filed action in the Western District of Washington and has requested that the court schedule a *Rule 16* Conference. (D.I. 33)

[HN13] Congress intended through *§ 1404* to place discretion in the district court to adjudicate motions to transfer according to an individualized, case-by-case consideration of convenience [*22] and the interests of justice. *Stewart Org., Inc. v. Ricoh Corp., 487 U.S. 22, 29, 101 L. Ed. 2d 22, 108 S. Ct. 2239 (1988); Affymetrix, Inc. v. Synteni, Inc., 28 F. Supp. 2d 192, 208 (D. Del. 1998).* The burden of establishing the need to transfer rests with the movant "to establish that the balance of convenience of the parties and witnesses strongly favors the defendants." *Bergman v. Brainin, 512 F. Supp. 972, 973 (D. Del. 1981)* (citing *Shutte v. Armco Steel Corp., 431 F.2d 22, 25 (3d Cir. 1970),* cert. denied, *401 U.S. 910, 27 L. Ed. 2d 808, 91 S. Ct. 871 (1971)).* "Unless the balance is strongly in favor of a transfer, the plaintiff's choice of forum should prevail." *ADE Corp. v. KLA-Tencor Corp., 138 F. Supp. 2d 565, 567 (D. Del. 2001); Shutte, 431 F.2d at 25.*

The deference afforded plaintiff's choice of forum will apply as long as a plaintiff has selected the forum for some legitimate reason. *C.R Bard, Inc. v. Guidant Corp., 997 F. Supp. 556, 562 (D. Del. 1998); Cypress Semiconductor Corp. v. Integrated Circuit Systems, Inc., 2001 U.S. Dist. LEXIS 20803, Civ. No. 01-199-SLR, 2001 WL 1617186 (D. Del. 2001).* [*23] Although transfer of an action is usually considered as less convenient to a plaintiff if the plaintiff has not chosen its "'home turf' or a forum where the alleged wrongful activity occurred, the plaintiff's choice of forum is still of paramount consideration, and the burden remains at all times on the defendants to show that the balance of convenience and the

interests of justice weigh strongly in favor of transfer." *In re ML-Lee Acquisition Fund II, L.P., 816 F. Supp. 973, 976 (D. Del. 1993).*

[HN14] The Third Circuit Court of Appeals has indicated the analysis for transfer is very broad. *Jumara v. State Farm Ins. Co., 55 F.3d 873, 879 (3d Cir. 1995).* Although emphasizing that "there is no definitive formula or list of factors to consider," id., the court has identified potential factors it characterized as either private or public interest. The private interests include: (1) plaintiff's forum preference as manifested in the original choice; (2) defendant's preference; (3) whether the claim arose elsewhere; (4) the convenience of the parties as indicated by their relative physical and financial condition; (5) the convenience of the witnesses-but only [*24] to the extent that the witnesses may actually be unavailable for trial in one of the fora; and (6) location of books and records (similarly limited to the extent that the files could not be produced in the alternative forum)." Id. (citations omitted).

The public interests include: (1) the enforceability of the judgment; (2) practical considerations that could make the trial easy, expeditious or inexpensive; (3) the relative administrative difficulty in the two fora resulting from court congestion; (4) the local interest in deciding local controversies at home; (5) the public policies of the fora; and (6) the familiarity of the trial judge with the applicable state law in diversity cases." Id. (citations omitted).

The court is unpersuaded that the private or public interests warrant a transfer. Both plaintiff and defendant DSI are located within close proximity to this court, in Pennsylvania and New Jersey, respectively. Although defendant NetMotion is located in Seattle, Washington, it is a company trying to conduct business on a nationwide basis, including Delaware. Therefore, consistent with the deference afforded a plaintiff's choice of forum as well as the record established [*25] on the jurisdictional discovery issue, the court is satisfied that this litigation can be maintained without undue burden to the parties.

## VI. CONCLUSION

For the reasons stated, defendants' motion to dismiss and to transfer (D.I. 9) is denied. An order consistent with this memorandum opinion shall issue.

### ORDER

At Wilmington this 24th day of May, 2004, consistent with the memorandum opinion issued concomitantly,

IT IS ORDERED that:

2004 U.S. Dist. LEXIS 9658, *

1. Defendants' motion to dismiss and to transfer is denied. (D.I. 9)

2. Defendants shall file their Answer on or before June 11, 2004.

Sue L. Robinson

United States District Judge

# EXHIBIT 19

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| MICHELLE DEULEY, *et al.* )<br><br>Plaintiffs, )<br><br>v. )<br><br>DYNCORP INTERNATIONAL, INC.,<br>*et al.* )<br><br>Defendants. ) | C.A. No. 06-cv-605 (GMS) |

## DECLARATION OF H. MONTGOMERY HOUGEN

1.    I, H. Montgomery Hougen, certify that I am over the age of 18 years and have personal knowledge of the matters set forth herein.

2.    I am competent to testify to the matters set forth herein.

3.    I am the Corporate Secretary of DynCorp International Inc. and the Vice President, Secretary & Deputy General Counsel of DynCorp International LLC.

4.    In my position, I am familiar with the corporate structure and principal places of business of the DynCorp International entities referenced above.

5.    DynCorp International LLC is a Delaware limited liability company. Until August 31, 2006, its principal place of business was in Irving, Texas. Its principal place of business is now in Falls Church, Virginia.

6.    DynCorp International Inc. is a Delaware corporation. Until August 31, 2006, its principal place of business was in Irving, Texas. Its principal place of business is now in Falls Church, Virginia.

7.    DynCorp International Inc. is currently, and has been since February 2005, the parent company of DynCorp International LLC.

244677.1

EXHIBIT

19

8.    Prior to February 2005, Computer Sciences Corporation ("CSC") and DynCorp, a wholly owned subsidiary of CSC, held equity interests in DynCorp International LLC.  In February 2005, CSC and DynCorp sold their equity interests in DynCorp International LLC to DI Acquisition Corp., a company controlled by The Veritas Capital Fund II, L.P.  Upon completion of the transaction on February 11, 2005, DI Acquisition Corp. was renamed DynCorp International Inc.

**I DECLARE UNDER PENALTY OF PERJURY THAT THE FOREGOING IS TRUE AND CORRECT.**

Executed on October 25, 2006.

H. Montgomery Hougen

244677.1

# EXHIBIT 20

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| **MICHELLE DEULEY, Individually, and in her** )<br>**Capacities as Surviving Spouse of John Deuley,** )<br>**as Executrix of the Estate of John Deuley, Deceased** )<br>**And as Mother, Guardian and/or Next Friend of** )<br>**Amberyle Marie Deuley, Justin Andrew Deuley, and** )<br>**Jordan Aubrey Deuley, Minor Children of John Deuley;** )<br>**JOSEPH AND KIM DICKINSON; KATHY** )<br>**GIBSON, Individually, and in her Capacities as** )<br>**Surviving Spouse of Gerald Gibson and as** )<br>**Executrix of the Estate of Gerald Gibson, Deceased** )<br>)<br>     **Plaintiffs,** )<br>)<br>     **v.** )<br>)<br>**DYNCORP INTERNATIONAL, INCORPORATED,** )<br>**a Delaware Corporation, Parent of the co-defendant** )<br>**DYNCORP entities, formerly known as** )<br>**DI Acquisition Corp.; DYNCORP INTERNATIONAL** )<br>**LLC; a Delaware Limited Liability Corporation; and** )<br>**CSC APPLIED TECHNOLOGIES LLC, formerly** )<br>**known as Dyncorp Technical Services, LLC, a** )<br>**Delaware Limited Liability Corporation,** )<br>)<br>     **Defendants.** )<br>) | **C.A. No. 06-cv-605 (GMS)** |

## DECLARATION OF CHERALYN S. CAMERON

1.     I, Cheralyn S. Cameron, certify that I am over the age of 18 years and have personal knowledge of the matters set forth herein.

2.     I am competent to testify to the matters set forth herein.

3.     As of March 7, 2003, I am an attorney employed by Computer Sciences Corporation (CSC) as Senior Counsel. Prior to that date, I was employed by DynCorp which merged into CSC but survived the merger as a wholly owned corporate entity with the same tax identification number.

244799.1

EXHIBIT
20

4.    I have been in my current position for 17 years.

5.    In my position of Senior Counsel, I am familiar with the corporate structure and relationships of the CSC entities.

6.    CSC Applied Technologies LLC is a Delaware corporation with its principal place of business in Texas.

7.    CSC Applied Technologies LLC does maintain an office in Virginia.

**I DECLARE UNDER PENALTY OF PERJURY THAT THE FOREGOING IS TRUE AND CORRECT.**

Executed on October 23, 2006.

Cheralyn S. Cameron, Esquire

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| **MICHELLE DEULEY,** *et al.* | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | **C.A. No. 06-cv-605 (GMS)** |
| **v.** | ) | |
| | ) | |
| **DYNCORP INTERNATIONAL, INC.,** | ) | |
| *et al.* | ) | |
| | ) | |
| **Defendants**. | ) | |
| | ) | |

## <u>ORDER</u>

Upon consideration of Defendants' Motion to Dismiss or, in the alternative, Motion to Transfer Venue, Plaintiffs' Opposition thereto, and Defendants' Reply, IT IS HEREBY ORDERED THAT DEFENDANTS' MOTION TO DISMISS IS GRANTED IN ITS ENTIRETY.  Plaintiffs' Complaint is hereby DISMISSED WITH PREJUDICE.

_____
United States District Judge

243175.3

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| **MICHELLE DEULEY**, *et al.* | ) |
| | ) |
| **Plaintiffs,** | ) |
| | ) **C.A. No. 06-605 (GMS)** |
| **v.** | ) |
| | ) |
| **DYNCORP INTERNATIONAL, INC.,** | ) |
| *et al.* | ) |
| | ) |
| **Defendants**. | ) |

<u>**ORDER**</u>

Upon consideration of Defendants' Motion to Dismiss or, in the alternative, Motion to Transfer Venue, Plaintiffs' Opposition thereto, and Defendants' Reply, IT IS HEREBY ORDERED THAT DEFENDANTS' MOTION TO TRANSFER VENUE IS HEREBY GRANTED. The Clerk of this Court shall transfer this case to the United States District Court for the Eastern District of Virginia, Alexandria Division upon entry of this Order.

_____
United States District Judge