**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| **MICHELLE DEULEY,** *et al.*, | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | **C.A. No. 06-605 (GMS)** |
| **v.** | ) | |
| | ) | |
| **DYNCORP INTERNATIONAL, INC.,** | ) | |
| *et al.*, | ) | |
| | ) | |
| **Defendants**. | ) | |

## DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR REMAND

Robert J. Katzenstein (Del. ID No. 378)
Robert K. Beste, III (Del. ID No. 3931)
SMITH, KATZENSTEIN & FURLOW LLP
800 Delaware Avenue, 7th Floor
P.O. Box 410
Wilmington, DE 19899 (Courier 19801)
Telephone:    (302) 652-8400
Facsimile:    (302) 652-8405

*Of Counsel*:
Robert B. Wallace
Kevin P. Farrell
Yoora Pak
WILSON, ELSER, MOSKOWITZ,
EDELMAN & DICKER LLP
The Colorado Building
1341 G Street, N.W., 5th Floor
Washington, DC 20005
Telephone:    (202) 626-7660
Facsimile:    (202) 628-3606

*Attorneys for Defendants*
*DynCorp International, Inc., DynCorp*
*International LLC, and CSC Applied*
*Technologies LLC*

November 3, 2006

# TABLE OF CONTENTS

TABLE OF CONTENTS ..................................................................................................ii

TABLE OF AUTHORITIES ...........................................................................................iii

NATURE AND STAGE OF PROCEEDINGS ................................................................ 1

SUMMARY OF ARGUMENT ....................................................................................... 2

STATEMENT OF FACTS .............................................................................................. 2

   A.   ALLEGATIONS IN COMPLAINT ...................................................................2
   B.   DEFENDANTS' NOTICE OF REMOVAL ......................................................3
   C.   CIVPOL ..............................................................................................................4
   D.   CIVPOL IN AFGHANISTAN ...........................................................................7
   E.   SECURITY FOR DYNHOUSE AND EMPLOYEES .......................................8

ARGUMENT ................................................................................................................. 10

   A.   DEFENDANTS PROPERLY REMOVED THIS ACTION UNDER
        THE FEDERAL OFFICER REMOVAL STATUTE AND IN
        ACCORDANCE WITH THE *FEIDT* TEST ..........................................................10

       1.   Standard of Review Under 28 U.S.C. § 1442(a)(1) ........................................ 11

       2.   Government Contractors May Remove Cases Under Section 1442(a)(1)...... 13

       3.   Defendants Properly Removed This Action Under the *Feidt* Test ................. 13

           a.   Defendants are "persons" within the meaning of Section
               1442(a)(1) .............................................................................................14

           b.   Plaintiffs' claims are based on Defendants' conduct "acting
               under" federal office ............................................................................15

           c.   Defendants have established colorable federal defenses ..........................18

               (1)  Government contractor defense ...................................................... 18

               (2)  Political question doctrine............................................................... 22

               (3)  Defense Base Act ........................................................................... 25

           d.   Defendants have established a causal relationship between the
               alleged wrongful acts and their official acts ................................................29

   B.   DEFENDANTS FOLLOWED PROPER PROCEDURE FOR
        REMOVAL OF THIS ACTION TO THIS COURT PURSUANT TO
        28 U.S.C. § 1446 ................................................................................................32

   C.   DEFENDANTS' REMOVAL IS BASED ONLY ON THE FEDERAL
        OFFICER REMOVAL STATUTE .....................................................................34

   D.   PLAINTIFFS ARE NOT ENTITLED TO ATTORNEY FEES............................35

CONCLUSION .............................................................................................................. 37

# TABLE OF AUTHORITIES

## Cases

Adorno v. Correctional Services Corp.,
312 F. Supp. 2d 505 (S.D.N.Y. 2004)............................................................................ 19

Arizona v. Manypenny,
451 U.S. 232 (1981)...................................................................................................... 11

Baker v. Carr,
369 U.S. 186 (1962)...................................................................................................... 23

Berven v. Fluor Corp.,
171 F. Supp. 89 (S.D.N.Y. 1959).................................................................................. 27

Boyle v. United Technologies Corp.,
487 U.S. 500 (1988)........................................................................................... 3, 18, 20

Feidt v. Owens Corning Fiberglas Corp.,
153 F.3d 124 (3d Cir. 1998)................................................................................ 1, 14, 36

Fisher v. Halliburton, Inc.,
2006 U.S. Dist. LEXIS 68413 (S.D. Tex. Sept. 22, 2006) ........................................... 24

Flying Tigers Lines, Inc. v. Landy,
370 F.2d 46 (9th Cir. 1966) ........................................................................................ 26

Good v. Armstrong World Indus., Inc.,
914 F. Supp. 1125 (E.D. Pa. 1996) ............................................................................... 31

Gross v. German Foundation Indus. Initiative,
456 F.3d 363 (3d Cir. 2006)......................................................................................... 23

Guckin v. Nagle,
259 F. Supp. 2d 406 (E.D. Pa. 2003) ...................................................................... 31, 33

Hudgens v. Bell Helicopters/Textron,
328 F.3d 1329 (11th Cir. 2003) .................................................................................. 20

In re World Trade Center Disaster Site Litig.,
2006 U.S. Dist. LEXIS 75020 (S.D.N.Y. Oct. 17, 2006) ............................................. 19

In re: Jean Fowler,
2006 Bankr. LEXIS 2117 (D. Del. Sept. 11, 2006) ........................................................ 5

In re: Nazi Era Cases Against German Defendants Litig. (Rozenkier v. AG
    Schering), 2006 U.S. App. LEXIS 19477 (3d Cir. Aug. 2, 2006) ............................... 23

Japan Whaling Ass'n v. Am. Cetacean Soc'y,
478 U.S. 221 (1986)................................................................................................. 23

Jefferson County v. Acker,
527 U.S. 423 (1999)..................................................................................... 13, 14, 31

Kos Pharm., Inc. v. Andrx Corp.,
369 F.3d 700 (3d Cir. 2004)....................................................................................... 5

Lane v. Halliburton,
2006 U.S. Dist. LEXIS 63948 (S.D. Tex. Sept. 7, 2006) ........................ 13, 18, 24, 25, 33

Malesko v. Correctional Services Corp.,
229 F.3d 374 (2d Cir. 2000), rev'd on other grounds, 534 U.S. 61 (2001) ..................... 19

Malsch v. Vertex Aerospace, LLC,
361 F. Supp. 2d 583 (S.D. Miss. 2005)................................................................. 13, 33

Martin v. Franklin Capital Corp.,
126 S. Ct. 704 (2005)............................................................................................... 37

McMahon v. Presidential Airways, Inc.,
410 F. Supp. 2d 1189 (M.D. Fla. 2006)............................................................... 13, 22

Megill v. Worthington Pump, Inc.,
1999 U.S. Dist. LEXIS 4433 (D. Del. Mar. 26, 1999) ............................. 11, 14, 22, 31, 36

Mesa v. California,
489 U.S. 121 (1989)............................................................................... 12, 13, 34, 35

New Jersey Dep't of Environ. Prot. v. Dixo Co.,
2006 U.S. Dist. LEXIS 68288 (D.N.J. Sept. 22, 2006) .............................................. 13, 31

New Jersey Dep't of Environ. Prot. v. Exxon Mobil Corp.,
381 F. Supp. 2d 398 (D.N.J. 2005) ............................................................................ 13

Pack v. AC and S, Inc.,
838 F. Supp. 1099 (D. Md. 1993) ...................................................................... 13, 32, 35

Pulley v. Peter Kiewit Son's Co.,
223 F.2d 191 (7th Cir. 1955) ................................................................................... 26

Richland-Lexington Airport Dist. v. Atlas Prop., Inc.,
854 F. Supp. 400 (D.S.C. 1994)............................................................ 20

Ross v. DynCorp,
362 F. Supp. 2d 344 (D.D.C. 2005) ...................................................... 26

Smith v. Halliburton Co.,
2006 U.S. Dist. LEXIS 61980 (S.D. Tex. Aug. 30, 2006)................... 24

Sparks v. Wyeth Lab., Inc.,
431 F. Supp. 411 (W.D. Okla. 1977) .................................................... 26

Sun Buick, Inc. v. Saab Cars USA, Inc.,
26 F.3d 1259 (3d Cir. 1994)................................................................. 11

Tennessee v. Davis,
100 U.S. 257 (1880)............................................................................. 12

Virden v. Altria Group, Inc.,
304 F. Supp. 2d 832 (N.D. W. Va. 2004) ....................................... 13, 18

Watson v. Philip Morris Cos.,
420 F.3d 852 (8th Cir. 2005) ............................................................. 18

Whitake v. Kellogg Brown & Root, Inc.,
2006 U.S. Dist. LEXIS 45708 (M.D. Ga. Jul. 6, 2006)...................... 25

Willingham v. Morgan,
395 U.S. 402 (1969)........................................... 11, 12, 13, 14, 31, 33

**Statutes**

28 U.S.C. § 1442(a)(1)............................................................... *passim*
28 U.S.C. § 1446........................................................................ 32
28 U.S.C. § 1446(a) ................................................................... 32
28 U.S.C. § 1446(b).................................................................... 32
28 U.S.C. § 1446(d).................................................................... 32
Defense Base Act, 42 U.S.C. § 1651 *et seq.* ............................... 4
Defense Base Act, 42 U.S.C. § 1651(a)(4) ................................. 26
Defense Base Act, 42 U.S.C. § 1651(b)(1)................................. 26
Defense Base Act, 42 U.S.C. § 1651(c).................................. 27
Defense Base Act, 42 U.S.C. § 1651(d) ................................ 27, 28
Longshore and Harbor Workers' Compensation Act, 33 U.S.C. §§ 901 *et seq.* ................ 4
Longshore and Harbor Workers' Compensation Act, 33 U.S.C. § 905(a)................. 27, 28

**<u>Other Authorities</u>**

Government Accounting Office, <u>Afghanistan Security: Efforts to Establish
Army and Police Have Made Progress, but Future Plans Need to Be Better
Defined</u>, Report No. 05-575 (2005) ............................................................. 7, 8, 15, 16

Defendants DynCorp International, Inc., DynCorp International LLC, and CSC Applied Technologies LLC (hereinafter "Defendants") properly removed this case to this Court pursuant to the federal officer removal statute, 28 U.S.C. § 1442(a)(1), based on the elements set forth by the Third Circuit Court of Appeals in <u>Feidt v. Owens Corning Fiberglas Corp.</u>, 153 F.3d 124, 127 (3d Cir. 1998). Consequently, Plaintiff's motion for remand must be denied.

## <u>NATURE AND STAGE OF PROCEEDINGS</u>

This action arises out of the deaths of John Deuley and Gerald Gibson and alleged serious and permanent injuries sustained by Plaintiff Joseph Dickinson [hereinafter collectively referred to as "the Employees"][1] while performing their employment duties in Kabul, Afghanistan on a U.S. CIVPOL mission. (<u>See</u> D.I. 1 (Defendants' Notice of Removal) and D.I. 1, Exhibits 1-3 (Complaint), ¶¶ 2-4 [hereinafter referred to as "the Complaint"].) The surviving spouses and executrices of the estate of the decedents, on their own behalf and on behalf of decedents' surviving children, allege survival and wrongful death actions, and Plaintiffs Joseph and Kim Dickinson allege personal injury actions. (Complaint, ¶¶ 47-59.)

Plaintiffs originally filed this action in the Superior Court for the State of Delaware in and for New Castle County on or about August 22, 2006. Defendants properly removed the action to this Honorable Court on September 27, 2006, based on the federal officer removal statute, 28 U.S.C. § 1442(a)(1). On October 4, 2006, this

---

[1] Defendants' collective reference to John Deuley, Gerald Gibson, and Joseph Dickinson as "the Employees" throughout this Brief is not an admission or other acknowledgement as to the relationship between Defendants and Messrs. Deuley, Gibson, and Dickinson. The collective reference is solely for ease of reference to these three individuals. Without dispute, Plaintiffs acknowledge that these three individuals were employed by DynCorp International FZ-LLC, an entity which is not a party to this lawsuit. Complaint, ¶ 11-14.

Court granted Defendants' motion for extension of time to Answer or otherwise respond to the Complaint.  On October 25, 2006, Defendants' timely filed a motion to dismiss or, in the alternative, motion to transfer venue, based on lack of subject matter jurisdiction under the political question doctrine, waiver, immunity under the Defense Base Act's exclusivity of remedies provision, the government contractor defense, and improper venue.

On October 12, 2006, Plaintiffs' filed a Motion for Remand.  Despite many attempts to contact Plaintiffs' counsel regarding an extension of time to file this Opposition to their Motion for Remand, Plaintiffs' counsel failed to return phone calls or email correspondence.  Defendants' therefore filed a motion with this Court seeking an extension of time to file this Opposition, which the Court granted, in part, to November 3, 2006.

<u>**SUMMARY OF ARGUMENT**</u>

Defendants properly removed this action based on the federal officer removal statute, 28 U.S.C. § 1442(a)(1).

<u>**STATEMENT OF FACTS**</u>

A.    <u>ALLEGATIONS IN COMPLAINT</u>

This case arises from the deaths of and/or the injuries sustained by the Employees while they were performing their job duties in Kabul, Afghanistan in support of Defendants' contract with the U.S. Department of State ("Department of State") to administer and implement the Department of State's obligations pursuant to the United States' commitment to the Civilian Police ("CIVPOL") program.  In Paragraph 46 of the Complaint, Plaintiffs list the alleged conduct by Defendants at issue in this lawsuit,

including the alleged denial of requests for security purchases, allegedly failing to

provide basic security, allegedly failing to heed the Employees' warnings to move

Defendants' offices (known as "DynHouse"), allegedly ordering the removal of vehicle

barriers, allegedly refusing to permit Employees from closing the street adjacent to

DynHouse, and allegedly disregarding "credible warnings of an imminent attack in the

area where DynHouse was located."  Complaint, ¶ 46(a)-(f).

B.    DEFENDANTS' NOTICE OF REMOVAL

The opening paragraph of the Notice of Removal broadly states that removal is

based on 28 U.S.C. §§ 1331, 1441, 1442, and 1446 -- thereby listing the federal statutes

referred to in the Notice in numerical order.  Thereinafter, in Paragraph 16 of the Notice

of Removal, the primary and substantive basis for removal is clearly stated -- 28 U.S.C. §

1442(a)(1), otherwise known as the federal officer removal statute.  (D.I. 1, ¶ 16.)

The pertinent paragraphs of the Notice of Removal stating this Court's

jurisdiction under the federal officer removal statute are as follows:

> 16.    The United States District Courts have original jurisdiction
> over this civil action pursuant to 28 U.S.C. § 1442(a)(1), which provides a
> civil action originally filed in a State court may be removed if it is against
> the "United States or any agency thereof or any officer (or any person
> acting under that officer) of the United States or of any agency thereof,
> sued in an official or individual capacity for any act under color of such
> office," because, as a CIVPOL government contractor, at all relevant
> times to this Complaint, Defendants were acting under the direction and
> color of the United States.
>
> 17.    Defendants will assert, and has a colorable basis for
> asserting, *inter alia*, federal common law defenses, including the
> Government Contractor Defense established in Boyle v. United
> Technologies Corp., 487 U.S. 500, 504-505 (1988) (holding that tort
> liabilities arising out of the performance of a federal government contract
> and "the civil liability of federal officials for actions taken in the course of
> their duty" are areas of "uniquely federal interests" that are "so committed
> by the Constitution and laws of the United States to federal control that

3

state law is pre-empted" and replaced by federal common law), as well as a defense that the claims as pled are not justiciable under the political question doctrine because they concern decisions and acts implicating or involving policy decisions and value determinations made by the Executive Branch, through its U.S. Department of State and/or the U.S. armed forces.

18.    In addition, Defendants will assert, *inter alia*, a defense based on the exclusivity of remedies for decedents' deaths and Plaintiff Dickinson's injuries as established by the Defense Base Act, 42 U.S.C. § 1651 *et seq.*, and the Longshore and Harbor Workers' Compensation Act, 33 U.S.C. §§ 901 *et seq.* a federal statute.

. . .

22.    Pursuant to 28 U.S.C. § 1446(a), all copies of all process, pleadings, and orders served on Defendants are attached to this Notice of Removal and undersigned counsel certifies that a copy of this Notice of Removal will be served promptly on plaintiffs and filed with the Clerk of the Superior Court of the State of Delaware in and for New Castle County.

23.    Accordingly, removal of this action is proper under 28 U.S.C. §§ 1331, 1441, 1442, and 1446 because Defendants are "persons" acting under an officer of the United States or an agency thereof and are being sued in its individual capacity for acts performed under color of office of such officer or agency and because Defendants intends to assert defenses based on federal statutory and common law.

D.I. 1, ¶¶ 16-18, 22-23.

Thus, Defendants pleaded that: (1) they were "persons" (D.I. 1, ¶ 23); (2) they were acting under color of and pursuant to the direction of a federal officer (id. at ¶¶ 11-13, 15), (3) they were able to assert a colorable federal defense (id. at ¶¶ 17-18, 23), and (4) there was a causal connection between the acts performed under color of office and the acts forming the basis of this lawsuit (id. at ¶12, 13, 15, 23).

C.    CIVPOL

CIVPOL is a vital tool in U.S. foreign policy and important international peacekeeping missions.  See Exhibit ("Ex.") 1, ¶ 6 (Declaration of Angelic Little-Turner).

As explained by the Department of State, CIVPOL deployments "assist international military forces in the short term by addressing civilian law enforcement matters," and "help to develop the local democratic policing institutions that ultimately will be responsible for all law and order functions once the military and CIVPOL depart." Ex. 2.[2]  The U.S. Government's decisions to participate in CIVPOL missions are made after consultation among the President, the Department of State, and Department of Defense, and other agencies.  Ex. 1, ¶ 7.

Presidential Decision Directive ("PDD") 71, which was signed by President Clinton in 2000, designated the Department of State as the lead agency on behalf of the United States to coordinate, implement, and supervise U.S. participation in CIVPOL. See Ex. 3 at 3.  The Department of State is responsible for policy development, provision and oversight of CIVPOL field operations, and development and implementation of training and technical assistance programs for foreign police forces.  Ex. 3 at 3.  Within the Department of State, the Bureau of International Narcotics and Law Enforcement Affairs ("INL") was designated as the lead office for CIVPOL.  Ex. 1, ¶ 4; Ex. 19 (Supplemental Declaration of Angelic Little-Turner), ¶ 4.  The President authorized the Department of State "to use contractor support to assist in its duties . . . ."  Ex. 3 at 3.

---

[2] Defendants respectfully request that the Court take judicial notice of the U.S. Department of State's official pronouncements regarding the CIVPOL program as officially posted on the Department of State's website at www.state.gov.  See Kos Pharm., Inc. v. Andrx Corp., 369 F.3d 700, 705 n.5 (3d Cir. 2004) (taking judicial notice of Patent and Trademark Office records available on-line); In re: Jean Fowler, 2006 Bankr. LEXIS 2117, at *5 n.2 (D. Del. Sept. 11, 2006) (taking judicial notice of IRS publications available on IRS's website) (attached hereto as Ex. 13).

The Department of State entered into a contract with Defendants in February 2004,[3] which delegates some of its CIVPOL responsibilities ("CIVPOL Contract") to Defendants.  Ex. 19, ¶ 5; Ex. 1, ¶ 14; see generally Ex. 4 (relevant excerpts of CIVPOL Contract).  For instance, Defendants were responsible for establishing, recruiting, and maintaining a cadre of 2,000 experienced law enforcement personnel who would be ready for speedy deployment.  Ex. 19, ¶ 6; Ex. 5, ¶ 3 (Supplemental Declaration of Richard Cashon); Ex. 4 at 10-13.  In addition, Defendants' responsibilities under the CIVPOL Contract include, among other things, training or providing advisory services to foreign civilian police forces.  These services include assessment of existing public security conditions or events, institutional capacities relating to academy, forensic sciences, organizational development, and accreditation, judicial systems, corrections or corrections-related activities.  The CIVPOL Contract tasked Defendants with developing or redesigning basic to advanced law enforcement topics, such as arrest procedures, patrol, firearms, self-defense, crime scene management, civil disturbance management and criminal investigations, among others.  Defendants also provided training and advisory services to promote the development of a sustainable, credible, and legitimate police force necessary for long term stability in the host country.  Ex. 5, ¶ 4; Ex. 4 at 15.

Because the United States does not have a volunteer police force, Defendants were performing tasks under the CIVPOL Contract that otherwise might have been performed by other government agencies.  Ex. 19, ¶ 9.  Defendants performed these tasks under direct orders from and control of the Department of State and the INL

_____

[3] Specifically, the CIVPOL Contract was entered into by DynCorp International LLC.  However, for purposes of this Opposition, and without waiving any arguments or defenses that can be asserted by DynCorp International, Inc. and CSC Applied Technologies LLC, the contracting party will be referred to as "the Defendants."

representative.  Ex. 19, ¶ 10; Ex. 5, ¶¶ 8, 20, 21.  The Department of State, through the INL representative, also provided ongoing and continuous oversight and directives.  Ex. 19, ¶ 11.

D.    <u>CIVPOL IN AFGHANISTAN</u>

Afghanistan was invaded by the United States and coalition forces after the September 11, 2001 terrorist attacks because it was considered a haven for terrorists. Government Accounting Office ("GAO"), <u>Afghanistan Security: Efforts to Establish Army and Police Have Made Progress, but Future Plans Need to Be Better Defined</u>, Report No. 05-575, at 1 (2005) (attached hereto and referred to hereinafter as "Ex. 6"). After the invasion, the United States met with several other countries in Geneva, Switzerland in April 2002 to develop a five-pillared reform agenda for Afghanistan that addressed reforms of Afghanistan's army, police, justice, drug policies, and the disarmament, demilitarization,        and reintegration of the country.  Ex. 6 at 5.  The United States volunteered to lead the army reform effort while Germany volunteered to lead the police reform effort.  <u>Id.</u>

The United States initiated its own police training program in Afghanistan in 2003 because of concerns that the Germans were progressing too slowly and concentrating on officers instead of patrolmen.  <u>Id.</u> at 19.  Under the CIVPOL Contract with Defendants, the Department of State deployed a CIVPOL mission to Afghanistan.  <u>Id.</u> at 8. Defendants were responsible for, among other things, training and equipping the Afghan police, advising the Afghan Ministry of Interior, and providing infrastructure assistance, including the construction of several police training centers.  Ex. 19, ¶ 5.  The Department of State, through the INL representative, controlled and directed Defendants'

performance under the CIVPOL Contract.  Ex. 19, ¶¶ 10-11; Ex. 5, ¶¶ 8, 20-21.  All aspects of Defendants' CIVPOL operation in Kabul were established under the specific direction of the INL representative and the Department of State.  Ex. 19, ¶ 14.

While in Afghanistan, the Government Accounting Office (GAO), which audited the United States' participation in Afghanistan, observed the following:

- "The United States employs a 'train the trainer' approach.  More than 800 Afghans who have completed a 3-week instructor development course conduct the training with DynCorp advisors" (Ex. 6 at 20);

- "DynCorp completed construction of the Central Training Center for Police in Kabul in May 2003, and in 2004 it constructed and began training at seven regional centers across the country" (id. at 21);

- "In early 2005, DynCorp deployed police trainers to the field for the first time" (id. at 24); and

- "State embedded 30 DynCorp advisors within the [Afghan] [M]inistry [of the Interior] at the end of 2004" and based on their observations, a comprehensive reform package was proposed to and accepted by the Afghan Government (id. at 25).

In addition, when the GAO needed status information regarding the Afghan CIVPOL mission, it turned to Defendants, who provided assessments about the effectiveness of the police force training program (id. at 22); the status of Afghanistan's supply of police force weapons (id. at 23); the overall Afghan police reform effort (id. at 25-26); the needs for other police equipment (id. at 24); patrolmen's salary (id. at 26); and budgets for police equipment (id. at 26).

E.    SECURITY FOR DYNHOUSE AND EMPLOYEES

Defendants interfaced with the Resident Security Officer ("RSO") at the U.S. Embassy in Kabul, Afghanistan with respect to issues related to security.  Ex. 5, ¶ 18.

The RSO issued specific directives, real-time warnings, and reviewed and approved security measures. <u>See</u> <u>id.</u>, ¶¶ 13-21.

The Department of State required that Defendants secure office space in Kabul. <u>Id.</u>, ¶ 13; Ex. 19, ¶ 13. Defendants found a location that had been previously used by the U.S. military in Shar-e-Nau, an affluent residential area which is home to many international organizations and guesthouses for their employees. Ex. 5, ¶ 14. It was located on a street that was heavily traveled by vehicles and pedestrians. <u>Id.</u> There are many commercial establishments in Shar-e-Nau that were frequented by coalition employees, including restaurants, cafes, and other office buildings. <u>Id.</u> The wall around the compound was topped with "razor" wire. <u>Id.</u> The Assistant Resident Security Officer (ARSO) from the U.S. Embassy in Kabul inspected the location in Shar-e-Nau to determine if it was an acceptable location vis-à-vis the U.S. Embassy in Kabul, if the location provided the appropriate level of security, and if the location was suitable for purposes of the CIVPOL Contract. <u>Id.</u>, ¶ 13. The ARSO approved the proposed location and the Department of State authorized funding for this location. <u>Id.</u> This location is known as "DynHouse." <u>Id.</u>

Similarly, when Defendants decided to place armed security guards, who were members of the Nepalese military regiment known as the Gurkas, at the gate of the DynHouse's walled compound and at the ends of the street on which DynHouse was located, Defendants sought permission from the RSO, who reviewed and approved the plan. <u>Id.</u>, ¶ 15. The RSO and Defendants coordinated the hiring criteria for the Gurka guards and discussed guidelines and policies for their use. <u>Id.</u> The ARSO approved the use of Gurkas who had been with British regiments and who had English language

facility.  <u>Id.</u>  Upon ARSO approval, the Department of State approved the task order and funding was provided to hire the Gurka guards.  <u>Id.</u>

Defendants did not have any authority to close the streets around DynHouse or to place vehicle barriers around DynHouse to block traffic.  <u>Id.</u>, ¶ 19.  Defendants would have had to make the request to the RSO, who, if he approved the plan, would have had to seek permission from the Afghan Government to implement the plan.  <u>Id.</u>  Only after the Afghan Government approved the RSO's request would the RSO allow Defendants to go forward with this increased security.  <u>Id.</u>

Under the CIVPOL Contract, Defendants were required to provide personal protective equipment to personnel, such as a 9mm weapon with holster, magazines, baton, handcuffs, reflective traffic vest, and soft body armour.  <u>Id.</u>, ¶ 16; Ex. 4 at 12.  If Defendants wanted to upgrade or change the type of equipment to be provided to personnel under the contract, they had to obtain approval from the RSO.  Ex. 5, ¶ 16.

Defendants' personnel were under the same travel restrictions as the U.S. Mission at the U.S. Embassy.  <u>Id.</u>, ¶ 17.  In accordance with the RSO's directives, they were not allowed to use commercial aircraft for travel.  <u>Id.</u>  Instead, the Department of State obtained permission from the U.S. military to allow Defendants' personnel to travel on military aircraft.  <u>Id.</u>

## <u>ARGUMENT</u>

A.  <u>DEFENDANTS PROPERLY REMOVED THIS ACTION UNDER THE FEDERAL OFFICER REMOVAL STATUTE AND IN ACCORDANCE WITH THE *FEIDT* TEST</u>

Removal is appropriate in this case because Defendants satisfied all of the elements of the <u>Feidt</u> test established by the Third Circuit Court of Appeals.  It is clear

that Defendants have pleaded that: (1) they are "persons" (D.I. 1, ¶ 23); (2) they are

acting under color of and pursuant to the direction of a federal officer (id. at ¶¶ 11-13,

15), (3) they are able to assert a colorable federal defense (id. at ¶¶ 17-18, 23), and (4)

there is a causal connection between the acts performed under color of office and the acts

forming the basis of this lawsuit (see id. at¶12, 13, 15, 23).   Accordingly, Plaintiffs'

motion for remand must be denied.

> 1.    Standard of Review Under 28 U.S.C. § 1442(a)(1)

The federal officer removal statute provides in pertinent part:

> A civil action . . . commenced in a State court against any
> of the following may be removed by them to the district
> court of the United States for the district and division
> embracing the place wherein it is pending:
>
> (1)    The United State or any agency thereof or
> any officer (**or any person acting under that officer**) of
> the United States or of agency thereof, sued in an official or
> individual capacity for any act under color of such office
> . . . .

28 U.S.C. § 1442(a)(1) (emphasis added).  This provision is not to be construed narrowly.

Willingham v. Morgan, 395 U.S. 402, 406 (1969) (holding that Section 1442(a)(1) is "not

'narrow' or 'limited'").  Instead, as recognized by the Third Circuit Court of Appeals and

this District Court, it must be broadly construed.  Megill v. Worthington Pump, Inc., 1999

U.S. Dist. LEXIS 4433, at *5-6 (D. Del. Mar. 26, 1999) (citing Sun Buick, Inc. v. Saab

Cars USA, Inc., 26 F.3d 1259, 1262 (3d Cir. 1994))(attached hereto as Exhibit 8); see

Arizona v. Manypenny, 451 U.S. 232, 242 (1981) (holding that "the right of removal is

absolute for conduct performed under color of federal office, and . . . the policy favoring

removal should not be frustrated by a narrow, grudging interpretation of § 1442(a)(1)").

The Supreme Court stated that this provision is, "[a]t the very least, . . . broad enough to

11

cover all cases where federal officers can raise a colorable defense arising out of their duty to enforce federal law." Willingham, 395 U.S. at 407 (stating that "[t]his policy should not be frustrated by a narrow, grudging interpretation of § 1442(a)(1)").

The purpose of the federal officer removal statute "is not hard to discern." Id. at 406. As recognized by the Supreme Court over 125 years ago, the U.S. Government:

> can act only through its officers and agents . . . . If, when thus acting, and within the scope of their authority, those officers can be . . . brought to trial in a State court, for an alleged offence against the law of the State, yet warranted by the Federal authority they possess, and if the general government is powerless to interfere at once for their protections, -- if their protection must be left to the action of the State court, -- the operations of the general government may at any time be arrested at the will of one of its members.

Id. (quoting Tennessee v. Davis, 100 U.S. 257, 263 (1880)). Without question, one of the primary purposes of the federal officer removal statute is to have federal defenses litigated in federal courts. Id. at 407. To that end, it is "impossible that the Constitution should so weaken the Federal Government as to prevent it from protecting itself against unfriendly state [laws] which 'may affix penalties to acts done under the immediate direction of the national government, and in obedience to its laws [or] may deny the authority conferred by those laws.'" Mesa v. California, 489 U.S. 121, 127 (1989) (quoting Tennessee, 100 U.S. at 263). Accordingly, because federal jurisdiction rests on the "very basic" federal interest of enforcing federal law through federal officials, "the right of removal under § 1442(a)(1) is made absolute whenever a suit in a state court is for any act 'under color' of federal office, regardless of whether the suit could originally have been brought in a federal court." Willingham, 395 U.S. at 406 (citations omitted).

Finally, it is well established that Section 1442(a) creates an exception to the well-pleaded complaint rule because it predicates removal based on the existence of a colorable federal defense.  Mesa, 489 U.S. at 139 (holding that removal under 28 U.S.C. § 1442(a) "must be predicated upon averment of a federal defense").  Thus, a case "may be removed despite the nonfederal cast of the complaint."  Jefferson County v. Acker, 527 U.S. 423, 431 (1999) (holding that "the federal question element is met if the defense depends on federal law").

2.      Government Contractors May Remove Cases Under Section 1442(a)(1)

As the language of Section 1442(a)(1) clearly states, a private party, such as a government contractor, may remove an action under this statutory provision.  New Jersey Dep't of Environ. Prot. v. Dixo Co., 2006 U.S. Dist. LEXIS 68288, at *5 (D.N.J. Sept. 22, 2006) (holding same and citing New Jersey Dep't of Environ. Prot. v. Exxon Mobil Corp., 381 F. Supp. 2d 398 (D.N.J. 2005)) (attached hereto as Exhibit 9).  See also Lane v. Halliburton, 2006 U.S. Dist. LEXIS 63948 (S.D. Tex. Sept. 7, 2006) (denying motion to remand in case brought against a government contractor who removed the case to federal district court based on Section 1442(a)) (attached hereto as Exhibit 10); McMahon v. Presidential Airways, Inc., 410 F. Supp. 2d 1189 (M.D. Fla. 2006) (same); Malsch v. Vertex Aerospace, LLC, 361 F. Supp. 2d 583 (S.D. Miss. 2005) (same); Virden v. Altria Group, Inc., 304 F. Supp. 2d 832, 845 (N.D. W. Va. 2004) (same); Pack v. AC and S, Inc., 838 F. Supp. 1099 (D. Md. 1993) (same).

3.      Defendants Properly Removed This Action Under the *Feidt* Test

To establish removal jurisdiction under Section 1442(a)(1), the Third Circuit Court of Appeals, relying on Mesa and Willingham, set forth the following four criteria:

(1)     The defendant must establish that it is a "person" within the meaning of the statute;

(2)     The defendant must establish that the plaintiff's claims are based upon the defendant's conduct "acting under" a federal office;

(3)     The defendant must establish that it can raise a colorable federal defense; and

(4)     The defendant must establish a causal nexus between the plaintiff's claims and the conduct performed under color of federal office.

Feidt v. Owens Corning Fiberglas Corp., 153 F.3d 124, 127 (3d Cir. 1998); Megill, 1999 U.S. Dist. LEXIS 4433 at *6. The Court of Appeals did not otherwise analyze how these criteria should be applied because it determined that it was precluded from reviewing the District Court's remand decision pursuant to 28 U.S.C. § 1447(d). Feidt, 153 F.3d at 127.

The Supreme Court, however, has admonished that federal officers, and thus entities acting under such officers, "need not win his case before he can have it removed." Willingham, 395 U.S. at 407; Jefferson County, 527 U.S. at 431. "[O]ne of the most important reasons for removal is to have the validity of the defense of official immunity tried in a federal court. . . . Congress has decided that federal officers, and indeed the Federal Government itself, require the protection of a federal forum." Willingham, 395 U.S. at 407.

a.     Defendants are "persons" within the meaning of Section 1442(a)(1)

As recognized by this Court in Megill, a corporation is a "person" within the meaning of Section 1442(a)(1). 1999 U.S. Dist. LEXIS 4433 at * 6. Defendants, who are corporations, pleaded in Paragraph 23 of their Notice of Removal that they "are 'persons' acting under an officer of the United States or an agency thereof and are being

14

sued in [their] individual capacity for acts performed under color of office of such officer or agency."  Accordingly, Defendants have satisfied the first criterion.

            b.      <u>Plaintiffs' claims are based on Defendants' conduct "acting under"</u>
                      <u>federal office</u>

Ms. Angelic Little-Turner is a Foreign Affairs Officer assigned to manage the Afghan Police Program in INL in the U.S. Department of State.  Ex. 19, ¶ 1.  As stated in her Supplemental Declaration in support of Defendants' Opposition, Defendants were acting under direct orders from her office with ongoing and continuous oversight and directives.  Ex. 19,. ¶¶ 10-11, 14; Ex. 5, ¶ 8.  For example, Defendants, under the direction and oversight of the Department of State and the INL representative, conducted the Afghan police force training programs that are crucial to CIVPOL missions at DynHouse.  Ex. 19, ¶ 5, 10-11, 14; Ex. 5, ¶ 4.  Defendants, under the direction and oversight of the Department of State and the INL representative, were imbedded in the Afghan Ministry of the Interior (which oversees the Afghan police force) to assess problems existing in the Ministry that were hampering the reform effort, from which a comprehensive reform plan was proposed by and accepted by the Afghan Government. <u>Id.</u>; Ex. 6 at 25.  Defendants, under the direction and oversight of the Department of State and the INL representative, were responsible for recruiting, establishing, and maintaining a cadre of CIVPOL personnel for speedy deployment, among other things, as mandated by PDD 71.  Ex. 19, ¶ 5, 10-11, 14; Ex. 5, ¶ 3.  Defendants were also under the supervision of and subject to audit by the GAO.  <u>See</u> Ex. 6.

Defendants had limited discretion when performing the tasks under the CIVPOL Contract.  The materials used by Defendants for the Afghan police force training sessions

were prepared by the Justice Department's International Criminal Investigation Training Assistance Program.  Ex. 6 at 21.  The CIVPOL Contract also required Defendants, among other things, to obtain prior written approval for any travel under the contact (Ex. 4 at 9); to establish and maintain the cadre of 2,000 experienced law enforcement personnel at certain percentage levels for each specialty (id. at 11, 17); to provide a specific list of basic and personal equipment to each individual at a minimum and to obtain prior approval prior to purchasing any additional items (Ex. 9 at 11-12); to comply with multiple government regulations that were incorporated by reference, including the Federal Acquisition Regulation and the Department of State Acquisition Regulations (id. at 44-48); to recruit and hire personnel who possessed the required qualifications and experience established by the Department of State (id. at 17-26); and to provide certain insurance, such as the Defense Base Act insurance (id. at 39-40).  See also Complaint, ¶¶ 1, 11, 12, 18-21 (acknowledging that Defendants were acting pursuant to specific contractual obligations in Kabul).

With respect to security matters, Defendants were required to comply with the requirements of the CIVPOL Contract and seek approval from the RSO prior to implementing any additional or modifications to contract required measures.  Ex. 5, ¶¶ 11-21.  The CIVPOL Contract specifies the type of weapon to be issued to CIVPOL personnel (9mm weapon) as well as other personal security equipment (such as batons, reflective vests, and soft body armour).  Ex. 4 at 12.  The CIVPOL Contract also requires Defendants to "[t]ake appropriate actions to address security threats to contractor personnel and facilities."  Ex. 9 at 14.  These actions are dictated, in large part, by the RSO at the U.S. Embassy.  For example, the RSO inspected and approved the location of

DynHouse, approved task orders requesting upgrades or changes to the list of personal protective equipment to be issued to personnel, and placed travel restrictions on personnel.  Ex. 5, ¶¶ 13, 16, 17.

In addition, when Defendants, as part of the comprehensive security plan, desired to place Gurka guards at the gate of the DynHouse walled compound and at the ends of the street on which DynHouse was located, they had to seek approval from the RSO.  The RSO placed guidelines on the use and placement of Gurkas in and around the vicinity of DynHouse and approved the use of Gurkas from British regiments with English language facility.  Ex. 5, ¶ 15.

The Afghan Government and the RSO controlled and dictated what kind of security measures could be implemented on Kabul's streets.  Defendants did not have the authority to close the streets around DynHouse or put up vehicle barriers.  Ex. 1, ¶ 23; Ex. 5, ¶ 19; Ex. 7, ¶ 13-14 (Declaration dated October 2006 of Richard Cashon).  As described above, DynHouse was located in an affluent residential area in which many international organizations maintained offices and guesthouses.  Ex. 5, ¶ 14.  The street is heavily traveled by both vehicles and pedestrians.  Id.  Street closings and vehicle barricades that impeded traffic were the province of the Afghan Government, and the RSO had to seek permission from the Afghan Government before permitting American contractors, such as Defendants, to do so.  Id., ¶ 19; Ex. 1, ¶ 23; Ex. 7, ¶ 13-14.

In summary, Defendants' performance obligations, including responsibilities related to security issues, were established and prescribed by the CIVPOL Contract, the INL Representative, the RSO and ARSO, related task orders, the Afghan Government, and real-time warnings and orders from the RSO with respect to specific threats.  See Ex.

5, ¶¶ 3-21; see generally Ex. 4; Ex. 19, ¶ 15.  Consequently, with respect to all of the

activities that form the basis of Plaintiffs' claims, Defendants were acting under a federal

officer and/or agency.  See Watson v. Philip Morris Cos., 420 F.3d 852, 857 (8th Cir.

2005) (noting in *dicta* that courts "have found private actors, working under government

contracts, to be acting under the direction of a federal officers where the government

maintained control over the manner in which the contractor performed the contracted

work or monitored the performance of the work"); Virden, 304 F. Supp. 2d at 846

(holding that a government contractor is acting under a federal office if the federal

government "deputizes . . . [an] entity through a contract" because "its activities are

controlled and funded by the government").

<div align="center">

c.     Defendants have established colorable federal defenses

</div>

Defendants raised three federally-based defenses in their Notice of Removal: (1)

the government contractor defense established by the Supreme Court in Boyle v. United

Technologies Corp., 487 U.S. 500, 504-505 (1988); (2) the political question doctrine;

and (3) the Defense Base Act, 42 U.S.C. § 1651.  (D.I. 1, ¶¶ 17-18.)  Each of these

defenses was fully briefed in Defendants' Motion to Dismiss or, in the Alternative,

Motion to Transfer Venue, which is hereby incorporated by reference.  (See D.I. 14.)

Notably, "[o]nly one colorable defense is needed to meet this prong of the [Feidt] test."

Lane, 2006 U.S. Dist. LEXIS 63948 at *11.

<div align="center">

(1)     Government contractor defense

</div>

While neither the Third Circuit Court of Appeals nor this District Court has

applied the Boyle three-part test to nonmilitary service contracts, Defendants submit that

the government contractor defense applies in this case.  The Third Circuit Court of

<div align="center">

18

</div>

Appeals has acknowledged that "the federal interest in a performance contract . . . [is] essentially the same as the federal interests in procurement contracts" and that the defense is available to contractors who are "compelled by a contract to perform an obligation for the United States."  Carley v. Wheeled Coach, 991 F.3d 1117, 1120 (3d Cir. 1993) (holding that the government contractor defense applies to nonmilitary procurement contracts); see Hudgens v. Bell Helicopters/Textron, 328 F.3d 1329 (11th Cir. 2003) (applying the Boyle government contractor defense to service maintenance contracts); Malesko v. Correctional Services Corp., 229 F.3d 374, 381-382 (2d Cir. 2000), rev'd on other grounds, 534 U.S. 61 (2001) (stating in dicta that  "[w]here the government has directed a contractor to do the very thing that is the subject of the claim, we have recognized this as a special circumstance where the contractor may assert a defense"); In re World Trade Center Disaster Site Litig., 2006 U.S. Dist. LEXIS 75020 (S.D.N.Y. Oct. 17, 2006) (holding that "the immunity traditionally afforded to the federal government for actions taken in furtherance of its government functions" has been extended to "private entities hired to facilitate the government in the implementation of its programs and goals") (attached hereto as Ex. 11); Adorno v. Correctional Services Corp., 312 F. Supp. 2d 505, 521-522  (S.D.N.Y. 2004) (assuming applicability of the government contractor defense to a nonmilitary service contract); Richland-Lexington Airport Dist. v. Atlas Prop., Inc., 854 F. Supp. 400 (D.S.C. 1994).  Thus, Plaintiffs' unsupported assertion that "'uniquely federal interests' . . . are [not] relevant to private parties" (D.I. 11 at 2) stands in stark contrast to the Supreme Court's decision to establish the government contractor defense and apply a derivative sovereign immunity to acts

performed by government contractors pursuant to contracts with the United States.  See Boyle, 487 U.S. at 511-512.

In Boyle, the Supreme Court established the government contractor defense in the context of a design defect/product liability case.  Under a modified test found applicable to service contracts, Defendants are entitled to immunity with respect to the tort claims alleged in this case because: (1) the Department of State at all relevant times managed U.S. policy on civilian security issues, retained review and approval authority over the implementation of security measures and purchases, and established standard operating procedures and protocols for implementing security measures and responding to security warnings; (2) Defendants complied with the Department of State's policy, standard operating procedures, and protocols; and (3) Defendants were not aware of dangers posed by the policies, standard operating procedures or protocols issued by the Department of State with respect to security issues.  See Hudgens, 328 F.3d at 1335-1345 (holding that government service contractors are entitled to the government contractor defense and applying a modified three-part test to service contracts); Richland-Lexington, 854 F. Supp. at 423-424 (holding that nonmilitary government service contractors were entitled to the government contractor defense and applying a modified Boyle three-part test).

First, as described above, the "unique federal interest" at the heart of the government contractor defense, Boyle, 487 U.S. at 507, is obvious.  Defendants were performing tasks pursuant to a contractual obligation in support of an international peacekeeping mission supported and mandated by the President of the United States and implemented by the U.S. Department of State.  Defendants were training the Afghan

police force, working with the Afghan Ministry of the Interior, and participating in an international effort to establish a sustainable reform of the Afghan police force.

With respect to the first prong, the Department of State approved any security measures and provided specific instructions and directives regarding security measures. See Ex. 5, ¶¶ 13-21. The Department of State directly "manage[d] U.S. policy on . . . civilian security issues" in Kabul, Afghanistan. See Ex. 2. In addition, the Department of State specified exactly what kind of personal protective equipment must be supplied to personnel in the CIVPOL Contract. See Ex. 4 at 12. The Department of State specified the type of weapon to be issued to CIVPOL personnel (9mm weapon) and required personnel to be equipped with batons, handcuffs, reflective vests, and soft body armour. Id.

In addition, the RSO at the U.S. Embassy in Kabul inspected and approved the location of DynHouse, approved task orders requesting upgrades or changes to the list of personal protective equipment to be issued to personnel, approved the procedure for hiring and the placement of Gurkas in and around the vicinity of DynHouse, and placed travel restrictions on personnel. Ex. 5, ¶¶ 13, 15, 16, 17. The RSO issued direct, real-time warnings and directives to close down American facilities, such as DynHouse, when necessary. Pursuant to standard operating procedure and established protocol, warnings issued by ISAF were relayed to the RSO, who then disseminated the warnings to American personnel in Kabul with specific security measures to implement. Ex. 1, ¶ 21; Ex. 7, ¶ 9. Finally, Defendants did not have authority to close the streets around DynHouse or put up vehicle barriers around DynHouse. See Ex. 1, ¶ 23; Ex. 5, ¶ 19; Ex.

7, ¶ 13-14.  The street closings and vehicle barricades to impede traffic past DynHouse were the province of the Afghan Government.  Id.

In short, Defendants' security measures were based on their CIVPOL Contract with the Department of State, approval from the RSO and ARSO, related task orders, the Afghan Government, and real-time warnings and orders from the RSO with respect to specific threats.

Defendants complied with all of the Department of State's security directives and specifications.  Ex. 5, ¶ 20-21.  Thus, Defendants satisfy the second prong of the modified Boyle test.

Finally, Defendants were not aware of any dangers of which the Department of State was not aware.  Standard operating procedure and protocol dictated that ISAF warnings would be issued to all American personnel directly from the RSO.  Ex. 1, ¶ 21; Ex. 7, ¶ 9, 11, 12.  Thus, the chain of command required the RSO and the Department of State to have first knowledge of all warnings and threats.

In conclusion, Defendants have established a colorable federal defense based on the government contractor defense.  See Megill, 1999 U.S. Dist. LEXIS 4433 at *8-12 (analyzing the government contractor defense as a colorable federal defense); see also McMahon, 410 F. Supp. 2d at 1197-1198 (holding that the government contractor defense was raised as a colorable federal defense).

(2)    Political question doctrine

As held by the Court of Appeals for the Third Circuit, "'[t]he political question doctrine excludes from judicial review those controversies which revolve around policy choices and value determinations constitutionally committed for resolution to the halls of

Congress or the confines of the Executive Branch.'"  Gross v. German Foundation Indus. Initiative, 456 F.3d 363, 377 (3d Cir. 2006) (quoting Japan Whaling Ass'n v. Am. Cetacean Soc'y, 478 U.S. 221, 230 (1986)).  In Baker v. Carr, 369 U.S. 186 (1962), the Supreme Court articulated six factors to be considered in determining the presence or absence of a nonjusticiable political question:

> (1)    a textually demonstrable constitutional commitment of the issue to a coordinate political department; or
>
> (2)    a lack of judicial discoverable and manageable standards for resolving it; or
>
> (3)    the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion; or
>
> (4)    the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government; or
>
> (5)    an unusual need for unquestioning adherence to a political decision already made; or
>
> (6)    the potential for embarrassment from multifarious pronouncements by various departments on one question.

Id. at 217, cited and quoted by Gross, 456 F.3d at 377; In re: Nazi Era Cases Against German Defendants Litig. (Rozenkier v. AG Schering), 2006 U.S. App. LEXIS 19477, at *12 (3d Cir. Aug. 2, 2006) (dismissing survivor's claim against foundation created to compensate survivors of the Holocaust based on the political question doctrine because judicial review would express a lack of respect for the Executive Branch and its longstanding foreign policy interest in resolving Nazi-era claims through intergovernmental negotiations) (attached hereto as Ex. 12).  "A finding of any one of the six factors indicates the presence of a political question."  Gross, 456 F.3d at 377.

As set forth in Defendants' Motion to Dismiss, Defendants submit that this Court should dismiss this action under the political question doctrine because: (1) the Executive Branch's foreign policy decisions are implicated in almost every aspect of this case because the CIVPOL mission was under the auspices of the United States' relationship with the United Nations, Afghanistan, and other ally countries, such as Germany, Italy, the United Kingdom, and Japan (the five donor countries involved in the five pillared reform agenda in Afghanistan); (2) there are no judicially discoverable standards by which this Court could determine the adequacy of security measures in a hostile, conflict-ridden country like Afghanistan while simultaneously balancing the Department of State's policy, numerous government, coalition, and U.N. interests and authorities; and (3) the Court would essentially be second-guessing the Executive Branch's commitment to the CIVPOL program, which President Clinton mandated pursuant to PDD 71.  (See D.I. 14.)

Contrary to the assertion by Plaintiffs that the political question doctrine is not a federal defense available to Defendants (D.I. 11 at 2), several district courts have considered and applied the political question doctrine as a defense in similar cases involving government contractors.  See Fisher v. Halliburton, Inc., 2006 U.S. Dist. LEXIS 68413 (S.D. Tex. Sept. 22, 2006) (dismissing case based on the political question doctrine because the deaths and injuries suffered by civilian employees in Iraq occurred while under contract with the Army) (attached hereto as Ex. 14); Smith v. Halliburton Co., 2006 U.S. Dist. LEXIS 61980 (S.D. Tex. Aug. 30, 2006) (dismissing case based on the political question doctrine because negligence claims arose from a suicide bomb attack on a military base in Iraq) (attached hereto as Ex. 15); Lane, 2006 U.S. Dist.

LEXIS 63948 at *11-15 (holding that the political question defense is applicable to government contractors); Whitaker v. Kellogg Brown & Root, Inc., 2006 U.S. Dist. LEXIS 45708 (M.D. Ga. Jul. 6, 2006) (dismissing case based on the political question doctrine because the alleged negligence causing the soldier's death was based on acts performed by a government contractor's employee pursuant to the military's planning, orders and regulations) (attached hereto as Ex. 16).

In summary, because this case involves a review of the Executive's foreign policy decisions and missions, because there are no judicially discoverable standards upon which this Court could rely to determine if Defendants' acts or omissions were reasonable under the applicable tort laws, and because the Court would be second-guessing the Executive's policy decisions regarding the Afghan CIVPOL mission, Defendants have raised a colorable federal defense.  See Lane, 2006 U.S. Dist. LEXIS 63948 at *15 (denying remand because the government contractor "has presented enough facts to allow it to have this issue decided in a federal forum," even though it "may not have the evidence to prove that it was under the control of the Army at the time in question").

(3)     Defense Base Act

Defendants have also raised a colorable federal defense based on exclusivity provision of the Defense Base Act, 42 U.S.C. § 1651, a provision of a federal statute that preempts all of Plaintiffs' claims against Defendants.

Plaintiffs readily concede that the Employees were covered by the DBA while they were performing their work on the CIVPOL mission in Kabul.[4]  Complaint, ¶ 15.

---

[4]There can be no question that the Employees were covered by the DBA.  The DBA, 42 U.S.C. § 1651, applies to employees who are employed under a government contract or subcontract (1)

Thus, whether DBA coverage is required and whether it has been properly provided are not issues in this case.

For employees who are covered by the DBA, the death and disability benefits provided under the LHWCA are the exclusive remedy for the deaths and injuries suffered by DBA-covered employees.  See Ross v. DynCorp, 362 F. Supp. 2d 344, 358 (D.D.C. 2005) (granting judgment as a matter of law on the ground that the LHWCA, pursuant to the DBA, provided the exclusive remedies to plaintiffs who brought wrongful death and survivorship actions based on the death of an employee working under a government contract in Columbia, South America).  See also Flying Tigers Lines, Inc. v. Landy, 370 F.2d 46, 52 (9th Cir. 1966) (holding that the DBA evidenced Congress' intent that the LHWCA compensation scheme is to be the employee's sole remedy); Pulley v. Peter Kiewit Son's Co., 223 F.2d 191, 194 (7th Cir. 1955) (holding that the remedies provided by the LHWCA were exclusive as long as the employer complied with the mandates of the statute); Sparks v. Wyeth Lab., Inc., 431 F. Supp. 411, 417 (W.D. Okla. 1977) (holding that the DBA "makes the exclusive remedy of an employee of a covered government contractor against that contractor a compensation remedy under the

---

entered into with the United States or an applicable department or agency thereof; (2) that is to be performed outside the continental United States; and (3) entered into for the purpose of engaging in public work.  42 U.S.C. § 1651(a)(4).  Applying these factors to the present case, as alleged in the Complaint, it is clear that the Employees were covered by the DBA and that they received such coverage.  See Complaint, ¶¶ 15-16.  The Employees were employed under a subcontract to a general contract with the U.S. Department of State, thereby satisfying the first criterion.  See id., ¶¶ 1-4, 9, 11.  The Employees were employed to perform their duties in Afghanistan, thereby satisfying the second criterion for DBA coverage.  The Employees were employed under service contracts "to assist the democratic government of Afghanistan in developing a modern, indigenous police force to maintain peace and stability," a "public work" as defined by 42 U.S.C. § 1651(b)(1) (defining "public work" as any "service contracts or projects in connection with the national defense or with war activities" for the "public use of the United States or its allies").

[LHWCA]"); Berven v. Fluor Corp., 171 F. Supp. 89, 90 (S.D.N.Y. 1959) (dismissing complaint based on exclusivity of LHWCA benefits pursuant to the DBA).

The exclusivity provision of the DBA applies to Defendants. Section 1651(c) of the DBA plainly immunizes Defendants from liability. DBA, 42 U.S.C. § 1651(c). It provides:

> Liability as exclusive. The liability of an employer, *contractor (or any subcontractor or subordinate subcontractor with respect to the contract of such contractor) under this Act shall be exclusive and in place of all other liability of such employer, contractor, subcontractor, or subordinate contractor to his employees (and their dependents*) coming within the purview of this Act, under the workmen's compensation law of any Sate, Territory, or other jurisdiction, irrespective of the place where the contractor hire of any such employee may have been made or entered into.

42 U.S.C. § 1651(c) (emphasis added). As the plain language of the DBA states, a contractor's liability is limited to those remedies available under the DBA and its DBA liability "shall be exclusive and in place of all other liability." Id. The immunity from "all other liability" goes to any claims brought by or on behalf of the employees. Id. Thus, under Section 1651(c) of the DBA, Defendants, who are contractors (see Complaint, ¶¶ 1, 9, 10, 18), are immune from the tort claims brought by Plaintiffs arising out of the deaths and injuries suffered by the Employees.

Moreover, Section 1651(d) of the DBA defines "contractors" as "employers" under the Longshore and Harbor Workers' Compensation Act ("LHWCA"). Compare LHWCA, 33 U.S.C. § 905(a) with DBA, 42 U.S.C. § 1651(c) and § 1651(d). The DBA further provides that a contractor shall have "the rights, obligations, liability and duties *of the employer* under such Longshoremen's and Harbor Workers' Compensation Act." Id.

27

§ 1651(d) (emphasis added). Thus, the DBA expressly provides that a contractor is an employer for purposes of "the rights, obligations, liability and duties" under the LHWCA. Because Defendants are deemed to be employers under the LHWCA by the DBA, Defendants are entitled to the immunity provided to an employer under the LHWCA. Accordingly, because the Employees were properly provided DBA coverage, Defendants are not liable to the employees, their legal representatives, husbands or wives, parents, dependents, next of kin or anyone else who may be entitled to bring a claim against Defendants.

Finally, Defendants are entitled to assert the exclusivity of remedies as an affirmative defense under the LHWCA because Defendants in fact paid for DBA coverage for the Employees. See Ex. 17 (Insurance Endorsement adding U.S. Department of State Contract No. S-LMAQM-04-C-0030 for Afghanistan to the DBA Insurance Policy).[5] Because Defendants paid for DBA coverage, they are deemed the "employer" of the Employees for purposes of DBA benefits. See LHWCA, 33 U.S.C. § 905(a).[6]

In summary, because the DBA preempts all of Plaintiffs' allegations against Defendants, and Defendants are covered by the exclusivity provision of the DBA, Defendants have asserted a colorable federal defense based on the DBA, a federal statute.

---

[5] As Exhibit 18 shows, Defendant DynCorp International LLC entered into the MNSTC-I Contract, Contract No. S-LMAQM-04 C-0030, with the U.S. Department of State on February 18, 2004. In February 2004, DynCorp International LLC was owned by Computer Sciences Corporation ("CSC") and DynCorp, a wholly owned subsidiary of CSC. See Ex. 18, ¶ 8 (Declaration of H. Montgomery Hougen). In February 2005, CSC's and DynCorp's interests in DynCorp International LLC were sold to another entity. Thus, for purposes of this Opposition to Plaintiffs' Motion for Remand, during the relevant time period, DynCorp International LLC was owned by CSC and DynCorp and covered under CSC's DBA Insurance Policy.

[6] Section 905(a) provides in pertinent part: "For purposes of this subsection, a contractor shall be deemed the employer of a subcontractor's employees only if the subcontractor fails to secure the payment of compensation as required by section 4 [33 USC § 904]." 33 U.S.C. § 905(a).

d.     Defendants have established a causal relationship between the alleged wrongful acts and their official acts

As stated above, Defendants were required to comply with the requirements of the CIVPOL Contract and seek approval from the RSO prior to modifying contract-required security measures or implementing additional security measures. Ex. 5, ¶¶ 11-21.  In addition, Defendants had to seek approval from the RSO prior to implementing security measures not specifically mentioned in the contract and comply with any directives or orders issued by the RSO regarding the implementation of security measures.  Id., ¶ 18. Thus, there is a causal relationship between Plaintiffs' alleged wrongful acts and Defendants' authority.

With respect to Plaintiffs' allegations regarding the location of DynHouse (Complaint, ¶ 46(c)), the ARSO inspected and approved the location of DynHouse.  Ex. 5, ¶ 13.  The ARSO visited the site to determine if it was in an acceptable location vis-à-vis the U.S. Embassy, if the location provided the appropriate level of security, and if the location was suitable for the purposes of the CIVPOL Contract.  Id.  The DynHouse compound had been previously used by the U.S. military, and there was a wall around the compound that was topped with "razor" wire.  Id., ¶ 14.  Other international organizations also located their offices in or around the same area as DynHouse.   Id.  The ARSO approved the site and based on such approval, the Department of State authorized funding for expenses related to the use of this facility.  Id., ¶ 13.  Thus, the location of DynHouse was secured pursuant to explicit approval by the ARSO and the Department of State.

With respect to Plaintiffs' allegations that Defendants should have closed the streets around DynHouse or put up vehicle barriers around the DynHouse walled compound, the Afghan Government and the RSO controlled and dictated what kind of

29

security measures could be implemented on Kabul's streets. Defendants did not have the authority to close the streets around DynHouse or put up vehicle barriers. Ex. 1, ¶ 23; Ex. 5, ¶ 19; Ex. 7, ¶ 13-14 (Declaration dated October 2006 of Richard Cashon). As described above, DynHouse was located in an affluent residential area in which many international organizations maintained offices and guesthouses. Ex. 5, ¶ 14. The street is heavily traveled by both vehicles and pedestrians. Id. Street closings and vehicle barricades that impeded traffic were the province of the Afghan Government, and the RSO had to seek permission from the Afghan Government before permitting American contractors, such as Defendants, to do so. Id., ¶ 19; Ex. 1, ¶ 23; Ex. 7, ¶ 13-14.

With respect to Plaintiffs' allegations that Employees were not provided with basic security, the CIVPOL Contract specifies the type of weapon to be issued to CIVPOL personnel (9mm weapon) as well as other personal security equipment (such as batons, reflective vests, and soft body armour). Ex. 4 at 12. In addition, the RSO approved the use and placement of Gurkas in and around the vicinity of DynHouse. Ex. 5, ¶ 15. DynHouse, which had been used previously by the U.S. military and which the ARSO personally inspected and approved, was surrounded by a wall that was topped with "razor" wire. Id., ¶ 14. In addition, standard operating procedures and protocols, warnings issued by ISAF are first relayed to the RSO, who then disseminates the warning to all American personnel in Kabul with orders to implement appropriate security measures that may include orders to "lockdown" all American facilities. Ex. 7, ¶ 9.

In summary, as Ms. Littler-Turner acknowledges, all aspects of Defendants' CIVPOL operations in Kabul were established under the specific direction of the INL and the Department of State. Ex. 19, ¶ 14. Thus, there is a causal relationship between

Defendants' performance obligations (including responsibilities related to security issues), which were established and prescribed by the CIVPOL Contract, the INL Representative, the RSO and ARSO, related task orders, the Afghan Government, and real-time warnings and orders from the RSO with respect to specific threats, and the alleged wrongful acts or omissions alleged by Plaintiffs.[7]  See Ex. 5, ¶¶ 3-21; see generally Ex. 4.

In conclusion, Defendants have established and pleaded all four elements for removal under the federal officer removal statute.  Because Defendants have "sufficiently put in issue the questions of official justification and immunity[,] the validity of their defenses should be determined in the federal courts."  Willingham, 395 U.S. at 409 (holding that "[t]his is exactly what the removal statute was designed to accomplish").  See also Jefferson County, 527 U.S. at 432 (holding that "demanding an airtight case on

---

[7] Because there is a causal relationship between the government control over Defendants' activities in Kabul and the "litigated activity" (i.e., alleged wrongful acts or omissions claimed by Plaintiffs), the instant case is distinguishable from the cases cited by Plaintiffs in their opening brief.  This Court in Megill granted the remand motion because it found that there was no causal connection between the allegations in the complaint and the official acts because the government contractor did not provide any evidence that it was prohibited from taking certain actions.  Megill, 1999 U.S. Dis. LEXIS 4433 at *12.  Similarly, in New Jersey Dep't of Environ. Prot. v. Dixo Co., 2006 U.S. Dist. LEXIS 68288 (D.N.J. Sept. 22, 2006), the district court granted the remand motion because the government contractor could not establish that the government had control over the litigated activity.

Guckin v. Nagle, 259 F. Supp. 2d 406 (E.D. Pa. 2003), is simply inapposite to this case.  The district court in Guckin held that removal under Section 1442(a)(1) was not proper because the defendants were manufacturing an FDA-regulated devise for profit, not as a government contractor required to deliver a product to the United States.  Guckin, 259 F. Supp. 2d at 417-418.  Good v. Armstrong World Indus., Inc., 914 F. Supp. 1125 (E.D. Pa. 1996), was decided before Feidt and the district court in that case granted the motion to remand because the government contractor did not show that it was acting under a specific federal officer, even though the court acknowledged that it was acting under the United States Navy.  Good, 914 F. Supp. at 1129.  This Court effectively rejected the Eastern District of Pennsylvania's narrow construction of the "acting under a federal office" element in its decision in Megill when it followed "the Third Circuit's mandate to broadly construe the federal officer removal statute," and concluded that the government contractor in Megill had set forth sufficient control by the U.S. Navy.  Megill, 1999 U.S. Dist. LEXIS 4433 at * 7-8.

the merits in order to show the required causal connection" would defeat the purpose of the removal statute and accepting the "theory of the case" as an "adequate threshold showing that the suit is for an act under color of office" (quotations and citations omitted)).  Accordingly, Plaintiffs' motion for remand must be dismissed.  See Pack, 838 F. Supp. at 1103 (holding that defendants have raised a colorable federal defense for the purposes of § 1442(a)(1) removal and therefore, removal is appropriate under §§ 1441(a) and 1442(a)(1)).

B.    DEFENDANTS FOLLOWED PROPER PROCEDURE FOR REMOVAL OF THIS ACTION TO THIS COURT PURSUANT TO 28 U.S.C. § 1446

The process for removal is set forth in 28 U.S.C. § 1446.  It is not, as Plaintiffs correctly point out, an independent basis for removal.  Defendants referred to 28 U.S.C. § 1446 in its Notice of Removal to notify the Court that it had compiled with the procedural requirements for removal, not to assert this statutory provision as an independent basis for removal.

Under 28 U.S.C. § 1446(a), Defendants seeking removal must file a notice: (1) signed pursuant to Rule 11 of the Federal Rules of Civil Procedure; and (2) containing "a short and plain statement of the grounds for removal, together with a copy of all process, pleadings, and orders served upon such . . . defendants in such action."  28 U.S.C. § 1446(a). Section 1446(b) requires the notice of removal to be filed within thirty days after receipt of the initial pleading.  28 U.S.C. § 1446(b).  Section 1446(d) requires Defendants to provide notice of the removal to all adverse parties and to file a copy of the notice of removal with the state court in which the initial pleading was filed.  28 U.S.C. § 1446(d).

In accordance with these requirements, within thirty days of receipt of the Complaint, Defendants filed a notice of removal containing a "short and plain statement"

of their grounds for removal with a copy of all process served on Defendants.   In addition, Defendants served copies of the Notice of Removal on Plaintiffs and filed a copy with the Superior Court of the State of Delaware in and for New Castle County. (See generally D.I. 14.)   Counsel for Defendants signed the Notice of Removal under Rule 11.  Defendants' failure to present the basis for removal in accordance with Feidt is not procedurally fatal.  See Guckin v. Nagle, 259 F. Supp. 2d 406, 416 n.10 (E.D. Pa. 2003) (evaluating propriety of removal under Feidt even though the defendants "did not tailor its arguments on federal officer removal to fit exactly within the parameters of the inquiry established in Feidt").

Defendants' failure to submit declarations in support of its allegations in the Notice of Removal is also not fatal to the removal.  The Supreme Court has held that while supporting documentations "should have appeared in the petition for removal, . . . it is proper to treat the removal petition as if it had been amended to include the relevant information contained in the later-filed affidavits."  Willingham, 395 U.S. at 407 n.3. Courts are to consider the entire record to determine if removal is proper.  Id. at 407 (considering affidavits filed in support of a motion for summary judgment in determining basis for removal); see Lane, 2006 U.S. Dist. LEXIS 63948 at *5 (holding that Section 1442(a) creates an exception to the well-pleaded rule and that the court may look to defendant's pleadings to determine jurisdiction).  Moreover, a "notice of removal" is not a motion seeking relief and thus is not required to be submitted with supporting affidavits.   Malsch, 361 F. Supp. 2d at 586 n.2 (rejecting plaintiff's argument that defendant waived its right to submit supporting documentation because it did not submit such documentation with its notice of removal).

33

C.     DEFENDANTS' REMOVAL IS BASED ONLY ON THE FEDERAL OFFICER
       REMOVAL STATUTE

Plaintiffs' challenges to Defendants' removal are based on a serious misreading and misrepresentation to this Court of Defendants' Notice of Removal.  Plaintiffs refer only to the preamble and paragraphs 13, 17, and 18 of the Notice of Removal as "the only grounds defendants have provided for removal."  (D.I. 11 at 3.)  This is not true. Plaintiffs pointedly ignore paragraph 16 of the Notice of Removal, which plainly states:

> The United States District Courts have original jurisdiction over this civil action pursuant to 28 U.S.C. § 1442(a)(1), which provides a civil action originally filed in a State court may be removed if it is against the "United States or any agency thereof or any officer (or any person acting under that officer) of the United States or of any agency thereof, sued in an official or individual capacity for any act under color of such office," because, as a CIVPOL government contractor, at all relevant times to this Complaint, Defendants were acting under the direction and color of the United States.

D.I. 1, ¶ 16.  Contrary to Plaintiffs' remark that Defendants have "failed to state their grounds for removal with any specificity" (D.I. 11, p. 4), Paragraph 16 clearly and specifically states that the removal of this case is based on the federal officer removal statute.  It is difficult to imagine how Defendants' statement could have been more clear to inform Plaintiffs that the removal in this case was based on 28 U.S.C. § 1442(a)(1).

Defendants referred to 28 U.S.C. § 1331 because the averment of federal questions is a prerequisite for the federal officer removal statute.  See Mesa, 489 U.S. at 136 (holding that "it is the raising of a federal question in the officer's removal petition that constitutes the federal law under which the action against the federal officer arises for Art. III purposes").  It is not an independent basis for removal in this case and Defendants clearly have not pleaded any facts or presented any arguments to support

34

removal on this basis in their Notice of Removal. Defendants raised federal defenses, such as the government contractor defense, the political question doctrine, and the immunity under the Defense Base Act (a federal statute), as bases for removal under Section 1442(a)(1) and in accordance with the <u>Feidt</u> test. Thus, Plaintiffs' challenge to Defendants' removal of this case on this ground is irrelevant and frivolous.

Similarly, Plaintiffs' second basis for challenging Defendants' removal -- that removal is improper under Section 1441(b) -- is without merit. Defendants have not asserted removal under Section 1441(b). Paragraph 16 of the Notice of Removal clearly states that removal is based on Section 1442(a)(1). Because Section 1441 addresses removal actions generally, a Section 1442 removal also falls under this general provision. <u>See</u> <u>Pack</u>, 838 F. Supp. at 1103 (holding that defendants have raised a colorable federal defense for the purposes of § 1442(a)(1) removal and therefore, removal is appropriate under §§ 1441(a) and 1442(a)(1)).

In summary, the one and only basis for removal in this case is clearly, plainly, and unambiguously stated in paragraph 16 of Defendants' Notice of Removal - 28 U.S.C. § 1442(a)(1).

D.    <u>PLAINTIFFS ARE NOT ENTITLED TO ATTORNEY FEES</u>

Plaintiffs' motion for remand is based on a misreading of Defendants' plainly and clearly stated basis for removal. Had Plaintiffs' presented to this Court a fair reading of the entire Notice of Removal, including paragraph 16, they would have been force to admit that removal is based on 28 U.S.C. § 1442(a)(1) and that removal under the federal officer removal statute allows removal based on the assertion of a federal defense even if the complaint does not allege a claim based on federal law. <u>See</u> <u>Mesa</u>, 489 U.S. at 139

35

(holding that removal under 28 U.S.C. § 1442(a) "must be predicated upon averment of a federal defense").

To that end, Plaintiffs' assertion -- that "'Defendants' performance under the CIVPOL Government Contract was directed and monitored by the United States Department of State' is directly in opposition to all of the existing precedent, provides no grounds for overruling or distinguishing that precedent, and does not even conform to the pleading requirements set forth by the Third Circuit in <u>Feidt</u> and recognized by this Court in <u>Megill</u>" -- is absolutely specious.  The extent of government control and direction is one of the central factors in the <u>Feidt</u> test.  <u>See</u> <u>Feidt</u>, 153 F.3d at 127 (holding that defendants must establish that "plaintiff's claims are based upon the defendant's conduct 'acting under' a federal office"); <u>Megill</u>, 1999 U.S. Dist. LEXIS 4433 at *6 (citing <u>Feidt</u>). Defendants were not making that statement to provide a basis for overturning or overruling precedent -- the statement was made in accordance with well established precedent.  And finally, as shown above, Defendants pleaded the necessary elements of the <u>Feidt</u> test.

In addition, filing the Notice of Removal within the time allowed under the Delaware Rules of Civil Procedure does not support Plaintiffs' completely unfounded presumption that "the sole purpose" of Defendants' removal was to "prolong[] Plaintiffs' litigation as much as possible."  (D.I. 11 at 10.)  In that same vein, it is worth noting that Plaintiffs re-filed their lawsuit two years after the date of the accident.  They initially filed this lawsuit in the Southern District of New York on August 29, 2005.

As shown above, Defendants have an "objectively reasonable basis for seeking removal" and thus, Plaintiffs' request for fees must be denied.  <u>See</u> <u>Martin v. Franklin</u>

Capital Corp., 126 S. Ct. 704, 711 (2005) (holding that "when an objectively reasonable basis exists, fees should be denied). Without commenting in detail on the quality of Plaintiff's Motion for Remand, suffice it to say that their request for attorney fees is utterly lacking in merit and should be dismissed.

## **CONCLUSION**

For all of the foregoing reasons, Defendants submit that they properly pleaded the four elements necessary for federal officer removal as set forth in Feidt and that removal of this case was entirely proper. Consequently, Defendants respectfully request that this Court deny Plaintiffs' Motion for Remand.

<table>
<tr><td></td><td>SMITH, KATZENSTEIN & FURLOW LLP</td></tr>
<tr><td><em>Of Counsel</em>:<br>Robert B. Wallace<br>Kevin P. Farrell<br>Yoora Pak<br>WILSON, ELSER, MOSKOWITZ,<br>EDELMAN & DICKER LLP<br>The Colorado Building<br>1341 G Street, N.W., 5th Floor<br>Washington, DC 20005<br>Telephone:     (202) 626-7660<br>Facsimile:     (202) 628-3606</td><td><br><br>_____/s/_____ <em>Robert K. Beste</em>_____.<br>Robert J. Katzenstein (Del. ID No. 378)<br>Robert K. Beste, III (Del. ID No. 3931)<br>800 Delaware Avenue, 7th Floor<br>P.O. Box 410<br>Wilmington, DE 19899 (Courier 19801)<br>Telephone:     (302) 652-8400<br>Facsimile:     (302) 652-8405</td></tr>
<tr><td></td><td><em>Attorneys for Defendants<br>DynCorp International, Inc., DynCorp<br>International LLC, and CSC Applied<br>Technologies LLC</em></td></tr>
</table>

November 3, 2006

37

## CERTIFICATE OF SERVICE

I hereby certify that **DEFENDANTS' OPPOSITION TO PLAINTIFFS'
MOTION FOR REMAND** was served on the following via ECF on this 3rd day of
November, 2006:

      Neilli Mullen Walsh
      Ben T. Castle
      Young Conawat Stargatt & Taylor, LLP
      The Brandywine Building
      1000 West Street, 17th Floor
      P.O. Box 391
      Wilmington, DE 19899-0391

                              /s/    *Robert K. Beste*            .
                                Robert K. Beste, III  (ID No. 3931)

# EXHIBIT 1

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| MICHELLE DEULEY, *et al.* )<br><br>Plaintiffs, )<br>)<br>v. )<br>)<br>DYNCORP INTERNATIONAL, INC., )<br>*et al.* )<br>)<br>Defendants. )<br>——————————————————— ) | C.A. No. 06-cv-605 (GMS) |

## DECLARATION OF ANGELIC LITTLE-TURNER

I, Angelic Little-Turner, certify that I am over the age of eighteen (18) years and that I have personal knowledge of the matters set forth herein.

1.      I am currently a Foreign Affairs Officer assigned to manage the Afghan Police Program in the Bureau of International Narcotics and Law Enforcement Affairs ("INL") in the U.S. Department of State.  I have been in my current position for 5 years.

2.      In 2004, I was the Program Manager stationed in Washington, D.C.  I was assigned on Temporary Duty (TDY) to the U.S. Embassy in Kabul, Afghanistan from August 29, 2004 to September 1, 2004.

3.      I am familiar with the State Department's Civilian Police ("CIVPOL") missions.

4.      INL oversees the participation of the United States in CIVPOL missions in various countries.

5.      CIVPOL missions are sponsored by the United Nations and/or regional security organizations.

244701.1



6.    CIVPOL missions are regarded as a vital tool in U.S. foreign policy and important as peacekeeping missions.

7.    Decisions to deploy CIVPOL missions are made after consultation with the White House, Department of State, Department of Defense, and other agencies.

8.    Upon deployment, CIVPOL personnel are under the operational control of the sponsoring organization.

9.    The private contractor maintains an office in the mission area to provide administrative and support services to their personnel.

10.    During the life of the CIVPOL mission, the State Department, among other things, provides funding and oversight for mission operations, and manages U.S. policy on CIVPOL operations, other related law enforcement, and civilian security issues.

11.    CIVPOL missions are deployed through government contracts with private companies.

12.    The State Department participated in a CIVPOL mission in Afghanistan.

13.    The United States' assistance in Afghanistan is based on a Letter of Agreement between the Government of Afghanistan and the United Nations.

14.    DynCorp International LLC was selected as the general contractor(s) for the CIVPOL mission in Afghanistan.

15.    As a CIVPOL government contractor, Defendants are required to abide by State Department regulations and requirements.

16.    As the contractor, Defendants were responsible for recruiting, selecting and deploying civilian police officers for the CIVPOL mission. Defendants are permitted to subcontract these responsibilities to another entity.

2

244701.1

17.    State Department regulations and requirements dictate the contractor's recruitment, selection, equipment, and deployment of civilian police officers for a CIVPOL mission.

18.    If the State Department's Contracting Officer responsible for CIVPOL contract oversight determines that continued performance under the CIVPOL contract by any Contractor or subcontractor personnel is contrary to the public interest, the Contracting Officer may require the Contractor shall remove the employee from all work under the CIVPOL contract.

19.    The State Department required contractors, such as Defendants, to lease facilities in Kabul and to provide security for those facilities.

20.    I am familiar with the International Security Assistance Force ("ISAF"), an international force of about 30,000 troops mandated by the United Nations and commanded by the North Atlantic Treaty Organization ("NATO").

21.    Pursuant to standard operating procedure and established protocol, warnings issued by ISAF are relayed to the U.S. Embassy's Resident Security Officer ("RSO") in Kabul. The RSO then disseminates the warning to all American personnel in Kabul, including government contractors, with orders to implement appropriate security measures that may include orders to "lockdown" all American facilities.

22.    On August 29, 2004, I am not aware of any directive by the RSO to lock down "DynHouse" or of any efforts to seek approval from the Government of Afghanistan to close off streets or otherwise restrict vehicular traffic.

23.    Before a contractor could close streets adjacent to their offices or buildings in Kabul or deploy vehicle barricades, the contractor would have had to make that request to the RSO, who would have been responsible for evaluating the request and if the RSO deemed it

appropriate of discussing this security measure with the Afghan Government. Permission to close a street or deploy vehicle barricades could only have been granted by the Afghan Government.

24.    I am familiar with the car bombing that occurred on August 29, 2004, at a location in Kabul known as "DynHouse." In fact, I was on my way to DynHouse for a meeting when the bombing occurred.

**I DECLARE UNDER PENALTY OF PERJURY THAT THE FOREGOING IS TRUE AND CORRECT.**

Executed on October 24, 2006.

Angelie Little-Turner
Foreign Affairs Officer
International Narcotics and Law Enforcement Affairs
U.S. Department of State
Washington, D.C.

244701.1

4

**EXHIBIT 2**



Daily Press Briefing | Other News...
SEARCH [GO]
Subject Index

**U.S. DEPARTMENT of STATE**

Home | Issues & Press | Travel & Business | Youth & Education | About State Department

**Bureau for International Narcotics and Law Enforcement Affairs**

**International Civilian Police Program (CivPol)**

- Fact Sheets
- Archive

# International Civilian Police Program (CivPol)

In addition to its anti-narcotics and anti-crime programs, the Bureau for International Narcotics and Law Enforcement Affairs recruits U.S. police officers from all over the country to participate in international civilian police activities and local police development programs in countries around the world.

Civilian police officers from over 50 countries are deployed around the globe in support of international peacekeeping operations. CIVPOL programs most often are sponsored by the United Nations but also can be sponsored by regional security organizations such as the Organization for Security and Cooperation in Europe (OSCE). The U.S. participated in its first CIVPOL mission in 1994 in Haiti. Today, more than 700 U.S. police officers are contributing to public safety in areas recovering from conflict.

Recruitment information for International Police Programs can be found at these websites:

- www.civilianpolice.com
- www.PoliceMission.com
- www.paecivpol.com

For more information about the CIVPOL program, please see the State Department fact sheet on international civilian police.



**What's New | Frequent Questions | Contact Us | Email this Page | Subject Index | Search**
The Office of Electronic Information, Bureau of Public Affairs, manages this site as a portal for information from the U.S. State Department. External links to other Internet sites should not be construed as an endorsement of the views or privacy policies contained therein.
**FOIA | Privacy Notice | Copyright Information | Other U.S. Government Information**



EXHIBIT 2



Fact Sheet
Bureau for International Narcotics and Law Enforcement Affairs
Washington, DC
May 18, 2005

# The United States and International Civilian Policing (CIVPOL)

*[For more information on the CIVPOL program, please contact CIVPOL@state.gov]*

**The CIVPOL Mission**

Civilian police (CIVPOL) from over 50 countries are deployed around the globe in support of international peacekeeping operations. Their presence promotes peace and stability in areas recovering from conflict and their efforts to develop modern, democratic indigenous police forces help to ensure that peace and stability can be sustained, even after international peacekeepers depart.

Most CIVPOL programs are sponsored by the United Nations (UN), but they are also sponsored by regional security organizations such as the Organization for Security and Cooperation in Europe (OSCE) or by coalitions of interested countries. Today, more than 7,500 international police are deployed in UN CIVPOL missions alone.

The UN launched its first CIVPOL mission in the Congo in 1960, but CIVPOL did not become a major component of peacekeeping operations until the end of the Cold War. Since then, they have become an integral component of what were traditionally military peacekeeping operations.

CIVPOL missions vary. In some missions, officers perform typical law enforcement functions (patrol, investigation, etc.) in the absence of professional indigenous police forces. In other cases, CIVPOL may be responsible for restructuring, monitoring, and/or advising local police who are making the transition to democratic policing. They also may be directly involved in the training and development of local police.

**The United States and CIVPOL**

The United States participated in its first CIVPOL operation in 1994 in Haiti. The United States led the multinational military intervention to restore the elected government of Haiti and sponsored a 20-country International Police Monitor (IPM) mission to help provide public security, maintain the rule of law, and establish a new Haitian National Police Service. The IPM mission transitioned to the UN in March 1995.

CIVPOL have become a vital tool of U.S. foreign policy. Only 50 American police participated in the Haiti CIVPOL mission in 1994. Since then, over 4,000 experienced U.S. police officers and law enforcement experts have participated in CIVPOL missions in Bosnia-Herzegovina (1996-2002); the Eastern Slavonia region of Croatia (1996-2003); Jericho (2002); Palestinian Authority (2003); Sierra Leone (2003-2004); East Timor (1999-2005); OSCE Head Quarters in Vienna (2002-2004); Haiti (1996-2000; 2004-present); Kosovo (1999-present); Serbia & Montenegro (2001-present); Macedonia (2002-present); Afghanistan (2002-present); Iraq (2003-present); and Liberia (2003-present). Currently, more than 1,000 American officers are deployed to CIVPOL missions. This dramatic climb in U.S. participation in CIVPOL missions reflects the U.S. Government's recognition of its importance to peacekeeping missions in the post-cold war world. While international military forces often are necessary to restore a secure environment following a major conflict, they generally are not, in themselves, sufficient for the long-term reestablishment of civil order where local institutions have broken down. CIVPOL not only assist international military forces in the short term by addressing civilian law enforcement matters, but also help to develop the local democratic policing institutions

that ultimately will be responsible for all law and order functions once the military and CIVPOL depart.

Decisions to deploy U.S. CIVPOL in a specific mission are made at the highest levels of the federal government based on consultations among the White House, Department of State, Department of Defense, and other agencies. The responsibility for managing U.S. CIVPOL and related issues rests with the Department of State.

**The Mechanics of U.S. CIVPOL**

Most other countries that provide CIVPOL have national police forces and related personnel mechanisms to deploy officers for overseas service. Because the United States does not maintain a national police force, we must seek volunteers on an individual basis. To handle such a large task, the State Department contracts with private companies, currently DynCorp International, Civilian Police International LLC, and PAE Government Services, Inc. The contractors implement requirements provided by the State Department to recruit, select, equip, and deploy police from all over the country. After conducting a rigorous screening process, the companies contract with individual officers to provide their salary and benefits for one year.

Following pre-deployment training in the United States, officers are sent to the mission area and are "seconded" to the UN (or other sponsoring organization -- such as the OSCE). In mission, officers are under the operational control of the sponsoring organization, which also provides officers with an allowance to cover food, lodging, and incidental expenses. The contractors maintain offices in the mission areas to handle administrative and support (e.g. medical) issues, and assist with programs designed to improve quality of life (i.e., video libraries, fitness equipment).

Throughout the life of a mission, the State Department provides funding and oversight for mission operations, manages U.S. policy on CIVPOL operations and other related law enforcement and civilian security issues, provides bilateral assistance to local police forces, engages with the UN and other CIVPOL contributing countries on mission priorities and challenges, and keeps Congress, other U.S. Government agencies, and the White House informed of progress.

# EXHIBIT 3



**PDD-71**

---

24 February 2000

## Text: The Clinton Administration White Paper on Peace Operations

(On rebuilding effective foreign criminal justice systems) (5510)

The Clinton Administration's WHITE PAPER on PDD-71 dealing with "Strengthening Criminal Justice Systems in Support of Peace Operations" states that "the intent of PDD 71 is that the Executive Branch of the U.S. Government improve its capacities to participate in rebuilding effective foreign criminal justice systems by implementing the directives described in this white paper.

"Furthermore," the white paper says, "together with U.S. allies, the Executive Branch shall seek to improve the capacities of other organizations to participate in these activities.

"By enhancing U.S. capabilities and helping others to do the same," the white paper says, "the U.S. will be better prepared to advance its national interests when those interests require the reestablishment of a criminal justice system overseas."

Following is the State Department text:

(begin text)

WHITE PAPER

The Clinton Administration's Policy on Strengthening Criminal Justice Systems in Support of Peace Operations

February 2000

Contemporary peace operations and other complex contingencies, though aimed at mitigating military conflict, often confront considerable civil disorder, violence, and crime. Time and again, we have seen that as military conflict ends (and armies demobilize), a security vacuum develops that indigenous law enforcement organizations cannot fill, at least initially. These institutions usually have been destroyed, rendered ineffective by the conflict or corruption, or become part of the conflict due to partisan behavior. In Somalia, for example, the police simply left their posts in 1991 when a new government failed to emerge after the Siad Barre government was deposed. In Haiti and Bosnia, the police were involved in the conflict and consequently were viewed as biased combatants rather than public servants by large segments of the population. Even before the conflict arose, the public safety forces in Haiti, as in many areas where peace operations are conducted, were the primary instrument for state-sponsored repression of the citizens.

The phenomenon of nonexistent, inept, or partisan police forces is not unique to peace operations. Similar problems occurred following the U.S. interventions in Grenada and Panama during the 1980s. Furthermore, in all these situations the other aspects of the



EXHIBIT
3

11/2/2006

indigenous criminal justice system, the judicial system, the penal system, and the law code, were in disarray and needed substantial reform.

Effective indigenous law enforcement and criminal justice systems are necessary for a society to achieve and maintain durable peace. Therefore, helping to reestablish an indigenous criminal justice system is often, and appropriately, a fundamental aspect of a successful peace operation or other complex contingency operation. The experience of the U.S. Government and the international community has demonstrated the difficulty and complexity of this task. In spite of the difficulties that have been faced, our experience also demonstrates that participating in both bilateral and multilateral efforts to reconstitute indigenous criminal justice systems, promoting public safety in the short term and developing responsive criminal justice institutions over the long term, can successfully and economically support American interests.

In addition to helping bring peace operations to successful completion, an effective and just criminal justice system in countries emerging from conflict serves other very important U.S. interests. In particular, it helps to deter the presence of criminals who seek to base their operations in areas where they can operate without fear of arrest and prosecution. Such wrongdoers often include organizers of terrorism, illicit drug and arms trafficking, and international criminal syndicates.

Intent

The intent of PDD 71 is that the Executive Branch of the U.S. Government improve its capacities to participate in rebuilding effective foreign criminal justice systems by implementing the directives described in this white paper. Furthermore, together with U.S. allies the Executive Branch shall seek to improve the capacities of other organizations to participate in these activities. By enhancing U.S. capabilities and helping others to do the same, the U.S. will be better prepared to advance its national interests when those interests require the reestablishment of a criminal justice system overseas.

Scope of the PDD

PDD 71 is the third in a series of PDDs designed to promote U.S. interests by improving our ability to effectively manage or resolve inter and intra-state conflict. The other two documents, PDD-25, U.S. Policy on Reforming Multilateral Peace Operations and PDD-56, Managing Complex Contingency Operations, and this new directive should be applied together. This directive amplifies guidance given in PDD-25 concerning police and judicial dimensions of peace operations.

PDD 71 applies to U.S. Government processes dealing with peace operations and other complex contingency operations as defined in PDDs 25 and 56 respectively. The Peacekeeping Core Group (PCG) as described in PDD-25, under the review of the Deputies Committee, shall remain the primary interagency policy development body for peace operations, including the issues related to public safety and criminal justice addressed in this directive. Further, when an Executive Committee (ExCom) as described in PDD-56 is established, it shall be the primary interagency mechanism to conduct political-military planning and to coordinate the day-to-day management of U.S. participation in a

specific operation.

This white paper is organized in four sections: improving U.S. Government organization and capabilities, improving capabilities of other organizations, activities at the operational level, and general policy guidance.

Improving U.S. Government Organization and Capacities

Create a Lead Agency: The State Department shall create an office, or modify an existing one, to assume lead agency responsibility for the full spectrum of issues related to U.S. Government involvement in the reform of criminal justice systems during peace operations and complex contingencies. This office shall be responsible for policy development, all aspects of provision and oversight of U.S. CIVPOL to field operations, development and implementation of training and technical assistance plans and programs for foreign police forces, and priority setting and coordination among other U.S. activities relating to the criminal justice system, among other tasks. Consolidation of these functions within the agency that has primary responsibility for foreign policy will enable the U.S. Government to be more responsive by clarifying responsibilities among the Departments of State, Justice, and Defense and the U.S. Agency for International Development (USAID).

When the integrated planning processes described in PDD-56 are used, the lead agency shall normally lead development of the portions of the political-military (pol-mil) plan dealing with public safety and restoration of the criminal justice system. When related issues fall under the purview of another part of the Government, such as reform of the judicial system, which has traditionally been accomplished by USAID and the Department of Justice, the lead agency shall normally organize and lead an interagency working group of the various governmental organizations to coordinate and prepare products for the pol-mil plan. When the lead agency is developing policies and long-range plans for future programs and contingencies, it shall involve the Department of Justice and other interested agencies.

At the request of the Peacekeeping Core Group (PCG) or ExComm, the lead agency shall be responsible for developing and providing pol-mil planning advice and liaison on public safety and criminal justice issues in peace operations and complex contingencies to other organizations and countries.

At the request of the PCG or ExComm, the lead agency shall organize and lead an interagency criminal justice assessment team for a specific operation. The purpose of such a team shall be to gather information and facilitate development of a comprehensive plan for reform. Assessment teams could also be used to help develop benchmarks, measure progress against those benchmarks, and develop advice for mid-course corrections. An assessment team will normally be composed of a full range of criminal justice experts from throughout the U.S. Government, including persons from the Department of Justice, USAID, and federal law enforcement agencies. The Departments of State, Defense, Justice, Treasury, Transportation, Agriculture, Interior, and any law enforcement agencies under their auspices shall be prepared to participate in these assessment teams as needed.

It is appropriate for the lead agency to use contractor support to assist in its duties when cost effective, reasonable, and consistent

with laws and regulations. Furthermore, the other Departments and Agencies shall consider providing various types of support to the lead agency, including seconding personnel to serve in the responsible office.

Since our efforts to help rebuild foreign criminal justice systems are usually a multiyear activity, the lead agency and other responsible agencies shall seek adequate, designated funding in subsequent years of a particular operation until our foreign policy goals are accomplished. Further, the Secretary of State and the Director of the Office of Management and Budget shall work together to ensure that programs conducted by or through the lead agent are funded at a level that reflects the high priority I give to these activities.

Enhance U.S. Government Capacity to Provide CIVPOL to Field Operations: Since 1994, which marked the initiation of the operation in Haiti, the United States has steadily increased its contributions of civilian police officers to peace operations. In 1996, the U.S. contribution was 154 officers in an average month; in 1997 the average was 275. By the end of 1999, the U.S. had more than 600 CIVPOL deployed. These contributions have been to operations in Haiti, the Former Yugoslavia, and East Timor. It will be in the U.S. interest to continue to participate in and support CIVPOL activities. As always, future decisions on U.S. involvement in CIVPOL activities will be coordinated on a case-by-case basis through the Peacekeeping Core Group, as described in PDD-25.

The current process used by our Government to recruit, prepare, train, and deploy civilian police officers to CIVPOL operations is not adequate. The lead agency shall place special emphasis on making immediate improvements. Improvements should focus, in part, on improving the speed with which the U.S. is able to provide personnel for specific CIVPOL operations and enabling the U.S. to participate in UN Standby Arrangements with CIVPOL. The lead agency also should develop mechanisms to improve the discipline and accountability of U.S. CIVPOL officers deployed in UN missions, to include the possibility of a more formal affiliation with the lead agency. The lead agency shall identify any new legislative authorities that would be necessary to implement such improvements. Another broad area for improvement relates to the recruitment and preparation of U.S. CIVPOL. In this regard, the lead agency, or another agency operating under its supervision, must develop training programs for U.S. CIVPOL that incorporate all aspects of service in a CIVPOL field operation. To further enhance the law enforcement expertise of the lead agency, the U.S. Secret Service and the U.S. Park Police shall consider providing, if requested, an individual with appropriate law enforcement and technical expertise to the lead agency to serve within the office responsible for the management of U.S. CIVPOL contributions.

The lead agency shall specify funds within its budget submissions to cover the costs related to the provision of U.S. CIVPOL to field operations, including reimbursement to the state and municipal law enforcement agencies for their participation and seek any additional implementing legislation, if necessary. Necessary reimbursement procedures shall be negotiated between the federal government and the law enforcement agencies. Given the organization of the U.S. law enforcement system, the majority of U.S. CIVPOL will likely come from state and municipal law enforcement agencies. Members of the federal law enforcement agencies should also be available for CIVPOL service on a voluntary basis similar to municipal officers, or via another

appropriate method.

Enhance U.S. Government Capacity to Provide Training and Developmental Assistance to Foreign Police Forces: The U.S. Government should enhance its capability to train and develop foreign police forces during peace operations and other complex contingencies. The agencies involved in implementation must work from a common set of goals and must receive adequate institutional support, especially at the headquarters-level. Furthermore, they must devise programs that include mechanisms to ensure that human rights issues receive adequate attention and oversight.

To carry this out, the Secretary of State and the Attorney General, within four months of the signing of PDD 71, shall prepare a plan to implement this guidance and present it to the President through the Assistant to the President for National Security Affairs. In the plan, the Attorney General should specifically address measures by the Department of Justice which are necessary to broaden and strengthen ICITAP's capacity to engage in long-range planning to support the policy and planning development work of the lead agency, as well as ICITAP's capacity to both provide training and coordinate with CIVPOL activities in support of peace operations and other complex contingencies.

Create an Interagency Partnership in Judicial, Penal, and Legal Code Developmental Assistance: In the increasingly global world, U.S. national security and other interests are inescapably linked to the effectiveness of foreign criminal justice systems. When such systems break down or are destroyed, the damage is felt in a variety of ways, ranging from economic interests, to humanitarian concerns, to the physical safety of American citizens. We must therefore continue to expand and improve cooperation and development activities with other countries, especially those emerging from periods of instability where havens of criminal impunity might otherwise develop.

To respond rapidly and effectively to emerging contingencies, the Secretary of State will call upon relevant departments and agencies to participate in operations pertaining to urgent and immediate interventions in the criminal justice sector. The Department of State, as lead agency, will harmonize and assure rapid response assistance, training and other necessary support to strengthen judicial and penal systems and legal code reform during complex contingencies and in their aftermath.

The Attorney General and the Administrator of the U.S. Agency for International Development shall establish a partnership that will include subordinate offices, including ICITAP, OPDAT, and the USAID's Center for Democracy and Governance, to improve the capability of the U.S. Government to develop and assure delivery of rapid response assistance. Working through the Center for Democracy and Governance, these offices will conduct contingency planning and develop emergency assistance programs, relying on analyses of ongoing and past assistance programs and resulting lessons learned to guide future actions. The Center will draw upon the expertise of USAID's Office of Transition Initiatives as well as the expert resources available within other departments and agencies as necessary.

During the planning and execution of peace operations and complex contingencies, the Center for Democracy and Governance shall coordinate its developmental assistance activities with the lead

agency, which will retain overall responsibility for planning, overseeing, and coordinating U.S. actions to rebuild the criminal justice sector. Programs must be developed that enable the U.S. to respond quickly to help establish rudimentary judicial and penal capacity during peace operations and complex contingencies. These programs must at the same time lead to sustainable, credible, and legitimate state institutions necessary for long-term stability. Therefore, they should be implemented in the context of a broader criminal justice reform strategy.

The Secretary of State, the Attorney General, the USAID Administrator, and the Director for the Office of Management and Budget shall work together to ensure this initiative receives authority and funding that is commensurate with the high priority that I place on it. The operating costs of the Center shall continue to be borne by USAID while costs of DOJ's participation in the Center's contingency planning and program development shall be borne by the Department of Justice. The field operations conducted through it should normally be funded from foreign assistance appropriations and other sources as appropriate. None of these funds shall be used by other USAID or USG elements for judicial, penal, or legal code developmental assistance unless coordinated through the Center.

Improving the Capacities of Other Organizations and Countries

Despite the critical importance of U.S. enhancements in these areas, U.S. Government capabilities should not become the international community's instrument of first resort whenever CIVPOL-related requirements arise. Many other countries and organizations have similar interests and responsibilities and should share the burden of these activities. Therefore, the U.S. Government shall seek to enhance the capacities of non-U.S. entities including those of other countries, international organizations, and non-governmental organizations. Furthermore, the U.S. Government shall seek to build and sustain the will of other countries and organizations to be involved in this type of activity and develop mechanisms for greater cooperation and coordination.

The UN is the international body with the most extensive experience and dedicated mechanisms focused on peace operations. Indeed, until the recent advent of the police role for the OSCE in Eastern Slovenia and Kosovo, the UN had been the only international or regional organization to mount a significant CIVPOL operation. Among international organizations, the U.S. Government shall focus its reform efforts for CIVPOL activities on the UN, just as we did for general peacekeeping reforms following PDD-25. At the same time, the United States shall continue to support efforts to improve regional organizations' peace operations capabilities, including those related to criminal justice systems. In particular, the U.S. will work to further develop the capacities of the OSCE to conduct these operations.

Because we can only advocate, rather than direct, specific policies and processes of international organizations, PDD 71 outlines general policy objectives. During the implementation phase, specific proposals and a strategy for achieving them shall be developed. To facilitate these policy objectives, the State Department shall seek like-minded states and organizations to serve as partners in our efforts to improve the capacities of the UN and other regional organizations.

Within the UN Secretariat staff, greater emphasis should be placed on matters related to the criminal justice system during peace operations. The current staff devoted to CIVPOL matters in DPKO is insufficient to accomplish the planning, coordination, and conduct of these operations. The United States shall advocate that DPKO strengthen its capabilities by installing an appropriate, senior-rank individual, with appropriate staff support, to oversee criminal justice matters. The United States will consider providing individuals with criminal justice expertise to serve within DPKO. Furthermore, criminal justice functions should be fully integrated with other peacekeeping functions in DPKO. Adequate planning capacity within DPKO should account for CIVPOL requirements, including a criminal justice element, before a new operation is initiated or a mandate renewed. Criminal justice planners should be integrated into UN assessment teams that deploy to sites of potential peacekeeping operations and CIVPOL capabilities of more member states should be entered into the UN Standby Arrangements system. The Standby Arrangements system enables the international community to respond more quickly to crises through rosters of pre-identified, screened and trained police experts from around the world who can be deployed on very short notice. Finally, other organizations or UN specified agencies should develop means to take over the longer-term aspects of criminal justice development once the peacekeeping phase of a complex contingency is completed and peace-building activities have begun.

The U.S. Government will advocate that UN missions make use of a suitable mix of military and paramilitary forces to accomplish the assigned tasks of any new peace operation. Constabulary forces, that is, paramilitary forces that train for and conduct a law enforcement function in their home countries, should be deployed by the UN in appropriate circumstances. Such forces bring specialized skills, such as crowd control capabilities, that are not common to traditional military or civilian police organizations. These forces are most effective when deployed as units rather than individuals. Generally, constabulary and other paramilitary units should be placed under the operational control of the military force commander, like the Multinational Support Units (MSU) that have been part of the military forces in Bosnia and Kosovo. In some circumstances, it may be appropriate to place a constabulary-type force under the operational control of the UN police commissioner. When under the operational control of the military force commander, and when feasible and allowable under existing statutes, these elements should receive logistic, intelligence, and other types of support in the same manner as the regular military units.

The lead agency shall develop methods to provide specialized training to foreign civilian police and foreign gendarme or constabulary forces in order to enhance their preparedness for service in peace operations and other complex contingencies. The lead agency shall seek new legislative authorities, if required, and adequate funding to allow such activity. This new capacity will provide the U.S. Government a means to improve the overall performance of CIVPOL operations, by enhancing the quality of CIVPOL participants. The training should include standard operating procedures for field operations, which may need to be developed in concert with other countries, the United Nations, and other international organizations. Given the high priority the President places on human rights issues and risks involved in training foreign police forces, the U.S. will ensure appropriate mechanisms to guarantee that human rights issues are fully considered.

Improving Activities at the Operational Level

U.S. experiences in recent operations have shown that a number of operational level activities related to rebuilding the indigenous criminal justice system can be improved. The aim should be to have an indigenous public security and law enforcement network with trained, certified, and equipped police -- all of which are firmly embedded in a system of legitimate and credible justice sector institutions. A key measure of progress would be to assess the extent to which a self-sufficient and impartial law enforcement system is being established.

Enhance CIVPOL Headquarters Capacities: Currently, operational-level headquarters capacities for CIVPOL are generally deficient. If field activities are to be improved, this shortfall must be corrected. Ideally, the CIVPOL component should be capable of operating independently, since CIVPOL will not always be deployed with military forces, as was the case at the end of the Haiti operation. Headquarters capacity becomes even more important if the CIVPOL component is controlling some sort of special security unit or a constabulary force. At a minimum, the headquarters should have the ability to conduct current operations, plan future operations, collect and assess field information, and manage its logistical support. The headquarters element should also have the ability to conduct liaison with elements of the host state and the other components of the peacekeeping force as well as other actors involved in rebuilding the criminal justice system.

Where appropriate, the CIVPOL headquarters should be capable of assuming responsibility to coordinate and oversee the overall reform process for the criminal justice sector. As more outside agencies become involved with this sector, the importance of coordination increases. The CIVPOL operational headquarters should incorporate a coordination mechanism akin to the Civil Military Operations Center (CMOC) used by the military and civilian agencies to synchronize their activities. When the United States is participating in a peace operation involving CIVPOL, but is not leading it, the PCG shall give special consideration to contributing qualified U.S. personnel to the operation to serve in the planning and coordination roles of the CIVPOL headquarters. Enhance Coordination and Synchronization: Just as CIVPOL and other peacekeeping functions should be coordinated at the strategic level, they must also be coordinated fully at the operational level. The United States Government shall advocate that military peacekeepers and CIVPOL shall, as feasible, coordinate activities to ensure maximum support of the overall objectives of the operation. Past operations have been successful by colocating headquarters, or colocating with the CMOC, or developing other effective liaison processes, to allow sharing of information on planning and execution processes. In addition, in every recent peace operation involving CIVPOL, the conduct of joint and/or parallel patrols consisting of indigenous police, CIVPOL monitors, and military peacekeepers has proven valuable in maintaining public safety and raising the effectiveness of the indigenous police. The first source for CIVPOL communications and logistic support should be from commercial sources; however, since the military component of a peacekeeping operation is more likely to have effective communication systems, logistic support systems, and intelligence or information structures throughout the area of operations, the military commander should consider providing the CIVPOL component access to and mutual

use of these capabilities when feasible and allowable by law and when it will not interfere with execution of the mission of the military component. Independent CIVPOL support systems should be developed as soon as possible to minimize the dependency on military systems and allow full withdrawal of military forces as soon as the military mission is completed.

In some instances, military support to the CIVPOL component has proven essential to successful accomplishment of the overall mission. Such support might take the form of technical assistance resident in the civil affairs, psychological operations, military intelligence, or military police elements of armed forces. At the same time, we must avoid situations in which the CIVPOL component is completely dependent upon the military peacekeeping component. Such military support may not always be feasible, or allowable under existing statutes, and the military-unique aspects of the mission will likely be completed prior to the public safety related tasks. Any U.S. military equipment, services or supplies should normally be provided to CIVPOL on a reimbursable basis.

Enhance CIVPOL Competence: The United States will advocate that whichever organization is organizing a particular peace operation, be it the UN or a regional grouping like the OAU or the OSCE, a military alliance such as NATO, or a lead state, will develop specific job descriptions and other standards for the various individual experts required in an operation, e.g., police monitor and mentor, police operations planner, penal system advisor, judicial system advisor, etc. The United States will urge that the organizing body abide by the highest standards for recruitment and have the authority to dismiss CIVPOL that fail to perform adequately. The U.S. lead agency will prepare template job descriptions and other standards that would speed the process of recruiting a CIVPOL force and share them with potential CIVPOL organizing bodies.

Training and preparedness of individuals and units being supplied to coalition peace operations should remain a national responsibility. However, international organizations or other organizing bodies may need to supplement national training from time to time. The U.S. lead agency shall maintain the capacity to provide tailored training packages to U.S. and international CIVPOL when requested by the organizing body or the contributing state and when appropriate U.S. funding or appropriate reimbursement is available.

General Policy Guidance

Constabulary Activities: As already described, in some cases indigenous police forces are unable to provide adequate public safety when peacekeepers arrive. In these cases, outside agencies may need to assist in ensuring basic public safety until this function can be accomplished effectively by newly strengthened indigenous police. Generally, outsiders should not be tasked to conduct law enforcement as there are significant complications to using outsiders to enforce the law of the country in crisis, with which outsiders may not be familiar. Furthermore, ultimate responsibility to conduct law enforcement should not be taken away from local police forces as this may breed dependency. Rather, outsiders may be given responsibility to carry out a more narrow range of activities to create and maintain a reasonable measure of public safety. Such tasks may include actions to regulate movements which may be necessary for the cause of safety; intervene to stop civil violence, such as vigilante lynchings or other

violent public crimes; stop and deter widespread or organized looting, vandalism, riots, or other mob-type action; and disperse unruly or violent public demonstrations and civil disturbances, among other tasks. For the purposes of PDD 71, this general category of tasks shall be termed constabulary activities.

Military or paramilitary forces are best suited to accomplish constabulary tasks. International civilian police officers (CIVPOL) as they have been traditionally deployed to peace operations do not have the unit cohesion, training, or equipment to conduct constabulary functions. Generally, the United States shall prefer that constabulary functions, when they are necessary, be conducted by a paramilitary force such as exists in many other countries. However, suitable partners may not always be available, or a short lag time may occur before a civilian, paramilitary force becomes operational in a specific situation. Therefore, U.S. military forces shall maintain the capability to support constabulary functions abroad, and if necessary carry out constabulary functions under limited conditions for a limited period of time. For example, in Haiti, in operation UPHOLD DEMOCRACY, the U.S. military contingent temporarily conducted constabulary functions and other law enforcement-like activities until civilian organizations were able to conduct these tasks. Maintaining a constabulary capability in no way obligates the U.S. military to conduct these tasks in any particular operation or to develop specialized constabulary units dedicated to this mission. As always, specific missions and tasks of any U.S. military elements serving in peace operations will be developed and approved by the National Command Authority.

Executive Authority: Generally, the U.S. Government shall advocate that CIVPOL not be given responsibility to enforce local law (executive authority) -- the responsibility for local law enforcement will remain with the indigenous police forces. In some instances, it may be appropriate to give monitors the authority (if not the responsibility) in their mandate to respond to local crimes when indigenous police are unable to take action. This authority may include the right to use detention and deadly force, for example, in an instance where there is a risk of death or serious bodily harm. In these situations, which place them at greater risk, CIVPOL officers should be given sufficient discretion over whether or not to exercise their authority. Where CIVPOL officers are granted such authority, their activities must be thoroughly coordinated with the military force commander to avoid the potential for conflict between elements of the overall peace operation force.

In some exceptional circumstances, such as those in Kosovo and East Timor where the international community is responsible for administration of a territory, CIVPOL might appropriately be tasked with full law enforcement responsibility and authority.

Protection of CIVPOL: CIVPOL, as other peacekeepers, have the right to self-defense. Appropriate measures therefore must be taken to ensure that monitors are adequately protected. In many cases, the prestige and respect imbued to monitors because of their affiliation with the overall peacekeeping operation provides sufficient safety. In the instances where monitors have been at risk, they were able to call upon the military component of the operation for support. Recently, in Haiti, this type of support was transferred from the military component of the operation to a civilian, paramilitary unit. Generally, this method of protecting CIVPOL monitors has worked well.

However, in some instances, this method may be insufficient. In these cases, the United States shall consider advocating that the CIVPOL monitors be armed in order to facilitate their self-defense. The U.S. will generally not consider sidearms alone to constitute adequate defense for the monitors, as they often will be significantly "outarmed" by the civilian population and, in particular, criminals and other rogue elements. We must recognize that if CIVPOL monitors are armed, their training and preparation needs will increase. Nonetheless, in addition to increasing the personal security of CIVPOL, experience in Haiti suggests that, in some situations, an armed CIVPOL monitor is better able to mentor indigenous police if by being armed they are allowed to be present in the dangerous situations indigenous police face. Obviously, in those situations where CIVPOL are tasked to conduct law enforcement, they must be armed appropriately.

The Role and Limits of Military Support: Actions related to criminal justice are primarily civilian in character: military forces are not police officers. U.S. armed forces do not normally have inherent law enforcement authority overseas. Furthermore, using military forces for law enforcement tasks over an extended period may send inappropriate signals to civil authorities and the local population, may place U.S. forces in situations for which they have not been thoroughly trained, and may detract from other purposes of the military forces. We should use democratic civilian policing models as the basis for rebuilding and training indigenous police forces, and that is what we hope to build in recovering societies. Nonetheless, the military component of a peace operation does have a vital role to play in the overall recovery of criminal justice capacities. Unless basic public safety is provided, the civilian organizations will be unable to conduct their tasks. If public safety is not maintained, the social fabric will not be ready for the assistance to be provided by the civilian agencies. In addition to the task of contributing to public safety, there are a number of supporting tasks that the military can conduct to hasten the progress of the civilian agencies dealing with criminal justice, as described above in the section on operational level improvements.

U.S. military personnel shall not provide formal training to foreign criminal justice systems unless authorized under existing authorities. However, this does not restrict U.S. military personnel from interacting with or conducting joint operational activities with elements belonging to the indigenous criminal justice system. In accordance with laws and regulations, the U.S. military may provide training and assistance to host state security elements that are part of the host state's defense establishment. Furthermore, DOD shall, if appropriately directed and on a case-by-case basis under appropriate legal authorities, provide assistance and support to the agencies providing training and developmental assistance to foreign police forces. Such assistance and support may include, inter alia, logistics, communications, transportation, and selected technical expertise.

(end text)

(Distributed by the Office of International Information Programs, U.S. Department of State. Web site: usinfo.state.gov)

**EXHIBIT 4**

| SOLICITATION, OFFER AND AWARD | 1 THIS CONTRACT IS A RATED ORDER UNDER DPAS (15 CFR 350) | RATING | PAGE OF PAGES |
|---|---|---|---|
| | | | 1 : 55 |

| 2 CONTRACT (Proc Inst Ident.) NO | 3 SOLICITATION NO | 4 TYPE OF SOLICITATION | 5 DATE ISSUED | 6 REQUISITION/PURCHASE NO |
|---|---|---|---|---|
| S-LMAQM-04 C-0030 | | [ ] SEALED BID (IFB) <br> [ ] NEGOTIATED (RFP) | See Block 28 | |

| 7 ISSUED BY | CODE | | 8 ADDRESS OFFER TO (If other than item 7) |
|---|---|---|---|
| U S. DEPARTMENT OF STATE <br> OFFICE OF ACQUISITION, A/LM/AQM RM 206 SA-6 <br> PO BOX 9115 ROSSLYN STATION <br> ARLINGTON, VA 22219 <br> Phone 703-875-5238      Fax 703-875-5272 | | | |

NOTE In sealed bid solicitation "offer" and "offeror" mean "bid" and "bidder"

## SOLICITATION

9  Sealed offers in original and ___ copies for furnishing the supplies or services in the Schedule will be received at the place specified, in the depository located in until _____ local time

CAUTION  LATE Submissions, Modifications, and Withdrawals See Section L, Provision No 52 215 1  All offers are subject to all terms and conditions contained in this solicitation

| 10  FOR INFORMATION CALL | A   NAME <br> Brian M. Carper | B   TELEPHONE (NO COLLECT CALLS) <br> 703-875-5238 | C   E-MAIL ADDRESS <br> CarperBM@state.gov |
|---|---|---|---|

## 11  TABLE OF CONTENTS

| (x) | SEC | DESCRIPTION | PAGE(S) | (x) | SEC | DESCRIPTION | PAGE(S) |
|---|---|---|---|---|---|---|---|
| | | PART I  THE SCHEDULE | | | | PART II  CONTRACT CLAUSES | |
| X | A | SOLICITATION/CONTRACT FORM | 1 | X | I | CONTRACT CLAUSES | 44 |
| X | B | SUPPLIES OR SERVICE AND PRICES/COSTS | 2 | | | PART III  LIST OF DOCUMENTS, EXHIBITS AND OTHER ATTACH | |
| X | C | DESCRIPTIONS/SPECS/WORK STATEMENT | 10 | X | J | LIST OF ATTACHMENTS | 55 |
| X | D | PACKAGING AND MARKETING | 30 | | | PART IV  REPRESENTATIONS AND INSTRUCTIONS | |
| X | E | INSPECTION AND ACCEPTANCE | 31 | | K | REPRESENTATIONS, CERTIFICATIONS AND | |
| X | F | DELIVERIES OR PERFORMANCE | 32 | | | OTHER STATEMENTS OF OFFERORS | |
| X | G | CONTRACT ADMINISTRATION | 34 | | L | INSTRS. COND  AND NOTICES TO OFFERORS | |
| X | H | SPECIAL CONTRACT REQUIREMENTS | 37 | | M | EVALUATION FACTORS FOR AWARD | |

## OFFER (Must be fully completed by offeror)

NOTE  ITEM 12 does not apply if the solicitation includes the provisions at 52 214 16, Minimum Bid Acceptance Period

12  In compliance with the above the undersigned agrees  if this offer is accepted within _____ calendar days (120 calendar days unless a different period is inserted by the offer)  from the date for receipt of offers specified above, to furnish any or all items upon which prices are offered at the price set opposite each item, delivered at the designated point(s), within the time specified in the schedule

| 13  DISCOUNT FOR PROMPT PAYMENT  SEE 14 (See section I, Clause No 52 232 8) | 10 CALENDAR DAYS       % | 20 CALENDAR DAYS       % | 30 CALENDAR DAYS       % | CALENDAR DAYS       % |
|---|---|---|---|---|

| 14  ACKNOWLEDGMENT OF AMENDMENTS (The offeror acknowledges receipt of amendments to the solicitation and related documents ) numbered and dated | AMENDMENT NO | DATE | AMENDMENT NO | DATE |
|---|---|---|---|---|
| | 0001 | 10-28 2003 | 0005 | 11 25 2003 |
| | 0002 | 11 04 2003 | 0006 | 11 26 2003 |
| | 0003 | 11-07-2003 | 0007 | 1-13 2004 |
| | 0004 | 11-14 2003 | 0008 | 1-26-2004 |
| | | | 0009 | 2-10-2004 |

| 15A NAME AND ADDRESS OF OFFEROR | CODE | | FACILITY | 16  NAME AND TITLE OF PERSON AUTHORIZED TO SIGN OFFER (Type or print) |
|---|---|---|---|---|
| Dyncorp International LLC <br> One Ridgmar Place <br> 6500 West Freeway Suite 600 <br> Fort Worth TX 76116 | | | | John W Supina <br> Sr Vice President, Contract Administration |

| 15B TELEPHONE NO (Include area code) 972 - 871 - 6780 | 15C CHECK IF REMITTANCE ADDRESS [X] IS DIFFERENT FROM ABOVE ENTER  SUCH ADDRESS | 17 SIGNATURE | 18 OFFER DATE 18 February 2004 |
|---|---|---|---|

## AWARD (To be completed by Government)

| 19  ACCEPTED AS TO ITEM NUMBERED <br> Contract S LMAQM 04-C-0030 and amendments 0001 to 0008 | 20 AMOUNT | 21  ACCOUNTING AND APPROPRIATION <br> N/A Funding Shall be provided Incrementally | |
|---|---|---|---|
| 22 AUTHORITY FOR USING OTHER THAN FULL AND OPEN COMPETITION <br> [ ] 10 U S C 2304(c)( )      [ ] 41 U S C 253(c)( ) | | 23  SUBMIT INVOICES TO ADDRESS SHOWN IN <br> (4 copies unless otherwise specified) | ITEM |
| 24. ADMINISTRATION BY (If other than Item 7) CODE | | 25  PAYMENT WILL BE MADE BY      CODE | |

| 26   NAME OF CONTRACTING OFFICER (Type or print) <br> Ann H Truitt | 27  UNITED STATES OF AMERICA <br> (Signature of Contracting Officer) | 28  AWARD DATE <br> 2/18/04 |
|---|---|---|

IMPORTANT – Award will be made on this form  or on the Standard Form 26  or by other authorized official written notice

NSN 7540-01 152 8064

STANDARD FORM 33 (REV 9 97)

EXHIBIT 4

S-LMAQM 04-C-0030

## SECTION B — SUPPLIES OR SERVICES AND PRICES/COSTS

**B 1    TYPE OF CONTRACT (05/95)**

This is a combination Firm Fixed Price Indefinite Quantity Indefinite Quality, Cost-Plus-Fixed Fee type solicitation. THE U.S. GOVERNMENT RESERVES THE RIGHT TO MAKE MULTIPLE AWARDS FROM THIS SOLICITATION The minimum number of awards shall be one and the maximum number of awards shall be three provided that proposals received are technically acceptable and reasonably priced

**B 2    MINIMUM AND MAXIMUM CONTRACT AMOUNTS–INDEFINITE QUANTITY CONTRACT (05/95)**

(a)    Per FAR 52 216-22 "INDEFINITE QUANTITY," the minimum for this indefinite quantity contract shall be any quantity or combination of supplies and services equal to the amount(s) set forth below  If this contract contains options, the minimum for each option shall apply separately and independently to that option



Base ▮▮▮▮▮(per award)
Option 1▮▮▮▮▮(per award)
Option 2▮▮▮▮(per award)
Option 3▮▮▮(per award)
Option 4▮▮▮(per award)

(b)    The maximum if one award is made for this indefinite quantity contract (including options) shall be any quantity or combination of supplies and services equal to the amounts set forth below



Base ▮▮▮▮▮
Option 1▮▮▮▮▮
Option 2▮▮▮▮▮
Option 3▮▮▮▮
Option 4▮▮▮▮

(c)    The maximum if two awards are made for this indefinite quantity contract (including options) shall be any quantity or combination of supplies and services equal to the amounts set forth below

Base ▮▮▮▮▮(per award)
Option 1▮▮▮▮▮(per award)
Option 2▮▮▮▮(per award)
Option 3▮▮▮▮(per award)
Option 4▮▮▮▮(per award)

(d)    The maximum if three awards are made for this indefinite quantity contract (including options) shall be any quantity or combination of supplies and services equal to the amounts set forth below   –

Base ▮▮▮▮▮(per award)
Option 1▮▮▮▮(per award)
Option 2▮▮▮▮(per award)
Option 3▮▮▮▮(per award)
Option 4▮▮▮▮(per award)

S-LMAQM 04-C-0030

## B 3    PRICES/COSTS

The following Sub-Sections are structured for one award B3 1, B3 2, B3 3, B3 4, and B3 5  If multiple awards are made from this solicitation the estimated maximum number of hour/units shall be reduced in half except for CLINs' 1001, 1002, 1003 (including options) shall remain unchanged and the reimbursable CLINs' Total Dollar Amount shall be reduced in half  Offerors shall submit a separate price/cost for one award, and provide a separate price/cost for multiple awards

(a) Offerors' cost proposals shall set forth a detailed/itemized listing and estimated cost breakout of all of the components of all overhead, G&A, and profit/fee

(b) CLIN 0001 is a firm fixed price and shall be paid once upon successful competition of the referenced requirement. CLIN 0002 to 003 is a firm fixed price and shall be paid on a monthly basis  Offerors are not required to have databases in place prior to award  Offerors are required to demonstrate prior to award that they have the ability to maintain and create each database  The Contractor(s) shall receive a written notification regarding when to proceed with creating and maintaining the databases  It is at that time Contractor(s) shall be required to have the databases operational within thiry (30) days

(c) CLIN 0004 to 0033 shall be a firm fixed labor rate  This includes wages, overhead, fringe benefits, G&A, and profit/fee  Basic and Personal Equipment (C 3 31) shall be included in overhead

(d) CLIN 0034 to 0039 and 0041 are reimbursable only with the price ceiling set forth below

(e) CLINS 0034, 0036, 0038,0039, 0041 are direct costs only  These CLINS are reimbursable only and require proof of cost from the contractor(s)  The costs of maintaining and other administrative costs associated with this shall be included under each individual labor category as O/H  For example, If four (4) Civilian Police Border Officers require training  The training cost shall only be billed against CLIN 0036  Any and all other costs incurred by the contractor(s) shall be included in the Civilian Police Border Officers rate   This does not apply for the training of foreign officers  All costs associated with training foreign officers shall be reimbursed and the contractor(s) shall propose a total burden rate to include all O/H, profit, and G&A associated with these   The burden rate shall only be allowed for this type of training

(f) CLIN 0040 is a Cost Plus Fixed Fee as detailed in Section C 7

(g) All other additional insurance costs shall be included in overhead

(h) 20% of weapons listed on the inventory list in Section J shall be usable

S-LMAQM-04-C-0030

(a)Travel must be directly related to and required for performance of this contract, and authorized in advance and in writing by the Contracting Officer's Representative (COR). In no event shall costs associated with employee commuting be reimbursable as a direct cost under this contract

(b) Administrative support (coordination of travel arrangements, etc.) will be the responsibility of the Contractor

(c) When local travel between the Contractor employee's regular place of performance and other locations is specifically authorized by the COR, transportation expenses shall be allowable costs under this contract. For the purposes of this clause, local travel means travel within a 50-mile radius of the Contractor employee's regular place of performance and does not include daily commuting or associated costs

(d) For travel where use of a personal automobile has been specifically authorized by the COR, reimbursement shall be computed on the basis of actual miles traveled from starting point to destination Other related miscellaneous expenses, such as tolls and parking fees, incurred in the performance of tasks authorized under this contract, will be reimbursed  Car rentals require advance approval by the COR and will be authorized only when consistent with good business practice  Allowable costs shall not exceed the actual cost of renting a compact automobile (a maximum of one for five Contractor personnel), unless extenuating circumstances (e.g., excess baggage) require other arrangements and subsequent COR approval is obtained

(e) Cost of air travel by the most direct route  Air Coach and air tourist accommodations constitute the normal class or airfare that shall be utilized  First class airfare shall not be authorized or allowed under this contract

(f) The Government will reimburse the Contractor for Contractor employee's travel time to or from other authorized work locations, except that for labor categories which are exempt from the Fair Labor Standards Act, a reimbursement will be allowed only for travel during the employee's regular working hours The Contractor will not be reimbursed for time spent in stand down or temporary layovers for the convenience of the Contractor except as authorized by the Federal Travel Regulations

(g) The Contractor shall be responsible for ensuring that all personnel who will be required to travel outside the United States have current and valid passports  The Contractor shall also be responsible for obtaining any visas required for travel to foreign countries under this contract  The Contractor shall make no direct labor charges for obtaining/maintaining passports and/or visas

The above travel expense shall be reimbursed on actual cost basis in accordance with the Federal Travel Regulations, and in all cases the Government official specified in the delivery order shall approve all travel

## B 7    DOSAR 652 228-76 DEFENSE BASE ACT INSURANCE RATES--LIMITATION-- COST-REIMBURSEMENT, LABOR-HOUR, AND TIME-AND-MATERIALS (AUG 1999)

(a) The Department of State has entered into a contract with an insurance carrier to provide DBA insurance to Department of State contractors at a contracted rate  In preparing the cost proposal, the offeror shall use the following rates in computing the cost for DBA insurance.

Services @ $4 30 per $100 00 of compensation (direct salary plus differential, but excluding per diem, housing allowance, education allowance, and miscellaneous allowances), or

Construction @ $5 56 per $100 00 of compensation.

(b) These rates apply to all job classifications in those particular categories  The successful offeror shall be advised of the name and address of the insurance broker who will process the DBA insurance coverage
(c) Should an offeror compute or include higher DBA insurance rates, the rates shall be disallowed.

(d) Offerors shall include in their proposals a statement as to whether or not local nationals or third country nationals will be employed on the resultant contract

9

S LMAQM-04-C-0030

## SECTION C — DESCRIPTION/SPECIFICATIONS/WORK STATEMENT

### C 1    INCORPORATION OF CONTRACTOR'S TECHNICAL PROPOSAL (05/95)

(a)    The Contractor shall perform this contract in accordance with its technical proposal dated December 1, 2003 and any revisions thereto submitted in response to Solicitation No S-LMAQM-03-R-0109

(b)    The Contractor's technical proposal is incorporated by reference and hereby made subject to the provisions of the "ORDER OF PRECEDENCE" clause in SECTION I of this contract Under the "ORDER OF PRECEDENCE" clause, the Contractor's technical proposal shall follow "the specifications" in the order of precedence

### C.2    GENERAL PROGRAM DESCRIPTION AND REQUIREMENT OVERVIEW

The Department of State, Bureau for International Narcotics and Law Enforcement Affairs (INL), pursuant to Presidential Decision Directive 71 (PDD 71) on strengthening criminal justice systems in support of peace operations and other complex security operations overseas, has a requirement to

C 2 1    Personnel  Establish and maintain a cadre of up to 2,000 (U S ) experienced law enforcement personnel, available to serve in civilian peacekeeping missions overseas  The cadre will include a broad range of law enforcement experts and specialists, including generalists, trainers, border police, crimes against persons/property crimes investigators, crime scene investigators, managers (executive and supervisory), court security officers, corrections officers, intelligence officers, customs officers, dignitary protection officers, civil disorder specialists, organized crime investigators, and traffic accident investigators

C 2 2    Logistics and Support  Provide pre deployment and deployment support, including contract program management, uniforms and equipment, transportation arrangements and per diem for basic, in-service, and specialized training programs developed by the Government for the cadre of up to 2,000 law enforcement personnel, and provide in country or off-site administrative, technical, logistical, or other unanticipated services, or actions to support the items cited in this RFP

C 2 3    Databases  Maintain an existing database for U S  contributions to a particular international organization and create additional databases, as required, to manage records relating to the cadre of up to 2,000 law enforcement personnel, including personnel and equipment inventories

C 2 4    Procurement  Provide procurement services, as approved by the Contracting Officer (CO) and/or Contracting Officer's Representative (COR), of equipment for foreign police, and construction services, as directed, to support foreign police

### C.3    PERSONNEL  ESTABLISHMENT AND MAINTAINENCE OF A CADRE OF UP TO 2,000 POLICE

A key element of PDD-71 on enhancing U S  capacities to respond to criminal justice aspects of peace operations and other complex contingencies is the establishment of a roster of up to 2,000 experienced American civilian law enforcement personnel  The purpose for creating a roster is to establish a U S capability to deploy quickly in response to urgent requests from the United Nations (UN), Organization for Security and Cooperation in Europe (OSCE), European Union (EU), other international or regional organizations to participate in international police operations, or to participate in complex security operations  Individual candidates for the roster will be carefully recruited, screened and selected to participate in such missions overseas   In addition, successful applicants will receive uniforms, service

10

S-LMAQM 04-C 0030

weapons (e g 9MM handgun or other weapons authorized for a particular mission), personal equipment, and training and be given opportunities to participate in special training events on a regular basis in preparation for a future deployment overseas Establishing a cadre of up to 2,000 law enforcement professionals will eliminate the requirement to conduct from scratch, recruitment, selection, and training activities each time the U S contributes police to an international CIVPOL operation The names and qualifications, and/or areas of expertise of up to 2,000 police will be submitted at the direction of INL to the UN, OSCE, EU, or other international or regional organization for acceptance, i e , certified as qualified to participate in missions established by those respective organizations

C.3 1    The make-up of the cadre should include a mix of levels, fields of expertise, and representation of the full range of law enforcement organizations including federal state, and local agencies The following provides optimal percentages to obtain a mix of specialties within the cadre with a maximum of up to 2,000

Recruitment Categories  (Percentages based on 2,000 officers)

Law Enforcement Generalists - 45%
Certified Trainers - 12%
Border Police - 3%
Crimes Against Persons Investigators - 4%
Property Crimes Investigators - 3%
Supervisory/Mgmt Officers  7%
Court Security Specialists - 2%
Corrections Officers - 3%
Intelligence Officers - 2% with DISCO clearances up to top secret level
Custom Specialists -- 2%
Crime Scene Investigators -- 4%
Commanders/Executive Officer - 1% with DISCO clearances up to top secret level
Dignitary Protection Officers - 3%
Civil Disorder Specialist - 3%
Organized Crime Investigators - 2%
Traffic Accident Investigators - 4%

C 3 2    Development of the U S CIVPOL capacity includes continuing the practice of seconding individuals for general CIVPOL duties, specialized functions, and potentially assignment as formed U S teams or units to participate in general or specialized police peacekeeping and complex security operations and functions  Such teams or units will be formed, trained and deployed for specific purposes for both short term (days to months) and long term (months to one year or longer) assignments  While most deployments are for a period of one year, extensions for varying periods of time are increasingly common An important contractor activity will be ensuring that personnel rotation schedules reflect extensions and necessary personnel replacements in accordance with established procedures and practices of the host organization (e g , United Nations) and in coordination with the COR

C.3.3    The Contractor shall be prepared to equip and deploy personnel to meet a wide-range of requirements in diverse environments, e g , urban, rural, mountainous, or otherwise remote terrain with extreme weather conditions (winter/snow, desert/extreme heat, tropical/rainy) and intermittent or unreliable potable water, food, energy resources

C.3 3 1  Basic and Personal Equipment

The Contractor shall provide and maintain a detailed list from existing commercial sources of uniforms and personal equipment, including  recommended quantity to be issued to each person, specifications for the following items at a minimum, and a recommendation and justification to the COR for any additional items not included below (Basic and personal equipment shall be included in overhead)

11

S-LMAQM 04-C-0030

Boots (winter/summer)
Socks
Dress shoes
Turtleneck shirt
Sweater
Dress shirt (short sleeve/long sleeve)
Dress pants
Watch Cap
All weather jacket/pants
Nametags
Shield
Identification credential
Thermal tops/pants
Parka
Gloves
Duffel bag
Flashlight (w/ batteries/bulbs)
Inner/outer leather belts
Pocket tool
US flag patch
Latex gloves
First aid kits
9MM weapon w/ holster
Magazines/pouches
Holsters
Handcuffs w/ case
Radio pouch
Spray pouch
Asp baton pouch
Keepers
Baton
Double mag flashlight w/ pouch
Raid jacket
Sleeping bag
Fanny pack
Gun cleaning kit
Reflective traffic vest
Soft body armor
BDU sets
Winter/summer uniform shirts

## C.3.4    CADRE OF UP TO 2,000 PERSONNEL

C.3.4.1  U.S. voluntary contributions to CIVPOL components of international peacekeeping missions include direct support that complements and is in addition to support provided by the UN or OSCE for U.S. personnel seconded to the operational control of the CIVPOL Commissioner.  U.S. CIVPOL members receive a basic issue of uniforms and personal equipment, including weapon, selected for each mission by INL.  Once deployed, personnel assigned to CIVPOL missions receive support from the INL contractor designed to address personnel administration matters and critical operational requirements, including security, reliable energy sources or potable water, rapid acclimatization to CIVPOL organizations and field environment, administrative services, personal equipment repair and replacement, provision of routine and emergency medical support, facilitate communication with immediate family members back in the U.S., and promote morale, welfare and recreation.  The type and level of field support provided to U.S. CIVPOL, which varies from mission to mission is determined at the time a policy decision is reached regarding the number of U.S. police being contributed to a particular mission.

12

S-LMAQM-04 C-0030

C.3 4 2  U S  personnel assigned to perform training and advisory tasks involving foreign CIVPOL personnel, new or existing local police, or host government officials may be required to do so as uniformed members of the U S  CIVPOL contingent, or as non uniformed law enforcement trainers or technical experts  Such training and advisory activities may be provided as U S  bilateral assistance or as U S contributions to specific multilateral initiatives

## C.3 5    DIRECT U S GOVERNMENT INVOLVEMENT IN THE CIVPOL TRAINING PROGRAM

C.3.5.1  U S  Government/Department of State, Bureau of International Narcotics and Law Enforcement Affairs (USG/INL) is developing a training program to ensure that members of the group of up to 2,000 are trained and prepared to the maximum extent possible for assignment in international civilian police missions  While INL is developing the program to ensure the curriculum meets Police Officer Standards and Training (POST) certification requirements across the United States, the contractor may be tasked to provide classroom space, access to firearms shooting ranges (handgun and shotgun), space to conduct indoor/outdoor physical activities (fitness evaluation may include specific requirements, e g , obstacle course), and deliver modular segments of the program (e g , defensive tactics, weapons qualification, physical fitness qualification)  In addition, INL anticipates the participation of other USG and private agencies and organizations in the delivery of various elements of the training program  Individuals selected for the group will also receive training on an annual basis in policing skills recognized across the United States as essential to conducting effective law enforcement that is consistent with internationally recognized principles of policing in a democracy and concern for human rights and dignity  In addition, specialized and in-service training opportunities and combined exercises will be developed and made available on a regular basis in various U S  and overseas locations  A unique aspect of the program will be participation of foreign police officers at the invitation of the US  The overall training program and its specialized components will be presented to U S  and certain foreign, international and regional law enforcement organizations and training academies for recognition and certification

C 3 5 2  Direct USG/INL support for CIVPOL training activities may include pay, allowances, per diem, round-trip transportation, lodging and meals, training equipment, supplies and materials, facilities rental and maintenance, honoraria for guest speakers, and special uniforms and personal equipment

## C 3 6    LOGISTICAL AND ADMINISTRATIVE SUPPORT IN THE FIELD

C 3 6 1  USG experience with operational capabilities of international and regional organizations, such as the United Nations, is that direct USG support is preferable for U S  personnel assigned to peacekeeping operations in the field as a supplement to any operational support provided by the host organization. The contractor shall be required to respond to a wide variety of operational circumstances, including extreme weather conditions and rudimentary infrastructure  For example, winter conditions may be exacerbated by low availability of heating fuel, intermittent access to electrical power, extremely poor road conditions, partially destroyed residential structures, limited access to furniture and other household features, unreliable telephone service, no commerce, poor sanitary conditions and generally unresponsive public works  Such conditions may be further complicated, particularly in the early start-up phases of peacekeeping operations, by tenuous public security, ineffective police and judicial organizations, and no access to medical assistance or facilities  International peacekeeping operations in areas emerging from violent hostilities may be initiated in the midst of political and civil unrest involving armed groups, refugees, internally displaced persons, thugs and organized gangs, and remnants of recently active military units

C 3 6 2  An important aspect of U S  participation in international operations is the ability of the support contractor to provide support systems that address such difficult field conditions  The contractor must be prepared to deploy support personnel in advance of U S  CIVPOL deployment to conduct such activities as the following

- Confirm field conditions
- Identify adequate housing for U S  CIVPOL and contractor support personnel, modify such housing as required, e g , provide generators for electrical power, repair plumbing and electrical functions, clean and repair destroyed buildings

13

S-LMAQM-04-C-0030

- Provide food (MREs) and deliver potable water for people in the field
- Take appropriate actions to address security threats to contractor personnel and facilities
- Establish emergency medical capacities, to include mechanisms to move seriously injured U S CIVPOLs out of the AOR for medical treatment (in a hospital plane if necessary)
- Provide access to routine and preventative medical care in the field
- Establish and administer Morale, Welfare and Recreation programs,
  - E g , access to telephone and Internet for routine and emergency connection to immediate family members in the US, paperback books and video/DVD entertainment, physical fitness equipment, and travel assistance
- Administer time and attendance requirements
- Provide access to uniform and personal equipment items to replace unserviceable items Establish and maintain warehouse facility for personal equipment, emergency equipment and supplies, equipment procured as part of a foreign assistance program, and other support capabilities

## C.3 7    MAINTAIN AN EXISTING DATABASE

C.3 7 1 INL, through a State Department contract, has established a database of law enforcement personnel who meet criteria for various positions established by the Organization and Security and Cooperation in Europe (OSCE) for potential service in its Rapid Expert and Assistance Cooperation Teams (REACT) system  Personnel included in the REACT database are potential candidates for seconded assignments to OSCE for periods up to one year  The U S is currently contributing to OSCE police observer, training, and advisory missions in Croatia, Kosovo, Southern Serbia, and Macedonia  The Contractor shall maintain this existing personnel database, including safeguarding database fields of information, varying firewalls, and levels of access  Information must be maintained to record how new applicant (successful, unresponsive, rejected, or inactive) data will be processed and maintained  The database is the property of the USG, and is available to INL on-line on demand from INL headquarters in Washington, DC

The OSCE REACT database fields are provided as an Attachment in Section J

The software is a 3-tiered Web based application built using Microsoft Active Server Pages (ASP) for the presentation layer, Microsoft Component Object Model (COM) objects in the business layer and Microsoft SQL Server 2000 in the data layer  The user interface is rendered in Microsoft Internet Explorer 5 5 SP2 or higher

## C.3 8    CREATE, PROVIDE AND MAINTAIN A SECOND PERSONNEL SYSTEM DATABASE

C.3 8 1 The Contractor shall provide a comprehensive personnel database for the cadre of civilian police required under this contract  This database shall be available for use and up and running in accordance with the timetable set forth in the Contractor's technical proposal (and/or as said timetable is reviewed/approved by the COR) for establishing a database, capacity, proposed fields to be included in the database, and how the system will be maintained  As with the OSCE database, this new database will be the property of the USG and made available to INL on-line access on demand from INL headquarters in Washington, DC  Ideally the database would be available via Internet connection

## C.3 9    IDENTIFICATION OF TECHNICAL ADVISORS (e g , Law Enforcement/Police advisors, Prisons/Corrections advisors, Judicial advisors)

C.3 9 1 Civilian police peacekeeping increasingly includes international efforts to establish effective democratic law enforcement institutional capabilities  This may include creating police forces where none previously existed, restructuring existing police forces to provide law enforcement systems consistent with internationally recognized principles of democratic policing, or substantially enhancing police force capabilities in countries or regions emerging from conflict  Such activities may be the direct responsibility of an international CIVPOL mission under a specific mandate authorized by the UN or regional organization, a component of a larger regional or international effort, and/or supported and delivered

14

S-LMAQM 04 C-0030

through U S and other bilateral assistance programs U S participation may include a combination of voluntary and assessed financial contributions to an international mission, voluntary financial contributions to an international mission, contributions of in-kind technical advisory services of individuals seconded to an international mission, or direct bilateral assistance to the recipient government or entity

C.3 9 2  U S involvement in establishing institutional capabilities may include contributions of experts to develop and/or deliver training or advisory services for both short-term (1 day to 6 months) and long term (6 months to 1 year, plus) assignments   Activities may include

- Conducting assessments of existing public security conditions or events, institutional capacities relating to academy (curriculum, facilities), forensic sciences (laboratory, practices, effectiveness), organizational development (institutional policies, standard operating procedures, strategic planning and budget formulation), and accreditation (use of force, public complaint procedures and supporting legislation and legal affairs functions), judicial system (elements and capabilities of prosecutors and defense/bar, courts, court procedures and management, training, criminal codes and procedures), or corrections (establish detention centers and organization, establishment and management of up to maximum security prison facilities, training for correctional personnel), or other corrections-related activities

- Developing or redesigning basic to-advanced law enforcement topics, to include specific curricula on specialized law enforcement topics, such as human rights/dignity, democratic policing, arrest procedures, patrol, station house procedures and management, interview techniques, radio procedures, firearms, self defense, arrest and control, crime scene management, civil disturbance management, criminal investigations, traffic control/accident investigations, supervision and management, drug investigations, domestic violence, dispute resolution, organized crime, forensics, document fraud, case management, witness and court security, courtroom conduct and procedures, drafting legislation and implementation regulations, and other relevant and timely law enforcement topics, providing advisory services to individual officers, line supervisors, mid-level and senior police, judicial, corrections and other law enforcement managers and personnel

- Provide training and advisory services to promote timely development of sustainable, credible, and legitimate state institutions necessary for long term stability

C.3 9.3 U S participation in developing curricula and delivering training for existing police personnel or new police candidates includes a wide range of law enforcement expertise, including but not limited to program development to provide all the elements necessary for basic policing skills and field training officer (FTO) programs, organizational planning, recruitment and selection, institutional policies and standard operating procedures, train-the-trainer instructor development, police supervision, leadership and management, and other relevant and timely topics

The contractor must be prepared to deploy technical advisors and training teams with appropriate support that may require vehicles, special personal equipment and clothing, computers and other highly technical equipment, communications, training-related classroom equipment and supplies, and/or international or regional transportation

## C 3 9 4 IDENTIFICATION OF CRIMINAL JUSTICE SPECIALISTS

In addition, criminal justice specialists may be deployed to serve as legal advisors, senior leadership or technicians who may be assigned to international organizations (such as the UN and OSCE), assigned to implementing criminal justice reforms, providing guidance and assistance in drafting and adopting new legal codes and procedures, providing technical expertise in developing and delivering training programs to local justice officials to enable implementation of new laws and procedures  Such assignments may also include responsibility providing advice and guidance in managing complex investigations and prosecuting difficult crimes such as organized crime and terrorism

## C 3 9 5 KEY REQUIREMENTS TO DEVELOP, SUPPORT AND MAINTAIN THE CADRE

15

S-LMAQM-04 C-0030

The successful offeror should have established operating procedures and policies to conduct the following activities in the performance of the contract

- Maintenance of personnel system and database(s) that addresses the minimum criteria for candidates for all positions

- Maintenance of a personnel recruitment strategy and timetable for filling each position. This shall include a detailed description of the process for candidate identification, screening, and selection criteria as well as the process leading to selection and deployment of each candidate

- Maintenance of a organizational charts and detailed descriptions of CIVPOL, personnel, pay grades, criteria for each, positions, functions, and staffing patterns for both US based support personnel and operational support personnel

- Maintenance of a U S CIVPOL rank structure, including numbers at each level and process for promotion

- Maintenance of a process for identifying and supporting individuals, teams and units for varying levels of readiness and deployment

- Maintenance of a detailed performance criteria for CIVPOL personnel that includes a detailed process for implementing systematic evaluation, internal affairs, and disciplinary functions

- Maintenance of a program documenting an awards system to recognize meritorious individual and group performance

- Maintenance of an inventory and description of support equipment to support field operations

- Maintenance of inventories and of uniforms, uniform items, insignias, shield and identification credentials initial issues of uniforms, and personal equipment

- Maintenance of inventories of recommended operational gear for varying climates, e g , temperate mountains, desert, tropics

## C.4    CONTRACTOR PROCUREMENT OF SUPPLIES, EQUIPMENT AND SERVICES

C.4 1    The objectives of contributing experienced American law enforcement personnel to an international peacekeeping mission or complex security operation include 1) support international efforts to establish and maintain a safe and secure environment, 2) establish and maintain civilian authority over all aspects of the rule of law, including police, judicial and corrections functions, and 3) establish and/or restructure and develop host country capacities to conduct effective law enforcement in accordance with democratic principles and consistent with internationally recognized principles of human rights

C 4 2    Developing local capabilities may include provision of U S Govt funded supplies, equipment and services, as described in specific Task Orders    Examples of items previously provided include the following uniform items, communications infrastructure and equipment, handcuffs, pepper spray, collapsible batons, flashlights, computers with software and related equipment, construction/renovation services, office furniture and supplies, forensics laboratory equipment and chemical supplies, riot control protective equipment, vehicles, technical services and training, travel services to attend various functions and programs at home and abroad, maintenance and training services, and other equipment

C 4 3    Contractors shall provide and maintain systems to conduct procurement in accordance with Federal Acquisition Regulations, an existing inventory system, ability to warehouse materials where needed (in the U S or in operational areas overseas), ability to provide surface and air transport of

S LMAQM-04 C-0030

materials from US locations to operational areas around the world, and experience with various import-export procedures, permits, and licenses for all categories of materials and equipment (including ammunition, personal weapons, and controlled medicines)

## C 5    SYSTEMS OF RECORDS ON INDIVIDUALS (02/96)

This contract requires the design, development or operation of a System of Records on Individuals subject to the Privacy Act of 1974   Performance of work under this contract shall be in accordance with FAR 52 224-1 "PRIVACY ACT NOTIFICATION," FAR 52 224-2 "PRIVACY ACT," and the following agency rules and regulations  Department of State Privacy Act Guidelines and 5 FAM 400

## C 6    PERSONNEL CATEGORIES AND DESCRIPTIONS

The following are personnel descriptions/categories that will be needed to fulfill the United States CIVPOL capacity

Recruitment Categories  (Percentages based on 2,000 officers)

> Law Enforcement Generalists - 45%
> Certified Trainers - 12%
> Border Police - 3%
> Crimes Against Persons Investigators - 4%
> Property Crimes Investigators - 3%
> Supervisory/Mgmt Officers - 7%
> Court Security Specialists (e g , Bailiff's) - 2%
> Corrections Officers - 3%
> Intelligence Officers (with Security Clearances) - 2%
> Custom Specialists – 2%
> Crime Scene Investigators – 4%
> Commanders/Executive Officer (with Security Clearances) - 1%
> Dignitary Protection Officers - 3%
> Civil Disorder Specialist - 3%
> Organized Crime Investigators - 2%
> Traffic Accident Investigators - 4%

All officers/personnel must meet the following Minimum qualifications

- U S Citizen
- Preference is that the applicant have a minimum of 8 years of active duty law enforcement, however the applicant MUST have a combined total of eight (8) years work experience with at least five (5) years being in a position of sworn civilian law enforcement, in a full service law enforcement agency
- Actively serving sworn law enforcement officer, or recently separated sworn law enforcement official (within 5 years)
    - Note  Successfully completed or current assignments to U S  CIVPOL contingents in Kosovo and East Timor will be accepted as active service time
- Ability to communicate in English
- Valid U S  driver's license and ability to operate a standard transmission 4x4 vehicle
- Unblemished background
- Excellent health and be able to pass a law enforcement physical, agility and a psychological test
- Valid U S  passport
- Negotiating Interpersonal and Leadership Skills
- Knowledge of International Police Standards
- Experience in a multicultural environment
- The ability and willingness to train other individuals in their area of expertise

17

S LMAQM 04-C-0030

### C 6 2     Position Descriptions

### C 6 2 1     Civilian Police Generalist – (Law Enforcement Generalist)

**Responsibilities**
- International Civilian police work typically involves assessing, monitoring, advising and mentoring the local civil police in order to ensure that law and order are maintained effectively and impartially according to democratic policing principles, and that human rights and fundamental freedoms are fully protected

Depending on the mandate of the mission, responsibilities may involve performing the full range of law enforcement and policing functions, such as patrolling and responding to calls such as burglary, theft, assault, sexual assault, murder, disturbances and family disputes. Other duties may be enforcing traffic laws, issuing citations, apprehending violators, preparing and submitting reports of patrol activities

### C 6 2 2     Civilian Police Training Officer – (Certified Trainer)

**Responsibilities/Qualifications**
- The international civilian police training officer responsibilities typically involve assessing, advising, training and mentoring local police forces
- The incumbent will instruct probationary and experienced local police officers in areas such as police patrol operations, police ethics, investigative methods and techniques, search and seizure requirements firearms, defensive tactics, law and community relations
- May assess training needs and current programs in order to propose new courses, determine the feasibility and effectiveness of proposed courses and identify instructors and resources in order to implement new courses
- May develop curriculum and instruct in a classroom or field setting in the knowledge, techniques and procedures necessary to execute the duties of police officers
  Two years full-time experience in a police training position
- Certified/licensed police instructor
- Computer literate
- Excellent communication skills

### C 6 2 3     Civilian Police Border Officer

**Responsibilities/Qualifications**
- Civilian police border patrol officers monitor, advise, train and mentor existing local border patrol agencies or assist with the establishment of new border patrol agencies if none exist
- May monitor borders during a peacekeeping mission in order to deter the illegal movement of people and goods across borders
- Patrols on foot, by motor vehicle or boat in order to detect persons attempting to cross borders illegally
- May apprehend and detain illegal entrants for subsequent action by immigration authorities
- Two years full-time experience as a border patrol officer

### C 6 2 4     Civilian Police Crimes Against Persons (CAPERS) Investigator

**Responsibilities/Qualifications**
- The international civilian police crimes against persons investigator position typically involves assessing, advising, training and mentoring local police in crimes against persons investigation units
- The investigator will thoroughly investigate all offenses against individuals as assigned. They will make a diligent effort to identify and apprehend the suspect and assist with the prosecution in court
- The duties also involve the investigation of crime scenes, the questioning of witnesses and suspects and the preparation and submission of the proper reports for superiors
- Two years full-time experience as Crimes against Persons Investigator
  Documented attendance at advanced criminal investigation courses

18

S LMAQM-04 C-0030

**C 6 2 5        Civilian Police Property Crimes Investigator**

Responsibilities/Qualifications
- The international civilian police property crimes investigator position typically involves assessing, advising, training and mentoring local police in property crimes investigation units
- The investigator will thoroughly investigate all offenses against property as assigned  They will make a diligent effort to identify and apprehend the suspect and assist with the prosecution in court
- The duties also involve the investigation of crime scenes, the questioning of witnesses and suspects and the preparation and submission of the proper reports for superiors
- Two years full-time experience as a Property Crimes Investigator
- Documented attendance of advanced criminal investigation courses, such as auto theft and financial crimes

**C 6 2 6        Civilian Police Supervisory/Management Officers**

Responsibilities/Qualifications
- Directs and coordinates the activities of members of the U S  CIVPOL contingent
- Explains general orders, special messages and decisions of contingent command staff to subordinates Informs U S  CIVPOL officers of changes in regulations and policies, implications of new or amended laws and new techniques in police work
- Investigates charges of inefficiency or neglect of duty against contingent members and files report or charges based on the findings
- Recommends merit awards for subordinates for outstanding performance
- Five years full-time experience in a supervisory law enforcement position with some documented internal affairs experience
- Documented attendance of a 3-week supervisory course

**C 6 2 6        Civilian Police Court Security Expert**

Responsibilities/Qualifications
- Maintain order in the courtroom during trials and guard juries from outside contact  Enforce courtroom rules of behavior and prevent the disturbance of court procedure  Provides jury escort and guards lodging of sequestered juries
- Advises and trains local court security officers so that they may fulfill their responsibilities and ensure the security of the courts
  At least two years experience as a court security officer or bailiff

**C 6 2 8        Civilian Police Corrections Officer**

Responsibilities/Qualifications
- Assess, monitor and advise local corrections officers as they perform their duties
- May enforce the rules and regulations governing a correctional facility  This includes the confinement, safety, health and protection of inmates as well as supervising the various work assignments of inmates
- May also involve the selection, screening and training of local correction officer candidates  Such work seeks to reform and develop the local civil police and corrections systems, or to create a new system where none exist
- 2 years full-time experience as a corrections officer
- Documented attendance of a basic correctional course

**C 6 2 9        Civilian Police Intelligence Officer**

19

S-LMAQM-04-C-0030

**Responsibilities/Qualifications**
- Responsible for reconstructing the course of individual criminal incidents, identifying a series of related crimes, understanding criminal networks and analyzing the scope and patterns of criminal activities
- Advising, monitoring and training local criminal intelligence officers in the techniques and skills of criminal intelligence analysis   May also include selection and screening of local criminal intelligence officers
  Two years service as a criminal intelligence officer
- A current USG TOP SECRET security clearance or higher
- Documented attendance of an advanced criminal intelligence course

## C 6 2 10        Civilian Police Customs Officer

**Responsibilities/Qualifications**
- Responsible for boarding ships and aircraft to check for compliance with regulations and search for undocumented cargo, prohibited goods or stowaways
- Responsible for processing and risk assessing passengers entering or leaving the area of responsibility
- Responsible for monitoring security in Customs controlled areas including wharves and airport tarmacs
- Responsible for the processing of cargo including documentary checks and physical examination
- May be responsible for advising, monitoring and training local customs officers in the techniques and skills of customs work.  May also include selection and screening of local customs officers
  Two years service as a customs officer

## C 6 2 11        Civilian Police Crime Scene Investigation Officer

**Responsibilities/Qualifications**
- Responsible for identifying, collecting and preserving evidence at crime scene investigations including, but not limited to, burglaries, robberies, deaths, thefts and assaults
- Identifies, collects and secures physical evidence such as blood, hair, firearms or narcotics
- Photographs and fingerprints suspects, witnesses, victims and witnesses
- Establishes and maintains records to ensure a proper chain of custody of physical evidence
- May be responsible for advising, monitoring and training local crime scene investigators in the techniques and skills of crime scene investigation   May also include selection and screening of local crime scene investigators
- Two years service as a crime scene investigator
- Documented evidence of attendance of an advanced crime scene investigation course

## C 6 2 12        Civilian Police Commander/Executive Officer

**Responsibilities/Qualifications**
- Responsible for the proper distribution of assigned personnel based on need and ability
- Responsible for the prompt and complete handling of special assignments from commanding personnel
- Responsible for identifying training needs of personnel on a continuing basis and arranging for the necessary training
- Responsible for determining and requesting budgetary needs
- A current USG TOP SECRET security clearance or higher
- Responsible for keeping all subordinate personnel informed on all matters pertaining to special assignments and CIVPOL directives
- Ten years of progressively responsible experience in police management and supervision, visionary skills and ability to form strong partnerships in a diverse culture
- Bachelor's degree in criminal justice/law enforcement or related field, advanced degree or law enforcement command training through FBI, PERF, SPI, Northwestern, etc

## C 6 2 13        Civilian Police Dignitary Protection Officer

S-LMAQM-04-C-0030

**Responsibilities/Qualifications**
- Responsible for the protection of both visiting and permanently stationed chief personnel
- Responsible for advance team visits prior to dignitary arrivals in order to perform surveys to determine manpower and equipment needs as well as emergency hospital and evacuation routes
- Coordinates activities with all law enforcement representatives and civilian entities associated with the dignitary visit
- Reviews and assesses completed protective operations in order to determine necessary improvements for future operations
- Two years service as a dignitary protection officer
- Documented attendance of a dignitary protection course

## C 6 2 14    Civilian Police Civil Disorder Specialist

**Responsibilities/Qualifications**
- Responsible for responding to both planned and spontaneous situations involving large crowds, civil disobedience or civil disorder
- Responsible for recognizing and evaluating the objectives of both planned and spontaneous civil disturbances
- When possible, the incumbent will evaluate the proposed event in order to determine and advise on the manpower and equipment needs
- Ability to develop and manage police special operations capacities, to include tactical responses to high risk situations, dignitary protections, civil disorder management, explosive ordinance disposal, and hostage negotiation
- Two years service as a civil disturbance officer (SWAT, Tactical or Special Operations Unit )
- Documented attendance of an advanced tactical response course

## C 6 2 15    Civilian Police Organized Crime Investigator

**Responsibilities/Qualifications**
- Responsible for conducting investigations on individuals and groups that are engaged in traditional and non traditional organized criminal activities
- Responsible for investigations that target the illicit activities of individuals affiliated with traditional organized crime families, which may include loan sharking, bookmaking, worldwide criminal organizations, terrorism, narcotics, environmental crime, as well as developing crime analysis information
- Two years service as an organized crime investigator
- A current USG SECRET security clearance or higher
- Documented attendance of an organized crime course

## C 6.2 16    Civilian Police Traffic Accident Investigator

**Responsibilities/Qualifications**
- Investigates traffic accidents, assumes charge at an accident scene, secures emergency medical aid for injured persons, may administer first aid, direct traffic, and sees that site is cleared and safe for traffic, prepares and submits written reports as necessary
- May instruct probationary and experienced local police officers in areas such as described above
- Two years experience as a traffic accident investigator
  Documented attendance of an advanced accident investigation course

## C 6 2 16    Law Enforcement/Police Advisor

**Responsibilities/Qualifications**
- A law enforcement/police advisor will assess existing law enforcement capacity and police institutions and make recommendations to senior government, law enforcement and criminal justice officials to develop and/or strengthen democratic civilian policing

S LMAQM-04-C-0030

- Assessments and recommendations may be in countries with no existing civilian police structure and require working with other international and local officials and international organizations to create a comprehensive structure and institutions
- Advisors should have a broad range of law enforcement experience, including supervisory and management, budget and personnel, training and mentoring
- Excellent analytical and communication skills

### C 6 2 18    Prisons/Corrections/Probation/Parole Advisors

**Responsibilities/Qualifications**
- Prisons/Corrections Advisors will assess existing incarceration structures and facilities and make recommendations to senior government, prison/corrections/probation/parole and criminal justice officials to develop and/or strengthen structures, facilities and programs, with due regard for human rights
- Assessments and recommendations may be in countries with records of gross violations of human rights
- Assessors may have to work with other international and local officials and international organizations in developing assessments and recommendations
- Advisors should have experience in a managerial role in a prison or correctional facility, or in a probation or parole program.
- Excellent analytical and communication skills

### C 6 2 19    Judicial Advisors

**Responsibilities/Experience**
- Judicial Advisors will assess existing judicial structures and institutions and make recommendations to senior government, judicial, and criminal justice officials to develop and/or strengthen a competent independent judicial system
- Assessments and recommendations may be in countries with no existing independent judicial system
- Assessors may have to work with other international and local officials and international organizations in developing assessments and recommendations
- Assessors should have experience as a judge or court administrator

### C 6 2 20    Criminal Justice Specialists

**Responsibilities/Experience**
- Criminal Justice Specialists will provide a broad range of advice and technical assistance on criminal justice issues to senior officials
- Specialists will provide advice and assistance to draft new legal codes and procedures, train local officials on new codes and procedures (including training local trainers), and provide advice and guidance on managing and prosecuting complex criminal cases
- Specialists may have to work with other international and local officials and international organizations
- Specialists should be licensed to practice law
- Specialists should have at least 3 years of criminal trial experience, preferably as a prosecutor
- Excellent analytical and communication skills

### C 6.2 21    Interpreters

**Responsibilities/Experience**
- Ability to translate the language(s) of the foreign country(s) into the English language, and the English language into the language(s) of the foreign county(s)
- Interpreters are routinely local nationals

22

S-LMAQM 04-C 0030

## C 6 2 22    Program Manager

**Responsibilities/Experience**
- Establish and or meet program objectives in accordance with the contract statement of work and direction from the Contracting Officer
- Identify and ensure adequate and appropriate resources
- Directly responsible for implementation and maintenance of contractual modifications, reporting on the performance of the program and ensuring that the customer requirements are met in a timely manner This includes contract administration, respond to customer's needs/requests, program finance, ensure staffing levels, and provide support services to the Client
- Must be familiar with the Federal Acquisition Regulation (FAR)
- 4 year BA or BS degree
- Must have at least Five Years Contract Administration experience
- 7-10 Years working in Overseas Contingency Logistics

## C 6 2 23    Deputy Program Manager

**Responsibilities/Experience**
- Assist in establishing and or meeting program objectives
- Assist in identifying and ensuring adequate and appropriate resources are available
- Assist with the implementation and maintenance of contractual modifications, reporting on the performance of the program and ensuring that the customer requirements are met in a timely manner This includes contract administration, respond to customer s needs/requests, program finance, ensure staffing levels, and provide support services to the Client
- Must be familiar with the Federal Acquisition Regulation (FAR)
- 4 year BA or BS degree
- Three Years Program Management Experience
- Must have at least Five Years International Program Management work experience

## C 6 2 24    Logistics Supervisor

**Responsibilities/Experience**
  Plans, directs, controls, coordinates and evaluates logistics management functions
- Bachelor's degree in an associated discipline Two (2) years experience in logistics or related field may be substituted for each year of the four (4) years college
- Twelve (12) years experience in supply chain management and/or government property administration Prefer at least four (4) years management position in contingency logistics environment
- Knowledge of the Federal Acquisition Regulation (FAR) and related federal and state legislation and regulations
- Knowledge of various computer applications such as Microsoft applications (i.e Excel, Word, PowerPoint)

- Strong analytical and organizational skills to oversee total operations of the logistics organization

## C 6 2 25    Logistics Coordinator

**Responsibilities/Experience**
- Coordinates information received and materials issued and received from various activities and sites concerning logistics operations
- Supervises and Coordinates day to day logistics operations within the theatre of operation as assigned
- High school diploma plus some technical training College-level logistics or military logistics training courses preferred
- Two (2) years experience in logistics related field  Experience with database entry related to Logistics applications
- Demonstrate knowledge of material controls systems

S-LMAQM-04-C-0030

- Ability to read and understand Engineering Drawings and associated lists
  Understand logistical technical language terms and writing skills
- Demonstrate proficiency with Microsoft applications and relational databases

## C 6 2 26     Physician Assistant

**Responsibilities/Experience**
- Plans, directs, controls, coordinates and evaluates medical operations and activities associated with the medical care of deployed police officers and support personnel
- Provides health care services to patients under the direction and responsibility of a physician.
- Examines patients, performs physical exams, and compiles patient medical data, including health history and results of physical exam, radiological and laboratory tests
- Creates working Standard Operating Procedures based on individual site conditions and medical services available in the local area
- Working skill in interviewing and counseling patients, in communicating observations, information, or recommendations, regarding diagnosis or treatment to medical professionals and other staff in oral/written form.
- Working ability to comprehend, communicate and apply state and federal laws and health laws, which affect medical care
- Provides preventative, therapeutic, restorative, and maintenance aspects of health care
- Coordinates treatment plan with other caregivers such as, regional medical personnel, U N Medical Director, KFOR Medical assets, physical therapists, other local medical assets
- Participates in medical employee orientation and training programs
- Tracks certifications of all medical staff personnel and ensures currency is maintained
  Supervises assigned medical staff and local host national physician
- Minimum Education, Training and Experience Requirements are to be certified as a Physician Assistant in the United States    Licensure must be current with all applicable education/re-certification requirements completed
- Ten (10) years experience in the medical field with at least 4 years as a Physicians Assistant
- Should have experience on deployed contingency operations or similar medical experience
- Experience as a Physician Assistant within the military is expected

## C 6 2 27     Registered Nurse

**Responsibilities/Experience**
- Provides health care services to patients under the direction and responsibility of a physician assistant, physician or nurse practitioner
- Examines patients, performs physical exams, and compiles medical data, including health history
- Performs therapeutic procedures, such as injections, immunizations, management of infection, EKG s etc
- Renders direct patient care, including assessing, diagnosing, planning, prescribing pharmacological and non-pharmacological treatment of health problems, health promotion and preventative care
- Assesses health and needs of individuals and populations    Collects, records, and analyzes patient or population health data from preventative health assessments, health evaluation and risk appraisals, patient history, health screening and other sources    Uses the data to determine nursing needs of the individual patients and/or populations, including abnormal findings, risk factors, and nursing diagnoses
- Applies scientific knowledge to treat human responses to actual or potential health problems
- Documents and maintains patient records of services
- Coordinates treatment plan with other caregivers such as, regional medical personnel, U N Medical Director, KFOR Medical assets, physical therapists, other local medical assets
- Participates in employee orientation and training programs
- Coordinates with operational mission planners for the safe evacuation of the patients from the originating mission to destination facility  Provides medical attendance if required.
- Minimum Education, Training and Experience Requirements are to be certified as a Registered Nurse in the United States.

S-LMAQM-04 C 0030

- Requires a Bachelor's degree with at least 2-4 years of clinical experience
- Must meet state nurse licensure requirements. Licensure must be current with all applicable education/re-certification requirements completed
- 5-10 years experience in the medical field with at least 4 years as a Registered Nurse. Should have experience on deployed contingency operations are or similar medical experience

## C 6 2 28     Medics

### Responsibilities/Experience
- Provides health care services to patients under the direction and responsibility of a physician assistant, physician or nurse practitioner
- Examines patients, performs physical exams, and compiles medical data, including health history
- Performs therapeutic procedures, such as injections, immunizations, management of infection, EKG's etc
- Renders direct patient care, including assessing diagnosing, planning, prescribing pharmacological and non-pharmacological treatment of health problems, health promotion and preventative care
- Applies scientific knowledge to treat human responses to actual or potential health problems
- Documents and maintains patient records of services
- Coordinates treatment plan with other caregivers such as, regional medical personnel, U N Medical Director, KFOR Medical assets, physical therapists, other local medical assets
- Participates in employee orientation and training programs
- Plans and prepares for aero medical evacuation missions. Coordinates with operational mission planners for the safe evacuation of the patients from the originating mission to destination facility. Provides medical attendance if required.
- Minimum Education, Training and Experience Requirements are to have a current National EMT-P certification. Certification must be current with all applicable education/re-certification requirements completed
- 5-7 years experience in the medical field as a Medic. Should have experience on deployed contingency operations are or similar medical experience

## C 62 29     Administrative Assistant

### Responsibilities/Experience
- Coordinates administrative functions for the Program Manager and Logistics Manager. Performs various task associated with operations of an administrative office supporting logistics, personnel management, and finance
- Performs many of the following responsibilities
    * Responsible for tracking, filing and updating all information directed to the Logistics Manager IAW the Company Management and Control Plan, Government regulations and contract requirements. This information includes, but is not limited to
    * Purchase Orders, correspondences, Bids, Leases and any other document received by the International Police Program.
    * Tracks and records Local national, International, vehicle, generator, information (ID numbers, expiration dates, end of mission dates, service and next due dates, leave dates etc )
    * Tracks and receives shipments
    * Interacts with US Police Officers in the absences of the Logistics Manager
    * Answers phones, data entry, faxing, making copies and when needed ordering office supplies
    * Interacts daily with non Host Nationals and Internationals to provide all services (housing, offices, utilities, maintenance) necessary to ensure Headquarters Support Facility remains in operation
    * Works with or through Governmental (both Host and International), and Non-Governmental Agencies to ensure contractual obligations are met
    * Ensures that all Government Furnished Property (GFP), Equipment (GFE), and Contractor Property are maintained, controlled and reported In Accordance With Company Management and Control Plan, Government regulations and contract requirements

S LMAQM-04 C-0030

- • Perform all duties as host / English language translator
- • Performs all additional duties directed by senior management
- High school education
- Two (2) years experience in logistics related field  Must speak conversational English
- Recommended Skills
  - • Basic Computer knowledge
  - • Knowledge Microsoft Office
  - • Type 50 wpm
  - • Read and write at U S  Government Interagency Language Roundtable (LIR) 2 Level

### C 6 2.30      Logistic Assistant (Local Nationals)

Responsibilities/Experience
- Coordinates information received and materials issued and received from individuals at the direction of the Logistics Coordinator  Responsible for supporting logistics operations as tasked by the Logistics Coordinator
- Performs day to day logistics tasks associated with logistical support for deployed operations
- Performs tasks associated with Morale, Welfare & Recreation (MWR) functions (book and video library, TV and Weight Rooms, mail, Package, and travel Services), as well as Logistical (uniforms and equipment) support
- High school education
- Two (2) years experience in logistics related field  Must speak conversational English.
- Knowledgeable of supply and logistics operations

### C 7      COST REIMBURSABLE ITEMS

The Cost Reimbursement CLIN of this contract will consist of services and supplies that are not covered by the other line item costs of Section B  Due to the unforeseen and variable nature of the projects covered by this contract, a maximum ceiling for Cost Reimbursement Fixed Fee has been established  This contract cost consists of but is not limited to materials, supplies, services, subcontracts, minor construction, and MWR activities  Titles to all items remain with the Government upon contract expiration. This line item is Cost Plus Fixed Fee  Along with all proposed rates in Section B (breakdown of all rates and supporting documentation), the selected firm's proposed Cost Reimbursement Fixed Fee rate, Cost Reimbursement Overhead rate, Cost Reimbursement G&A rate, Material Handling Fee rate, Cost Reimbursement Subcontracts Overhead Rate, Cost Reimbursement Subcontracts G&A rate will be incorporated into the contract  For subcontracts, the prime contractor will be allowed to bill only the Cost Reimbursement Subcontract Overhead rate and the Cost Reimbursement Subcontractor G&A rate  Material Handling Fee will be the only allowable charge for purchase and shipment of materials and equipment  Overhead and Subcontracts Overhead, G&A and Subcontracts G&A will not be allowed on items involving the Material Handling Fee  These rates will be utilized for all Cost Reimbursement items and the contractor will not be allowed to deviate from these rates

If cost reimbursement effort is foreseen by the Government, the contractor will be required to submit a proposed cost reimbursement budget prior to starting the effort.  The contractor is not allowed to start or incur any cost reimbursement costs without prior written Government approval  The contractor is not allowed to bill to the cost reimbursement CLIN contract costs that are already established by the other CLINs in this contract  All applicable Government accounting standards will be utilized in monitoring this contract cost as well as all contract costs

### C 8      General Description Of Level Of Support Needed In The Field

There are several factors contributing to the U S  decision to provide support for U S  CIVPOL personnel serving overseas, including  1) U S  personnel often deploy soon after the cessation of hostilities to areas

that have experienced substantial physical destruction and/or the total disruption of public works and commercial activities, 2) Our experience strongly indicates that the international organization with responsibility for administering a particular CIVPOL operation is unlikely to meet U S standards for addressing health or welfare needs of individuals in the field, 3) Our experience also indicates that the United Nations does not have the capacity to address medical requirements, particularly emergencies, in a timely manner, 4) US deployments are large compared to many other countries and create a immediate strain on any existing support systems being established to service a peacekeeping mission, and 5) U S deployments may include assignment of individuals who require special support, e g , in addition to a large uniformed CIVPOL contingent, U S participation may include advisors, trainers, consultants and technical specialists who are not assigned to serve in CIVPOL units   Such individuals may require housing, transportation, communications, and computers and administrative support

Once deployed, requirements for field support change over time   While field support in the first six months of an operation may be the most critical to individual police officers, field support continues to be key for effective U S participation in a peacekeeping operation for the first 12 18 months   During this period, U S CIVPOL are likely to be assigned to difficult or remote locations and depend on Contractor field support to help them adjust to what may be harsh living conditions, lack of potable water, difficulties in obtaining regular access to healthful food and/or food supplies, inconsistent availability of heat or electricity, poor sanitation, access to modern medical services, concerns for personal safety, communications with family members in the U S , access to functioning financial institutions and services   Over time, general conditions improve and people deployed to U S CIVPOL missions require lower levels of support, however, such conditions and a timeline for planning reductions in filed support cannot be determined in advance of actual deployment

Requirements in the field that the Contractor may be directed to provide include  warehouse for personal equipment (clothing, camping equipment, ballistic vests, weapons, ammunition, etc) and warehouse equipment, supplies and materials needed to establish, store and manage inventory, new construction and renovation of existing offices, buildings, classrooms, housing to support operational requirements, procurement of equipment that will be provided to foreign law enforcement personnel as part of U S foreign assistance programs, procurement, installation and maintenance of generators,  communications systems design, procurement of communications equipment, installation and maintenance of such equipment, and training for key operators, establishment of a medical clinic and system for addressing day-to-day health conditions of a U S police contingent that may be assigned to various locations throughout the area of responsibility, and a capacity to stabilize and evacuate under emergency medical conditions,  office space, furniture, equipment for administrative purposes, MWR features (Internet, telephones, computers, video and book library, physical fitness space/equipment), and space for vehicles

## C 9    Short Narrative On History/Scope/Duration Of Each Known Requirement

The U S has been participating in police components of peacekeeping and complex security operations since the 1994 Multinational intervention in Haiti   To date, an estimated over 2,500 U S police and other law enforcement, legal and judicial experts have participated in the following

United Nations Interim Administration in Kosovo (UNMIK)  United Nations Security Council resolution 31244 authorized the UNMIK mission in June 1999  As a part of a peace agreement to end the NATO bombing campaign, Serbia was forced to withdraw all of its security forces, including police, from Kosovo  Serbian police had provided all law enforcement in the province since 1989 and their departure left a public security vacuum that NATO military forces could only partially fill  An UNMIK Police Force was created to perform the range of law enforcement functions in Kosovo and to assist in the training and development of a new Kosovo Police Service (KPS) comprised of ethnic Albanians, Serbs, and other minorities  The KPS ultimately will assume full responsibilities for policing Kosovo from the UNMIK Police—over 5600 KPS officers have been trained and deployed  The U S currently provides approximately 500 American police (with a high of 605 U S police) to the 4,500-member UNMIK Police from over 50 countries, including a Deputy Commissioner  In addition, we provide approximately 12 police trainers to the KPS school (with a high of approximately 75 U S trainers), operated by the Organization for Security and Cooperation in Europe (OSCE)

S-LMAQM 04-C-0030

United Nations Mission in Bosnia-Herzegovina (UNMIBH) The Dayton peace accords, signed in December 1995, ended the bloody, four year conflict among Serbs, Croats, and Muslims The Peace Accords created two entities within the country of Bosnia Herzegovina—the Republika Srpska and the Federation of Bosnia-Herzegovina Police in both entities had been pulled into the fighting, military, paramilitary and police units were commingled, many of those officers performing police functions were not trained in civilian policing, and infrastructure and resources were destroyed. An unarmed international CIVPOL mission, the International Police Task Force (IPTF) was established by UN Security Council resolution 1031 in December 1995 to, inter alia, oversee the reform of Bosnian police institutions The U S provided 200 of the authorized 2053 officers from some 40 nations authorized to participate in the mission. Key IPTF responsibilities have included certifying police personnel, separating civilian law enforcement personnel and functions from the military, reforming and restructuring police forces to reflect independent civilian authority, vetting police personnel for human rights violations and other crimes, and training, monitoring, and advising the entities police forces on the principles of democratic policing. U S involvement in the civilian police mission in Bosnia phased out when the United Nations mission ended in December 2002 IPTF responsibilities have been redefined and transitioned to the European Union Police Mission (EUPM)

United Nations Transitional Administration in East Timor (UNTAET) UN Security Council resolution 1272 authorized the UNTAET mission in 1999 in the aftermath of a bloody rampage conducted by militias (gangs) following a referendum to separate East Timor from Indonesia and establish an independent country of East Timor The UN established a transitional administration to perform interim governmental functions, including law enforcement, and to establish local government institutions, such as the 3,000-member East Timor Police Service (ETPS) Currently the U S provides 46 police of the some 500 international police currently assigned to the UNTAET CIVPOL mission On May 20, 2002 East Timor became the world's newest independent country The UNTAET CIVPOL mission is downsizing with a currently projected end date of May 2004 Thus, our contribution will be declining as well

Afghanistan After decades of internal political and religious conflicts, U S military actions following the September 11, 2001 terrorist attack on the World Trade Center to dismantle the Taliban regime, and efforts to destroy the al Qaeda terrorist organization, much of Afghanistan's infrastructure and physical plant in Kabul is in need of substantial repair, renovation, and reconstruction Police stations were bombed and burned, vehicles and equipment were confiscated, records and administrative capacities were destroyed and police personnel were forced into hiding under the threat of death. The U S is supporting the German-led international effort to reform, equip and train the Afghanistan National Police (ANP) U S assistance will focus on providing basic policing skills training, communications and other law enforcement equipment, advisors and technical assistance for the 7,000 ANP in Kabul, with the potential to expand to include the police in provinces throughout Afghanistan. The U S has also agreed to provide training and other technical assistance to a significant number of Afghanistan Highway Patrol Officers, and is currently working on plans to assist in the development of the Afghan Border Police The U S also supports the Italian led initiative to reform and develop the judicial sector in Afghanistan, to include training, materials, equipment and infrastructure support

Iraq The Department of State, Bureau for International Narcotics and Law Enforcement Affairs (INL) is developing options to support police, justice, and prison programs that may be implemented in Iraq While the precise program requirements have not been defined, USG/INL is supporting the Department of Defense (DOD), Coalition Provisional Authority (CPA) (formerly the Office of Reconstruction and Humanitarian Affairs (ORHA)), as it exercises responsibility for overall civil administration in Iraq INL may be required to establish and maintain a group of up to 1,000 (U S) experienced law enforcement personnel, available to serve in this operation in Iraq The group could include a broad range of law enforcement experts and specialists, including generalists, trainers, border police, homicide investigators, crime scene investigators, managers (executive and supervisory), court security officers, corrections officers, intelligence officers, customs officers, dignitary protection officers, civil disorder specialists, organized crime investigators, and traffic accident investigators This project will also provide support, including transportation arrangements for up to 1,000 advisors and provide in-country or off-site administrative, technical, logistical, or other unanticipated services, or actions to support the project In addition the project will establish and maintain a personnel database of U S personnel assigned to this

28

S-LMAQM-04-C-0030

## SECTION D — PACKAGING AND MARKING

**D 1    DATA PACKAGING REQUIREMENTS (11/96)**

(a)    All unclassified data shall be prepared for shipment in accordance with best commercial practices

(b)    Classified reports data, and documentation shall be prepared for shipment in accordance with the National Industrial Security Program Operating Manual (DOD 5220 22 M)

**D 2    MARKING OF REPORTS (05/95)**

All reports delivered by the Contractor to the Government under this contract shall prominently show on the cover of the report

        (a)    Name and business address of the Contractor;

        (b)    Contract number and delivery order number, if applicable,

        (c)    Date of report, and

        (d)    Program office(s)

**D 3    PACKING OF SUPPLIES FOR DOMESTIC SHIPMENT (05/95)**

Supplies shall be packed for shipment in a manner that will ensure acceptance by common carriers and safe delivery at destination   Containers and closures shall comply with the Interstate Commerce Commission Regulations, Uniform Freight Classification Rules, and regulations of other carriers as applicable to the mode of transportation

**D.4    PACKING LIST(S) (05/95)**

A packing list or other suitable shipping document shall accompany each shipment and shall include the following information

        (a)    Name and address of consignor,

        (b)    Name and address of consignee,

        (c)    Government contract number (and delivery order number, if used),

        (d)    Government bill of lading number covering the shipment, if any, and

        (e)    Description of the items shipped, including item number, quantity, number of containers, and package number, if any

S-LMAQM-04-C-0030

## SECTION E — INSPECTION AND ACCEPTANCE

### CLAUSES INCORPORATED BY REFERENCE

| FAR SOURCE | TITLE AND DATE |
|---|---|
| 52 246-3 1 | INSPECTION OF SUPPLIES--COST-REIMBURSEMENT (MAR 2001) |
| 52 246-4 | INSPECTION OF SERVICES--FIXED-PRICE (AUG 1996) |
| 52 246-5 | INSPECTION OF SERVICES--COST-REIMBURSEMENT (APR 1984) |
| 52 246-6 | INSPECTION--TIME-AND-MATERIAL AND LABOR-HOUR (MAR 2001) |

### E 1    INSPECTION AND ACCEPTANCE — SERVICES (05/95)

Inspection and acceptance of the services to be provided hereunder shall be made by the Contracting Officer's Representative

S-LMAQM-04 C-0030

## SECTION F — DELIVERIES OR PERFORMANCE

### CLAUSES INCORPORATED BY REFERENCE

| FAR SOURCE | TITLE AND DATE |
|---|---|
| 52 242-15 | STOP-WORK ORDER (AUG 1989)--ALTERNATE I (APR 1984) ALT I |
| 52 247-55 | F O B POINT FOR DELIVERY OP GOVERNMENT-FURNISHED PROPERTY (JUNE 2003) |

### F 1    MONTHLY PROGRESS REPORT (COST TYPE CONTRACT) (05/95)

(a)    The Contractor shall furnish three (3) copies of a combined monthly technical and financial progress report briefly stating the progress made during the reporting period, broken down by delivery order or by task, if applicable  Specific discussions shall include difficulties encountered and remedial action taken during the reporting period, and anticipated activity during the subsequent reporting period  In addition, the report shall specify contract financial status as follows

      (1)    For term type contracts, provide

          (i)    Cumulative costs and direct labor hours expended from the effective date of the contract through the last day of the current reporting month  Include a cumulative incurred cost per direct labor hour average computation and compare the result to the cumulative average cost per direct labor hour derived from the estimated cost of the contract.

          (ii)    Actual costs and direct labor hours expended during the current reporting month

          (iii)    Estimated costs and direct labor hours to be expended during the next reporting period

          (iv)    Cumulative and monthly actual costs and direct labor hours incurred for each work assignment or task issued and estimates of costs and hours required to complete each work assignment or task.

      (2)    For completion type contracts, provide a graph using a vertical axis for dollars and a horizontal axis for time increments that shows the actual and projected rate of expenditures against the total estimated cost of the contract

(b)    Submission of this financial information required by these reports does not change the notification requirements of FAR 52 232-20 "LIMITATION OF COST" or FAR 52.232-22 "LIMITATION OF FUNDS" which requires separate written notice to the Contracting Officer

(c)    The reports shall be submitted to the following addressees on or before the fifth day of each month following the first complete calendar month of the contract  Distribute reports as follows

| No  of Copies | Addressee |
|---|---|
| Two | Contracting Officer's Representative |
| One | Mike Larson, Contracting Officer |

### F 2    PERIOD OF PERFORMANCE (05/95)

This contract's base period of performance shall be for one year past the effective date of the contract as executed by the Contracting Officer  This solicitation contemplates the award of a contract with four additional (one year each) option periods

S-LMAQM 04 C-0030

### F.3     PLACE OF PERFORMANCE (10/97)

The place(s) of performance for this contract is worldwide and shall be stated in individual task orders/modifications

S LMAQM-04-C-0030

## SECTION G — CONTRACT ADMINISTRATION DATA

**G 1    CONTRACT ADMINISTRATION DATA (07/01)**

Contracting Officer

Michael S  Larson
(703) 875 6672

Contract Administrator

Brian M  Carper
Telephone Number  703-875-5238
Facsimile Number  703-875-5272

First Class Mailing

U S  Department of State
Office of Acquisition Management
P O  Box 9115, Rosslyn Station
Arlington, Virginia 22219

Courier or Hand Delivery

U S  Department of State
Office of Acquisition Management
Room 200
1701 N  Ft. Myer Drive
Arlington, Virginia 22209
(Visitor's entrance via 17th Street)

Contracting Officer's
Representative (COR)

Robert B  Gifford
Telephone Number  202 647-0401
Facsimile Number

U S  Department of State
INL/PC, Room 7334
2201 C  Street N W
Washington, D C  20520

**G 2    DOSAR 652 232-71 VOUCHER SUBMISSION (COST-REIMBURSEMENT) (AUG 1999)**

(a) General  The Contractor shall submit, on a monthly basis, an original and four copies of each voucher  In addition to the items necessary per FAR 52 232 25, "PROMPT PAYMENT," the voucher items shall show the elements of cost for the billing period and the cumulative costs to date  At a minimum the Contractor shall identify employee's names, hours worked and allowances claimed.  (Although timesheets are not required to be submitted to the Government, the Government retains the right to access/review the time sheets and resumes for each employee hired under this contract whenever it deems it necessary )  An original and three copies of each voucher shall be submitted to the Contracting Officer's Representative (COR) at the address referenced in Section G of this contract under "CONTRACT ADMINISTRATION DATA "  One copy of the voucher shall be concurrently submitted to the Contracting Officer at the address referenced in Section G of this contract under ' CONTRACT ADMINISTRATION DATA "

(b)      *Contractor Remittance Address*  Payment shall be made to the Contractor's address as specified on the cover page of this contract, unless a separate remittance address is specified below

_____
_____

**G 3    DOSAR 652 232-70  PAYMENT SCHEDULE AND INVOICE SUBMISSION (FIXED-PRICE) (DEC 1994) (ACQ STANDARD FORMAT) (05/95)**

S-LMAQM-04-C-0030

(a)    *General*  The Government shall pay the contractor as full compensation for all work required, performed and accepted under this contract, inclusive of all costs and expenses, the firm-fixed-price stated in Section B of this contract

(b)    RESERVED

(c)    *Invoice Submission*  Invoices shall be submitted in an original and three copies to the contracting officer's representative at the address referenced in Section G of this contract under "CONTRACT ADMINISTRATION DATA." One copy of the invoice shall be concurrently submitted to the contracting officer at the address referenced in Section G of this contract under "CONTRACT ADMINISTRATION DATA." To constitute a proper invoice, the invoice must include all items per FAR 52 232 25, "PROMPT PAYMENT"

(d)    *Contractor Remittance Address*  Payment shall be made to the contractor's address as specified on the cover page of this contract, unless a separate remittance address is specified below

## G 4    652 242-70 Contracting Officer's Representative (COR)

As prescribed in 642 271, insert a clause substantially the same as follows
Contracting Officer's Representative (Aug 1999)

(a) The Contracting Officer may designate in writing one or more Government employees, by name and position title, to take action for the Contracting Officer under this contract  Each designee shall be identified as a Contracting Officer's Representative (COR)  Such designation(s) shall specify the scope and limitations of the authority so delegated, provided, that the designee shall not change the terms or conditions of the contract, unless the COR is a warranted Contracting Officer and this authority is delegated in the designation

(End of clause)

## G 5    ORDERING PROCEDURES (11/96)

(a) In accordance with FAR 52 216-18 "ORDERING," the following individuals and activities are authorized to issue delivery orders or task orders hereunder

>        Department of State Contracting Officer
>        Michael S Larson
>        A/LM/AQM/WWD/DAB

(b) Orders placed under this contract shall contain the following information

(1)    Date of order,
(2)    Contract number and order number;
(3)    Item number and description, quantity, and unit price,
(4)    Delivery or performance date,
(5)    Place of delivery or performance (including consignee),
(6)    Packaging, packing, and shipping instructions, if any,
(7)    Accounting and appropriation data,
(8)    Security clearance level(s), applicable to the order, if any, and
(9)    Any other pertinent information

(c) Issuance of orders by facsimile is authorized in accordance with FAR 52 216-18 "ORDERING "

S LMAQM-04-C 0030

## G 6  ADDITIONAL ORDERING PROCEDURES FOR OTHER GOVERNMENT AGENCIES (02/96)

Contracting Officers for the other Government agencies, identified in the clause entitled "ORDERING PROCEDURES," are authorized to issue delivery orders or task orders under this contract only after obtaining prior written authorization from the designated Contracting Officer's Representative (COR) Requests for authorization shall include contract line item numbers, quantities, and prices for all items to be ordered  If approved, a copy of the COR's letter granting authorization shall be attached to the delivery order or task order  The Contractor shall not accept any orders from other Government agencies which do not include a copy of the COR's authorization  A copy of each delivery order or task order shall be provided to the U S  Department of State's Contracting Officer and COR at the time the order is issued

## G 7  TASK ORDERS (11/96)

(a) Task Order Requests shall be issued in writing to the Contractor by the Contracting Officer or the Contracting Officer's Representative (COR) and will describe the specific support required by the Department of State  A Task Order Request is a request for proposal, it is not a Task Order and does not authorize performance

(b) Each Task Order Request shall include, at a minimum

   (1) A description of the work to be performed,

   (2) Reporting, briefings, and/or other deliverable requirements, and

   (3) The estimated period of performance or required completion date

(c) The Contractor(s) shall, within ten working days of the receipt of a Task Order Request, submit to the COR a written technical proposal and a separate detailed cost proposal  A cost proposal shall include the following, as applicable

   (1) The required number of labor hours by labor classification and labor rates,

   (2) Overtime hours and rates by labor category,

   (3) Direct material, travel, subsistence, and similar costs,

   (4) Dollar amount and type of any proposed subcontract(s),

   (5) Total estimated price, and,

   (6) Proposed completion or delivery dates

(d) The COR shall review the proposal(s) and forward his written recommendations, along with a copy of the proposal, to the Contracting Officer  Following successful negotiations of the Contractor's proposal, the Contracting Officer shall issue a written Task Order to the Contractor providing the necessary funding and authorizing the Contractor to begin work

The Government shall not be obligated to pay the Contractor any amount in excess of the total Task Order amount, and the Contractor shall not be obligated to continue performance if to do so would exceed the total Task Order amount

(e) If multiple contracts are awarded the U S  Department of State reserves the right to award task orders on a competitive or sole source basis depending on the situation and environment

S-LMAQM 04 C-0030

## SECTION H — SPECIAL CONTRACT REQUIREMENTS

**H 1    CONTRACTOR COMMITMENTS, WARRANTIES AND REPRESENTATIONS (05/95)**

Any written commitment by the Contractor within the scope of this contract shall be binding upon the Contractor. Failure of the Contractor to fulfill any such commitment shall render the Contractor liable for liquidated or other damages due to the Government under the terms of this contract. For the purpose of this clause, a written commitment by the Contractor is limited to the proposal submitted by the Contractor, and to specific written modifications to the proposal. Written commitments by the Contractor are further defined as including (1) any warranty or representation made by the Contractor in a proposal as to hardware or software performance, total systems performance, and other physical, design, or functional characteristics of equipment, software package or system, or installation date, (2) any warranty or representation made by the Contractor concerning the characteristics or items described in (1) above, made in any publications, drawings, or specifications accompanying or referred to in a proposal, and (3) any modification of or affirmation or representation as to the above which is made by the Contractor in or during the course of negotiations, whether or not incorporated into a formal amendment to the proposal.

**H2    KEY PERSONNEL (02/96)**

(a) The Contractor shall assign to this contract the following key personnel:

| LABOR CATEGORY | NAME |
|---|---|
| Headquarters Program Manager | Mr. Dick Cashon |
| In country Deputy Program Managers | Mr. Gherdy Francis (Iraq)<br>Mr. Buck Pflanz (Kosovo)<br>Mr. Jerry Parr (Afghanistan) |

(b) The Contractor agrees that a partial basis for award of this contract is the list of key personnel proposed. Accordingly, the Contractor agrees to assign to this contract those key persons whose resumes were submitted with the proposal necessary to fulfill the requirements of the contract. No substitution shall be made without prior notification to and concurrence of the Contracting Officer. During the first ninety days of performance, the Contractor shall make no substitutions of key personnel unless the substitution is necessitated by illness, death, or termination of employment.

(c) All proposed substitutes shall meet or exceed the qualifications of the person to be replaced. The Contracting Officer shall be notified in writing of any proposed substitution at least forty-five days or ninety days if a security clearance is to be obtained, in advance of the proposed substitution. Such notification shall include (1) an explanation of the circumstances necessitating the substitution, (2) a complete resume of the proposed substitute, and (3) any other information requested by the Contracting Officer to enable him to judge whether or not the Contractor is maintaining the same high quality of personnel that provided the partial basis for award.

**H.3    NONPAYMENT FOR UNAUTHORIZED WORK (05/95)**

No payments will be made for any unauthorized supplies or services, or for any unauthorized changes to the work specified herein. This includes any services performed by the Contractor of his own volition or at the request of an individual other than a duly appointed Contracting Officer. Only a duly appointed Contracting Officer is authorized to change the specifications, terms, and/or conditions of this contract.

**H 4    ORGANIZATIONAL CONFLICT OF INTEREST - GENERAL (02/96)**

37

S-LMAQM 04 C-0030

(a) The Contractor warrants that, to the best of its knowledge and belief, there are no relevant facts or circumstances which would give rise to an organizational conflict of interest, as defined in FAR Subpart 9 5, or that the Contractor has disclosed all such relevant information

(b) The Contractor agrees that if an actual or potential organizational conflict of interest is discovered after award, the Contractor will make a full disclosure in writing to the Contracting Officer This disclosure shall include a description of actions, which the Contractor has taken or proposes to take to avoid or mitigate the actual or potential conflict

(c) If the Contractor was aware of a potential organizational conflict of interest prior to award or discovered an actual or potential conflict after award and did not disclose or misrepresented relevant information to the Contracting Officer, the Government may terminate the contract for default

(d) The Contractor shall insert the substance of this clause, including this paragraph (d), in all subcontracts

## H 5     SAFEGUARDING OF INFORMATION (05/95)

The Contractor and its employees shall exercise the utmost discretion in regard to all matters relating to their duties and functions  They shall not communicate to any person any information known to them by reason of their performance of services under this contract which has not been made public, except in the necessary performance of their duties or upon written authorization of the Contracting Officer  All documents and records (including photographs) generated during the performance of work under this contract shall be for the sole use of and become the exclusive property of the U S  Government  Furthermore, no article, book, pamphlet, e-mail, recording, broadcast, speech, television appearance, film or photograph concerning any aspect of work performed under this contract shall be published or disseminated through any media without the prior written authorization of the Contracting Officer  These obligations do not cease upon the expiration or termination of this contract  The Contractor shall include the substance of this provision in all contracts of employment and in all subcontracts hereunder

## H 6     TECHNICAL DIRECTION (05/95)

(a)     Performance of the work hereunder shall be subject to technical instructions, whether oral or written, issued by the Contracting Officer's Representative specified in SECTION G of this contract  As used herein, technical instructions are defined to include the following

> (1)     Directions to the Contractor which suggest pursuit of certain lines of inquiry, change work emphasis, fill in details or otherwise serve to assist in the Contractor's accomplishment of the Statement of Work

> (2)     Guidance to the Contractor which assists in the interpretation of drawings, specifications or technical portions of work description

(b)     Technical instructions must be within the general scope of work stated in the contract  Technical instructions may not be used to  (1) assign additional work under the contract, (2) direct a change as defined in the "Changes" clause of this contract, (3) increase or decrease the contract price or estimated contract amount (including fee), as applicable, the level of effort, or the time required for contract performance, or (4) change any of the terms, conditions or specifications of the contract

(c)     If, in the opinion of the Contractor, any technical instruction calls for effort outside the scope of the contract or is inconsistent with this requirement, the Contractor shall notify the Contracting Officer in writing within ten working days after the receipt of any such instruction  The Contractor shall not proceed with the work affected by the technical instruction unless and until the Contractor is notified by the Contracting Officer that the technical instruction is within the scope of this contract.

(e)     Nothing in the foregoing paragraph shall be construed to excuse the Contractor from performing that portion of the contractual work statement which is not affected by the disputed technical instruction

S-LMAQM-04 C-0030

### H 7    STANDARDS OF CONDUCT

The Contractor shall ensure that personnel assigned to this contract observe the highest standards of personal and professional conduct, and that employee assigned to locations outside the United States observe the requirements of the local law and applicable US mission regulations, including but not limited to instructions or policies governing outside employment, commercial activities, currency exchange, travel restrictions, and nonfraternizatio with host country nationals

The Contractor is responsible for recruiting and hiring only those personnel who can maintain the standards of conduct required under this contract   Additionally, the Contractor is responsible for maintaining satisfactory standards of employee conduct and integrity and shall be held fully accountable for the conduct of its employees and its subcontractor's employees

If the Contracting Officer determines that continued performance under this contract by any Contractor or subcontractor personnel is contrary to the public interest, the Contractor shall remove the employee from all work under this contract   The costs incurred for removal of personnel for violation of standards of conduct, including but not limited to travel or defense of litigation, shall not be allowable under this contract unless the Contracting Officer determines that the Contractor fulfilled its responsibility in the recruitment, employment, and oversight of the individual(s) involved.

Additionally, the contractor shall adhere to the following prohibited activities which include any unauthorized involvement in trafficking of person, unauthorized frequenting of locations known to be involved with prostitution or trafficking of persons, any involvement with the soliciting of persons for the purpose of engaging in sexual acts, and any participation in sexual activity in exchange for any monetary or non-monetary form of consideration

### H 8    CONTRACTOR PERSONNEL MEDICAL REQUIREMENTS

The Contractor shall be responsible for assuring that Contractor personnel, including subcontractor personnel, who are required to travel in connection with this contract, are physically able to travel to the intended destination and remain there without significant risks to health for the required periods The Contractor shall be responsible for assuring that such individuals receive the proper immunizations and take the proper health measures before, during, and after said travel   Physical examinations and immunizations will not be provided by the Government

### H 9    INSURANCE (05/95) MODIFIED (04/96)

(a)    In accordance with FAR 52 228-5 "INSURANCE--WORK ON A GOVERNMENT INSTALLATION," the Contractor shall, at no additional expense to this contract, provide and maintain, in addition to any other insurance coverage required elsewhere in this contract, the following types of insurance in the amounts specified   Before commencing work under this contract, the Contractor shall certify to the Contracting Officer in writing that at least the kinds and minimum amounts of insurance required below have been obtained.

(b)    The Contractor shall insert the substance of this clause, including this paragraph, in subcontracts under this contract that require work in a Government installation and shall require subcontractors to provide and maintain the insurance required in the Schedule or elsewhere in the contract   The Contractor shall maintain a copy of all subcontractors' proofs of required insurance, and shall make copies available to the Contracting Officer upon request

(c)    Types of Insurance Required

    (1) Workers' Compensation and Employers' Liability   The Contractor is required to comply with all applicable Federal and State workers' compensation and occupational disease statutes   If occupational diseases are not compensable under those statutes, they shall be covered under the employer's liability

39

S LMAQM-04-C-0030

section of the insurance policy, except when contract operations are so commingled with a Contractor's commercial operations that it would not be practical to require this coverage  Employer's liability coverage of at least $100,000 is required, except in States with exclusive or monopolistic funds that do not permit worker's compensation to be written by private carriers

(2)    General Liability  The Contractor shall provide bodily injury liability insurance coverage written on the comprehensive form of policy of at least $500,000 per occurrence

(3)    Automobile Liability  The Contractor shall provide automobile liability insurance written on the comprehensive form of policy  The policy shall provide for bodily injury and property damage liability covering the operation of all automobiles used in connection with performing the contract  Policies covering automobiles operated in the United States shall provide coverage of at least $200,000 per person and $500,000 per occurrence for bodily injury and $20,000 per occurrence for property damage  The amount of liability coverage on other policies shall be commensurate with any legal requirements of the locality and sufficient to meet normal and customary claims

(4)    Aircraft Public and Passenger Liability  When aircraft are used in connection with performing the contract, the Contractor shall provide aircraft public and passenger liability insurance  Coverage shall be at least $200,000 per person and $500,000 per occurrence for bodily injury other than passenger liability, and $200,000 per occurrence for property damage  Coverage for passenger liability bodily injury shall be at least $200,000 multiplied by the number of seats or passengers, whichever is greater

(5)    Vessel Liability  When contract performance involves use of vessels, the Contractor shall provide vessel collision liability and protection and indemnity liability insurance as determined by the Department of State

(6)    Defense Base Act  The Defense Base Act applies to this procurement  The Contractor is required to comply with Section I clause 52 228 03, Workers' Compensation Insurance (Defense Base Act)  (See also Section H clause, Waiver of Defense Base Act Insurance Requirements for Local and Third Country Nationals Employed on Overseas Contracts )

(7)    Insurance – Liability to Third Persons  The Contractor shall provide liability insurance as required by Section I clause 52 228-07, Insurance - Liability to Third Persons

(8)    Medical Evacuation Insurance  The Contractor shall provide medical evacuation insurance for those Contractor employees hired in the United States and assigned overseas on permanent assignment or temporary duty  The insurance shall provide for at least telephone access, medical reference service, emergency evacuation, medically supervised repatriation, repatriation of mortal remains  The Contractor is exempt from the requirement if the Contractor's health insurance program includes sufficient medevac coverage, as approved by the Contracting Officer

## H 10    CERTIFICATE OF INSURANCE

The Contractor shall furnish the Contracting Officer with a current certificate of insurance as evidence of the insurance required  In addition, the Contractor shall furnish evidence of a commitment by the insurance carrier to notify the Contracting Officer in writing of any material change, expiration or cancellation of any of the insurance policies required not less than thirty (30) days before such change, expiration or cancellation is effective  When coverage is provided by self-insurance, the Contractor shall not change or decrease the coverage without the Contracting Officer's approval

S-LMAQM-04-C 0030

## H 11    SOURCE/ORIGIN/NATIONALITY REQUIREMENTS FOR PROCUREMENT GOODS AND SERVICES

(a) General   Except as may be specifically approved or directed in advance by the Contracting Officer, all goods (e g , equipment, vehicles, materials and supplies), and services which will be financed under this contract with United States dollars shall be procured in and shipped from the United States   The authorized geographic source code for this contract is 000, United States   Guidance on eligibility of specific goods or services may
be obtained from the Contracting Officer   DOS has adopted the Agency for International Development's (AID) policies on source and nationality requirements which are contained in Chapters 4 and 5 of AID Handbook 1, Supplement B (Procurement Policies)

(b) Ocean and air transportation.

(1) Except as otherwise approved in writing by the Contracting Officer, DOS will finance only those costs

(i) Incurred on vessels under U S  flag registry, when Geographic Code 000 is authorized for procurement of goods or services,

(ii) incurred on vessels under flag registry of any free world country, if the costs are part of the total cost on a through bill of lading paid to a carrier for initial carriage on a vessel which is authorized in accordance with paragraphs (b)(1)(i) above

(2) When use of non-U S  flag vessels has been authorized, the following requirements still apply

(i) At least 50% of the gross tonnage of all goods purchased under this contract and transported to the host country on ocean vessels shall be transported on privately-owned U S  flag commercial vessels, to the extent such vessels are available at fair and reasonable rates for such vessels, and

(ii) At least 50% of the gross freight revenue generated by shipment of goods purchased under this contract and transported to the host country on dry cargo liners shall be paid to or for the benefit of privately owned U S  flag commercial vessels to the extent such vessels are available at fair and reasonable rates for such vessels

(3) When U S  flag vessels are not available, or their use would result in a significant delay, the Contractor may request a certificate of non-availability from the COR, giving the basis for the request   Such a determination of non-availability will relieve the Contractor of the requirement to use U S  flag vessels for the tonnage of goods included in the determination

(4) Vouchers submitted for reimbursement which include ocean shipment costs shall contain a certification essentially as follows  "I hereby certify that a copy of each ocean bill of lading concerned has been submitted to the Maritime Administration, Cargo Preference Control Center, Commerce Building, Washington, D C  20235 and that such bills of lading state all of the carrier's charges including the basis for calculation such as weight or cubic measurement"

(5) For use of U S  flag air carriers, see Section I clause 52 247-63, Preference for U S  Flag Air Carriers

(c) Marine insurance  The eligibility of marine insurance is determined by the country in which it is "placed"  Insurance is "placed" in country if payment of the insurance premium is made to, and the insurance policy is issued by, an insurance company located in that country   Eligible countries for placement are governed by the authorized geographic code, except that if Code 941 is authorized, the host country is also eligible  Section 604(d) of the Foreign Assistance Act requires that if a recipient country discriminates by statute, decree, rule, or practice with respect to DOS-financed procurement against any marine insurance company authorized to do business in any State of the United States, then any DOS-

41

S LMAQM 04-C-0030

financed commodity shipped to that country shall be placed in the U S with a company or companies authorized to do a marine insurance business in any State of the U S

(d) Ineligible goods and services  The following goods or services shall not be procured under this contract:

(1) Abortion equipment and services,
(2) Luxury goods and gambling equipment, or
(3) Weather modification equipment

If DOS determines that the Contractor has procured any of these specific ineligible goods and services under this contract and has received payment therefor, the Contractor agrees to refund to DOS the entire amount of the purchase

(e) Restricted Goods  The Contractor shall not procure any of the following goods or services without the prior written approval of the Contracting Officer

(1) Agricultural commodities,
(2) Motor vehicles,
(3) Pharmaceuticals,
(4) Pesticides,
(5) Plasticizers,
(6) Used equipment,
(7) U S  Government-owned excess property, or
(8) Fertilizer,
(9) Weapons/ammunition
(10) Controlled items requiring export license approvals

If DOS determines that the Contractor has procured any of these specified restricted goods under this contract without the prior written authorization of the Contracting Officer, and has received payment for such purposes, the Contractor agrees to refund to DOS the entire amount of the purchase

(f) Printed or audio-visual teaching materials  If the effective use of printed or audio-visual teaching materials depends upon their being in the local language and if such materials are intended for technical assistance projects or activities financed by DOS in whole or in part and if other funds, including U S  owned or U S -controlled local currencies are not readily available to finance the procurement of such materials, local language versions may be procured from the following sources, in order of preference

(1) Code 000, United States,
(2) Code - -, Cooperating Country
(3) Code 941, Selected Free World,
(4) Code 899, Free World

(g) Ineligible suppliers  Funds provided under this contract shall not be used to procure any commodity or commodity-related services furnished by any supplier whose name appears on the List of Ineligible Suppliers under AID Regulation 8, "Suppliers of Commodities and Commodity-Related Services Ineligible for AID Financing" (22 CFR Part 208)

(h) Waiver for transactions not exceeding $25,000  On October 25, 1989, the Assistant Secretary for International Narcotics and Law Enforcement Affairs executed a blanket source/origin/nationality waiver covering transactions for procurement of INC-funded commodities, commodity-related services and technical services not exceeding $25,000

## H 12    DIFFERENTIALS AND ALLOWANCES

42

The following differentials and allowances are reimbursable under this contract at rates not to exceed those contained in the Department of State Standardized Regulations (Government Civilians, Foreign Areas), Section 920 Post Classification and Payment Tables  The differential and allowance benefits are available for Contractor personnel hired in the United States  These benefits are not extended to dependents of the Contractor's personnel nor are they available to Contractor personnel who are US citizens hired in the host country, host country personnel and third country nationals

Post differential  Post differential is an additional compensation for service at places in foreign areas where conditions of environment differ substantially from conditions of environment in the continental United States and warrant additional compensation as a recruitment and retention incentive  In areas where post differential is paid to Department of State (DOS) direct-hire employees, post differential not to exceed the percentage of salary as is provided such DOS employees in accordance with Standardized Regulations (Government Civilians, Foreign Areas), Chapter 900, as from time to time amended, will be reimbursable hereunder for employees in respect to amounts earned during the time such employees actually spend overseas on work under this contract  Section 552, "Ceiling on Payments," will not be applicable to this contract  When such post differential is provided to Contractor employees, it shall be payable beginning on the date of arrival at the post on official business, until the close of business on the day of departure from post of assignment en route to the United States  Sick or vacation leave taken at or away from the post of assignment will not interrupt the continuity of the assignment or require a discontinuance of such post differential payments, provided such leave is not taken within the United States or the territories of the United States  Short-term employees shall be entitled to post differential beginning with the forty three (43rd) day at post

Danger Pay Allowance  The Danger pay allowance is designed to provide additional compensation above basic compensation to all U S  Government civilian employees, including chiefs of Mission, for service at places in foreign areas where there exist conditions of civil insurrection, civil war, terrorism or wartime conditions which threaten physical harm or imminent danger to the health or well-being of an employee  These conditions do not include acts characterized chiefly as economic crime  The amount of danger pay cannot exceed 25 percent of basic compensation  The amount of danger pay allowance shall be at the rates of 15, 20 and 25 percent, based on the determined level of danger and the presencence of non-essential personnel at post  Danger pay allowance commences on the date of designation by the Secretary of State for employees present at the post on assignment or detail, and on the date of arrival at post for subsequently assigned or detailed employees or for employees returning to post after temporary absence  The danger pay allowance terminates as of the close of business on the day the designation is removed by the Secretary of State, or the day the employee departs the post for any reason for a post or country/area not designated for the danger pay allowance  Additional information can be found in the Standardized Regulations, Chapter 650

43

S-LMAQM-04-C-0030

## SECTION I — CONTRACT CLAUSES

**SUBSECTION I-1        CLAUSES INCORPORATED BY REFERENCE**

**I  FEDERAL ACQUISITION REGULATION (48 CFR CHAPTER 1) CLAUSES**

| SOURCE | TITLE AND DATE |
|--------|----------------|
| 52 202-1 | DEFINITIONS (DEC 2001) |
| 52.203-3 | GRATUITIES (APR 1984) |
| 52 203-5 | COVENANT AGAINST CONTINGENT FEES (APR 1984) |
| 52 203 6 | RESTRICTIONS ON SUBCONTRACTOR SALES TO THE GOVERNMENT (JUL 1995) |
| 52 203-7 | ANTI-KICKBACK PROCEDURES (JUL 1995) |
| 52.203-8 | CANCELLATION, RESCISSION, AND RECOVERY OF FUNDS FOR ILLEGAL OR IMPROPER ACTIVITY (JAN 1997) |
| 52 203 10 | PRICE OR FEE ADJUSTMENT FOR ILLEGAL OR IMPROPER ACTIVITY (JAN 1997) |
| 52 203-12 | LIMITATION ON PAYMENTS TO INFLUENCE CERTAIN FEDERAL TRANSACTIONS (JUN 1997) |
| 52 204-2 | SECURITY REQUIREMENTS (AUG 1996) |
| 52 204-4 1 | PRINTED OR COPIED DOUBLE-SIDED ON RECYCLED PAPER (AUG 2000) |
| 52 204-7 | CENTRAL REGRISTRATION, ALT 1 (OCT 2003) |
| 52 209 6 | PROTECTING THE GOVERNMENT'S INTEREST WHEN SUBCONTRACTING WITH CONTRACTORS DEBARRED, SUSPENDED, OR PROPOSED FOR DEBARMENT (JUL 1995) |
| 52 211-5 | MATERIAL REQUIREMENTS (AUG 2000) |
| 52 215-2 | AUDIT AND RECORDS -NEGOTIATION (JUN 1999) |
| 52 215-8 | ORDER OF PRECEDENCE—UNIFORM CONTRACT FORMAT (OCT 1997) |
| 52 215 10 | PRICE REDUCTION FOR DEFECTIVE COST OR PRICING DATA (OCT 1997) |
| 52 215-12 | SUBCONTRACTOR COST OR PRICING DATA (OCT 1997) |
| 52 215 15 | PENSION ADJUSTMENTS AND ASSET REVERSIONS (DEC 1998) |
| 52 215-18 | REVERSION OR ADJUSTMENT OF PLANS FOR POSTRETIREMENT BENEFITS (PRB) OTHER THAN PENSIONS (OCT 1997) |
| 52 215-19 | NOTIFICATION OF OWNERSHIP CHANGES (OCT 1997) |

44

S LMAQM-04-C-0030

| 52 215-21 | REQUIREMENTS FOR COST OR PRICING DATA OR INFORMATION OTHER THAN COST OR PRICING DATA–MODIFICATIONS (OCT 1997) |
| 52 216-7 | ALLOWABLE COST AND PAYMENT (FEB 2002) |
| 52 216 8 1 | FIXED FEE (MAR 1997) |
| 52 217-8 | OPTION TO EXTEND SERVICES (AUG 1989) |
| 52 219-8 | UTILIZATION OF SMALL BUSINESS CONCERNS (OCT 2000) |
| 52 219-9 | SMALL BUSINESS SUBCONTRACTING PLAN (JAN 2002)– ALTERNATE II (JAN 1999) |
| 52 219-16 | LIQUIDATED DAMAGES--SUBCONTRACTING PLAN (JAN 1999) |
| 52.222-2 | PROHIBITION OF SEGREGATED FACILITIES (FEB 1999) |
| 52 222-26 | EQUAL OPPORTUNITY (APR 2002) |
| 52 222-29 | NOTIFICATION OF VISA DENIAL (FEB 1999) |
| 52 222-35 | EQUAL OPPORTUNITY FOR SPECIAL DISABLED VETERANS, VETERANS OF THE VIETNAM ERA, AND OTHER ELIGIBLE VETERANS (DEC 2001) |
| 52 222-36 | AFFIRMATIVE ACTION FOR WORKERS WITH DISABILITIES (JUN 1998) |
| 52 222-37 | EMPLOYMENT REPORTS ON SPECIAL DISABLED VETERANS, VETERANS OF THE VIETNAM ERA, AND OTHER ELIGIBLE VETERANS (DEC 2001) |
| 52 223-5 | POLLUTION PREVENTION AND RIGHT-TO KNOW INFORMATION (APR 1998) |
| 52 223-6 | DRUG-FREE WORKPLACE (MAR 2001) |
| 52 223-14 | TOXIC CHEMICAL RELEASE REPORTING (OCT 2000) |
| 52 224-1 | PRIVACY ACT NOTIFICATION (APR 1984) |
| 52 224-2 | PRIVACY ACT (APR 1984) |
| 52 225-5 | TRADE AGREEMENTS (FEB 2002) |
| 52 225-8 | DUTY-FREE ENTRY (FEB 2000) |
| 52 225-13 | RESTRICTIONS ON CERTAIN FOREIGN PURCHASES (JUL 2000) |
| 52 227-1 | AUTHORIZATION AND CONSENT (JUL 1995) |
| 52 227-2 | NOTICE AND ASSISTANCE REGARDING PATENT AND COPYRIGHT INFRINGEMENT (AUG 1996) |
| 52 227-3 | PATENT INDEMNITY (APR 1984) |
| 52 227-14 | RIGHTS IN DATA -GENERAL (JUN 1987) |
| 52 227-14 | RIGHTS IN DATA--GENERAL (JUN 1987) -ALTERNATE II |

S-LMAQM 04 C-0030

                         (JUN 1987)

52 227-14      RIGHTS IN DATA--GENERAL (JUN 1987)--ALTERNATE III
                  (JUN 1987)

52 227 16      ADDITIONAL DATA REQUIREMENTS (JUN 1987)

52 227-19      COMMERCIAL COMPUTER SOFTWARE--RESTRICTED RIGHTS (JUN 1987)

52 228-3       WORKER'S COMPENSATION INSURANCE (DEFENSE BASE ACT) (APR 1984)

52 228-7INSURANCE- LIABILITY TO THIRD PERSONS (MAR 1996)

52 229-6       TAXES--FOREIGN FIXED-PRICE CONTRACTS (JUN 2003)

52 229-8       TAXES--FOREIGN COST-REIMBURSEMENT CONTRACTS (MAR 1990)

52.230-2       COST ACCOUNTING STANDARDS (APR 1998)

52 230-6       ADMINISTRATION OF COST ACCOUNTING STANDARDS (NOV 1999)

52.232-9       LIMITATION ON WITHHOLDING OF PAYMENTS (APR 1984)

52 232-17      INTEREST (JUN 1996)

52 232-18      AVAILABILITY OF FUNDS (APR 1984)

52 232-22      LIMITATION OF FUNDS (APR 1984)

52 232-23      ASSIGNMENT OF CLAIMS (JAN 1986)

52 232-25      PROMPT PAYMENT (FEB 2002)--ALTERNATE I (OCT 2001)

52 232-33      PAYMENT BY ELECTRONIC FUNDS TRANSFER--CENTRAL CONTRACTOR
                  REGISTRATION (OCT 2003)

52 233-1       DISPUTES (JUL 2002)

52 233-3       PROTEST AFTER AWARD (AUG 1996)--ALTERNATE I (JUN 1985)

52 236-5       MATERIAL AND WORKMANSHIP (APR 1984)

52.236-7       PERMITS AND RESPONSIBILITIES (NOV 1991)

52 236-18      WORK OVERSIGHT IN COST REIMBURSEMENT CONSTRUCTION CONTRACTS
                  (APR 1984)

52 236-19      ORGANIZATION AND DIRECTION OF THE WORK (APR 1984)

52 236 28      PREPARATION OF PROPOSALS--CONSTRUCTION (OCT 1997)

52 237-2       PROTECTION OF GOVERNMENT BUILDINGS, EQUIPMENT, AND VEGETATION
                  (APR 1984)

52 237-3       CONTINUITY OF SERVICES (JAN 1991)

S-LMAQM 04-C-0030

| | |
|---|---|
| 52 337-7 | INDEMNIFICATION AND MEDICAL LIABILITY INSURANCE (JAN 1997) |
| 52 242-1 | NOTICE OF INTENT TO DISALLOW COSTS (APR 1984) |
| 52 242-3 | PENALTIES FOR UNALLOWABLE COSTS (MAR 2001) |
| 52 242-4 | CERTIFICATION OF FINAL INDIRECT COSTS (JAN 1997) |
| 52 242-13 | BANKRUPTCY (JUL 1995) |
| 52 243-1 | CHANGES--FIXED PRICE (AUG 1987) |
| 52 243-2 | CHANGES--COST-REIMBURSEMENT (AUG 1987)  ALTERNATE II (APR 1984) |
| 52 244-2 | SUBCONTRACTS (AUG 1998)  ALTERNATE II (AUG 1998) |
| 52 244-5 1 | COMPETITION IN SUBCONTRACTING (DEC 1996) |
| 52 245 2 | GOVERNMENT PROPERTY (FIXED-PRICE CONTRACTS) (JUN 2003) |
| 52 245-5 | GOVERNMENT PROPERTY (COST-REIMBURSEMENT, TIME AND-MATERIAL, OR LABOR HOUR CONTRACTS) (JAN 1986) |
| 52 245-19 | GOVERNMENT PROPERTY FURNISHED "AS IS" (APR 1984) |
| 52 246-23 | LIMITATION OF LIABILITY (FEB 1997) |
| 52 246-25 | LIMITATION OF LIABILITY--SERVICES (FEB 1997) |
| 52 232 19 | AVAILABILITY OF FUNDS FOR THE NEXT FISCAL YEAR (APR 1984) |
| 52 247-1 | COMMERCIAL BILL OF LADING NOTATIONS (APR 1984) |
| 52 247 64 | PREFERENCE FOR U S -FLAG AIR CARRIERS (JAN 1997) |
| 52 249-2 | TERMINATION FOR CONVENIENCE OF THE GOVERNMENT (FIXED-PRICE) (SEP 1996) |
| 52 249-6 1 | TERMINATION (COST-REIMBURSEMENT) (SEP 1996) |
| 52 249 8 | DEFAULT (FIXED PRICE SUPPLY AND SERVICE) (APR 1984) |
| 52 249-14 | EXCUSABLE DELAYS (APR 1984) |
| 52 251-1 | GOVERNMENT SUPPLY SOURCES (APR 1984) |
| 52 253-1 | COMPUTER GENERATED FORMS (JAN 1991) |

II DEPARTMENT OF STATE ACQUISITION REGULATION (48 CFR CHAPTER 6) CLAUSES

| | |
|---|---|
| 652 225-71 | SECTION 8(A) OF THE EXPORT ADMINISTRATION ACT OF 1979, AS AMENDED (AUG 1999) |

S LMAQM 04-C-0030

| | |
|---|---|
| 652 228-71 | WORKER'S COMPENSATION INSURANCE (DEFENSE BASE ACT)–SERVICES (AUG 1999) |
| 652 229 71 | PERSONAL PROPERTY DISPOSITION AT POSTS ABROAD (AUG 1999) |
| 652 237-72 | OBSERVANCE OF LEGAL HOLIDAYS AND ADMINISTRATIVE LEAVE (AUG 1999) |
| 652 242 73 | AUTHORIZATION AND PERFORMANCE (AUG 1999) |
| 652 243-70 | NOTICES (AUG 1999) |

## SUBSECTION I-2    CLAUSES INCORPORATED IN FULL TEXT

### FAR 52 217-8 OPTION TO EXTEND SERVICES (NOV 1999)

The Government may require continued performance of any services within the limits and at the rates specified in the contract. These rates may be adjusted only as a result of revisions to prevailing labor rates provided by the Secretary of Labor  The option provision may be exercised more than once, but the total extension of performance hereunder shall not exceed 6 months  The Contracting Officer may exercise the option by written notice to the Contractor at any time prior to the expiration date of the contract

### FAR 52 217-9 OPTION TO EXTEND THE TERM OF THE CONTRACT (MAR 2000) (ACQ VARIATION) (11/99)

(a)  The Government may extend the term of the contract by written notice(s) to the Contractor within the period(s) specified below

| ITEM(S) | LATEST OPTION EXERCISE DATE |
|---|---|
| 0001-0040 | 60 Days Prior To The End Of The Base Period |
| 1001-1040 | 60 Days Prior To The End Of Option Year 1 |
| 2001-2040 | 60 Days Prior To The End Of Option Year 2 |
| 3001 3040 | 60 Days Prior To The End Of Option Year 3 |
| 4001-4040 | 60 Days Prior To The End Of Option Year 4 |

(b)  If the Government exercises this option, the extended contract shall be considered to include this option clause

(c)  The total duration of this contract, including the exercise of any option(s) under this clause, shall not exceed 5 YEARS

### FAR 52 227-23 RIGHTS TO PROPOSAL DATA (TECHNICAL) (JUN 1987)

Except for data contained on pages _____, it is agreed that as a condition of award of this contract, and notwithstanding the conditions of any notice appearing thereon, the Government shall have unlimited rights (as defined in the "Rights in Data–General" clause contained in this contract) in and to the technical data contained in the proposal dated _____, upon which this contract is based

### 52 222-2 PAYMENT FOR OVERTIME PREMIUMS (JUL 1990)

48

(a) The use of overtime is authorized under this contract if the overtime premium cost does not exceed zero dollars or the overtime premium is paid for work -

    (1) Necessary to cope with emergencies such as those resulting from accidents, natural disasters, breakdowns of production equipment, or occasional production bottlenecks of a sporadic nature,

    (2) By indirect-labor employees such as those performing duties in connection with administration, protection, transportation, maintenance, standby plant protection, operation of utilities, or accounting,

    (3) To perform tests, industrial processes, laboratory procedures, loading or unloading of transportation conveyances, and operations in flight or afloat that are continuous in nature and cannot reasonably be interrupted or completed otherwise, or

    (4) That will result in lower overall costs to the Government

(b) Any request for estimated overtime premiums that exceeds the amount specified above shall include all estimated overtime for contract completion and shall--

    (1) Identify the work unit; e g , department or section in which the requested overtime will be used, together with present workload, staffing, and other data of the affected unit sufficient to permit the Contracting Officer to evaluate the necessity for the overtime,

    (2) Demonstrate the effect that denial of the request will have on the contract delivery or performance schedule,

    (3) Identify the extent to which approval of overtime would affect the performance or payments in connection with other Government contracts, together with identification of each effected contract, and

    (4) Provide reasons why the required work cannot be performed by using multishift operations or by employing additional personnel

**FAR 52 232-35 DESIGNATION OF OFFICE FOR GOVERNMENT RECEIPT OF ELECTRONIC FUNDS TRANSFER INFORMATION (MAY 1999)**

(a) As provided in paragraph (b) of the clause at 52.232-34, Payment by Electronic Funds Transfer--Other than Central Contractor Registration, the Government has designated the office cited in paragraph (c) of this clause as the office to receive the Contractor's electronic funds transfer (EFT) information, in lieu of the payment office of this contract

(b) The Contractor shall send all EFT information, and any changes to EFT information to the office designated in paragraph (c) of this clause  The Contractor shall not send EFT information to the payment office, or any other office than that designated in paragraph (c)  The Government need not use any EFT information sent to any office other than that designated in paragraph (c)

(c) Designated Office

| | |
|---|---|
| Name | U S  Department of State Payments Division Interface Control Branch |
| Mailing Address | Washington, DC  20522 1506 |
| Telephone Numbers | Voice 703/875-6471 Fax  703/875 6686 |

S LMAQM 04 C-0030

| | |
|---|---|
| Person to Contact | Mr Chauncey Lynch, Division Chief |
| Electronic Address | VendorClaims@state gov |

[NOTE  Vendor shall submit EFT information using the attached Standard Form 3881, "ACH Vendor/Miscellaneous Payment Enrollment Form " Effective October 1, 1999, the vendor's Taxpayer Identification Number must be included on all invoices and vouchers ]

## FAR 52 242-4 CERTIFICATION OF INDIRECT COSTS (OCT 1995)

(a) The Contractor shall -

(1) Certify any proposal to establish or modify billing rates or to establish final indirect cost rates,

(2) Use the format in paragraph (c) of this clause to certify, and

(3) Have the certificate signed by an individual of the Contractor's organization at a level no lower than a vice president or chief financial officer of the business segment of the Contractor that submits the proposal

(b) Failure by the Contractor to submit a signed certificate, as described in this clause, shall result in payment of indirect costs at rates unilaterally established by the Government

(c) The certificate of indirect costs shall read as follows

### CERTIFICATE OF INDIRECT COSTS

This is to certify that to the best of my knowledge and belief

1  I have reviewed this indirect cost proposal,

2  All costs included in this proposal _____ (*identify proposal and date*) to establish billing or final indirect costs rates for _____ (*identify period covered by rate*) are allowable in accordance with the requirements of contracts to which they apply and with the cost principles of the Federal Acquisition Regulation (FAR) and its supplements applicable to those contracts,

3  This proposal does not include any costs which are unallowable under applicable cost principles of the FAR or its supplements, including, but not limited to   advertising and public relations costs, contributions and donations, entertainment costs, fines and penalties, lobbying costs, defense of fraud proceedings, and goodwill, and

4  All costs included in this proposal are properly allocable to Government contracts on the basis of a beneficial or causal relationship between the expenses incurred and the contracts to which they are allocated in accordance with applicable acquisition regulations

I declare under penalty of perjury that the foregoing is true and correct

Firm _____

Signature _____

Name of Certifying Official _____

Title _____

S-LMAQM-04 C 0030

Date of Execution _____

FAR 52 243-7 NOTIFICATION OF CHANGES (APR 1984)

(a) *Definitions* 'Contracting Officer," as used in this clause, does not include any representative of the Contracting Officer

"Specifically Authorized Representative (SAR)," as used in this clause, means any person the Contracting Officer has so designated by written notice (a copy of which shall be provided to the Contractor) which shall refer to this subparagraph and shall be issued to the designated representative before the SAR exercises such authority

(b) *Notice* The primary purpose of this clause is to obtain prompt reporting of Government conduct that the Contractor considers to constitute a change to this contract Except for changes identified as such in writing and signed by the Contracting Officer, the Contractor shall notify the Administrative Contracting Officer in writing promptly, within TBD calendar days from the date that the Contractor identifies any Government conduct (including actions, inactions, and written or oral communications) that the Contractor regards as a change to the contract terms and conditions On the basis of the most accurate information available to the Contractor, the notice shall state--

      (1) The date, nature, and circumstances of the conduct regarded as a change,

      (2) The name, function, and activity of each Government individual and Contractor official or employee involved in or knowledgeable about such conduct;

      (3) The identification of any documents and the substance of any oral communication involved in such conduct;

      (4) In the instance of alleged acceleration of scheduled performance of delivery, the basis upon which it arose,

      (5) The particular elements of contract performance for which the Contractor may seek an equitable adjustment under this clause, including-

            (i) What contract line items have been or may be affected by the alleged change,

            (ii) What labor or materials or both have been or may be added, deleted, or wasted by the alleged change,

            (iii) To the extent practicable, what delay and disruption in the manner an sequence of performance and effect on continued performance have been or may be caused by the alleged change,

            (iv) What adjustments to contract price, delivery schedule, and other provisions affected by the alleged change are estimated, and

      (6) The Contractor's estimate of the time by which the Government must respond to the Contractor's notice to minimize cost, delay or disruption of performance

(c) *Continued performance.* Following submission of the notice required by (b) above, the Contractor shall diligently continue performance of this contract to the maximum extent possible in accordance with its terms and conditions as construed by the Contractor, unless the notice reports a direction of the Contracting Officer or a communication from a SAR of the Contracting Officer, either of which events the Contractor shall continue performance, *provided,* however, that if the Contractor regards the direction or communication as a change as described in (b) above, notice shall be given in the manner provided All directions,

S LMAQM-04-C-0030

communications, interpretations, orders and similar actions of the SAR shall be reduced to writing promptly and copies furnished to the Contractor and to the Contracting Officer  The Contracting Officer shall promptly countermand any action, which exceeds the authority of the SAR.

(d) *Government response*  The Contracting Officer shall promptly, within TBD calendar days after receipt of notice, respond to the notice in writing  In responding, the Contracting Officer shall either--

    (1) Confirm that the conduct of which the Contractor gave notice constitutes a change when necessary direct the mode of further performance,

    (2) Countermand any communication regarded as a change,

    (3) Deny that the conduct of which the Contractor gave notice constitutes a change and when necessary direct the mode of further performance, or

    (4) In the event the Contractor's notice information is inadequate to make a decision under (1), (2) or (3) above, advise the Contractor that additional information is required, and establish the date by which it should be furnished and the date thereafter by which the Government will respond

(d)    *Equitable adjustments*  (1)  If the Contracting Officer confirms that Government conduct effected a change as alleged by the Contractor, and the conduct causes an increase or decrease in the Contractor's cost of, or the time required for, performance of any part of the work under this contract, whether changed or not changed by such conduct, an equitable adjustment shall be made--

    (i)  In the contract price or delivery schedule or both, and

    (ii)  In such other provisions of the contract as may be affected

    (2)  The contract shall be modified in writing accordingly  In the case of drawings, designs or specifications which are defective and for which the Government is responsible, the equitable adjustment shall include the cost and time extension for delay reasonably incurred by the Contractor in attempting to comply with the defective drawings, designs or specifications before the Contractor identified, or reasonably should have identified, such defect.  When the cost of property made obsolete or excess as a result of a change confirmed by the Contracting Officer under this clause is included in the equitable adjustment, the Contracting Officer shall have the right to prescribe the manner of disposition of the property  The equitable adjustment shall not include increased costs or time extensions for delay resulting from the Contractor's failure to provide notice or to continue performance as provided, respectively, in (b) and (e) above

## FAR 52 244-6 SUBCONTRACTS FOR COMMERCIAL ITEMS (MAY 2002)

(a) Definitions  As used in this clause –

    "Commercial item" has the meaning contained in the clause at 52.202-1, Definitions

    "Subcontract" includes a transfer of commercial items between divisions, subsidiaries, or affiliates of the Contractor or subcontractor at any tier

(b)  To the maximum extent practicable, the Contractor shall incorporate, and require its subcontractors at all tiers to incorporate, commercial items or nondevelopmental items as components of items to be supplied under this contract.

(c)(1)  The Contractor shall insert the following clauses in subcontracts for commercial items

S LMAQM-04-C-0030

(i) 52 219-8, Utilization of Small Business Concerns (OCT 2000) (15 U.S C 637(d)(2) and (3)), in all subcontracts that offer further subcontracting opportunities  If the subcontract (except subcontracts to small business concerns) exceeds $500,000 ($1,000,000 for construction of any public facility), the subcontractor must include 52 219-8 in lower tier subcontracts that offer subcontracting opportunities

(ii) 52 222-26, Equal Opportunity (APR 2002) (E.O 11246)

(iii) 52 222-35, Equal Opportunity for Special Disabled Veterans, Veterans of the Vietnam Era, and Other Eligible Veterans (DEC 2001) (38 U S C 4212(a))

(iv) 52 222-36, Affirmative Action for Workers with Disabilities (JUN 1998) (29 U S C 793),

(v) 52 247 64, Preference for Privately Owned U S -Flag Commercial Vessels (JUN 2000) (46 U S C Appx 1241) (flowdown not required for subcontracts awarded beginning May 1, 1996)

(2)  While not required, the Contractor may flow down to subcontracts for commercial items a minimal number of additional clauses necessary to satisfy its contractual obligations

(d)  The Contractor shall include the terms of this clause, including this paragraph (d), in subcontracts awarded under this contract.

### FAR 52.252-2  CLAUSES INCORPORATED BY REFERENCE (FEB 1998)

This contract incorporates one or more clauses by reference, with the same force and effect as if they were given in full text  Upon request, the Contracting Officer will make their full text available  Also, the full text of a clause may be accessed electronically at this/these address(es)

|  |  |
|---|---|
| FAR | www arnet.gov/far |
| DOSAR | www statebuy gov/home htm |

### ACCESSIBILITY OF ELECTRONIC AND INFORMATION TECHNOLOGY (JUN 2001)

(a)  Each Electronic and Information Technology (EIT) product or service furnished under this contract shall comply with the Section 508 Accessibility Standards (36 CFR 1194), as specified in the contract. If the Contracting Officer determines any furnished product or service is not in compliance with the contract, the Contracting Officer will promptly inform the Contractor in writing  The Contractor shall, at no cost to the Government, repair or replace the non-compliant products or services within the period of time specified by the Contracting Officer  If the repair or replacement is not completed within the time specified, the Contracting Officer may

(1)  Cancel the contract, delivery or task order, purchase order or line item without termination liabilities, or

(2)  In the case of custom EIT being developed under this contract, have any necessary changes made or repairs performed by Government employees or by another contractor and the Contractor must reimburse the Government for any expenses incurred thereby

(b)  For every EIT product or service accepted under this contract by the Government that does not comply with 36 CFR 1194, the Contractor must, at the discretion of the Contracting Officer, make every effort to replace or upgrade it with a compliant equivalent product or service, if commercially available and cost neutral, on either the planned refresh cycle of the product or service, or on the contract renewal date, whichever occurs first

S-LMAQM-04-C-0030

## COMPLIANCE WITH SECTION 508 OF THE REHABILITATION ACT OF 1973, AS AMENDED (INDEFINITE DELIVERY CONTRACTS) (JUN 2001)

(a)  The Contractor must provide a comprehensive list of all offered specific electronic and information technology (EIT) products that fully comply with Section 508 of the Rehabilitation Act of 1973, per the 1998 Amendments, and the Architectural and Transportation Barriers Compliance Board's Electronic and Information Technology Accessibility Standards at 36 CFR Part 1194  The Contractor must clearly indicate where this list with full details of compliance can be found (e g , vendor's or other exact web page location)  The Contractor must ensure that the list is easily accessible by typical users beginning five calendar days after award  The Contractor must maintain this detailed listing of compliant products for the full contract term, including all forms of extensions, and must ensure that it is current within three calendar days of changes to its product line

(b)  For every EIT product accepted under this contract by the Government that does not comply with 36 CFR Part 1194, the Contractor shall, at the discretion of the Government, make every effort to replace or upgrade it with a compliant equivalent product, if commercially available and cost neutral, on either the planned refresh cycle of the product or service, or the contract renewal date, whichever shall occur first

## ARAB LEAGUE BOYCOTT OF ISRAEL (06/95)

(a)  *Definitions*  As used in this clause

(1)  The term "foreign person" means any person other than a United States person as defined in paragraph (2), and

(2)  The term "United States person" means any United States resident or national (other than an individual resident outside the United States and employed by other than a United States person), any domestic concern (including any permanent domestic establishment of any foreign concern), and any foreign subsidiary or affiliate (including any permanent foreign establishment) of any domestic concern which is controlled in fact by such domestic concern, as determined under regulations of the President.

(b)  *Certification*  By submitting this offer, the Contractor certifies that it is not

(1)  Taking or knowingly agreeing to take any action, with respect to the boycott of Israel by Arab League countries, which Section 8(a) of the Export Administration Act of 1979, as amended (50 U S C  App  2407(a)) prohibits a United States person from taking, or

(2)  Discriminating in the award of subcontracts on the basis of religion

54

Mid effort ok

S-LMAQM 04-C-0030

## SECTION J — LIST OF ATTACHMENTS

| | TITLE | DATE | NO OF PAGES |
|---|---|---|---|
| ATTACHMENT A | Standard Form 3881, ACH Vendor/ Miscellaneous Payment Enrollment Form | 12/90 | 2 |
| ATTACHMENT B | Disclosure of Lobbying Activities (SF LLL) | N/A | 3 |
| ATTACHMENT C | DD Form 254, Department of Defense Contract Security Classification Specification | 9/13/03 | 3 |
| ATTACHMENT D | OSCE DATA BASE FORM | N/A | 8 |
| ATTACHMENT E | CURRENT INVENTORY | N/A | 51 |
| ATTACHMENT F | PAST PERFORMANCE EVALUATION | N/A | 5 |
| ATTACHMENT G | DS-1843 (minimum medical standards/medical history) | | 4 |

## CONTRACTOR SCREENING AND SELECTION PROCESS

| SCREENING | SELECTION PROCESS |
|---|---|
| 1   Resume Received, Reviewed for completeness<br>– Incomplete packages not reviewed<br>– Complete packages – placed in tracking database | 1   Background investigation initiated.<br>– Multiple calls / call backs<br>– Interviews conducted<br>– Internal affairs reports and performance evaluations reviewed<br>– Biographies written<br>– Driving records<br>– Internal affairs / P E reviewed<br>– Interview/personal references<br>– Credit history<br>– Civil / criminal records check<br>**NOTE**: Background investigations are performed by outside firms such as ChancePoint, Knoll, James E Van Ella & Associates. (The contractor is not obligated to use these vendors) |
| 2   Qualifications reviewed.<br>– Special skill identified<br>– If qualified, data entered into database | 2   Quality review of investigation by contracting firm |
| 3   Applicant sent packet | 3   Medical, dental exams and drug screening results returned and reviewed by doctor, failures rejected. |
| 4   Financial and criminal records checked.<br>– 1   Approve / disapproved<br>– 1   Selection process continued for approved personnel | 4   Written and or face to face psychological review by psychologist, failures are rejected. |
|  | 5   Screening is completed |
|  | 6   Candidate is notified of acceptance and orientation / evaluation dates |
|  | 7   Synopsis of investigation forwarded to DOS once all requirements have been met and a task order is issued and deployment is imminent |

MINIMUM PERSONNEL SECURITY REQUIREMENTS FOR SPECIFIC
HUMAN INTELLIGENCE THREAT POSTS

Company  DYNCORP INTERNATIONAL, LLC

CONTRACT NUMBER   S-LMAQM-04-C-0030

1    Specifically designated contractor personnel who will perform
tasks at specific human intelligence (HUMINT) threat posts for a
period in excess of sixty (60) days or who will make cumulative
visits in excess of sixty (60) days during a one-year period must
possess a final TOP SECRET personnel security clearance and
undergo a favorable DS acceptability review.    (The COR will
provide the list of specific HUMINT threat posts.)    Personnel
traveling to specific human intelligence threat posts for short-
term visits (less than 60 days) must have a minimum Final Secret
clearance.    A  Top  Secret  clearance  will  be  required  for
performance of specific duties as directed by the COR

2    All clearances for personnel who will be traveling to specific
HUMINT threat posts in excess of 60 days must be processed in
accordance with the following procedures

    a    The contractor submits requests for TOP SECRET clearances to
DISCO for routine processing

    b    DISCO issues a Letter of Consent (LOC) indicating that the
individual has been issued a clearance.    The LOC must indicate
that the individual has a Final TOP SECRET clearance (based on a
single-scope background investigation current within the past 5
years)    Persons issued interim TOP SECRET clearances or final
SECRET clearances are not authorized to travel to specific
HUMINT threat posts in excess of 60 days

    c    The contractor immediately sends a Visit Authorization
Request (VAR) to DS/IS/IND. Attached to that VAR must be a copy
of the individual's LOC, an SF 86 which is current as of the
date of the acceptability review request, and a Department of
State Disclosure and Authorization Pertaining to Consumer
Reports Pursuant to the Fair Credit Reporting Act.    Upon
receipt, DS will

        (1) conduct a preliminary check to determine whether the
        employee  is  eligible  for  deployment  while  the
        acceptability review is pending, and

        (2) obtain the investigative file for the required
        acceptability review and approval/disapproval

d    If the contractor employee is approved for deployment while the acceptability review is pending, (paragraph c (1) above), he/she can be immediately deployed  However, if the acceptability review is ultimately adjudicated unfavorably, upon notification by the COTR the contractor employee must be immediately removed from the site

e    If, in accordance with paragraph c (1), the contractor employee is not approved for immediate deployment, the acceptability review will be completed and adjudicated prior to the contractor's employee's deployment  If the acceptability review is unfavorably adjudicated, the contractor employee is not authorized for deployment in performance of this contract at this time.

d    DS/IS/IND will notify the COR (with a copy to the firm) of approval or disapproval for specific HUMINT threat post assignment

3    All assignments to designated intelligence threat posts must be approved by DS.  The 60-day period is cumulative within one year



Organization for Security and Co-operation in Europe



# APPLICATION FORM

| NOMINATION DETAILS   To be completed by the nominating authority only. | | |
|---|---|---|
| **Submitted by (Nominating Authority)** <br> - please specify - | Code | Please indicate the vacancy notice number if applicable <br><br> Vacancy Notice No |
| **Application submitted for** <br> ☐ REACT <br> ☐ Specific vacancy notice (Please complete next block) <br> ☐ Any vacancy within specified Field of Expertise | | Vacancy Notice No <br><br> Vacancy Notice No |
| **Please indicate the candidate's primary (and optionally the secondary) Field of Expertise** | | |
| **Primary Field of Expertise** <br> - please specify - | Code | **Secondary Field of Expertise** ‖ Code |

## APPLICATION SECTION

### I    PERSONAL DATA

INSTRUCTIONS  1  Please read relevant Application Form Guidelines. 2  Please answer each question clearly and completely
Type in black ink. Read carefully and follow all directions. Fields marked with an asterisk (*) are compulsory

| Family name * | Maiden name | | |
|---|---|---|---|
| First name * | Middle name | | |
| **Date of birth *** (YYYY/MM/DD) | Place of birth | Country of birth * <br> - please specify - | Code | **Sex *** <br> ☐ Male <br> ☐ Female |
| **Present nationality *** <br> - please specify - | | Code | **Do you have multiple nationality?** <br> ☐ Yes ☐ No |
| Other nationality | | Code | **Are you in the process of changing nationality?** ☐ Yes ☐ No |

1 1

**Mailing address** (or where you may be reached)

| Street | | Zip/ Postal Code |
|---|---|---|
| Town/City | County/State/Province | Country <br> - please specify - ‖ Code |
| Telephone No | Fax No | |
| E-Mail address | | |

1 2

**Permanent address** (if different from above)

| Street | | Zip/ Postal Code |
|---|---|---|
| Town/City | County/State/Province | Country ‖ Code |
| Telephone No | Fax No | |
| E Mail address | | |

## 2 EDUCATION AND PROFESSIONAL TRAINING

**Highest degree / diploma achieved**

Please tick one only

☐ Ph D   ☐ Master   ☐ Bachelor   ☐ Diploma   ☐ Certificate

2 1

**Fields of Study** (Please indicate primary and secondary field of study)

| Field | Pri¹ | Sec² | Field | Pri | Sec | Field | Pri | Sec |
|---|---|---|---|---|---|---|---|---|
| **Architecture & Planning** | | | Electronic Engineering | ☐ | ☐ | **Social Sciences** | | |
| Regional Planning & Development | ☐ | ☐ | Telecommunications Engineering | ☐ | ☐ | Cultural Studies | ☐ | ☐ |
| **Arts & Humanities** | | | **Information Sciences** | | | Economics | ☐ | ☐ |
| History | ☐ | ☐ | Information Management | ☐ | ☐ | Gender Studies | ☐ | ☐ |
| Modern Languages | ☐ | ☐ | Information Technology | ☐ | ☐ | International Relations | ☐ | ☐ |
| Translation & Interpretation | ☐ | ☐ | Journalism | ☐ | ☐ | International Studies | ☐ | ☐ |
| **Business & Administration** | | | Library Sciences | ☐ | ☐ | Oriental Studies | ☐ | ☐ |
| Accountancy | ☐ | ☐ | Mass Communications | ☐ | ☐ | Political Science | ☐ | ☐ |
| Administration | ☐ | ☐ | Media Studies | ☐ | ☐ | Psychology | ☐ | ☐ |
| Business & Commerce | ☐ | ☐ | **Law** | | | Sociology | ☐ | ☐ |
| Finance & Budget | ☐ | ☐ | European Community Law | ☐ | ☐ | **Technology** | | |
| Human Resources Management | ☐ | ☐ | Human Rights | ☐ | ☐ | Maintenance Technology | ☐ | ☐ |
| Personnel Management | ☐ | ☐ | International Law | ☐ | ☐ | **Transport & Communications** | | |
| Public Relations | ☐ | ☐ | Justice Administration | ☐ | ☐ | Transport Management | ☐ | ☐ |
| **Diplomatic Studies** | | | Law (generic) | ☐ | ☐ | Telecommunications Services | ☐ | ☐ |
| Diplomatic Studies | ☐ | ☐ | Private Law | ☐ | ☐ | **Welfare & Protective Services** | | |
| **Education & Teacher Training** | | | Public Law | ☐ | ☐ | Civil Security | ☐ | ☐ |
| Adult Education | ☐ | ☐ | **Mathematics & Computer Science** | | | Military Science | ☐ | ☐ |
| Teacher Trainers Education | ☐ | ☐ | Computer Science | ☐ | ☐ | Environmental Studies | ☐ | ☐ |
| **Engineering** | | | Mathematics | ☐ | ☐ | Peace & Disarmament | ☐ | ☐ |
| Computer Engineering | ☐ | ☐ | | | | Police Studies | ☐ | ☐ |

¹Pri = Primary  ²Sec = Secondary

2 2

**Name of other Field of Study**

2 3

## 3 PROFESSIONAL EXPERIENCE

**Total number of years of relevant professional experience \***

☐ Less than 2   ☐ 2 to 5   ☐ 6 to 9   ☐ 10 to 19   ☐ 20 or more

**Total number of years of managerial experience \***

☐ Less than 3   ☐ 3 to 4   ☐ 5 or more

3 1

**Fields of Expertise** (Please indicate number of years of professional experience for each field of expertise)

| Field | Less than 2 | 2 to 5 | 6 to 9 | 10 or more | Administration & Support [1] sub-categories | Less than 2 | 2 to 5 | 6 to 9 | 10 or more |
|---|---|---|---|---|---|---|---|---|---|
| Administration & Support [1] | ☐ | ☐ | ☐ | ☐ | Buildings Management | ☐ | ☐ | ☐ | ☐ |
| Civilian Police [2] | ☐ | ☐ | ☐ | ☐ | Budget & Finance | ☐ | ☐ | ☐ | ☐ |
| Democratization [3] | ☐ | ☐ | ☐ | ☐ | Communications | ☐ | ☐ | ☐ | ☐ |
| Economic & Environmental Affairs [4] | ☐ | ☐ | ☐ | ☐ | General Administration | ☐ | ☐ | ☐ | ☐ |
| Elections [5] | ☐ | ☐ | ☐ | ☐ | Human Resources Management | ☐ | ☐ | ☐ | ☐ |
| General Staff/Monitoring [6] | ☐ | ☐ | ☐ | ☐ | Information Technology & Information Management | ☐ | ☐ | ☐ | ☐ |
| Human Rights [7] | ☐ | ☐ | ☐ | ☐ | Procurement | ☐ | ☐ | ☐ | ☐ |
| Media Development [8] | ☐ | ☐ | ☐ | ☐ | Security | ☐ | ☐ | ☐ | ☐ |
| Military Affairs [9] | ☐ | ☐ | ☐ | ☐ | Supply & Logistics | ☐ | ☐ | ☐ | ☐ |
| Political Affairs [10] | ☐ | ☐ | ☐ | ☐ | Training | ☐ | ☐ | ☐ | ☐ |
| Press & Public Information [11] | ☐ | ☐ | ☐ | ☐ | Transportation | ☐ | ☐ | ☐ | ☐ |
| Rule of Law [12] | ☐ | ☐ | ☐ | ☐ | | | | | |

| | Yes | No |
|---|---|---|
| Are you currently employed with the OSCE? * | ☐ Yes | ☐ No |
| Have you been employed with the OSCE before? * | ☐ Yes | ☐ No |
| Have you applied to the OSCE before? * | ☐ Yes | ☐ No |

**Current or, if inapplicable, longest continuous assignment with the OSCE**

| From (YYYY/MM) | To (YYYY/MM) |
|---|---|
| Location | Functional title |

**Have you had any other previous field mission work experience? (Please tick accordingly)**

| | | |
|---|---|---|
| ☐ Baltics & Eastern Europe | ☐ Middle East & North Africa | ☐ South East Asia |
| ☐ Caucasus | ☐ Other Americas | ☐ South Eastern Europe |
| ☐ Central Asia | ☐ Pacific | ☐ Sub Sahara Africa |
| ☐ Latin America | ☐ South Asia | ☐ Other |

**Have you had any previous international organisation experience? (Please tick accordingly)**

| | | |
|---|---|---|
| ☐ International organisations | ☐ International NGOs | ☐ Humanitarian aid/technical assistance |

`3 3`

# 4 FURTHER SKILLS

**Native Language ³ ***

| – please specify – | | **Language code** |
|---|---|---|

**For languages other than your native language, indicate the language and its relative code⁴**

**Indicate your level of proficiency using the codes given⁵**
If a language is specified, the proficiency is compulsory

| Language | Language code | Speak | Write | Read | Understand |
|---|---|---|---|---|---|
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |

³ No further grading required for the native language. ⁴ For language codes please refer to the "Language Codes Table" in the guidelines.
⁵ A = Professional Fluency B = Working Knowledge C = Limited Knowledge (see guidelines for definitions of proficiency levels)

`4 1`

**Computer skills** Ability to operate the following applications.

| | | |
|---|---|---|
| ☐ Spreadsheet | ☐ Web browser/E-Mail | ☐ Graphics/Images/Photo | ☐ Word Processing |
| ☐ Database | ☐ Briefing/Presentation | ☐ G I S ⁶/Mapping | ☐ B A ⁷ Packages |

| Driving skills | Yes | No | | Yes | No |
|---|---|---|---|---|---|
| Valid automobile driving licence * | ☐ | ☐ | More than 2 years of driving experience * | ☐ | ☐ |
| Ability to drive vehicles with manual transmission * | ☐ | ☐ | Experience driving 4x4 vehicles * | ☐ | ☐ |

⁶ G I S = Geographic Information Systems ⁷ B.A = Business Administration

`4 2`

# 5 ADDITIONAL INFORMATION

| Does your spouse/relative work for the OSCE? | ☐ Yes | ☐ No |
|---|---|---|
| Location | Functional title | |

| | Yes | No |
|---|---|---|
| Are you in excellent physical condition with no chronic health problems that limit your physical activity? * | ☐ Yes | ☐ No |
| Are you free from any disease or health condition that may prevent you from carrying out your assignment or may pose a threat to the health of others? * | ☐ Yes | ☐ No |
| Are you free of any disabilities which may limit your undertaking fieldwork? * | ☐ Yes | ☐ No |

| Preferred employment duration | Availability for deployment |
|---|---|
| ☐ 3 months ☐ 6 months ☐ 9 months ☐ Any length of time | ☐ Within 2 weeks ☐ Within 4 weeks ☐ Within 8 weeks |

| Do you have any objections to our making enquiries of your present/past employer? * | ☐ Yes | ☐ No |
|---|---|---|

| Have you ever been arrested, indicted, or summoned into court as a defendant in a criminal proceeding, or convicted, fined or imprisoned for the violation of any law (excluding minor traffic violations)? * | ☐ Yes | ☐ No |
|---|---|---|
| If "yes" please submit full details of each case in an attached statement | | |

CURRICULUM VITAE SECTION

## 6 EDUCATION AND PROFESSIONAL TRAINING

Please give exact titles of degrees in original language  Please do not translate or equate to
other degrees  Give full details in chronological order starting from the most recent degree/
diploma achieved  Include courses and post graduate studies if applicable

### University education or equivalent

| Attended From (YYYY/MM) | To (YYYY/MM) | Institution name, place and country | Degree(-s) and academic distinctions obtained | Main course / field of study |
|---|---|---|---|---|
| | | | | |
| | | | | |
| | | | | |
| | | | | |

61

### Schools or other formal vocational training or preparation

| Attended From (YYYY/MM) | To (YYYY/MM) | Institution name, place and country | Degree(-s) and academic distinctions obtained | Main course / field of study |
|---|---|---|---|---|
| | | | | |
| | | | | |
| | | | | |
| | | | | |

62

## 7 EMPLOYMENT RECORD

Starting with your current position, list in reverse chronological order relevant professional positions held  Use a separate block for
each position  Include also service in the armed forces

### Current position

| From (YYYY/MM) | To (YYYY/MM) | Functional title |
|---|---|---|
| | | |

| Name and address of employer |
|---|
| |

| Telephone No | Fax No | E-Mail |
|---|---|---|
| | | |

| Name and functional title of immediate supervisor |
|---|
| |

Description of your duties and responsibilities

7 1 1

## Previous relevant positions [1]

| From (YYYY/MM) | To (YYYY/MM) | Functional title |
|---|---|---|
| | | |

Name and address of employer

| Telephone No | Fax No | E-Mail |
|---|---|---|
| | | |

Name and functional title of immediate supervisor

Description of your duties and responsibilities

7 2 1

## Previous relevant positions [2]

| From (YYYY/MM) | To (YYYY/MM) | Functional title |
|---|---|---|
| | | |

Name and address of employer

| Telephone No | Fax No | E-Mail |
|---|---|---|
| | | |

Name and functional title of immediate supervisor

Description of your duties and responsibilities

**Previous relevant positions [3]**

| From (YYYY\MM) | To (YYYY\MM) | Functional title |
|---|---|---|
| | | |

| Name and address of employer |
|---|
| |

| Telephone No | Fax No | E-Mail |
|---|---|---|
| | | |

| Name and functional title of immediate supervisor |
|---|
| |

| Description of your duties and responsibilities |
|---|
| |

723

**Other employment**

| From (YYYY\MM) | To (YYYY\MM) | Name of employer | Functional title |
|---|---|---|---|
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

73

## 8 ADDITIONAL INFORMATION

| List your current membership(s) in professional associations/societies and your activities in civic, public or international organisations or affairs |
|---|
| |

| List trades/professions in which you are currently licensed |
|---|
| |

List awards/honours you have received

List any significant publications you have written (Do not attach)

82

## References

List three persons, not related to you, who are familiar with your character and qualifications
Do not repeat names of supervisors previously listed under "Employment Record"

Name [1]

Full address (including telephone, fax e mail)

Type of business, functional title

Name [2]

Full address (including telephone, fax, e-mail)

Type of business, functional title

Name [3]

Full address (including telephone, fax, e mail)

Type of business, functional title

By submitting this application form, I certify that the statements made by me in answer to the foregoing questions are true, complete and correct to the best of my knowledge and belief. I understand that any misrepresentation or material omission made on the Application Form or other documents submitted to the OSCE may result in the application being void from inception or may render the OSCE Mission Member liable to termination or dismissal

Date (YYYY/MM/DD)

## APPLICATION DETAILS
For use by the applicant only

**Submit to (Designating Authority) ***

- please specify -

**Code**

**Interested in**

**Vacancy Notice No**

☐ REACT
☐ Any vacancy within specified Field of Expertise

**Vacancy Notice No**

**Vacancy Notice No**

**Please indicate your preferred Field of Expertise**

| Primary Field of Expertise | Code | Secondary Field of Expertise | Code |
|---|---|---|---|
| | | | |

**Interested in any of the following areas of operation**

☐ South-Eastern Europe
☐ Baltics & Eastern Europe

☐ Caucasus
☐ Central Asia

**Availability within**

☐ Two weeks     ☐ Four weeks     ☐ Eight weeks

8 4

## STATE ANY ADDITIONAL SKILLS AND RELEVANT FACTS
For use by the applicant only

You can submit your application to your designated authority by entering the e-mail address and clicking on the button below
Please make sure that you have entered all required information (fields marked with *) before submission !

E-Mail to

## COMMENTS
For use by the nominating authority only

**EXHIBIT 5**

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| MICHELLE DEULEY, *et al.* | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | ) C.A. No. 06-cv-605 (GMS) |
| | ) |
| DYNCORP INTERNATIONAL, INC., | ) |
| *et al.* | ) |
| | ) |
| Defendants. | ) |
| | ) |

## SUPPLEMENTAL DECLARATION OF RICHARD CASHON

I, Richard Cashon, certify that I am over the age of eighteen (18) years and that I have personal knowledge of the matters set forth herein.

1.      I am an employee of DynCorp International LLC ("DynCorp"). My current position is Vice President/Program Manager for the Civilian Police ("CIVPOL") Program.

2.      In September 2004, I was the Program Manager and in charge of DynCorp's contract with the U.S. Department of State in support of the United States' participation in the CIVPOL program ("CIVPOL Contract"). During that time, I was working in Fort Worth, Texas.

3.      Under the CIVPOL Contract, DynCorp was responsible for, among other things, establishing and maintaining a cadre of up to 2,000 experienced law enforcement personnel ("CIVPOL Personnel") to be available for speedy deployment by the State Department on civilian peacekeeping missions overseas.

4.      CIVPOL Personnel could be asked to, among other things, provide training or advisory services to foreign civilian police forces; develop or redesign basic to advanced law enforcement topics; and provide training and advisory services to promote the development of a

245554.1

EXHIBIT
5

sustainable, credible, and legitimate police force necessary for long term stability in the host country.

5.      DynCorp was responsible for recruiting, selecting and deploying civilian police officers for the Afghan CIVPOL mission.

6.      DynCorp trained the Afghan police force based on a curriculum developed and approved by the U.S Department of Justice, International Criminal Investigative Training Assistance Program.

7.      The State Department contracted out the implementation of its CIVPOL participation. Under the CIVPOL Contract, the State Department deployed DynCorp CIVPOL Personnel to Afghanistan.

8.      CIVPOL Personnel performed their tasks in Afghanistan under direct orders from and control of the State Department.

9.      DynCorp was present in Kabul, Afghanistan only pursuant to its government contracts with the State Department. DynCorp did not have any other, nongovernmental basis for conducting business in Afghanistan.

10.     DynCorp is required to abide by the State Department's foreign policy directives as dictated by the CIVPOL program.

11.     DynCorp's contract with the State Department was on a "cost plus reimbursable" basis. Thus, DynCorp would have been reimbursed for all expenses incurred for the provision of security measures.

12.     Performance under the contract is funded by task orders. Each time DynCorp needed or was required to perform a task, it submitted a task order to the State Department for approval.

245554.1

13.    Pursuant to its contractual obligation to provide in-country support services to CIVPOL Personnel, DynCorp was required to lease facilities in Kabul, Afghanistan. DynCorp searched and submitted a task order to the State Department requesting approval of the final selection of the location of its offices. The Assistant Resident Security Office ("ARSO") at the U.S. Embassy in Kabul visited the site to determine if it was in an acceptable location vis-à-vis the U.S. Embassy, if the location provided the appropriate level of security, and if the location was suitable for purposes of the CIVPOL Contract. Upon approval of the proposed site, the State Department approved the task order and authorized funding.. This site is known as "DynHouse."

14.    DynHouse was located in Shar-e-Nau, an affluent residential area which was home to many international organizations and guesthouses for their employees. The offices are located on a street that is heavily traveled by vehicles and pedestrians. There are many commercial establishments in Sahr-e-Nau that were frequented by Coalition employees, including restaurants, cafes, and other office buildings. It is a walled compound that was previously used by the U.S. military. There is "razor" wire on top of the wall surrouding the compound.

15.    DynCorp sought approval to place Gurka guards at the gate of the walled compound known as DynHouse and at the ends of the street on which DynHouse was located. DynCorp coordinated the hiring criteria for the Gurka guards with the RSO and submitted a task order, and DynCorp and the ARSO discussed guidelines and policies for their use. For instance, the ARSO approved the use of Gurkas who had British regiment experience and English language facility. Upon ARSO approval, the State Department approved the task order and funding was provided to hire the guards..

245554.1

16.     DynCorp was required to provide personal protective equipment under the CIVPOL Contract, including a 9mm weapon, magazines, holsters, handcuffs, baton, baton pouch, reflective traffic vest, and soft body armour. If DynCorp wanted to upgrade or change the personal protective equipment issued to personnel, it had to discuss it with the RSO to obtain initial approval and then submit a task order for State Department approval and funding..

17.     DynCorp personnel were under the same travel restrictions as the U.S. Mission in Afghanistan. In accordance with the RSO's directives, they were not allowed to use commercial aircraft. Instead, the State Department obtained permission from the U.S. military to allow DynCorp personnel to travel on military aircraft.

18.     I interfaced with the Resident Security Officer and ARSO at the U.S. Embassy in Kabul. I had to seek approval from the RSO prior to implementing security measures not specifically mentioned in the contract and comply with any directives or orders issued by the RSO regarding the implementation of security measures.

19.     DynCorp did not have authority to close the streets around DynHouse or put up vehicle barriers. If it wanted to do so, it had to request permission from the RSO, who would have sought permission from the Afghan Government. Only after the Government of Afghanistan approved the RSO's request would the RSO allow DynCorp to go forward with the increased security.

20.     Despite the lack of written regulations, all aspects of our operation in Kabul were established under the specific direction and approval of the State Department.

21.     DynCorp complied with all of the State Department's security and other requirements.

22.    Afghanistan is a very volatile country and bomb attacks by enemy insurgents, such as the Taliban and al Qaeda, were then, and still are, a constant concern.

**I DECLARE UNDER PENALTY OF PERJURY THAT THE FOREGOING IS TRUE AND CORRECT.**

Executed on November 3, 2006.

Richard Cashon
Vice President/Program Manager
    for the Civilian Police Program
DynCorp International LLC

245554.1

**EXHIBIT 6**

**United States Government Accountability Office**

# GAO

## Report to the Committee on International Relations, House of Representatives

June 2005

# AFGHANISTAN SECURITY

# Efforts to Establish Army and Police Have Made Progress, but Future Plans Need to Be Better Defined



G A O

Accountability ★ Integrity ★ Reliability

GAO-05-575

EXHIBIT

*6*



G A O

Accountability·Integrity·Reliability

# Highlights

Highlights of GAO-05-575, a report to the Committee on International Relations, House of Representatives

June 2005

# AFGHANISTAN SECURITY

## Efforts to Establish Army and Police Have Made Progress, but Future Plans Need to Be Better Defined

## Why GAO Did This Study

After more than two decades of war, Afghanistan had no army or functioning police and, before September 11, 2001, was a haven for international terrorists. In April 2002, the United States and several other nations agreed to reform the five pillars of Afghanistan's security sector—creating an Afghan army, reconstituting the police force, establishing a working judiciary, combating illicit narcotics, and demobilizing the Afghan militias. As the leader for the army pillar, the United States has provided about $3.3 billion. For the German-led effort to reconstitute the Afghan police, the United States has provided over $800 million. We examined the progress made, and limitations faced, in developing the army and police forces. We also identified challenges that must be addressed to complete and sustain these forces.

## What GAO Recommends

GAO recommends that the Secretaries of Defense and State develop more detailed plans for completing and sustaining the Afghan army and police forces. GAO also recommends that the Secretaries work to help ensure that progress in the other security pillars is congruous with the army and police programs. Defense, Justice, and State generally concurred with the report's recommendations.

www.gao.gov/cgi-bin/getrpt?GAO-05-575.

To view the full product, including the scope and methodology, click on the link above. For more information, contact David Gootnick, (202) 512-3149 or GootnickD@gao.gov.

## What GAO Found

As of March 2005, Defense had trained more than 18,300 Afghan combat troops—over 42 percent of the army's projected total of 43,000—and deployed them throughout the country. During 2004, the Department of Defense significantly accelerated Afghan combat troop training. However, Defense efforts to fully equip the increasing number of combat troops have fallen behind, and efforts to establish sustaining institutions, such as a logistics command, needed to support these troops have not kept pace. Plans for completing these institutions are not clear.

Germany and the United States had trained more than 35,000 police as of January 2005 and expect to meet their goal of training 62,000 police by December 2005. However, the Department of State has just begun to address structural problems that affect the Afghan police force. Trainees often return to police stations where militia leaders are the principal authority; most infrastructure needs repair, and the police do not have sufficient equipment—from weapons to vehicles. Furthermore, limited field-based mentoring has just begun although previous international police training programs have demonstrated that such mentoring is critical for success. Moreover, the Afghan Ministry of the Interior (which oversees the police force) requires reform and restructuring. Finally, neither State nor Germany has developed plans specifying how much the program will cost and when it will be completed.

Without strong and self-sustaining Afghan army and police forces and concurrent progress in the other pillars of security sector reform, Afghanistan could again become a haven for terrorists. However, establishing viable Afghan army and police forces will almost certainly take years and substantial resources. Available information suggests that these programs could cost up to $7.2 billion to complete and about $600 million annually to sustain. Furthermore, the other lead nations have made limited progress in reforming Afghan's judiciary, combating illicit narcotics, and demobilizing the militias.

Five Pillars of Security Sector Reform in Afghanistan



Source: GAO analysis of Department of Defense data.

_____ **United States Government Accountability Office**

# Contents

| Letter | | 1 |
|---|---|---|
| | Results in Brief | 2 |
| | Background | 4 |
| | U.S. Training of Afghan Combat Troops Has Outpaced Efforts to Equip and Sustain Them | 11 |
| | Difficult Conditions Have Hampered Reconstituting of Police and State Does Not Have an Overall Plan to Complete the Effort | 19 |
| | Efforts to Complete and Sustain the Afghan Army and Police Face Major Challenges | 27 |
| | Conclusions | 33 |
| | Recommendations for Executive Action | 33 |
| | Agency Comments and Our Evaluation | 34 |

| Appendixes | | |
|---|---|---|
| Appendix I: | Scope and Methodology | 36 |
| Appendix II: | Assistance Provided to Afghan Army and Police by Non-U.S. Donors | 40 |
| Appendix III: | Comments from the Department of Defense | 43 |
| Appendix IV: | Comments from the Department of Justice | 45 |
| Appendix V: | Comments from the Department of State | 47 |

| Tables | | |
|---|---|---|
| Table 1: | U.S. Support for the Afghan Army and Police, Fiscal Years 2002-2006 | 9 |
| Table 2: | Number of Afghan Police Reported Trained as of January 2005 and Training Targets for December 2005 | 20 |
| Table 3: | Estimated Value of Assistance Provided to Afghan Army and Police by Non-U.S. Donors | 41 |

| Figures | | |
|---|---|---|
| Figure 1: | Five Pillars of Security Sector Reform in Afghanistan | 5 |
| Figure 2: | Afghan Army Commands and Police Training Centers | 7 |
| Figure 3: | Kabul Military Training Center | 12 |
| Figure 4: | Defective Boot Purchased Locally and an Afghan Soldier Wearing Sandals | 16 |
| Figure 5: | Police Regional Training Center in Jalalabad—Dining Facility and Classroom Building | 22 |
| Figure 6: | Jalalabad Police Station | 24 |
| Figure 7: | Heavy Weapons Cantonment Site Outside Kabul | 32 |

Contents

## Abbreviations

State/INL   Bureau for International Narcotics and Law Enforcement
            Affairs
OMC-A       Office of Military Cooperation-Afghanistan
NATO        North Atlantic Treaty Organization

This is a work of the U.S. government and is not subject to copyright protection in the United States. It may be reproduced and distributed in its entirety without further permission from GAO. However, because this work may contain copyrighted images or other material, permission from the copyright holder may be necessary if you wish to reproduce this material separately.

**G A O**
Accountability ★ Integrity ★ Reliability

**United States Government Accountability Office**
**Washington, D.C. 20548**

June 30, 2005

The Honorable Henry J. Hyde
Chairman
The Honorable Tom Lantos
Ranking Minority Member
Committee on International Relations
House of Representatives

After more than two decades of war left Afghanistan without an army or a functioning police force, the country became a haven for international terrorists, including the al Qaeda terrorist group that attacked two U.S. cities on September 11, 2001. Since ousting the Taliban regime from Afghanistan in 2001, the United States has spent almost $3 billion to help reconstruct this poor and ethnically divided country.[1] However, pervasive internal security threats—including terrorists, ethnic and regional militias commanded by powerful warlords, and a large trade in illegal narcotics—continue to undermine efforts to rebuild Afghanistan's shattered economy, government, and infrastructure. The United States and allied nations maintain more than 28,000 combat and support troops in Afghanistan to counter these threats.[2]

To help Afghanistan provide for its own security, the United States and several other nations agreed at a conference in December 2002 to help create multiethnic, professionally trained Afghan national army and police forces.[3] Donor nations also agreed to help establish a working judicial sector, combat the narcotics trade, and demobilize Afghanistan's militias. As leader of the effort to create the new army, the United States provided approximately $3.3 billion during fiscal years 2002 through 2005 toward the goal of eventually establishing a 70,000 man force that includes 43,000 ground combat troops. The Department of Defense facilitates the training and equipping of the Afghan army through its Combined Forces

---

[1]For a detailed discussion of efforts to reconstruct postwar Afghanistan, see our report *Afghanistan Reconstruction: Deteriorating Security and Limited Resources Have Impeded Progress; Improvements in U.S. Strategy Needed*, GAO-04-403 (Washington, D.C.: June 2, 2004).

[2]These forces include about 8,300 North Atlantic Treaty Organization peacekeepers.

[3]The conference's final communiqué, also known as the "Bonn II" Agreement, supports efforts started under the Bonn Agreement of December 2001 to promote national reconciliation, lasting peace, stability, and respect for human rights in Afghanistan.

Command's Office of Military Cooperation–Afghanistan (OMC-A) in the capital city of Kabul. As the largest donor for the reconstitution of the national police, which is led by Germany, the United States provided about $804 million during fiscal years 2002 through 2005 for police training, equipment, and infrastructure. The Department of State oversees the U.S. police effort through its Bureau for International Narcotics and Law Enforcement Affairs (State/INL) in Washington, D.C., and the U.S. Embassy in Kabul, with assistance from the Department of Justice. In its fiscal year 2006 budget request, the executive branch has requested nearly $60 million for the Afghan police but, according to Defense officials, no additional funds for the Afghan army.

To review the status of U.S. efforts to strengthen Afghanistan's security, we (1) examined the progress made, and limitations faced, by the United States and other donor nations in building Afghanistan's national army; (2) examined the progress made, and limitations faced, by the United States and other donor nations in reconstituting Afghanistan's national police forces; and (3) identified challenges that the United States, other donor nations, and Afghanistan must address to complete and sustain the Afghan army and police forces. To address these objectives, we reviewed pertinent Defense and State planning, funding, and evaluation documents for the Afghan army and police programs. We discussed these programs with cognizant officials from the Departments of Defense, Justice, and State in Washington, D.C., and Kabul, Afghanistan. In Afghanistan, we traveled to Herat and Jalalabad to view Afghan army facilities and a police training site, respectively, and to meet with cognizant U.S. and Afghan officials. We also met with government officials from Germany and other key donor nations. We determined that the data provided to us were sufficiently reliable for the purposes of this report. (See app. I for a more complete description of our scope and methodology.)

We conducted our review from January 2004 through May 2005 in accordance with generally accepted government auditing standards.

## Results in Brief

The United States has made important progress in training and deploying Afghan army combat troops but has not fully addressed limitations that impede its progress in establishing a self-sustaining Afghan army. Defense has established programs for recruiting and training battalions of ethnically mixed combat troops, including a field-based mentoring program. In 2004, as security concerns persisted, Defense significantly accelerated Afghan combat troop training, and as of March 2005 more than 42 percent of the

army's total projected combat strength of 43,000 troops was deployed in strategic locations throughout the country. However, OMC-A's efforts to fully equip the increasing number of combat troops being trained have fallen behind. In addition, OMC-A's efforts to establish institutions needed to support these troops have not kept pace with the accelerated training program. Plans for the completion of these institutions are not clear. Nonetheless, U.S. trainers and other military officials have stated that Afghan combat troops generally perform well in small units, despite some shortcomings.

Germany and the United States have made progress in training individual Afghan policemen and policewomen but have not addressed many limitations impeding the reconstitution of a national police force. As of January 2005, the Department of State and Germany have trained more than 35,000 police and expect to meet their goal of training 50,000 national and highway police and 12,000 border police by December 2005. However, trainees face difficult working conditions. They return to district police stations that need extensive reconstruction or renovation; militia leaders are often the principal authority; and they lack weapons, vehicles, communications, and other equipment. In addition, the police training includes limited field-based training and mentoring, although previous international peacekeeping efforts showed that such mentoring is critical to the success of police training programs. Furthermore, the Afghan Ministry of the Interior (which oversees the police force) faces several problems, including corruption and an outdated rank structure, that require reform and restructuring. Finally, neither State nor Germany have developed an overall plan specifying how or when construction tasks and equipment purchases will be completed, how much the buildup of the police will cost, and when the overall effort to reconstitute the police will be finished.

The United States, other donors, and the new Afghan government face significant challenges to establishing viable Afghan army and police forces. Although Defense and State have not yet prepared official cost estimates, the army and police programs could cost up to $7.2 billion to complete and about $600 million annually to sustain. Moreover, slow progress in resolving other Afghan security problems—the lack of an effective judiciary, the substantial illicit narcotics industry, and the continued presence of armed militias—threaten to undermine overall progress made toward providing nationwide security and ensuring the stability of the Afghan government.

We are recommending that the Secretaries of Defense and State develop detailed plans for completing and sustaining the Afghan army and police forces, including clearly defined objectives and performance measures; milestones; funding requirements; and a strategy for sustaining the results achieved. In addition, we are recommending that the Secretaries work with the other lead nations to help ensure that progress in the other pillars of Afghan's security reform is congruous with the progress made in the army and police programs. In both cases, we recommend that the Secretaries report their progress to the Congress. In commenting on a draft of this report, the Departments of Defense and State generally concurred with our recommendations, but both stated that appropriate reporting mechanisms are already in place. The Department of Justice strongly concurred in regards to the Afghan police training program and noted that its expertise could be more effectively utilized.

## Background

Afghanistan, a mountainous and land-locked country in central Asia, is one of the poorest countries in the world. More than 60 percent of its population is illiterate. Afghanistan lacks effective nationwide communications, banking, and transportation systems. Its estimated per capita gross domestic product for 2003 was about $700. The International Monetary Fund estimates that Afghan government revenues will average $387 million per year during 2005 through 2008—less than half of its projected average annual expenditures for government salaries and operations of $879 million. Afghanistan remains dependent on other nations for support; international assistance provided 93 percent of Afghanistan's $4.75 billion budget for 2005.

Afghanistan's economic plight is partially the result of its long history of war and civil strife. Afghanistan's ethnically mixed population is due to its location on historical invasion and trade routes. The Soviet Union invaded Afghanistan in 1979 and withdrew only after waging a prolonged and destructive war against Afghan resistance groups. Following a protracted civil war, most of Afghanistan fell under the control of the fundamentalist Taliban group by 1998. Under the Taliban, Afghanistan became a haven for terrorists, and, as a result, the United States and a coalition of its allies invaded Afghanistan after the terrorist attacks of September 11, 2001.

Afghanistan's security institutions, including its national army, police, and judiciary, collapsed or were severely damaged prior to the U.S. occupation. During the Taliban rule the army disintegrated and was superseded by various ethnic and regional militias. The Afghan national police force,

which was organized as a two-track system of career officers and largely untrained conscripts who served for 2 years, had also declined over the past 25 years.

Afghanistan continues to face significant internal threats. Widespread trade in opium and heroin provides drug producers and traffickers with the resources and motivation to resist efforts to curb the illicit narcotics industry. Taliban fighters and terrorist groups remain active in parts of the country, and attacks on civilian reconstruction workers have prompted some international assistance groups to leave the country. Regional warlords maintain thousands of militia fighters who could be used to challenge the authority of Afghanistan's new central government.

To help Afghanistan address such threats, the United States and several other donor nations met in Geneva, Switzerland, in April 2002. At the conference, the donors established a five-pillared security reform agenda and designated a donor country to take the lead in reforming each pillar. The United States volunteered to lead the army reform effort, and Germany volunteered to lead the police reform effort (see fig. 1).

**Figure 1: Five Pillars of Security Sector Reform in Afghanistan**



Source: GAO analysis of Department of Defense data.

## Army

At a December 2002 conference (Bonn II) near Bonn, Germany, the Afghan government and the donor nations agreed that the new Afghan army should be ethnically balanced, voluntary, and consist of no more than 70,000 individuals (including all civilian and Ministry of Defense personnel). They also agreed that the army's commands should be located in Kabul and other geographically strategic locations. The Afghan government and the donors did not set a deadline for the completion of the army.

Following the Bonn II conference, U.S. Defense planners, in conjunction with Afghan officials, developed a force structure for the army that includes (1) 43,000 ground combat troops based in Kabul and four other cities, (2) 21,000 support staff organized in four sustaining commands (recruiting, education and training, acquisition and logistics, and communications and intelligence), (3) 3,000 Ministry of Defense and general staff personnel, and (4) 3,000 air staff to provide secure transportation for the President of Afghanistan.[4] According to Defense, the mission of the new army will include providing security for Afghanistan's new central government and political process, replacing all other military forces in Afghanistan, and combating terrorists and other destructive elements in cooperation with coalition and peacekeeping forces. As of May 2005, Defense's target date for completing the army is the fall of 2009.

U.S. efforts to establish the army are led by Defense, with support from State. The Defense-staffed Office of Military Cooperation–Afghanistan (OMC-A) in Kabul oversees the development of the Afghan army's force structure, decision processes, and garrisons, and provides equipment. OMC-A works closely with Task Force Phoenix, which is a joint coalition task force charged with training Afghan army battalions at the Kabul Military Training Center and elsewhere in the country. The U.S. Joint Chiefs of Staff and U.S. Central Command provide planning and other support, and the U.S. Army Corps of Engineers is constructing facilities for the Afghan army's central and regional commands (see fig. 2). In Washington, D.C., the Defense Security Cooperation Agency uses Defense and State funds to provide financial and administrative support for OMC-A. The agency purchases services and equipment requested by OMC-A through the U.S. Army Security Assistance Command and transfers funds to OMC-A to allow it to procure services and equipment from local vendors.

---

[4]As currently planned, the air wing would not be able to transport large numbers of Afghan troops from one part of the country to another.

**Figure 2: Afghan Army Commands and Police Training Centers**



Afghan army soldiers in Herat

Trainees at Police Central Training Center

| ⊕ Army Central Corps | ■ Kabul Police Academy |
|---|---|
| ○ Army regional commands | ● Police regional training centers |
| △ Kabul Military Training Center | ▲ Police Central Training Center |

Sources: GAO analysis of Departments of Defense and State data; photos (GAO); Map Resources (map).

Police

Afghanistan's police reform process began formally in February 2002, when Germany, as the leader for this sector, convened a conference in Berlin to discuss international support for the Afghan police. Subsequently, donor nations agreed to establish a multiethnic, sustainable, and countrywide 62,000-member professional police service that is fully committed to the rule of law. The overall goal of the program is to enhance security in the provinces and districts outside of Kabul. They did not set a deadline for completing the police.

U.S. support for the police sector is overseen by State/INL in Washington, D.C., and by staff at the U.S. Embassy in Kabul. State has a contract with DynCorp Aerospace Technology to train and equip the police, advise the Ministry of Interior, and provide infrastructure assistance, including constructing several police training centers (see fig. 2). Defense has also provided infrastructure and equipment to police in border regions. In addition, Germany has a training program for police officers at the Kabul Police Academy and has convened several donors' conferences. Germany also tracks pledges and projects implemented by various donors. Furthermore, various donors established the United Nations' Law and Order Trust Fund for Afghanistan to help ensure that the police are paid regularly and are issued adequate equipment.

U.S. Support

The United States has provided approximately $4.1 billion during fiscal years 2002 through 2005 to support the Afghan army and police force.[5] In the President's budget request for fiscal year 2006, the administration has requested an additional $58.5 million for the Afghan police program but, according to Defense officials, no additional funds for the Afghan army. (See table 1.)

---

[5]About $1.4 billion of this amount was provided during fiscal years 2002 through 2004, of which more than $980 million had been obligated and more than $511 million had been expended as of January 2005. Over $1.8 billion of this amount is part of the fiscal year 2005 emergency supplemental which was enacted into law on May 11, 2005.

**Table 1: U.S. Support for the Afghan Army and Police, Fiscal Years 2002-2006**

Dollars in millions

| Fiscal year | 2002 | 2003 | 2004 | 2005 (estimated) | 2005 Supplemental (estimated) | 2006 (proposed) | Total |
|---|---|---|---|---|---|---|---|
| Afghan army | | | | | | | |
| State[a] | $74.9 | $191.4 | $434.4 | $421.4 | $0 | $0 | $1,122.1 |
| Defense[b] | 4.3 | 156.2 | 285.0 | 429.3 | 1,285.0 | 0 | 2,159.8 |
| **Subtotal** | **79.2** | **347.6** | **719.4** | **850.7** | **1,285.0** | **0** | **3,281.9** |
| Afghan police | | | | | | | |
| State[c] | 26.6 | 0 | 160.0 | 65.0 | 360.0 | 58.5 | 670.1 |
| Defense[d] | 0 | 0 | 47.0 | 7.8 | 137.3 | 0 | 192.1 |
| **Subtotal** | **26.6** | **0.0** | **207.0** | **72.8** | **497.3** | **58.5** | **862.2** |
| **Total** | **$105.8** | **$347.6** | **$926.4** | **$923.5** | **$1,782.3** | **$58.5** | **$4,144.1** |

Source: Departments of Defense and State.

[a]Most of State's funds for the Afghan army come from its Foreign Military Financing program. Foreign Military Financing funds are administered by Defense through its Defense Security Cooperation Agency, which provides funds, equipment, and services for the army through OMC-A. State also supports the Afghan army through its Peace Keeping Operations program (from which the salaries for Afghan troops are financed) and International Military Education and Training program.

[b]Defense funds for the Afghan army are drawn from three principal sources:

The Afghan Freedom Support Act (P.L. 107-327), as amended, states that the President may exercise his drawdown authorities (as authorized under section 506 (A) (2) of the Foreign Assistance Act of 1961) by supplying Afghanistan with defense services, articles, and education "acquired by contract or otherwise." Under this provision, OMC-A has been given authority to spend U.S. Army operations and maintenance funds to train and equip the Afghan army. During fiscal years 2002 through 2004, approximately $287 million was drawn down via such contracts by Defense. In addition, under section 506 (A) (2) of the Foreign Assistance Act of 1961, as amended, approximately $11 million in military trucks and armored personnel vehicles were drawn down from Defense for the Afghan army. For more details on such drawdowns, see *Foreign Assistance: Reporting of Defense Articles and Services Provided through Drawdowns Needs to Be Improved*, GAO-02-1027 (Washington, D.C.: Sept. 20, 2002).

The Emergency Supplemental Appropriation Act for Defense and for the Reconstruction Iraq and Afghanistan, 2004, (P.L. 108-106), and the Defense Appropriations Act for fiscal year 2005 (P.L. 108-287) authorize Defense to use U.S. Army operations and maintenance funds for several purposes, including training and equipping the new Afghan armed forces. Defense has provided a total of $440 million in such funds for the Afghan army.

The Emergency Supplemental Appropriations Act for Defense, the Global War on Terror, and Tsunami Relief, for the fiscal year ending September 30, 2005, and for other purposes (P.L. 109-13) authorizes Defense to provide up to $1.285 billion in assistance to the Afghan army. Of this amount, $290 million will be used to reimburse the U.S. Army for costs incurred to train, equip, and provide related assistance to the Afghan army.

[c]State has supported the Afghan police through programs managed by its Bureau for International Narcotics Control and Law Enforcement Affairs. Of the $160 million that State provided in 2004, $50 million was drawn from fiscal year 2003 Emergency Response Funds.

[d]Defense has supported the Afghan police with counternarcotics funding provided through its Office for Special Operations and Low Intensity Conflict, as authorized by the Emergency Supplemental

Appropriation Act for Defense and for the Reconstruction of Iraq and Afghanistan, 2004, (P.L. 108-106). Defense also drew on approximately $17 million in Commanders Emergency Response Program funds to support police projects.

| | |
|---|---|
| **Other Donor Support** | More than 40 nations and international organizations have also provided funds, equipment, and training to support the Afghan army and police. As of March 2005, other donors had provided about $193 million to supplement U.S. efforts to create the Afghan army and about $246 million for reconstituting the Afghan police. (See app. II for more information on other donors' support for the army and police.) |
| **Allied and multilateral forces** | Pending the creation of functioning Afghan army and police forces, more than 28,000 foreign troops operate in Afghanistan. These include about 18,000 U.S. troops, an estimated 1,900 troops from other members of the coalition, and over 8,300 peacekeepers from the North Atlantic Treaty Organization (NATO). In August 2003, NATO assumed control over the International Security Assistance Force in response to a United Nations' mandate to provide security in the Kabul area and to support the reconstruction of Afghanistan. In addition, NATO's members agreed to begin establishing provincial reconstruction teams in northern and western Afghanistan. Although NATO has had difficulty persuading nations to provide the resources needed for these teams, it has established seven provincial reconstruction teams. After taking control of a team sponsored by Germany in Kabul, NATO announced in June 2004 that it would also assume control of four additional teams in northern Afghanistan. These teams are sponsored by the United Kingdom, Germany, and the Netherlands. British and German officials informed us that their teams focus primarily on reconstruction and have limited roles in providing direct security for local Afghans and in working with the Afghan army and police. On May 31, 2005, NATO took control of two additional provincial reconstruction teams in western Afghanistan. They are sponsored by Italy and the United States. |

# U.S. Training of Afghan Combat Troops Has Outpaced Efforts to Equip and Sustain Them

Defense, with the government of Afghanistan, has established programs for recruiting and training battalions of Afghan combat troops. OMC-A significantly accelerated Afghan combat troop training in 2004, and over 42 percent of the army's total projected combat strength of 43,000 soldiers was deployed throughout the country. However, OMC-A's efforts to fully equip the increasing number of combat troops have fallen behind. In addition, OMC-A's efforts to establish the institutions needed to support these troops have not kept pace, and plans for their completion are not clear. Despite some shortcomings, OMC-A personnel and the embedded trainers we met with told us that Afghan combat troops have generally performed well under U.S. supervision.

## The United States Has Established Recruiting Effort

Defense, in conjunction with the government of Afghanistan, is establishing recruiting stations in each of Afghanistan's 34 provinces. To help ensure that the army is ethnically balanced, Defense attempts to form new battalions[6] for training with volunteers drawn from Afghanistan's major ethnic groups.[7] Information provided by OMC-A indicates that the army as a whole generally reflects the country's balance of major ethnic groups.[8]

While many of those initially recruited left the army before competing their terms, by late 2004 the army's attrition rate had dropped to 1.1 percent per month.[9] While attrition appears to have abated, U.S. and Afghan officials told us that soldiers often leave their units without permission for as long as 2 weeks to take their pay home to their families. The officials attributed these unauthorized absences to the lack of an Afghan national banking

---

[6]An Afghan battalion consists of about 610 men.

[7]According to Defense officials, volunteers are vetted through community elders and State. Ex-militia fighters may enlist on an individual basis, but United Nations reports indicate that less than 2 percent had done so as of February 2005.

[8]According to the U.S. government, as of January 2004, the ethnic composition of the Afghan population was 42 percent Pashtun, 27 percent Tajik, 9 percent Hazara, 9 percent Uzbek, and 13 percent "other." According to OMC-A, as of February 15, 2005, the ethnic composition of the Afghan army was 49 percent Pashtun, 21 percent Tajik, 6 percent Hazara, 3 percent Uzbek, and 22 percent "other" (the total of the individual percentages is greater than 100 percent due to rounding). Individual units vary in their ethnic balance. According to OMC-A, at least two battalions have no or very few Uzbek troops.

[9]Defense fielding plans for the army assume an attrition rate of 2 percent per month. Soldiers absent for more than 60 days are dropped from the army's rolls.

system and the absence of significant penalties for such absences from the volunteer Afghan army.

**Army Troops Receive Basic and Field Training**

OMC-A and Task Force Phoenix have established programs for training Afghan army troops in battalions at locations including the Kabul Military Training Center (see fig. 3) and in the field. Battalions now receive 14 weeks of training at the center and elsewhere, including training for officers and noncommissioned officers. According to Joint Chiefs of Staff planners, this training includes 6 weeks of basic training, 6 weeks of advanced individual training, and 2 weeks of collective training. The program also includes training on human rights and the laws of war, as well as specialized training for some troops in tank maintenance, logistics, and medical skills. OMC-A and Task Force Phoenix officials informed us that the Afghan army now conducts basic training classes. U.S. officials also stated that France and the United Kingdom have helped train Afghan army personnel.

**Figure 3: Kabul Military Training Center**



Source: GAO.

Training at the Center is followed by training in the field. OMC-A embeds a team of U.S. trainers and mentors in each battalion to help achieve full operational capability. The embedded team accompanies the battalion into the field and provides leadership, tactical training, and logistical support. As originally envisioned, embedded trainer teams were to include 16 U.S. officers and noncommissioned officers and remain with battalions for 2 years.

## Defense Accelerated Training

At OMC-A's recommendation, Defense accelerated its training of Afghan combat troops throughout 2004 by more than doubling the number of battalions in basic training at a given time. As a result, OMC-A had deployed more than 42 percent of the army's total projected combat strength at commands throughout the country as of March 2005. OMC-A projects that it will complete basic training for all 43,000 combat troops by the fall of 2007.

Defense time frames for building the Afghan army were in flux throughout 2004. As security concerns persisted, OMC-A accelerated the training and fielding of combat troops.[10] In January 2004, OMC-A increased the number of battalions in training at one time from two to three; in May 2004, it began training four battalions; and, as of the end of January 2005, it was training five. These concerns also prompted Defense and the Afghan government to change their plans for establishing the army's four regional commands. At the beginning of 2004, they had planned to establish the four regional commands in sequence, with the fourth command to be established in 2006. By May 2004, Defense and the Afghan government had decided to establish all four regional commands by the end of September 2004, with as few as 150 troops stationed at each one.

According to the Joint Chiefs of Staff planning staff, as of March 2005, more than 18,300 troops—over 42 percent of the army's total projected combat strength of 43,000 men—had completed basic training. Having fully staffed the Kabul central command with about 10,500 troops, OMC-A assigned the remaining 7,800 troops to the four regional commands.[11] It plans to field

---

[10]The security concerns included factional unrest in Herat in March and August 2004, as well as violence preceding Afghanistan's first-ever democratic presidential election in October 2004.

[11]The U.S. Army Corps of Engineers is constructing facilities at these locations. As of January 2005, funding provided to the Corps for this effort totaled $740 million.

combat troops to the regional commands as quickly as possible to provide more security for Afghanistan's parliamentary elections (currently planned for September 2005). Accordingly, it increased the number of combat troops assigned to regional commands by more than 18 percent between February and March 2005.

In early 2005, OMC-A projected that it would complete basic training for the remaining 24,700 combat troops by the fall of 2007 if it continued to train five battalions at once. However, in May 2005, OMC-A proposed increasing the number of combat troops in the planned force structure from 43,000 to 46,000 and projected that it could train the additional 3,000 combat troops by the fall of 2007. Although OMC-A is seeking permission to begin training six battalions at once, it has not been able to fully equip the units already trained and faces a shortage of embedded trainers.

## Afghan Army Is Experiencing Equipment Shortages

According to U.S. Defense and Afghan army personnel, Afghan army units are experiencing equipment shortages. U.S. embedded trainers and other defense personnel informed us that Afghan soldiers have had to cope with shortages of useable uniforms, boots, communications gear, infantry weapons, ammunition, and vehicles.[12] Embedded trainers provided us with examples of poorly made uniforms and boots and told us that Afghan army units must use old and often faulty small arms and ammunition. OMC-A logistics personnel confirmed that Afghan battalions do not have needed vehicles. Embedded trainers told us that the equipment shortages have negatively affected the army's effectiveness and discipline.

OMC-A is responsible for managing efforts to supply the army's rapidly growing combat element needed equipment, but it has had difficulty establishing requirements and complying with security assistance procedures to fulfill those requirements. Defense Security Cooperation Agency and U.S. Army Security Assistance Command personnel informed us that in many cases OMC-A had not provided them with adequately prepared requests and forecasts of future requirements in a timely manner. For example, Defense Security Cooperation Agency staff noted that OMC-A

---

[12]One embedded trainer informed us that he has had to rely on a cell phone that he purchased at a U.S. retail outlet to communicate with his unit during operations.

required almost a year to establish specific requirements for a standard light tactical vehicle to transport Afghan troops.[13]

OMC-A and other Defense personnel told us that several factors complicate OMC-A's efforts to project the army's requirements and to use the defense security assistance process. These include the numerous changes that OMC-A made in its plans to build the army, including accelerating the number of battalions in training and establishing the regional commands simultaneously in 2004. OMC-A officials also noted that the involvement of nascent Afghan army units in combat and the lack of historical data on material usage rates further complicated their efforts to project requirements. In addition, Defense Security Cooperation Agency, U.S. Army Security Assistance Command, and State officials in Washington, D.C., and OMC-A officials told us that OMC-A has not had adequate numbers of personnel trained in security assistance procedures to support its efforts. OMC-A officials stated that OMC-A has never been staffed at more than about 71 percent of its approved personnel level.[14] They also noted that Defense efforts to train OMC-A personnel in defense security assistance procedures and preserve the institutional knowledge of lessons learned from former personnel are constrained by the rotation of Air Force, Navy, and Marine personnel from OMC-A after as few as 4 months.[15]

To address some shortages of needed equipment, OMC-A bought items directly from non-U.S. vendors.[16] However, it sometimes purchased faulty items because it did not take adequate steps to ensure their quality. For example, OMC-A purchased combat boots from regional vendors to support the new higher basic training rate of five battalions. OMC-A

---

[13]The light tactical vehicle is essentially a modified pickup truck that would replace four different types of vehicles now used by the army. These vehicles were donated by the United Arab Emirates, Germany, and Greece. OMC-A officials told us that these donations helped fill the Afghan army's early requirement for transportation but are now complicating the army's logistics situation.

[14]At the time of our work in Afghanistan, Defense had allocated OMC-A 211 military positions and 95 contractor and civilian positions.

[15]According to OMC-A, Air Force personnel were assigned to Afghanistan for 4 months, Navy and Marine Corps personnel for 6 months, and Army personnel for 12 months. Defense officials in the United States informed us that Air Force personnel may now be assigned to fill certain critical positions for as long as 12 months.

[16]OMC-A requested and received offshore procurement waivers between fiscal years 2002 and 2005 to spend up to $596 million to procure non-U.S. items overseas.

officials told us that many boots proved to be defective because OMC-A had given vendors too much latitude in filling their contracts. U.S. trainers told us that Afghan troops sometimes wore sandals during operations in mountainous, difficult terrain because their boots had failed (see fig. 4). OMC-A personnel informed us that they now use a broader array of local vendors, set more stringent specifications, and employ Afghan civilians to inspect the quality of locally procured goods.

**Figure 4: Defective Boot Purchased Locally and an Afghan Soldier Wearing Sandals**



Source: GAO.

Defense has also experienced difficulties in obtaining adequate supplies of serviceable Soviet-era equipment. Early in the Afghan army program, Defense decided to equip the army with donated and salvaged Soviet weapons and armored vehicles. It did so because (1) such equipment was widely used by the former Afghan army and by Afghan militias and (2) several coalition nations once allied with the former Soviet Union were willing to provide equipment from their arsenals. However, much of the donated and salvaged equipment proved to be worn out, defective, or incompatible with other equipment. For example, Defense officials abandoned plans to use Soviet armored personnel carriers after they determined that the vehicles had been manufactured to differing standards depending on the country of origin. Defense and State officials also informed us that the demobilization of Afghan militias had yielded fewer serviceable Soviet AK-47 assault rifles and ammunition caches than

anticipated. In response, OMC-A has cannibalized serviceable parts from the assault rifles obtained to make usable weapons and has purchased more weapons than originally planned. Defense and State officials informed us that they are stepping up efforts to obtain donations of serviceable arms.

## Number of Embedded Trainers Does Not Meet Needs

OMC-A's acceleration of the number of battalions in basic training has strained its embedded trainer team program. By increasing the number of battalions in training from four to five, OMC-A's requirement for embedded trainers increased from about 410 to nearly 700. Because it was unable to obtain the additional trainers from the military services in a timely manner, Task Force Phoenix reassigned officers from other duties in Afghanistan. It also temporarily reduced the number of embedded trainers assigned to a battalion from 16 to 12.

According to the Joint Chiefs of Staff's Afghanistan desk, another 192 trainers will be needed if OMC-A increases the number of battalions in basic training to six. Because individuals with the skills needed to serve as trainers are in demand in other theaters, increasing the training rate to six battalions could require Defense to reassign U.S. personnel in Afghanistan to serve as embedded trainers.[17]

OMC-A's need for more embedded trainers could further increase if it determines that individual battalions are not yet ready to operate without trainers. While some battalions have already operated with embedded trainers for longer than the initially planned 2-year period, OMC-A has not yet fully implemented recently developed criteria for assessing a battalion's readiness to operate without trainers. As of May 2005, none of the Afghan battalions had graduated from the embedded trainer program.

## Sustaining Institutions Are Lagging and Plans for Their Completion Are Not Clear

OMC-A's efforts to establish sustaining institutions (such as an acquisition and logistics command) needed to support the combat troops have not kept pace with the accelerated basic training program. The Afghan army currently consists almost entirely of infantry forces that cannot sustain themselves. At the beginning of 2005, Defense planners envisioned that the

---

[17]Defense officials informed us that NATO members may contribute embedded trainers in the future.

army would need 21,000 support personnel in four sustaining commands to provide essential services to the army's combat elements. However, as of March 2005, it had assigned only 1,300 personnel to the sustaining commands. In an apparent attempt to address this shortfall, OMC-A proposed, in May 2005, that the number of personnel assigned to these commands be reduced from 21,000 to 14,000 and that the time frames for completing these commands be extended from the end of 2008 to the fall of 2009.

Without fully functioning sustaining commands, the Afghan army will continue to rely on OMC-A, embedded trainers, and other U.S. military forces for acquisition, logistics, communications, and other key support functions. OMC-A informed us that it would continue to sustain the Afghan army on an interim basis to ensure the rapid introduction of Afghan army combat units. According to Defense officials, they plan to use $210 million from the 2005 emergency supplemental to help ensure that the sustaining commands can keep pace with the fielding of combat units.

To ensure that the Afghan army's combat elements are fully trained and supplied and can readily communicate with one another, OMC-A would have to recruit, train, and organize at least 12,000 individuals for the sustaining commands. To ease the difficulty of doing so in a largely illiterate country that has had little exposure to U.S. logistical practices, OMC-A may recruit former militia fighters with logistics experience. However, Defense plans for ensuring that these sustaining commands are fully functional by the fall of 2009 are not clear. Defense has not yet adopted plans that would guide OMC-A's efforts to complete these commands nor have Defense planners in the United States and OMC-A reached agreement on an overall concept of operations for the Afghan army.

## Afghan Troops Said to Perform Well Despite Shortcomings

Defense officials in Afghanistan, including representatives of the U.S. combat operations command, told us that U.S.-trained Afghan troops had accompanied U.S. forces in operations against terrorist groups, helped restore stability in Herat in response to riots and clashes between militias, assisted in providing security for Afghanistan's first democratic presidential election, and protected army infrastructure construction sites around Afghanistan. U.S. embedded trainers we met with near Kabul and in Herat, as well as U.S. combat officers, praised the quality, morale, and motivation of the Afghan troops in conducting these operations. For example, they noted the speed with which Afghan units were able to

mobilize for transportation to Herat and their ability to quell civilian rioters.[18] The commander of OMC-A told us that coalition forces have sought out opportunities to work with Afghan troops. According to U.S. embedded trainers and OMC-A officials, the multiethnic Afghan army units typically have developed good relations with Afghan citizens in different parts of the country. None reported significant evidence of ethnic discord within the army. However, U.S. Defense personnel informed us that Afghan troops and officers have not yet gained significant experience in battalion-level operations. They also noted the army's command processes are limited by the high rate of illiteracy among the troops.

# Difficult Conditions Have Hampered Reconstituting of Police and State Does Not Have an Overall Plan to Complete the Effort

Germany—the lead nation for rebuilding the Afghan police—and the United States have trained thousands of Afghanistan police officers and patrolmen and expect to meet training targets for end of 2005. However, many trainees return to difficult working conditions, including police stations where resources are inadequate and militia leaders are still the principal authority, and they receive limited opportunities for follow-up training or mentoring. Furthermore, Afghan's Ministry of the Interior, which oversees the Afghan police, faces pervasive problems that require reform or restructuring. Finally, neither State nor Germany has an overall plan delineating what is needed to complete the rebuilding of the police sector.

## Donors Expect to Meet Police Training Targets

As of January 2005, Germany and the United States had trained more than 35,000 national, highway, and border police, and they expect to meet the overall goal of training 62,000[19] by December 2005 (see table 2). The United States initiated its police training program in Afghanistan in 2003 because of concerns that the German training program was moving too slowly and was concentrating on officers. Initially, the U.S. program focused on training police patrolmen (and some women) to establish a national police presence for the Afghan presidential elections.[20] The U.S. program has

---

[18]In 2004, Afghan troops were flown to Herat on U.S. military and allied aircraft.

[19]The target numbers were derived by considering the security needs and population density of geographic areas, as well as the expected organizational structure of the police.

[20]More than 20,000 police were trained before the Afghan presidential elections in October 2004.

emphasized meeting specific training targets set by the Afghan government in consultation with U.S. and German governments.[21]

**Table 2: Number of Afghan Police Reported Trained as of January 2005 and Training Targets for December 2005**

| Afghan police role[a] | Police reported trained as of January 2005[b] | Training target for December 2005 |
|---|---|---|
| National police | 33,903 | 47,400 |
| Highway police | 220 | 2,600 |
| Border police | 1,151 | 12,000 |
| **Total** | **35,274** | **62,000** |

Source: State/INL data (includes German officer training data).

[a]National police fill the traditional role of community law enforcement. Highway police focus on road security outside of Kabul. Border police are responsible for border protection and control.

[b]State/INL could not readily identify the numbers of officers versus patrolmen and women by police role.

The United States employs a "train the trainer" approach. More than 800 Afghans who have completed a 3-week instructor development course conduct the training with DynCorp advisors. The basic training consists of an 8-week course for new recruits and a 2-week program for veteran police. Highway and border police receive 2 weeks of additional specialized training. U.S. trainers have also developed a shortened training program to accommodate illiterate recruits. According to State/INL and DynCorp officials, the Afghan police trainees are generally eager to learn and they support the idea of a national police force dedicated to the rule of law. In addition, according to these officials, attrition rates have been low.

Germany's chief role in rebuilding the police has been to refurbish the Kabul Police Academy near Kabul and establish a permanent training program there for commissioned and noncommissioned Afghan police officers.[22] The program, which began in August 2002, provides 3 years of

---

[21]The United States assumed responsibility for the border police when Norway and Germany did not follow through on commitments to provide the training. Norway provided some funding for the renovation of the border police academy.

[22]Commissioned and noncommissioned officers constitute the police's upper and intermediate ranks, respectively, while patrolmen are lower level.

training for officers and 1 year of training for noncommissioned officers. According to a German Ministry of Interior official, as of January 2005, 41 officers and 2,583 noncommissioned officers had completed the full German program, and an additional 4,880 commissioned and noncommissioned officers had received short-term specialized training. According to this same official, Germany plans to train an additional 4,950 commissioned and noncommissioned officers at the Academy and the regional training centers by December 2005.

Although the Bonn II agreement calls for a multiethnic police force, the Afghan government, Germany, and the United States do not track the ethnicity of police trainees. German and State officials reported that they had received no complaints about the ethnic composition of police units or deployments or their interaction with minority populations. However, neither had systematically surveyed the impact of ethnicity on police performance, relying instead on anecdotal accounts.

DynCorp completed construction of the Central Training Center for Police in Kabul in May 2003, and in 2004 it constructed and began training at seven regional centers across the country. (Fig. 5 shows the police training center in Jalalabad, Afghanistan.) The Department of Justice's International Criminal Investigative Training Assistance Program developed the curriculums, which include such topics as crime investigation, operational police skills, and human rights.

**Figure 5: Police Regional Training Center in Jalalabad–Dining Facility and Classroom Building**



Source: GAO.

## Police Face Difficult Working Conditions

A number of difficult conditions hamper the effort to rebuild the police in Afghanistan. Newly trained police often return to community police stations staffed by poorly trained, illiterate conscripts or former militia members who have little loyalty to the central government. According to State/INL and Defense officials, many of the untrained officers remain loyal to local militias in an environment dominated by ethnic loyalties. Working with untrained colleagues, newly trained policemen often find it difficult to apply the principles they learned during training. For example, according to several DynCorp trainers, some recently trained police were forced to give their new equipment to more senior police and were pressured by their commanders to participate in extorting money from truck drivers and travelers. U.S. and other donor officials told us that many police resort to corrupt practices, in part because their salaries are low and inconsistently paid. The Afghan Ministry of the Interior has limited awareness over police operations outside of Kabul and has not systematically vetted existing police staff for human rights violations or corruption, which complicates the ministry's efforts to support and oversee the police.

In addition, police across Afghanistan confront shortages of equipment. According to a 2002 German government assessment, less than 10 percent of the police had adequate equipment, and U.S. and other donor government officials noted that the police are often outgunned by militias, criminals, and drug traffickers because they lack adequate numbers of weapons or ammunition supplies. According to DynCorp, the Ministry of the Interior has approximately 36,500 serviceable rifles and pistols on hand, mainly seized weapons. DynCorp officials estimate that the police need an additional 48,500 side arms, 10,000 automatic rifles, and 6,250 machine guns. Through March 2005, trainees were not receiving firearms training, because the United States and the other donors had not yet provided weapons and ammunition. Further, DynCorp officials estimated that the Afghan national police have approximately 3,000 serviceable vehicles and require an additional 7,400 vehicles. Most police do not perform routine patrols because they lack adequate numbers of vehicles and the fuel to operate them. State/INL officials reported that police often rely on civilian complainants for transportation during law enforcement investigations.

Moreover, poor infrastructure conditions hamper police work. According to the 2002 German government assessment, approximately 80 percent of police infrastructure was destroyed. According to a Defense estimate, varying degrees of construction or renovation are needed for more than 800 buildings among Afghanistan's provincial police stations, district police and border police brigade stations, and subdistrict and village level stations.[23] State/INL officials reported that criminal suspects are sometimes detained in private residences because most police stations lack secure holding facilities or reliable electricity and drinking water and have only rudimentary office furniture and equipment. On our visit to a Jalalabad police station (see fig. 6), we observed prisoners in a communal holding facility with dirt floors and rudimentary toilet facilities. We also noted that police manning a nearby guard tower were sleeping outside between their shifts.

---

[23]The fiscal year 2004 supplemental provided Defense's Office for Special Operations and Low Intensity Conflict $73 million to support Afghan border security, law enforcement, and counter narcotics efforts. The program was refocused in the spring of 2004 to concentrate on police infrastructure and capabilities in southern and southeastern Afghanistan.

**Figure 6: Jalalabad Police Station**



Source: GAO.

In addition, although the U.S. government recently constructed a communication network that links the provincial headquarters with the Ministry of Interior, police at the provincial, district, and subdistrict levels are generally unable to communicate with police in other locations. DynCorp officials estimate that the police need 420 base radios for district and border stations, more than 10,400 mobile-vehicle mounted radios, and 20,700 hand-held radios.

## Limited Follow-Up Training, Mentoring, or Evaluation of Trainees

In early 2005, DynCorp deployed police trainers to the field for the first time—12 outside of Kabul and 4 at a district headquarters in Kabul. International peacekeeping efforts in Bosnia, Kosovo, and East Timor have shown that such training is critical to the success of similar programs.[24] Field-based training and mentoring allows trainers to build on classroom

---

[24]According to officials from the U.N. Department of Peacekeeping Operations, field-based training of local police by international police trainers was key to establishing professional police forces in these countries.

instruction and provide a more systematic basis for evaluating police performance. Nevertheless, the German, U.S., and Afghan governments have only limited ability to evaluate police trainees' performance after graduation—especially in the more remote areas of Afghanistan. State/INL officials cited the high costs, the security threat to training personnel stationed in the field, and the difficulty of recruiting sufficient numbers of international police as impediments to implementing a countrywide field-based program. OMC-A estimates a first-year cost for implementing a countrywide training and mentoring program at approximately $160 million.

Nonetheless, U.S. government and other donor officials reported overall improvements in police performance since the training programs began and noted that public attitudes toward the police are becoming more positive. According to U.S. officials, police played a stabilizing role before and during the presidential elections in October 2004. For example, according to U.S. military personnel, police confiscated weapons and explosives in 12 separate incidents on election day in Jalalabad. However, according to OMC-A officials, police failed to control a riot that occurred after the Afghan government removed the provincial governor from power in Herat in August 2004. As a result, the Afghan army was called in to restore order.

## Afghan Ministry of the Interior Undergoing Reform

The Afghan Ministry of the Interior, which is responsible for managing the country's national police force, faces a number of problems that require reform or restructuring. According to State/INL and DynCorp officials, these problems include pervasive corruption; an outdated rank structure overburdened with senior level officers; lack of communication and control between central command and the regions, provinces, and districts; pay disparity between the army and the police; and a lack of professional standards and internal discipline. To address these problems, State embedded 30 DynCorp advisors within the ministry at the end of 2004 and drafted a comprehensive reform program. According to ministry and State officials, the reform package was accepted by the Afghan Government, and implementation has begun. The ministry adopted a new, streamlined organizational structure to address command and control problems, including a new rank structure with salaries commensurate with responsibilities. The ministry also created a professional standards unit (similar to an internal affairs unit) that is responsible for disciplining corrupt or underachieving officers throughout the police force. DynCorp officials stated that the operation of this unit will be critical to the success

of the police reform effort. However, according to DynCorp officials, the overall reform program will require more than a year to implement and will not produce results across the country for several years.

The Ministry of the Interior has not yet reformed its police pay system. Patrolmen generally are paid $30 to $50 per month, less than the $70 per month new army recruits are paid and often less than day laborers can earn on construction sites. According to DynCorp officials, patrolmen's salaries are insufficient to support a family's living expenses and often cause policemen to resort to corruption to augment their income. Ministry officials told us that they are aware that low salaries are hurting the professionalism of the police force and that they are working to institute a new salary structure.

## State and Germany Do Not Have an Overall Plan for Reconstituting the Afghan National Police

In 2003, Germany developed a strategy paper that assessed the condition of the police and proposed ways to reconstituting the police sector. However, this strategy was not widely circulated and was not adopted by other donors, including the United States; State/INL officials told us that they could not provide us a copy of the German strategy because they did not possess a copy themselves. According to cognizant German officials, Germany has viewed its role as one of advising and consulting with other donors and the Afghan government rather than as the major implementer or funding source for the police sector.

State has not developed a plan for addressing the overall requirement of equipping and fielding a fully functioning police force by a stated end date. Budget estimates produced (at our request) by DynCorp provide a partial listing of essential elements for building the police—personnel, equipment, facilities and communication equipment—through 2006 that totals more than $580 million. However, State has not specified how or when these equipment purchases and construction projects will be completed; what additional infrastructure, equipment, and training are needed; how much the total buildup of the police will cost; and when the overall effort to build the Afghan police will be finished.

In addition, State did not have adequate staff in Kabul to manage the day-to-day activities of the police program, hampering State's effort to plan for and execute the rebuilding of the Afghan police. In 2003, the U.S. Embassy in Kabul had one full-time staff member assigned to manage the police program. When this person left to take another position with the Afghan Ministry of the Interior, State used a series of temporary duty staff in 2004

and 2005 to manage the program, employing one temporary staff member for more than 6 months to manage both the Embassy's police and counternarcotics programs.[25] According to the temporary-duty official, because of understaffing she was limited in her ability to oversee and monitor the program, dependent on DynCorp contractors for progress reports and management support, and unable to attend many donor and other coordination meetings. In January 2005, to help address this problem, State/INL established a Narcotics Affairs Section in Kabul to oversee the U.S. police and counternarcotics programs. At the time, one full-time U.S. direct-hire employee and one personal services contractor were assigned.

# Efforts to Complete and Sustain the Afghan Army and Police Face Major Challenges

The United States, other donors, and the new Afghan government face significant challenges to their plans to establish viable Afghan army and police forces. Completing and sustaining the army and police will cost several billion dollars over the next decade. Moreover, slow progress in resolving other Afghan security problems could undermine the prospects for effective army and police forces.

## Long-Term Costs Unclear but Likely to Be Substantial

Defense and State have not clearly defined the long-term costs of completing the army and police programs. However, available information suggests that these institutions could cost up to $7.2 billion to complete and about $600 million per year to sustain.

- Defense has not clearly defined the cost of completing the Afghan army. However, in November 2004, OMC-A officials indicated that completing the army could cost another $5.4 billion (in fiscal year 2005 dollars).[26] Future funding would be used to fully supply the Afghan army with equipment and vehicles; train Afghan troops; complete the regional and sustaining commands; and provide the capability to safely transport the Afghan president by air. However, these funds would not suffice to provide the army with the capability to airlift large numbers of troops

---

[25]By contrast, Defense's Combined Forces Command had assigned up to 10 personnel to a law enforcement planning cell to prepare for a possible Defense role in the police buildup.

[26]OMC-A officials stated that the total cost of the army program would be at least $7 billion. The United States and other donors have already provided approximately $1.6 billion for the army through fiscal year 2004.

GAO-05-575 Afghanistan Security

from one part of the country to another. OMC-A officials told us that adding this capability could cost as much as $3 billion.[27]

• State has not clearly defined the cost of reconstituting the police. However, our analysis of State and Defense planning documents suggest that completing the police program could cost between $800 million and $1.8 billion.[28] Most of these funds would pay for construction and equipment, including more than $500 million to construct police stations and buildings; about $100 million for trucks, buses, and other vehicles; and more than $85 million to provide each patrolman a weapon, uniform, ammunition, and related gear.

Similarly, Defense and State have not clearly defined the annual cost of sustaining the completed army and police forces. OMC-A officials and Joint Chiefs of Staff planners told us that sustaining the completed Afghan army could cost at least $420 million (in 2005 dollars) annually. The majority of these costs would be for general equipment repair, maintenance, supplies, medical support, salaries, and food. DynCorp police planning documents project that maintaining police force operations could cost $180 million annually (in 2005 dollars). Of this amount, about $100 million would cover personnel costs. The rest would pay for fuel, vehicle replacement and maintenance, ammunition, and facilities upkeep.

The United States has not committed to pay for creating and sustaining the army and police. To date, the United States has been the major contributor to Afghan's security sector reform, providing about 90 percent of funding for the Afghan army and the largest share of funding for police, judiciary, and counternarcotics efforts. At the same time, other nations have not demonstrated the willingness to provide the funds that may be needed to complete and sustain these forces. For example, while the United States has provided the $277 million it pledged at a 2004 police donor conference, as of March 2005, the other donor nations had provided only about half of the $73 million that they pledged at the same conference. Also, donors have provided the United Nations Law and Order Trust Fund for Afghanistan

---

[27]Adding a larger air wing would also require English-language training for a greater number of Afghans if the air wing were equipped with U.S. manufactured aircraft.

[28]The higher estimate includes an expanded field-based training program, additional civilian staffing, an aviation capacity, and a doubling of the Afghan border police from the current plan of 12,000 to 24,000.

with about $60 million of the $149 million pledged for April 2004 through March 2005.

## Slow Progress in Addressing Other Pillars Could Undermine Afghan Security

The ability to field fully functioning Afghan army and police forces is dependent on concurrent success in the other security sector reform pillars. The lack of an effective judicial sector, the substantial illicit narcotics industry, and the continued existence of armed militias threatens to undermine overall progress toward providing nationwide security and the stability of the Afghan government.

### Afghanistan Lacks Effective Judicial Sector

Establishing a working judiciary based on the rule of law is a prerequisite for effective policing. However, according to donor officials, few linkages exist between the judiciary and the police, and the police have little ability to enforce judicial judgments. In addition, judges and prosecutors are not being exposed to police training and practices, and the police training curriculum does not include instruction on criminal law and procedure. Moreover, according to U.S. embassy officials, the Afghan judiciary has not yet acquired the political authority needed to adjudicate a criminal or drug case against a high-level political or warlord figure.

Supported by the United States, other donors, and international organizations, Italy—the lead nation for reforming the judiciary—has followed a three-pronged strategy: (1) developing and drafting legal codes, (2) training judges and prosecutors, and (3) renovating the country's physical legal infrastructure. The Italian government has provided approximately $10 million annually to support the judicial reform, and the United States has provided approximately $28 million for fiscal years 2003 through 2004. However, according to Italian and U.S. government officials, the reform program is under funded and understaffed.

Italy and the other donors have made some progress in promoting reform. These include drafting a new criminal procedure code, training several hundred judges, and renovating courthouses. However, these accomplishments address only a small portion of Afghanistan's overall need for judicial reform. Afghanistan's judicial sector is currently characterized by a conflicting mix of civil, religious, and customary laws, with few trained judges, prosecutors, or other justice personnel. Furthermore, its penal system is nonfunctioning, and its buildings, official records, and essential office equipment and furniture have been damaged extensively. U.S. and donor officials informed us that progress in rebuilding the judicial sector lags far behind the other security pillars and that the

reform effort is being undermined by systemic corruption at key national and provincial justice institutions.

**Illicit Narcotics Industry Threatens Government Authority**

The production and trafficking of illicit narcotics poses a serious challenge to the Afghan government's authority. According to the United Nations, Afghanistan produces almost 90 percent of the world's illicit opium, generating revenues equivalent to about 60 percent of Afghanistan's gross domestic product for 2003. According to State, narcotics revenues breed corruption at virtually all levels of the Afghan government while providing resources to Taliban remnants, drug lords, and other terrorist groups. Solving the narcotics problem in Afghanistan is widely seen as critical to achieving security in Afghanistan.

The United Kingdom is leading international counternarcotics efforts in Afghanistan and is trying to persuade other nations to contribute to a new Afghan counternarcotics trust fund. From 2002 to 2004, the United States obligated approximately $380 million and assisted the counternarcotics efforts by training Afghan narcotics interdiction units, constructing border and highway checkpoint facilities, and supplying operational support and nonlethal equipment to Afghan eradication teams. For fiscal year 2005, the United States has provided about $966 million for a counternarcotics program that includes public information, alternative livelihoods, law enforcement, interdiction, and eradication campaigns. The goal of the new U.S. program is to ensure that narcotics production and drug trade do not subvert efforts to rebuild the Afghan police and army.

Although the president of Afghanistan took several counternarcotics initiatives at the end of 2004,[29] the decree banning opium production has been weakened by the Afghan government's lack of a transparent criminal justice system and the underequipped, decentralized police force. The Afghan government's eradication force and provincial forces have undertaken only marginal crop destruction in a few locations. U.S. officials stated that these eradication efforts have had no material effect on the quantity of opium produced. In addition, U.S. proposals for large-scale aerial eradication programs have been resisted by Afghan government officials and other international donors. According to U.S. officials, opium

---

[29]Two days after Afghanistan's December 2004 presidential inauguration, the president of Afghanistan launched a counternarcotics campaign. The president appointed a cabinet-level minister for counternarcotics and created a subcabinet interagency working group that includes the Afghan counternarcotics, interior, finance, and rural development ministries.

is being produced in record amounts in all 34 provinces, and a centrally trained and directed Afghan counternarcotics force would likely face significant opposition from provincial drug lords and many citizens. Although U.S. and internationally sustained counternarcotics and security programs could potentially reduce the amount of opium produced over time, State officials expect that drug processing and trafficking will continue until security is established.

## Militias Have Not Been Fully Reintegrated

Although the number of known militia fighters has been reduced in recent months, the disarming, demobilizing, and reintegrating of members of Afghanistan's once-dominant militias is not complete. While many militias are under the nominal authority of the Afghan Defense Ministry, they pose a threat to the stability of the Afghan government and its ability to extend control throughout Afghanistan. Of concern, according to Japanese officials, is that former combatants may be attracted by the higher salaries provided by militia leaders in the illegal narcotics industry.

To help the Afghan government disarm, demobilize, and reintegrate militia fighters, donor nations established the Afghan New Beginnings Programme in early 2003. Under the auspices of Japan and the United Nations Assistance Mission to Afghanistan, the program oversaw the demobilization of more than 34,000 former combatants by January 2005. The program also oversaw the seizure or destruction of more than 90 percent of the heavy weapons formerly controlled by militias (see fig. 7). Defense is providing transportation for heavy weapons and is monitoring the surrender of militias' small arms and light weapons. Also, the U.S. Agency for International Development donated $4 million to the Afghan New Beginnings Programme in fiscal year 2005.

**Figure 7: Heavy Weapons Cantonment Site Outside Kabul**



Source: GAO.

However, the program's success is not assured. According to U.S. and Japanese government officials responsible for monitoring the demobilization process, the total number of troops still belonging to militias and other armed factions remains unknown.[30] In addition, U.S. troops monitoring and assisting in the disarmament process reported that the Afghan government has collected only limited numbers of poor-quality assault rifles and that better quality weaponry may still be held by the former combatants and their commanders.

Former combatants have limited employment opportunities when they leave the militias and attempt to reintegrate into society. As of January 2005, only one reintegration center in Kabul provided vocational training to former combatants. Although Afghanistan plans to open another seven regional centers by early 2005, the eight centers together can retrain only 2,000 students per year.

---

[30]Estimates of the total number of militia fighters and other armed factions operating in Afghanistan in 2002 have ranged from 100,000 to over 1 million.

## Conclusions

Without strong and self-sustaining Afghan army and police forces, international terrorists could again create a haven in Afghanistan and jeopardize donor efforts to develop the country. However, Afghanistan remains dependent on other nations for support—international assistance provided over 90 percent of Afghanistan's $4.75 billion budget for 2005. The International Monetary Fund estimates that Afghan government revenues will average less than $400 million per year through 2008—less than half its projected expenditures just for government salaries and operations.

The United States has provided over $4.1 billion since 2002 to help create a new Afghan army and reconstitute Afghanistan's police force. Despite initial progress, the United States and the other donors continue to face numerous challenges. Although Defense has succeeded in training and fielding thousands of Afghan combat troops, it has not been able to fully equip them and it has lagged in establishing the institutions the Afghan army needs to sustain itself. Similarly, while State has trained thousands of police, it has just begun to address the structural problems that affect the Afghan police force. In addition, neither Defense nor State has fully addressed how and when Afghanistan will be able to sustain its completed security forces.

Establishing viable Afghan army and police forces will almost certainly require years of effort and the investment of additional resources. Available information suggests the army and police programs could cost up to $7.2 billion to complete and an estimated $600 million annually to sustain. However, Defense and State have not developed detailed plans, performance measures, cost estimates, or milestones for completing and sustaining these forces. Moreover, progress in the other pillars of Afghan's security reform is critical to eventually sustaining and maximizing the effectiveness of the Afghan army and police forces. Yet, reform of the Afghan judiciary lags behind the other security pillars, trafficking in illicit narcotics remains a challenge to the Afghan government's authority, and thousands of militia fighters have not been disarmed and reintegrated into society.

## Recommendations for Executive Action

Because of Afghanistan's prolonged conflict and its limited financial resources, we recommend that the Secretaries of Defense and State develop detailed plans for completing and sustaining the Afghan army and police forces. The plans should include clearly defined objectives and performance measures; milestones for achieving stated objectives; future

funding requirements; and a strategy for sustaining the results achieved, including transitioning program responsibility to Afghanistan. The Secretaries should provide this information to the Congress when the executive branch next requests funding for the Afghan army or police forces.

In addition, because reform in the other pillars of the Afghan security sector—building an effective judiciary, curbing the production and trafficking of illicit narcotics, and disarming and reintegrating militia fighters—is critical to the success of the army and police programs, we recommend that the Secretaries of Defense and State work with the other lead donor nations to help ensure that progress in the other pillars is congruent with the progress made in the army and police programs. The Secretaries should regularly report to the Congress, but no less than annually, on the progress made in addressing these other security pillars.

## Agency Comments and Our Evaluation

The Departments of Defense, Justice, and State provided written comments on a draft of this report. See appendixes III, IV, and V, respectively. We also met with cognizant officials from Defense and State to discuss their comments and observations. Both departments provided technical comments and updates that we incorporated throughout the report, as appropriate. Overall, Defense, Justice, and State found the report helpful, thorough, and accurate.

Justice characterized the Afghan police training program as extremely important and enormously complex. It shared our concerns that more detailed plans for the creation of a sustainable and effective Afghan police force must be developed. Justice went on to note that its International Criminal Investigative Training Assistance Program is providing critical support to the Iraqi Police Service and has assisted other police training programs around the world, but has almost no role in the ongoing efforts to assist the Afghan police.

Although Defense and State generally concurred with our recommendations, both suggested that existing reporting requirements addressed the need to report their plans for completing and sustaining the Afghan army and police forces. Defense indicated that detailed plans will allow it to effectively manage already scarce manpower and resources and should foster deliberate and proactive long-term planning with State. State noted that coordination efforts have characterized these programs since inception and will continue.

We do not dispute that current law, including the Afghan Freedom Support Act of 2002, as amended, and the fiscal year 2005 emergency supplemental, mandate a number of reports on Afghanistan. However, our analysis of past Defense and State reporting—both internally and to the Congress—indicates that the departments do not have detailed plans for equipping and fielding fully functioning Afghan army and police forces by a stated end date. We continue to believe that developing and following such plans and ensuring concurrent progress in the other security pillars is essential to the overall future success of the Afghan security effort. Whatever reporting mechanisms Defense and State choose, the departments need to specify what their objectives are and how they will assess progress, when the effort to build the Afghan army and police will be completed, and what future funding will be needed. In addition, in light of the Justice comments, we encourage State to take advantage of Justice's police training expertise in developing its detailed plans for completing and sustaining the Afghan police program.

As agreed with your office, unless you publicly announce its contents earlier, we plan no further distribution of this report until 30 days from the date of this letter. At that time, we will send copies of this report to interested congressional committees and to the Secretaries of Defense and State. We will also make copies available to others on request. In addition, this report will be available at no charge on the GAO Web site at http://www.gao.gov.

If you or your staff have any questions about this report, please contact me at (202) 512-3149 or GootnickD@gao.gov. Key contributors to this report were Al Huntington, Pat Dickriede, Reid Lowe, Pierre Toureille, Eve Weisberg, and Joe Zamoyta.

David Gootnick, Director
International Affairs and Trade

Appendix I
# Scope and Methodology

To examine the progress made, and limitations faced, by the United States and other donor nations in creating a new Afghan national army, we reviewed documents obtained from several offices and agencies in the U.S. Department of Defense, including the Joint Chiefs of Staff/J-5 (Office of Strategic Plans and Policy's Afghanistan Desk), U.S. Central Command, the Defense Security Cooperation Agency (Middle East, Asia and North Africa division), the U.S. Army Corps of Engineers, the U.S. Army Security Assistance Command, the Office of Military Cooperation–Afghanistan, and Task Force Phoenix. We also reviewed documents from State's Bureau of South Asian Affairs. Our review of these documents provided us with information concerning the program's structure, current time frames and objectives, progress, limitations, and funding status. In addition, we met with the following various cognizant officials to discuss the progress made and limitations faced by the United States:

- In Washington, D.C., we met with officials from the Joint Chiefs of Staff, the Office of the Secretary of Defense, the Defense Security Cooperation Agency, the U.S. Army Security Assistance Command, and the U.S. Army Corps of Engineers. At State, we met with officials from State's South Asia and Political-Military Affairs bureaus. In Tampa, Florida, we met with officials of the U.S. Central Command, which has military oversight for Afghanistan.

- We attended a meeting on the status of Afghan military construction projects at the U.S. Army Corps of Engineers' Transatlantic Programs Center in Winchester, Virginia, which oversees the Corps' construction projects in Afghanistan.

- We attended a 3-day conference in New Cumberland, Pennsylvania, where representatives from the Defense Security Cooperation Agency, the U.S. Army Security Assistance Command, and the Office of Military Cooperation–Afghanistan discussed problems that were impeding security assistance to the Afghan army.

In Kabul, Afghanistan, we met with officials of the Combined Forces Command, the Office of Military Cooperation–Afghanistan, and Task Force Phoenix; U.S. embedded trainers; and the Afghan Deputy Minister of Defense. Also in Afghanistan, we traveled to Herat, where we met with U.S. embedded trainers, the commander of the Afghan army's regional command, and some Afghan army troops.

To examine the progress made, and limitations faced, by the United States and other donor nations in reconstituting the Afghan national police, we reviewed relevant documents on police program planning, resources, and implementation. We analyzed documents from State's International Narcotics and Law Enforcement Affairs/Resource Management Office to obtain a detailed costs and funding sources. Defense's Office of Special Operations and Low Intensity Conflict provided us with planning materials on the police-related counternarcotics program, as well as funding documents for this program. In addition, we reviewed the U.S. curricula for Afghan police training provided to us by the Department of Justice. We also examined documentation from the United Nations Law and Order Trust Fund for Afghanistan to obtain an overview of funding from non-U.S. donors. We reviewed German government documents on the German strategy for the Afghan police, German police program, and its funding information. We also met with the following cognizant officials to discuss the progress made, and limitations faced, by the United States and the other donors:

- In Washington, D.C., we met with officials from State's Bureau for International Narcotics and Law Enforcement Affairs who focus on police training and the rule of law, as well as with officials from State's South Asia Bureau. At Justice, we spoke with officials from the International Criminal Investigative Training Assistance Program. We also met with representatives of DynCorp Aerospace Technology—the State contractor for the Afghan police program. At Defense, we met with officials from the Office of the Secretary of Defense's Office for Special Operations and Low Intensity Conflict.

- In New York City, we held discussions with representatives of the United Nations Department of Peacekeeping Operations' Civilian Police Division and with officials from the United Nations Law and Order Trust Fund for Afghanistan.

- In Afghanistan, we met with U.S. embassy officials overseeing the police training program, officials at the Afghan ministry of Interior, and representatives of the German embassy charged with overseeing Germany's police program. In addition, we traveled to Jalalabad to meet with DynCorp police trainers and Afghan police personnel; we also toured a police training facility and inspected an Afghan police station.

To identify future challenges that the United States, other donor nations, and Afghanistan must address to complete and sustain the Afghan army

and police forces, we reviewed documents prepared by Defense, State, the government of Afghanistan, foreign donor governments, and international organizations. We also met with Defense, State, and DynCorp officials in the United States and Afghanistan to obtain information concerning the potential future costs of the army and police programs. In Afghanistan, we met with officials at the embassies of Italy, the United Kingdom, and Japan to discuss the Afghan judiciary, the Afghan narcotics problem, and the continued presence of militia fighters, respectively. In the United Kingdom and Germany, we met with officials from those nations' ministries of foreign affairs and defense to discuss overall Afghan security issues. In Belgium, we met with U.S. officials at the U.S. Mission to the North Atlantic Treaty Organization in Brussels, Belgium, and with officials at its Supreme Headquarters for Allied Powers in Europe in Mons, Belgium, to discuss their perspectives on the challenges posed by the Afghan security situation.

To determine the reliability of the funding data, Afghan army troop data, and Afghan police training data obtained from Defense and State officials, we compared multiple reports and sources and interviewed cognizant officials regarding the controls and checks they used to compile the data.

- To help confirm the completeness and consistency of U.S. and international funding data, we compiled and compared data from multiple sources—Defense, State, Justice, and other donor countries— with information from cognizant U.S. agency officials and donor country officials in Washington, D.C., and Afghanistan. We used a questionnaire to address the accuracy of the data; the security of the databases used; and the limitations, if any, of the data. We also compared the funding data to appropriations and authorization legislation, congressional budget requests, and reports to the Congress. Although we did not audit the funding data and are not expressing an opinion on them, based on our examination of the documents received and our discussions with cognizant agency officials, we concluded that the funding data we obtained were sufficiently reliable for the purposes of this engagement.

- To assess the reliability of the data regarding the number of Afghan troops assigned to Afghan army commands, we discussed with Defense officials how they check data from the commands and compared it with information from embedded trainers and payroll records. To assess the reliability of the data regarding the number of Afghan police trained, we interviewed State officials who received data from DynCorp, Justice, and the German Ministry of Interior to determine how they verify the data; we also compared the various information sources provided to us.

**Appendix I**
**Scope and Methodology**

However, because of the security situation in Afghanistan, we could not independently verify or test the army and police training information at field locations. Nevertheless, based on our assessments of the data provided and our discussions with the cognizant officials, we concluded that the Afghan army troop data and Afghan police training data provided to us were sufficiently reliable for the purposes of this report.

Appendix II

# Assistance Provided to Afghan Army and Police by Non-U.S. Donors

Forty-one non-U.S. donors have provided approximately $439 million in cash, equipment, and services for the Afghan army and police (see table 3). Approximately $193 million was donated to supplement U.S. efforts to build the Afghan army, and about $246 million was provided for the Afghan police program (see table 3). Six donors—the Czech Republic, the European Union, France, Germany, the United Kingdom, and the World Bank—provided almost 65 percent of the total donations.

- For the Afghan army, over $52 million was donated in cash and an estimated $141 million was donated in weapons, ammunition, vehicles, infrastructure support, communications equipment, medical equipment, and clothing.[1]

- For the Afghan police, over $120 million was donated in cash to the United Nations' Law and Order Trust Fund for Afghanistan,[2] and an estimated $126 million was donated in equipment, construction assistance, and training.

In addition, Defense estimates that approximately $24 million of military equipment was recovered from the demobilization of militias and other salvaged equipment in Afghanistan.

---

[1]OMC-A and U.S. Central Command calculated the value of donated resources and services in U.S. dollar equivalents in the year donated. These figures do not include the value of donors' training teams or support to the Kabul Military Training Center.

[2]Donors reported the monetary value of their donations to the German Ministry of Foreign Affairs in the year they provided the donations.

Appendix II
Assistance Provided to Afghan Army and
Police by Non-U.S. Donors

**Table 3: Estimated Value of Assistance Provided to Afghan Army and Police by Non-U.S. Donors**

Dollars in millions

| Donor | Army[a] (as of March 2005) | Police (as of January 2005) | Totals |
|---|---|---|---|
| Albania | $* | $0 | $* |
| Australia | 0 | 1 | 1 |
| Belgium | * | 0 | * |
| Bosnia | 1 | 0 | 1 |
| Bulgaria | 17 | 0 | 17 |
| Canada | 2 | 10 | 12 |
| China | 0 | 2 | 2 |
| Croatia | 4 | 0 | 4 |
| Czech Republic | 59 | 0 | 59 |
| Denmark | * | * | * |
| Egypt | 2 | 0 | 2 |
| European Union | 0 | 86 | 86 |
| Finland | 0 | * | * |
| France | 5 | 20 | 25 |
| Germany | 1 | 68 | 69 |
| Greece | 2 | 0 | 2 |
| Hungary | 9 | 0 | 9 |
| Iceland | 1 | 0 | 1 |
| India | 10 | 0 | 10 |
| Ireland | 0 | 1 | 1 |
| Italy | * | 0 | * |
| Japan | 0 | 20 | 20 |
| Kazakhstan | * | 0 | * |
| Liechtenstein | 0 | * | * |
| Netherlands | 0 | 8 | 8 |
| New Zealand | * | 0 | * |
| Norway | 1 | 5 | 6 |
| Pakistan | 2 | 0 | 2 |
| Poland | 1 | 0 | 1 |
| Qatar | 5 | 0 | 5 |
| Romania | 8 | 0 | 8 |
| Russia | 1 | 0 | 1 |
| Slovenia | 2 | 0 | 2 |

**Appendix II**
**Assistance Provided to Afghan Army and**
**Police by Non-U.S. Donors**

*(Continued From Previous Page)*

Dollars in millions

| Donor | Army[a] (as of March 2005) | Police (as of January 2005) | Totals |
|---|---|---|---|
| South Korea | 1 | 0 | 1 |
| Spain | 2 | 0 | 2 |
| Switzerland | 1 | 1 | 2 |
| United Arab Emirates | 3 | 0 | 3 |
| Ukraine | 1 | 0 | 1 |
| United Kingdom | 20 | 2 | 22 |
| World Bank | 0 | 22 | 22 |
| Other | 32 | 0 | 32 |
| **Total** | **$193** | **$246** | **$439** |

Source: GAO analysis of data from the U.S. Central Command and U.S. Defense Security Cooperation Agency (Afghan army) and the German Ministry of Foreign Affairs (Afghan police).

*Less than $500,000.

[a]Bulgaria, Canada, France, Germany, Mongolia, Romania, South Korea, and the United Kingdom also provided military trainers to the Afghan army.

Appendix III

# Comments from the Department of Defense



DEFENSE SECURITY COOPERATION AGENCY

WASHINGTON, DC 20301-2800

**JUN 1 0 2005**

In reply refer to:
05/007846-ME

Mr. David Gootnick
Director, International Affairs and Trade
US General Accounting Office
Washington, D.C. 20548

Dear Mr. Gootnick:

This is the Department of Defense (DoD) response to the GAO draft report (05-575), 'AFGHANISTAN SECURITY: Efforts to Establish Army and Police Have Made Progress But Future Plans Need to Be Better Defined,' dated May 11, 2005 (GAO Code 320240,320278).

DoD acknowledges receipt of the draft report, and we concur with the report in principle. Our response to the recommendations posed by GAO is attached.

The Department appreciates the opportunity to comment on the draft report. My point of contact on this matter is LTC Brett Floro. He may be contacted by email: brett.floro@dsca.mil or by telephone at (703) 604-6626.

Sincerely,

JEFFREY B. KOHLER
LIEUTENANT GENERAL, USAF
DIRECTOR

Attachments
As stated

Appendix III
Comments from the Department of Defense

GAO DRAFT REPORT DATED MAY 11, 2005
GAO-05-575 (GAO CODE 320240,320278)

"AFGHANISTAN SECURITY: EFFORTS TO ESTABLISH
ARMY AND POLICE HAVE MADE PROGRESS BUT FUTURE
PLANS NEED TO BE BETTER DEFINED"

DEPARTMENT OF DEFENSE COMMENTS
TO THE GAO RECOMMENDATIONS

**RECOMMENDATION 1:** The GAO recommended that the Secretaries of Defense and
State develop detailed plans for completing and sustaining the Afghan army or police
forces. The plans should include clearly defined objectives and performance measures;
milestones for achieving stated objectives; future funding requirements; and a strategy for
sustaining the results achieved, including transitioning program responsibility to
Afghanistan. The Secretaries should provide this information to the Congress when the
executive branch next requests funding for the Afghan army or police forces. (p. 38/GAO
Draft Report)

**DOD RESPONSE:** Partially Concur. Detailed plans will allow the Departments to
effectively manage already scarce manpower and resources to meet the Combatant
Commander's requirements. While there are situations beyond U.S control which will
impact on established plans, detailed plans with specific requirements should foster
deliberate and proactive long-term planning between the Departments. The Department
of Defense also recommends that the information to be provided to Congress be
incorporated into existing reporting requirements of the recently enacted FY 2005
Emergency Supplemental Act. Also, the Department suggests that funding for
Afghanistan security forces be made available until expended to ensure funding
availability corresponds with ongoing multi-year programs.

**RECOMMENDATION 2:** The GAO recommended that the Secretaries of Defense and
State work with the other lead donor nations to help ensure that progress in the other
pillars is congruent with the progress made in the army and police programs. The
Secretaries should regularly report to the Congress, but no less than annually, on the
progress made in addressing these other security pillers.. (p. 38/GAO Draft Report)

**DOD RESPONSE:** Concur. While we have made great strides training the Afghan
National Army, it is only one of the five pillars. For the Government of Afghanistan to
operate effectively, the other pillars must be built, trained and sustained. Additionally, all
five pillars must develop close working relationships and learn to integrate their actions
among themselves.

Attachment

Appendix IV

# Comments from the Department of Justice



**U.S. Department of Justice**

Criminal Division

---

*International Criminal Investigation Training Assistance Programs*      *Washington, D.C. 20530*

June 16, 2005

David Gootnick, Director
International Affairs and Trade (IAT)
United States Government Accountability Office (GAO)
Washington, DC 20548

Dear Mr. Gootnick,

The Department of Justice greatly appreciates the opportunity to comment on this document, and lauds GAO's efforts to address an extremely important and enormously complex program initiative.

We strongly support GAO's statement *that "[w]ithout strong and self-sustaining Afghan army and police forces and concurrent progress in the other pillars of security sector reform, Afghanistan could again become a haven for terrorists."* Further, we share GAO's concerns that more detailed plans for the creation of a sustainable and effective Afghan police force must be developed posthaste – to include "*clearly defined objectives and performance measures; milestones; funding requirements; and a strategy for sustaining the results achieved.*"

The Department's International Criminal Investigative Training Assistance Program (ICITAP) is uniquely qualified to develop, implement and manage such a large-scale program effort. ICITAP is the USG's lead implementing agency in the area of international law enforcement development and training worldwide with 19 years of unequaled experience in over 50 countries. In Iraq for example, ICITAP has provided critical support to the development of the Iraqi Police Service since May of 2003. ICITAP and the Department's law enforcement components work directly with Multi-National Security Transition Command - Iraq (MNSTC-I) and the U.S. Embassy's Senior Law Enforcement Advisor, who serves as the principal deputy of the MNSTC-I Civilian Police Assistance and Training Team (CPATT). ICITAP has not only participated in the leadership of CPATT since inception, but it has developed and/or delivered roughly 15 distinct basic, advanced or specialized police training courses, and has over 330 International Police Trainers (IPTs) actively deployed in Iraq and Jordan in support of these efforts. ICITAP has operational oversight of the mentoring program, which includes up to 500 U.S. police liaison officers deployed by the Department of State.

ICITAP currently has almost no role in on-going program efforts to assist the Afghan police forces. While the report notes that ICITAP developed curricula for the Afghanistan

mission, it does not speak to this matter, and it does not clearly articulate the role the Department and ICITAP should play in future program efforts. We continue to be dedicated to interagency cooperation and the ultimate success of the USG's mission in Afghanistan, but are concerned that our expertise is not being utilized – much to the detriment of the USG's efforts.

We believe GAO's recommendations should include consideration of the USG's operational law enforcement interests that are directly tied to U.S. national security. In that light, the Department of Justice should logically have a prominent role in developing and training the Afghan police forces and rule of law institutions, both from a national security and a best practices perspective. Any ambiguity in this area could be detrimental to the development of the Afghan police forces, the emerging Afghan democracy, and our national security interests.

Sincerely,

R. Carr Trevillian, IV
Deputy Director

cc: Bruce C. Swartz
    Deputy Assistant Attorney General
    Criminal Division
    Department of Justice

2

Appendix V

# Comments from the Department of State



**United States Department of State**

*Assistant Secretary and Chief Financial Officer*

*Washington, D.C. 20520*

Ms. Jacquelyn Williams-Bridgers
Managing Director
International Affairs and Trade
Government Accountability Office
441 G Street, N.W.
Washington, D.C. 20548-0001

JUN 10 2005

Dear Ms. Williams-Bridgers:

    We appreciate the opportunity to review your draft report, "AFGHANISTAN SECURITY: Efforts to Establish Army and Police Have Made Progress But Future Plans Need to Be Better Defined," GAO Job Code 320240.

    The enclosed Department of State comments are provided for incorporation with this letter as an appendix to the final report.

    If you have any questions concerning this response, please contact Ron Packowitz, Afghanistan Desk Officer, Bureau of South Asian Affairs at (202) 647-1113.

Sincerely,

Sid Kaplan (Acting)

cc:    GAO – Terry Hanford
        SA – Christina Rocca
        State/OIG – Mark Duda

Appendix V
Comments from the Department of State

Department of State Comments on GAO Draft Report
"AFGHANISTAN SECURITY – Efforts to Establish Army and Police
Have Made Progress But Future Plans Need to Be Better Defined"
GAO-05-575
GAO Code 320240

The Department of State has reviewed the draft report and the GAO's recommendations. We concur in the recommendation that the Department of State and Department of Defense develop more detailed plans for completing and sustaining the Afghan army and police. We also concur in the recommendation to work with other lead nations. Such internal and international coordination efforts have characterized these training programs since they were established and will be continued.

The U.S. Government's security assistance mission, providing support for the Afghan National Army and Afghan National Police, Border Police, and Highway Patrol, is rapidly helping the Afghan government build capacity to provide public security. Our goal is to develop competent, professional security forces with sufficient training, equipment, infrastructure, institutional capacity, and organizational structure. Our support for the Afghan army and police is doing just that, and we are pleased that FY 2005 supplemental funds will allow us to increase our assistance in these vital efforts.

While the Department agrees with the recommendations noted in the first paragraph above, we respectfully disagree with the recommendation for new reporting to Congress. Currently mandated reports from the Department of State on Afghanistan are quite comprehensive, and include a report due later this year that will describe "the procedures of the Department of State and Department of Defense to ensure the coordination of police and army training efforts..." We believe we can address the GAO's concerns in our currently mandated reports.

| **GAO's Mission** | The Government Accountability Office, the audit, evaluation and investigative arm of Congress, exists to support Congress in meeting its constitutional responsibilities and to help improve the performance and accountability of the federal government for the American people. GAO examines the use of public funds; evaluates federal programs and policies; and provides analyses, recommendations, and other assistance to help Congress make informed oversight, policy, and funding decisions. GAO's commitment to good government is reflected in its core values of accountability, integrity, and reliability. |
|---|---|
| **Obtaining Copies of GAO Reports and Testimony** | The fastest and easiest way to obtain copies of GAO documents at no cost is through GAO's Web site (www.gao.gov). Each weekday, GAO posts newly released reports, testimony, and correspondence on its Web site. To have GAO e-mail you a list of newly posted products every afternoon, go to www.gao.gov and select "Subscribe to Updates." |
| Order by Mail or Phone | The first copy of each printed report is free. Additional copies are $2 each. A check or money order should be made out to the Superintendent of Documents. GAO also accepts VISA and Mastercard. Orders for 100 or more copies mailed to a single address are discounted 25 percent. Orders should be sent to:<br><br>U.S. Government Accountability Office<br>441 G Street NW, Room LM<br>Washington, D.C. 20548<br><br>To order by Phone:  Voice: (202) 512-6000<br>TDD: (202) 512-2537<br>Fax:   (202) 512-6061 |
| **To Report Fraud, Waste, and Abuse in Federal Programs** | Contact:<br>Web site: www.gao.gov/fraudnet/fraudnet.htm<br>E-mail: fraudnet@gao.gov<br>Automated answering system: (800) 424-5454 or (202) 512-7470 |
| **Congressional Relations** | Gloria Jarmon, Managing Director, JarmonG@gao.gov (202) 512-4400<br>U.S. Government Accountability Office, 441 G Street NW, Room 7125<br>Washington, D.C. 20548 |
| **Public Affairs** | Paul Anderson, Managing Director, AndersonP1@gao.gov (202) 512-4800<br>U.S. Government Accountability Office, 441 G Street NW, Room 7149<br>Washington, D.C. 20548 |

 PRINTED ON RECYCLED PAPER

**EXHIBIT 7**

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| MICHELLE DEULEY, *et al.*              ) <br>           ) <br>     Plaintiffs,            ) <br>           ) <br>     v.                 ) <br>           ) <br> DYNCORP INTERNATIONAL, INC.,  ) <br> *et al.*                    ) <br>           ) <br>     Defendants.         ) <br>           ) | C.A. No. 06-cv-605 (GMS) |

## DECLARATION OF RICHARD CASHON

I, Richard Cashon, certify that I am over the age of eighteen (18) years and that I have personal knowledge of the matters set forth herein.

1.      I am an employee of DynCorp International LLC (DI LLC). My current position is Vice President/Program Manager for the Civilian Police Program.

2.      In September 2004, I was the Program Manager and in charge of DI LLC's contract with the U.S. Department of State ("DOS") in support of the United States' participation in the CIVPOL program in Afghanistan ("Afghan CIVPOL Contract"). During that time, I was working in Fort Worth, Texas.

3.      Under the Afghan CIVPOL Contract, DI LLC was responsible for recruiting, selecting and deploying civilian police officers for the Afghan CIVPOL mission.

4.      DOS directives and requirements dictated how we were to recruit, select, equip and deploy the civilian police officers for the Afghan CIVPOL mission.

5.      If DOS's contracting officer responsible for CIVPOL contract oversight determines that continued performance under the CIVPOL contract by any contractor or



subcontractor personnel is contrary to the public interest, the contracting officer may require the contractor to remove the employee from all work under the CIVPOL contract.

6.      DOS required DI LLC to lease facilities in Kabul, Afghanistan and to provide security for those facilities.

7.      DOS established the necessary security measures that had to be observed at American facilities.  Any changes to securities measures were dictated by DOS.

8.      I am familiar with the International Security Assistance Force ("ISAF"), an international force of about 30,000 troops mandated by the United Nations and commanded by the North Atlantic Treaty Organization ("NATO").

9.      Pursuant to standard operating procedure and established protocol, warnings issued by ISAF are relayed to the U.S. Embassy's Resident Security Officer ("RSO") in Kabul. The RSO then disseminates the warning to all American personnel in Kabul, including government contractors, with orders to implement appropriate security measures that may include orders to "lockdown" all American facilities.

10.      On or about August 29, 2004, I am not aware of any warnings issued by ISAF about a possible bombing or other threat against coalition targets in Kabul.

11.      The RSO would have received notice of an ISAF warning before the warning was disseminated to all American contractors in Kabul, including DI LLC.

12.      If a warning had been issued by ISAF, the RSO would have disseminated the warning and would have determined and dictated the appropriate level of security measures to implement.  On or about August 29, I am not aware that the RSO had instructed U.S. government and contractor facilities to close the streets or install vehicle barricades around their

facilities.  Moreover, I am not aware of any directives from the RSO at that time to "lockdown" facilities because of a security threat.

13.     It is my understanding that if the RSO had determined that appropriate security measures in response to a threat included closing the streets or installing vehicle barricades, the RSO would have had to request permission from the Afghan Government to do so.

14.     If we wanted to close the streets adjacent to DynHouse or install vehicle barricades in front or around DynHouse, we would have had to ask the RSO, who would have had to ask the Afghan Government.

15.     Because the RSO did not direct us to close adjacent streets or install vehicle barricades in response to an alleged ISAF warning on or about August 29, 2004, we did not do so.

16.     I am not aware of any requests from DynHouse security personnel about closing the street or installing vehicle barricades in and around DynHouse.

17.     The blast from the explosion damaged property more than 300 yards away from the point of detonation the explosion.

18.     DI LLC's contract with DOS was on a "cost plus reimbursable" basis.  Thus, DI LLC would have been reimbursed for expenses incurred for the provision of security measures.

**I DECLARE UNDER PENALTY OF PERJURY THAT THE FOREGOING IS TRUE AND CORRECT.**

Executed on October ___, 2006.

*ℓℓℓ*

Richard Cashon
Vice President/Program Manager
    for the Civilian Police Program
DynCorp International LLC

# EXHIBIT 8

LEXSEE 1999 US DIST LEXIS 4433

**DAVID E. MEGILL and JENNY LEE W. MEGILL, his wife, Plaintiffs, v. WORTHINGTON PUMP, INC., et al., Defendants.**

**Civil Action No. 98-76-SLR**

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF DELAWARE**

*1999 U.S. Dist. LEXIS 4433*

**March 26, 1999, Decided**

**DISPOSITION:** [*1] Plaintiffs' motion to remand granted.

**COUNSEL:** For plaintiffs: Robert Jacobs, Esquire, Vincent J.X. Hedrick, II, Esquire, Jacobs & Crumplar, Wilmington, Delaware.

For Worthington Pump, Inc., defendant: Christian J. Singewald, Esquire, White & Williams, Wilmington, Delaware.

**JUDGES:** Sue L. Robinson, District Judge.

**OPINION BY:** Sue L. Robinson

**OPINION:**

### MEMORANDUM OPINION

Dated: March 26, 1999

Wilmington, Delaware

Sue L. Robinson, District Judge

## I. INTRODUCTION

Plaintiffs David E. Megill and Jenny Lee W. Megill brought suit against numerous defendants in the Superior Court of the State of Delaware in and for New Castle County. In their complaint, it is alleged that plaintiff David E. Megill was exposed to asbestos and asbestos-containing products and that plaintiffs were injured thereby. The complaint contains allegations that Worthington Pump, Inc. ("Worthington") and other defendants were

> at all times pertinent directly or indirectly engaged in the mining, manufacturing, distribution, sales, licensing, leasing, installation, removal or use of asbestos and asbestos-containing products. They were also engaged in the development, manufacture, distribution, sales, [*2] licensing or leasing of equipment procedures and/or technology necessary to mine, manufacture, sell, distribute, install, remove and the use of asbestos and asbestos-containing products.

(D.I. 2, Ex. A, 8) Plaintiffs further allege that

> the defendants were negligent in conducting the above activities in that despite the fact that the defendants knew or should have known that asbestos exposure could result in serious injury, disease and/or death they:
>
> > (a) Failed to substitute, suggest, promote or require the substitution of materials other than asbestos;
> >
> > (b) Failed to adequately warn all the potential victims of asbestos including the plaintiff as well as other users, bystanders, household members and members of the general public of the risks of asbestos;
> >
> > (c) Failed to adequately test, research and investi-



EXHIBIT
8

gate asbestos and/or its effects prior to sale, as to use, and/or exposure of the plaintiff and others similarly situated;

(d) Failed to adequately package, distribute and use asbestos in a manner which would minimize the escape of asbestos fibers therefore adding to the exposure of the plaintiff and others similarly situated;

(e) Failed [*3] to take adequate steps to remedy the above failure, including but not limited to recall of asbestos and asbestos products, to conduct research as to how to cure or minimize asbestos injuries, to distribute asbestos so as to render it safe or safely remove the asbestos now in place.

(D.I. 2, Ex. A, 13)

Through preliminary discovery, defendant Worthington determined that plaintiff David Megill was exposed to its products while working on board United States Navy vessels. Based on this information, Worthington filed a notice of removal in February 1998 pursuant to *28 U.S.C. § 1442*(a)(1), which provides in relevant part that

[a] civil action . . . commenced in a State court against any of the following may be removed by them to the district court of the United States for the district and division embracing the place wherein it is pending:

(1) The United States or any agency thereof or any officer (or any person acting under that officer) of the United States or of any agency thereof, sued in an official or individual ca-

pacity for any act under color of such office . . . .

Plaintiffs responded thereto by filing a motion to remand. Following limited [*4] discovery, briefing was completed.

For the reasons stated below, plaintiffs' motion to remand (D.I. 5) shall be granted.

## II. FACTS

The relevant facts of record are not in dispute. Defendant Worthington supplied various pumps to the U.S. Navy for use on naval vessels. As averred by John P. McAdams,

all Navy combat vessel equipment, including Worthington pumps, were built according to U.S. Navy and Military specifications under the supervision of Naval officers and civilian employees. Such equipment was approved for installation aboard these vessels exclusively by the Navy and its designated officers and employees.

(D.I. 2, Ex. G, 13) According to the military specifications included in the record, asbestos was specifically mentioned twice: 1) paragraph 3.2.8 provides that "all packing and gaskets shall be in accordance with Drawing B-153" which, in turn, specifies "asbestos metallic cloth, sheet" and "asbestos metallic cloth, gasket;" and 2) paragraph 3.3.9.14 provides that "pump casing joints shall be made up using compressed asbestos sheet gaskets." (See, e.g., D.I. 2, Ex. D to Ex. F and Ex. A to Ex. G) The court has discerned no evidence that the specifications [*5] address the issues of product research (aside from quality assurance and performance testing), packaging, labels, and warnings as they relate to asbestos. Similarly, there is no evidence of record that Worthington's commercial products (which comport with commercial specifications) in any way deviated from the products sold to the Navy (which comported with military specifications). (D.I. 44 at 38-39, 115, 124)

## III. ANALYSIS

As noted above, defendant Worthington has removed this litigation from state to federal court pursuant to the federal officer removal statute, *28 U.S.C. § 1442*(a)(1). Consequently, it is Worthington's burden to demonstrate that subject matter jurisdiction exists and that removal was proper. *Boyer v. Snap-on Tools Corp.,*

*913 F.2d 108, 111 (3d Cir. 1990).* In this regard, the Third Circuit apparently has drawn a distinction between the removal provisions of [section] 1441, which "'are to be strictly construed against removal and all doubts should be resolved in favor of remand,'" id. (quoting *Steel Valley Auth. v. Union Switch & Signal Div., 809 F.2d 1006, 1010 (3d Cir. 1987)),* and the provisions of the federal officer removal statute, which [*6] are to be "broadly construed." *Sun Buick, Inc. v. Saab Cars USA, Inc., 26 F.3d 1259, 1262 (3d Cir. 1994).* To establish removal jurisdiction under § 1442(a), a defendant such as Worthington must establish that:

> (1) it is a "person" within the meaning of the statute; (2) the plaintiff's claims are based upon the defendant's conduct "act-ing under" a federal office; (3) it raises a colorable federal defense; and (4) there is a causal nexus between the claims and the conduct performed under color of a fed-eral office.

*Feidt v. Owens Corning Fiberglas Corp., 153 F.3d 124, 127 (3d Cir. 1998).* See *Mesa v. California, 489 U.S. 121, 129, 103 L. Ed. 2d 99, 109 S. Ct. 959 (1989).*

With respect to the first of the above requirements, the court finds that, as a corporation, defendant Wor-thington is a "person" within the meaning of the federal officer removal statute. See *Good v. Armstrong World Indus., Inc., 914 F. Supp. 1125, 1127-28 (E.D. Pa. 1996).*

The second factor has been described as requiring "a showing that the acts forming the basis of the state suit were performed pursuant to an officer's direct orders or comprehensive and detailed regulations." [*7] *Id. at 1128.* In Good, as in the case at bar, the removing defen-dant offered evidence that it "manufactured and supplied the equipment pursuant to strict direction and control of the United States Navy/Department of the Navy" through "contract documents, design and construction drawings, written specifications, and personal oversight of West-inghouse's work by Naval officers and by civilian em-ployees of the U.S. Navy." *Id. at 1128-29.* Recognizing that "the United States Navy and many individuals em-ployed by the Navy worked with Westinghouse," the court in Good nevertheless concluded that Westinghouse had not demonstrated "that the Secretary of the Navy or any other federal officer directly controlled and super-vised the work of Westinghouse." Id. The court in Good further found that none of the documents relied on by Westinghouse even mentioned asbestos, bolstering the court's conclusion in that case that no federal officer had

"specified the use of asbestos in the design and manufac-ture" of the Westinghouse products at issue. *Id. at 1130.*

Following the Third Circuit's mandate to broadly construe the federal officer removal statute, the court finds that Worthington [*8] has "set forth the substance of the regulations and specifications" which required "the use of asbestos in the design and manufacture" of its pumps supplied to the Navy. *Id. at 1130.* Under these circumstances, the court concludes that defendant has adequately demonstrated that it acted "pursuant to an officer's direct orders or comprehensive and detailed regulations." *Id. at 1128.*

The third factor requires a removing defendant to show that there is a colorable federal defense to a plain-tiff's claims. Defendant Worthington asserts the federal common law government contractor defense, as enunci-ated by the Supreme Court in *Boyle v. United Technolo-gies Corp., 487 U.S. 500, 101 L. Ed. 2d 442, 108 S. Ct. 2510 (1988).* n1 The Supreme Court, in deciding when a contractor providing military equipment to the Federal Government can be held liable under state tort law for injury caused by a design defect, held in Boyle that

> liability for design defects in military equipment cannot be imposed, pursuant to state law, when (1) the United States ap-proved reasonably precise specifications; (2) the equipment conformed to those specifications; and (3) the supplier warned the United [*9] States about the dangers in the use of the equipment that were known to the supplier but not to the United States. The first two of these con-ditions assure that the suit is within the area where the policy of the "discretionary function" would be frustrated - i.e., they assure that the design feature in question was considered by a Government officer, and not merely by the contractor itself. The third condition is necessary because, in its absence, the displacement of state tort law would create some incentive for the manufacturer to withhold knowledge of risks, since conveying that knowledge might disrupt the contract but withholding it would produce no liability.

*Id. at 512.*

> n1 The record contains no evidence that the pumps sold by Worthington to the U.S. Navy

Case 1:06-cv-00605-GMS    Document 18-7    Filed 11/03/2006    Page 10 of 25

Page 4
1999 U.S. Dist. LEXIS 4433, *

were different from those pumps sold commercially. Because the Third Circuit in *Carley v. Wheeled Coach, 28 V.I. 310, 991 F.2d 1117 (3d Cir. 1993),* concluded that the government contractor defense should be available to all contractors who are "compelled by a contract to perform an obligation for the United States," even where a nonmilitary product is at issue, *991 F.2d at 1120,* the Boyle analysis is still appropriate.

[*10]

The Boyle analysis has been applied in failure to warn cases, such as the one at bar. See e.g., *In re Hawaii Fed. Asbestos Cases, 960 F.2d 806 (9th Cir. 1992); In re Joint E. & S. Dist. New York Asbestos Litig., 897 F.2d 626 (2d Cir. 1990).* Indeed, the determination of whether defendant has demonstrated a colorable defense under Boyle collapses into the analysis required for determining whether defendant has shown a causal connection between plaintiffs' claims and the conduct performed under color of a federal office.

The Supreme Court in Boyle held that the government contractor defense pre-empts state tort law when "the state-imposed duty of care that is the asserted basis of the contractor's liability . . . is **precisely contrary** to the duty imposed by the Government contract. . . ." *Boyle, 487 U.S. at 509* (emphasis added). As recognized by the courts above, in order to establish that Boyle displaces any state law duty to warn, defendant

must show that the applicable federal contract includes warning requirements that significantly conflict with those that might be imposed by state law. Moreover, it seems clear to us that Boyle's requirement [*11] of government approval of "reasonably precise specifications" mandates that the federal duties be **imposed** upon the contractor. The contractor must show that whatever warnings accompanied a product resulted from a determination of a government official, . . . and thus that the Government itself "dictated" the content

of the warnings meant to accompany the product.

*In Re Joint E. & S. Dist. New York Asbestos Lit., 897 F.2d at 630.* In In Re New York, as well as in In Re Hawaii, the respective courts found that the government in no way had prohibited the contractors from placing warnings on their asbestos-containing products. Both courts concluded that "there thus existed no conflict between [the contractors'] state law duty to provide adequate warnings to the users of their [products] and the [product design] conditions imposed on them pursuant to the agreements they had entered into with the Government." *In Re Hawaii, 960 F.2d at 812.* To put the point differently, a crucial element of both the Boyle defense and the removal requirements is missing if the contractor fails to establish a causal connection between the conduct being supervised by the federal [*12] officer/government and the conduct deemed offensive in the plaintiff's complaint.

In the case at bar, plaintiffs assert liability based on the following conduct: 1) failure to substitute other materials for asbestos; 2) failure to warn; 3) failure to adequately research the dangers of asbestos; 4) failure to adequately package, distribute and use asbestos; and 5) failure to remedy the above failures. Worthington has not established that the U.S. Navy prohibited it from substituting materials or otherwise changing the specifications, so long as protocol was followed. (D.I. 44 at 25-32, 41-6) Likewise, there is no evidence of record that the U.S. Navy prohibited defendant from, or otherwise directed defendant in, issuing warnings or researching and effecting product safety. Under these circumstances, the court concludes that there is no causal connection between plaintiffs' claims and the conduct performed under color of a federal office; thus, there is no colorable federal defense.

**IV. CONCLUSION**

For the reasons stated, plaintiffs' motion to remand is granted.

An order shall issue.

# EXHIBIT 9

LEXSEE 381 FSUPP2D 398

**NEW JERSEY DEPARTMENT OF ENVIRONMENTAL PROTECTION, Plaintiff,
v. EXXON MOBIL CORP., Defendant.**

**Civil Action No. 04-CV-4897 (DMC)**

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF NEW JERSEY**

*381 F. Supp. 2d 398; 2005 U.S. Dist. LEXIS 17279*

**March 24, 2005, Decided
March 24, 2005, Filed**

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Plaintiff, the New Jersey Department of Environmental Protection, filed separate suits in the New Jersey Superior Court, Law Division, Hudson County and Union County, against defendant oil company alleging that the company had violated the New Jersey Spill Compensation and Control Act (Spill Act). The Department filed a motion to remand after the company removed the suits pursuant to 28 U.S.C.S. § 1442(a)(1). They were consolidated in the court.

**OVERVIEW:** The Department brought the suits pursuant to the Spill Act, N.J. Stat. Ann. § § 58:10-23.11 to -23.24, seeking to recover cleanup costs, removal costs, and damages arising out of discharges at the company's Hudson and Union County properties. The company contended that the suits were removable under 28 U.S.C.S. § 1442(a)(1) because the discharges resulted from World War II activities that it had conducted at the federal government's behest. The court held that Fed. R. Civ. P. 6(e) applied and extended the time for filing of the motion to remand under 28 U.S.C.S. § 1447(c) because the notice of removal had been served on the Department by mail. The company had raised a federal contractor defense in its suit; that was a sufficient colorable federal law defense for 28 U.S.C.S. § 1442(a)(1) removal purposes. Removal was not appropriate under § 1442(a)(1) because the company had not shown the causal nexus necessary to invoke the protections of the federal officer removal statute. While the government might have directed the company's manufacture, production, storage, and transfer of petroleum products, it had not exercised control over the company's disposal of hazardous substances.

**OUTCOME:** The court granted the Department's motion to remand.

**LexisNexis(R) Headnotes**

*Civil Procedure > Removal > Basis > General Overview
Governments > Federal Government > Claims By & Against
Governments > Federal Government > Employees & Officials*
[HN1] 28 U.S.C.S. § 1442(a)(1) directs that an action in state court brought against an officer, or person acting under that officer, of the United States or an agency thereof, for any act under color of such office maybe removed to federal court.

*Civil Procedure > Removal > Basis > Cases Involving Federal Officers
Civil Procedure > Removal > Basis > Federal Questions
Governments > Federal Government > Employees & Officials*
[HN2] 28 U.S.C.S. § 1442 represents an exception to the general rule that removal of an action is governed by the claims asserted in the plaintiff's well-pleaded complaint. This is due to the fact that federal officer removal operates on the basis of issues generally thought to be defensive in character rather than on the content of the plaintiff's claim. A defendant who is able to meet the requirements for removal under § 1442(a)(1) gains access to federal court even where no federal question is presented by the plaintiff.

*Civil Procedure > Jurisdiction > Subject Matter Jurisdiction > Jurisdiction Over Actions > General Overview
Civil Procedure > Removal > Postremoval Remands > Jurisdictional Defects*


EXHIBIT
9

381 F. Supp. 2d 398, *; 2005 U.S. Dist. LEXIS 17279, **

*Civil Procedure > Removal > Postremoval Remands > Motions for Remand*
[HN3] Any motion to remand a case to state court on the basis of a defect in removal procedure must be made within 30 days of filing of the notice of removal. 28 U.S.C. § 1447(c). A motion to remand on the basis that the district court lacks subject matter jurisdiction may be made at any time.

*Admiralty Law > Practice & Procedure > Jurisdiction*
*Civil Procedure > Jurisdiction > General Overview*
*Civil Procedure > Removal > Postremoval Remands > Motions for Remand*
[HN4] Fed. R. Civ. P. 6(e) provides for an additional three days whenever a party has the right or is required to do some act or take some proceedings within a prescribed period after the service of a notice or other paper upon the party and service is accomplished through mail.

*Administrative Law > Judicial Review > Remands & Remittiturs*
*Civil Procedure > Removal > Postremoval Remands > General Overview*
*Civil Procedure > Removal > Proceedings > General Overview*
[HN5] The United States Court of Appeals for the Third Circuit has not yet ruled specifically whether Fed. R. Civ. P. 6(e) applies to a motion to remand where notice of removal is served by mail. A handful of cases outside the Third Circuit hold that Rule 6(e) is not applicable to a remand motion. A number of Third Circuit cases hold that Rule 6(e) is inapplicable in different circumstances, such as with regard to the delivery of a check to a claimant and the period within which an employee is required to file employment discrimination complaint with the Equal Employment Opportunity Commission.

*Civil Procedure > Removal > Postremoval Remands > General Overview*
*Civil Procedure > Pleading & Practice > Pleadings > Time Limitations > General Overview*
[HN6] Only two cases within the Third Circuit are directly on point with regard to whether Fed. R. Civ. P. 6(e) applies to a motion to remand where notice of removal is served by mail. One has held that Rule 6(e) does not apply to extend the 30 days provided by 28 U.S.C.S. § 1447(c), and the other holds that Fed. R. Civ. P. 6(e) does apply. The reasoning in the latter case is more persuasive. In that case, the United States District Court for the Eastern District of Pennsylvania interpreted previous holdings of the United States Court of Appeals for the Third Circuit to demonstrate that Rule 6(e) is in-

applicable to situations where the time period commences upon the entry of a court order or judgment but does apply where the opposing party triggers the applicable response period. The court's rationale is that an opposing party is more likely to use service by mail for a strategic advantage, and Rule 6(e) compensates for this possibility. Rule 6(e) does not apply where the time period only begins once notice is received. In such a case, the rule is not necessary because the method of service is irrelevant, and the applicable response period commences when the party receives notice, negating any advantage to be gained by service by mail.

*Civil Procedure > Jurisdiction > Subject Matter Jurisdiction > Jurisdiction Over Actions > Limited Jurisdiction*
*Civil Procedure > Removal > Basis > General Overview*
*Civil Procedure > Removal > Proceedings > General Overview*
[HN7] Federal courts are courts of limited jurisdiction, having the power to hear only those cases to which Congress has specifically extended jurisdiction over the subject matter. Removal of a complaint from state court to federal court is generally proper only if the federal court to which the action is removed would have jurisdiction over the matter had it originally been filed there. 28 U.S.C.S. § 1441(a), (b). The burden is upon a defendant to show that removal is proper, and the federal court is obligated to strictly construe the removal statutes against removal and resolve any doubts in favor of remand.

*Civil Procedure > Removal > Basis > Cases Involving Federal Officers*
*Governments > Federal Government > Employees & Officials*
*Public Contracts Law > Governmental Immunities > Sovereign Immunity*
[HN8] 28 U.S.C.S. § 1442 should be more broadly construed than 28 U.S.C.S. § 1441. The right of removal is absolute for conduct performed under color of federal office, and the policy favoring removal should not be frustrated by a narrow, grudging interpretation of 28 U.S.C.S. § 1442(a)(1). Private actors seeking to assert the right of federal officer removal bear a special burden of establishing the official nature of their activities. The purpose of a broad reading of 28 U.S.C.S. § 1442 is a mistrust of states and state courts to protect federal interests, which is inapplicable when the immunity of government contractors rather than federal officials is at issue.

*Civil Procedure > Removal > Basis > General Overview*

381 F. Supp. 2d 398, *; 2005 U.S. Dist. LEXIS 17279, **

*Evidence > Procedural Considerations > Burdens of Proof > General Overview*
*Governments > Courts > Authority to Adjudicate*
[HN9] In order to remove an action from state to federal court under 28 U.S.C.S. § 1442(a)(1), the following prerequisites must be satisfied: 1) the defendant must be a "person" under the statute; 2) the defendant must be an officer of the United States or an agency thereof, or the defendant must have been acting under the direction of an officer of the United States or an agency thereof; 3) the defendant must have a colorable federal defense; and 4) the defendant must establish a causal connection between the activities carried out under federal authority and the state court actions.

*Business & Corporate Law > Corporations > Shareholders > Actions Against Corporations > General Overview*
*Civil Procedure > Removal > Basis > General Overview*
[HN10] Most courts have held that a corporation qualifies as a person for purposes of 28 U.S.C.S. § 1442(a)(1).

*Civil Procedure > Removal > Basis > General Overview*
*Civil Procedure > Removal > Proceedings > General Overview*
[HN11] Many courts combine the second and fourth components of the 28 U.S.C.S. § 1442(a)(1) analysis into one analysis. The United States District Court for the District of New Jersey shall do the same.

*Civil Procedure > Removal > Basis > General Overview*
*Civil Procedure > Pleading & Practice > Defenses, Demurrers, & Objections > Affirmative Defenses*
*Evidence > Procedural Considerations > Burdens of Proof > General Overview*
[HN12] Proper removal under 28 U.S.C.S. § 1442(a)(1) requires the defendant to raise a colorable defense under federal law. The question before the court is not whether a claimed defense is meritorious, but only whether a colorable claim to such a defense has been made.

*Civil Procedure > Federal & State Interrelationships > Federal Common Law > General Overview*
*Military & Veterans Law > Tort Liability*
*Public Contracts Law > Governmental Immunities > Sovereign Immunity*
[HN13] The government contractor defense for military contractors has been established by the United States Supreme Court and extended to nonmilitary contractors by the United States Court of Appeals for the Third Cir-

cuit. The Supreme Court has announced a three-part test for determining when state tort law is displaced by federal common law in a suit against a government military contractor: (1) the United States approved reasonably precise specifications; (2) the equipment conformed to those specifications; and (3) the supplier warned the United States about the dangers in the use of the equipment that were known to the supplier but not to the United States. This holding has been extended to nonmilitary contractors with the rationale that a private contractor who is compelled by a contract to perform an obligation for the United States should, in some circumstances, share the sovereign immunity of the United States.

*Civil Procedure > Removal > Basis > Cases Involving Federal Officers*
*Environmental Law > Litigation & Administrative Proceedings > Defenses*
*Environmental Law > Litigation & Administrative Proceedings > Nuisances, Trespasses & Strict Liability*
[HN14] The official immunity of the type asserted under a government contractor defense is a colorable federal defense. However, it is not entirely clear that this defense, which sounds in products liability, will apply to an issue turning on the construction of state environmental law. Such an analysis goes to the merits of the defense and not to the question of whether the defense is "colorable." As such, this is a colorable federal defense for 28 U.S.C.S. § 1442(a)(1) removal purposes.

*Criminal Law & Procedure > Interrogation > General Overview*
*Governments > Courts > Authority to Adjudicate*
*Governments > Federal Government > Employees & Officials*
[HN15] To establish that it was "acting under" an officer of the United States for 28 U.S.C.S. § 1442(a)(1) removal purposes, a defendant must show a causal nexus between the conduct charged in the plaintiff's claims and the acts performed by the defendant at the direction of official federal authority. Courts generally require a defendant to demonstrate that the federal officer had direct and detailed control over the operation in question. In other words, this control requirement can be satisfied by strong government intervention and the threat that a defendant will be sued in state court based upon actions taken pursuant to federal direction.

*Civil Procedure > Removal > Basis > Cases Involving Federal Officers*

381 F. Supp. 2d 398, *; 2005 U.S. Dist. LEXIS 17279, **

*Governments > Federal Government > Employees & Officials*
*Torts > Public Entity Liability > Liability > General Overview*

[HN16] Not one of the cases holding that the government exercised the requisite amount of control to trigger federal officer removal under 28 U.S.C.S. § 1442(a)(1) involves an instance of disposal of toxic substances ordered produced by the government. All the cases are personal injury products liability actions in which the actual production of toxic substances ordered by the government gives rise to the alleged harm. Cases which have found federal officer removal inappropriate illustrate the distinction between governmental control over manufacture and production versus disposal.

**COUNSEL:** [**1] For ADMINISTRATOR, NEW JERSEY SPILL COMPENSATION FUND, Plaintiff: RICHARD FRANCIS ENGEL, RICHARD J. HUGHES JUSTICE COMPLEX, TRENTON, NJ.

For NEW JERSEY ENVIRONMENTAL PROTECTION, Plaintiff: RICHARD FRANCIS ENGEL, DEPARTMENT OF LAW & PUBLIC SAFETY DIVISION OF LAW, TRENTON, NJ.

For EXXON MOBIL CORPORATION, Defendant: MARC A. ROLLO, ARCHER & GREINER, A PROFESSIONAL CORPORATION, HADDONFIELD, NJ.

**JUDGES:** Hon. Dennis M. Cavanaugh.

**OPINION BY:** Dennis M. Cavanaugh

**OPINION:**

[*400] **OPINION**

DENNIS M. CAVANAUGH, U.S.D.J.:

This matter comes before the Court upon motion by Plaintiff New Jersey Department of Environmental Protection ("NJDEP") for remand of the above-captioned action to the New Jersey Superior Court, Law Division. Oral argument was heard by the Court on March 22, 2005. n1 After carefully considering the submissions and arguments of all parties, it is the finding of this Court that NJDEP's motion is **granted.**

> n1 The Court made its ruling on the record immediately following oral argument on March 22, 2005. However, in light of the intricacy of the issues before it, the Court subsequently determined to file this Opinion clarifying the bases for

its decision to remand. The Court's findings of fact and analysis of legal arguments remain the same and thus this Opinion is substantially identical to the ruling of the Court on the record at oral argument.

[**2]

**I. BACKGROUND**

NJDEP brought this action in state court n2 against Defendant Exxon Mobil Corp. ("Defendant") for violations of the New Jersey Spill Compensation and Control [*401] Act ("Spill Act"), *N.J.S.A. 58:10-23.11 to -23.24.* NJDEP seeks cleanup and removal costs, as well as damages for injuries to natural resources of the State of New Jersey allegedly caused by discharges at Defendant's property in Bayonne and Linden, New Jersey. n3

> n2 NJDEP originally filed two suits against Defendant in New Jersey Superior Court, Law Division, Hudson County and New Jersey Superior Court, Law Division, Union County. Defendant removed both cases to federal court on October 6, 2004, where they were docketed as Civil Action Nos. 04-4897 and 04-4898. Magistrate Judge Mark Falk ordered the actions be consolidated into one on December 16, 2004.

> n3 Defendant refers to these properties as the Jersey Works.

Defendant filed a notice of removal in state court, contending that removal is proper [**3] pursuant to [HN1] *28 U.S.C. § 1442(a)(1),* n4 which directs that an action in state court brought against an officer, or person acting under that officer, of the United States or an agency thereof, for any act under color of such office maybe removed to federal court. Defendant alleges that certain of its production activities during World War II were at the behest of and under the control of the federal government, and these activities resulted in the disposal of products included in the conduct alleged against it by NJDEP. Defendant also contends that removal is appropriate under *28 U.S.C. § 1441(a),* which permits a defendant to remove any civil action from state court if the federal courts would have had original jurisdiction under *28 U.S.C. § 1331* (federal question jurisdictional statute). Defendant maintains that the claims of harm to New Jersey surface waters and coastal wetlands asserted by NJDEP fall under federal admiralty and/or federal enclave jurisdiction. NJDEP disputes both points and seeks to remand the action back to New Jersey Superior Court.

n4 [HN2] *Section 1442* represents an exception to the general rule that removal of an action is governed by the claims asserted in the plaintiff's well-pleaded complaint. 14C Wright, Miller, & Cooper, Federal Practice and Procedure: Jurisdiction 3d § 3727 (1998). This is due to the fact that federal officer removal "operates on the basis of issues generally thought to be defensive in character rather than on the content of the plaintiff's claim." Id. A defendant who is able to meet the requirements for removal under *§ 1442(a)(1)* "gain[s] access to federal court [even] when no federal question is presented by the plaintiff." *Ryan v. Dow Chemical Co., 781 F.Supp. 934, 939 (E.D.N.Y.1992).*

[**4]

## II. DISCUSSION

### A. Motion to Remand

#### 1. Timeliness

[HN3] Any motion to remand a case to state court on the basis of a defect in removal procedure must be made within thirty days of filing of the notice of removal. *28 U.S.C. § 1447(c).* A motion to remand on the basis that the district court lacks subject matter jurisdiction may be made at any time. Id. NJDEP filed its motion to remand on November 8, 2005, thirty-three days after filing of the notice of removal.

Here, Defendant argues that NJDEP's motion is untimely as it was not made within thirty days of the filing of notice of removal, and NJDEP has waived any objection to defects in removal procedure. Defendant contends that, in any event, this Court has subject matter jurisdiction sufficient to survive a motion to remand, because the action could originally have been brought here under admiralty or enclave jurisdiction. NJDEP argues that because it received notice of removal by mail, its motion was timely under [HN4] *Federal Rule of Civil Procedure 6(e)*, which provides for an additional three days "whenever a party has the right or is required [**5] to do some act or take some proceedings within a prescribed period after the service of a notice or other paper upon the party" and service is accomplished through mail. Defendant disputes that *Rule 6(e)* is applicable to the filing of a notice of removal pursuant to *28 U.S.C. § 1447(c).*

[*402] [HN5] The Third Circuit has not yet ruled specifically whether *Rule 6(e)* applies to a motion to remand where notice of removal was served by mail. Defendant directs the Court to a handful of cases outside this Circuit which hold *Rule 6(e)* is not applicable to a remand motion, see e.g., *Pavone v. Mississippi Riverboat Amusement Corp., 52 F.3d 560 (5th Cir. 1995)* ("Rule

*6(e)* does not extend the thirty-day period of *§ 1447(c)*, as that rule applies only when a party is required to act within a prescribed period after *service,* not after *filing*") (emphasis in original), as well as a number of Third Circuit cases holding *Rule 6(e)* inapplicable in different circumstances. See, e.g., *Sea-Land Svc., Inc. v. Barry, 41 F.3d 903, 908 (3d Cir. 1994)* (*Rule 6(e)* does not apply to allow employer an additional three days for delivery of check to claimant); [**6] *Mosel v. Hills Dep't Store, Inc., 789 F.2d 251, 253 (3d Cir. 1986)* (*Rule 6(e)* did not apply to extend 90-day period following receipt of right-to-sue letter from Equal Employment Opportunity Commission within which employee was required to file employment discrimination complaint).

[HN6] Only two cases within this Circuit directly on point have been brought to the Court's attention, *In re: Diet Drugs Products Liability, 2004 U.S. Dist. LEXIS 18705, 2004 WL 2062894 (E.D.Pa. Sept. 15, 2004)* (following Pavone without further analysis and holding *Rule 6(e)* does not apply to extend the thirty days provided by *§ 1447(c)*) and *McPherson v. Peelle Co., 1995 U.S. Dist. LEXIS 1619, 1995 WL 56600 (E.D.Pa. Feb. 6, 1995)* (holding *Rule 6(e)* does apply). The two cases reach contrary results, but the reasoning of the District Court in *McPherson* is more persuasive. The McPherson Court interpreted previous holdings of the Third Circuit to demonstrate that *Rule 6(e)* is "inapplicable to situations where the time period commences upon the entry of a court order or judgment" but does apply "where the opposing party triggers the applicable response period." *1995 U.S. Dist. LEXIS 1619, 1995 WL 56600 at *2.* The rationale [**7] here is that "an opposing party is more likely to use service by mail for a strategic advantage and *Rule 6(e)* compensates for this possibility."Id. Similarly, *Rule 6(e)* does not apply where the time period only begins once notice is received. *1995 U.S. Dist. LEXIS 1619, [WL] at *3.* In such a case, the rule is not necessary because the method of service is irrelevant and the "applicable response period commences when the party receives notice, negating any advantage to be gained by service by mail." Id.

As such, under *Rule 6(e)*, NJDEP's motion to remand, which was filed within thirty-three days of the filing of notice of removal, was timely filed. Thus, NJDEP has not waived its right to move for remand on the basis of any defects in removal procedure.

#### 2. *Section 1441* - Removal based upon Federal Subject Matter Jurisdiction

[HN7] Federal courts are courts of limited jurisdiction, having the power to hear only those cases to which Congress has specifically extended jurisdiction over the subject matter. *Kokkonen v. Guardian Life Ins. Co. of America, 511 U.S. 375, 377, 128 L. Ed. 2d 391, 114 S.*

*Ct. 1673 (1994).* Removal of a complaint from state court to federal court is generally proper only if the federal court to which [**8] the action is removed would have jurisdiction over the matter had it originally been filed there. *28 U.S.C. § § 1441(a)-1441(b).* The burden is upon a defendant to show that removal is proper, and the federal court is obligated to "strictly construe the removal statutes against removal and resolve any [*403] doubts in favor of remand." *Entrekin v. Fisher Scientific, Inc., 146 F. Supp. 2d 594, 604 (3d Cir.2001)* (internal citations omitted).

### 3. *Section 1442* - Federal Officer Removal n5

n5 Defendant correctly states that [HN8] *§ 1442* should be more broadly construed than *§ 1441.* See, e.g., *Arizona v. Manypenny, 451 U.S. 232, 242, 68 L. Ed. 2d 58, 101 S. Ct. 1657 (1981)* ("the right of removal is absolute for conduct performed under color of federal office, and . . . the policy favoring removal should not be frustrated by a narrow, grudging interpretation of *§ 1442(a)(1)*") (internal quotations omitted); *Sun Buick, Inc. v. Saab Cars, Inc., 26 F.3d 1259, 1262 (1994)* (distinguishing, in dicta, *§ 1442,* "which is broadly construed," from *§ 1441,* "which is strictly construed"). However, these cases are not entirely relevant here, as they involved removal by actual federal officers, and not by government contractors attempting to invoke the protection of the statute. More applicable to the issue at hand is a case cited by NJDEP, *Freiberg v. Swinerton & Walberg Property Services, Inc., 245 F.Supp.2d 1144 (D.Colo.2002),* which held that private actors seeking to assert the right of federal officer removal "bear a special burden of establishing the official nature of their activities." *245 F.Supp. 2d at 1150.* The Freiberg Court carefully analyzed the holdings of the Supreme Court regarding federal officer removal and found that the purpose of a broad reading of *§ 1442* is a "mistrust of states and state courts to protect federal interests" and was inapplicable when the immunity of government contractors rather than federal officials was at issue. *Id. at 1152 n.6.* See also Kristina L. Garcia, The Boyle Festers: How Lax Causal Nexus Requirements and the "Federal Contractor Defense" Are Leading to a Disruption of Comity under the Federal Officer Removal Statute, *28 U.S.C. 1442(a)(1),* 46 Emory L.J. 1629 (1997).

[**9]

[HN9] In order to remove an action from state to federal court under *28 U.S.C. § 1442(a)(1),* the following prerequisites must be satisfied: 1) the defendant must be a "person" under the statute; n6 2) the defendant must be an officer of the United States or an agency thereof, or the defendant must have been acting under the direction of an officer of the United States or an agency thereof; 3) the defendant must have a colorable federal defense; and 4) the defendant must establish a causal connection between the activities carried out under federal authority and the state court actions. n7 *Feidt v. Owens Corning Fiberglas Corp., 153 F.3d 124, 127 (3d Cir.1998).*

n6 NJDEP does not dispute Defendant's assertion that it is a person under the statute, and [HN10] most courts have held that a corporation such as Defendant qualifies as a person. *Crackau v. Lucent Technologies, 2003 WL 21665135, *2 (D.N.J. Jun. 25, 2003); Arness v. Boeing North America, Inc., 997 F.Supp. 1268, 1271-72 (C.D.Cal. 1998).* As such, this Court need not conduct an in-depth analysis of this prong of the test and will instead assume that Defendant is a person for purposes of *§ 1442(a)(1).*

[**10]

n7 [HN11] Many courts combine the second and fourth components into one analysis. This Court shall do the same.

*a. Has Defendant Asserted a Colorable Federal Defense?*

[HN12] Proper removal under *§ 1442(a)(1)* requires the defendant to raise a colorable defense under federal law. *Mesa v. California, 489 U.S. 121, 103 L. Ed. 2d 99, 109 S. Ct. 959 (1989); Bahrs v. Hughes Aircraft Co., 795 F.Supp. 965, 969 (D.Ariz. 1992).* The question before the court on this prong is "not whether [a] claimed defense is meritorious, but only whether a colorable claim to such a defense has been made." *Fung v. Abex Corp., 816 F.Supp. 569, 573 (N.D.Cal.1992).* The defense asserted by Defendant in this case is [HN13] the government contractor defense for military contractors established by the Supreme Court in *Boyle v. United Technologies Corp., 487 U.S. 500, 507-08, 101 L. Ed. 2d 442, 108 S. Ct. 2510 (1988),* and [*404] extended to nonmilitary contractors by the Third Circuit in *Carley v. Wheeled Coach, 991 F.2d 1117, 1120, 28 V.I. 310 (3d Cir. 1993).* In *Boyle,* the Supreme Court announced a three-part test for determining when state [**11] tort law is displaced by federal common law in a suit against a government military contractor: "(1) the United States approved reasona-

Case 1:06-cv-00605-GMS    Document 18-7    Filed 11/03/2006    Page 18 of 25

Page 7

381 F. Supp. 2d 398, *; 2005 U.S. Dist. LEXIS 17279, **

bly precise specifications; (2) the equipment conformed to those specifications; and (3) the supplier warned the United States about the dangers in the use of the equipment that were known to the supplier but not to the United States." *487 U.S. at 512.* Carley extended this holding to nonmilitary contractors with the rationale that "a private contractor who is compelled by a contract to perform an obligation for the United States should, in some circumstances, share the sovereign immunity of the United States." *991 F.2d at 1120.*

[HN14] The official immunity of the type asserted by Defendant is a colorable federal defense. *Bahrs, 795 F.Supp. at 969.* However, it is not entirely clear that this defense, which sounds in products liability, would apply here, to an issue turning on the construction of state environmental law. On the other hand, such an analysis goes to the merits of the defense and not to the question of whether the defense is "colorable." As such, the Court finds that Defendant has asserted a colorable [**12] federal defense and move on to the final component of the test for federal officer removal.

*b. Was Defendant "Acting Under " the Direction of a Federal Officer?*

[HN15] To establish that it was "acting under" an officer of the United States, Defendant must show a causal nexus between the conduct charged in NJDEP's claims and the acts performed by Defendant at the direction of official federal authority. See *Arness, 997 F.Supp. at 1273; Willingham v. Morgan, 395 U.S. 402, 409, 23 L. Ed. 2d 396, 89 S. Ct. 1813 (1969).* Courts generally require a defendant to demonstrate that the federal officer had "direct and detailed control over the operation in question." *Reed v. Fina Oil & Chemical Co., 995 F.Supp. 705, 710 (E.D.Tex.1998).* In other words, "this control requirement can be satisfied by strong government intervention and the threat that a defendant will be sued in state court based upon actions taken pursuant to federal direction." *Fung, 816 F.Supp. at 572* (internal quotations omitted).

Defendant argues that it has "provided this Court with ample evidence of the requisite federal control over the Jersey Works' operations during World War II and a period [**13] thereafter." (Def.'s Br. at 25.) Specifically, Defendant presents declarations of several executives to demonstrate that the Petroleum Administration for War issued daily orders and directives regarding "the manufacture, production, storage, and transfer of petroleum products." (Id. at 26.) NJDEP contends that "Defendant has failed to produce evidence indicating that the government directed it to improperly dispose of hazardous wastes . . . Defendant has ignored the fact that [NJDEP]'s claims do not relate to Defendant's actual manufacturing and production operations." (Pl.'s Rep. Br. at 14.) NJDEP

asserts that Defendant has failed to demonstrate a causal nexus between the allegations of improper disposal of toxic substances into the waters of the State of New Jersey and those of Defendant's actions directed by an officer of the federal government.

An examination of the case law cited by each party reveals much about the merits of Defendant's assertions. [HN16] Not one of Defendant's cited cases holding that the government exercised the requisite amount of [*405] control to trigger federal officer removal involves an instance of *disposal* of toxic substances ordered produced by the government. [**14] All these cases are personal injury products liability actions in which the actual *production* of toxic substances ordered by the government gave rise to the alleged harm. In contrast, cases relied upon by NJDEP, which found federal officer removal inappropriate, illustrate the distinction between governmental control over manufacture and production versus disposal. See, e.g., *Bahrs, 795 F.Supp. at 970* ("while the government officials were undoubtedly most interested in the production of war materials, the record before this Court does not demonstrate the government's necessary control over the method of waste disposal"); *Arness, 997 F.Supp. at 1268* ("[Defendant]'s use of [hazardous materials] did not cause Plaintiffs' injuries. Rather, Plaintiffs' injuries were allegedly caused by [Defendant]'s negligent disposal and storage of [hazardous materials], which activities were not performed at the government's behest").

Accordingly, as Defendant has not offered any evidence supporting its claim that the federal government exercised control over the disposal of hazardous substances, this Court holds that Defendant has not met its burden to demonstrate [**15] the requisite causal nexus to invoke the protections of the federal officer removal statute. Removal was not appropriate pursuant to *§ 1442(a)* and the case will be remanded to state court.

**CONCLUSION**

For the reasons stated, it is the finding of this Court that Plaintiff's motion to remand is **granted.** An appropriate Order accompanies this Opinion.

S/ Dennis M. Cavanaugh

Dennis M. Cavanaugh, U.S.D.J.

Date: March 24, 2005

**ORDER**

This matter coming before the Court upon motion by Plaintiff New Jersey Department of Environmental Protection ("NJDEP") for remand of the above-captioned action to the New Jersey Superior Court, Law Division; the Court having carefully considered the submissions

381 F. Supp. 2d 398, *; 2005 U.S. Dist. LEXIS 17279, **

and arguments of all parties; and for the reasons stated on the record on March 22, 2005, and in the Court's Opinion filed on this day;

IT IS on this 24th day of March, 2005,

ORDERED that Plaintiff's motion to remand is **granted.**

S/ Dennis M. Cavanaugh

Dennis M. Cavanaugh, U.S.D.J.

Date: March 24, 2005

# EXHIBIT 10

LEXSEE 2006 US DIST LEXIS 63948

**REGINALD CECIL LANE, ET AL, Plaintiffs, v. HALLIBURTON, A CORPORATION, ET AL, Defendants.**

**CIVIL ACTION H-06-1971**

**UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF TEXAS, HOUSTON DIVISION**

*2006 U.S. Dist. LEXIS 63948*

**September 7, 2006, Decided**
**September 7, 2006, Filed**

**COUNSEL:** [*1] For Reginald Cecil Lane, an individual, by and through Linda Marlene Lane, as the duly appointed Conservator/Guardian of Reginald Cecil Lane, Linda Marlene Lane, an individual, Plaintiffs: Kenneth T Fibich, Fibich Hampton, Houston, TX; Roger E Hawkins, Todd Andrew Daley, Hawkins Prata & Daley LLP, Los Angeles, CA.

For Halliburton, a Corporation, Kellogg Brown & Root, Inc., a Corporation and Wholly Owned Subsidiary of Halliburton and KBR Holdings, LLC, Service Employees International Inc., a Foreign Corporation and Wholly Owned Subsidiary of Halliburton and Kellogg Brown & Root International, Inc., DII Industries, LLC, a Wholly Owned Subsidiary of Halliburton Energy Services, Inc., a Corporation, Halliburton Energy Services, Inc., a corporation, Kellogg Brown & Root Services, Inc., a Corporation and Wholly Owned Subsidiary of Kellogg Brown & Root, Inc., Kellogg Brown & Root International, Inc., a Corporation and a Wholly Owned Subsidiary of Kellogg Brown & Root, Inc., a Corporation, Defendants: James H Hall, Jones Day, Houston, TX; David Kasanow, McKenna Long et al, Washington, DC; Herbert Lawrence Fenster, McKenna Long & Aldridge, Washington, DC; Raymond B Biagini, McKenna Long [*2] & Aldridge LLP, Washington, DC.

For Strategic Ecomm, Inc., Defendant: Daniel F Crowder, Beck & Crowder LLP, Houston, TX.

For Webrecruiter, Defendant: Margaret T Brenner, Bracewell & Giuliani LLP, Houston, TX; Thomas A Kissane, Schlam Stone and Dolan, New York, NY.

For Professional Services Council, Movant: Alan Chvotkin, Arlington, VA.

For Professional Services Council, Amicus: Alan Chvotkin, Arlington, VA.

**JUDGES:** Gray H. Miller, United States District Judge.

**OPINION BY:** Gray H. Miller

**OPINION:**

### ORDER

Pending before the court is the plaintiffs' motion to remand. Dkt. 25. After considering the parties' arguments, the evidence, and the applicable law, the court concludes that the motion for remand should be DENIED.

### BACKGROUND

The facts as alleged in the plaintiffs' original petition are as follows. Dkt. 1, Ex. 2. The defendant Kellogg Brown & Root (KBR) performed non-combat logistical services for the United States Army Material Command in Iraq under the Logistics Civil Augmentation Program (LOGCAP) contract. The Army specified services to be performed through Task Orders. Task Order 59 directed KBR and its affiliates to institute a hiring campaign to recruit civilian [*3] truck drivers for work in Iraq.

In October 2003, the plaintiff Reginald Cecil Lane left his current employment to work for KBR as a truck driver in Iraq. Under Task Order 43, Lane and the other civilian truck drivers were assigned to deliver fuel from their station at Camp Anaconda to specified locations in the Area of Operations. On April 9, 2004, Lane was assigned to the Longstreet Convoy, one of several fuel convoys. Lane's convoy was dispatched into an area known by the Army to have been subjected to continuous attack by anti-American factions. Lane's convoy came under fire along its route injuring many of the civilian

EXHIBIT

10

drivers. Lane, in particular, suffered the partial loss of an arm and irreparable brain damage.

Plaintiffs allege state court actions, including fraud and deceit, fraud in the inducement, intentional concealment of material facts, intentional misrepresentations, intentional infliction of physical and emotional injuries, and common law civil conspiracy to commit fraud. The plaintiffs seek general, punitive and exemplary damages. The plaintiffs also requested that the state court enjoin KBR and all other defendants from continuing "their unlawful, fraudulent and [*4] deceitful actions."

## PROCEDURAL HISTORY

On April 7, 2006, the plaintiffs moved to intervene in *Fisher v. Halliburton, 2006 U.S. Dist. LEXIS 26971, No. H-05-1731*. *Fisher* Dkt. 90. On May 8, 2006, Judge Atlas denied their motion to intervene. *Fisher* Dkt. 95. Accordingly, on May 9, 2006, the plaintiffs filed suit in the 333rd Judicial District of Harris County, Texas, *Lane v. Halliburton*, No. 2006-28755. In a timely fashion, the defendants (Halliburton) n1 removed the case to this court pursuant to *28 U.S.C. § § 1442* (federal officer removal) and 1441 (federal question removal). Dkt. 1. The plaintiffs timely filed a motion to remand. Dkt. 25.

n1 All the defendents joined in the removal. In the interest of clarity, the court will call them Halliburton, or KBR where appropriate, throughout this order. The Halliburton defendants consist of: Halliburton; KBR Holdings, LLC; Kellogg Brown & Root, Inc.; Service Employees International Inc.; DII Industries, LLC; Kellogg Brown & Root Services, Inc.; Kellogg Brown & Root International, Inc. The other defendants are Strategic Ecomm, Inc., Webrecruiter, and Doe Defendants 1 Through 10.

[*5]

## FEDERAL OFFICER REMOVAL UNDER *28 U.S.C. § 1442(a)*.

It is a basic tenant of removal that the defendant bears the burden of establishing federal jurisdiction over the case. *Winters v. Diamond Shamrock Chemical Co., 149 F.3d 387, 397 (5th Cir. 1998)*. Ordinarily, the court is bound by the well-pleaded complaint rule, restricting it to a survey of the entire record, including the defendant's pleadings, only when required to shed light on the plaintiff's pleadings. *Aquafaith Shipping, Ltd. v. Jarillas, 963 F.2d 806, 808 (5th Cir. 1992)*. However, *section 1442(a)* creates an exception to the well-pleaded complaint rule because it predicates removal on the existence of a colorable federal defense. *Id.* As such, the court may look to

the defendant's pleadings as well in determining jurisdiction.

The federal officer removal statute "is a pure jurisdictional statute, seeking to do nothing more than grant district court jurisdiction over cases in which a federal officer is a defendant." *Mesa v. California, 489 U.S. 121, 136, 109 S.Ct. 959, 968, 103 L. Ed. 2d 99 (1989)*. But, once the defendant qualifies for *section 1442(a)*, the [*6] right of removal is absolute. *Arizona v. Manypenny, 451 U.S. 232, 242, 101 S.Ct. 1657, 1664, 68 L. Ed. 2d 58 (1981)*. In enacting *section 1442(a)*, Congress "has decided that federal officers, and indeed the Federal Government itself, require the protection of a federal forum." *Willingham v. Morgan, 395 U.S. 402, 407, 89 S.Ct. 1813, 1816, 23 L. Ed. 2d 396 (1969)*. Although "the right to [federal officer] removal is not unbounded," it must not be "frustrated by a grudgingly narrow interpretation." *Winters, 149 F.3d at 398*.

In order to remove under *section 1442(a)*, Halliburton must meet three prerequisites. *Winters, 149 F.3d at 398-400*. First, Halliburton must be a "person" as contemplated by the statute. *Id. at 398*. Second, Halliburton must show that it "acted pursuant to a federal officer's directions and that a causal nexus exists between [its] actions under color of federal office and the plaintiff's claims." *Id.* Lastly, Halliburton must assert a "colorable federal defense." *Id. at 400*. Halliburton easily satisfies the first prong since the Fifth Circuit has held that corporate entities are "persons" under *section [*7] 1442(a)*. *Id.* The remaining two prongs are vigorously contested by the parties.

### 1. Actions Under Color of Federal Office.

In analyzing the "color of federal office" requirement, the Fifth Circuit notes that the requirement should be given a broad reading "so as not to frustrate the statute's underlying rationale." *Winters, 149 F.3d at 398*. However, it has limits and may only arise when there is a federal interest in the matter. *Id.* The inquiry centers around "the causal nexus between the federal officer's directions and the plaintiff's claims." *Id.* Here, the connection between the government's level of control over the truck convoys under Task 43, specifically the deployment of the Longstreet Convoy on April 9, 2004, and the injuries Mr. Lane sustained as a result of that deployment must be examined.

The Fifth Circuit has not yet addressed the level of supervision necessary to support the causal nexus in a service contract. But, parallels may be drawn to its analysis of the sustained, long-term contract for goods at issue in *Winters v. Diamond Shamrock Chemcal Company*. In *Winters*, the court reviewed the amount of control the Defense Department [*8] had over the chemical companies with whom it had contracted to make Agent

Orange. n2 *Id.* The contractual relationship between the United States and the chemical manufacturer lasted from 1962 to 1971. *Id. at 390.* The Defense Department dictated the specific make-up, packaging and delivery of Agent Orange. *Id. at 400.* Additionally, the Department maintained on-going supervision and strict control over Agent Orange's development throughout the life of contract. *Id. at 399.* The court found that significant, detailed, ongoing supervision of the contractor was sufficient to allow the contractor to qualify for federal officer removal.

> n2 Agent Orange was a chemical blend of herbicides used as a defoliator by the United States military in the Vietnam war. *Winters, 149 F.3d at 390.*

Much has been made by the parties about the difference between a service contract and a contract for goods. However, the amount of ongoing supervision in either contract [*9] supplies the necessary causal nexus, not the subject of the contract itself. According to an exhibit to the plaintiff's original petition, the Department of the Army was inextricably involved in any decision to deploy a convoy. Dkt. 1, Ex. 2 (Plaintiff's Original Petition, Ex. 9). According to the Army's investigation report issued August 2, 2004, the decision of where to send the convoys on April 9, 2004 was not relayed to Kellogg Brown & Root (KBR) until the 724th Transportation Company (TC) arrived at the staging area that morning. *Id.* In fact the report describes the mission as "a no notice mission." *Id.* The Army also made the following findings:

> KBR had no prior knowledge of the mission change.
>
> . . .
>
> The personnel of the 724th TC and KBR did not have any knowledge of the location or route to BIAP, n3 other than one military guide.
>
> . . .
>
> Planning of Route Selection: The route provided the 724th TC was given to the 172 CSG S3 n4 from the 13th COSCOM. n5
>
> . . .

> The convoy briefing given by the CC n6 did cover the information required for members of the convoy. The CC reviewed the change in rules of engagement (ROE), highway speeds, actions with vehicles, [*10] frequencies, recovery procedures, actions on contact, and other standard convoy topics. [Redacted], the guide for the convoy, outlined in the sand/stone with his boot a rough diagram of the route and exits. The military drivers had a rough strip map of the route but the KBR drivers had no type of maps. Many of the drivers both military and KBR did not understand the route and knew only to follow the vehicle in front of them.

*Id.* The amount of control over the route information, the manner, and the security for each convoy amply satisfies the second prerequisite for federal officer removal. The Army's supervision was significant, detailed and ongoing.

> n3 Baghdad International Airport.

> n4 172nd Corps Support Group's Operations and Training Officer.

> n5 13th Corps Support Command.

> n6 Convoy Commander. While this can refer to the KBR CC or the military CC, the context suggests that it was a military CC because of references to "his soldiers" and "his PLT SGT" (Platoon Sargent).

### [*11] 2. Assertion of a Colorable Federal Defense.

"Federal officer removal under *28 U.S.C. § 1442(a)* must be predicated upon the averment of a federal defense." *Mesa, 489 U.S. at 139, 109 S.Ct. at 970.* Only one colorable defense is needed to meet this prong of the test. *See, e.g., Winters, 149 F.3d at 400.* One of the main purposes of the federal officer removal statute was to ensure a federal forum where federal defenses could be litigated. *Id.* Therefore, the "defendants need not prove the asserted defense but need only articulate its 'colorable' applicability to the plaintiff's claims." *Id.* The defendants have asserted several possible federal defenses, including the government contractor defense, the "com-

2006 U.S. Dist. LEXIS 63948, *

bat activities" exception to the Federal Tort Claims Act, the state secrets doctrine, the Defense Production Act of 1950, federal immunities, and the political question doctrine, the viability of any one of which will be sufficient to meet the third requirement for federal officer removal. Dkt. 1.

"The political question doctrine excludes from judicial review those controversies which revolve around policy choices [*12] and value determinations constitutionally committed for resolution to the halls of Congress or the confines of the Executive Branch." *Japan Whaling Ass'n v. American Cetacean Society, 478 U.S. 221, 230, 106 S.Ct. 2860, 2866, 92 L. Ed. 2d 166 (1986).* The Supreme Court has set out a list of six formulations to aid courts in a "discriminating inquiry into the precise facts and posture of the particular case." *Baker v. Carr, 369 U.S. 186, 217, 82 S.Ct. 691, 710, 7 L. Ed. 2d 663 (1962).*

> (1) Prominent on the surface of any case held to involve a political question is found a textually demonstrable constitutional commitment of the issue to a coordinate political department;
>
> (2) or a lack of judicially discoverable and manageable standards for resolving it;
>
> (3) or the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion;
>
> (4) or the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government;
>
> (5) or an unusual need for unquestioning adherence to a political decision already made;
>
> (6) or the potentiality of embarrassment from [*13] multifarious pronouncements by various departments on one question.

*Id.* "[O]ne of these formulations [must be] inextricable from the case at bar." *Id.* Therefore, for Halliburton to present a colorable political question argument, it must have alleged facts sufficient to bring at least one of the *Baker* formulations into question.

The first and arguably most important formulation is a "textually demonstrable constitutional commitment of the issue to a coordinate political department." *Id.* The Constitution allocates the power of Commander in Chief of the United States Army and Navy to the executive branch. *U.S. CONST. art II, § 2, cl. 1.* At issue in this case is the question of whether Halliburton or the Army had control over the decision to deploy the convoy. As demonstrated in the above discussion regarding "under color of federal office," Halliburton has made an initial showing that the Army made all of the decisions at issue. If the evidence shows that the Army did control the decisions of when and where to send the convoys, Halliburton could make the argument that a review of Army policy relating to conduct in a theater of war would implicate separation [*14] of powers issues. This same initial showing could arguably impact two or even three other formulations under *Baker.* Halliburton could argue that such an examination would require "initial policy determinations of a kind clearly for nonjudicial discretion," or would express a "lack of the respect due coordinate branches of government." *Id.*

The applicability of the political question defense to independent contractors in a similar setting has been demonstrated recently in two district court decisions. In a case involving the bombing of a dining facility managed by KBR for the Army in Iraq, Judge Lake dismissed the case for want of jurisdiction based on political question. *Smith v. Halliburton, 2006 U.S. Dist. LEXIS 61980, No. 4:06CV0462, 2006 WL 2521326, (S.D. Tex Aug. 30, 2006).* Also, in a Georgia case, the district court dismissed as non-justiciable a negligence case brought by the family of a U.S. soldier killed by a suicide bomber while escorting a KBR convoy. *Whitaker v. Kellogg Brown & Root, 2006 U.S. Dist. LEXIS 45708, No. 4:05-CV-78, 2006 WL 1876922, (M.D. Ga. July 6, 2006).* The court does not express an opinion with regard to the merits of the political question arguments or the degree of [*15] similarity of these two recent cases to the instant case beyond finding that Halliburton has a colorable defense based on political question. Halliburton may not have the evidence to prove that it was under the control of the Army at the time in question, but it has presented enough facts to allow it to have this issue decided in a federal forum. *Willingham v. Morgan, 395 U.S. 402, 409, 89 S.Ct. 1813, 1817, 23 L. Ed. 2d 396 (1969)* (holding that a defendant need only "put in issue the questions" in order to allow "the validity of [his] defenses [to] be determined in the federal courts"). Halliburton has satisfied all three prerequisites for federal officer removal under *section 1442(a).* Accordingly, the court finds that it has subject matter jurisdiction to hear the case at bar.

## CONCLUSION

Based on the foregoing discussion and analysis, the plaintiff's motion to remand is DENIED.

Signed at Houston, Texas on September 7, 2006.

2006 U.S. Dist. LEXIS 63948, *

Gray H. Miller                                United States District Judge

# EXHIBIT 11

LEXSEE 2006 US DIST LEXIS 75020

**IN RE WORLD TRADE CENTER DISASTER SITE LITIGATION**

**21 MC 100 (AKH), 03 Civ. 00007 et al. (AKH)**

**UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF
NEW YORK**

*2006 U.S. Dist. LEXIS 75020*

**October 17, 2006, Decided**

**JUDGES:** [*1] ALVIN K. HELLERSTEIN, United States District Judge.

**OPINION BY:** ALVIN K. HELLERSTEIN

**OPINION: OPINION DENYING AND GRANTING MOTIONS FOR JUDGMENT ON THE PLEADINGS AND FOR SUMMARY JUDGMENT**

ALVIN K. HELLERSTEIN, U.S.D.J.:

It took ten months to remove the debris that resulted when the terrorists crashed their hijacked airplanes into the Twin Towers of the World Trade Center on September 11, 2001. Thousands of workers converged on the site, toiling day and night, seven days a week until they completed their jobs. They risked their lives from shifting debris, fires, smoke, and acrid and polluted air to complete their work in record time, in an extraordinary effort to close the gaping hole caused by the terrorists to the landscape and psyche of New York and the nation.

I consider in this Opinion the claims of approximately 3,000 of these workers, claiming permanent injury to their respiratory systems and their health and vitality, and a shortening of their lives. They claim that the City and its contractors, and other Defendants, were negligent in monitoring the air and assuring appropriate safety in the workplace, particularly in not providing adequate respiratory equipment, and assuring [*2] proper use thereof.

Defendants now move to dismiss these claims, contending that they are immune from suit pursuant to state and federal laws providing immunity for actions undertaken in response to a disaster created by an enemy attack on the state and nation. Plaintiffs argue that Defendants are not immune, particularly in light of Congress' clear contemplation, in the Air Transportation Safety and System Stabilization Act of 2001, that the City was exposed to numerous claims resulting from or relating to the terrorist-related aircraft crashes of September 11, 2001, and granting to the City a cap to limit its potential liability stemming from such claims. Furthermore, Plaintiffs argue, Congress again recognized the City's exposure to suits such as those at bar by granting a one billion dollar fund to the City to pay for the City's losses, liabilities and expenses, enabling the City to create a captive insurance fund to insure its exposure.

I discuss the various motions of the City and other Defendants in this Opinion and hold that the Defendants are benefited by limited immunity, limited according to time and activity, and that the issues are fact-intensive and cannot be decided [*3] on motion at this juncture. My conclusion also expresses some suggestions for the future progression of these cases, to enable the parties to begin discussions of settlements and to prepare for trial.

TABLE OF CONTENTS

I. INTRODUCTION
II. THE FACTUAL BACKGROUND
A. The Declarations of Emergency: The Immediate Government Response
B. The City Asserts Control and the Recovery Operation Commences
C. The Development of Health and Safety Standards at the Site
D. The Implementation and Enforcement of Health and Safety Standards
E. The Role of Federal Agencies
1. The Activation of Federal Assistance



EXHIBIT
11

## TABLE OF CONTENTS

2. The Role of the Occupational Safety and Health Administration
3. The Role of the Environmental Protection Agency
4. The Role of the Army Corps of Engineers
F. The Rescue and Recovery Effort Comes to a Close
G. The Continuing Vitality of Applicable Safety Standards and
Labor Laws
III. THE PROCEDURAL BACKGROUND AND THE PENDING MOTIONS
A. The Procedural Background
B. The Pending Motions
IV. THE PREEMPTIVE EFFECT OF THE ATSSSA
A. The Doctrine of Preemption
B. The Alleged Preemptive Effect of the ATSSSA and the Captive
Insurance Fund
C. Discussion
V. THE MOTIONS FOR JUDGMENT ON THE PLEADINGS--STATE IMMUNITY
A. The Standard of Review
B. The New York State Defense Emergency Act
1. The Immunity Provision of the SDEA
2. The Continued Vitality of the SDEA
3. Qualifying Laws under the SDEA
4. Civil Defense Activities and the Requirement of Good Faith
a. Civil Defense Activities
b. The Requirement of Good Faith
c. Discussion
C. The Argument of Immunity Under the New York Disaster Act
1. The Limited Scope of the Disaster Act's Application
2. The Extension of Disaster Act Immunity to Non-Government Actors
D. New York State Common Law Immunity
VI. THE MOTIONS FOR SUMMARY JUDGMENT--FEDERAL IMMUNITY
A. Standard of Review
B. Derivative Federal Immunity
1. The Relevant Case Law
2. Application to the Rescue and Recovery Efforts at Ground Zero
C. Stafford Act Immunity
D. Other Bases for Federal Immunity
VII. THE MOTIONS BY THE LESSEES
A. The Work Performed by the Lessee Defendants
1. The Work Performed by Con Edison
2. The Work Performed by the Silverstein Defendants
B. Plaintiffs' Supplemental Submissions
C. Alleged Grounds of Liability
1. Dismissal of Claims Pursuant to New York Labor Law for Failure
to Show the Necessary Degree of Ownership or Control
2. Dismissal of Claims Sounding in Negligence in the Absence of Any
Duty Owed
3. Dismissal of all Remaining Claims for Failure to Show any
Underlying Claim
VIII. CONCLUSION

[*4]

## I. INTRODUCTION

The terrorist attacks of September 11, 2001 inflicted a gaping wound on the structure and spirit of New York City. But it did not defeat the City, nor its population. As the nation began to absorb the enormity of the devasta-

tion and loss of lives that resulted from the terrorist attacks, an army of responders--instrumentalities of federal, state and city governments, private contractors, and thousands of firemen, policemen, paramedics, and construction workers--descended on the site of the devastation in New York City, initially to participate in the desperate search for survivors and, after all hope of life had faded, to assist in the recovery of remains and the clearing of debris. Working night and day, seven days a week, overcoming intense heat, persistent fires, and noxious fumes, the work was done and the site was cleared, in just under ten months--record time.

The extraordinary efforts of the men and women who worked on the site took a toll. A few have died, with at least one of their deaths having been attributed to the poisons they breathed while looking for survivors and clearing the debris. Anthony DePalma, Debate Revives as 9/11 Dust is Called [*5] Fatal, N.Y. Times, April 14, 2006, at B2. Many others allege serious respiratory injuries, threatening to shorten their lives and afflict their remaining years. Anthony DePalma, Illness Persisting in 9/11 Workers, Big Study Finds, N.Y. Times, Sept. 5, 2006, at A6. A study released by doctors at Mount Sinai Medical Center shows that approximately 70 percent of the 10,000 workers who were tested reported that they suffer from new or substantially increased respiratory problems since September 11. Id. In all, more than 3,000 of these men and women have filed suit in this Court, and even more suits are likely as respiratory injuries continue to manifest themselves. Under procedures outlined in the *New York General Municipal Law section 50-e*, allowing for leave to serve notice of claims upon the City of New York outside of the prescribed 90-day period, hundreds of additional persons have gained leave by the New York Supreme Court also to file suits, adding to the lawsuits consolidated before me. *Abdelrehim v. City of New York, 2006 WL 2193044* (S.D.N.Y. Aug. 3, 2006).

The main Defendant in these lawsuits is the City of New York. [*6] The City's Department of Design and Construction coordinated all the work on the site, drawing on the expertise of other City agencies, for example, the City Office of Emergency Management, and of the federal and state governments. The Port Authority of the States of New York and New Jersey, the owner of the World Trade Center site, also had a role, and it, too, is named as a Defendant. The site was divided into quadrants, and in each, a general contractor and numerous subcontractors undertook the work; they also are Defendants. Finally, various entities with a property interest in buildings at and around the World Trade Center site, namely Verizon Communications, Consolidated Edison, the Silverstein Entities and the Westfield Entities, are named as Defendants.

## II. THE FACTUAL BACKGROUND n1

> n1 Defendants move for judgment on the pleadings, *Fed. R. Civ. P.12(c)*, and for summary judgment, *Fed. R. Civ. P. 56*. In determining motions for judgment on the pleadings, I am limited to consideration of the facts as alleged in the parties' pleadings and thus may not consider matters outside of the pleadings. For the limited purposes of this Opinion, however, and in the interest of providing as fully-developed a factual record as possible, I refer to the exhibits submitted in support of and in opposition to the motions for summary judgment on the basis of federal immunity in setting out the facts that are generally applicable to this decision. I recognize that this is not the ordinary course, but believe that such a complete record is warranted in a case such as this that carries with it unique and important public policy considerations. Reliance on documents and matters outside of the pleadings should not be considered as a conversion of the motions for judgment on the pleadings to motions for summary judgment.

[*7]

The devastation wrought by the terrorist attacks of September 11, 2001 was unimaginable. One and Two World Trade Center, once great symbols of the City's economic strength and vitality, came crashing down, consuming and entombing the remains of almost 3,000 people who were caught inside the buildings. Three World Trade Center, Four World Trade Center, and Six World Trade Center sustained extensive fire damage. Seven World Trade Center caught fire from the falling debris of the Twin Towers and, after burning unimpeded for several hours, also collapsed. See In re September 11 Property Damage and Bus. Loss Litig. (Aegis Ins. Serv. v. The Port Authority), *2006 WL 62019* at *1 (S.D.N.Y. Jan. 12, 2006) (hereinafter 7WTC). The shopping malls and parking lots beneath the World Trade Center complex sustained massive structural damage and partial collapse. The World Financial Center and the glassen closure of its "Winter Garden," the Verizon Building at West and Vesey Streets, the Deutsche Bank Building at 90 West Street, the St. Nicholas Church at Barclay and West streets, and 125 Cedar Street also sustained extensive damage.

Rescue and recovery workers, and the contractors [*8] and government agencies overseeing their efforts, were faced with the daunting task of conducting an emergency response in a hellish setting: a smoldering pile of twisted and entangled shapes of rods and beams towering over twelve stories high and weighing more

than one and half million tons, harboring fires within and emanating clouds of noxious dust and vapors. The fires took three months to go out, until December 2001. Conditions were further exasperated by the nature of the various substances present at the site. Thousands of tons of hazardous materials were released into the air of lower Manhattan, including asbestos, lead, mercury, cadmium, polychlorinated biphenyls ("PCBs"), benzene, and chromium, among others, creating a mixture of toxic gases and ultra-fine particles never before experienced on such a scale. As Plaintiffs' Master Complaint alleges:

> asbestos, lead, and mercury from such items as personal computers, main frame computers, and copy machines; mercury from florescent lights; plastics, polyvinyl chloride insulations of cables, nylon carpeting, and other materials containing and/or producing dioxins and other harmful materials when burned; benzene from the [*9] jet fuel and other petroleum products stored in the towers; lead ammunition from the on-site Secret Service shooting range; and arsenic, lead, mercury and chromium stored in the U.S. Customs Laboratory.

(Pls.' Master Compl. P376, dated Aug. 19, 2005.)

In the initial days following the attacks of September 11, the primary focus of all at the site was rescuing any potential survivors. In re World Trade Center Disaster Site Litig. (Hickey v. Port Authority of N.Y. & N.J.), *270 F. Supp. 2d 357, 372 (S.D.N.Y. 2003); aff'd in part, dismissed in part by McNally v. The Port Authority, 414 F.3d 352 (2d Cir. 2005)* (hereinafter Hickey). Unfortunately, there were too few and, by September 29, 2001, all hope of finding lives having faded, the search for survivors closed, and efforts turned to "demolition of the ruined structures of the Towers, removal of thousands of tons of debris, and cleanup of the World Trade Center site[.]" *Hickey, 270 F. Supp. at 372.*

### A. The Declarations of Emergency: The Immediate Government Response

In the aftermath of the attacks, government leaders at the local, state and federal levels [*10] took immediate action to secure physical assistance and funding for the recovery effort at the World Trade Center site. The Mayor of the City of New York, the Governor of the State of New York, and the President of the United States all declared states of emergency, authorizing and directing government agencies and officials to undertake those measures necessary to assist the City of New York in its process of recovery.

Pursuant to the authority granted him under the Executive Law of New York, *N.Y. Exec. Law § 24* (McKinney 2006), the Mayor of the City of New York, Rudolph W. Giuliani, issued a Mayoral Order on September 11, 2001, proclaiming a local state of emergency based on the danger to public safety posed by the attacks. In declaring a state of emergency, the Mayor directed "the Police, Fire and Health Commissioners and the Director of Emergency Management to take whatever steps are necessary to preserve the public safety and to render all required and available assistance to protect the security, well-being and health of the residents of the City." Proclamation of a State of Emergency, Mayor Rudolph W. Giuliani (September 11, 2001). In subsequent proclamations, [*11] and pursuant to Executive Law section 24(1)(g) allowing for suspension of local laws and regulations during states of emergency, the Mayor directed that local regulations governing the leasing of real property to the City be suspended so as to "permit the immediate leasing of office and other space for use by City agencies in order to continue to provide essential services and critical functions of the City." Proclamation of State of Emergency, Mayor Rudolph Giuliani (Sept. 14, 2001). The Proclamation of Emergency was renewed by Mayoral Order every five days, as mandated by the Executive Law, throughout the duration of the recovery and cleanup efforts at the World Trade Center site, through the end of June 2002. See e.g., Proclamation of a State of Emergency, Mayor Rudolph W. Giuliani (Sept. 11, 2001); Proclamation of State of Emergency, Mayor Michael R. Bloomberg (June 29, 2002).

A disaster emergency was also declared for the State of New York by Executive Order of Governor George E. Pataki on September 11, 2001, pursuant to the authority granted him under the New York State and Local Natural Disaster and Man-Made Disaster Preparedness Law ("Disaster Act"). N.Y. Exec. Law § § [*12] 20-29-g (McKinney 2006). Noting the "unspeakable atrocities" that occurred in New York City, Washington D.C., and Pennsylvania, Governor Pataki "direct[ed] the implementation of the State Disaster Preparedness Plan and authorize[d]," various state agencies to take "all appropriate actions to assist in every way all persons killed or injured and their families, and protect state property and to assist those affected local governments and individuals in responding to and recovering from this disaster, and to provide such other assistance as necessary to protect the public health and safety[.]" Exec. Order No. 113 of Governor George E. Pataki (Sept. 11, 2001), N.Y. Comp. Codes R. & Regs. tit. 9, § 5.113 (2005).

On September 14, 2001, President George W. Bush, acting pursuant to the National Emergencies Act, *50*

*U.S.C. § § 1601-1651* (2006), declared the existence of a national state of emergency "by reason of the terrorist attacks at the World Trade Center ... and the Pentagon, and the continuing and immediate threat of further attacks on the United States." Proclamation No. 7463, *66 Fed. Reg. 48, 199* (Sept. 14, 2001). The [*13] declaration was deemed effective as of September 11, 2001. The declaration served also to activate the provisions of the Stafford Disaster Relief and Emergency Assistance Act ("Stafford Act"). *42 U.S.C. § § 5121-5206* (2006). Pursuant to the Presidential declaration of a national emergency, the Director of the Federal Emergency Management Agency ("FEMA"), Joe M. Allbaugh, declared that a national emergency existed in the State of New York and, in the interest of ensuring the provision of federal assistance, authorized FEMA "to allocate from funds available for these purposes, such amounts as [are] necessary for Federal disaster assistance and administrative expenses." *66 Fed. Reg. 48,682* (Sept. 21, 2001).

## B. The City Asserts Control and the Recovery Operation Commences

The City response began mere moments after the terrorist attacks on New York City. American Airlines Flight 11 crashed into One World Trade Center at 8:40 a.m. By 8:50 a.m. on September 11, the City, initially through the Fire Department, had established its Incident Command Post and had asserted control over the World Trade Center complex and the surrounding [*14] areas. The rescue and recovery efforts at the site were thereafter coordinated through the City Office of Emergency Management ("OEM"), with the Fire Department designated as the incident commander for the site, and with the City Department of Design and Construction ("DDC") assuming total control over all aspects of safety, construction, demolition, and cleanup activities at the site.

On September 12, 2001, the DDC set up a temporary command center at Public School IS 89 in lower Manhattan, immediately to the North of the World Trade Center site, and commenced daily meetings to organize rescue and recovery efforts. Of utmost concern to the DDC was securing the World Trade Center site and limiting access to the area. Together with other City agencies, including the OEM, the DDC established stringent protocols determining "not only who would have access to the site, but also how that access would take place and under what constraints." (Pls.' Decl. at 11.) The City further enlisted the Port Authority of New York and New Jersey (the "Port Authority") to assist in maintaining the security of the perimeter and to report observed safety protocol discrepancies. (Pls.' J.A., Vol. 1, Ex. [*15] 8.)

The City also engaged private contractors for the recovery effort. On September 15, 2001, FEMA confirmed that contracts could be awarded without need for competitive bidding under the emergency conditions existing after September 11. (Pls.' J.A. Vol. 4, Ex. 53.) Requirements for competitive bidding having been waived, and pursuant to the Declarations of Emergency issued at the City, State and Federal levels, the DDC engaged Bovis Lend Lease, AMEC Construction Management, Tully Construction Company, and Turner Construction Company to "provide the work necessary for removal and demolition services." n2 (Pls.' Decl. at 6.) These four contractors were designated as the City's Primary Contractors and assumed lead roles in the recovery and cleanup efforts at the site. n3 (Pls.' J.A. Vol. 8, Ex. 149 (WTC Environmental Health and Safety Plan dated Oct. 15, 2001).) The efforts of the Primary Contractors were coordinated, and supervised, through the DDC at twice daily meetings held at the temporary command center, and by numerous visits to the worksite. By September 14, 2001, the DDC had divided the site into four quadrants with a Primary Contractor assigned as a "construction manager" [*16] for each individual quadrant. n4 The Primary Contractors acted as supervisors for their individual quadrants, with responsibility for enforcing applicable regulations and ensuring compliance.

> n2 The work of the Contractors was financed by the City. At the close of the rescue and recovery efforts, total payments to the Primary Contractors were in excess of $ 200 million.

> n3 The Primary Contractors in turn entered into subcontracts with dozens of specialty subcontractors needed to provide all services necessary to completion of the recovery effort.

> n4 The Primary Contractors were assigned to the four zones as follows: Tully Construction (Zone 1), Bovis Lend Lease (Zone 2), AMEC (Zone 3), Turner Construction (Zone 4). Two additional quadrants were also established, covering Piers 6 and 26 and the barging and marine operations (Zone 5) as well as Fresh Kills (Zone 6).

Cognizant also of the need for additional space outside of the World Trade Center complex to which all debris from the site could be [*17] removed and where searches for evidence and human remains could be conducted, the City re-opened the Fresh Kills Landfill ("Fresh Kills") on Staten Island. As debris was cleared from the site, it was loaded onto barges and transferred by the Department of Sanitation ("DOS") to Fresh Kills for sorting and further inspection.

The DDC, with the assistance of the Port Authority engineers, regulated and controlled the removal of debris from the site, and all issues pertaining thereto. Global Positioning System devices were installed in all vehicles carrying debris from the site, allowing the City to improve the efficiency of the debris removal process. All trucks leaving the site were issued "Load Debris Tickets" containing information about the destination of the truck and its cargo. As debris was removed from the site, the DDC tracked and coordinated the following: "(a) FDNY/Rescue operations; (b) Structural concerns; (c) Progress of work; (d) Weather; (e) Trucking/Traffic operations-Manifests; (f) Safety concerns; (g) Manpower (contractor/CM Staff-site & home office); (h) Equipment on site; (i) Idle equipment; (j) Material deliveries/usage; and (k) Crane issues." (Pls.' J.A. Vol. 1, [*18] Ex. 7.) The DDC further controlled all aspects relating to persons working at the site, from regulating shift changes and meal allowances, to payment and payroll.

In the initial days and weeks following September 11, the City and its Contractors, together with public utilities, worked also to restore essential services to the City. The September 11 attacks resulted in the immediate loss of power to all of lower Manhattan and in the destruction of critical components of the gas and steam infrastructure. The Con Edison substations, which had been located directly beneath World Trade Center Seven, were destroyed by fire and by the building's ultimate collapse, resulting in a critical disruption of services to Lower Manhattan. See *7WTC, 2006 WL 62019* at *7-10. Con Edison assumed sole responsibility for restoring electric, gas and steam services and related facilities that were damaged or destroyed due to the events of September 11. The Verizon Building, located at 140 West Street, also sustained severe structural damage, crippling the phone system. Other critical services, such as the transportation system running through the World Trade Center site, were also destroyed [*19] and disrupted.

*C. The Development of Health and Safety Standards at the Site*

Conditions at the World Trade Center site, particularly the hazards posed by the dust and contaminants that enveloped lower Manhattan for weeks following the attacks, posed significant dangers to the rescue and recovery workers. (Pls.' Decl. at 4.) In the months following September 11, and continuing to the close of operations at the site in June of 2002, the Occupational Safety and Health Administration ("OSHA") reported levels of various contaminants, including dioxin and asbestos, in excess of OSHA's permissible exposure limits. n5 The debris pile itself, containing what remained of two 110-story towers of concrete and steel, created its own volatile, unstable, and inherently dangerous worksite. Imple-

mentation and enforcement of viable and responsive health and safety standards was therefore essential. The workers at the site were presented with a dangerous environment, below and surrounding their work activities, threatening their health and safety.

> n5 A report dated April 12, 2002 indicates that only a fraction of the total 1286 samples showed elevated level of asbestos on the debris field. (Pls.' J.A. Vol. 4, Ex. 47 ("OSHA Sampling Results Summary as of 4/12/02) at BOVCM3-000002942.) Other samples, however, showed elevated levels of silica and other compounds, including dioxins. (Id. at 000002943.) Nevertheless, as early as October 17,2001, OSHA assured the DDC that "[a]ll DDC personnel should feel confident that they are not being exposed to unhealthy levels of chemicals and that air quality around the WTC is generally good." (Pls.' J.A. Vol. 4, Ex. 67.) OSHA continued to recommend the use of respirators. (Id.)

[*20]

By September 12, 2001, the City had established itself as the lead entity charged with the development and enforcement of health and safety standards at the site, and had instituted daily meetings with representatives of the Primary Contractors as well as with the FDNY, NYPD, OEM, and OSHA, to organize the rescue and recovery operation. These meetings would continue throughout the duration of the recovery effort. At the request of the DDC, Bechtel Environmental Safety & Health ("Bechtel") also began work at the site on September 12, 2001, assisting the City with monitoring compliance with health and safety standards.

Critical to any health and safety plan was the development of appropriate standards for the use of personal protective equipment ("PPE"), including respirators. Within hours of the collapse, the FDNY advised its employees that respirators should be worn at the site and placed an order for over 5,000 respirators and 10,000 cartridges to provide its employees with the necessary respiratory protection. n6 The FDNY also ordered adapters to convert 15,000 "Scott" facemasks, designed for use with self-contained breathing equipment, to be used instead with filter cartridges. [*21] The City was also focused on establishing appropriate PPE standards at the site and, by September 21, 2001, plans were in place to:

> Develop the job and site specific PPE requirements (DDC); Develop and distribute a list of required PPE to all site emer-

gency response and workers, including posters for staging areas (DDC); Provide respirator fit-testing, maintenance and use information, and comprehensive technical support (NYCDOH); Aggressively promote minimum PPE use in all areas where highest exposures may occur (NYCDOH, NYPD, FDNY, National Guard).

(Pls.' Timeline at 2.)

> n6 However, it was not until September 28, 2001 that a written order was prepared and it was not until November 26, 2001 that all necessary bureaucratic authorization was given. On September 22, 2001, the FDNY complained of the delay, and admonished officials "OEM must develop a plan ... to address overall use & respirator issue[s]." (Pls.' Decl. at 4.)

The DDC, together with the New York City Department of Health ("City [*22] DOH"), assumed primary responsibility for developing and enforcing PPE requirements, with each agency at various times proclaiming itself as the lead agency in charge of worker health and safety. As a general matter, the DDC assumed responsibility for City and contractor personnel, while the City DOH assumed responsibility for FDNY and NYPD personnel.

On September 20 and 22, the City DOH issued criteria for minimum safety gear to be worn at the site. Similarly, on September 21, and again on October 19, the City DOH issued orders mandating the use of specific protective actions to be taken as personnel and vehicles left the site:

> It is hereby ordered that all persons leaving the WTC site shall follow personal hygiene protocols, including but not limited to ... removal or HEPA vacuuming of work clothes ...
>
> It is further ordered that all vehicles leaving the WTC site be spray washed[.]

(Pls.' J.A. Vol. 5, Ex. 64 (City DOH Order dated Sept. 21, 2001).) On October 22, 2001, the City DOH issued a directive specifically addressing the use of safety equipment and respirators:

> Personal Protective Equipment Required in Debris Area
>
> - Hardhat or helmet
>    ***
>
> - [*23] Respirator (half-face reusable) with P100/organic vapor/acid gas (OVAG) filter cartridges

(Pls.' J.A. Vol. 6, Ex. 97 (Health Bulletin dated Oct. 22, 2001).)

The DDC, together with Bechtel, also played an important role in establishing health and safety protocols, periodically issuing Environmental Health and Safety Bulletins outlining the applicable safety standards in force at the site. In a Bulletin issued in February 2002, the DDC, after consultation with OSHA representatives, announced its concurrence with the City DOH determination as to minimum respiratory protective equipment:

> A half-face respirator with P-100, organic vapor, acid gas filters/cartridges is required within the confines of the slurry wall and for any activity or area outside the slurry wall that generates dust, fumes or vapors[.]

(Pls.' J.A. Vol. 6, Ex. 93 (February 2002 Environmental Health and Safety Bulletin).)

*D. The Implementation and Enforcement of Health and Safety Standards*

From as early as September 12, 2001, the DDC, working primarily with Bechtel, the lead contractor in charge of health and safety concerns at the site, and with the assistance of the Port Authority [*24] and the Primary Contractors, began conducting inspections in order to enforce compliance with applicable PPE requirements. Federal agencies, including the Environmental Protection Agency ("EPA") and OSHA, also participated in safety monitoring and assumed a leading role with respect to certain tasks relevant to health and safety monitoring.

By October of 2001, the City had distributed an initial version of its comprehensive Environmental Safety and Health Plan (the "ES&H Plan"), addressing all aspects of worker safety at the site. (See Pls.' J.A. Vol. 6, Ex. 99, 100, 109; Vol. 8, Ex. 149.) Numerous revisions to the Plan would follow. The ES&H Plan operated to define the "minimum acceptable requirements for ensur-

ing workers' safety and health at the World Trade Center (WTC) Emergency Project" and established the hierarchy of responsibility and enforcement. Setting forth its general purpose and the DDC's lead role in its enforcement, the Plan expressly provided as follows:

> This ES&H Plan is directly applicable to all work conducted by agency and prime contractor/subcontractor personnel engaged in any activity associated with the cleanup and recovery efforts on the WTC Emergency [*25] Project. The DDC has overall responsibility for the site's ES&H program.

(Pls.' J.A. Vol. 8, Ex. 149.)

The ES&H Plan provided that the DDC had lead responsibility for "Environmental Health and Safety Services," with the City's Primary Contractors also assuming responsibility for enforcing the terms of the Plan. Specifically, the Plan provided that "each prime contractor and their subcontractors are responsible for implementation, enforcement and compliance with all aspects of this plan." (Pls.' J.A. Vol. 8, Ex. 149.) Site monitoring was also performed by other city, state and federal agencies. The results of such monitoring, and all tests setting forth rates of exposure were to be provided to the City DOH for presentation of a final report to the DDC. Further, the DDC alone had the authority to stop work in the event of workplace hazards.

Separately from the ES&H Plan, the DDC and FDNY, as co-incident commanders at the site, together with the Primary Contractors, four separate employer/employee associations, and OSHA entered into the WTC Emergency Project Partnership Agreement (the "Partnership Agreement") on November 20, 2001, and which was subsequently revised on April 10, 2002. ( [*26] See Defs.' J.A. Vol. 3, Ex. AO (WTC Project Partnership Agreement, dated April 10, 2002).) The Partnership Agreement affirmed "the value of working in a cooperative, focused and voluntary effort to ensure a safe and healthful environment for everyone involved," and memorialized the parties' commitment to "advance the goal of environmental health and safety" and to "share safety hazard data."

In accordance with the ES&H Plan and the Partnership Agreement, reports documenting the results of these safety compliance inspections were prepared throughout the duration of the recovery effort at the direction of the DDC. The reports prepared by the DDC, and reports and documents prepared by the Primary Contractors and other agencies at the site, highlight ongoing and persis-tent problems with enforcing compliance with applicable PPE requirements. n7 Within the first month of initiating operations at the site, the Primary Contractors, AMEC, Tully, Bovis, and Turner, had all documented problems with PPE compliance and particularly with respirator use. Indeed, problems with respirator usage would pervade the entirety of the recovery operation at the site, with estimates prepared in January [*27] of 2002 showing compliance rates below twenty-nine percent.

> n7 Plaintiffs' timeline indicates numerous problems with enforcing compliance. (See Pls.' Timeline at 8, 11, 13, 14, 19, 20, 27, 28, 29, 30, 31, 33, 34, 35, 36, 37.) Such problems are also highlighted in the various exhibits submitted by Plaintiffs in opposition to Defendants' motions for summary judgment. Within a week of the attacks, Bechtel had noted that "[m]any workers are either not wearing or wearing inappropriate respiratory protection." (Pls.' J.A. Vol. 6, Ex. 77 (WTC Site Evaluation, Sept. 19, 2001).) An October 18, 2001 report by Bechtel summarized observed safety discrepancies. (Pls.' J.A. Vol. 6, Ex. 80 (Memo from Mike Burton, dated Oct. 18, 2001).) Also in October of 2001, the EPA notified the City Department of Health that it had observed "very inconsistent compliance with our recommendations[.]" (Pls.' J.A. Vol. 4, Ex. 62 (Letter from Bruce Sprague, EPA, dated Oct. 5, 2001).) By January 2002, the DDC reported compliance rates with respirator requirements below thirty-percent. (Pls.' J.A. Vol. 6, Ex. 103, DDC Memo dated Jan. 3, 2002).) By February, compliance rates were believed to be at an all time low. (Pls.' J.A. Vol. 6, Ex. 106 (Labor Management Site Meeting dated Feb. 20, 2002).)

[*28]

E. The Role of Federal Agencies

The enormity of the task necessitated the involvement of, and cooperation with, federal agencies. Although the City, through the DDC, assumed primary control over the site, several federal agencies, including FEMA, OSHA, the EPA and the United States Army Corps of Engineers ("Army Corps"), participated in the rescue and recovery effort. (Pls.' J.A. Vol. 4, Ex. 49, FEMA Debris Monitoring Plan ("The City has primary responsibility for oversight and monitoring.").) These various agencies would ultimately play an active role in the efforts at the World Trade Center, most particularly through their attendance at meetings addressing overall concerns of worker health and safety and through their

assistance in developing and enforcing appropriate health and safety protocols responsive to such concerns.

### 1. The Activation of Federal Assistance

On September 14, 2001, President George W. Bush declared a National State of Emergency, thereby activating the Stafford Disaster Relief and Emergency Assistance Act ("Stafford Act"), *42 U.S.C. § § 5121-5206* (2006). Activation of the Stafford Act by Declaration [*29] of National Emergency allowed for implementation of the course of federal assistance provided pursuant to the framework outlined in the Federal Response Plan ("FRP"). (Defs.' J.A., Vol. 1, Ex. L (the "FRP").)

The FRP, an agreement among twenty-seven federal agencies, "establishes a process and structure for the systematic, coordinated, and effective delivery of federal assistance to address the consequences of any major disaster or emergency declared under the [Stafford Act]." (FRP, Ex. L at 1.) Specifically, the FRP sets forth a "Basic Plan," presenting "the policies and concept of operations that guide how the Federal Government will assist disaster-stricken State and local governments." (Id. at 4.) The Basic Plan provides that, upon exhaustion of local resources and at the request of the affected local government, FEMA shall operate as the lead federal agency for coordinating an appropriate federal response, providing for both technical and financial assistance. (Id. at 7-8, 12.)

The FRP further coordinates the structure and nature of federal assistance by grouping the types of federal assistance most likely to be utilized by overwhelmed state and local governments into [*30] twelve separate Emergency Support Functions ("ESFs"). n8 (Id. at 13.) Each individual ESF is headed by a primary agency "designated on the basis of its authorities, resources, and capabilities in the particular functional area," and assisted by one or more other federal agencies acting in a supporting capacity. (Id.) As the lead agency in charge of coordinating any federal response pursuant to a declaration of emergency, FEMA is authorized to activate "some or all of the ESFs, as necessary." (Id.)

> n8 The twelve ESFs established pursuant to the FRP are as follows: ESF 1 (Transportation); ESF 2 (Communications); ESF 3 (Public Works and Engineering); ESF 4 (Firefighting); ESF 5 (Information and Planning); ESF 6 (Mass Care); ESF 7 (Resource Support); ESF 8 (Health and Medical Services); ESF 9 (Urban Search and Rescue); ESF 10 (Hazardous Materials); ESF 11 (Food); ESF 12 (Energy). (FRP, Ex. L at 14.)

Pursuant to activation of the FRP, and FEMA's subsequent activation of the relevant ESFs, OSHA, the EPA [*31] and the Army Corps each provided technical and physical assistance to the City of New York in their respective areas of expertise and authority. Federal financial assistance was also provided throughout the duration of the recovery effort with FEMA promising to cover the cost of all operations at the World Trade Center Site as well as at Fresh Kills Landfill. (Defs.' J.A., Vol. 2, Ex. S (Press Release, The White House, dated Sept. 18, 2001).)

### 2. The Role of the Occupational Safety and Health Administration

In keeping with its designation under the FRP, OSHA assumed the lead role for developing and enforcing respirator requirements at the site. Within a few days of the attacks, OSHA had begun working with the City and other local agencies to develop comprehensive and effective PPE requirements and overall worker health and safety protocols. (Defs.' J.A., Vol. 3, Ex. AC (email from Bob Adams).) OSHA advised the City that the use of P-100 filters, rather than standard combination filter/cartridges, would provide workers with adequate protections against the respiratory dangers presented at the site. OSHA also performed atmospheric monitoring throughout the rescue and recovery effort [*32] to establish the geographical boundaries within which respirator use would be required and in order to determine the level of respiratory protection needed to protect workers against contamination by the surrounding atmosphere. (Def. J.A. Vol. 3, Ex. AE (Ryan Dep.) at 144:5-25.)

On approximately September 20, 2001, at the request of the City DOH, OSHA assumed a role as the "lead agency for distributing, fitting, and training for respirators for the recovery of workers." (Defs.' J.A., Vol. 2, Ex. Q (Clark Dep.) at 87:19-88:6; Pls.' J.A. Vol. 4, Ex. 56.) OSHA took over the operation of the FDNY's respirator distribution staging area, ultimately becoming the "sole provider of respiratory protection equipment, fit-testing and training for new shift FDNY personnel." (Clark Dep., Ex. Q at 89:5-25.) OSHA also distributed respirators to NYPD personnel. (Id. at 89:5-25.)

Distribution of respirators and other safety equipment at the site was coordinated through plywood huts set up by OSHA at various points surrounding the World Trade Center project. (Defs.' J.A., Vol. 3, Ex. AE (Ryan Dep.), at 66:14-67:13.) OSHA ultimately distributed over 131,000 respirators. (Clark Dep., Ex. Q at 66: [*33] 7-17.) All individuals to whom OSHA distributed respirators received qualitative and quantitative fit-checks, and training for the proper use, storage, and maintenance of respiratory equipment. (Id. at 87:19-88:6; 93:19-94:5.) OSHA also developed a 10-hour health and safety course focusing on the proper use of respirators. All individuals

who worked in a supervisory role at the site, including employees of the Primary Contractors, were required to attend the course prior to being admitted to the site. (Defs.' J.A. Vol. 3, Ex. AA ("OSHA's role in Response"); Ex. AJ ("Workers Safety Bulletin # 13); Ex. AK (Weekly EHS Meeting Minutes).)

OSHA, however, did not assume direct supervisory power to assure that workers used respiratory equipment consistently and efficiently. (Pls.' J.A. Vol. 3, Ex. 39, Public Hearing, 326:19-23; Ex. 40, DOH email ("Unfortunately, OSHA has taken an 'advisory' role to date.'").) OSHA's role was thus one of "assistance and consultation, not enforcement." (Pls.' J.A. Vol. 4, Ex. 42, OSHA Talking Points (emphasis in original).) Even though OSHA deployed over 1,000 inspectors to the site to report safety violations to the various contractors and to document [*34] observed safety violations in weekly reports, the prevalence of violations supported by anecdotal evidence of substantial non-use of PPE suggests that safety standards were not uniformly and consistently enforced. (Ryan Dep., Ex. AE at 70:5-72:7, 73:8-25, 143:2-6, 191:22-192:25.) Furthermore, it is not clear if OSHA inspectors had the authority to stop work at the site upon observing critical safety violations. Per the express terms of the ES&H Plan, the DDC retained exclusive stop work authority. Nevertheless, Walter Murray of Turner Construction testified that he believed that OSHA also had authority to stop work at the site. (Defs.' J.A. Vol. 2, Ex. W (Walter Dep.), 229:21-230:10.) By the close of operations at the World Trade Center site, OSHA had identified more than 9,000 hazards as needing correction. Defendants ask me to presume that employers had corrected the problems pointed out to them, but it would be improper for me to do so on a Rule 12(c) motion. (Def.'s J.A. Vol. 3, Ex. AH (OSHA, Inside the Green Line).) Clearly, problems with enforcing PPE requirements persisted and not OSHA, but the DDC and the private Contractors, were responsible to ensure that compliance at the [*35] site would be enforced.

3. The Role of the Environmental Protection Agency

Under the FRP, the EPA is designated as the lead agency responsible for the cleanup of sites contaminated by "hazardous materials release[s] caused by a catastrophic event." (Defs.' J.A. Vol. 4, Ex. AS (Hearing Before U.S. Senate Appropriations Committee, Nov. 28, 2001); FRP, Ex. L at TI-13; Vol. 3, Ex. AM (National Contingency Plan, *40 C.F.R. § 300.130(i)*).) As such, the EPA, in conjunction with the City Department of Environmental Protection ("City DEP"), assumed the lead role for "hazardous waste disposal" at the World Trade Center site. (Defs.' J.A. Vol. 4, Ex. AU (Hearing Before U.S. Senate Committee on Environment and Public Works, Feb. 11, 2001); Vol. 2, Ex. O (Touw Dep.) at 123:13-16,

131:25-132:11; Vol. 4, Ex. AT ("EPA Response to September 11: Oh My God, Look at that Plane.").) The EPA further assumed "primary responsibility for monitoring the ambient air, water and drinking water and coordinating the sampling data for all the response agencies." (Defs.' J.A. Vol. 4, Ex. AU (Hearing Before U.S. Senate Committee on Environment and Public Works, Feb. 11, 2001).) In [*36] accordance with its lead role in environmental monitoring at the site, the EPA also assumed responsibility for public dissemination of the results of environmental monitoring tests conducted at the site, regularly publishing such results on its website and at the tented area where workers ate their meals. (Defs.' J.A. Vol. 4, Ex. AQ (New York City Council, Transcript, Nov. 1, 2001) at 24:22-23. ("EPA has taken the lead in making the data available to the public through our website.").)

Environmental testing by the EPA was coordinated with OSHA and other City agencies through the use of multiple ambient air monitors at locations in and around the World Trade Center site and through the collection of data from pre-existing air monitors in the area. (Defs.' J.A. Vol. 4, Ex. AY (WTC Response Activity Situation Report # 5).) At the close of operations in June of 2002, OSHA had taken over 6,100 air samples and had turned over the results of these tests to the EPA for further evaluation and examination. (Defs.' J.A., Vol. 3, Ex. AA (OSHA's Role in Response and Recovery Operations).) Although other City agencies, including the City DOH and the City DEP, also conducted environmental monitoring [*37] at the site, the results of such monitoring were coordinated through the EPA and shared with the Environmental Assessment Group, a inter-agency group comprised of federal, state and City agency representatives. On the basis of these tests, both the EPA and the Environmental Assessment Group determined to adopt the rule that all workers be required to wear respirators at all times while working on the pile. (Pls.' J.A. Vol. 4, Ex. 62 ("EPA has recommended, and continues to recommend, that workers at the Site wear respiratory protection.").)

The EPA thus worked with City and federal agencies to develop adequate health and safety protocols, but limited its role to monitoring of air quality and removal of hazardous materials. Indeed, the EPA expressly acknowledged that it lacked "authority to enforce the worker health and safety policies for non-EPA/USCG employees." (Pls.' J.A. Vol. 4, Ex. 62 ("We have observed very inconsistent compliance with our recommendations, however, we do not have the authority to enforce the worker health and safety policies[.]").)

4. The Role of the Army Corps of Engineers

On October 1, 2001, at the request of the City under ESF 3 (Public Works and Engineering) [*38] of the FRP, the Army Corps assumed control over the coordination, implementation, structure and enforcement of safety and health procedures and protocols at Fresh Kills. (Defs.' J.A. Vol. 5, Ex. BH (Office of History, U.S. Army Corps of Engineers, Fact Sheet).) Although the Army Corps' role at Fresh Kills was limited as an initial matter to the development and implementation of health and safety standards for contractor personnel only, as of October 10, 2001, the scope of its role at Fresh Kills was expanded to include "the implementation of a comprehensive health and safety plan for all personnel working at the landfill site." (Defs.' J.A. Vol. 5, Ex. BJ (Amendment to 3-COE, Oct. 10, 2001).)

In accordance with its expanded role at the Fresh Kills Landfill, the Army Corps identified the following areas for inclusion in a comprehensive health and safety plan: "Establish baseline worker exposure levels for each job site activity; Develop job and site specific PPE requirements; Establish an ongoing worker exposure monitoring program; Issue daily work site air quality updates; Implement dust control measures; Establish the presence of health and safety team monitors." (Defs.' J.A. [*39] Vol. 5, Ex. BJ (Memo Re. Amendment to 30COE NAD-39).) To assist in the development and enforcement of such a comprehensive plan, the Army Corps contracted with a private contractor, Phillips & Jordan, to act as the Construction Manager for the Fresh Kills site. Specifically, Phillips & Jordan assumed responsibility for the management of the forensic recovery operation at the site and for the enforcement of the site safety and health plan. (Defs.' J.A. Vol. 5, Ex. BK (Phillips & Jordan Disaster Recovery Group: Experience).) The Army Corps further enlisted the assistance of a subcontractor, Evans Environmental & Geosciences, to develop an Environmental Safety and Health Plan tailored to the concerns presented by the recovery operations at Fresh Kills and to develop and implement necessary training and monitoring programs.

### F. The Rescue and Recovery Effort Comes to a Close

From the time that the rescue and recovery operation began at the World Trade Center site in the moments following the September 11 attacks, to the close of operations in June of 2002, work at the site never ceased, continuing twenty-four hours a day, seven days a week, including holidays, with the exception [*40] only of Veteran's Day 2001. Despite the enormity of the task, however, work progressed at a rate that many could not have imagined and, as early as April of 2002, the transition of control over the site from the DDC to the Port Authority was being designed and implemented.

On May 10, 2002, control over Seven World Trade Center was returned to the Port Authority. The turnover of control as to the remainder of the World Trade Center complex followed shortly thereafter, on June 30, 2002, with the Port Authority once again assuming complete responsibility for the site. Although control has officially been returned to the Port Authority, work at the site continues to this day with efforts now turned to the completion of all steps necessary to rebuilding.

### G. The Continuing Vitality of Applicable Safety Standards and Labor Laws

Throughout the duration of the rescue and recovery effort, the City agencies and Primary Contractors remained obligated to abide by applicable safety standards and labor laws.

Pursuant to the authority granted under Executive Law section 24, both the Governor of the State of New York and the Mayor of the City of New York had the capacity to suspend, or [*41] direct the suspension of, "any of its local laws, ordinances or regulations, or parts thereof subject to federal and state constitutional, statutory and regulatory limitations, which may prevent, hinder, or delay necessary action in coping with a disaster or recovery therefrom[.]" N.Y. Exec. Law § 24 (McKinney 2006). Both declined, however, to authorize wholesale suspension of applicable laws and regulations, instead authorizing only the suspension of the sign-in/sign-out procedures required by New York State Labor Law for the period from September 11, 2001 to October 14, 2001. (Pls.' Decl. at 31.)

In the absence of any such suspension of applicable labor laws, the City expressly mandated that its Primary Contractors abide by and enforce all relevant laws, ordinances, and regulations. Specifically, draft contracts between the DDC and the contractors show that compliance with applicable safety standards was required. The DDS mandated compliance with the following:

> a. New York State Uniform Fire Prevention and Building Code;
> b. National Fire Prevention Association (NFPA) requirements;
> c. National Electrical Code (NEC);
> d. American National Standard [*42] -- ANSI, A117.1 1986 or current edition (Accessibility and Usability by the Handicapped);
> e. Occupational Safety and Health Administration (OSHA);
> f. New York State Department of Labor Rules and Regulations;
> g. New York State Energy Code;

h. Local Codes and Ordinances;
i. New York State Department of Health Requirements; and
j. New York State Department of Environmental Conservation

(Pls.' Decl. at 30-31; see also Pls.' J.A. Vol. 6, Ex. 110, Revised Draft Contracts with Primary Contractors, dated Oct. 11, 2001.)

By their pleadings, however, Plaintiffs allege that "non-compliance with relevant statutes, regulations and ordinances was rampant," with workers being encouraged in a least some instances to forego filing of complaints for safety violations so as not to interfere with the recovery operation. Plaintiffs contend that this failure to enforce applicable safety standards and the failure to provide adequate and appropriate respiratory protection resulted in unprecedented exposure to various contaminants and toxins, and thus gave rise to the respiratory injuries that now plague so many of the rescue workers.

## III. THE PROCEDURAL BACKGROUND AND THE PENDING [*43] MOTIONS

### A. The Procedural Background

Indeed, just as the process of recovery and rebuilding began, those who participated in the efforts that made such recovery possible began to suffer from a host of respiratory ailments. In the months following September 11, and continuing until today, thousands of suits alleging respiratory injuries sustained as a result of violations of various state and federal safety laws and regulations were filed in New York State Court. To date, more than 3,000 cases alleging respiratory injuries have been filed, with thousands more in the offing. By their Master Complaint dated August 19, 2005, Plaintiffs asserted ten separate claims for recovery. Counts One and Two asserted claims pursuant to New York Labor Law. Counts Three and Four asserted claims pursuant to those provisions of the General Municipal Law allowing suits by injured and deceased firefighters and police officers and their representatives. Count Five stated a claim sounding in common law negligence. Counts Six and Seven asserted claims for medical monitoring and fear of cancer, respectively. Count Eight asserted a claim for fraud and misrepresentation. Count Nine asserted a claim [*44] for wrongful death. Finally, Count Ten asserted a claim on behalf of all derivative plaintiffs.

The Defendants removed the actions to federal court asserting jurisdiction under the Air Transportation Safety and System Stabilization Act ("ATSSSA" or "the Act"), 49 U.S.C. § 40101 note (2006). The Act provides a federal cause of action for actions for damages "arising out

of" the terrorist-related aircraft crashes of September 11 and vests the District Court for the Southern District of New York with "original and exclusive jurisdiction over all actions brought for any claim (including any claim for loss of property, personal injury, or death) resulting from or relating to the terrorist-related aircraft crashes of September 11, 2001." ATSSSA § 408(b)(3). Motions to remand followed.

In determining the scope of federal jurisdiction provided under the Act, and noting the important concerns of federalism counseling against the imputation of a congressional intent to preempt an entire panoply of state law without a clearly expressed intent to provide such preemption, I held "that claims alleging respiratory injuries suffered at the World Trade Center site, up to [*45] and including September 29, 2001, [were] preempted by section 408 of the Act, and that claims incurred after that date or at different sites [were] not preempted." *Hickey, 270 F. Supp. 2d at 374.* Cognizant, however, of the importance of a final determination as to the scope of my jurisdiction under the Act, I certified the order providing for federal jurisdiction for interlocutory appeal, *28 U.S.C. § 1292(b)*, and stayed the remand of cases not subject to federal jurisdiction pending review by the Court of Appeals. *Id. at 381.*

Proceeding on the assumption that federal jurisdiction existed as to all cases coordinated under 21 MC 100 absent a decision to the contrary by the Court of Appeals, I directed that the parties proceed on a limited, albeit extensive, course of discovery, focusing on Defendants' anticipated dispositive defense of immunity under state and federal law and with the aim of establishing a joint offer of proof, alleviating Plaintiffs of the burden of proving all factual averments. (See Case Management Order No. 3 ("CMO 3"), dated Feb. 7. 2005.) I ordered further that Plaintiffs file separate claims for [*46] each individual claimant, holding that the individual issues relevant to each claimant predominated over common issues. Thus, as the parties awaited decision by the Court of Appeals, the litigation continued to move forward.

As discovery relevant to the asserted defenses continued, the Court of Appeals delivered its decision. Although the Court concurred with my finding of jurisdiction as to respiratory injuries sustained at the World Trade Center site in the period between September 11 and September 29, 2001, and with my general proposition that, by enactment of the Act, Congress did not in fact intend to "displace the entire panoply of state law 'regulat[ing] the health and safety of the workplace,'" *McNally v. The Port Authority, 414 F.3d 352, 379 (2d Cir. 2005)*, the Court expressed in dicta its disagreement with that portion of my Opinion remanding those actions asserting injuries arising at sites other than the World Trade Center and subsequent to September 29. See *Id. at*

*380* ("We need not take the phrase 'relating to' to any metaphysical extreme in order to conclude that it encompasses the claims brought before the district court . [*47] .., i.e., that airborne toxins and other contaminants emanating from the debris created by the crashes caused respiratory injuries to plaintiffs employed to sift, remove, transport, or dispose of that debris."). By Order of July 22, 2005, I adopted the reasoning of the Court of Appeals in McNally without prejudice to future submissions as to the extent of my jurisdiction pursuant to the Act. (See Amended Order Following Appellate Remand, Extending Jurisdiction, dated July 22, 2005.)

Having adopted the reasoning of McNally, I turned to furthering the progress of the litigation. The parties appeared before me for a status conference on November 7, 2005 to address the status of limited discovery pursuant to CMO 3 and to address the practicability of adopting a joint offer of proof. At the conference it became readily apparent that any hope for a joint offer of proof had been dashed and I conceded that any further efforts in this regard would be futile. Although abandoning efforts to arrive at a joint offer of proof, I nevertheless acknowledged the dispositive nature of the immunity defenses and directed the parties to proceed, under completion of discovery, by motion. The [*48] parties subsequently completed the mandated course of discovery pursuant to CMO 3 in early 2006, with Defendants then proceeding to make motions for judgment on the pleadings and motions for summary judgment on the basis of state and federal immunity.

## B. The Pending Motions

The motions now pending before me concern whether Plaintiffs may proceed with their claims alleging respiratory injuries sustained at the World Trade Center site n9 during the recovery and cleanup efforts following September 11 against the City and its Contractors (the "City Defendants"), n10 the Port Authority of New York and New Jersey (the "Port Authority"), Consolidated Edison ("Con Ed"), n11 the Silverstein Defendants, n12 and the Westfield Defendants. n13 The various Defendants assert immunity on the basis of state and federal statutory and common law immunity. Separately, Con Ed, the Silverstein Defendants, and the Westfield Defendants (collectively the "Lessee Defendants") seek dismissal of all claims against them on the ground that they were divested of their leasehold interests during the duration of the recovery and cleanup efforts at the World Trade Center and thus may not be held liable for [*49] injuries sustained during the course of such efforts. The papers filed on behalf of the City Defendants represent the lead papers in this litigation, with the other Defendants filing motions joining, in whole or in part, the defenses asserted by the City Defendants and providing supplemental arguments in favor of dismissal.

n9 Pursuant to CMO 3, the World Trade Center site is defined as "the 16-acre site including the sites of the buildings known as 1 World Trade Center, 2 World Trade Center, 3 World Trade Center (a/k/a the Marriott World Trade Center Hotel), 4 World Trade Center, 5 World Trade Center and 7 World Trade Center, as well as the surrounding plaza and underground shopping, parking, and public transit facilities." (See CMO 3 at 1.)

n10 The following contractors join in the City's motions asserting immunity: AMEC Construction Management, Inc.; AMEC Earth & Environmental, Inc.; Bechtel Associates, P.C.; Bechtel Construction, Inc.; Bechtel Corp.; Bechtel Environmental, Inc.; Bovis Lend Lease, Inc.; Bovis Lend Lease LMB, Inc.; Bovis Lend Lease Interiors, Inc.; Bovis Holdings Ltd.; Bovis Int'l, Inc.; Evergreen Recycling of Corona; Plaza Construction Corp.; Plaza Construction Management Corp.; Tully Construction Co., Inc.; Tully Industries, Inc.; Tully Environmental, Inc.; Tully Consulting Corp.; Tully Construction Company; Turner Construction Company; Turner Construction Co.; Turner Construction Int'l, LLC; Turner/Plaza A Joint Venture.

[*50]

n11 At the time of oral argument, claims were asserted against the following Consolidated Edison entities: Consolidated Edison Company of New York, Inc., Consolidated Edison, Inc., Consolidated Edison Energy, Inc., Consolidated Edison Solutions, Inc., and Consolidated Edison Development, Inc. However, by their supplemental submission of July 12, 2006, Plaintiffs submit that they have reached agreement in principal to dismiss without prejudice claims against all Consolidated Edison Defendants with the exception of Consolidated Edison Company of New York, Inc. For purposes of this motion, I refer to Consolidated Edison Company of New York, Inc. interchangeably either as Consolidated Edison or Con Ed. A separate order will issue dismissing all cross-claims against incorrectly named Consolidated Edison Defendants.

n12 The Silverstein Defendants, also referred to as the World Trade Center ("WTC") Defendants, include the following entities: World Trade Center Properties LLC, 1 World Trade Center LLC, 2 World Trade Center LLC, 4 World Trade Center LLC, 5 World Trade Center LLC, 1 WTC Holdings LLC, 2 WTC Holdings LLC, 4 WTC Holdings LLC, 5 WTC Holdings LLC, Silverstein WTC Properties LLC, Silverstein WTC LLC, Silverstein WTC Mgmt. Co. LLC, Silverstein WTC Facility Manager LLC, Silverstein Properties [sic], and Silverstein Properties LLC.

[*51]

n13 The Westfield Defendants include: Westfield America, Inc., Westfield WTC Holding LLC, Westfield WTC LLC a/k/a WTC Retail LLC, and Westfield Corp.

The City Defendants move for judgment on the pleadings and summary judgment. By their motion for judgment on the pleadings, the City Defendants assert immunity pursuant to the New York State Defense Emergency Act ("SDEA"), the New York Disaster Act ("Disaster Act"), and under state common law. By their motion for summary judgment, the City Defendants assert immunity pursuant to federal law.

The Port Authority together with the Silverstein Defendants join in part the motions filed by the City Defendants and have filed further, supplemental papers. The Port Authority moves both for dismissal and for summary judgment on the basis of immunity pursuant to the SDEA and moves also for judgment on the pleadings asserting immunity under state common law. Separately, the Silverstein Defendants move for summary judgment pursuant to the SDEA. Both the Port Authority and the Silverstein Defendants move for summary judgment on the ground of federal immunity. [*52] The Silverstein Defendants assert further the separate defense that they were divested of their leasehold interest at the time that Plaintiffs sustained their alleged injuries and thus may not be liable for damages resulting from such injuries and move for summary judgment on this basis. n14

n14 Although the Silverstein Defendants join in the pending motions, they assert separately that many of the separate entities named in Plaintiffs' complaint have never had any interest in any part of the World Trade Center and thus were improperly sued. The Silverstein Defendants reserve the right of these separate defendants to move to dismiss the actions against them on those grounds.

The Westfield Defendants move for summary judgment asserting that, as lessees out of possession with no control over the operations at the World Trade Center, that they may not be liable for damages resulting from conditions at the site. The Westfield Defendants move also on the basis of immunity under the SDEA and, to the extent applicable [*53] to non-government actors, pursuant to the Disaster Act, state common law, and federal law.

Con Ed moves for summary judgment on the ground of immunity pursuant to the SDEA and on the basis of federal derivative immunity. Con Ed joins in the motions of the other Lessee Defendants, namely the Silverstein and Westfield Defendants, seeking dismissal on the ground that as a lessee out of possession it lacked control over the operations at the World Trade Center site. Separately, Con Ed seeks dismissal of Plaintiffs' claims alleging fraud and misrepresentation, medical monitoring, fear of cancer and wrongful death, and all derivative claims of spouses and children.

The parties appeared before me for oral argument on June 22 and 26, 2006. By Summary Order of June 23, 2006, in the absence of any showing by Plaintiffs that the claims against them should be allowed to proceed, I granted the Westfield Defendants' motion for summary judgment and dismissed all claims against them currently pending under 21 MC 100. (See Summary Order, dated June 23, 2006.) Concerned that Plaintiffs had failed to state viable claims against various of the other Defendants as well, I directed that they re-plead [*54] certain of their claims. By separate Summary Order of June 27, 2006, I dismissed the claims against the Port Authority without prejudice to re-pleading. I further directed Plaintiffs to re-plead the claims asserted against Verizon and Tishman Construction, as well as various of the contractor defendants. (Id.) As to the individual counts set forth in Plaintiffs' Master Complaint, I ordered Plaintiffs to remove those counts alleging claims for medical monitoring and fear of cancer, as these counts are remedies that follow the success of Plaintiffs' substantive claims, and further advised Plaintiffs to reconsider their claim of fraud and misrepresentation. Plaintiffs also were directed to complete all individual check-off complaints by October 20, 2006. (Id.) Finally, I directed Plaintiffs to file supplemental briefing as to the veracity of claims pending against the Silverstein Defendants and Con Ed. (See Transcript, dated June 22, 2006, 117:4-16; 125:7-9.) Judgment was reserved as to all other matters.

The parties have now fully complied with all of the foregoing. Plaintiffs have submitted newly amended

2006 U.S. Dist. LEXIS 75020, *

Master Complaints as to the separate categories of Defendants with [*55] separate complaints filed as to the City, the Port Authority, the World Trade Center Defendants, Con Ed, the Construction Defendants, the Contractor Defendants, Verizon Communications, and the Tishman Defendants. n15 By their newly amended complaints, Plaintiffs have dropped all claims sounding in medical monitoring and fear of cancer as well as all claims of fraud and misrepresentation. Thus, Plaintiffs now assert claims for negligence, wrongful death, derivative plaintiffs, and for violations of New York Labor and General Municipal Law.

> n15 The cases against the Verizon and Tishman Defendants are proceeding separately. Motions will follow as to these Defendants following the completion of discovery pursuant to CMO 3.

## IV. THE PREEMPTIVE EFFECT OF THE ATSSSA

The Air Transportation Safety and System Stabilization Act, *49 U.S.C. § 40101* note, sets forth the essential statutory framework for the consideration and treatment of claims arising from the terrorist attacks of September 11, 2001. Enacted [*56] following September 11, the Act was aimed at protecting the airline industry from potential economic collapse while simultaneously providing a simplified avenue for recovery by those immediate victims of the attacks who wished to take advantage of that method, and an exclusive federal remedy for all others having a cause of action. See *Colaio v. Feinberg, 262 F. Supp. 2d 273 (S.D.N.Y. 2003); see also Hickey, 270 F. Supp. 2d at 362.*

By amendments, the protections of the Act were extended to additional parties--of relevance here, the City of New York and the Port Authority of New York and New Jersey. ATSSSA § § 408(a)(1), (3). The Act, as originally enacted, limited the liabilities of the airline industry defendants to the defendants' insurance coverages. The liability of the Port Authority in relation to its property interest in the World Trade Center was also limited to the aggregate of its liability insurance. ATSSSA § 408(a)(1). Separately, the liability of the City was limited to the higher of its liability insurance coverage or $ 350,000,000. ATSSSA § 408(a)(3).

As to plaintiffs, those who sustained injury as a direct result of the attacks, [*57] were given a special means of redress, in a specially authorized and appropriated Victim Compensation Fund ("VCF") or, alternatively, through litigation in the federal courts, specifically the United States District Court for the Southern District of New York. ATSSSA § § 408(a), 408(b).

Other plaintiffs, including those in the lawsuits which are the subject of this Opinion, were also granted rights of action arising from the ATSSSA but, since they incurred their injuries in the days and months following September 11, could not take advantage of the VCF and were limited to suit in the United States District Court for the Southern District of New York.

Plaintiffs argue that granting immunity to the Defendants, pursuant either to state or federal immunity doctrines, would contradict Congressional intent as expressed in the Act. Particularly, Plaintiffs argue, Congress appropriated one billion dollars to the City, enabling the City to establish a Captive Insurance Fund. Consolidated Appropriations Resolution, Pub. L. No. 108-7 (2003). Plaintiffs argue that Congress could not have legislated a $ 350 million ceiling on the City's aggregate liability and a $ 1 billion special litigation authorization [*58] without recognizing the City's exposure to the claims of those who engaged in the debris removal and cleanup work, for any other source of significant exposure is not apparent. This legislative purpose, Plaintiffs argue, preempts pre-existing state and federal law providing immunity to the City and its contractors, as well as to the other Defendants.

### A. The Doctrine of Preemption

Determinations as to whether a particular federal law operates to preempt state law are "fundamentally a matter of Congress' intent." *McNally, 414 F.3d at 371* (citing *English v. General Elec. Co., 496 U.S. 72, 78-79, 110 L. Ed. 2d 65 (1990); Hillsborough County v. Automated Med. Labs., Inc., 471 U.S. 707, 713, 85 L. Ed. 2d 714 (1985)).* The doctrine of preemption, rooted in the Supremacy Clause of the United States Constitution, U.S. Const. art. VI, cl. 2, provides that to the extent a state law conflicts with federal law, the contradictory state law is "without effect." *Hickey, 270 F. Supp. 2d at 366.* The Supreme Court has recognized two general types of preemption, express and implied.

> Congress can expressly preempt [*59] state law by explicitly providing for the displacement of state law. See *Hillsborough County v. Automated Med. Labs., Inc., 471 U.S. 707, 713, 105 S. Ct. 2371, 85 L. Ed. 2d 714 (1985).* Even if Congress does not expressly preempt state law, state law may be impliedly preempted if Congress either 1) has legislated in a particular field so pervasively that no room is left for concurrent state legislation, see *id.*; or 2) has enacted federal laws that conflict with state laws, see *Geier v. American*

*Honda Motor Co., 529 U.S. 861, 873-74, 120 S. Ct. 1913, 146 L. Ed. 2d 914 (2000).*

Id.

There are "no fixed meanings or shorthand rules to demarcate just where the traditional jurisdiction of state courts and application of state law must be ousted." Id. at 367. Courts are to adopt a fluid approach to setting the scope of a particular statute's preemptive effect.

> Beginning with the presumption that Congress does not intend to displace state law, especially in traditional areas of state control, ..., courts go on to weigh whether the central motivations behind the federal law favor preemption--in other words, whether allowing [*60] state law to govern would undermine federal control or weaken the protections Congress intended to provide.

Id. As a general rule, preemption of areas traditionally subject to state regulation will not be found unless it is the "clear and manifest purpose of Congress." *CSX Transp. Inc. v. Easterwood, 507 U.S. 658, 664, 123 L. Ed. 2d 387 (1993)* (quoting *Rice v. Santa Fe Elevator Corp., 331 U.S. 218, 91 L. Ed. 1447 (1947))*.

If, however, traditional state law principles contradict the purpose of a federal statute, preemption will be applied. In *Burnett v. Grattan, 468 U.S. 42, 82 L. Ed. 2d 36 (1984)*, the Supreme Court held that application of a restrictive administrative statute of limitations to bar litigation under the Civil Rights Act "ignore[d] the dominant characteristic of civil rights actions: they belong in court." *Id. at 50* (citing *McDonald v. West Branch, 466 U.S. 284, 80 L. Ed. 2d 302 (1984))*. Thus, the Court approved application of a more liberal statute of limitations. Id. at 55. The Court of Appeals for the Second Circuit reached a similar conclusion regarding the application [*61] of restrictive state statutes in a section 1983 action by a former university professor, noting that "[i]t would be anomalous for a federal court to apply a state policy restricting remedies against public officials to a federal statute that is designed to augment remedies against those officials, especially a federal statute that affords remedies for the protection of constitutional rights." *Pauk v. Board of Trustees of City Univ. of New York, 654 F.2d 856, 862 (1981)*.

*B. The Alleged Preemptive Effect of the ATSSSA and the Captive Insurance Fund*

The Act expressly provides that those who sustained injury as a result of the September 11 attacks may gain redress from the VCF or, alternatively, seek it in traditional litigation, but only in the federal court for the Southern District of New York. Both manners of relief are, however, limited in several important respects. As an initial matter, eligibility for the VCF is limited to those who suffered physical injury or death as a result of the terrorist-related aircraft crashes and who were "on the planes or at the World Trade Center, the Pentagon, or the crash site at Shanksville, Pennsylvania at the time, [*62] or in the immediate aftermath, of September 11, 2001." *Hickey, 270 F. Supp. 2d at 362* (quoting ATSSSA § 405(c)). Further, upon the submission of a claim under the VCF, individuals "waive the right to file a civil action ... in any Federal or State court for damages sustained as a result of" the September 11 attacks. ATSSSA § 405.

To the extent persons who were injured as a result of September 11 chose not to participate in, or were not eligible for, the VCF, section 408 of the Act, as amended in November of 2001, establishes a "federal cause of action" as the "exclusive remedy for damages arising out of" the September 11 attacks. ATSSSA § 408(b)(1). The section further vests the United States District Court for the Southern District of New York "with original and exclusive jurisdiction" over all claims "resulting from or relating to the terrorist-related aircraft crashes[.]" ATSSSA § 408(b)(3). Creation of a federal cause of action, however, did not serve to preclude application of state law. Instead, Congress expressly provided that, in actions brought pursuant to the Act, the "substantive law for decision ... shall be derived from the law ... of the state [*63] in which the crash occurred unless such law is inconsistent with or preempted by federal law." ATSSSA § 408(b)(2).

Section 408(a) operates also to limit the potential liability of defendants likely to be named in actions resulting from or relating to the September 11 attacks (other than the terrorists themselves or those who conspired with, or aided and abetted them). Thus, the liability of any "air carrier, aircraft manufacturer, airport sponsor, or person with a property interest in the World Trade Center" may not exceed "the limits of [their] liability insurance coverage." ATSSSA § 408(a)(1). The potential liability of the City of New York is also limited. By amendment to the Act, passed at the urging of the City, the Act expressly provides that "[l]iability for all claims ... against the City of New York shall not exceed the greater of the City's insurance coverage or $ 350,000,000." ATSSSA § 408(a)(2). In addition, further to provide financial protection to the City of New York and its Contractors, another Act of Congress, passed one year later, appropriated 1 billion dollars in federal fund-

ing to "establish a captive insurance company ... for claims arising from debris [*64] removal[.]" Consolidated Appropriations Resolution, 2003, Pub. L. No. 108-7 (2003). The Captive Policy insures the City and its Contractors against potential liability, as well as associated costs and expenses, and affords the City and its Contractors fully-funded financial protection against all potential claims. WTC Captive Insurance Company Liability Insurance Policy, § 2.04 ("Defense of Suits and Related Defense Costs") (the "Captive Insurance Fund").

## C. Discussion

As noted earlier, I begin "with the presumption that Congress does not intend to displace state law[.]" *Hickey, 270 F. Supp. 2d at 366* (citing New York State *Conf. of Blue Cross & Blue Shield Plans v. Travelers Ins. Co., 514 U.S. 645, 661, 131 L. Ed. 2d 695 (1995)).* Preemption will not be found unless it is the "clear and manifest purpose of Congress." *CSX Transp. Inc., 507 U.S. at 664* (quoting *Rice v. Santa Fe Elevator Corp., 331 U.S. 218, 91 L. Ed. 1447 (1947)).*

Here, neither the plain language of the statute, nor its purpose, evince a Congressional intent to supplant the application of state law principles. To the contrary, Congress [*65] expressly provided that the "substantive law for decision" in any suit relating to the September 11 attacks "shall be derived from the law ... of the state in which the crash occurred," unless "inconsistent with or preempted by federal law." ATSSSA § 408(b)(2). Application of such state substantive law is not "inconsistent" with federal law as embodied in the Act. See *7WTC, 2006 WL 62019* at *6-8 (granting immunity to the City of New York pursuant to the New York State Defense Emergency Act as to claims asserted by Consolidated Edison's insurers for damage resulting from the collapse of Seven World Trade Center). Nothing in the Act or its legislative history suggests that defenses against potential lawsuits are prohibited. It is Plaintiffs' burden to show that Congress intended to remove reliance on such defenses insofar as they directly contradict Congressional intent, see *Silkwood v. Kerr-McGee Corp., 464 U.S. 238, 255, 78 L. Ed. 2d 443 (1984),* and Plaintiffs are unable to meet such a burden.

The limited purpose of section 408 was to provide an efficient and rational means for the adjudication of claims relating to or resulting from September 11. [*66] It was not intended to guarantee compensation to those injured by the September 11 attacks. The possibility that compensation might ultimately be denied to those who declined to, or were ineligible to, participate in the Fund was contemplated by Congress and expressed by Senator John McCain during the Congressional debate: "To ensure that the victims and families of victims who were physically injured or killed on September 11th are com-

pensated even if courts determine that the airlines and any other potential corporate defendants are not liable for the harm ... the [Act] also creates a victims' compensation fund." 147 Cong. Rec. S9589091 at S9594 (Sept. 21, 2001 (statement of Sen. McCain); see also *Colaio, 262 F. Supp. 2d 273.*

Thus, I decline to extend the scope of federal preemption under the Act to preclude application of otherwise available state law immunity defenses. I further decline to bar application of federal immunity doctrines as contradictory to the alleged compensatory purpose of the Act. The preemptive effect of the Act serves to displace, "not the substantive standards governing liability, but only the state-law damages remedies," *McNally, 414 F.3d at 380,* [*67] in the sense of placing a monetary limit to those remedies. Risks are inherent in the very nature of litigation, even where claims are brought pursuant to express Act of Congress. *In re September 11 Litig., Opinion and Order Regulating Testimony at Depositions, 2006 WL 846346,* * 10 (S.D.N.Y. March 31, 2006). Although "[i]t would be anomalous for a federal court to apply a state policy restricting remedies," *Pauk, 654 F.2d at 862,* to a statute designed to expand remedies, the ATSSSA is not such a statute. Nor is it the role of the federal courts to eliminate entirely the risks inherent to litigation. By enactment of the ATSSSA, Congress intended to create a federal forum for the adjudication of claims arising out of the September 11 attacks, to consolidate and rationalize all such suits in a single forum, and to protect defendants against a multiplicity of actions in multiple forums. To infer from the Act that all Plaintiffs should be entitled to compensation would run counter to the otherwise clearly expressed intent of Congress. It is an inference that I decline to make.

Having thus ruled, I concede a sense of disquiet. I have not come across [*68] federal legislation of the type we have here--providing a limit to how much aggregate liability the City can incur--except in bankruptcy or insolvency practice, and there is no suggestion of that here. Nor, except perhaps in the case of atomic energy disasters, have I encountered a contribution from the federal fisc to create a litigation defense fund, and even in that case there is a significant difference. Here, the City was given one billion dollars to assure against liability, loss or expense, while in the case of atomic energy disaster, there is a provision only of federal insurance. *42 U.S.C. § 2210 (2005).*

What, one may ask, was the City, and Congress, contemplating if not the kinds of suits as those over which I preside? Clearly, provisions of insurance do not concede liability, as Defendants stress, but never have we seen provisions as those we have here.

Provisionally, and subject to further consideration as these cases progress, the case for preemption has not been made. But neither is there to be a blank check to enrich lawyers with endless stratagems of motions and delays. Congress legislated for the public welfare, and that translates in this [*69] instance to speedy proceedings towards the merits, to distinguish between cases proving injuries arising from the terrorist-related aircraft crashes and from the conditions resulting from those crashes, and cases lacking proof of such a right to recover, and to fashion remedies appropriate to those showing a right to relief. These are the goals that I set for the parties, and for myself in presiding over these cases, to bring these cases to a place where they can be settled or tried as speedily as the interest of justice allows.

## V. THE MOTIONS FOR JUDGMENT ON THE PLEADINGS--STATE IMMUNITY

The various Defendants move for judgment on the pleadings on the basis of various state statutes and doctrines of common law providing for immunity, and assert that liability may not attach for actions taken in response to the terrorist attacks of September 11. Specifically, the Defendants, in various groupings, assert immunity under the New York State Defense Emergency Act, the New York State and Local Natural Disaster and Man-Made Disaster Preparedness Law, and New York common law.

### A. The Standard of Review

The standard employed in reviewing a motion for judgment on the pleadings [*70] pursuant to *Rule 12(c), Fed. R. Civ. P.*, is the same as that employed for motions brought pursuant to *Rule 12(b)(6), Fed. R. Civ. P.*

A Rule 12(b)(6) motion requires the court to determine if the plaintiff has stated a legally sufficient claim. A motion to dismiss under Rule 12(b)(6) may be granted only if "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson, 355 U.S. 41, 45-46, 2 L. Ed. 2d 80 (1957); Branum v. Clark, 927 F.2d 698, 705 (2d Cir. 1991).* The court's function is "not to assay the weight of the evidence which might be offered in support" of the complaint, but "merely to assess the legal feasibility" of the complaint. *Geisler v. Petrocelli, 616 F.2d 636, 639 (2d Cir. 1980).* In evaluating whether plaintiff may ultimately prevail, the court must take the facts alleged in the complaint as true and draw all reasonable inferences in favor of the plaintiff. See *Jackson Nat'l Life Ins. Co. v. Merrill Lynch & Co., 32 F.3d 697, 699-700 (2d Cir. 1994).* [*71] If matters outside of the pleadings are considered by the court, the motion shall be treated as motion for summary judgment, *Fed. R. Civ. P. 56*, and all parties should be given opportunity to submit relevant materials. *Fed. R. Civ. P. 12(c).*

### B. The New York State Defense Emergency Act

Enacted in 1951, at the height of the Cold War, the New York State Defense Emergency Act (the "SDEA") provides for a comprehensive response to attacks upon the United States, and the State of New York, by coordinating the private and public sectors to "make possible the recovery of the people and the rehabilitation of the economic and social life of the state following any such attack." N.Y. Unconsol. Law SDEA § 9102-a (McKinney 2006). See also *7WTC, 2006 WL 62019 at *6; Daly v. The Port Authority, 7 Misc. 3d 299, 793 N.Y.S.2d 712 (N.Y. Sup. Ct. 2005).* In the interest of ensuring that public and private entities will work aggressively to prepare for and to respond to attacks, the SDEA provides immunity for actions taken "in good faith carrying out, complying with or attempting [*72] to comply with" any law or order requiring such a unified response and relating to "civil defense." SDEA § 9193. See also *7WTC, 2006 WL 62019 at *6.*

The City Defendants, the Port Authority, the Silverstein Defendants, and Con Ed, join in asserting immunity pursuant to the SDEA for actions taken in the wake of the September 11 attacks. Defendants assert that all actions they took in response to the attacks were taken in good faith, to comply with the Declarations of Emergency issued by the President, the Governor, and the Mayor, that all actions related to the "civil defense," and that their actions thus fall within the express grant of immunity provided by the SDEA.

#### 1. The Immunity Provision of the SDEA

The immunity provision of the SDEA provides for protection to various entities--government, individuals, partnerships, and corporations--who, in good faith, are engaged in activities in preparation for and responsive to attacks on the State, pursuant to the law or to duly promulgated rules, regulations or orders. The protection extends to preparations against attacks, see *7WTC, 2006 WL 62019 at *6 - *8*, and to "activities . . . following attacks, [*73] " including, as part of the definition of "civil defense," essential debris clearance, immediately essential repairs of damaged facilities, and the restoration of essential services. SDEA § 9103(5). The SDEA provides that parties engaged in such civil defense activities "shall not be liable for any injury or death to persons or damage to property as the result thereof."

> The state, any political subdivision, municipal or volunteer agency, or another state or a civil defense force thereof or of the federal government or of another country or province or subdivision

thereof, performing civil defense services in this state pursuant to an arrangement, agreement or compact for mutual aid and assistance, or any agency, member, agent or representative of any of them, or any individual, partnership, corporation, association, trustee, receiver or any of the agents thereof, in good faith carrying out, complying with or attempting to comply with any law, any rule, regulation or order duly promulgated or issued pursuant to this act, any federal law, or any arrangement, agreement or compact for mutual aid and assistance or any order issued by federal or state military authorities, relating [*74] to civil defense, including but not limited to activities pursuant thereto, in preparation for anticipated attack, during attack, or following attack or false warning thereof, or in connection with an authorized drill or test, shall not be liable for any injury or death to persons or damage to property as the result thereof.

SDEA § 9193(1).

2. The Continued Vitality of the SDEA

Plaintiffs argue that the SDEA was enacted during the height of the Cold War as the nation braced for what seemed to be inevitable nuclear attack, and is no longer viable. Plaintiffs assert further that the SDEA was effectively repealed by subsequent passage of the New York State and Local Natural Disaster and Man-Made Disaster Act, N.Y. Exec. Law § § 20-29-g (McKinney 2006) (the "Disaster Act"). Plaintiffs' arguments are without merit and run counter to the plain language and express purpose of both the SDEA and the Disaster Act. The dangers to our nation, state and city that led to the passage of the SDEA are dangers that exist today. In 1947, we were concerned with the warlike stance of the Soviet Union and international communism. Today, we are concerned with international terrorism. Prime [*75] Minister Nikita S. Khruschev at the United Nations threatened to bury us, pounding his shoe on the lectern for emphasis. The terrorists who sent their bombers into the World Trade Center buried almost three thousand of us, and there are too many threats from too many sources to allow us to forget our concerns in sanguine obliviousness.

Enactment of the SDEA was responsive to a perceived threat "of atomic conflict with communist nations and the concomitant need for a comprehensive plan to ensure the survival of the State's citizens in the event of foreign attack." *Fitzgibbon v. County of Nassau, 147 A.D.2d 40, 541 N.Y.S.2d 845, 847* (2d Dep't 1989). As I

observed in an earlier decision, the statute "is not limited to a particular time or a particular threat." 7 WTC, 2006 WL 62019, at *6. I ruled that the legislative history and plain language of the statute show that it was based upon "a broad notion of 'enemy attack' using any kind of weapon capable of inflicting mass injury." Id. Thus, the statute gives broad meaning to the term "attack," defining it as:

> [a]ny attack, actual or imminent, or series of attacks by an enemy or a foreign nation upon [*76] the United States causing, or which may cause, substantial damage or injury to civilian property or persons in the United States in any manner by sabotage or by the use of bombs, shellfire, or nuclear, radiological, chemical, bacteriological, or biological means or other weapons or processes.

SDEA § 9103(2). By its plain language the SDEA "is not limited to a nuclear attack or particular enemy." *Daly, 793 N.Y.S.2d at 716.* Here, it is clear that the hijacking and subsequent crashes of American Airlines Flight 11 and United Airlines Flight 175 into the Twin Towers, resulting in the destruction of a once great financial and business center and in the loss of thousands of lives, constitute an "attack" as contemplated under the SDEA. The SDEA remains viable legislation.

With regard to the Disaster Act, as enacted in 1951, its application was limited to natural disasters such as "flood, drought, tidal wave, fire, hurricane, earthquake, windstorm, or other storm, landslide, or other catastrophe," and not disasters resulting from "an enemy attack as defined in the New York state defense emergency act." N.Y. Executive Laws Art. 2 § 10 (repealed). Almost thirty years [*77] later, in 1978, the definitions were expanded to include disasters resulting from "manmade causes." N.Y. Cons. Laws, Executive Laws Art. 2(b) § 20(2)(a). But nothing in the plain language of the statute or in its legislative history suggests an intent to override the immunities provided by the SDEA. The two statutes must be read together, harmoniously. See *J.E.M. AG Supply, Inc. v. Pioneer Hi-Bred Int'l, Inc., 534 U.S. 124, 143-44, 151 L. Ed. 2d 508 (2001)* ("[W]hen two statutes are capable of coexistence, it is the duty of the courts, absent a clearly expressed congressional intention to the contrary, to regard each as effective.") (quoting *Morton v. Mancari, 417 U.S. 535, 551, 41 L. Ed. 2d 290 (1974)*) (internal quotation marks omitted).) See also *Rodriguez v. United States, 480 U.S. 522, 524, 94 L. Ed. 2d 533 (1987)* ("[R]epeals by implication are not favored, and will not be found unless an intent to repeal is

'clear and manifest.'") (quoting *United States v. Borden, 308 U.S. 188, 198, 84 L. Ed. 181 (1939)*) (internal quotation marks and citations omitted). Thus, I hold that the SDEA remains a valid basis [*78] for asserting immunity. See 7 WTC, 2006 WL 62019, at *6; *Daly, 793 N.Y.S.2d at 716.*

### 3. Qualifying Laws under the SDEA

The grant of immunity provided by the SDEA is limited to actions taken "in good faith carrying out, complying with, or attempting to comply with" "any law, any rule, regulation or order duly promulgated or issued pursuant to [the SDEA]" and "relating to civil defense[.]" SDEA § 9193(1). All agree that neither the Mayor nor the Governor of New York invoked any provisions of the SDEA in their various declarations of emergency following September 11. But that does not mean that the governmental entities, and the persons, firms and corporations that were engaged in debris removal and cleanup of the World Trade Center site did not act pursuant to the laws, regulations and orders issued by the President, Governor and Mayor to organize the carrying out of such activities.

The SDEA defines "law" broadly to include "[a] general or special statute, law, city, or village charter, local law, ordinance, resolution, rule, regulation, order or rule of common law." SDEA § 9103(17). The Executive Orders issued by the Mayor of the City of New York [*79] and the Governor of the State of New York are precisely such laws. By their executive orders, the Mayor and the Governor ordered the City and State civil defense agencies to engage in civil defense activities. "Civil Defense Activities" are defined by the statute to include immediately essential repairs and restoration of essential services. The City and State agencies acted also pursuant to the common law, for when an emergent disaster threatens society as a whole, the doctrine of *salus populi suprema lex* (the welfare of the people is the highest law) requires the government to act, enlisting persons, firms and corporations in the private sector to eliminate the threat to society and restore society's ability to function. See *Matter of Cheesebrough, 78 N.Y. 232 (1879). Salus populi* means "that society has a right that corresponds to the right of self-preservation in the individual, and it rests upon necessity because there can be no effective government without it." *Daly, 793 N.Y.S.2d at 721-22* (quoting 20 N.Y. Jur. 2d. Const. Law § 192). *Salus Populi* and the SDEA coincide, for both encourage immediate action to preserve society. [*80] See id. at 718.

Plaintiffs argue that the Contractor Defendants, since they were engaged by private contracts and since they acted, not pursuant to the Mayor's and Governor's Executive Orders, but pursuant to their contracts, were not "carrying out, complying with or attempting to comply with any law, any rule, regulation or order duly promulgated or issued pursuant to [the SDEA]." SDEA § 9193(1). Plaintiffs cite *Abbott v. Page Airways, 23 N.Y.2d 502, 245 N.E.2d 388 (N.Y. 1969)*, where the New York Court of Appeals declined to extend SDEA immunity to a helicopter company that was engaged by the Director of the Civil Defense Office of Monroe County, New York, pursuant to contract, to hover over a riotous demonstration in the City of Rochester to enable the Director to survey the disorder. The chartered helicopter crashed, killing four people, injuring several others, and causing extensive property damage. Id. The helicopter company claimed immunity pursuant to the SDEA. The New York Court of Appeals held, however, that the helicopter company was not entitled to immunity from suit pursuant to the SDEA, as the defendant was "doing nothing more ... than engaging [*81] in its regular course of business of providing air transportation for hire." Id. at 391. "[T]he policy of New York State," the Court of Appeals held, "has been to reduce rather than increase the obstacles to recovery of damages for negligently caused injury or death." Id.

Plaintiffs contend that the Contractor Defendants were paid for their services, and thus were "doing nothing more ... than engaging in [the] regular course" of their respective businesses. Id. However, one cannot compare the havoc caused by the September 11 attacks, and the concomitant need for private assistance with the riot in Rochester in the mid-1960s. The declarations of emergency following the September 11 attacks authorized the City's remedial actions and its call for the assistance and cooperation of scores of private entities and thousands of workers. In contrast, the helicopter company in Abbott was involved in the emergency response in the most limited and peripheral sense. To deny immunity here based on the mere fact of payment for services rendered, without considering the circumstances presented by the September 11 attacks, would run counter to the plain language of the SDEA, expressly [*82] contemplating participation by private actors and providing an intentionally expansive definition of legal authorities. Plaintiffs' argument is more properly addressed to the question whether Defendants were undertaking civil defense activities in good faith, and it is to this argument that I now turn.

### 4. Civil Defense Activities and the Requirement of Good Faith

#### a. Civil Defense Activities

The grant of immunity under the SDEA is limited to "civil defense" "activities and measures designed or undertaken ... to minimize the effects upon the civil population caused or which would be caused by an attack." SDEA § 9193. Where the activities are taken in response

to an attack, civil defense measures are defined to include, among a wide range of measures, "essential debris clearance," "immediately essential emergency repair or restoration of damaged vital facilities," "means and methods for the recovery and rehabilitation of the state," and "the restoration of essential community services, industrial and manufacturing capacity, and commercial and financial activities in the state." n16 Specifically, civil defense activities responsive to an attack include:

> activities for [*83] fire fighting; rescue, emergency medical, health and sanitation services; monitoring for radiation and other specific hazards of special weapons; decontamination procedures; unexploded bomb reconnaissance; essential debris clearance; emergency welfare measures; immediately essential emergency repair or restoration of damaged vital facilities; the implementation of the means and methods for the recovery and rehabilitation of the state; effective utilization of all persons and materials; care and shelter for those made homeless; distribution of stockpiled food, water, medical supplies, machinery and other equipment; the preservation of raw materials; the restoration of essential community services, industrial and manufacturing capacity, and commercial and financial activities in the state; and the resumption of educational programs[].

SDEA § 9103(5).

n16 Civil defense is also defined to include activities in preparation for an attack. Such measures include: "the establishment of appropriate organizations, operational plans, and the supporting agreements; the recruitment and training of personnel; the conduct of research; the procurement and stockpiling of materials necessary to the survival, recovery and rehabilitation of the state and its inhabitants; the provision of suitable warning systems; the construction or preparation of shelters and control centers; provisions for the continuity of state and local governments; and, when appropriate, the non military evacuation of the civil population[.]" SDEA § 9013(5). See also 7 WTC, 2006 WL 62019, at *6 (granting immunity to the City of New York for claims arising from the construction and management of the City's Office of Emergency Management).

[*84]

"[T]he framers [of the SDEA] undoubtedly anticipated that the various civil defense functions contemplated by the Act would be undertaken *during the rush of emergency." Fitzgibbon, 541 N.Y.S.2d at 849* (emphasis added). Thus, in Fitzgibbon, the court excluded routine patrol functions from the immunity provisions of the Act. The court held that although directing traffic in the event of an attack would be covered by SDEA immunity, the SDEA would not grant immunity to the actions of an auxiliary police officer engaged in otherwise routine patrol functions. Id. at 849-50. The court reasoned that if a defendant was engaged in conduct otherwise ordinary and routine to its business, the mere presence of an emergency condition would not operate to mandate the extension of SDEA immunity to otherwise routine conduct. See *Abbott, 23 N.Y.2d 502, 245 N.E.2d 388;* see also 7 WTC, 2006 WL 62019, at *6 (distinguishing between "routine conduct for which there is no immunity under the [S]DEA, and conduct that a municipality performed while engaged in a civil defense function"). Thus, the statute defines as a civil defense activity, not all debris [*85] clearance, but only "essential" debris clearance; not all repair or restoration of damaged vital facilities, but only that which is "immediately essential" and which constitutes "emergency" repair or restoration; and not the restoration of all community services, but only those which are "essential."

### b. The Requirement of Good Faith

Civil defense actions pursuant to the SDEA must also be taken in "good faith carrying out, complying with or attempting to comply with" the legal authorities enumerated therein in order for immunity to attach. SDEA § 9193(1). In this respect, Defendants again urge that the relevant inquiry is not *how* the Defendants acted, but rather *why* the Defendants acted. According to Defendants, the good faith requirement refers only to Defendants' compliance, or attempted compliance, with a civil defense law within the meaning of the SDEA. Moreover, Defendants assert that, regardless of the proper form of inquiry, Plaintiffs have in any event failed to make a showing of bad faith sufficient to defeat the pending motion for judgment on the pleadings.

To date, no cases, either federal or state, have directly addressed the nature of the SDEA's good faith [*86] requirement. The courts have, however, interpreted the parallel good faith provision of the SDEA's precursor statute, the War Emergency Act ("WEA"), in a series of cases addressing claims arising from injuries sustained during the mandatory blackouts of the 1940s. Defining good faith as "an honesty of intention," *Smith v. Town of Orangetown, 57 F. Supp. 52, 55-57 (S.D.N.Y. 1944),* the courts have focused their inquiry on whether

the individual defendant's alleged negligence resulted from a good faith attempt to comply with an order or regulation cognizable under the WEA.

Thus, in Smith, the District Court affirmed the jury's grant of immunity to a police officer who, while driving during a blackout, drove into a group of soldiers, killing one and wounding several. Id. at 53. The analysis adopted by the trial court required a two part inquiry: first, whether the defendant had acted negligently, and, if so, whether the defendant had been pursuing his duties in good faith at the time of the alleged negligence. Id. at 54. So long as the defendant was acting in a good faith attempt to comply with his duties, liability for negligence [*87] would not attach. Id. Similarly, in Gaglio v. the City of New York, 143 F.2d 904 (2d Cir. 1944), the Second Circuit affirmed the District Court's setting aside of a jury verdict in favor of a plaintiff who sustained injuries after falling onto a railroad track allegedly as a result of dim lighting necessitated by the mandated blackouts. Id. The Gaglio court noted that the proper inquiry was not how the City acted but, rather, whether the City's actions constituted a "it bonafide attempt to comply with ... army regulations." Id.

The grant of immunity under the WEA, however, was not absolute. In Jones v. Gray, 267 A.D. 242, 45 N.Y.S.2d 519 (App. Div. 1943), a case factually similar to Smith, an air raid warden, while allegedly responding to a blackout, crashed his car into another vehicle, killing several people. Id. at 520. The defendant argued that he was immune from liability pursuant to the WEA. The court rejected this defense finding that the warden was not "in good faith ... attempting to perform his duties as an air raid warden at the time of the collision," but instead was on what could only be characterized as a fateful "joy [*88] ride." Id. at 523.

Good faith thus may not be inferred simply from the fact that, at the time of the allegedly negligent acts, the Defendants were acting in a manner responsive to a declaration of emergency. Nor may cases granting immunity for isolated incidents of negligence be extended as to allow for the wholesale grant of immunity to incidents of negligence that occurred, not at isolated intervals, but rather continually over a period of several months. Although the question of why the Defendants acted may ultimately prove critical to determining immunity under the SDEA, the interests of justice mandate also a consideration of how the Defendants acted. Special consideration must also be given where the obligation of good faith runs, not to third parties potentially injured by the attacks, but instead to those directly engaged, for all intents and purposes as employees, in the recovery effort. Those who engage others in their service owe definite and specific obligations which may not easily be abandoned.

### c. Discussion

Defendants argue that as long as they were attempting to comply with a legal authority "relating to civil defense" and doing so "in good faith," they [*89] should be entitled to SDEA immunity, and should not be accountable for any deficiencies or negligence in how they carried out their activities, even to the workmen to whom they would otherwise owe a duty. Under this interpretation of the SDEA, immunity should extend to all of Defendants' activities that were responsive to the civil defense emergency created by the attacks, from beginning to end, as they concerned the implementation of "means and methods for the recovery and rehabilitation" of the City. SDEA § 9103(5). Thus, there should not be an inquiry into whether or when an emergency condition existed or ceased to exist, or whether the specific actions undertaken were themselves in good faith. The plain language of the statute, however, considered together with the unique and important public policies implicated by the instant litigation, counsel against adoption of Defendants' arguments. The proper analysis requires consideration of potential temporal limitations on the grant of immunity as well as a consideration of the obligation of good faith that extends beyond mere implementation.

Critically, the statute extends immunity, not to all activities following an emergency, but [*90] limits immunity only to those activities that are, in themselves, "essential," or "immediately essential," and "emergency" in nature. The few cases are in accord, limiting the statute and generally finding immunity. See e.g., Abbott, 23 N.Y.2d 502, 245 N.E.2d 388. Thus, the statute's text limits immunity to activities that must be done immediately to resolve pressing needs, in order to enable society to prepare for an attack, and to begin to function following an attack.

The limitation of immunity to acts undertaken in the context of an emergency is essential to ensure "the least possible interference with the existing division of the powers of the government and the least possible infringement of the liberties of the people[.]" SDEA § 9102. Limitations on the right to seek redress for injuries sustained must be strictly limited, extended only where necessary to restore the ability of society again to begin functioning. Defendants argue that immunity is necessary to encourage companies to volunteer their efforts; the fear of lawsuits, Defendants argue, otherwise will cause them to hold back. But individual workers also are essential to the response effort, and [*91] those who claim injury are the very individuals who, without thought of self, rushed to the aid of the City and their fallen comrades. Their efforts also must be encouraged, for their fear of injury without redress can cause such volunteers also to hold back. A delicate balance has to be struck, one that encourages both companies and indi-

viduals to come forward to clear the effects of the blows to society.

These two competing interests, namely the need to allow for an immediate and effective response to an attack on the state as against the need to ensure persons injured the right of redress, may be considered as existing along a spectrum. Where the emergency condition predominates, the interest of protecting those engaged to assist in the emergency response must necessarily be of less concern. In the rush of an emergency, the ability and capacity to adequately implement and effect necessary safety procedures is greatly reduced. The SDEA's immunity provision operates to ensure that fear of liability will not operate to dissuade government and private entities from responding to a disaster, even in the absence of otherwise mandated safety protocols and procedures. However, as the emergency [*92] condition fades, as the rights and obligations of persons and entities engaged in the response effort become regulated by contract, n17 as procedures and protocols are implemented to protect against potential dangers, the need for immunity diminishes and the obligations and duties otherwise imposed once again must be protected.

n17 Draft contracts between the City and the Primary Contractors show that continued compliance with applicable safety regulations was required. (Pls.' J.A. Vol. 6, Ex. 110.)

There is no bright-line demarcation between that which is emergent and that which is done in the more normal course. In a jurisdictional setting, I proposed to create a two-week period after September 11, to September 29, 2001, at which time, pursuant to order of the Mayor, efforts turned from rescue of victims to clearance of debris. See *Hickey, 270 F. Supp. 2d at 374* (holding that causes of action of workers claiming respiratory injury arose under the Air Transportation Safety and System Stabilization [*93] Act before September 29, 2001, and under New York State law thereafter). The Court of Appeals, however, disapproved of any such bright-line and ruled that claims throughout the period of the rescue and recovery effort were covered by the Act. See *McNally, 414 F.3d at 380-81.* The New York Supreme Court applied the bright-line rule of Hickey to claims under the SDEA, but the questionable efficacy of Hickey casts doubt also on the decision of the New York Supreme Court. *Daly, 793 N.Y.S.2d at 719.*

That an emergency existed for some time following September 11 is without question. n18 But whether the emergency lasted for days, or weeks, or months, and in connection with which precise activities, are fact-intensive questions, not possible to answer in connection

with a Rule 12 motion addressed to the pleadings. Clearly, the desperate search for survivors constituted an unprecedented setting, and nothing about what took place in connection with such a search could be considered ordinary or routine--at least, so it would seem. But at some point after the attacks, the emergency conditions subsided, the extraordinary settled into a routine, and [*94] the Defendants' argument for immunity loses cogency under the teachings of the New York cases.

n18 Defendants point to the fact that the State of Emergency within the City of New York was renewed by Mayoral Order every five days, from September 11, 2001 through June 29, 2002, as proof that the emergency condition existed throughout the duration of the rescue and recovery effort. The renewed Proclamations of Emergency, however, served as a general authority for City agencies to take "whatever steps necessary" to respond to the September 11 attacks. The Proclamations do not serve to define "emergency" for purposes of determining the extent and scope of immunity under the SDEA.

The difficulty of discerning the precise point at which the emergency condition ceased to exist is further complicated by the SDEA's parallel requirement of good faith. The SDEA mandates that all actions pursuant to the Act be undertaken "in good faith carrying out, complying with or attempting to comply with" relevant legal authorities. [*95] SDEA § 9193(1). The factual record before me shows clearly that, in responding to the September 11 attacks, Defendants endeavored to develop a viable health and safety plan for workers at the site. As Defendants put it, the efforts to ensure worker health and safety were extensive and included:

(1) employing health and safety experts; (2) participating in daily health and safety meetings; (3) implementing health and safety protocols, plans, and agreements; (4) adopting a clear and consistent respiratory protection policy, devised by experts and based on proven monitoring and analytical techniques; (5) sharing environmental information with intergovernmental agencies; (6) consulting with top experts in the selection of respirators; (7) overcoming Herculean challenges in acquiring and distributing respirators to workers from the outset; and (8) consistently making an effort to ensure worker compliance with respirator use directives.

(Defs.' Reply Mem. at 30). The pleadings, however, show also that there were critical lapses in the enforcement of safety standards and in the dissemination of vital information about the safety of the air at Ground Zero to those most affected, [*96] the workers themselves. (See Pls.' Timeline at 8, 11, 13, 14, 19, 20, 27, 28, 29, 30, 31, 33, 34, 35, 36, 37.) As of January 2002, compliance rates for respirator usage fell below twenty-nine percent, and Plaintiffs allege that "[r]espirator fit testing done at and around the WTC site was illusory, at best," and, in any event, "did not meet OSHA standards." (Pls.' Master Compl. at P383.)

Accepting all allegations alleged in the complaint as true, as I am required to do on a motion pursuant to *Rule 12(c), Fed. R. Civ. P.*, I cannot determine at this stage that Defendants' actions all were in good faith, nor which acts might have been, and which appear not to have been, conducted in good faith. There is no standard in case law to help me determine if good faith should be considered according to the motives with which actions were undertaken, in which case good faith likely would be found, or if good faith should be considered in the context of the particular acts as to which the Defendants allegedly were negligent, in which case standards of good faith would tend to merge into standards of negligence. Regardless of Defendants' efforts and [*97] motives to develop safety standards, if the standards were not implemented or enforced in a systematic and reasonable manner, liability well may attach. It may not be sufficient for Defendants to assert simply that they were acting in a good faith attempt to comply with the various declarations of emergency, without considering also what they did, and did not, do. The cases over which I preside involve, not third parties claiming injury because of conduct of an emergency provider, but by the emergency providers themselves, based on allegations that those in charge of their respective workplaces did not provide the training and equipment available and necessary and appropriate to allow them to do their work and to protect them against the dangers incident to their workplaces. Whether Plaintiffs will be able to make a showing of bad faith is a question of fact for the jury that may not be summarily determined at this stage in the litigation. See *Smith, 57 F. Supp. at 55* ("[T]he existence of good faith is an issue for the jury to decide in any case[.]"). n19

n19 Outside of the applicability of the SDEA's general immunity provision, the Plaintiffs assert further that section 9193(2) of the SDEA bars application of immunity in this instance. Section 9193(2) provides that the immunity provisions of the SDEA may not operate to:

> affect the right of any person to receive benefits to which he may be entitled under the workers' compensation law, volunteer firefighters' benefit law, volunteer ambulance workers' benefit law, any pension law or the general municipal law, nor the right of any person to receive any benefits or compensation under any act of congress or under any law of this state.

SDEA § 9193(2). Plaintiffs assert that enactment of the ATSSSA establishes a system of benefits and compensation analogous to a state workers' compensation system and thus precludes application of immunity insofar as it might operate to bar the rights of the Plaintiffs to receive such benefits.

For the reasons stated in my earlier discussion of the preemptive effect of the ATSSSA, Plaintiffs argument is without merit. The ATSSSA was intended to create a federal forum for the adjudication of claims arising out of September 11 and to provide certain defendants with the protections necessary to avoid financial ruin. Its enactment did not serve to establish any form of guaranteed compensation to anyone other than those eligible to obtain relief through the Victim Compensation Fund. In the absence of such a guaranteed scheme for compensation, section 9193(2) is inapplicable.

[*98]

All of this teaches that one has to be cautious in considering a Rule 12(c) motion for judgment on the pleadings on the basis of a fact-laden defense. Defendants' motion accepts Plaintiffs' allegations of respiratory injury as fully proved, and so they must be in the context of a Rule 12(c) motion for judgment on the pleadings. *Fed. R. Civ. P. 12(c)*. A valid affirmative defense defeats even a well-pleaded claim, and the SDEA certainly is a valid defense, but the scope and extent of applicability of the defense is unclear, and a judge must be hesitant to apply such a defense beyond its narrow parameters to a valid claim of injury.

*C. The Argument of Immunity Under the New York Disaster Act*

The New York State and Local Natural Disaster and Man-Made Disaster Preparedness Law (the "Disaster Act"), N.Y. Exec. Law § § 20-19-g (McKinney 2006), provides another basis for the City Defendants' arguments of immunity.

1. The Limited Scope of the Disaster Act's Application

The Disaster Act provides that, upon the "occurrence or imminent threat of widespread or severe damage, injury, or loss of life or property, resulting from any manmade or [*99] natural causes," Disaster Act § 20(2)(a), the "chief executive of any political subdivision is ... authorized and empowered to and shall use any and all facilities, equipment, supplies, personnel and other resources of his political subdivision in such manner as may be necessary or appropriate to cope with the disaster or any emergency resulting therefrom." Disaster Act § 25(1). The Disaster Act provides also for immunity for discretionary functions performed by a political subdivision's officers and employees: "A political subdivision shall not be liable for any claim based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of any officer or employee in carrying out" its provisions. Disaster Act § 25(5). Political subdivisions are given immunity for those of its acts responding to a disaster that: (1) constitute discretionary functions or duties; and (2) are performed by its officers or employees.

Thus the Disaster Act protects political subdivisions, and immunizes then against lawsuits based on discretionary acts of their political officers and employees. There also are additional limitations relating to the Governor's [*100] powers to suspend laws, but not to suspend those laws that safeguard the public health and welfare. Section 29-a of the Disaster Act grants the Governor of the State of New York the authority to "suspend specific provisions of any statute, local law, ordinance, or orders, rules or regulations ... during a state disaster emergency, if compliance with such provisions would prevent, hinder, or delay action necessary to cope with the disaster." Disaster Act § 29-a(1). By implication, the obligations of the government to act consistently with statutory or regulatory duties remain in effect unless the Governor orders the suspension of such laws. Furthermore, the Governor may not suspend a law which safeguards public health and welfare and which is not "reasonably necessary" to the responsive effort.

> No suspension [of law] shall be made which does not safeguard the health and welfare of the public and which is not reasonably necessary to the disaster effort.

Disaster Act § 29-a(2)(b).

The rationale of the Disaster Act is clear. Political subdivisions of the State are to act to preserve the health and welfare of the public, but not at the expense of the public's health [*101] and welfare. The firemen, policemen and construction workers worked at the site to further the health and welfare of the public, but the political subdivisions that regulated their work were not at liberty to sacrifice their health and welfare, except possibly if there was no other way to combat the emergency effects of the disaster. And, significantly, Governor Pataki did not exercise his authority under section 29-a of the Disaster Act to suspend the protections of the New York Labor Law governing the health and welfare of workers at construction sites, presumably because "compliance with such provisions [did not] prevent, hinder, or delay action necessary to cope with the disaster." Disaster Act § 29-a(1). It follows that the provisions of the New York Labor Law relevant to worker safety remained in effect throughout the duration of the rescue and recovery effort, and that it was incumbent on those responsible for supervising the site to comply with those laws.

Thus, the City Defendants cannot argue cogently that they should be immunized for their decisions and conduct in putting out the fires and removing the debris from the rubble of Towers One, Two and Seven no matter what [*102] they did. As I ruled in relation to the SDEA, specific actions have to be evaluated according to time, place and necessity. There is likely to be a setting where immunity should be upheld, but the decisions cannot be made on motion, without a complete record. There is nothing in the Disaster Act that extends immunity beyond that provided by the SDEA, except perhaps if the Governor had found the need to suspend the New York Labor Law and other regulatory protections of the workplace.

The City Defendants argue that a liberal extension of immunity is important to encourage public actors to respond fully to a public disaster, for "[a] public officer, haunted by the specter of a lawsuit, may well be subject to the twin tendencies of procrastination and compromise to the detriment of the proper performance of his duties." *Rottkamp v. Young, 21 A.D.2d 373, 249 N.Y.S.2d 330,* PIN (App. Div. 1964). But large numbers of working people, as well as City officials, must work together to restore a society struggling to recover from a disaster. Extending too large an immunity to official actions, at the expense of the health and welfare of working people, will discourage one group [*103] of people while encouraging another group of people. "Neither the City nor any other entity has discretion to violate an applicable statute," *Daly, 793 N.Y.S.2d at 721,* least of all the strong policy of New York protective of worker safety. *Hickey,*

*270 F. Supp. 2d 357.* The Disaster Act should not be read to create blanket immunity.

Like the SDEA, the Disaster Act's grant of immunity is limited to actions that are emergent in their own quality, and not only because those actions were intended to alleviate a previous emergency condition. The Disaster Act authorizes actions upon the "occurrence or imminent threat of" a disaster, Disaster Act § 20(2)(a), and which are "necessary or appropriate to cope with the disaster or any emergency resulting therefrom." Disaster Act § 25(1). Immunity is thus provided, not necessarily to any actions taken in consequence of a disaster, but instead only to those actions which are necessary to cope with the disaster. Immunity is to be conferred sparingly, and is not to be a cloak excusing all accountability. *Abbott, 23 N.Y.2d 502, 245 N.E.2d 388.* The issue is fact intensive, and fixing the precise point [*104] when emergency efforts became routine is difficult. A proper resolution of the issue requires a properly developed factual record. See *McNally, 424 F.3d 352.*

For all these reasons, I decline to grant immunity under the Disaster Act beyond that which is available under the SDEA.

2. The Extension of Disaster Act Immunity to Non-Government Actors

The Disaster Act expressly limits its grant of immunity to actions taken by political subdivisions and their employees and officers. The City Defendants argue, however, that the grant of immunity should be extended to the private contractors whom the City engaged, and that doing so would be consistent with the policy of the Disaster Act and basic principles of common law. The argument, insofar as it argues for an immunity wider than that available under the SDEA, is without merit.

The immunity provision of the Disaster Act, section 25(5), offers protection only to "political subdivision[s]," and only when their officers or employees "exercise or perform" discretionary functions or duties." See also Disaster Act § 29-b(2), (3) (granting immunity to local civil defense forces operating under the direction and [*105] command of the city civil defense director as authorized by the governor). Had the legislature intended for immunity to extend to private actors, it could easily have so provided. I decline to legislate that which the legislature did not provide.

*D. New York State Common Law Immunity*

The City Defendants, together with the Port Authority and Con Edison, seek immunity also on the basis of state common law, arguing that they performed uniquely governmental functions in the aftermath of the September 11 attacks. In general, although the common law does provide immunity for acts that are "completely sov-

ereign in nature and completely foreign to any activity which could be carried out by a private person," n20 *Williams v. State, 90 A.D.2d 861, 456 N.Y.S.2d 491, 493 (App. Div. 1982),* there are important limitations. Common law immunity is limited to governmental acts that are discretionary in nature. Furthermore, the common law does not extend immunity to private entities that are sued for negligent or willful behavior. See *Haddock v. City of New York, 75 N.Y.2d 478, 553 N.E.2d 987, 991 (1990);* see also *Royal Ins. Co. v. Ru-Val Elec. Corp., 918 F. Supp. 647, 659 (E.D.N.Y. 1996).* [*106] Important public policy considerations require that the immunity granted to private entities acting at the behest of government entities be limited. *Royal Ins. Co., 918 F. Supp. at 659-60.*

n20 The immunity is a common law exception to the waiver of sovereign immunity pursuant to passage, in 1929, of the New York Court of Claims Act, N.Y.S. Ct. Cl. Act § 8. See *Royal Ins. Co. v. Ru-Val Elec. Corp, 918 F. Supp. 647, 659-60* (citing *Florence v. Goldberg, 44 N.Y.2d 189, 375 N.E.2d 763, 766 (1978)).*

The City and Port Authority argue that all acts performed in response to the September 11 attacks were discretionary and unique to governmental entities, including the exercise of traditional police powers in the interest of public health and safety. My task, however, is not to evaluate claims in their generality, but to "scrutinize specific claims," for "[i]t is the specific act or omission out of which the injury is claimed to have arisen and the capacity in [*107] which that act or failure to act occurred" that determines governmental immunity. In re September *11 Litigation, 280 F. Supp. 2d at 303* (quoting *Weiner v. Metro. Transp. Auth., 55 N.Y.2d 175, 433 N.E.2d 124, 127 (1982).* The issue cannot be decided in the context of a motion for judgment on the pleadings. It requires a proper, and fully developed, factual record. n21

n21 To the extent that immunity is in fact found to apply to government actions taken in the aftermath of the September 11 attacks, the Contractor Defendants and Con Edison assert that they are entitled to derivative governmental immunity. The Contractor Defendants and Con Edison assert that the extension of immunity is proper to the extent that they: (1) were at all times working under the direction of the City; and (2) that the actions of which Plaintiffs complain were undertaken pursuant to City directives. See *Yearsley v. W.A. Ross Construction, 309 U.S.*

*18 at 19, 84 L. Ed. 554 (1940)*. Because the grant of immunity pursuant to common law would at this stage be premature in light of the potential grant of statutory immunity, I decline to reach this argument here.

[*108]

## VI.  THE  MOTIONS  FOR  SUMMARY JUDGMENT--FEDERAL IMMUNITY

Defendants argue that they are entitled to immunity also under federal law, pursuant to the Stafford Act and under principles of federal derivative immunity. The Defendants assert that their actions after September 11 mainly were at the express direction of federal government agencies and that immunity should therefore extend to them insofar as they acted at the behest of the federal government. The Defendants assert further that to impose liability would run counter to basic principles of law to the extent that the federal government is the real party in interest. Defendants move for summary judgment, after full discovery relevant to their defense of federal immunity.

### A. Standard of Review

Summary judgment is warranted if the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits . . . show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Fed. R. Civ. P. 56(c)*. A "genuine issue" of "material fact" exists "if the evidence is such that a reasonable [*109] jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 91 L. Ed. 2d 202 (1986)*. Although all facts and inferences therefrom are to be construed in favor of the party opposing the motion, see *Harlen Assocs. v. Village of Mineola, 273 F.3d 494, 498 (2d Cir. 2001)*, the non-moving party must raise more than just "metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586, 89 L. Ed. 2d 538 (1986)*. "[M]ere speculation and conjecture is insufficient to preclude the granting of the motion." *Harlen, 273 F.3d at 499*. "If the evidence is merely colorable or is not significantly probative, summary judgment may be granted." *Anderson, 477 U.S. at 249-50* (citations omitted).

### B. Derivative Federal Immunity

The practicalities of modern governance have led courts, over the past sixty years, to extend the immunity traditionally afforded to the federal government for actions taken in furtherance of its government functions to private entities hired to facilitate the government in the implementation of its [*110] programs and goals. See *Yearsley v. W.A. Ross Const. Co., 309 U.S. 18, 84 L. Ed. 554 (1940)*. The extension of such immunity stems from the premise that, "[t]o insulate the United States from its discretionary decisions, but not to do likewise when the United States enters into contracts with others to execute the will of the United States 'makes little sense.'" *Richland-Lexington Airport District v. Atlas Properties, Inc., 854 F. Supp. 400 (D.S.C. 1994)* (quoting *Boyle v. United Techs. Corp., 487 U.S. 500, 511-512, 101 L. Ed. 2d 442 (1988))*. Indeed, the primary purpose of the defense "is to prevent the contractor from being held liable when the government is actually at fault" but is otherwise immune from liability. *Trevino v. General Dynamics Corp., 865 F.2d 1474, 1478 (5th Cir. 1989)*.

Defendants, the City of New York and its Contractors as well as the Port Authority and the WTC Defendants, urge that under the principles first enunciated in *Yearsley, 309 U.S. 18, 84 L. Ed. 554*, and further developed in *Boyle, 487 U.S. at 505*, and *Richland-Lexington, 854 F. Supp. 400*, [*111] they are entitled to immunity for actions taken in the aftermath of the September 11 attacks to the limited extent that such actions were controlled by and undertaken pursuant to the direction of federal agencies, namely the Army Corps, OSHA and the EPA. They contend that to impose liability on Defendants for actions that were undertaken at the direction of federal agencies would work a manifest injustice and would severely hinder the ability of the government to provide an effective and immediate response to future disasters.

#### 1. The Relevant Case Law

The Supreme Court first recognized the doctrine of derivative immunity for private contractors, the so-called government contractor defense, in *Yearsley, 309 U.S. 18, 84 L. Ed. 554*, dismissing a suit by landowners for damage to their property arising from work performed by a private contractor pursuant to a contract with the federal government. The landowners alleged that the contractor's negligence in constructing dikes in the Missouri River at the direction of the federal government led to the erosion of ninety-five acres of private property. Id. The Court held that the interests of justice required that federal [*112] immunity be extended to private contractors where: (1) the contractor was working pursuant to the authorization and direction of the federal government; and (2) the acts complained of fell within the scope of such government directives. *Id. at 21*. Under the rule set forth in Yearsley, so long as, "[the] authority to carry out the project was validly conferred, that is, if what was done was within the constitutional power of Congress, there is no liability on the part of the contractor for executing" the will of the federal government. Id. Thus, liability may attach only where the contractor exceeded

Case 1:06-cv-00605-GMS    Document 18-9    Filed 11/03/2006    Page 10 of 20

Page 28
2006 U.S. Dist. LEXIS 75020, *

the scope of his authorization, or where the authority itself was not validly conferred. Id.

The purpose and scope of the government contractor defense was clarified and expanded in *Boyle. 487 U.S. 500, 101 L. Ed. 2d 442.* There, pursuant to specifications provided by the United States, a private manufacturer had constructed a military helicopter with an allegedly defective escape hatch. *Id. at 502-503.* As a result of the defective hatch, the co-pilot was killed when he was unable to open the hatch after the helicopter crashed [*113] into the water. Id. A jury had returned a verdict in favor of the executor of the co-pilot's estate on the basis of state law. Although remanding for further consideration, the Supreme Court held that principles of government immunity applied with equal force to the case of a private manufacturer acting pursuant to precise government specifications. Id. Rejecting the argument that federal immunity is necessarily limited to actions taken by an official in the course of performing his or her duties as a federal employee, the Court instead framed the essential issue as the "uniquely federal interest" "in getting the Government's work done." *Id. at 505.* Such unique federal interest, in turn, mandated the displacement of state law to the extent that application of state law principles would give rise to a "significant conflict" with an "identifiable 'federal policy or interest.'" *Id. at 507* (quoting *Wallis v. Pan American Petroleum Corp., 384 U.S. 63, 69, 16 L. Ed. 2d 369 (1966)).*

The Court made clear, however, that a federal interest alone is insufficient to displace state law. Id. at 507. State law is instead displaced only [*114] where it presents a significant conflict with federal policy, such that "the application of state law would 'frustrate specific objectives' of 'federal legislation.'" Id. (quoting *United States v. Kimbell Foods, Inc., 440 U.S. 715, 728, 59 L. Ed. 2d 711 (1979)).* Although the conflict need not be as absolute as that which is required under ordinary preemption analysis where Congress has legislated in an area traditionally governed by state law, "conflict there must be." Id. at 508. In the absence of a conflict, state law obligations remain in effect. Thus, if:

> the United States contracts for the purchase and installation of an air-conditioning unit, specifying the cooling capacity but not the precise manner of construction, a state law imposing upon the manufacturer of such units a duty to include a certain safety feature would not be a duty identical to anything promised the Government, but neither would it be contrary. The contractor could comply with both its contractual obligations and

the state-prescribed duty of care. No one suggests that state law would generally be pre-empted in this context.

Id. at 509.

In the case presented in [*115] *Boyle*, however, the Court recognized the potential for the finding of a "significant conflict." Id. at 511. Neither the federal government nor its officers could be sued for designing an unsafe and defective helicopter because of an inadequate escape hatch, for the Federal Tort Claims Act ("FTCA") precluded the imposition of liability for "the exercise or performance or the failure to exercise or perform a discretionary function or duty." *28 U.S.C. § 2680(a).* The Court in *Boyle* therefore reasoned that, if the federal government could not be sued for performing discretionary acts, neither could a private contractor, and any state law providing for such liability would necessarily give rise to an inherent conflict. On the basis of such a significant conflict, *Boyle* held, the imposition of liability pursuant to state law must fail where: "(1) the United States approved reasonably precise specifications; (2) the equipment conformed to those specifications; and (3) the supplier warned the United States about the dangers in the use of the equipment that were known to the supplier but not to the United States." *Boyle, 487 U.S. at 512.* [*116]

*Boyle* ruled that there was a unique federal interest implicated in the securing of military procurement contracts. The rule of *Boyle*, however, is more expansive and extends to other fields of strong federal interest. The dispositive issue is "whether there is a uniquely federal interest in the subject matter of the contract." *Richland-Lexington, 854 F. Supp. at 422.* Thus, in Richland-Lexington, the District Court for South Carolina extended federal immunity to a private contractor hired by the Environmental Protection Agency to cleanup and stockpile contaminated soil. *Id. 423-24.* Applying *Boyle*, the court ruled that the actions of the EPA were discretionary in nature, and that the discretionary function exception of the FTCA operated to prevent it and its employees and officials from being sued. *Id. at 423.* The court then applied *Boyle's* three-prong test, and concluded that state law conflicted insofar as it operated to impose liability on a private contractor hired by the EPA and therefore was displaced. First, the court found that the EPA had approved the site for cleanup, had determined the best method for cleanup, [*117] and had hired the defendant contractor to excavate and remove contaminated soil from the site according to that method. Second, the court found that the defendant contractor had performed pursuant to performance specifications issued by the EPA and under the EPA's supervision. Third, the

court found that the defendant contractor had not been aware of any dangers with respect to the cleanup activity as to which the EPA was not also aware. *Id. at 423-24.* The court concluded that state tort law was displaced and the defendant contractor was therefore immune from suit, sharing in the immunity traditionally granted the federal government. *Id. at 424.*

The crucial element is that the government contractor acted in compliance with "reasonably precise specifications" approved by the United States. *Boyle, 487 U.S. at 512.* The very essence of the defense is to "prevent the contractor from being held liable when the government is actually at fault," *Trevino, 865 F.2d at 1478,* for "[w]hen a contractor acts under the authority and direction of the United States, it shares in the immunity enjoyed by the Government." *Zinck, 690 F. Supp. at 1333* [*118] (citing *Yearsley, 309 U.S. 18, 84 L. Ed. 554).* If, however, the private actor was acting independently of precise government directions and approvals, the defense does not apply. *Trevino, 865 F.2d at 1480;* see also *Tate v. Boeing Helicopters, 55 F.3d 1150 (6th Cir. 1995).* Furthermore, the government must supervise and control the contractor's actions, for if it does not, or if it fails to exercise supervisory judgment as to the particularities of the project, state law allowing lawsuits for negligence and federal policy providing for immunity are not in conflict and displacement of state law may not be warranted. *Tate, 55 F.3d at 1154.* In the latter case, the discretionary functions of the government are not implicated and the government contractor defense as enunciated in Yearsley and *Boyle may not apply. Trevino, 865 F.2d at 1480.*

> When the government merely accepts, without any substantive review or evaluation, decisions made by a government contractor, then the contractor, not the government, is exercising discretion. A rubber stamp is not a discretionary function; therefore, a rubber [*119] stamp is not 'approval' under Boyle.

Id. Thus, derivative immunity arises where the government: (a) approves in its discretion reasonably precise specifications, (b) supervises and controls the implementation of those specifications, and (c) the contractor is not aware of reasons not known to the government why the application is unsafe or unreasonable. Id. Immunity will not attach, however, where the private contractor acts, or knows material facts, independently of the federal agency.

2. Application to the Rescue and Recovery Efforts at Ground Zero

Defendants claim that federal agencies assumed exclusive control over three distinct areas of the rescue and recovery effort following September 11, and that they are therefore entitled to share in the immunity enjoyed by the federal government with respect to all claims arising from those areas. Specifically, Defendants claim federal control as follows: (1) the Army Corps assumed control over the design, implementation and enforcement of environmental health and safety monitoring at Fresh Kills; (2) OSHA assumed the lead role for respirator distribution, fit-testing, training and use at and around Ground Zero; [*120] and (3) the EPA assumed lead responsibility for environmental monitoring and hazardous waste removal. The Defendants thus argue that they are entitled to derivative immunity from all claims relating to the health and safety protocols in effect at Fresh Kills; claims relating to respirator distribution, fit-testing and training at and around Ground Zero; and all claims arising from air quality monitoring and hazardous materials removal conducted at the World Trade Center site.

The first step in the Boyle analysis is to identify the unique federal interest. That lies in the Federal Response Plan ("FRP") which expressly provides for "a process and structure for the systematic, coordinated, and effective delivery of Federal assistance to address the consequences of any major disaster or emergency[.]" (FRP, Ex. L at 1.) The Presidential Declaration of a National State of Emergency on September 14, 2001 activated the FRP, leading the Army Corps of Engineers, OSHA and the EPA to become involved in the recovery efforts at Ground Zero.

The next step is to identify if a substantial conflict exists between federal policy and application of state law, as "[c]onflict there must be." [*121] *Boyle, 487 U.S. at 508.* Pursuant to the Stafford Act, a federal agency or employee acting in accordance with the FRP "shall not be liable for any claim based upon the exercise or performance of or the failure to exercise or perform a discretionary function or duty[.]" FRP at 8; *42 U.S.C. § 5148.* To the extent the actions challenged were discretionary in nature, allowing for "'second-guessing' of these judgments ... through state tort suits ... would produce the same effect sought to be avoided" by the Stafford Act and FRP exemption. *Boyle, 487 U.S. at 511.* It would make little sense to immunize the federal agencies and officers from liability for decisions made as to protocols to be followed at the site while at the same time imposing liability on the City and other Defendants simply for abiding by such federally-determined protocols.

The question, however, is whether the same or different conduct is implicated, that is, whether the contractor is merely carrying out that which federal officers chose to do in the exercise of their discretion, under the supervision and control of federal officers, or whether

the contractor did [*122] something materially different or additional for which they are being sued. Here, to the extent that the relevant federal agencies did not exercise oversight over Defendants' actions, federal immunity will not operate to protect Defendants from liability by suspending application of state law. *Tate, 55 F.3d at 1154.*

On October 1, 2001, and at the request of the City, the Army Corps assumed limited control over operations at Fresh Kills Landfill and, on October 10, 2001, assumed responsibility for "the implementation of a comprehensive health and safety plan for all personnel working at the landfill site." (Defs.' J.A. Vol. 5, Ex. BJ (Amendment to 3-COE, Oct. 10, 2001).) It engaged Phillips & Jordan to develop and implement the various protocols and procedures for a comprehensive scheme for managing health and safety at the landfill, including dust control measures and monitoring compliance with protocols by workers. (Defs.' J.A. Vol. 5, Ex. BK (Phillips & Jordan Disaster Recovery Group: Experience).)

However, there has been no showing that the Army Corps exercised a level of control and supervision over the operations at the Fresh Kills worksite sufficient to [*123] warrant the extension of federal immunity to the City and other Defendants. To the contrary, the record suggests that the City continued to exercise an independent degree of supervisory control over operations. It was the DDC, and not the Army Corps, that designated Fresh Kills as one of the zones of the rescue and recovery effort. It was the City, not the Army Corps, that commissioned the Environmental Health and Safety Plan ("ES&H"), first distributed in October of 2001, to address the implementation of health and safety protocols within the four primary zones constituting the former site of the World Trade Center and surrounding areas, and which addressed itself to the issues of worker safety at Fresh Kills, incorporating the more extensive recommendations by Phillips & Jordan and placing such recommendations on file with the DDC.

The mere fact that a federal agency, rather than a private contractor, assumed responsibility for operations within the Fresh Kills zone does not require that immunity automatically attach. Although the Plaintiffs cannot "second-guess" the reasonableness of the Army Corps' recommendations, the Plaintiffs are not precluded from attacking other aspects [*124] of the operations which were outside the direction of the Army Corps, directly or through Phillips & Jordan, or which were not part of the work that the City supervised and controlled. n22 Indeed, the clear understanding was that the Army Corps, far from assuming authoritative control over operations at Fresh Kills, worked "on an as required basis" as the City of New York requested its assistance. (Pls.' J.A. Vol. 4, Ex. 49.)

n22 It should be noted that nothing in the FRP, pursuant to which the Army Corps assumed its role at Fresh Kills, supposes that reliance on federal assistance and resources serves to divest a local authority of control. (See FRP, Ex L ("The combined emergency management authorities, policies, procedures, and resources of local, State, and Federal governments as well as voluntary disaster relief organizations ... constitute a national disaster response framework for providing assistance following a major disaster or emergency.").)

As to OHSA, within days of the September 11 attacks, [*125] and at the request of the City DOH, OSHA became the "lead agency for distributing, fitting, and training for respirators for the recovery of workers." (Defs.' J.A., Vol. 2, Ex. Q (Clark Dep.) at 87:19-88:6; Pls.' J.A. Vol. 4, Ex. 56.) OSHA selected the type of respirators to be distributed, and coordinated the distribution of respirators at huts set up throughout the World Trade Center site, providing respirator-fit and -use training, including a mandatory 10-hour health and safety course for all individuals working in a supervisory role at the site. Further, to ensure compliance with established standards, OSHA deployed over 1,000 inspectors to the site to supervise the work of the Primary Contractors and to document violations.

And yet, despite its designated position as the lead agency for respirator training and use, the record clearly shows that OHSA continued to work in an advisory capacity, providing assistance only as needed and requested by the City. Throughout the recovery effort, the City DOH continued to act as the agency responsible for the development of job and site-specific PPE requirements, including establishing relevant respiratory requirements. The ES&H Plan clearly [*126] sets out the DDC, with the assistance of other City agencies and the Primary Contractors, as having primary responsibility for environmental safety and health at the site. Moreover, OSHA expressly declined to assume an enforcement role at the site, instead limiting its inspectors to reporting any observed violations to the relevant Primary Contractor. Enforcement was thus left to City agencies and the Primary Contractors. The cooperative relationship between OSHA and City agencies was memorialized in the WTC Emergency Project Partnership Agreement, affirming "the value of working in a cooperative, focused and voluntary effort to ensure a safe and healthful environment for everyone involved[.]" (Defs.' J.A. Vol. 3, Ex. AO.)

The EPA also played an important and vital role in the rescue and recovery efforts at Ground Zero. Like

OSHA, the EPA assumed its role at the site pursuant to a direct request by the City and pursuant to the authority granted the agency under the FRP. Specifically, the EPA assumed lead responsibility for the removal of hazardous materials at the site and for monitoring and reporting on atmospheric conditions. Air monitoring at the site was coordinated with OSHA [*127] and relevant City agencies through the use of air monitors stationed at locations in and around the World Trade Center site. At the same time, the City, through its own agencies, continued to conduct its own tests, independent of federal air quality monitoring. Both the City and the EPA shared their data with the inter-agency Environmental Assessment Group. Determinations as to respirator requirements on the basis of test results, in turn, were made, not by the EPA separately, but rather by the Environmental Assessment Group as a collective group.

The record thus shows that the City never abandoned its overall responsibility for worker health and safety. The EPA expressly acknowledged that it lacked the authority to enforce the worker health and safety policies for non-EPA employees. Moreover, even though the EPA had assumed lead responsibility for the removal of toxic waste at the site, it in fact exercised its authority in conjunction with the City DEP. (Pls.' J.A. Vol. 4, Ex. 49 ("The Environmental Protection Agency (EPA), in conjunction wit the City Department of Environmental Conservation, (DEP) is responsible for recovering, handling and disposing hazardous wastes at the disaster [*128] site.").) Thus, like the Army Corps and OSHA, the EPA operated at the site in an advisory capacity only, never divesting the City of its authority or its duty to protect those working at its behest.

Defendants urge that active participation of the federal agencies in developing protocols for health and safety suffices to extend immunity. But this is not so. The essential purpose of the derivative immunity doctrine is to "prevent the contractor from being held liable when the government is actually at fault[.]" *Trevino, 865 F.2d at 1478*. If the private actor acted in compliance with "reasonably precise specifications" established by the federal agency, and under the supervision and control of the federal agency, immunity is extended. *Boyle, 487 U.S. at 512*. But immunity is not extended where the private actor acts independently, or outside of, or in addition to, the government's specifications. Moreover, the safety of the workplace is heavily regulated by New York state labor law, a subject that I developed in Hickey, and to which I return in the next section. Unless adherence to the requirements of the labor law conflicts with federally-developed [*129] protocols, the state regulation is not ousted by the federal interest. *Id. at 509*.

Here, the record does not show exclusive federal control. The record instead presents a picture of coopera-

tion and collaboration, with federal agencies providing assistance pursuant to the request of the City and expressly declining to assume an enforcement role, deferring instead to the City agencies and the Primary Contractors. The City and the Primary Contractors it engaged exercised supervisory responsibility for worker health and safety at the site and for ensuring compliance with applicable safety standards. The exercise of discretionary functions by the federal agencies did not conflict with a continuing obligation by Defendants to abide by the mandatory laws regulating the health and safety of the workplace.

It is beyond any doubt that the City and other Defendants relied upon the assistance and expertise of the federal agencies. To the extent that reliance, and adoption of federal standards and protocols is shown, and the Defendants' conduct is tantamount to actions by the federal authority, the Defendants enjoy the same immunity as would be conferred on discretionary acts [*130] and decisions of federal officers and employees. At this point, however, the record is not sufficiently clear to enable the court to demark the boundary between federally instructed discretionary decisions, and those made by the various Defendants. There are material, triable issues of fact that will have to be resolved. At his point in the pre-trial proceedings, the Motions for Summary Judgment are denied.

*C. Stafford Act Immunity*

The various Defendants separately assert immunity pursuant to the Stafford Act. *42 U.S.C. § 5148* (2006). The Stafford Act provides that the federal government, "shall not be liable for any claim based upon the exercise or performance of or the failure to exercise or perform a discretionary function on the part of a Federal agency or an employee of the Federal Government in carrying out the provisions" of the FRP. *42 U.S.C. § 5148*. I decline, however, to extend the grant of immunity provided by the Stafford Act to non-federal actors beyond the limits of federal common law, for to do so would extend the Act beyond its plain terms.

Nothing in the plain language of the Stafford Act provides that immunity [*131] should be extended to non-federal actors. The mere fact that non-federal actors may participate in response and recovery efforts does not in and of itself require that immunity be extended to actors not included in the statutory provision of immunity. Indeed, "this court is not at liberty, because it thinks the provisions [of a statute] inconsistent or illogical, to re-write them in order to bring them into harmony with its views as to the underlying purpose of Congress." *Helvering v. New York Trust Co., 292 U.S. 455, 472, 78 L. Ed. 1361 (1934)*. That the Stafford Act's immunity provision should not be judicially rewritten is further underscored

by the doctrine of derivative federal immunity otherwise available (and previously discussed).

Immunity provisions are to be interpreted narrowly. *Abbott, 23 N.Y.2d 502, 245 N.E.2d 388.* Our system of justice is premised on accountability, save for specific exceptions based on statute or fundamental common law principles of necessity. Defendants urge that courts should encourage private actors to enlist in recovery efforts from mass disasters, but the same policy has to be sensitive to the individual workers [*132] who risk their lives. The job of restoring society cannot be based on a system rewarding businesses, but being indifferent to the health and welfare of working people.

### D. Other Bases for Federal Immunity

The Port Authority and the World Trade Center Defendants, as well as Con Ed, present additional arguments for immunity under federal law.

The Port Authority and the World Trade Center (Silverstein) Defendants argue that the federal government's promise to pay 100 percent of all costs associated with the rescue and recovery efforts at Ground Zero makes the federal government the real party in interest, thus mandating the dismissal of all claims as against them. They cite to the Presidential Declaration of National Emergency on September 14, 2001, by which President Bush ordered FEMA to pay all costs associated with the efforts taken in response to the September 11 attacks. Such promise of payment, however, does not operate to suspend ordinary rules of rights and obligations running between a tortfeasor and his alleged victim. The question properly before me by these pending motions is whether Defendants are in some manner entitled to immunity for acts undertaken in response to [*133] the September 11 attacks. That Defendants may ultimately seek indemnification from the federal government on the basis of FEMA's alleged obligation to pay 100 percent of costs is irrelevant to this larger question.

Con Ed's additional argument, additional to arguments of derivative governmental immunity and the Stafford Act, is based on its legal responsibility to restore energy to lower Manhattan. As a public utility, Con Ed argues that it performs a vital function of government, and it should be immune. Since the claims against Con Ed are dismissed on other grounds, as discussed in the next section, I decline to rule on its argument of immunity.

### VII. THE MOTIONS BY THE LESSEES

Con Ed and the Silverstein Defendants (collectively the "Lessee Defendants") move for summary judgment, *Fed. R. Civ. P. 56(c)*, dismissing all claims against them on the ground that they were divested of their leasehold interests during the duration of the recovery and cleanup efforts at the World Trade Center and thus may not be held liable for injuries sustained during the course of such efforts.

As the City established control over the World Trade Center [*134] site and surrounding areas in the moments following the September 11 attacks, those entities holding an interest in properties at the site found themselves displaced, barred from reentry absent express approval by the City. Plaintiffs seek now to impose liability on two former entities holding an interest in properties at the World Trade Center, Con Ed which operated substations beneath Seven World Trade Center and the Silverstein, or World Trade Center, Defendants, lessees of various properties at the World Trade Center, including One, Two, Four, Five, and Seven World Trade Center. At oral argument on June 22, 2006, I ordered Plaintiffs to submit further briefing as to the veracity of claims pending against the Lessee Defendants. In particular, I directed that Plaintiffs should specifically name and identify individual Plaintiffs who worked under the control of the World Trade Center Defendants or Con Ed during the rescue and recovery efforts at the World Trade Center site and surrounding areas.

By their supplemental submissions, Plaintiffs continue to urge that the claims pending against the Lessee Defendants should be allowed to continue, that these Defendants exercised the degree [*135] of control required under applicable law and owed Plaintiffs a duty to provide adequate protective equipment and enforce appropriate safety standards. Specifically, Plaintiffs assert claims under *New York Labor Law sections 200* and 241(6), General Municipal Laws section 205-a and 205-e, and on the basis of common law negligence.

### A. The Work Performed by the Lessee Defendants

#### 1. The Work Performed by Con Edison

Pursuant to a lease with the Port Authority, Con Edison operated two electronic substations adjacent to and beneath what would ultimately become Seven World Trade Center. *7WTC, 2006 WL 62019.* These two substations were essential to the electrical supply of the City, providing the sole source of electricity for approximately two-thirds of lower Manhattan. (See Donahue Aff. P10, Mem. of Consolidated Edison Supp. M. for SJ, dated Feb. 17, 2006 at 6.) On September 11, 2001 Seven World Trade Center collapsed, after burning unimpeded for several hours, destroying the Con Ed substations. 7WTC, at * 1.

Following the collapse of the first tower, at approximately 10:25 a.m., Con Ed evacuated its personnel from the World Trade Center [*136] site. (Rysavy Aff., Ex. DK.) When the substations were subsequently de-

stroyed, Con Ed immediately set about notifying all relevant authorities that the destruction may have resulted in the release of potentially toxic substances. n23 (See Rysavy Aff., Ex. DZ, EA.) However, essentially from the time of the collapse until the turnover of control of Seven World Trade Center to the Port Authority in May of 2002, access to the site by Con Ed personnel was highly restricted. Indeed, within mere moments of the attacks, the World Trade Center site, including Seven World Trade Center, was placed under the control of the City and access was denied to all but authorized persons. (See Louie Aff. P15; Donohue Aff. P29; Rysavy Aff., Ex. DQ.) Con Edison could not access the site for any purpose whatever without first obtaining the written approval of the Port Authority and the DDC. (See Louie Aff. P16.)

n23 Con Ed notified, among other government entities, the New York City Office of Emergency Management, the National Response Center, the New York City Department of Environmental Protection, the New York State Department of Environmental Conservation, the New York City Fire Department, Marine Division and Bureau of Operations, the New York City Department of Environmental Protection Right to Know, the New York Public Service Commission, and the United States Coast Guard Post of New York. (See Louie Aff., PP8, 9, 10 and 11; Rysavy Aff., Ex. DZ.)

[*137]

Access was granted to the site and the surrounding area for limited purposes. On November 30, 2001, the Port Authority allowed Con Edison to enter the site for the purpose of conducting an environmental impact assessment at the order of the New York Department of Environmental Conservation ("NYDEC"). (Louie Aff. P; Rysavy Aff., Ex. EB.) None of the Plaintiffs worked for the subcontractors who conducted the assessment, and thus no claim is alleged against Con Ed with respect to that activity.

By law, Con Ed was responsible to restore electric, gas, and steam services to lower Manhattan. *N.Y. Pub. Serv. Law § § 65*, 79 (McKinney 2006) ("Every gas corporation, every electric corporation, [every steam corporation] and every municipality shall furnish and provide such service, instrumentalities and facilities as shall be safe and adequate and in all respects just and reasonable."); N.Y. Comp. Codes R. & Regs. tit. 16, § 13.13 (2006) (public utilities "shall act promptly to restore service as soon as possible after [emergency] disconnection..."); Public Utility Regulatory Policies Act of 1978

("PURPA"), *16 U.S.C. § 2621(d)(6)* (2005). [*138] In order to discharge its responsibility, Con Ed had to build a new substation at the site of what was once Seven World Trade Center. (Donahue Aff. P23; Rysavy Aff., Ex. DT, DR, DS, DU, DV, DP.) Rebuilding of the structure, along with the office building at that site began shortly after the return of control to the Port Authority on May 10, 2002, and was completed on April 3, 2003. (Louie Aff. P25; Rysavy Aff., Ex. DX.) The new substation went back online May 26, 2004, fully restoring power to lower Manhattan. Work at the site was performed by Tishman Construction through subcontracts with Seasons Contracting and Urban Foundation Engineering. (See Pls.' Supp. J.A., Ex. 188 (contract between Tishman and Seasons dated May 6, 2006)). Langan Engineering and Environmental Services performed environmental monitoring for the project through separate subcontracts with Silverstein Properties, as the managing agent of 7WTC, and Con Edison. (Louie Aff. P25; Rysavy Aff., Ex. DX.) Nevertheless, Con Ed's contract with Langan for environmental services was not executed until March 11, 2005, well after work relevant to Con Ed had been completed at Seven World Trade Center. (Donahue Aff. P36; Louie [*139] Aff. P27.)

2. The Work Performed by the Silverstein Defendants

The Silverstein Defendants--the lessees, managers and operating agents of several properties at the World Trade Center site--were also excluded from these property interests following the September 11 attacks. Their personnel were allowed to enter the area only upon express authorization from the City. (See WTC Defs.' Mot. S.J., dated Feb. 17, 2006, at 3.) Limited access was first granted to the Seven World Trade Center site in May 2002, when control was returned to the Port Authority. Access to the areas of the site where One, Two, Four and Five World Trade Center had once stood was not granted until July 1, 2002. See *Diversified Carting, Inc. v. The City of New York, 2006 WL 147584*, at *1 (S.D.N.Y. Jan. 20, 2006). The Silverstein Defendants exercised no control or authority over the general conduct of rescue and recovery operations at the World Trade Center. See id. ("The Silverstein Entities had no control over the debris-removal activities, nor did they fund the clean up.").

In November 2001, when debris removal operations at Seven World Trade Center had been completed, the NYDEC gave [*140] permission to the Silverstein Defendants to remove the two diesel fuel tanks that formerly were part of Seven World Trade Center and the surrounding contaminated soil, in order to begin construction of a new office tower. The Silverstein Defendants, in turn, contracted with contractors Turner and Plaza for the removal of the tanks and soil. (See Levy Aff. P7; J.A., Ex. DE.) The work was subsequently com-

pleted in March and April 2002, prior to the turnover of control from the City to the Port Authority. (See Levy Aff. PP7, 8; J.A. Ex. DE.)

### B. Plaintiffs' Supplemental Submissions

Plaintiffs challenge the showings by Con Ed and Silverstein, and contend that they remained in control of the World Trade Center premises. Plaintiffs rely on seven supplemental affidavits. I granted leave to Plaintiffs to file such supplemental affidavits even though they gave no excuse why they had neglected during the deposition proceedings to identify these individuals as potential witnesses, or why their affidavits had not been submitted as part of their opposition papers.

Of the seven, Dean Curti states that he worked as a laborer at the World Trade Center from late October 2001 through [*141] early December 2001, primarily at Seven World Trade Center, that he was employed by Seasons Construction Company, a subcontractor to contractors Plaza and Turner, and that he observed Con Ed personnel at the Seven World Trade Center site in early December 2001 and Silverstein personnel at the site every day of his employment. Michael Clarke states that he worked at the Seven World Trade Center site as a crane operating engineer for Seasons from September 12, 2001 through mid-November 2001, and does not mention seeing any personnel of Con Ed or of Silverstein. Peter Vincent states that he worked as a supervisor of trucking at the World Trade Center site from September 12, 2001 until December 2001, primarily at Seven World Trade Center, and that in his second week at work (approximately the end of September) he observed Con Ed personnel dressed in hazard suits with full respiratory protection working on removing Con Ed's transformers. Robert Von See states that he worked at the World Trade Center site for approximately two months, beginning September 18, 2001, initially for Bovis and subsequently for Canron Steel Erectors at the South Tower, that he worked for Seasons Construction at [*142] the Seven World Trade Center site on September 25, 2001 and that he observed Con Ed Personnel at the site. Patrick D'Allegro states that he worked for Seasons as a labor-mechanic at the Seven World Trade Center site from September 14, 2001 until early July 2002, and that he saw Con Ed personnel at the site during the first three months after September 11. He does not mention seeing any Silverstein personnel. Michael Moscato, Sr. states that he worked as an operating engineer for Seasons at the Seven World Trade Center site from September 13, 2001 until November 2001, that Seasons was a subcontractor for N.Y. Crane to remove the burned and destroyed Con Ed transformers from the site, and fails to mention seeing either Con Ed personnel or Silverstein personnel at the site. William Moscato states that he worked at the Seven World Trade Center site as an oper-

ating engineer for Seasons from September 11, 2001 until the first week of December 2001 and that he observed Con Ed personnel at the site, but makes no mention of seeing any Silverstein personnel.

Plaintiffs' allegations, that some of them observed Con Ed and Silverstein personnel at the site are conclusory, and without evidentiary [*143] effect in relation to Defendants' motions. No Plaintiff offers any testimony that Con Ed or Silverstein assumed any operational control of the workforce at the site. There is no evidence that either enjoyed any aspect of the use of the premises that would be characteristic of a landholding, either as a landlord or as a tenant. In contradiction to their affidavits, Dean Curti and Robert Von See have not included Con Ed as a defendant in their individual complaints, even though they now claim that they saw Con Ed personnel at the job site. None of the seven affiants alleged in their complaints that they had worked at the Seven World Trade Center site, also contradicting their supplemental affidavits. Indeed, Plaintiff Patrick D'Allegro filed three prior complaints, and only now, in his supplemental affidavit, does he allege that he worked at the Seven World Trade Center site after November 2001.

I hold that there is no credible evidence to show that Con Ed or Silverstein had use of their respective premises, or even general access to them, during the relevant periods of time claimed by any Plaintiff. Nevertheless, I address below Plaintiffs' asserted bases for liability, finding that, [*144] regardless of the veracity of the allegations against Defendants, claims against Con Ed and Silverstein may not stand.

### C. Alleged Grounds of Liability

Plaintiffs assert claims against Con Ed and the Silverstein Defendants under sections 200 and 241(6) of New York Labor Law, sections 205-a and 205-e of the New York General Municipal Law, and state common law. (See Amended Master Complaint Against Consolidated Edison, dated Aug. 18, 2006, PP103-138; Amended Master Complaint Against World Trade Center Defendants, dated Aug. 18, 2006, PP94-127.) Plaintiffs fail, however, to establish that the Lessee Defendants, in their capacity as lessees, owed any duty towards Plaintiffs, and their claims therefore must be dismissed.

1. Dismissal of Claims Pursuant to New York Labor Law for Failure to Show the Necessary Degree of Ownership or Control

Counts One and Two of Plaintiffs' Amended Complaints allege violations of *New York Labor Law sections 200* and 241(6).

The common law duties traditionally owed by landowners, general contractors, and in very limited circumstances, lessees, to maintain and provide a safe work-

2006 U.S. Dist. LEXIS 75020, *

place are codified in *New York Labor Law section 200* [*145] . *N.Y. Lab. Law § 200 (2006). See Ross v. Curtis-Palmer Hydro Elec. Co., 81 N.Y.2d 494, 618 N.E.2d 82, 87 (N.Y. 1993).* Section 200 provides, in relevant part, as follows:

> All places to which this chapter applies shall be so constructed, equipped, arranged, operated and conducted as to provide *reasonable and adequate protection to the lives, health and safety* of all persons employed therein or lawfully frequenting such places. All machinery, equipment, and devices in such places shall be so placed, operated, guarded, and lighted as to *provide reasonable and adequate protection* to all such persons.

*N.Y. Lab. Law § 200(1)* (emphases added).

However, liability under this provision is dependent on a showing that the person or entity to be charged has exercised supervisory control, whether as an owner, lessee or contractor. See id. at 88. Recovery may not be had "unless it is shown that the party to be charged exercised some supervisory control over the operation." *Ross, 618 N.E.2d at 88* (citing *Lombardi v. Stout, 80 N.Y.2d 290, 604 N.E.2d 117, 119 (N.Y. 1992); Kappel v. Fisher Bros., 6th Ave. Corp., 39 N.Y.2d 1039, 355 N.E.2d 305, 306 (N.Y. 1976)).* [*146] Such limitation of liability stems from "the basic common-law principle that 'an owner or general contractor [sh]ould not be held responsible for the negligent acts of others over whom [the owner or general contractor] had no direction or control.'" *Ross, 618 N.E.2d at 88* (quoting *Allen v. Cloutier Constr. Corp., 44 N.Y.2d 290, 376 N.E.2d 1276, 1278 (N.Y. 1978)).* Liability in the absence of direction or control over the worksite may attach only where the person to be charged in fact caused the defective condition giving rise to injury. See *Murphy v. Columbia Univ., 4 A.D.3d 200, 773 N.Y.S.2d 10, 13 (N.Y. App. Div. 2004)* (holding that proof of control was not required where the "injury arose from the condition of the work place created by or known to the contractor[.]").

Here, the record demonstrates clearly that Con Ed and the Silverstein Defendants exercised no control over those aspects of the rescue and recovery efforts at the World Trade Center that gave rise to the injuries claimed by the Plaintiffs. Both Con Ed and the Silverstein Defendants had been divested of control over their leasehold interests immediately [*147] following the September 11 attacks, reentering the site only with the City's permission and for limited purposes.

The Silverstein Defendants, as the managing agent for the lessee of Seven World Trade Center, contracted with Turner and Plaza for the removal of two diesel fuel tanks and soil at the site between March and April of 2002. (See Levy Aff. P7; J.A., Ex. DE.) But there has been no showing that the Silverstein Defendants in fact exercised control over the work performed by Turner and Plaza. The evidence in the record is that the DDC exercised that supervisory control. Although Patrick D'Allegro asserts in his supplemental affidavit that he "often saw Silverstein personnel in hard hats walking in and around the worksite," (Pls.' Supp. J.A., Ex. 195 at P9) that bare assertion is not enough to establish liability under section 200. See *Ross, 618 N.E.2d at 88* (quoting *Allen, 376 N.E.2d at 1278).*

Con Ed's role at the site following September 11 was limited to its participation in a mandated environmental impact assessment and its role in the rebuilding of the substation at Seven World Trade Center. Plaintiffs concede that no claims arise [*148] from the conduct of the environmental assessment. As to the rebuilding of the substation, all work was performed pursuant to a contract between Tishman and Seasons dated May 2006. Aside from deposition statements by Eddy Louie, section manager in Con Ed's Environmental Health and Safety Department, providing generally that Con Ed at some point distributed respirators to Con Ed employees and others at the site, (see Pls.' J.A., Ex. 154 at 104-108) there is simply no evidence whatsoever that Con Ed exercised any control over the work performed by Tishman, Seasons, or any other contractors working at the site, and no Plaintiff cited that alleged distribution as the basis of any claim. Only affiant D'Allegro claims to have worked at Seven World Trade Center during the time in which Tishman and Seasons performed work pursuant to a contract with Con Ed, and D'Allegro's assertion that he "saw Con Edison personnel on and off within the first three months after September 11, 2001," (Pls.' Supp. J.A., Ex. 195) fails to establish the requisite involvement needed to impose liability under section 200.

Plaintiffs argue that, because Con Ed was aware of the dangerous conditions at the worksite [*149] arising from the release of potentially toxic materials when the substation was destroyed, and gave notice thereof to all responsible agencies, liability must attach even in the absence of a showing of control. See *Murphy, 773 N.Y.S.2d at 13.* Plaintiffs' argument is without merit. The record clearly demonstrates that Con Ed immediately warned all relevant authorities of the potential dangers resulting from the destruction of the substation, and that it was thereafter divested of any control over the conduct of the rescue and recovery efforts. To impose liability here would go beyond the requirements of the Labor Law.

Plaintiffs' claims under section 241 of the New York Labor Law must fail also. Section 241 further codifies the obligations of owners and contractors to ensure workers' safety. Section 241(6) specifically provides that:

> All contractors and owners and their agents ... when constructing or demolishing buildings or doing any excavating in connection therewith, shall comply with the following requirements:
>
> \*\*\*
>
> 6. All areas in which construction, excavation or demolition work is being performed shall be so constructed, shored, equipped, guarded, [\*150] arranged, operated and conducted as to *provide reasonable and adequate protection and safety to persons employed therein* or lawfully frequenting such places. The commissioner may make rules to carry into effect the provisions of this subdivision, and the owners and contractors and their agents for such work ... shall comply therewith.

*N.Y. Lab. Law § 241(6)* (2006) (emphasis added).

The duty imposed under section 241(6) may not be delegated. See *Ross, 618 N.E.2d at 87.* Thus, consideration of whether the defendant exercised control or supervision over the worksite is irrelevant. See id. However, because section 241(6) essentially provides for strict liability, courts are reluctant to extend such liability to mere lessees of property. Indeed, although lessees may be subject to liability under section 241(6), liability may not attach where the lessee is out of possession, does not contract for or supervise the work, and lacks any authority to control or direct the work which caused the injury. See *Crespo v. Triad, Inc., 294 A.D.2d 145, 742 N.Y.S.2d 25, 29 (N.Y. App. Div. 2002)* (holding that out-of-possession lessee [\*151] was not liable under section 241(6) where it neither contracted for nor supervised the work) (citing *Saaverda v. East Fordham Rd. Real Estate Corp., 233 A.D.2d 125, 649 N.Y.S.2d 416, 417 (N.Y. App. Div. 1996)* (affirming grant of out-of-possession lessee's motion for summary judgment on basis that lessee did not contract for or supervise the challenged work and had no authority to exercise control over the worksite)). A lessee may be considered the equivalent of an owner for purposes of section 241(6) only where it was the lessee, and not the owner, who engaged a contractor to undertake construction work for the lessee's benefit. *Copertino*

*v. Ward, 100 A.D.2d 565, 473 N.Y.S.2d 494, 496-97 (N.Y. App. Div. 1984).* Section 241(6) requires a finding "that the party to be cast in the role of 'owner' had the 'right to insist that proper safety practices were followed and it is the right to control the work that is significant.'" *Bateman v. Susquehanna Valley Cent. Sch. Dist., 289 A.D.2d 852, 734 N.Y.S.2d 704, 705-06 (N.Y. App. Div. 2001).*

The record here shows clearly that neither Con Ed nor the Silverstein Defendants, as lessees [\*152] of property interests at the World Trade Center site, possessed the control necessary to impose liability under section 241(6). Although both contracted for work to be performed at Seven World Trade Center in the Spring of 2002, a lessee may not be held liable merely on the basis of a contract running between it and a general contractor. Clear proof must be provided that the lessee in fact had the "right to control the work." *Bateman, 734 N.Y.S.2d at 705-06.* Here, no such proof was presented. Indeed, the only affiant who even claims to have worked at Seven World Trade Center in the period during which Con Ed and the Silverstein Defendants contracted for work to be performed, Patrick D'Allegro, states only that he observed Con Ed and Silverstein personnel at the site. This is an insufficient basis for liability under section 241(6). As such, the claims against Con Ed and the Silverstein Defendants pursuant to section 241(6) are dismissed.

2. Dismissal of Claims Sounding in Negligence in the Absence of Any Duty Owed

Plaintiffs assert liability also on the basis of statutory and common law negligence. Counts Three and Four of the Amended Complaints assert negligence [\*153] claims on behalf of firefighters, *N.Y. Gen. Mun. L. § 205(a)*, and police officers, *N.Y. Gen. Mun. L. § 205(e)*. Count Five is premised on common law negligence.

In the absence of a duty of care, liability in negligence may not attach. See *Palsgraf v. Long Island R.R. Co., 162 N.E.2d 99 (1928).* The scope of the duty owed, in turn, is a "legal issue for the court to resolve." *7WTC, 2006 WL 62019,* at \* 14 (citing *Waters v. New York City Housing Authority, 69 N.Y.2d 225, 505 N.E.2d 922, 923 (N.Y. 1987)).* Whether a duty in fact exists is determined by consideration of several factors including: (a) whether the relationship is such that it gives rise to a duty of care; (b) whether the plaintiff is within the zone of foreseeable harm; and (c) whether the accident was within the zone of reasonably foreseeable risks. See *7WTC, 2006 WL 62019,* at \* 14. Critical for the purposes of this analysis is whether the relationship running between the Lessee Defendants and the Plaintiffs is sufficient to give rise to a duty of care. It is well established that landowners, and persons [\*154] with an interest in property, "owe a duty to persons on their property to protect them from harm

arising from conditions on the property." Id. at *15 (citations omitted). The duty owed by the landowner, however, is not absolute. Where the landowner or person with a property interest has been divested of control over the property, liability may not be found. See *Kilmer v. White*, 254 N.Y. 64, 171 N.E. 908, 909 *(N.Y. 1930)* ("One's liability in negligence for the condition of land ceases when the premises pass out of one's control before injury results.").

Here, as the discussion above demonstrates, the Lessee Defendants were immediately divested of control over their leasehold interests and were entirely denied access to their properties absent express authorization by the City and Port Authority. Moreover, any work performed in the months following the September 11 attacks was not performed under the direct control or approval of the Lessee Defendants. Having been so divested of control, liability may not now attach.

In the absence of such a duty of care running between the Lessee Defendants and the Plaintiffs, the claims asserted under *New York General Municipal Law, sections 205(a)* [*155] and 205(e), must also fail. Sections 205(a) and (e) of the General Municipal Law impose liability for a plaintiff firefighter's or police officer's injury or death which is caused, either directly or indirectly, by the defendant's "neglect, omission, willful or culpable negligence" in failing to comply with applicable "statutes, ordinances, rules and requirements[.]" *N.Y. Gen. Mun. L. § § 205(a)*,(e). In order to defeat a motion for summary judgment, a plaintiff asserting claims under these provisions of the General Municipal law must: (1) identify the statute which the defendant allegedly violated; (2) detail the manner in which the plaintiff sustained injury; and (3) set out the facts from which it may be inferred that the defendant's negligence directly or indirectly caused the plaintiff's injury. See *Zvinys v. Richfield Investment Co., 2006 WL 20805*, at *1 (N.Y. App. Jan. 5, 2006). Here, in the clear absence of any duty owed by the Lessee Defendants to Plaintiffs, a claim in negligence under these sections may not stand. As such, Plaintiffs' claims against the Lessee Defendants under General Municipal Law sections 205(a) and (e) must be [*156] dismissed.

3. Dismissal of all Remaining Claims for Failure to Show any Underlying Claim

Counts Six and Seven of Plaintiffs' Amended Complaints against the Lessee Defendants assert derivative claims sounding in wrongful death and loss of consortium. In the absence of any viable theory of recovery as against the Lessee Defendants, these claims must also be dismissed.

In accordance with the foregoing, the claims against the Lessee Defendants are dismissed with prejudice.

## VIII. CONCLUSION

For the reasons discussed in the Opinion, the motions by the City and by the Port Authority to dismiss the complaints against them, and against the contractors engaged by the City are denied; the motions by Con Ed and the World Trade Center Defendants are granted, and the complaints against them are dismissed.

The state and federal statutes that provide immunity protect the remaining Defendants against suit, but the precise scope and extent of the immunity varies according to date, place and activity. As I indicated in the prior sections of this Opinion, the fact-intensive nature of the issue makes its resolution unsuitable for resolution by motion. Discovery, additional proceedings, [*157] and a more extensive factual record, and perhaps a trial, will be required.

The number of these cases present unusual complexities in these pre-trial proceedings. Plaintiffs, we have been told, worked for various contractors, on various dates, and in different portions of the World Trade Center site. Many contracting companies worked at the site, performing varying functions, each under separate contract, and each subject to varying supervision by different government inspectors, working for different federal, state and City agencies, and by the primary contractors and higher-level subcontractors. Although a considerable amount of discovery has taken place in connection with the pending motions, there is much more to come-- much, much more.

The needs of the parties, and the public interest, do not permit the leisurely and expensive progression of proceedings that are often characteristic of complex litigation. If even a minority of the Plaintiffs suffered serious injuries to their respiratory tracts arising from the acrid air of September 11, their claims deserve to be heard when a recovery could make a difference to their lives. Conversely, if complaints lack merit, or if defenses [*158] prove to be valid, defendants are entitled to the earliest possible release. The availability of a one billion dollar fund authorized by Congress should not serve as encouragement to lengthen and complicate these proceedings. The scar to the public interest needs to be cleansed, speedily, in good time.

By separate Order, I order various dates for proceeding: when Plaintiffs are to disclose the details of their alleged injuries and where and how they suffered their injuries; where contractors performed their operations, and under what contracts and with whom; and other such matters. The number of parties, both Plaintiffs and Defendants, make even these basic tasks arduous. To ease the tasks, develop efficiencies, and begin to prepare a plan for early dispositions of numbers of these cases by

2006 U.S. Dist. LEXIS 75020, *

settlement or by trials, my Order asks the parties to consider the utility of appointing a Special Master to assist the court and the parties to accomplish these goals. All of this will be considered in a conference to be held November 3, 2006, at 2:00 P.M., in Courtroom 14D, United States Courthouse, Southern District of New York.

    SO ORDERED.

Dated: New York, New York

    October 17, 2006 [*159]

    ALVIN K. HELLERSTEIN

    United States District Judge

# EXHIBIT 12

LEXSEE 2006 U.S. APP. LEXIS 19477

**IN RE: NAZI ERA CASES AGAINST GERMAN DEFENDANTS LITIGATION, SIMON ROZENKIER, Appellant v. AG SCHERING; BAYER AG**

**No. 04-3934**

**UNITED STATES COURT OF APPEALS FOR THE THIRD CIRCUIT**

*2006 U.S. App. LEXIS 19477*

**September 26, 2005, Argued
August 2, 2006, Opinion Filed**

**NOTICE:** RULES OF THE THIRD CIRCUIT COURT OF APPEALS MAY LIMIT CITATION TO UNPUBLISHED OPINIONS. PLEASE REFER TO THE RULES OF THE UNITED STATES COURT OF APPEALS FOR THIS CIRCUIT.

**PRIOR HISTORY:** [*1] On Appeal from the United States District Court for the District of New Jersey. (D.C. Civ. No. 03-cv-03413). District Judge: Honorable William G. Bassler. *Rozenkier v. Schering AG (In re Nazi Era Cases Against German Defendants Litig.), 334 F. Supp. 2d 690, 2004 U.S. Dist. LEXIS 18391 (D.N.J., 2004)*

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Appellant Holocaust survivor appealed from the United States District Court for the District of New Jersey which granted appellees, German corporations, motion to dismiss the survivor's complaint for failure to state a claim pursuant to *Fed. R. Civ. P. 12(b)(6)*.

**OVERVIEW:** The federal governments of the United States and Germany, German corporations, and attorneys for various Holocaust survivors agreed that the survivors would voluntarily dismiss their lawsuits in exchange for the creation of a foundation, which would make payments to Nazi victims. Notwithstanding his foundation application, the survivor filed suit against the corporations. On appeal, the survivor argued that the political question doctrine did not apply to his case because his claims neither threatened the operation of the foundation nor implicated the conduct of the United States or the post-war German government. The appellate court, however, agreed with the corporations that the district court correctly dismissed the survivor's claims as raising a nonjusticiable political question. The survivor's claims

presented a nonjusticiable political question because, inter alia, the adjudication of Nazi-era claims by United States federal courts would express a lack of respect for the executive branch because of the executive branch's longstanding foreign policy interest that issues relating to World War II and Nazi-era claims be resolved through intergovernmental negotiation.

**OUTCOME:** The appellate court affirmed the decision of the district court.

**LexisNexis(R) Headnotes**

*Civil Procedure > Justiciability > Political Questions > General Overview*
*Civil Procedure > Pleading & Practice > Defenses, Demurrers, & Objections > Failures to State Claims*
*Civil Procedure > Appeals > Standards of Review > De Novo Review*
[HN1] An appellate court's review of a dismissal under *Fed. R. Civ. P. 12(b)(6)* on the basis of the political question doctrine is plenary.

*Civil Procedure > Justiciability > Political Questions > Separation of Powers*
[HN2] The political question doctrine is a judicially created theory that limits the power of the federal courts to adjudicate certain types of claims. The nonjusticiability of a political question is primarily a function of the separation of powers.

*Civil Procedure > Justiciability > Political Questions > General Overview*
[HN3] Certain political issues are left to the executive, whose decisions on those matters are conclusive. By the

EXHIBIT
12

constitution of the United States, the president is invested with certain important political powers, in the exercise of which he is to use his own discretion, and is accountable only to his country in his political character, and to his own conscience. In such cases, their acts are his acts, and whatever opinion may be entertained of the manner in which executive discretion may be used, still there exists, and can exist, no power to control that discretion. The subjects are political. They respect the nation, not individual rights, and being entrusted to the executive, the decision of the executive is conclusive. Thus, when a court concludes that an issue presents a nonjusticiable political question, it declines to address the merits of that issue.

*Civil Procedure > Justiciability > Political Questions > Foreign Affairs*
[HN4] While cautioning that it is error to suppose that every case or controversy which touches foreign relations lies beyond judicial cognizance, the United States Supreme Court has identified six factors, any one of which indicates the presence of a nonjusticiable political question: Prominent on the surface of any case held to involve a political question is found (1) a textually demonstrable constitutional commitment of the issue to a coordinate political department; or (2) a lack of judicially discoverable and manageable standards for resolving it; or (3) the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion; or (4) the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government; or (5) an unusual need for unquestioning adherence to a political decision already made; or (6) the potentiality of embarrassment from multifarious pronouncements by various departments on one question.

*Civil Procedure > Justiciability > Political Questions > Foreign Affairs*
*Insurance Law > Industry Regulation > Holocaust Victims*
[HN5] Resolving Holocaust-era insurance claims that may be held by residents of the United States is a matter well within the executive's responsibility for foreign affairs. Since claims remaining in the aftermath of hostilities may be "sources of friction" acting as an "impediment to resumption of friendly relations" between the countries involved, there is a "longstanding practice" of the national executive to settle them in discharging its responsibility to maintain the nation's relationships with other countries. The issue of restitution for Nazi crimes has in fact been addressed in executive branch diplomacy and formalized in treaties and executive agreements over

the last half century, and although resolution of private claims was postponed by the Cold War, securing private interests is an express object of diplomacy today, just as it was addressed in agreements soon after the Second World War. Vindicating victims injured by acts and omissions of enemy corporations in wartime is thus within the traditional subject matter of foreign policy in which national, not state, interests are overriding, and which the national government has addressed.

*Civil Procedure > Justiciability > Political Questions > Foreign Affairs*
[HN6] The executive branch has expressed a longstanding foreign policy interest in resolving Nazi-era claims at the intergovernmental level, and that interest did not terminate with the creation of the German Foundation for "Remembrance, Responsibility and the Future".

**COUNSEL:** Carey R. D'Avino, Esquire, Stephen A. Whinston, Esquire (Argued), Berger & Montague, P.C., Philadelphia, PA, Counsel for Appellant.

John J. Gibbons, Esquire, Thomas R. Valen, Esquire Gibbons, Del Deo, Dolan, Griffinger & Vecchione, A Professional Corporation, Newark, NJ.; Roger M. Witten, Esquire (Argued), Wilmer Cutler Pickering Hale and Dorr LLP, New York, Counsel for Appellees.

**JUDGES:** BEFORE: ALITO,* AMBRO, and LOURIE,** Circuit Judges

> *ThenJudge, now Justice, Alito heard oral argument in this case but was elevated to the United States Supreme Court on January 31, 2006. The opinion is filed by a quorum of the panel. 28 U.S.C. § 46(d).

> **Honorable Alan D. Lourie,Circuit Judge for the United States Court of Appeals for the Federal Circuit, sitting by designation.

**OPINION BY:** LOURIE

**OPINION:** LOURIE, Circuit Judge

Simon Rozenkier appeals from the decision of the United States District Court for the District of New Jersey granting Schering AG's and Bayer AG's (the "Appellees") motion to dismiss Rozenkier's [*2] complaint for failure to state a claim pursuant to *Federal Rule of Civil Procedure 12(b)(6). In re Nazi Era Cases Against German Defendants Litigation, 334 F. Supp. 2d 690 (D.N.J. 2004)* ("Decision"). Because Rozenkier's claims are non-

justiciable under the political question doctrine, we affirm.

## I. BACKGROUND

This case arises from the horrific, widespread crimes perpetrated by the Nazi government during World War II. Rozenkier, a Holocaust survivor, was subjected to inhumane Nazi medical experimentation while he was imprisoned at the Auschwitz-Birkenau concentration camps. *Decision, 334 F. Supp. 2d at 691.* During his internment in 1944,he was forced to undergo injections of unknown chemical substances into his testicles causing swelling and bleeding of his genitalia. After his liberation from Auschwitz-Birkenau, Rozenkier emigrated from Poland to the United States. Id. In 1952, he married but was unable to have children. Id. The cause of his sterility remained unknown until 1999, when Rozenkier learned definitively that his "infertility was the result of a Nazi 'medical experiment. [*3] '" Id.

Rozenkier's case does not arise in isolation. In the late 1990's, Holocaust survivors filed a number of class action lawsuits seeking compensation from German corporations who allegedly participated in Nazi-era crimes arising from slave and forced labor during World War II. In 1998, at the request of the German government, the United States government agreed to facilitate the resolution of those lawsuits. Following the personal involvement of the President of the United States and German Chancellor Schroeder, the federal governments of the United States and Germany, German corporations, and attorneys for various plaintiffs agreed that the plaintiffs would voluntarily dismiss their lawsuits in exchange for the creation of the German Foundation "Remembrance, Responsibility and the Future" (the "Foundation"), which would make payments to Nazi victims from a DM 10 billion pool.

On July 17, 2000, the United States and German governments signed an agreement (the "Joint Statement") expressing their support for the Foundation. Joint Statement, at 3. Concurrently, the two governments signed an executive agreement (the "Executive Agreement") recognizing the desire of the two governments [*4] for an "all embracing and enduring legal peace to advance their foreign policy interests" and reflecting their commitments to the Foundation as "the exclusive remedy and forum for the resolution of . . . all claims that have been or may be asserted against German companies arising from the National Socialist era and World War II," Executive Agreement, Art. 1(1) (emphasis added), including specifically medical experimentation claims. Id. at Annex A, P4. The Executive Agreement also stated that the "United States shall . . . inform its courts through a Statement of Interest . . . that it would be in the foreign policy interests of the United States for the Foundation to

be the exclusive remedy and forum for resolution" of those claims. Id. at Art. 2(1). Specifically, the Executive Agreement provided:

> [T]he United States will timely file a Statement of Interest and accompanying foreign policy statement of the Secretary of State and Declaration of Deputy Treasury Secretary Stuart E. Eizenstat in all pending and future cases, regardless of whether the plaintiff(s) consent(s) to dismissal, in which the United States is notified that a claim has been asserted against [*5] German companies arising from the National Socialist era and World War II.

Id. at Annex B, at 1.

On August 12, 2000, after the Joint Statement and Executive Agreement were executed, the German government enacted laws for implementing the Foundation ("Foundation Law"). The Foundation Law allocated DM 50 million for the compensation of "other personal injuries," including injuries to victims of medical experimentation, and capped individual awards for those injuries at DM 15,000. Foundation Law, at § § 9(1), 9(3). In a series of letters from the lead German negotiator, Otto Graf Lambsdorff, to the lead United States negotiator, Stuart Eizenstat, the German government reaffirmed that the "DM 50 million allocation [for other personal injury] will be distributed to each partner organization so that each approved applicant is provided a pro-rata amount of the total amount of all approved 'other personal injury' applicants" and that the "Foundation will give victims of medical experimentation and Kinderheim cases priority over other non-labor personal injury wrongs." Letter from Lambsdorff to Eizenstat, July 11, 2000. On October 19, 2000, the United States and Germany exchanged [*6] diplomatic notes declaring the Foundation Law, as clarified by the Lambsdorff-Eizenstat letters, to be "fully consistent" with the Executive Agreement, causing the Executive Agreement to enter into force as of that date. Exchange of Notes between the Embassy of the United States and the Federal Foreign Office of Germany, Oct. 19, 2000.

In March 2001, Rozenkier applied for compensation from the Foundation for his injuries. In submitting his application, Rozenkier executed a waiver against "all German companies for claims in connection to National Socialist injustices." The Foundation approved Rozenkier's application by letter dated February 6, 2004, and issued him two compensation checks for $ 4,645.09 and $ 5,348.36. Decision, *334 F. Supp. 2d at 694.*

Notwithstanding his Foundation application, Rozenkier filed suit in the Eastern District of New York against Schering AG and Bayer AG (the "Appellees") on March 25, 2003, alleging that the Appellees had cooperated with the Nazi regime in causing his sterilization, and claiming damages under a number of tort theories, including negligence, infliction of emotional distress, assault and battery, conspiracy, fraud, and breach [*7] of the manufacturer's duty to warn, as well as violations of international law. Rozenkier also alleged that the waiver he had submitted with his Foundation application was void because the Foundation had unilaterally altered the compensation scheme and eliminated the right to file an appeal with the Independent Appeals Authority. In August 2003, the Judicial Panel on Multidistrict Litigation transferred the action to the United States District Court for the District of New Jersey pursuant to *28 U.S.C. § 1407*, on the ground that the case raised common questions of fact with 35 previously transferred Nazi-era cases filed by American plaintiffs against German corporations.

The Appellees moved to dismiss Rozenkier's complaint for failure to state a claim under *Federal Rule of Civil Procedure 12(b)(6)*,and the United States filed a statement of interest (the "Statement of Interest") recommending that the action be dismissed. On September 10, 2004, the district court granted the Appellees' motion, holding that Rozenkier's claims presented a nonjusticiable political question. The court explained that if it were to adjudicate [*8] the merits of the complaint, it would be acting against the recommendation of the Executive Branch on an issue of foreign policy. The court thus concluded that Rozenkier's claims were nonjusticiable and that the proper forum for restitution or compensation was the Foundation. In a footnote, the court remarked that it did not need to address Rozenkier's allegations concerning the Foundation's compensation scheme and the right of appeal in detail because those allegations did not involve acts by the Appellants. Finally, the court did not address whether Rozenkier's claim was nonjusticiable on the grounds of the act of state doctrine or international comity. Rozenkier timely appealed, and we have jurisdiction pursuant to *28 U.S.C. § 1291*.

## II. DISCUSSION

[HN1] Our review of a dismissal under *Federal Rule of Civil Procedure 12(b)(6)* on the basis of the political question doctrine is plenary. *State of New Jersey v. United States, 91 F.3d 463, 466 (3d Cir. 1996)*.

On appeal, Rozenkier argues that the political question doctrine does not apply to this case because his claims neither threaten the operation of [*9] the Foundation nor implicate the conduct of the United States or the post-war German government. According to Rozenkier,

the foreign policy interest of the United States was the creation of the Foundation, and that interest has been fulfilled. Rozenkier also asserts that the German Parliament ("Bundestag") unilaterally altered the compensation calculation for victims of medical experiments to be per capita payments rather than a pro rata distribution; he contends that because the United States did not get what it bargained for in the Executive Agreement, no foreign policy interest exists that would require dismissal of his action.

The Appellees respond that the political question doctrine applies to this case. According to Appellees, adjudicating this case would require United States courts to second-guess 60 years of exclusive intergovernmental resolution of Nazi-era claims, and in particular, the United States foreign policy decision articulated in the Statement of Interest that the Foundation should be the exclusive forum for resolution of the claims of Rozenkier and similarly situated individuals. Appellees also contend that the additional defenses of the act of state [*10] doctrine and international comity require dismissal as well.

We agree with the Appellees that the district court correctly dismissed Rozenkier's claims as raising a nonjusticiable political question. [HN2] The political question doctrine is a judicially created theory that limits the power of the federal courts to adjudicate certain types of claims. The "nonjusticiability of a political question is primarily a function of the separation of powers." *Baker v. Carr, 369 U.S. 186, 210, 82 S. Ct. 691, 7 L. Ed. 2d 663 (1962)*. As the Supreme Court held in the landmark case of *Marbury v. Madison, 5 U.S. 137, 1 Cranch 137, 2 L. Ed. 60 (1803)*, [HN3] certain political issues are left to the executive, whose decisions on those matters are conclusive:

> By the constitution of the United States, the President is invested with certain important political powers, in the exercise of which he is to use his own discretion, and is accountable only to his country in his political character, and to his own conscience. . . . In such cases, their acts are his acts; and whatever opinion may be entertained of the manner in which executive discretion may be used, still there exists, and can exist, [*11] no power to control that discretion. The subjects are political. They respect the nation, not individual rights, and being entrusted to the executive, the decision of the executive is conclusive.

*Id. at 165-66.* Thus, "[w]hen a court concludes that an issue presents a nonjusticiable political question, it declines to address the merits of that issue." *Department of Commerce v. Montana, 503 U.S. 442, 457-58, 112 S. Ct. 1415, 118 L. Ed. 2d 87 (1992).*

In *Baker*, the Supreme Court in dictum addressed political questions involving foreign relations, noting that judicial scrutiny of foreign relations decisions involves a "discriminating analysis of the particular question posed, in terms of the history of its management by the political branches, of its susceptibility to judicial handling in the light of its nature and posture in the specific case, and of the possible consequences of judicial action." *369 U.S. at 211-12.* [HN4] While cautioning that "it is error to suppose that every case or controversy which touches foreign relations lies beyond judicial cognizance," the Supreme Court identified six factors, any one of which indicates the presence [*12] of a nonjusticiable political question:

> Prominent on the surface of any case held to involve a political question is found [1] a textually demonstrable constitutional commitment of the issue to a coordinate political department; or [2] a lack of judicially discoverable and manageable standards for resolving it; or [3] the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion; or [4] the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government; or [5] an unusual need for unquestioning adherence to a political decision already made; or [6] the potentiality of embarrassment from multifarious pronouncements by various departments on one question.

*Id. at 211, 217.* Here, we conclude that Rozenkier's claims present a nonjusticiable political question because the fourth Baker factor is clearly implicated: the adjudication of Nazi-era claims by United States federal courts would express a lack of respect for the Executive Branch because of the Executive Branch's longstanding foreign policy interest that issues [*13] relating to World War II and Nazi-era claims be resolved through intergovernmental negotiation.

As the Executive Agreement notes, the United States and German governments worked for 55 years to address the consequences of the National Socialist era and World War II through political and governmental acts between the two governments, and "the Agreement and the establishment of the Foundation represent a fulfillment of these efforts." Executive Agreement, at 4. The first intergovernmental agreement to address Nazi-era wrongdoing by the German government and German companies was the 1945 Potsdam Agreement, in which the United States, Great Britain, and the Soviet Union agreed to remove German industrial assets as war reparations. See *American Ins. Ass'n v. Garamendi, 539 U.S. 396, 403, 123 S. Ct. 2374, 156 L. Ed. 2d 376 (2003).* That policy continued with the Paris Agreement, which provided that the signatory nations would share the seized German assets as settlement of "all [their] claims and those of [their] nationals against the former [German] Government and its Agencies, of a governmental or private nature, arising out of the war." Id. (quoting the Paris Agreement). The [*14] effect of the Paris Agreement was curtailed, however, and attention to reparations intentionally deferred, when the western Allies moved to end their occupation and reestablish a sovereign Germany as a buffer against Soviet expansion. Concerned that continued reparations would cripple the new Federal Republic of Germany economically, the Allies decided in the 1953 London Debt Agreement to put off "[c]onsideration of claims arising out of the second World War by countries which were at war with or were occupied by Germany during that war, and by nationals of such countries, against the Reich and agencies of the Reich. . . until the final settlement of the problem of reparation." *Id. at 403-04* (quoting the Agreement on German External Debts). Those terms were construed by German courts as postponing the resolution of foreign claims against both the German government and German industry until the terms of an ultimate postwar treaty were resolved. See *id. at 405.*

In the meantime, the Allies assigned the responsibility of providing restitution to victims of Nazi persecution to the new German government. See id. (citing the Convention of the Settlement [*15] of Matters Arising Out of the War and the Occupation, May 26, 1952). Pursuant to this treaty obligation, Germany enacted domestic legislation and entered into a number of bilateral agreements with other nations and non-governmental organizations. See id. By 2000, Germany had paid more than DM 100 billion in compensation to Nazi-era victims. See id. A number of victims, however, have attempted to pursue litigation in United States courts. Those suits generated much protest by the defendant companies and the German government, to the point that the United States government took action to try to resolve "the last great compensation related negotiation arising out of World War II." *Garamendi, 539 U.S. at 405* (quoting a press briefing by Deputy Secretary of Treasury Eizenstat). The

ensuing negotiations at the intergovernmental level culminated in the creation of the Foundation and the signing of the Executive Agreement. See id.

The history of the Foundation and the Executive Agreement make clear that the Executive and Legislative branches have exclusively managed the resolution of Nazi-era reparations claims for 55 years. The longstanding history of negotiations [*16] at the intergovernmental level represents a foreign policy interest that Nazi-era claims be resolved through the political branch. Here, we are mindful of the Supreme Court's emphasis on preserving the "'capacity of the President to speak for the Nation with one voice in dealing with other governments' to resolve claims . . . arising out of World War II." *Garamendi, 539 U.S. at 424.*

In Garamendi, the Supreme Court discussed the same set of agreements for Holocaust compensation that are at issue here, holding that California's Holocaust Victim Insurance Relief Act (HVIRA), and in particular a provision of the HVIRA requiring any insurer that did business in California and that sold insurance policies in Europe which were in effect during the Holocaust-era to disclose certain information about those policies to the California Insurance Commissioner or risk losing its license, impermissibly interfered with the Executive Branch's foreign policy, and was preempted on that basis. *Id., 539 U.S. at 421.* The Court observed:

> [HN5] [R]esolving Holocaust-era insurance claims that may be held by residents of this country is a matter well within the Executive's [*17] responsibility for foreign affairs. Since claims remaining in the aftermath of hostilities may be "sources of friction" acting as an "impediment to resumption of friendly relations" between the countries involved, there is a "longstanding practice" of the national Executive to settle them in discharging its responsibility to maintain the Nation's relationships with other countries. The issue of restitution for Nazi crimes has in fact been addressed in Executive Branch diplomacy and formalized in treaties and executive agreements over the last half century, and although resolution of private claims was postponed by the Cold War, securing private interests is an express object of diplomacy today, just as it was addressed in agreements soon after the Second World War. Vindicating victims injured by acts and omissions of enemy corporations in wartime is thus

> within the traditional subject matter of foreign policy in which national, not state, interests are overriding, and which the National Government has addressed.

*Id. at 420-21.* Although Garamendi was not a political question case, the same reasoning applies here. The Executive Branch engaged in a decades-long [*18] negotiation with the German government to resolve Nazi-era reparations claims. That process culminated with the signing of the Executive Agreement, which enunciated a foreign policy that the Foundation be the exclusive forum for claims by Nazi-era victims of medical experimentation against German companies. The Statement of Interest confirms that understanding. In this context, judicial review of Rozenkier's claims would express a lack of respect for the Executive Branch's longstanding foreign policy interest in resolving Nazi-era claims through intergovernmental negotiation. We therefore conclude that his case presents a nonjusticiable political question that requires dismissal.

We reject Rozenkier's argument that United States foreign policy interests were limited to the act of "creating" the Foundation. As discussed, [HN6] the Executive Branch has expressed a longstanding foreign policy interest in resolving Nazi-era claims at the intergovernmental level, and that interest did not terminate with the creation of the Foundation. Indeed, the Statement of Interest provides that, four years after the creation of the Foundation, the "United States maintains [the] policy in the current [*19] administration" that "all asserted claims should be pursued through the Foundation instead of the courts." Statement of Interest, at 11.

In so holding, we reach the same result as the Second Circuit and New Jersey district courts that have dismissed claims arising out of the Nazi-era on political question grounds. See *Whiteman v. Dorotheum GmbH & Co.KG, 431 F.3d 57 (2d Cir. 2005)* (affirming the dismissal of Nazi-era claims against Austria on political question grounds); *In re Nazi Era Cases Against German Defendants Litig., 129 F. Supp. 2d 370, 383 (D.N.J. 2001)* (dismissing on political question and international comity grounds); *Burger v. Fischer v. DeGussa AG, 65 F. Supp. 2d 248 (D.N.J. 1999)* (dismissing on political question grounds); *Iwanowa v. Ford Motor Co., 67 F. Supp. 2d 424 (D.N.J. 1999)* (dismissing on political question and international comity grounds).

In Whiteman, the Second Circuit dismissed a putative class action against Austria for Nazi-era wrongdoing as a nonjusticiable political question. *431 F.3d at 59-60.* The court held:

We conclude that we cannot "undertak[e] independent [*20] resolution without expressing lack of respect due" to the Executive Branch because (1) the Executive Branch has exercised its authority to enter into executive agreements respecting the resolution of the claims in question; (2) the United States Government (a) has established through an executive agreement an alternative international forum for considering the claims in question, and (b) has indicated that, as a matter of foreign policy, the alternative forum is superior to litigation; and (3) the United States foreign policy advanced by the executive agreement is substantially undermined by the continuing pendency of this case.

*Id. at 73-74* (quoting *Baker, 369 U.S. at 217*). The Second Circuit's analysis is thus consistent with our holding that the claims of Rozenkier and similarly situated individuals present a nonjusticiable political question. We note, however, that our conclusion rests not only on the foreign policy interests expressed in the Executive Agreement and the Statement of Interest, but also on the United States' long-standing foreign policy commitment to resolving reparations claims arising out of World War II and the Holocaust [*21] at the governmental level.

We are aware that the Ninth Circuit has rendered a decision in *Alperin v. Vatican Bank, 410 F.3d 532 (9th Cir. 2005)*, in which it arrived at the same conclusion that we do concerning slave labor claims against the Vatican Bank, but not with regard to property claims against the Vatican Bank. In Alperin, Holocaust survivors asserted property claims alleging that the Vatican Bank had profited from looted assets and slave labor during the Croatian Ustasha political regime, which was supported throughout World War II by Nazi forces. The Holocaust survivors also asserted slave labor claims alleging that the Vatican Bank had actively assisted the war objectives of the Utasha Regime in violation of international law. The Ninth Circuit allowed the property claims to proceed, but noted that the case was "distinguishable from those involving the Foundation in that there is no analogous executive agreement covering claims to the Ustasha treasury." *Id. at 550* (emphasis added) (referring to *Decision, 334 F. Supp. 2d at 696-97*). Thus, Alperin is not persuasive to the resolution of this case involving the Foundation. [*22] However, the court held that the slave labor claims were nonjusticiable because they raised a political question. *Id. at 562*. Thus, the holding of Alperin in its analysis of the slave labor

claims is consistent with our resolution here concerning tort claims.

Finally, we respectfully find the Eleventh Circuit's reasoning in *Ungaro-Benages v. Dresdner Bank AG, 379 F.3d 1227 (11th Cir. 2004)*, to be unpersuasive. In that case, the Eleventh Circuit declined to dismiss a Holocaust-related claim against German banks based on the political doctrine, instead dismissing the claim on the grounds of international comity. *379 F.3d at 1236, 1239*. The court reasoned that because the Executive Agreement, which is the same as that at issue here, stated that it did not provide an independent legal basis for dismissal, the "President has purposely chosen not to settle [the] claims directly" and therefore adjudication of the claims does not "interfere with American foreign relations." *Id. at 1237, 1236*.

We disagree with the Eleventh Circuit's interpretation of the Executive Agreement. The provision in the Executive Agreement that the court relied [*23] on for its holding that the political question doctrine was inapplicable is set forth in the section entitled "Elements of U.S. Government Statement of Interest," and provides: "The United States does not suggest that its policy interests concerning the Foundation in themselves provide an independent legal basis for dismissal, but will reinforce the point that U.S. policy interests favor dismissal on any valid legal ground." Executive Agreement, Annex B, P7.

However, that language does not preclude United States federal courts from dismissing claims arising under the Executive Agreement as raising a nonjusticiable political question. Indeed, in its Statement of Interest in this case, the United States recommends dismissal based on foreign policy interests. Thus, while the United States has not asserted that the foreign policy interests expressed in the Executive Agreement and the Statement of Interest n1 provide an independent legal basis for dismissal, such interests are especially compelling here, and the United States government's long-standing foreign policy commitment to resolving reparations claims arising out of World War II and the Holocaust at the governmental level, coupled [*24] with the more recent creation of the Foundation, the signing of the Executive Agreement, and the filing of the Statement of Interest in this case, together provide such a basis.

n1 The Executive Agreement states that "it would be in the foreign policy interests of the United States to be the exclusive remedy and forum for resolving . . . claims asserted against German companies . . . and that dismissal of such cases would be in its foreign policy interest." Executive Agreement, Art. 2(1). The Executive Agreement also explains that the foreign policy

interest at issue was resolving Nazi-era cases outside of litigation and creating an all-embracing and enduring peace. Executive Agreement, at 3. Further, the Statement of Interest asserts that [t]he President of the United States concluded that it would be in the foreign policy interests of the United States for the Foundation to be the exclusive forum and remedy for the resolution of all asserted claims against German companies arising from their involvement in the Nazi era and World War II, including without limitation those relating to compensation for slave and forced labor, "aryanization" or other confiscation of, damage to, or loss of property (including banking assets and insurance policies), subjection to medical experimentation, placement in children's homes, and other cases of personal injury. Statement of Interest, at 11 (citing Letter of President Clinton to Chancellor Schroeder, Dec. 13, 1999).

[*25]

Because we conclude that the claims of Rozenkier and similarly situated individuals present a nonjusticiable political question, we do not address whether the act of state doctrine and international comity are alternative grounds for dismissal. In addition, we have considered Rozenkier's remaining arguments and find them unpersuasive or unnecessary for our decision. Because Rozenkier's claims present a nonjusticiable political question, we affirm the district court's judgment granting the Appellees' motion to dismiss Rozenkier's complaint.

### III. CONCLUSION

For the foregoing reasons, we affirm the decision of the district court.

# EXHIBIT 13

LEXSEE 2006 US BANKR LEXIS 2117

**IN RE: JEAN FOWLER, Debtor.**

**Chapter 7, Case No. 06-10207 (MFW)**

**UNITED STATES BANKRUPTCY COURT FOR THE DISTRICT OF DELAWARE**

*2006 Bankr. LEXIS 2117; Bankr. L. Rep. (CCH) P80,722*

**September 11, 2006, Decided**

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Debtor filed a Chapter 7 bankruptcy complaint, and the United States Trustee (UST) filed a motion to dismiss the case pursuant to *11 U.S.C.S. § 707(b)(2)* and (b)(3). The issue was whether debtor, for purposes of § 707(b)(2)(A)(ii)(I), could take the ownership deduction specified in the Internal Revenue Service (IRS) Local Transportation Expense Standards for a car she owned, which was not collateral for any debt.

**OVERVIEW:** Debtor demonstrated that she did not have sufficient net monthly income for the presumption of abuse to arise under § 707(b)(2). The UST asserted, that the submitted form was erroneous because it included a deduction for owning a car even though debtor did not have a monthly car payment. Debtor argued that she was entitled to the deduction under the plain language of § 707(b)(2)(A)(ii)(I), which stated that the monthly expenses would be debtor's applicable monthly expenses under the National and Local Standards, which the IRS used to determine a taxpayer's ability to pay delinquent taxes. The court found that based on the plain language of the statute, debtor was entitled to take a car ownership deduction in the amount set forth in the Local Standards for her ownership of one car, even though she had no car payment. The plain language of § 707(b)(2)(A)(ii)(I) provided that debtor's monthly expenses were the debtor's applicable monthly expense amount specified under the Local Standards, which did not require an actual car expense. As a result, there was no presumption of abuse under § 707(b)(3).

**OUTCOME:** The court held that debtor could take the deduction.

**LexisNexis(R) Headnotes**

*Bankruptcy Law > Conversion & Dismissal > Liquidations*
[HN1] *11 U.S.C.S. § 707(b)(1)* provides that a court may dismiss a case filed by an individual debtor under the chapter whose debts are primarily consumer debts, or with the debtor's consent, convert such a case to a case under chapter 11 or 13 of the title if it finds that the granting of relief would be an abuse of the provisions of the chapter.

*Bankruptcy Law > Conversion & Dismissal > Liquidations*
*Bankruptcy Law > Discharge & Dischargeability > Liquidations > Eligible Debts*
[HN2] See *11 U.S.C.S. § 707(b)(2)(A)(i)*.

*Bankruptcy Law > Conversion & Dismissal > Liquidations*
*Bankruptcy Law > Discharge & Dischargeability > Liquidations > Eligible Debts*
[HN3] See *11 U.S.C.S. § 707(b)(2)(A)(ii)(I)*.

*Bankruptcy Law > Conversion & Dismissal > Liquidations*
*Bankruptcy Law > Discharge & Dischargeability > Liquidations > Eligible Debts*
*Tax Law > Federal Tax Administration & Procedure > Settlements > Closing Agreements & Compromises (IRC secs. 7121-7124) > Closing Agreements*
[HN4] The National and Local Standards, to which *11 U.S.C.S. § 707(b)(2)(A)(ii)(I)* refers, are the Collection Financial Standards used by the Internal Revenue Service to determine a taxpayer's ability to pay a delinquent tax liability. Based primarily on data from the United States Census Bureau and the Bureau of Labor Statistics

EXHIBIT
13
tabbies

Case 1:06-cv-00605-GMS    Document 18-10    Filed 11/03/2006    Page 12 of 36

Page 2

2006 Bankr. LEXIS 2117, *; Bankr. L. Rep. (CCH) P80,722

Consumer Expenditure Survey, the "National Standards" set, as objectively reasonable, amounts for five expenses: (1) food, (2) housekeeping supplies, (3) apparel and services, (4) personal care products and services, and (5) miscellaneous. The National Standards are based on the taxpayer's gross income and family size.

*Tax Law > Federal Tax Administration & Procedure > Settlements > Closing Agreements & Compromises (IRC secs. 7121-7124) > Closing Agreements*
[HN5] The Local Standards set, as objectively reasonable, separate amounts for (1) housing and utilities, and (2) transportation. The former are based on the taxpayer's family size and location. The transportation standards include two distinct components: (1) "Ownership Costs," which are based only on the number of cars owned by the taxpayer; and (2) "Operating Costs and Public Transportation Costs," which are based on the number of cars owned by the taxpayer and on the taxpayer's location.

*Tax Law > Federal Tax Administration & Procedure > Settlements > Closing Agreements & Compromises (IRC secs. 7121-7124) > Closing Agreements*
[HN6] The Financial Analysis Handbook contains instructions for analyzing the taxpayer's financial condition to help Internal Revenue Service field agents determine appropriate case resolution (e.g., collect, compromise, or report as uncollectible). To determine what portion of the taxpayer's income should be available for repayment of delinquent taxes, the Handbook allows deductions from the taxpayer's gross income in the amounts specified in the National and Local Standards, as well as deductions for reasonable amounts of other expenses that are necessary to provide for a taxpayer's and his or her family's health and welfare and/or production of income.

*Tax Law > Federal Tax Administration & Procedure > Settlements > Closing Agreements & Compromises (IRC secs. 7121-7124) > Closing Agreements*
[HN7] Under the Financial Analysis Handbook, a taxpayer is allowed the full amount of the National Standards deductions, regardless of his actual expenses. The total applicable expense allowance of the National Standards is to be given to each taxpayer, regardless of the taxpayer's actual expenditures in any of the individual National Standards categories or the taxpayer's actual total expenditures in the combined categories. Thus, even hypothetical taxpayers living in a Garden of Eden, with cost-free satisfaction of all their basic needs, would still be allowed a deduction from income in the total amount set out in the National Standards. For the Local Stan-

dards, however, the taxpayer is allowed the local standard or the amount actually paid, whichever is less.

*Bankruptcy Law > Conversion & Dismissal > Liquidations*
*Bankruptcy Law > Discharge & Dischargeability > Liquidations > Eligible Debts*
*Tax Law > Federal Tax Administration & Procedure > Settlements > Closing Agreements & Compromises (IRC secs. 7121-7124) > Closing Agreements*
[HN8] In interpreting the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005, a court begins, as always, with the language of the statute. The plain language of *11 U.S.C.S. § 707(b)(2)(A)(ii)(I)* provides that the debtor's monthly expenses shall be the debtor's applicable monthly expense amount specified under the Local Standards. *11 U.S.C.S. § 707(b)(2)(A)(ii)(I)*. There is no reference in that language to the use of the Local Standards as a cap. In contrast, the IRM expressly provides that the taxpayer is allowed the local standard or the amount actually paid, whichever is less. The fact that Congress did not use language similar to the IRM evidences that it did not intend the Local Standards to apply as a cap.

*Bankruptcy Law > Conversion & Dismissal > Liquidations*
*Bankruptcy Law > Discharge & Dischargeability > Liquidations > Eligible Debts*
*Governments > Legislation > Interpretation*
*Tax Law > Federal Tax Administration & Procedure > Settlements > Closing Agreements & Compromises (IRC secs. 7121-7124) > Closing Agreements*
[HN9] In the same sentence of *11 U.S.C.S. § 707(b)(2)(A)(ii)(I)*, Congress expressly states that a debtor would be entitled to "actual monthly expenses" for Other Necessary Expenses. The use of "actual" with respect to Other Necessary Expenses and "applicable" with respect to the National and Local Standards must mean that Congress intends two different applications. Where Congress includes particular language in one section of a statute but omits it in another section of the same act, it is generally presumed that Congress acted intentionally and purposely in the disparate inclusion or exclusion. In order to give effect to every word in § 707(b)(2)(A)(ii)(I), the term "actual monthly expenses" cannot be interpreted to mean the same as "applicable monthly expenses." The use of a particular phrase in one statute but not in another merely highlights the fact that Congress knows how to include such a limitation when it wants to.

2006 Bankr. LEXIS 2117, *; Bankr. L. Rep. (CCH) P80,722

*Governments > Legislation > Interpretation*
[HN10] Silence or lack of clarity at the point where crucial language is finally inserted can sometimes be clarified by legislative history, even from bills which did not pass in prior years.

*Bankruptcy Law > Conversion & Dismissal > Liquidations*
*Bankruptcy Law > Discharge & Dischargeability > Liquidations > Eligible Debts*
*Governments > Legislation > Interpretation*
*Tax Law > Federal Tax Administration & Procedure > Settlements > Closing Agreements & Compromises (IRC secs. 7121-7124) > Closing Agreements*
[HN11] Congress has intended that there be an easily applied formula for determining when a court should presume that a debtor is abusing the system by filing a chapter 7 petition. Presumptions are typically created to avoid litigation. By reference to the National and Local Standards, Congress has intended the court to use a chart of standard expenses for all debtors which could be easily and uniformly applied: the court simply takes the expense amount from the applicable column based on the debtor's income, family size, number of cars and/or locale. This easy application should avoid litigation.

*Bankruptcy Law > Conversion & Dismissal > Liquidations*
*Bankruptcy Law > Discharge & Dischargeability > Liquidations > Eligible Debts*
*Evidence > Inferences & Presumptions > Presumptions*
[HN12] Allowing a debtor a deduction under the means test does not insulate her case from dismissal. Instead, it simply means that there is not a presumption of abuse.

**COUNSEL:** [*1] For the Debtor: Vivian A. Houghton, Esquire, Wilmington, DE.

Montague S. Claybrook, Chapter 7 Trustee, Wilmington, DE.

**JUDGES:** Mary F. Walrath, United States Bankruptcy Judge.

**OPINION BY:** Mary F. Walrath

**OPINION:**

    **MEMORANDUM OPINION n1**

       n1 This Opinion constitutes the findings of fact and conclusions of law of the Court pursuant to *Federal Rule of Bankruptcy Procedure 7052,*

which is made applicable to contested matters by *Federal Rule of Bankruptcy Procedure 9014.*

    Before the Court is the Motion of the United States Trustee (the "UST") to Dismiss the chapter 7 case of Jean Fowler (the "Debtor") pursuant to *section 707(b)(2)* and *(b)(3).* The Debtor opposes the Motion. At the hearing on the Motion, the parties asked the Court to address the following discrete issue: whether the Debtor, for purposes of *section 707(b)(2)(A)(ii)(I),* may take the ownership deduction specified in the IRS Local Transportation Expense Standards for a car she owns which is [*2] not collateral for any debt. For the reasons stated below, the Court concludes that the Debtor may take the deduction.

**I. BACKGROUND**

    The Debtor filed her voluntary petition under chapter 7 on March 8, 2006. The Debtor filed her Schedules and Statement of Financial Affairs on that same date. Amended Schedules B and C were filed March 16, 2006. The Debtor's Schedules demonstrate that she has general unsecured debt of $ 48,776.72. The Debtor admits her debt is primarily consumer debt.

    On May 12, 2006, the UST filed a Motion to dismiss the case. The Debtor filed an Amended Form B 22A (Statement of Current Monthly Income and Means Test Calculation) on May 16, 2006, and responded to the UST's Motion on May 17, 2006.

    A hearing was held on the Motion on June 16, 2006, at which time the parties advised that, although there were other disputes regarding the Debtor's claimed expenses, there would be no presumption of abuse under *section 707(b)(2)* if the Court determines the Debtor may take the deduction for ownership of her car. Therefore, the parties presented oral argument and post-hearing briefs on that issue. The matter is ripe for decision.

**II. JURISDICTION**

    The Court [*3] has jurisdiction over this matter pursuant to *28 U.S.C. § § 1334 & 157(b)(2)(A) & (O).*

**III. DISCUSSION**

    The UST seeks dismissal of the Debtor's case under *section 707(b) of the Bankruptcy Code.* [HN1] *Section 707(b)(1)* provides that the Court "may dismiss a case filed by an individual debtor under this chapter whose debts are primarily consumer debts, or with the debtor's consent, convert such a case to a case under chapter 11 or 13 of this title if it finds that the granting of relief would be an abuse of the provisions of this chapter." Id.

    *Section 707(b)(2),* commonly known as the "means test," was added by Congress in the Bankruptcy Abuse

Prevention and Consumer Protection Act of 2005 ("BAPCPA"). It provides, in pertinent part:

> (2)(A)(i) [HN2] In considering under paragraph (1) whether the granting of relief would be an abuse of the provisions of this chapter, the court shall presume abuse exists if the debtor's current monthly income reduced by the amounts determined under clauses (ii), (iii), and (iv), and multiplied by 60 is not less than the lesser of -
>
> > (I) 25 percent of the debtor's nonpriority [*4] unsecured claims in the case, or $ 6,000, whichever is greater; or
> >
> > (II) $ 10,000.

*11 U.S.C. § 707(b)(2)(A)(i).*

The Debtor's Amended Form B 22A demonstrates that the Debtor does not have sufficient net monthly income for the presumption of abuse to arise under *section 707(b)(2)*. The UST asserts, however, that the Form is erroneous because it includes a deduction of $ 471 for owning a car even though the Debtor does not have a monthly car payment.

The Debtor argues that she is entitled to the deduction under the plain language of *section 707(b)(2)(A)(ii)(I)*, which provides in relevant part that:

> [HN3] The debtor's monthly expenses shall be the debtor's applicable monthly expense amounts specified under the National Standards and Local Standards, and the debtor's actual monthly expenses for the categories specified as Other Necessary Expenses issued by the Internal Revenue Service for the area in which the debtor resides, as in effect on the date of the order for relief . . . .

Id. (emphasis added).

A. The National and Local Standards

[HN4] The National and Local Standards, to which *section 707(b)(2)(A)(ii)(I)* refers, are the [*5] Collection Financial Standards used by the Internal Revenue Service (the "IRS") to determine a taxpayer's ability to pay a delinquent tax liability. n2 Based primarily on data from the United States Census Bureau and the Bureau of Labor Statistics Consumer Expenditure Survey, the "National Standards" set, as objectively reasonable, amounts for five expenses: (1) food, (2) housekeeping supplies, (3) apparel and services, (4) personal care products and services, and (5) miscellaneous. n3 The National Standards are based on the taxpayer's gross income and family size.

> n2 The Court takes judicial notice of the description of the Collection Financial Standards on the IRS website, available at http://www.irs.gov/individuals/index.html ("Collection Financial Standards" hyperlink), as well as the contents of the "Financial Analysis Handbook" located at part 5, chapter 15, section 1 of the Internal Revenue Manual ("IRM"), available at http://www.irs.gov/irm/part5/ch15s01.html.

> n3 The IRS has promulgated separate "National Standards" for some items in Alaska and Hawaii, because of their unique location and higher cost of living.

[*6]

[HN5] The "Local Standards" set, as objectively reasonable, separate amounts for (1) housing and utilities, and (2) transportation. The former are based on the taxpayer's family size and location. The transportation Standards include two distinct components: (1) "Ownership Costs," which are based only on the number of cars owned by the taxpayer; and (2) "Operating Costs & Public Transportation Costs," which are based on the number of cars owned by the taxpayer and on the taxpayer's location.

[HN6] The Financial Analysis Handbook contains "instructions for analyzing the taxpayer's financial condition" to help IRS field agents "determine appropriate case resolution" (e.g., collect, compromise, or report as uncollectible). IRM at 5.15.1.1 PP 1-3. To determine what portion of the taxpayer's income should be available for repayment of delinquent taxes, the Handbook allows deductions from the taxpayer's gross income in the amounts specified in the National and Local Standards, as well as deductions for reasonable amounts of "Other Expenses" that are "necessary to provide for a taxpayer's and his or her family's health and welfare and/or production of income." Id. at 5.15.1.7 PP 1, 2, & 5.

Case 1:06-cv-00605-GMS    Document 18-10    Filed 11/03/2006    Page 15 of 36

Page 5

2006 Bankr. LEXIS 2117, *; Bankr. L. Rep. (CCH) P80,722

[HN7] Under [*7] the Financial Analysis Handbook, the taxpayer is allowed the full amount of the National Standards deductions, regardless of his actual expenses. Id. at 5.15.1.*67 Cal. 451, 8 P 2.*

> The IRM makes it clear that the total applicable expense allowance of the National Standards is to be given to each taxpayer, regardless of the taxpayer's actual expenditures in any of the individual National Standards categories or the taxpayer's actual total expenditures in the combined categories. Thus, even hypothetical taxpayers living in a Garden of Eden, with cost-free satisfaction of all their basic needs, would still be allowed a deduction from income in the total amount set out in the National Standards.

Hon. Eugene R. Wedoff, Means Testing in the New World, *79 Am. Bankr. L.J. 231, 254 (Spring 2006)* (footnote omitted).

For the Local Standards, however, under the IRM "[t]he taxpayer is allowed the local standard or the amount actually paid, whichever is less." IRM at 5.15.1.*67 Cal. 27, 7 P 4* (emphasis added).

B. Plain Language of the Statute

The Debtor argues that the plain language of *section 707(b)(2)(A)(ii)(I)* which allows the "debtor's applicable [*8] monthly expense amounts specified under the National Standards and Local Standards" permits the Debtor to take the Local Standards deduction for ownership of one car, or $ 471 per month. *11 U.S.C. § 707(b)(2)(A)(ii)(I).*

The UST argues that, while the Debtor owns a car, she has no car payment. n4 Therefore, the UST contends that under the plain language of the statute, she has no "applicable" monthly expense for car ownership and is not entitled to take the Local Standards deduction. The Debtor counters that the term "applicable" simply means the number of vehicles owned by a Debtor, the Local Standards allowing different deductions depending on the number of vehicles owned.

> n4 The Debtor owns a car but has no car payment because she refinanced her home three years ago and repaid the car loan.

The UST refers to the IRM to support its interpretation that the Debtor is entitled to a deduction only if she has a car payment. The Debtor responds that the IRM is not applicable to the Bankruptcy [*9] Code. Under *section 707(b)(2)(A)*, the Local Standards are used not as a cap, but as the actual deductions to which the Debtor is entitled. In contrast, for IRS purposes, the Local Standards are used as a cap for expenses to which the taxpayer may be entitled. Id. at 5.15.1.*67 Cal. 27, 7 P 4.*

The Court agrees with the Debtor. [HN8] In interpreting BAPCPA, "we begin, as always, with the language of the statute." *Duncan v. Walker, 533 U.S. 167, 172, 121 S. Ct. 2120, 150 L. Ed. 2d 251 (2001).* The plain language of *section 707(b)(2)(A)(ii)(I)* provides that "[t]he debtor's monthly expenses shall be the debtor's applicable monthly expense amount specified under the . . . Local Standards." *11 U.S.C. § 707(b)(2)(A)(ii)(I).* There is no reference in that language to the use of the Local Standards as a cap. In contrast, the IRM expressly provides that "The taxpayer is allowed the local standard or the amount actually paid, whichever is less." IRM at 5.15.1.*67 Cal. 27, 7 P 4* (emphasis added). The fact that Congress did not use language similar to the IRM evidences that it did not intend the Local Standards to apply as a cap.

Further evidence of Congress' intent is seen [*10] from the fact that [HN9] in the same sentence of *section 707(b) (2) (A) (ii) (I)*, Congress expressly stated that a debtor would be entitled to "actual monthly expenses" for Other Necessary Expenses. The use of "actual" with respect to Other Necessary Expenses and "applicable" with respect to the National and Local Standards must mean that Congress intended two different applications. See *Duncan, 533 U.S. at 173* (citation omitted) (noting that "where Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acted intentionally and purposely in the disparate inclusion or exclusion"); *In re Demonica, 345 B.R. 895, 902 (Bankr. N.D. Ill. 2006)* (concluding that "[i]n order to give effect to every word in *[section 707(b)(2)(A)(ii) (I)]*, the term 'actual monthly expenses' cannot be interpreted to mean the same as 'applicable monthly expenses'."); *In re Donald, 343 B.R. 524, 537 (Bankr. E.D.N.C. 2006)* (stating that "the use of a particular phrase in one statute but not in another 'merely highlights the fact that Congress knew how to include such [*11] a limitation when it wanted to'" (quoting *In re Coleman, 426 F.3d 719, 725 (4th Cir. 2005))).*

The UST does not actually argue that the Local Standards should be applied exactly as the IRM would require, i.e., as a cap. Instead the UST argues only that a debtor must have a car payment in order to use the deduction. The test articulated by the UST is not supported

by the language of the statute and would create unfair results. For example, it would allow a debtor who had any car payment (even $ 1) to take the full Local Standards deduction of $ 471 but would not allow a debtor who had no car payment to take the deduction. Because Congress did not establish the Local Standards deduction as a cap under *section 707(b)(2)(A)(ii)(I)*, but instead made it the actual deduction, the Court concludes that the UST's interpretation is not sound. Judge Wedoff agrees:

> [A] plain reading of the statute would allow a deduction of the amounts listed in the Local Standards even where the debtor's actual expenses are less. Thus, as with the allowances of the National Standards, even if the debtor's transportation and housing needs were actually satisfied without cost to the debtor, [*12] *[section] 707(b)(2)(A)(ii)(I)* would allow the debtor a deduction in the amounts specified in the IRM's Local Standards. . . . The . . . IRM states that if the debtor makes no car payments, the ownership expense amount may not be claimed. Indeed this result follows necessarily from the IRM's treatment of the Local Standards as caps on actual expenditures: if a taxpayer has no car payments, the taxpayer obviously cannot claim a Local Standard amount intended to cap actual car payment expenses. However, since the means test treats the Local Standards not as caps but as fixed allowances, it is more reasonable to permit a debtor to claim the Local Standards ownership expense based on the number of vehicles the debtor owns or leases, rather than on the number for which the debtor makes payments. This approach reflects the reality that a car for which the debtor no longer makes payments may soon need to be replaced (so that the debtor will actually have ownership expenses), and it avoids arbitrary distinctions between debtors who have only a few car payments left at the time of their bankruptcy filing and those who finished making their car payments just before the filing.

Wedoff, [*13] *Means Testing in the New World, 79 Am. Bankr. L.J. at 255-57* (footnotes omitted).

As a result, the Court concludes that based on the plain language of the statute, the Debtor is entitled to take a car ownership deduction in the amount set forth in the Local Standards for her ownership of one car, even though she has no car payment.

C. Legislative History

Even if the statute were not clear, the legislative history supports the Debtor's interpretation of the Code. A prior version of the BAPCPA which was never passed defined "projected monthly net income" for the means test to require a calculation of expenses as follows:

> (A) the expense allowances under the applicable National Standards, Local Standards, and Other Necessary Expenses allowance (excluding payments for debts) for the debtor . . . in the area in which the debtor resides as determined under the Internal Revenue Service financial analysis for expenses in effect as of the date of the order for relief.

H.R. 3150, 105th Congress (1998) (emphasis added). The reference to the Internal Revenue Service financial analysis was replaced by the language currently in *section 707(b)(2)(A)* which [*14] simply states that a debtor gets the "applicable monthly expense amounts specified under the National and Local Standards." *11 U.S.C. § 707(b)(2)(A)(ii)(I)*.

The change from the prior version evidences Congress' intent that the Courts not be bound by the financial analysis contained in the IRM and lends credence to the Court's conclusion that it should look only to the amounts set forth in the Local Standards. See, e.g., *Transcontinental & Western Air, Inc. v. Civil Aeronautics Bd., 336 U.S. 601, 606, 69 S. Ct. 756, 93 L. Ed. 911 (1949)* (relying on legislative history to prior unenacted bill for clarification of language used in bill that was ultimately enacted); *Springfield Indus. Corp. v. United States, 663 F. Supp. 128, 11 Ct. Int'l Trade 331, 338 (1987)*, rev'd on other grounds, *842 F.2d 1284 (1988)* (acknowledging that [HN10] "[s]ilence or lack of clarity at the point where crucial language is finally inserted can sometimes be clarified by [legislative] history, even from bills which did not pass in prior years" but ultimately holding that the legislative history was not helpful to illuminate the term because the enacted bill was too different from the [*15] prior version).

D. Conflicting Case Law

Several courts agree, however, with the UST's argument that where a debtor has no car payment, no expense deduction should be allowed. See, e.g., *In re McGuire, 342 B.R. 608, 613 (Bankr. W.D. Mo. 2006)*; *In*

Case 1:06-cv-00605-GMS    Document 18-10    Filed 11/03/2006    Page 17 of 36

Page 7

2006 Bankr. LEXIS 2117, *; Bankr. L. Rep. (CCH) P80,722

*re Hardacre, 338 B.R. 718, 728 (Bankr. N.D. Tex. 2006).* But see *Demonica, 345 B.R. at 903-05* (concluding that debtor was entitled to take the Local Standards deduction for house and car even though he was not liable on the debts secured by the house and car). n5

> n5 Although all of the cases cited dealt with confirmation of a plan under chapter 13, they are instructive because for those purposes *section 1325* utilizes the means test under *section 707(b)(2)(A)* to determine the debtor's projected disposable income.

The Court respectfully disagrees with the decisions in McGuire and Hardacre and agrees with the decision of the Demonica Court. The Court in McGuire correctly noted that the Local [*16] Standards for transportation applied to vehicles owned by a debtor and stated that "[i]f a debtor does not own or lease a vehicle, the ownership expense is not 'applicable' to that debtor." *342 B.R. at 613.* The McGuire Court then concluded, however, that "if a debtor is not incurring expenses for the purchase or lease of a vehicle, the debtor cannot claim a vehicle ownership expense under the IRS Standards. This conforms with the IRS's application of the Standards." Id. It appears that the McGuire Court was equating "ownership" with "liability for debt." Further, the McGuire Court acknowledged that during the life of the debtor's plan, he probably would need to purchase a new car. *Id. at 614.* The Court stated that, if that happened, the debtor would be able to seek an adjustment of his plan payments to account for that. Id. Obviously, this Court, in determining a motion to dismiss a chapter 7 case, cannot do that.

The Court in Hardacre also relied on the IRM, not the Bankruptcy Code, to conclude that the deduction is allowable only for cars that are subject to a lease or purchase obligation. *Hardacre, 338 B.R. at 728.* [*17]

The Demonica Court, in discussing the housing deduction, correctly noted that "[t]he Local Standard deduction for housing categorizes the expense as mortgage/rent and specifies only one amount. Therefore, whether or not a debtor is liable on the mortgage is not relevant to determining the proper deduction for the housing expense." *345 B.R. at 903.* Similarly, the Demonica Court stated that with respect to the car, "[w]hile the Debtor is not obligated under the note, he does incur the expense to use the vehicle. Therefore, the Debtor can claim the Local Standard [deduction] for transportation ownership/lease expense . . . ." *Id. at 905.* n6

> n6 Though the debtor in Demonica was not liable on the car loan, the Court noted that he was making the payment. *345 B.R. at 902.*

For the reasons stated above, the Court declines to follow the decisions of the Courts in *McGuire* and *Hardacre*, and follows the decision in *Demonica*. Consequently, the Court [*18] concludes that *section 707(b)(2)(A)(ii)(I)* permits the Debtor to take the Local Standards deduction for ownership of a car even though she has no car payment.

E. Policy Considerations

The policy behind the means test also supports the Court's decision. [HN11] Congress intended that there be an easily applied formula for determining when the Court should presume that a debtor is abusing the system by filing a chapter 7 petition. Presumptions are typically created to avoid litigation. See, e.g., *General Motors Acceptance Corp. v. Jones, 999 F.2d 63, 70-71 (3d Cir. 1993)* (to avoid litigation expense, the Third Circuit created a rebuttable presumption that the contract rate of interest is the appropriate rate for payment of secured claim under chapter 13 plan). By reference to the National and Local Standards, Congress intended the Court to use a chart of standard expenses for all debtors which could be easily and uniformly applied: the Court simply takes the expense amount from the applicable column based on the debtor's income, family size, number of cars and/or locale. This easy application should avoid litigation.

In addition, it is important to keep in mind [*19] that [HN12] allowing the Debtor a deduction under the means test does not insulate her case from dismissal. Instead, it simply means that there is not a presumption of abuse. The UST can argue, and the Court can consider, the fact that the Debtor does not have any secured car debt to pay in determining whether the case should be dismissed under *section 707(b)(3).* See, e.g., *In re Pennington, 2006 Bankr. LEXIS 2025, No. 06-10066, 2006 WL 2505942 (Bankr. D. Del. Aug. 30, 2006)* (holding that, in considering whether case was an abuse under *section 707(b)(3),* court must consider debtor's current car payment rather than higher car payment he had at commencement of the case). See also, Wedoff, Means Testing in the New World, *79 Am. Bankr. L.J. at 257* ("Moreover, in a situation where a debtor owns a valuable car free of liens and is allowed by applicable exemption law to retain the car in Chapter 7, conversion or dismissal could still be obtained under the totality of financial circumstances standard that *[section] 707(b)(3)* applies in the absence of a means-test presumption.").

IV. CONCLUSION

2006 Bankr. LEXIS 2117, *; Bankr. L. Rep. (CCH) P80,722

For the foregoing reasons, the Court concludes that the Debtor may take the [*20] Local Standards deduction for ownership of a car. As a result, the UST concedes that there is no presumption of abuse under *section 707(b)(3)*. The Court will reschedule a hearing to consider the evidence and argument that may be presented on the issue of whether the Debtor's chapter 7 case should nonetheless be dismissed under *section 707(b)(3)*.

An appropriate Order is attached.

BY THE COURT:

Mary F. Walrath

United States Bankruptcy Judge

Dated: September 11, 2006

**ORDER**

**AND NOW,** this **11th** day of, **SEPTEMBER, 2006,** upon consideration of the UST's Motion to Dismiss Debtor's Case pursuant to *sections 707(b)(2) & (3)* and the Debtor's response thereto, it is hereby

**ORDERED** that the Motion is hereby **DENIED** as to *section 707(b)(2)*; and it is further

**ORDERED** that a hearing to consider the UST's allegations under *section 707(b)(3)* will be held on September 20, 2006, at 2:00 p.m.

BY THE COURT:

Mary F. Walrath

United States Bankruptcy Judge

cc: William K. Harrington, Esquire n1

n1 Counsel shall serve a copy of this Order and related Memorandum Opinion on all interested parties and file a Certificate of Service with the Court.

[*21]

# EXHIBIT 14

LEXSEE

**INGRID FISHER, INDIVIDUALLY AND AS SUCCESSOR IN INTEREST TO
DECEDENT, STEVEN FISHER, ET AL, Plaintiff, v. HALLIBURTON, INC., ET
AL, Defendants.**

**[REDACTED VERSION FOR CM/ECF FILING], CIVIL ACTION H-05-1731**

**UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF
TEXAS, HOUSTON DIVISION**

*2006 U.S. Dist. LEXIS 70048*

**September 27, 2006, Decided
September 27, 2006, Filed**

**PRIOR HISTORY:** *Fisher v. Halliburton, Inc., 2006
U.S. Dist. LEXIS 68413 (S.D. Tex., Sept. 22, 2006)*

**COUNSEL:** [*1] For Ingrid Fisher, individually and as
successor in interest to decedent Steven Fisher, Plaintiff:
Christina Anne Fountain, Newport Beach, CA; Jennifer
R Johnson, Vincent D Howard, Lopez Hodes et al, New-
port Beach, CA; Jennifer Lee Thompson, Ramon Rossi
Lopez, Lopez, Hodes, Restaino, Milman & Skikos,
Newport Beach, CA; Samuel Ainsworth Houston, Cruse
Scott et al, Houston, TX; Tobias A Cole, Midani Hinkle
Cole, Houston, TX; Jennifer Bickham Swick, Cruse
Scott Henderson & Allen LLP, Houston, TX; Kenneth T
Fibich, Fibich Hampton, Houston, TX; Mary Katherine
Bedard; W Michael Leebron, II, Fibich Hampton et al,
Houston, TX.

For Kristen Fisher, individually and as successor in in-
terest to decedent Steven Fisher, S.F. Jr, a minor, indi-
vidually and as successors in interest to decedent Steven
Fisher by and through next friend Ingrid Fisher, K.F., a
minor individually and as successors in interest to dece-
dent, Steven Fisher, by and through Next Friend Ingrid
Fisher, Marjorie Bell-Smith, individually and as succes-
sor in interest to decedent Timothy Bell, C.S.T., a minor,
individually and as successor in interest to decedent
Timothy Bell by and through her Next Friend Jacqueline
Tunstall, [*2] Andrew Jackson Bradley, individually
and as successor in interest to decedent William Bradley,
Hollie Hulett, individually and as successor in interest to
decedent, Steven Hulett, Alexandria Slingerland, indi-
vidually and as successor in interest to decedent Steven
Hulett, Jack Slingerland, individually and as successor in
interest to decedent, Steven Hulett, Lois Parker, indi-
vidually and as successor in interest to decedent, Jeffrey
Parker, Michael Brezovay, Nelson Howell, Betsy Mon-

tegue, individually and as successor in interest to dece-
dent, Jack Montegue, J M, a minor, individually and as
successor in interest to decedent Jack Montegue, by and
through her Next Friend, Betsy Montegue, Donna How-
ell, Jackie Lester, Naomi Lester, William J Peterson,
Edward Sanchez, Jr, Dana Sanchez, Calvin Keith
Stanley, Raymond T Stannard, Ricky L Tollison, Danny
R Wood, Lisa Hulett, individually and as successor in
interest to decedent Steven Hulett, April Johnson, indi-
vidually and as successor in interest to decedent Tony
Johnson, James Blackwood, Joann Blackwood, N. T. C.,
a minor, invidually and as successor in interest to dece-
dent Timothy Bell by and through his next friend Karen
Caffey, Timothy [*3] E Caffey, individually and as suc-
cessor in interest to decedent Timothy Bell, Plaintiffs:
Christina Anne Fountain, Newport Beach, CA; Jennifer
Lee Thompson, Ramon Rossi Lopez, Lopez, Hodes, Re-
staino, Milman & Skikos, Newport Beach, CA; Samuel
Ainsworth Houston, Cruse Scott et al, Houston, TX; To-
bias A Cole, Midani Hinkle Cole, Houston, TX; Jennifer
Bickham Swick, Cruse Scott Henderson & Allen LLP,
Houston, TX; Kenneth T Fibich, Fibich Hampton, Hous-
ton, TX;Mary Katherine Bedard ; W Michael Leebron,
II,, II, Fibich Hampton et al, Houston, TX.

For Halliburton, a Corporation, Defendant: David Ka-
sanow, McKenna Long et al, Washington, DC; Herbert
Lawrence Fenster, McKenna Long & Aldridge, Wash-
ington, DC; James Stanley Teater, Katie J Colopy, Jones
Day, Dallas, Tx; Raymond B Biagini, McKenna Long &
Aldridge LLP, Washington, DC; Thomas A Rector,
Jones Day, San Francisco, CA; James H Hall, Jones Day,
Houston, TX.

For Kellogg Brown & Root Inc, a Corporation and
Wholly Owned Subsidiary of Halliburton and KBR
Holdings LLC, Service Employees International Inc , a

EXHIBIT
14

2006 U.S. Dist. LEXIS 70048, *

Foreign Corporation and Wholly Owned Subsidiary of Halliburton and Kellogg Brown & Root International Inc, Defendants: Herbert Lawrence [*4]    Fenster, McKenna Long & Aldridge, Washington, DC; James Stanley Teater, Katie J Colopy, Jones Day, Dallas, Tx; Raymond B Biagini, McKenna Long & Aldridge LLP, Washington, DC; Thomas A Rector, Jones Day, San Francisco, CA; James H Hall, Jones Day, Houston, TX.

Does 4 through 10, Defendant, Pro se.

For Kellogg Brown & Root Services Inc, a Corporation and a Wholly Owned Subsidiary of Kellogg Brown & Root Inc, Kellogg Brown & Root International Inc, a Corporation and a Wholly Owned Subsidiary of Kellogg Brown & Root Inc, a Corporation, Defendants: James H Hall, Jones Day, Houston, TX.

For DII Industries LLC, a Wholly Owned Subsidiary of Halliburton Energy Services Inc, a Corporation, Defendant: Herbert Lawrence Fenster, McKenna Long & Aldridge, Washington, DC; Raymond B Biagini, McKenna Long & Aldridge LLP, Washington, DC; James H Hall, Jones Day, Houston, TX.

Strategic Ecomm Inc, Defendant, Pro se.

Webrecruiter, Defendant, Pro se.

For KBR Holdings LLC, Halliburton Energy Services Inc, a corporation, Brown & Root Services, a Division of Kellogg Brown & Root Inc, a Corporation, Defendants: Katie J Colopy, Jones Day, Dallas, Tx.

For Reginald Cecil Lane, [*5] Linda Marlene Lane, Intervenor Plaintiffs: Kenneth T Fibich, Fibich Hampton, Houston, TX.

For Keith Richard, Non-Party, Movant: Robin P Hartmann, A Michael Warnecke, Haynes & Boone, Dallas, TX.

For United States of America, Amicus: Daniel David Hu, US Attorneys Office, Houston, TX.

For Los Angeles Times, T. Christian Miller, Interested Partys: Charles L Babcock, Jackson Walker LLP, Houston, TX.

**JUDGES:** Gray H. Miller, United States District Judge.

**OPINION BY:** Gray H. Miller

**OPINION:**

### AMENDED MEMORANDUM AND ORDER

Pending before the court is defendants' motion to dismiss. n1 Dkt. 135. n2 After considering the parties' arguments, exhibits, and the applicable law, the court concludes that the case presents a non-justiciable political question. Accordingly, the court lacks jurisdiction to hear this case. As such the defendants' motion to dismiss is GRANTED.

n1 The defendants filing the motion are Halliburton Company; Kellogg, Brown & Root, Inc., Service Employees International, Inc.; Kellogg, Brown & Root Services, Inc.; DII Industries, LLC; and Kellogg, Brown & Root International, Inc.

n2 The memoranda in support and in opposition to the motion are filed with the court under seal. Dkts. 139, 140, 141, 149, 153, 155, 156, and 159. Additionally, the defendants filed a notice of supplemental authority, and plaintiffs responded, both not under seal. Dkts. 160 and 161.

[*6]

### BACKGROUND

In 1985, as part of a program to augment Army forces, the United States Army implemented the Logistics Civil Augmentation Program or LOGCAP. n3 Under LOGCAP, n4 the Army awarded Brown & Root Services (KBR) contract No. DAAA09-02-D-0007 to provide essential services in support of the military in Iraq. n5 Military Task Orders 43 and 59 defined KBR's specific tasks, including the transportation services at issue in this case. To fill the jobs created by the contract, KBR recruited civilian personnel. KBR hired the plaintiffs n6 as part of a group to provide transportation services. After terminating their current employment, the plaintiffs were transported to Iraq and assigned to Camp Anaconda. n7

n3 Dkt. 141, Exhibit B, at 1-1. The purpose of LOGCAP was to replace some services currently performed by Army personnel with civilian contractors. *Id.* Those Army personnel would then be available for other missions. *Id.*

n4 The court used definitions of Army terms and acronyms from the Records Management and Declassification Agency website. This database is available to the public at http://www2.arims.army.mil/abbreviation/MainMenu.asp.

[*7]

2006 U.S. Dist. LEXIS 70048, *

n5 Dkt. 141, Exhibit C.

n6 The plaintiffs are the personal representatives of the deceased drivers, Steven Fisher, Timothy Bell, William Bradley, Steven Hulett, Jack Montegue, Jeffrey Parker and Tony Johnson.; the injured drivers, Michael Brezovay, Nelson Howell, Jackie Lester, William Peterson, Edwards Sanchez Jr., Calvin Keith Stanley, Raymond T. Stannard, Ricky L. Tollison, Danny R. Wood, and James Blackwood; and their families. Although not all of the plaintiffs were truck drivers in Iraq, the court will use the term "the plaintiffs" throughout to mean either the truck drivers or those bringing the action according to context.

n7 *See*, Dkt. 74.

On the morning of April 9, 2004, upon arriving at the convoy staging area, the plaintiffs learned the planned route for that day had been changed. The new route called for the convoys to deliver fuel to Baghdad International Airport (BIAP). BIAP was an unfamiliar destination for the drivers. n8 Many drivers merely followed the vehicle directly in front of them, who in turn, followed the Army's local Iraqi guide. n9 According to the Army [*8] report of the incident, military personnel, including six gunners, accompanied the plaintiffs' convoy. n10 Even so, the plaintiffs were the majority of the KBR manpower for the first of two convoys. The first convoy was attacked by anti-American forces and sustained heavy casualties. Six men were killed, eleven more were seriously wounded, and one man is still missing and presumed dead. n11

n8 Dkt. 141, Exhibit A-A, at 3-9.

n9 *Id.*

n10 *Id.*

n11 Dkt. 74, at 26.

The plaintiffs originally filed their claim in Harris County District Court in April, 2005. Dkt. 1, Tab 2. The defendants timely removed the case to federal court on May 13, 2005. The plaintiffs' most recent complaint al-

leges, among other things, that (1) the defendants' recruitment activities included knowing fraudulent statements regarding the safety and nature of the civilian work in Iraq in order to induce plaintiffs to accept employment, (2) the defendants knowingly and intentionally deployed the first April 9th civilian convoy [*9] as a decoy into an area they knew to be under attack to ensure the safe passage of the second convoy, and (3) the defendants had complete control over the decisions of when, where and how to deploy civilian convoys. n12 Their causes of action include state law fraud claims, wrongful death, intentional infliction of physical and emotional distress, violations of civil rights under *§ 1983*, R.I.C.O., conspiracy, survivorship, and common law civil conspiracy. As a result they seek compensatory and exemplary damages.

n12 Dkt. 74, at 26.

The defendants respond that the Army had control over the deployment and protection of convoys. n13 They argue that since their decisions are so interwoven with Army decisions, the court lacks jurisdiction over the case under the political question doctrine. n14 The court agrees.

n13 Dkt. 140.

n14 *Id.* They also argue that they are entitled to official immunity, and alternatively that the plaintiffs' only legal recourse is defined under the Defense Base Act, *42 U.S.C. § 1651(a)*. *Id.* The court does not reach those issues, since its determination that it lacks jurisdiction renders them moot.

[*10]

## POLITICAL QUESTION

A case may meet every other jurisdictional and justiciability hurdle and still be barred by the presence of a political question. *Vieth v. Jubelirer, 541 U.S. 267, 277, 124 S.Ct. 1769, 1776, 158 L. Ed. 2d 546 (2004)*. "Sometimes, [] the law is that the judicial department has no business entertaining the claim of unlawfulness." *Id.* "The political question doctrine excludes from judicial review those controversies which revolve around policy choices and value determinations constitutionally committed for resolution to the halls of Congress or the confines of the Executive Branch." *Japan Whaling Ass'n v. American Cetacean Society, 478 U.S. 221, 230, 106 S.Ct. 2860, 2866, 92 L. Ed. 2d 166 (1986)*. Based on the con-

cept of the separation of powers, political questions are addressed and redressed by the people through the political process. n15 *See Occidental of Umm Al Qaywayn v. Certain Cargo of Petroleum, 577 F.2d 1196, 1203 (5th Cir. 1978)*. The Supreme Court has set out a list of six formulations to aid courts in a "discriminating inquiry into the precise facts and posture of the particular case." *Baker v. Carr, 369 U.S. 186, 217, 82 S.Ct. 691, 710, 7 L. Ed. 2d 663 (1962).* [*11]

> (1) Prominent on the surface of any case held to involve a political question is found a textually demonstrable constitutional commitment of the issue to a coordinate political department;
>
> (2) or a lack of judicially discoverable and manageable standards for resolving it;
>
> (3) or the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion;
>
> (4) or the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government;
>
> (5) or an unusual need for unquestioning adherence to a political decision already made;
>
> (6) or the potentiality of embarrassment from multifarious pronouncements by various departments on one question.

*Id.* "[O]ne of these formulations [must be] inextricable from the case at bar." *Id.* Here the nature of the litigation implicates several of the *Baker* formulations.

n15 The court notes that the political process has begun to address the very issues raised in this case. Congress has shown interest in contractor safety in Iraq. The Senate Democratic Policy Committee has just recently conducted "a hearing about contracting abuses." *See, e.g.*, David Ivanovich, *Halliburton Ignored Dangers, Drivers Say*, Houston Chronicle, Sep. 18, 2006, *available at* http://www.chron.com/disp/story.mpl/headline/bi z/4196908.html.

[*12]

## 1. Textual Constitutional Commitment to a Coordinate Branch.

The first and arguably most important formulation is a "textually demonstrable constitutional commitment of the issue to a coordinate political department." *Id.* The Constitution allocates the power of Commander in Chief of the United States Army and Navy to the executive branch. *U.S. CONST. art II, § 2, cl. 1.* Additionally, the Constitution gives the power "[t]o raise and support Armies . . . provide and support a Navy [and to] make Rules for the Government and Regulation of the land and naval Forces" to Congress. *Id.* at § 8, cls. 12-14. "Of the legion of governmental endeavors, perhaps the most clearly marked for judicial deference are provisions for national security and defense." *Tiffany v. United States, 931 F.2d 271, 277 (2d. Cir. 1991).* Moreover, making war in a foreign land also implicates another equally compelling executive branch power, foreign policy. *Baker, 369 U.S. at 211, 82 S.Ct. at 707.* "Not only does resolution of [foreign policy] issues frequently turn on standards that defy judicial application, or involve the exercise of a discretion demonstrably [*13] committed to the executive or legislature; but many such questions uniquely demand [a] single-voiced statement of the Government's views." *Id. See also Occidental, 577 F.2d at 1203* ("[I]n the realm of foreign relations, policy considerations render issues incompetent for a decision by the court."); *Dickson v. Ford, 521 F.2d 234, 236 (5th Cir. 1975)* (per curium) (finding conduct of foreign relations to be constitutionally committed to the executive and legislative branches.).

The Constitution mandates that war and foreign policy are the provenance of the Executive. In recognition of this, courts have consistently held that issues involving war, and actions taken during war, are beyond judicial competence. *See, e.g., Rostker v. Goldberg, 453 U.S. 57, 66, 101 S.Ct. 2646, 2652, 69 L. Ed. 2d 478 (1981)* (selective service registration for men, but not women) ("The operation of a healthy deference to legislative and executive judgments in the area of military affairs is evident in several recent decisions of this Court."); *Gilligan v. Morgan, 413 U.S. 1, 10, 93 S.Ct. 2440, 2446, 37 L. Ed. 2d 407 (1973)* (training of National Guard troops) ("[I]t is [*14] difficult to conceive of an area of governmental activity in which the courts have less competence."); *Farmer v. Mabus, 940 F.2d 921, 923 (5th Cir. 1991)* (adjutant general's discharge after court-martial) ("[J]udicial intrusion into military matters is to be most cautiously and charily approached. . . . [T]he judicial process is manifestly ill-suited for the resolution of most of the myriad disputes which arise in that field."); *Bynum v. FMC Corp., 770 F.2d 556, 562 (5th Cir. 1985)* (gov-

ernment contractor defense) ("It has long been recognized that interference by civilian courts with military authority inevitably raises both questions about judicial competency in this area and separation of powers concerns."); *Tiffany, 931 F.2d at 277* (military decision to shoot down potentially hostile aircraft) ("The strategy and tactics employed on the battlefield are clearly not subject to judicial review.").

If the Army were the defendant, then the commitment to a coordinate branch would be reasonably clear. However, the plaintiffs argue that the defendants may not shelter under the political question doctrine, because the plaintiffs' complaint [*15] (1) "involves claims by civilians, not military personnel," (2) "questions Defendants' actions as civilian contractors, not the Army's execution of a mission;" and (3) alleges that "Defendants, not the Army, [] deployed, directed, and controlled the civilian members of the Hamill Convoy, n16 thereby making inquiry into military decisions and rules of engagement unnecessary." n17 Even assuming the court found this statement to be true, the private character of the actions do not preclude the application of the political question doctrine. "Whether an issue presents a non-justiciable political question cannot be determined by a precise formula." *Saldano v. O'Connell, 322 F.3d 365, 368 (5th Cir. 2003).* The inquiry as laid out in *Baker* requires the court to posit whether a political question will arise during the course of the trial, not whether it is evident from the face of the complaint. *Occidental, 577 F.2d at 1202.* The political question "doctrine is designed to restrain the Judiciary from inappropriate interference in the business of the other branches of Government; the identity of the *litigant* is immaterial to the presence of these concerns [*16] in a particular case." *United States v. Munoz-Flores, 495 U.S. 385, 394, 110 S.Ct. 1964, 1970, 109 L. Ed. 2d 384 (1990).* Here, the court finds that it cannot try a case set on a battlefield during war-time without an impermissible intrusion into powers expressly granted to the Executive by the Constitution.

n16 Mr. Hammill was the lead KBR civilian truck driver for the first convoy on April 9th. He is not a party to this suit. Dkt. 74, at 26.

n17 Dkt. 149, at 34-35.

## 2. Lack of Judicially Discoverable and Manageable Standards.

The second *Baker* formulation is equally implicated. "One of the most obvious limitations [on the court] is

that judicial action must be governed by *standard*, by *rule*." *Vieth, 541 U.S. at 278, 124 S.Ct. at 1777.* Those standards are particularly elusive in the case at bar, where the court cannot escape an examination of Army decisions, an area "not subject to judicial second-guessing." *In re "Agent Orange" Product Liability Litigation, 818 F.2d 204, 206 (2d. Cir. 1987).* [*17] In the case at bar, the question becomes whether the court could extricate the defendants' acts from the Army's acts.

A review of the evidence submitted by the plaintiffs and the defendants shows the actions taken on April 9, 2004 were, at best, the result of a joint effort between the defendants and the Army. The contracts show that the Army, not the defendants, was responsible for the security of the convoys, up to and including the force protection for the trucks, n18 intelligence regarding the possible routes, n19 the decision regarding which route to take, n20 and the manner in which the drivers were to operate. n21 The Army's investigative report regarding the incident amply demonstrates the Army's significant actual involvement, in the events at issue. n22 Moreover, in a deposition taken by the plaintiffs, [REDACTED****] confirms that the Army chose the routes for the convoys and requested that they be sent. n23 Also, email among KBR employees during the time before, during and after the April 9th incident indicate that the Army had a significant role in the deployment of convoys. n24 Regardless of whether the evidence may show that KBR had any ability to deploy or recall [*18] convoys, it most certainly demonstrates that the Army was involved at each step in the process.

n18 LOGCAP Contract # DAAA09-02-D-0007 governing the relationship between the defendants and the Army states in relevant part:

[REDACTED****]

Dkt. 141, Exhibit C, at 00004. For an identical provision under Task order 59, see Dkt. 141, Exhibit C, at 00076.

n19 Task Order 59 dictates with regards to the transportation mission that [REDACTED****] Task Order 59, Dkt. 141, Exhibit C, at 00066.

n20 Under the Logistics Support Element of Task Order 59, the contract states that [REDACTED****] Task Order 59, Dkt. 141, Exhibit C, at 00075.

n21 [REDACTED****] Task Order 59, Dkt. 141, Exhibit C, at 00081.

n22 Dkt. 141, Exhibit A, at 3-9. [REDACTED****] *Id.* at 4. [REDACTED****] *Id.* at 5.9

n23 Dkt. 147, Exhibit U, at 17-18. [REDACTED ****] *Id.*

n24 *Id.*, Exhibit O, at 1. [REDACTED ****] *Id.*

The plaintiffs argue that the contract language required the defendants [*19] "to manage and direct their own convoys." n25 They point to the Army publication, "Contractors on the Battlefield" and quote it as follows:

> Management of contractor activities is accomplished through the responsible contracting organization, not the chain of command. Commanders do not have direct control over contractors or their employees (contractor employees are not the same as government employees); only contractors manage, supervise, and give directions to their employees. n26

However, this quote is malapropos. It was taken from the Overview section of the manual in a subsection entitled Contractor and Military Distinctions. n27 A review of the manual reveals other, more applicable passages.

n25 Dkt. 149, at 33.

n26 *Id.*

n27 Dkt. 149, Exhibit W, at 1-7.

Contractor Management in the Military Environment

[T]he regional combatant commander ... is responsible for accomplishing the mission and ensuring the safety of all deployed military, government civilian, *and contractor* [*20] *employees* in support of US military operations. . . . To fully integrate contractor support into the theater operational support structure, proper military oversight is imperative. n28

And later under the Force Protection chapter, the manual states:

Roles and Responsibilities

6-4. Protecting contractors and their employees on the battlefield is the commander's responsibility. When contractors perform in potentially hostile or hazardous areas, the supported military forces must assure the protection of their operations and employees. The responsibility for assuring that contractors receive adequate force protection starts with the combatant commander, extends downward, and includes the contractor.

. . .

6-6. Protection for contractors involves active use of armed military forces to provide escort or perimeter security, and passive measures that include protective military equipment, training, and equipping of contractor employees in self-protection. n29

Far from supporting the contention that KBR had sole control over the safety of its convoys, the manual offers express proof that security started with the Army. The plaintiffs also quote from [*21] Army Regulation 715-9 to support the argument that under the governing contracts the Army was not allowed to direct KBR employees. n30 "Contracted support service personnel shall not be supervised or directed by military or Department of the Army (DA) civilian personnel." n31 Again, a closer examination of the regulations demonstrates instead that the Army was, at the very least, significantly involved in transportation and force protection decisions.

n28 *Id.* (emphasis added).

n29 *Id.* at 6-2.

n30 Dkt. 149, at 33.

n31 *Id.*

> The Commander, AMC will . . . [c]oordinate transportation (i.e., to, from and within the theater), quality of life issues and force protection of deployed AMC contractors with the ASCC [Army Service Component Command].
>
> . . .
>
> [C]ontractor employees will be expected to adhere to all guidance and obey all instructions and general orders issued by the Theater Commander. n32

The evidence shows overwhelmingly that the Army was an integral part of [*22] any decision to deploy and protect convoys.

n32 Dkt. 149, Exhibit X, at 14.

In order to hear this case, the court would have to substitute its judgment for that of the Army. For example, the court would need to determine what intelligence the Army gave to KBR about the route, whether that intelligence was sufficient, what forces were deployed with the convoys, whether they were sufficient, and whether they performed properly. n33 Even if KBR had authority to deploy or recall the convoys, the court would still need to determine whether the Army could or should have countermanded that order. No judicial standards exist for making these determinations. To accept the plaintiffs' contentions that the defendants were in complete control of military vehicles transporting military supplies through a combat zone would require the court both to suspend disbelief and to disregard the governing contracts and the army incident report. This feat the court is simply not prepared to attempt.

n33 *See*, Dkt. 74.

[*23]

Even if the plaintiffs limited their arguments to what KBR did or did not do, eventually the court would be forced to distinguish between KBR's actions and the Army's actions. Because the defendants present a colorable argument based precisely on this distinction, the court would inexorably be drawn into an examination of Army decisions. And, the Army's decisions during a time

of war present a particularly inappropriate question for judicial examination. *Tiffany, 931 F.2d at 276* ("It would [be] unseemly for a democracy's most serious decisions, those providing for common survival and defense, [to] be made by its least accountable branch of government.").

Finally, the textual commitment of military decisions to coordinate branches, as discussed earlier, has an inverse relationship to the lack of judicially discoverable and manageable standards for resolving the case. *Nixon v. United States, 506 U.S. 224, 228-29, 113 S.Ct. 732, 735, 122 L. Ed. 2d 1 (1993)*. The more a decision is committed to another branch or branches of government, the less likely a court will find judicially discoverable and manageable standards to apply. *Id.* The Constitution specifically [*24] gives the Executive Branch the role of Commander in Chief of the Army. *U.S. CONST. art II, § 2, cl. 1.* The Army's actions and decisions in Iraq set the stage for this case. Every issue, every claim the plaintiffs make must be examined against the backdrop of battle. They are inextricably intertwined. Accordingly, the court finds that it lacks the standards to hear this case.

### 3. Nonjudicial Policy Determination and Lack of Respect.

If the second formulation asks the court to determine what happened on April 9, 2004, then the third formulation requires an examination of why it happened. In the broadest sense, the Executive Branch policy of using civilian contractors to free up military personnel for military missions would be under scrutiny. In the narrowest sense, the question would become why the defendants and the military sent two convoys on the road to BIAP on that fateful day. Is it wise to use civilian contractors in a war zone? Was it wise to send the convoy along the route to BIAP on April 9, 2004? Answering either question and the many questions in between would require the court to examine the policies of the Executive Branch during wartime, a step the court declines [*25] to take. Courts are "not tribal wisemen dispensing divinely or theoretically inspired judgments, but [are] limited to the application of predetermined law." *Occidental, 577 F.2d at 1203.*

### CONCLUSION

The court concludes that this case presents a nonjusticiable political question. The case at bar meets not one, but three of the formulations described in *Baker v. Carr. See Baker, 369 U.S. at 217, 82 S.Ct. at 710.* Nor is the court alone in this conclusion. Two recent federal court cases involving suits against civilian contractors in Iraq were dismissed on similar grounds. In a case involving the bombing of a dining facility managed by KBR for the Army in Iraq, Judge Sim Lake dismissed the case for want of jurisdiction based on political question. *Smith*

*v. Halliburton, 2006 U.S. Dist. LEXIS 61980, No. 4:06CV0462, 2006 WL 2521326, (S.D. Tex Aug. 30, 2006).* Also, in a Georgia case, the district court dismissed as non-justiciable a negligence case brought by the family of a U.S. soldier killed while escorting a KBR convoy. *Whitaker v. Kellogg Brown & Root, 2006 U.S. Dist. LEXIS 45708, No. 4:05-CV-78, 2006 WL 1876922, (M.D. Ga. July 6, 2006).*

For the foregoing reasons [*26] the court finds that it lacks jurisdiction to hear the above-styled case, be-cause it presents a non-justiciable political question. Accordingly, the defendants' motion to dismiss is GRANTED. Dkt. 135. The case is DISMISSED for want of jurisdiction.

It is so ORDERED.

Signed at Houston, Texas on September 27, 2006.

Gray H. Miller

United States District Judge

# EXHIBIT 15

LEXSEE 2006 U.S. DIST. LEXIS 61980

**SAVANAH ILISE SMITH, BRANDY LEIGH WILKISON, and PAMELA GENE KARM, Individually and as Representatives of the ESTATE OF ALLAN KEITH SMITH, Deceased, Plaintiffs, v. HALLIBURTON COMPANY, KELLOGG, BROWN & ROOT SERVICES, INC., and KELLOGG, BROWN AND ROOT, INC., Defendants.**

**CIVIL ACTION NO. H-06-0462**

**UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF TEXAS, HOUSTON DIVISION**

*2006 U.S. Dist. LEXIS 61980*

**August 30, 2006, Decided**
**August 30, 2006, Filed**

**PRIOR HISTORY:** *Smith v. Halliburton Co., 2006 U.S. Dist. LEXIS 30530 (S.D. Tex., May 16, 2006)*

**COUNSEL:** [*1] For Savanah Ilise Smith, Brandy Leigh Wilkinson, Pamela Gene Karm, Individually and as Representatives of the Estate of Allan Keith Smith, Deceased, Plaintiffs: Jim L Culpepper, Jim L Culpepper & Associates, Houston, TX.

For Halliburton Company, Kellogg, Brown & Root Services Inc, Kellogg, Brown & Root Inc., Defendants: David Kasanow, Herbert Lawrence Fenster, Raymond B Biagini, McKenna Long et al, Washington, DC; Robert Ellison Meadows, King and Spalding, Houston, TX.

**JUDGES:** SIM LAKE, UNITED STATES DISTRICT JUDGE.

**OPINION BY:** SIM LAKE

**OPINION:**

### MEMORANDUM OPINION AND ORDER

Plaintiffs, Savanah Ilise Smith, Brandy Leigh Wilkison, and Pamela Gene Karm, individually and as representatives of the Estate of Allen Keith Smith, deceased, filed this action in Texas state court against defendants, Halliburton Company, Kellogg, Brown & Root Services, Inc., and Kellogg, Brown & Root, Inc., n1 alleging negligence stemming from a suicide bomb attack on a base in Iraq. n2 Defendants timely removed the action to this court asserting federal question and federal officer jurisdiction under *28 U.S.C. § § 1441 and 1442.* n3 Pending before the court are Defendants' [*2] Renewed Motion to Dismiss Pursuant to *Rule 12(b)(1) of the Federal Rules of Civil Procedure* (Docket Entry No. 31), Plaintiffs' Response (Docket Entry No. 34), and Defendants' Reply to Plaintiffs' Response to Defendants' Renewed Motion to Dismiss (Docket Entry No. 37). For the reasons explained below, Defendants' Renewed Motion to Dismiss will be granted.

> n1 Defendants' pleadings state that on December 31, 2005, the principal business and related operations, assets and liabilities, rights, obligations, and contracts of Kellogg Brown & Root, Inc. were transferred to Kellogg Brown & Root LLC, a Delaware entity.

> n2 Plaintiffs' Original Petition, Exhibit A2 to defendants' Notice of Removal, Docket Entry No. 1.

> n3 Defendants' Notice of Removal, Docket Entry No. 1.

### I. Factual and Procedural History

Only a brief factual summary of this case is required because the court's previous Memorandum Order and Opinion recited the factual background in detail. n4 On [*3] or about December 21, 2004, a suicide bomber walked into the dining facility n5 ("DFAC") at Forward Operating Base ("FOB") Marez in Mosul, Iraq, and detonated explosives packed with ball bearings and other shrapnel. n6 Allen Keith Smith was killed, along with twenty-one other people.

**EXHIBIT**
**15**

n4 Memorandum Opinion and Order, pp. 2-3, Docket Entry No. 13.

n5 Plaintiffs' Original Petition refers to the dining facility as the "mess tent" but the court will refer to it as the dining facility, or DFAC, because this is the terminology used in the relevant contracts.

n6 Plaintiffs' Original Petition, P 10, Exhibit A2 to defendants' Notice of Removal, Docket Entry No. 1.

A division of defendant Kellogg Brown & Root, Inc. was operating in Iraq pursuant to Contract No. DAAA09-02-D-0007 (the "LOGCAP Contract"), under which defendants provided numerous services to the United States military throughout the world. n7 LOGCAP Contract requirements are listed as Task Orders, and Task Order 59 pertains to FOB Marez and governs [*4] the food services defendants provided at FOB Marez. n8

n7 The LOGCAP Contract, Exhibit A to Defendants' Renewed Motion to Dismiss Pursuant to *Rule 12(b)(1) of the Federal Rules of Civil Procedure.* LOGCAP stands for Logistics Civil Augmentation Program. Army Regulation 700-137, Logistics Civil Augmentation Program (16 December 1985). Portions of the LOGCAP Contract are attached as Exhibit A to Defendants' Renewed Motion to Dismiss, Docket Entry No. 34. This is actually the third LOGCAP contract, covering from December 2001 to the present.

n8 Task Order 59 is attached as Exhibit A to Defendants' Renewed Motion to Dismiss, Docket Entry No. 32. Plaintiffs complain that the contracts attached to Defendants' Renewed Motion to Dismiss are not the same documents produced by defendants in response to plaintiffs' discovery request. Plaintiffs' Response to Defendants' Renewed Motion to Dismiss, P 9, Docket Entry No. 34. This is immaterial because plaintiffs have had adequate time to read and respond to the contracts and to all of the other documents attached to Defendants' Renewed Motion to Dismiss.

[*5]

Plaintiffs allege that defendants were negligent in (1) failing to properly secure the DFAC, (2) failing to properly monitor the DFAC, (3) allowing a large number of people to gather at the mess tent at the same time, (4) not providing a search of the people who entered into the DFAC, (5) failing to have a secure perimeter around the DFAC, (6) failing to warn people that came into the DFAC that defendants had provided no security, and (7) failing to take reasonable precautions to make the DFAC safe from attacks and explosions of the type that killed Smith. As a result of this negligence, plaintiffs allege that the suicide bomber was able to enter and detonate explosives, killing Smith. n9

n9 Plaintiffs' Original Petition, PP 12-13, Exhibit A2 to defendants' Notice of Removal, Docket Entry No. 1.

On February 17, 2006, defendants filed a motion to dismiss the case for lack of subject matter jurisdiction pursuant to *Federal Rule of Civil Procedure 12(b)(1).* n10 Defendants [*6] argued that the case should be dismissed as nonjusticiable under the political question doctrine, or, alternatively, dismissed under the Federal Tort Claims Act. The court declined to dismiss the case, concluding that the Federal Tort Claims Act combatant activities exception does not preempt the state tort law action, and that there was not a sufficient factual predicate to determine whether the case presents a nonjusticiable political question. n11 The court granted plaintiffs' request for discovery on the jurisdictional issue, and invited defendants to refile their motion for dismissal after completion of discovery. n12 Defendants have done so, filing a renewed motion to dismiss for lack of subject matter jurisdiction on political question grounds. n13

n10 Defendants' Motion to Dismiss Pursuant to *Rule 12(b)(1) of the Federal Rules of Civil Procedure,* Docket Entry No. 4.

n11 Memorandum Opinion and Order, Docket Entry No. 13.

n12 Id. at pp. 13-14.

n13 Defendants' Renewed Motion to Dismiss Pursuant to *Rule 12(b)(1) of the Federal Rules of Civil Procedure.*

[*7]

## II. Political Question

Case 1:06-cv-00605-GMS    Document 18-10    Filed 11/03/2006    Page 31 of 36

Page 3
2006 U.S. Dist. LEXIS 61980, *

The political question doctrine is an aspect of "the concept of justiciability, which expresses the jurisdictional limitations imposed on the federal courts by the 'case or controversy' requirement" of Article III of the Constitution. *Schlesinger v. Reservists Comm. to Stop the War, 418 U.S. 208, 94 S.Ct. 2925, 2929, 41 L. Ed. 2d 706 (1974).* Courts lack jurisdiction over political questions that are by their nature committed to the political branches. *Bancoult v. McNamara, 445 F.3d 427, 432 (D.C. Cir. 2006)* (quoting *Schneider v. Kissinger, 366 U.S. App. D.C. 408, 412 F.3d 190, 193 (D.C. Cir. 2005)).* See also *Occidental of UMM al Qaywayn, Inc. v. Certain Cargo of Petroleum, 577 F.2d 1196, 1203 (5th Cir. 1978).*

"The political question doctrine excludes from judicial review those controversies which revolve around policy choices and value determinations constitutionally committed for resolution to the halls of Congress or the confines of the Executive Branch." *Japan Whaling Ass'n v. American Cetacean Society, 478 U.S. 221, 106 S.Ct. 2860, 2866, 92 L. Ed. 2d 166 (1986).* The following six tests determine the existence of a political question:

> (1)  [*8]  a textually demonstrable commitment of the issue to a coordinate political department;

> (2) a lack of judicially discoverable and manageable standards;

> (3) the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion;

> (4) the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government;

> (5) an unusual need for unquestioning adherence to a political decision already made; and

> (6) the potentiality of embarrassment from multifarious pronouncements by various departments on one question.

*Baker v. Carr, 369 U.S. 186, 82 S.Ct. 691, 710, 7 L. Ed. 2d 663 (1962).* These six tests "are probably listed in descending order of both importance and certainty." *Vieth v. Jubelirer, 541 U.S. 267, 124 S.Ct. 1769, 1776, 158 L. Ed. 2d 546 (2004).* The political question doctrine is not applied unless one of the six factors is "inextricable from the case at bar[.]" *Baker, 82 S.Ct. at 710.* In determining if a political question exists the court analyzes the claim "as it would be tried, to determine whether a political question will emerge." *Occidental, 577 F.2d at 1202.* [*9]  n14

> n14 The court may consider matters outside the complaint to resolve the jurisdictional issue. See *Barrett Computer Servs., Inc. v. PDA, Inc., 884 F.2d 214, 220 (5th Cir. 1989)* (stating that subject matter jurisdiction determinations may be made using any one of the following bases: (1) the complaint alone; (2) the complaint supplemented by undisputed facts evidenced in the record; or (3) the complaint supplemented by undisputed facts plus the court's resolution of disputed facts).

In its previous opinion the court concluded that the central inquiry in the political question determination was who had responsibility for security at the DFAC, defendants or the United States military? n15 Defendants argue that the evidence produced demonstrates that the United States military was solely responsible for force protection at FOB Marez. n16 Plaintiffs respond that defendants have not submitted any new evidence in their Renewed Motion to Dismiss and therefore revisiting the court's previous opinion [*10]  is unnecessary. n17 But a review of the pleadings reveals that defendants have submitted new evidence in the form of several sworn declarations and the relevant contract. The contract provides a factual framework with which the court can analyze the legal question. n18

> n15 Memorandum Opinion and Order, pp. 9-10, Docket Entry No. 13.

> n16 Defendants' Renewed Motion to Dismiss Pursuant to *Rule 12(b) (1) of the Federal Rules of Civil Procedure*, p. 8, Docket Entry No. 31.

> n17 Plaintiffs' Response to Defendants' Renewed Motion to Dismiss, P 37, Docket Entry No. 34.

> n18 Many of defendants' subpoena requests were denied by the Army and the Department of Defense, generally because the requested materials were classified. Exhibits N & O to Defendants' Renewed Motion to Dismiss Pursuant to *Federal Rule of Civil Procedure 12(b)(1).* De-

spite this, the court is satisfied that the evidence obtained by defendants and submitted in their Renewed Motion to Dismiss is sufficient to determine whether or not this case constitutes a political question.

[*11]

The LOGCAP Contract and Task Order 59 serve as the principal legal bases for the relationship between the Department of Defense and the contractor. n19 No provisions of the LOGCAP Contract or Task Order 59 give defendants responsibility for providing force protection in the FOB Marez DFAC to defendants. Force protection is defined as "[s]ecurity programs designed to protect Service members, civilian employees, family members, facilities, information, and equipment in all locations and situations, accomplished through the planned and integrated application of combating terrorism, physical security, operations security, personal protective services, and supported by intelligence, counterintelligence, and security programs." n20

> n19 Department of Defense Instruction 3020.41, Contractor Personnel Authorized to Accompany the U.S. Armed Forces, P 6.1.4 (October 3, 2005).

> n20 Department of Defense Instruction 2000.16, DoD Antiterrorism Standards, Enclosure 2 P E2.1.7 (June 14, 2001).

Defendants have submitted [*12] a sworn declaration from the Administrative Contracting Officer responsible for oversight of the relevant contract stating that "[t]he Army retained the authority and responsibility for the 'security' and 'force protection' functions at FOB Marez and the Marez DFAC at all times under this contract; KBR was never entrusted with such 'security' or 'force protection' functions." n21 Instead, defendants' responsibility was to provide food services at the FOB Marez DFAC. Not only are defendants without force protection responsibilities, but the contract provides that the Service Theater Commander will provide force protection to defendants and their employees. n22

> n21 Declaration of Major Judy P. Anderson, P 7, Exhibit G to Defendants' Renewed Motion to Dismiss Pursuant to *Federal Rule of Civil Procedure 12(b)(1)*. Plaintiffs object to the declaration, arguing that it constitutes an opinion as to the legal effect of a contract. Although it may contain a legal opinion, the court can determine the effect

of the contract by reading it, and will consider the declaration because it is relevant insofar as it addresses the military's understanding of defendants' lack of force protection responsibilities.

[*13]

> n22 LOGCAP Contract, P H-16, and Task Order 59, Statement of Work P 1.10, Exhibit A to Defendants' Renewed Motion to Dismiss Pursuant to *Federal Rule of Civil Procedure 12(b) (1)*.

In the absence of any contractual directive to provide security, the Army assigns responsibility for force protection, including security, to the military, not to civilian contractors. n23 As contractors, defendants are required to adhere to military guidance, instructions, and general orders issued by the Theater Commander including "any and all guidance and instructions issued based upon the need to ensure mission accomplishment, force protection, and safety[.]" n24 In addition, as contractors, defendants cannot "command, supervise, administer or control Army or Department of the Army Civilian (DAC) personnel." n25 Although contractors may be armed, they may only be armed for the purpose of individual self-defense. n26 The LOGCAP contract provides that the Theater Commander has discretion to allow contractors to carry government-issue firearms. n27 Defendants state that no [*14] such authorization was given to defendants at FOB Marez. n28

> n23 See DoD Instruction 2000.16, P E3.1.1.14.1 (June 14, 2001) ("Commanders shall maintain a comprehensive AT [anti-terrorism] program for those personnel and assets for which they have AT responsibilities"); Field Manual 100-21, Contractors on the Battlefield, P 6-3 (January 2003) ("Contractor employees cannot be required to perform force protection functions . . . and cannot take an active role in hostilities").

> n24 LOGCAP Contract, P H-13, Exhibit A to Defendants' Renewed Motion to Dismiss Pursuant to *Federal Rule of Civil Procedure 12(b)(1)*.

> n25 Army Regulation 715-9, Contractors Accompanying the Force P 3-3(a) (29 October 1999).

n26 DoD Instruction 3020.41, Contractor Personnel Authorized to Accompany the U.S. Forces, P 4.4.1 (October 3, 2005).

n27 LOGCAP Contract, P H-21, Exhibit A to Defendants' Renewed Motion to Dismiss Pursuant to *Federal Rule of Civil Procedure 12(b)(1)*.

n28 Defendants' Renewed Motion to Dismiss Pursuant to *Rule 12(b)(1) of the Federal Rules of Civil Procedure*, p. 12, Docket Entry No. 31.

[*15]

Defendants' evidence also demonstrates that as a practical matter the military, not defendants, actually provided security at the DFAC. n29 This security took the form of periodically stationing soldiers to check identification of personnel entering the DFAC and ensuring that loaded weapons were not brought into the DFAC. n30 There were apparently no soldiers performing these functions on December 21, 2004, when the DFAC was bombed, or for the several days preceding the bombing. n31 Nor did the military provide defendants with any warning that the DFAC might be targeted for attack by a suicide bomber, or targeted for any attack at all on December 21, 2004. n32

n29 Declaration of Mark C. Hall, PP 5 & 6, Exhibit I to Defendants' Renewed Motion to Dismiss Pursuant to *Federal Rule of Civil Procedure 12(b)(1)*.

n30 Id. at P 5.

n31 Id.

n32 Id. at P 7.

The evidence submitted establishes that defendants had no responsibility for force protection, notwithstanding [*16] plaintiffs' arguments to the contrary. The linchpin of plaintiffs' argument that defendants have force protection responsibilities as contractors is paragraph 6-4 of Field Manual 100-21, Contractors on the Battlefield, which states that "[t]he responsibility for assuring that contractors receive adequate force protection starts with the combatant commander, extends downward, and includes the contractor." n33 Plaintiffs attempt to characterize this as establishing a chain of command for force protection, starting with the combat-

ant commander and extending downward to the contractors. But the full text of the cited paragraph does not support plaintiffs' argument. The entire paragraph states as follows:

n33 Field Manual 100-21, Contractors on the Battlefield, P 6-4 (January 2003), Exhibit F to Defendants' Renewed Motion to Dismiss Pursuant to *Federal Rule of Civil Procedure 12(b)(1)*.

Protecting contractors and their employees on the battlefield is the commander's [*17] responsibility. When contractors perform in potentially hostile or hazardous areas, the supported military forces must assure the protection of their operations and employees. The responsibility for assuring that contractors receive adequate force protection starts with the combatant commander, extends downward, and includes the contractor. n34

n34 Id.

The first sentence of this document makes it clear that the intent is not to delegate force protection responsibilities to the contractor. Furthermore, the cited paragraph deals with protecting the contractors by military forces, not with requiring contractors to provide force protection to other parties. The last sentence ensures that contractors comply with force protection measures ordered by the commanders for their own benefit, such as using personal protective equipment and does not, as plaintiffs argue, demonstrate that the military delegated some of its force protection responsibility to defendants.

Plaintiffs also cite to a provision of Task [*18] Order 59 related to fire fighting services.

Task Order 59 of the LOGCAP contract requires that defendants

provide fire fighting protection services for U.S. Government owned or leased property, personnel and equipment on all Enduring Base Camps . . . The contractor shall provide fire department and fire protection functions according to DoD, local,

state, federal and industry standards. These functions include fire protection support, emergency response, equipment and vehicle management, fire prevention and education, and training. n35

n35 Task Order 59, Statement of Work, PP 8.18-8.18.1, Exhibit A to Defendants' Renewed Motion to Dismiss Pursuant to *Federal Rule of Civil Procedure 12(b)(1).*

Plaintiffs argue that fire fighting and prevention services include preventing a fire caused by a bomb explosion. n36 Reading fire prevention as broadly as plaintiffs suggest would bring this portion of Task Order 59 in unnecessary conflict with the contractual provisions [*19] requiring the United States government to provide force protection to contractor personnel. n37 In addition, the plain language of the contract belies plaintiffs' argument. The term "fire prevention" cannot reasonably be read to encompass prevention of infiltration or explosions caused by suicide bombers. Preventing suicide bomb attacks is more appropriately characterized as a force protection measure, contractually entrusted to the United States government and the military. Plaintiffs' arguments regarding the contractual provision that defendants shall be "responsible for the safety of employees and base camp residents during all operations in accordance with the Army and OSHA safety regulations and guidance" is similarly unavailing. n38 The reference to OSHA safety regulations indicates that "safety" in this provision is safety in the workplace, not security measures related to hostile forces.

n36 Plaintiffs' Response to Defendants' Renewed Motion to Dismiss, PP 60-62, Docket Entry No. 34.

n37 LOGCAP Contract, P H-16, and Task Order 59, Statement of Work, P 1.10, Exhibit A to Defendants' Renewed Motion to Dismiss Pursuant to *Federal Rule of Civil Procedure 12(b)(1).*

[*20]

n38 Plaintiffs' Response to Defendants' Renewed Motion to Dismiss, and Response to Defendants' Motion in the Alternative for Summary

Judgment, PP 53-58, Docket Entry No. 34 (quoting Task Order 59, Statement of Work, P 1.2).

Plaintiffs couch this lawsuit in terms of simple premises liability by arguing that the court need only determine what duties defendants, as possessor, occupier, and operator of the DFAC, owed to Allen Keith Smith as the invitee. n39 This formulation fails to recognize that were the case to proceed, this court would have to second-guess the decisions of the United States military, even though the suit is ostensibly against only military contractors. Although the military contracted out the logistical aspects of FOB Marez's DFAC operations to defendants, it did not delegate the force protection responsibilities to defendants.

n39 Id. at P 65.

Another district court recently addressed the issue of [*21] how government contractors affect the political question doctrine. In *Whitaker v. Kellogg Brown & Root, Inc.,* -- F.Supp.2d --, *2006 U.S. Dist. LEXIS 45708, 2006 WL 1876922 (M.D. Ga. July 6, 2006),* the surviving parents of a soldier serving in Iraq sued the government contractor after their son was killed while escorting a military supply convoy operated by the government contractor. *2006 U.S. Dist. LEXIS 45708, [WL] at *1.* Plaintiffs alleged that the defendant's drivers were negligent and that the defendant was negligent in hiring, training, and supervising those drivers. Id. The court dismissed the case on political question grounds despite the fact that the plaintiffs' allegations were against the civilian contractor. *2006 U.S. Dist. LEXIS 45708, [WL] at *3.* "When the military seeks to accomplish its mission by partnering with government contractors who are subject to the military's orders . . . the use of those civilian contractors to accomplish the military objective does not lessen the deference due to the political branches in this area." Id.

In this case the negligence allegations in plaintiffs' complaint directly address the security of the DFAC. Plaintiffs repeatedly argue that their complaint questions only the conduct of defendants [*22] in failing to provide security, not the military's force protection policies. But this argument fails because the evidence shows that defendants had no security responsibilities for the DFAC. By alleging that defendants were negligent in providing security for the DFAC at FOB Marez plaintiffs are, in effect, alleging that the military was negligent in providing security for the DFAC at FOB Marez.

Even assuming, arguendo, that the military and defendants had concomitant responsibility for security,

defendants were still operating pursuant to the military's orders, instructions, and regulations. The Whitaker court held that an injury "at the hands of a contractor which is performing military functions subject to the military's orders and regulations also raises . . . political questions." *Whitaker, 2006 U.S. Dist. LEXIS 45708, 2006 WL 1876922 at *3.* This court agrees. Even if defendants had some responsibility for implementing force protection measures promulgated by the military, the court would still be called upon to examine the military's decision-making in many respects, including determining whether the military gathered adequate intelligence regarding the threat of terror attacks, [*23] whether it conveyed this threat to defendants, how the military planned for and implemented base access measures, and whether the implementation of force protection measures was reasonable when measured against the risk assessment level.

Examining plaintiffs' complaint in this light, the court concludes that the first three *Baker v. Carr* tests are inextricable from the case at bar. The Constitution textually commits the issues in this case to the political branches. Article II, § 2 of the United States Constitution appoints the President Commander in Chief of the armed forces. Article I, § 8 grants to Congress authority to raise and support Armies, to provide and maintain a Navy, and to make rules for the governing and regulation of the land and naval forces. Courts have found that "the political branches of government are accorded a particularly high degree of deference in the area of military affairs." *Aktepe v. United States, 105 F.3d 1400, 1403 (11th Cir. 1997).* Allowing this action to proceed would require the court to substitute its judgment on military decision-making for that of the branches of government entrusted with this task. To determine whether [*24] the force protection in place was adequate the intelligence gathering, risk assessment, and security measures implemented by the military at FOB Marez would have to be examined. Because the suicide bomber managed to enter the base, the court would also have to examine base perimeter security. "The control of access to a military base is clearly within the constitutional powers granted to both Congress and the President." *Cafeteria & Rest. Workers Union v. McElroy, 367 U.S. 886, 81 S. Ct. 1743, 1746, 6 L. Ed. 2d 1230 (1961).* Judicial review of such decisions would intrude onto critical areas reserved to the Legislative and Executive Branches of government by the Constitution.

Moreover, there exists a lack of judicially discoverable and manageable standards to resolve this case. In order to determine if defendants acted reasonably as possessor, occupier, and operator of the DFAC, the court would have to decide what constitutes reasonable security measures at a military base located in an area of Iraq subject to threats from hostile forces. The court would

have to assess what intelligence had been gathered regarding potential threats and evaluate whether the security measures implemented [*25] were reasonable in light of the potential threats. Security measures on military bases balance the need for functionality and access with the need for force protection. In striking this balance the military must also allocate limited personnel and resources, with the need for security on base competing with mission requirements off base in Iraq as well as throughout the world. The court would have to determine if the military was reasonable in striking this balance. Courts lack the facts, expertise, and standards necessary to evaluate whether reasonable care was taken in these circumstances.

Finally, the issues in this case could not be resolved without an initial policy determination of a kind clearly for nonjudicial discretion. The court would substitute its judgment for that of the military on the issue of whether adequate force protection measures were in place. The court would also have to examine the military's policy of feeding soldiers by gathering them in one centralized location. Since the suicide bomber was apparently wearing an Iraqi uniform, the decision to allow Iraqi troops to dine in the DFAC would also be at issue. These are just a few examples of the many policy [*26] determinations that were involved in implementing force protection measures at the FOB Marez DFAC. "The complex subtle, and professional decisions as to the composition, training, equipping, and control of a military force are essentially professional military judgments, subject always to civilian control of the Legislative and Executive Branches." *Gilligan v. Morgan, 413 U.S. 1, 93 S.Ct. 2440, 2446, 37 L. Ed. 2d 407 (1973).* Policy determinations involving force protection measures in a hostile area of Iraq are clearly not appropriate for judicial determination.

For the foregoing reasons, the court concludes that it lacks jurisdiction to hear this case because it constitutes a nonjusticiable political question.

### III. Plaintiffs' Motions to Compel Discovery and for Leave to Amend

Plaintiffs have requested that defendants be ordered to respond to plaintiffs' discovery request. n40 This request is DENIED. Plaintiffs received defendants' responses to their discovery requests on July 10, 2006, but waited until filing their response to Defendants' Renewed Motion to Dismiss on August 22, 2006, to complain about defendants' discovery production. n41 Plaintiffs had more than adequate time [*27] to file a motion to compel production prior to filing their response. Furthermore, the evidence adduced by defendants was sufficient to determine that this case is nonjusticiable on political question grounds.

n40 Plaintiffs' Response to Defendants' Renewed Motion to Dismiss, p. 25, Docket Entry No. 34.

n41 Exhibits A & B to Plaintiffs' Response to Defendants' Renewed Motion to Dismiss, Docket Entry No. 34.

Plaintiffs also request leave to amend their complaint after receipt of defendants' response. n42 *Federal Rule of Civil Procedure 15(a)* states that "leave to amend should be freely given when justice so requires." However, a district court can deny leave to amend when allowing the amendment would be futile. *Jamieson v. Shaw, 772 F.2d 1205, 1208 (5th Cir. 1985).* See also *Martin's Herend Imports, Inc. v. Diamond & Gem Trading United States of America Co., 195 F.3d 765, 771 (5th Cir. 1999)* ("A district court acts within its discretion [*28] when dismissing a motion to amend that is frivolous or futile."). The evidence clearly establishes that the military had primary responsibility for force protection. Furthermore, the court has already examined the case as if the military and defendants had concomitant force protection responsibilities and determined that the case would still present a nonjusticiable political question. Allowing further discovery or amendment in this case would be futile because amending the complaint would not alter the basic nature of the instant case and the nonjusticiable political questions involved. Plaintiffs' motion for leave to amend their complaint is therefore **DENIED.**

n42 Id.

## IV. Conclusions and Order

For the foregoing reasons, Defendants' Renewed Motion to Dismiss Pursuant to *Rule 12(b)(1) of the Federal Rules of Civil Procedure* (Docket Entry No. 31) is **GRANTED.**

**SIGNED** at Houston, Texas, on this 30th day of August, 2006.

SIM LAKE

UNITED STATES [*29] DISTRICT JUDGE

# EXHIBIT 16

LEXSEE 2006 U.S. DIST. LEXIS 45708

**ANTHONY WHITAKER and JACQUELINE, WILLIAMS, as Surviving Parents of Marquis A. Whitaker, Deceased, and ANTHONY WHITAKER, as Administrator of the Estate of Marquis A. Whitaker, Plaintiffs, vs. KELLOGG BROWN & ROOT, INC., ESTATE OF QUAISAR KAHN, and HUSSAIN KIZHIKKINAM, Defendants.**

**CASE NO. 4:05-CV-78 (CDL)**

**UNITED STATES DISTRICT COURT FOR THE MIDDLE DISTRICT OF GEORGIA, COLUMBUS DIVISION**

*2006 U.S. Dist. LEXIS 45708*

**July 5, 2006, Decided
July 6, 2006, Filed**

**SUBSEQUENT HISTORY:** Judgment entered by *Whitaker v. Kellogg Brown & Root, Inc., 2006 U.S. Dist. LEXIS 45717 (M.D. Ga., July 6, 2006)*

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** In a negligence case, plaintiff surviving parents sued defendant defense contractor following the death of their son, a soldier in Iraq. The soldier was killed while escorting a military supply convoy operated by the contractor. The contractor moved to dismiss arguing that the case presented a non-justiciable political question because the case turned on strategic and tactical military decisions made in a combat zone.

**OVERVIEW:** In support of its motion, the contractor pointed to regulations regarding convoy operations and the use of civilian contractors. At the time of his death, the soldier was working in cooperation with government contractor employees to achieve military objectives in a wartime convoy operation that was planned and executed by the military. He was killed due to the alleged negligence of the government contractor's employees, which were performing their duties subject to the military's planning, orders, and regulations. The court rejected plaintiffs' contention that there were judicially discoverable and manageable standards for resolving the questions in the suit. While their simplistic labeling of the case as a garden variety road wreck was superficially appealing, it ignored the true nature of the circumstances giving rise to the tragedy. The question was not just what a reasonable driver would do--it was what a reasonable driver in a combat zone, subject to military regulations

and orders, would do. That question necessarily implicated the wisdom of the military's strategic and tactical decisions, a classic political question over which the court had no jurisdiction.

**OUTCOME:** The contractor's motion to dismiss was granted. The entire complaint was dismissed for lack of subject matter jurisdiction.

**LexisNexis(R) Headnotes**

*Military & Veterans Law > Warfare*
[HN1] Army regulations authorize the use of civilian contractors to perform selected services in wartime to augment Army forces. Army Reg. 700-137, at 1-1.

*Military & Veterans Law > Warfare*
[HN2] The purpose of the Logistics Civil Augmentation Program (LOGCAP) is to release military units for other missions or to fill shortfalls. Army Reg. 700-137, at 2-4 and 3-1. Contract employees are not under the direct supervision of the military. Army Reg. 700-137, at 3-2(d)(2) and Army Reg. 715-9, at 3-2(f). However, contractor employees are expected to work closely with military personnel. The Army will fight as part of a joint team. Motor transport units must be prepared to support the inland surface movement requirements of other services or nations and to integrate HN, LOGCAP, or other contract support. The Army will fight as a total force-active and reserve components and civilians. Army transportation headquarters units must be able to integrate all deployed mode operating units. The objective is

**EXHIBIT**

**16**

2006 U.S. Dist. LEXIS 45708, *

a seamless transportation system that supports the movement requirements of the joint force and the Army. Army Motor Transport Units and Operations, Army Field Manual 55-30, at 1-1 (Sept. 15, 1999) Contractor employees are expected to adhere to all guidance and obey all instructions and general orders issued by the Theater Commander. Army Reg. 715-9, at 3-2(f). Furthermore, if a contractor employee violates the Theater Commander's orders, the Army may demand that the contractor replace that individual. Army Reg. 715-9, at 3-2(f).

*Civil Procedure > Pleading & Practice > Defenses, Demurrers, & Objections > Motions to Dismiss*
[HN3] A court may review matters outside pleadings in deciding a *Fed. R. Civ. P. 12(b)(1)* motion.

*Military & Veterans Law > Warfare*
[HN4] The Army regulates all aspects of control, organization, and planning of Army convoy operations. Army Motor Transport Units and Operations, Army Field Manual (FM) 55-30. Army regulations provide that Logistics Civil Augmentation Program may be used for Army motor transport operations when contractor support is determined to be the most effective, expeditious, or cost effective. FM 55-30, at 1-11. A convoy commander oversees the preparation and planning of convoy operations, and convoy plans are made by military personnel pursuant to standing operating procedures, also developed by military personnel. FM 55-30, at 5-4 and 5-5. The convoy plans made by military personnel include, inter alia, placement of vehicles in the convoy, distance between vehicles in the convoy, rate of speed of the convoy, and convoy escort and security. FM 55-30, at 5-3 and 5-4. In preparing the convoy, the convoy commander must inspect convoy personnel and vehicles. FM 55-30, at 5-3 and 5-4.

*Civil Procedure > Justiciability > Political Questions > Separation of Powers*
[HN5] The political question doctrine is a function of the separation of powers, and it excludes from judicial review those controversies which revolve around policy choices and value determinations constitutionally committed for resolution to the halls of Congress or the confines of the Executive Branch.

*Civil Procedure > Justiciability > Political Questions > General Overview*
[HN6] In the Baker case, the United States Supreme Court has identified six hallmarks of political questions:

(1) a textually demonstrable constitutional commitment of the issue to a coordinate political department, (2) a lack of judicially discoverable and manageable standards for resolving it, (3) the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion, (4) the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government, (5) an unusual need for unquestioning adherence to a political decision already made, or (6) the potentiality of embarrassment from multifarious pronouncements by various departments on one question. At least one of those characteristics is required to invoke the political question doctrine.

*Civil Procedure > Justiciability > Political Questions > Separation of Powers*
[HN7] It is well accepted that, in general, soldiers injured at the hands of the military raise political questions. The United States District Court for the Middle District of Georgia, Columbus Division holds that a soldier injured at the hands of a contractor which is performing military functions subject to the military's orders and regulations also raises the same political questions.

*Civil Procedure > Justiciability > Political Questions > Separation of Powers*
[HN8] One important function of the political question doctrine is to prevent the courts from deciding questions that were intended by the Constitution to be left to the political branches. There is a textually demonstrable constitutional commitment of oversight and control of military force to the legislative and executive branches, and those political branches receive deference in the area of military affairs. When the military seeks to accomplish its mission by partnering with government contractors who are subject to the military's orders, regulations, and convoy plan, the use of those civilian contractors to accomplish the military objective does not lessen the deference due to the political branches in this area.

*Civil Procedure > Justiciability > Political Questions > General Overview*
[HN9] One purpose of the political question doctrine is to prevent courts from attempting to resolve questions where there are no judicially discoverable and manageable standards for resolving the questions.

**COUNSEL:** [*1] For Anthony Whitaker, as Surviving Parent of Marquis A. Whitaker, Deceased, Jacqueline Williams, as Surviving Parent of Marquis A. Whitaker, Deceased, Anthony Whitaker, as Administrator of the

Estate of Marquis A. Whitaker, Plaintiffs: Charles Frederick Overby, Columbus, GA.

For Kellogg Brown & Root, Inc., Defendant: Jonathan R. Friedman, Atlanta, GA; Kurt J. Hamrock, Lisa M. Norrett, Raymond Biagini, McKenna Long & Aldridge LLP, Washington, DC.

**JUDGES:** Clay D. Land, UNITED STATES DISTRICT JUDGE.

**OPINION BY:** Clay D. Land

**OPINION:**

ORDER

Presently pending before the Court is Defendant Kellogg Brown & Root, Inc.'s ("KBR") Motion to Dismiss (Doc. 7). For the reasons set forth below, KBR's Motion to Dismiss is granted.

BACKGROUND ALLEGATIONS

Plaintiffs are the surviving parents of a U.S. soldier ("Whitaker") who served in Iraq as a member of a Supply and Transport Troop that provided armed escorts for military supply convoys operated by KBR. On April 27, 2004, Whitaker was killed while escorting a military supply convoy operated by KBR. Plaintiffs allege that, while the convoy was returning to Scania, Iraq after completing a delivery in Al Kut, Iraq, one of KBR's drivers hit the guard rail [*2] of a bridge over the Tigris River and went off the bridge. Whitaker, who was driving an Army escort vehicle following that KBR rig, stopped his vehicle on the bridge. Then, another KBR driver struck Whitaker's vehicle from behind, knocking it close to the edge of the bridge where the guard rail had been destroyed. When Whitaker tried to extricate himself from his vehicle, he fell off the bridge and into the Tigris River. Rescue attempts failed, and Whitaker drowned. Plaintiffs seek to hold KBR liable under the doctrine of *respondeat superior* for the negligence of its drivers. Plaintiffs also contend that KBR should be held liable for its negligence in hiring, training, and supervising those drivers.

KBR responds that this case presents a nonjusticiable political question because the case turns on strategic and tactical military decisions made in a combat zone. n1 In support of its argument, KBR points to Army regulations regarding convoy operations and the use of civilian contractors. n2 U.S. [HN1] Army regulations authorize the use of "civilian contractors to perform selected services in wartime to augment Army forces." Logistics Civil Augmentation Program, U.S. Army Reg. 700-137, at [*3] 1-1 (Dec. 16, 1985) [hereinafter LOGCAP]. [HN2] The purpose of LOGCAP is to "re-

lease military units for other missions or [to] fill shortfalls." *Id.* at 2-4, 3-1. Contract employees are not under the direct supervision of the military. *Id.* at 3-2(d)(2); Contractors Accompanying the Force, U.S. Army Reg. 715-9, at 3-2(f) (Oct. 29, 1999) [hereinafter Army Reg. 715-9]. However, contractor employees are expected to work closely with military personnel:

> The Army will fight as part of a joint team. Motor transport units must be prepared to support the inland surface movement requirements of other services or nations and to integrate HN, LOGCAP, or other contract support. The Army will fight as a total force-active and reserve components and civilians. Army transportation headquarters units must be able to integrate all deployed mode operating units. The objective is a seamless transportation system that supports the movement requirements of the joint force and the Army.

Army Motor Transport Units and Operations, Army Field Manual 55-30, at 1-1 (Sept. 15, 1999) [hereinafter F.M. 55-30]. Contractor employees are "expected to adhere to all guidance and obey all instructions [*4] and general orders issued by the Theater Commander." Army Reg. 715-9, at 3-2(f). Furthermore, if a contractor employee violates the Theater Commander's orders, the Army may demand that the contractor replace that individual. *Id.*

> n1 KBR also argues that Plaintiffs' claims are preempted by the combatant activities exception of the Federal Tort Claims Act. Because the Court finds that this case presents a nonjusticiable political question, it is not necessary to reach this issue.

> n2 The Court discerns no factual dispute regarding the authenticity of these regulations or their application to this case. The Court recognizes that the Army regulations are not referenced in or attached to Plaintiffs' Complaint. The key question presently before the Court is whether the case involves a political question beyond the subject matter jurisdiction of the Court. Therefore, the Court may review the Army regulations in determining whether it has the power to hear this case. *Cf. Lawrence v. Dunbar, 919 F.2d 1525, 1529 (11th Cir. 1990)* (noting that [HN3] court

may review matters outside pleadings in deciding *12(b)(1)* motion).

[*5]

[HN4] The Army regulates all aspects of control, organization, and planning of Army convoy operations. *See generally* F.M. 55-30. Army regulations provide that LOGCAP may be used for Army motor transport operations "when contractor support is determined to be the most effective, expeditious, or cost effective." *Id.* at 1-11. A convoy commander oversees the preparation and planning of convoy operations, and convoy plans are made by military personnel pursuant to standing operating procedures, also developed by military personnel. *Id.* at 5-4, 5-5. The convoy plans made by military personnel include, *inter alia*, placement of vehicles in the convoy, distance between vehicles in the convoy, rate of speed of the convoy, and convoy escort and security. *Id.* at 5-3, 5-4. In preparing the convoy, the convoy commander must inspect convoy personnel and vehicles. n3 *Id.*

n3 The parties agree that the KBR driver who drove off the bridge was observed having difficulty operating his truck shortly before the convoy mission began. The convoy commander permitted him to drive anyway.

[*6]

DISCUSSION

The central question in this case is whether the political question doctrine applies to bar wrongful death and survivor claims by the family of a U.S. soldier killed during the war in Iraq due to the alleged negligence of a government contractor. [HN5] The political question doctrine is "a function of the separation of powers," *Baker v. Carr,* 369 U.S. 186, 210, 82 S. Ct. 691, 7 L. Ed. 2d 663 (1962), and it "excludes from judicial review those controversies which revolve around policy choices and value determinations constitutionally committed for resolution to the halls of Congress or the confines of the Executive Branch." *Japan Whaling Asso. v. American Cetacean Soc., 478 U.S. 221, 230, 106 S. Ct. 2860, 92 L. Ed. 2d 166 (1986).*[HN6] In *Baker,* the Supreme Court identified six hallmarks of political questions:

[1] a textually demonstrable constitutional commitment of the issue to a coordinate political department;

[2] a lack of judicially discoverable and manageable standards for resolving it;

[3] the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion;

[4] the impossibility of a court's undertaking independent resolution [*7] without expressing lack of the respect due coordinate branches of government;

[5] an unusual need for unquestioning adherence to a political decision already made; or

[6] the potentiality of embarrassment from multifarious pronouncements by various departments on one question.

*Baker, 369 U.S. at 217.* At least one of these characteristics is required to invoke the political question doctrine. *Aktepe v. United States, 105 F.3d 1400, 1403 (11th Cir. 1997).*

The Eleventh Circuit applied the *Baker v. Carr* analysis in *Aktepe.* In *Aktepe,* two live missiles from a U.S. ship struck a Turkish ship during a NATO training exercise, and the Turkish Navy sailors sued the United States for damages. The training exercise was under the command of a U.S. Navy Admiral, and the U.S. ship was under the command of a U.S. Navy Vice Admiral. The complaint alleged negligence relating to Navy communication, training, and drill procedures. The Eleventh Circuit found that most, if not all, of *Baker's* indicia of political questions were met. *Aktepe, 105 F.3d at 1403.* First, the court found that the legislative and executive [*8] branches have responsibility for military training procedures because there is a "textually demonstrable constitutional commitment" of military strategy to the political branches of the government: the Constitution confers upon the legislative and executive branches responsibility for oversight and control of military force. *Id.*; *accord* U.S. Const. art. I, § 8, cls. 11-16; U.S. Const. art. II, § 2; *Gilligan v. Morgan, 413 U.S. 1, 10, 93 S. Ct. 2440, 37 L. Ed. 2d 407 (1973).* As noted by the Eleventh Circuit, the political branches are accorded "a particularly high degree of deference in the area of military affairs." *Aktepe, 105 F.3d at 1403.* Second, the court in *Aktepe* found that there were no judicially discoverable and manageable standards for resolving the questions raised by the suit because the court would have to determine how a reasonable military force would have conducted the training exercise. *Id. at 1404.* Third, the court found that it would have to make policy decisions "of a kind appropriately reserved for military discretion." *Id.* Fourth, the court found that adjudicating the case would

express a lack of respect for the political branches [*9] of the government. *Id.* n4

> n4 *Cf. Gilligan v. Morgan, 413 U.S. 1, 3, 93 S. Ct. 2440, 37 L. Ed. 2d 407 (1973).* The situation in *Gilligan* is somewhat distinguishable from the instant case because the plaintiffs, students of Kent State University, were seeking *injunctive* relief against the governor of Ohio and the Ohio National Guard. The case is nonetheless instructive. Because Congress and the President had responsibility for oversight of various aspects of the National Guard, the *Gilligan* court found that the plaintiffs' "broad call on judicial power to assume continuing regulatory jurisdiction over the activities of the Ohio National Guard" would "embrace critical areas of responsibility vested by the Constitution in the Legislative and Executive Branches of the Government." *Id. at 6-7.* The Supreme Court also found that there was a lack of judicially discoverable and manageable standards for resolving the issue because it would require a judicial evaluation of military procedures and policies. *Id. at 8.* The Court recognizes that *Gilligan* and later cases suggest that a damages suit against the United States for unlawful conduct by military personnel would not be barred by political question doctrine in some circumstances, but these cases focus on injury to *civilians*-"injury resulting from military intrusion into the *civilian* sector." *Koohi v. United States, 976 F.2d 1328, 1332-33 (9th Cir. 1992)* (emphasis added); *see also Gilligan, 413 U.S. at 11-12.* None of these cases suggest that political question doctrine does not apply in cases such as the instant case, where a member of the military was injured in the course of military operations.

[*10]

The Court recognizes that the claims in *Aktepe* were against the United States and not a government contractor. The Court nonetheless finds that the same principles apply in this case and that the same indicia of a political question exist here. At the time of his death, Plaintiffs' son was working in cooperation with government contractor employees to achieve military objectives in a wartime convoy operation that was planned and executed by the military. He was killed due to the alleged negligence of the government contractor's employees, which were performing their duties subject to the military's planning, orders, and regulations. [HN7] It is well accepted that, in general, soldiers injured at the hands of the military raise political questions. *See Bentzlin v. Hughes Aircraft Co., 833 F. Supp. 1486, 1498 (C.D. Cal. 1993).* The Court

finds that a soldier injured at the hands of a contractor which is performing military functions subject to the military's orders and regulations also raises the same political questions. An examination of the purposes of the political question doctrine supports this conclusion.

As discussed *supra*, [HN8] one important function of the political [*11] question doctrine is to prevent the courts from deciding questions that were intended by the Constitution to be left to the political branches. *See Gilligan, 413 U.S. at 10-11.* There is a textually demonstrable constitutional commitment of oversight and control of military force to the legislative and executive branches, and those political branches receive deference in the area of military affairs. *See Aktepe, 105 F.3d at 1403.* n5 When the military seeks to accomplish its mission by partnering with government contractors who are subject to the military's orders, regulations, and convoy plan, the use of those civilian contractors to accomplish the military objective does not lessen the deference due to the political branches in this area.

> n5 *See also Gilligan, 413 U.S. at 10* ("The complex, subtle, and professional decisions as to the composition, training, equipping, and control of a military force are essentially professional military judgments, subject *always* to civilian control of the Legislative and Executive Branches.").

[*12]

[HN9] Another purpose of the political question doctrine is to prevent courts from attempting to resolve questions where there are no judicially discoverable and manageable standards for resolving the questions. Plaintiffs contend that there are judicially discoverable and manageable standards for resolving the questions in this suit. The Court does not agree. While Plaintiffs' simplistic labeling of this case as a "garden variety road wreck" is superficially appealing, it ignores the true nature of the circumstances giving rise to this tragedy. This wreck occurred in a combat zone during wartime while Plaintiffs' son, along with his Supply and Transport Troop and a group of civilian contractors, transported supplies from one military camp to another. The convoy operation was planned by the military, which determined the placement of vehicles in the convoy, the speed of the convoy, and the distance between vehicles in the convoy. Clearly, these circumstances differ dramatically from driving on an interstate highway or county road in the United States without any constraints other than ordinary skill, judgment, and prudence. The question here is not just what a reasonable driver would do-it [*13] is what a reasonable driver in a combat zone, subject to military regulations

2006 U.S. Dist. LEXIS 45708, *

and orders, would do. That question necessarily implicates the wisdom of the military's strategic and tactical decisions, a classic political question over which this Court has no jurisdiction.

For all of these reasons, the Court finds that this case presents a non-justiciable political question. Accordingly, KBR's Motion to Dismiss is granted based upon lack of subject matter jurisdiction. n6

n6 For the same reasons described in this Order, the Court also finds that it does not have subject matter jurisdiction over Plaintiffs' claims against the remaining individual Defendants. Accordingly, Plaintiffs' entire Complaint is dismissed for lack of subject matter jurisdiction.

IT IS SO ORDERED, this 5th day of July, 2006.

S/ Clay D. Land

UNITED STATES DISTRICT JUDGE

# EXHIBIT 17

# International General Change Endorsement

Endorsement No. 6

This endorsement forms a part of the designated policy and applies, unless otherwise stated herein, as of the effective time and date of such policy.

**Policy Issued By**

The Fidelity & Casualty Co. of New York
(A New Hampshire Corporation) A Stock Company  (15)
General Offices   40 Wall Street, 7th Floor NY, NY  10005

**Policy No.**  DOS 22 390 7481
**Policy Period:**  7/1/04-05

**Producer's Name**
Rutherford International, Inc.
5500 Cherokee Avenue, Suite 300
Alexandria, VA  22312

**Effective:** 7/1/04

**Producer's Code**
98703911

**Named Insured**

Computer Sciences Corporation, etal
2100 East Grand Avenue
El Segundo, CA 90245

> In consideration of the additional premium shown, it is hereby understood and agreed that payroll for the U.S. Department of State contract #S-LMAQM-04-C-0030 is added to the policy.
>
> Total remuneration for said contract reads $▮▮▮▮▮▮

Country: Afghanistan

**ADDITIONAL PREMIUM**  $▮▮▮▮▮▮

COUNTERSIGNED ___9/27/2004___          BY _____
                  (Date)                            (Authorized Representative)
This endorsement shall not be binding upon the company unless countersigned by a duly authorized representative of the company.

EXHIBIT
17

*Counted as Endt. 4 but not endt., renewal dec Per. T. Mack.*



# Defense Base Act Common Policy Declaration

## Common Policy Declarations

| | |
|---|---|
| **Policy Issued By** | The Fidelity and Casualty Company of New York (A New Hampshire Corporation) A Stock Company (15) General Offices: 40 Wall Street — 9th Floor, New York, NY 10005 |

**Policy Number:** DOS 22 390 7481    (Renewal)

| | |
|---|---|
| **Producer's Name and Address** | Rutherford International, Inc. 5500 Cherokee Avenue, Suite 300 Alexandria, VA 22312 703-813-6500 |

**Producer Code:** 9B703911

| | |
|---|---|
| **Named Insured Mailing Address** | Computer Science Corporation 2100 East Grand Avenue El Segundo, CA 90245 UNITED STATES |

*POC:* Dean Uyeda 310-615-1408

| | |
|---|---|
| **Policy Period** | From July 1, 2004 to July 1, 2005 12:01 A.M. Standard time at Named Insured's mailing address shown above. |

## Coverage

In return for the payment of the premium, and subject to all the terms of this policy, we agree with you to provide the insurance as stated in this policy. This policy consists of the following coverage forms for which a premium is indicated. This premium may be subject to adjustment.

| Coverage Form | Premium |
|---|---|
| International Commercial Property Coverage Form | Excluded |
| International Business Income Coverage Form | Excluded |
| International Boiler and Machinery Coverage Form | Excluded |
| International Employee Dishonesty and/or Crime Coverage | Excluded |
| International Commercial General Liability Coverage Form | Excluded |
| International Automobile DIC/Excess Liability Coverage Form | Excluded |
| International Voluntary Workers' Compensation and Employers' Liability Coverage Form | Included |
| International Kidnap and Ransom / Wrongful Detention Coverage Form | Excluded |
| International Confiscation, Expropriation and Nationalization Coverage Form | Excluded |
| **Total Advance Premium:** | ▬▬▬ |

---

Parts of this policy auditable? Yes

## Notes

Form(s) and Endorsement(s) applicable to all Coverage Forms and made a part of this policy at time of issue: WP 0001 02 01, WP 0010 02 01

THESE DECLARATIONS TOGETHER WITH THE COMMON POLICY CONDITIONS, COVERAGE FORM DECLARATIONS, COVERAGE FORM(S) AND OTHER FORMS AND ENDORSEMENTS, IF ANY, ISSUED TO FORM A PART THEREOF, COMPLETE THE ABOVE NUMBERED POLICY.

NO PREMIUM CHARGE HAS BEEN MADE FOR THE WAR-RISK HAZARD, IT BEING UNDERSTOOD THAT THE UNITED STATES GOVERNMENT SELF-INSURES THE EXPOSURES FALLING UNDER THE PROVISIONS OF THE WAR-HAZARD COMPENSATION ACT.

COUNTERSIGNED: 6/16/2004    BY _____
                  *Date*              *Signature*

---

RUII CONTROL #: 20040511 RUII

Page 1 of 1

 **International Voluntary Workers' Compensation and Employers' Liability Coverage Form**

## Declarations

NAMED INSURED:    Computer Science Corporation

2100 East Grand Avenue

El Segundo, CA 90245

*POC:*

Dean Uyeda, 310-615-1408,

EFFECTIVE DATE:    From July 1, 2004  to July 1, 2005

Policy Number

DOS 22 390 7481  (Renewal)

## Limits of Insurance

**Workers' Compensation Insurance:**
  Part One of this Coverage Form applies to the Workers' Compensation Law of the states, territories and countries listed here:
  U.S. Employees: Defense Base Act

**Employers Liability Insurance:**
  Part Two of this Coverage Form applies to Employers' Liability, with Limits of Insurance as follows:
  Bodily Injury by Accident $500,000 each accident
  Bodily Injury by Disease $500,000 policy limit

## Sublimits/Additional Coverages/Coverage Extensions

Excess Repatriation:   $75,000 per employee

## Premium

| Contract Number | Payroll | Rate Type | Premium |
|---|---|---|---|
| ███████████████ | ███████ | Service | ███████ |
| ███████████████ | $██████ | Service | $██████ |
| ███████████████ | $██████ | Service | $██████ |
| ███████████████ | $██████ | Service | $██████ |
| ███████████████ | $██████ | Service | $██████ |
| ███████████████ | $██████ | Service | $██████ |
| ███████████████ | $██████ | Service | $██████ |
| ███████████████ | $██████ | Service | $██████ |
| | | Total: | $██████ |

All information required for calculation of premium is subject to verification and change by audit.

## Notes

Form(s) and Endorsement(s) applicable to all Coverage Forms and made a part of this policy at time of issue:

WP 0001 02 01, WP 0010 02 01

# EXHIBIT 18

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| MICHELLE DEULEY, *et al.* )<br><br>Plaintiffs, )<br><br>v. )<br><br>DYNCORP INTERNATIONAL, INC., )<br>*et al.* )<br><br>Defendants. ) | C.A. No. 06-cv-605 (GMS) |

### DECLARATION OF H. MONTGOMERY HOUGEN

1.    I, H. Montgomery Hougen, certify that I am over the age of 18 years and have personal knowledge of the matters set forth herein.

2.    I am competent to testify to the matters set forth herein.

3.    I am the Corporate Secretary of DynCorp International Inc. and the Vice President, Secretary & Deputy General Counsel of DynCorp International LLC.

4.    In my position, I am familiar with the corporate structure and principal places of business of the DynCorp International entities referenced above.

5.    DynCorp International LLC is a Delaware limited liability company. Until August 31, 2006, its principal place of business was in Irving, Texas. Its principal place of business is now in Falls Church, Virginia.

6.    DynCorp International Inc. is a Delaware corporation. Until August 31, 2006, its principal place of business was in Irving, Texas. Its principal place of business is now in Falls Church, Virginia.

7.    DynCorp International Inc. is currently, and has been since February 2005, the parent company of DynCorp International LLC.

244677.1

EXHIBIT
18

8.    Prior to February 2005, Computer Sciences Corporation ("CSC") and DynCorp, a wholly owned subsidiary of CSC, held equity interests in DynCorp International LLC. In February 2005, CSC and DynCorp sold their equity interests in DynCorp International LLC to DI Acquisition Corp., a company controlled by The Veritas Capital Fund II, L.P. Upon completion of the transaction on February 11, 2005, DI Acquisition Corp. was renamed DynCorp International Inc.

**I DECLARE UNDER PENALTY OF PERJURY THAT THE FOREGOING IS TRUE AND CORRECT.**

Executed on October 25, 2006.

H. Montgomery Hougen

# EXHIBIT 19

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| MICHELLE DEULEY, *et al.* | ) |
| | ) |
| Plaintiffs, | ) |
| | ) C.A. No. 06-cv-605 (GMS) |
| v. | ) |
| | ) |
| DYNCORP INTERNATIONAL, INC., | ) |
| *et al.* | ) |
| | ) |
| Defendants. | ) |

**SUPPLEMENTAL DECLARATION OF ANGELIC LITTLE-TURNER**

I, Angelic Little-Turner, certify that I am over the age of eighteen (18) years and that I have personal knowledge of the matters set forth herein.

1.      I am currently a Foreign Affairs Officer assigned to manage the Afghan Police Program in the Bureau of International Narcotics and Law Enforcement Affairs ("INL") in the U.S. Department of State. I have been in my current position for 5 years.

2.      In 2004, I was the Program Manager stationed in Washington, D.C. I was assigned on Temporary Duty (TDY) to the U.S. Embassy in Kabul, Afghanistan from August 29, 2004 to September 1, 2004.

3.      I am familiar with the Civilian Police ("CIVPOL") missions.

4.      INL oversees the participation of the United States in CIVPOL missions in various countries.

5.      Because the United States does not have a volunteer police force, the State Department has a contract with DynCorp International LLC ("DynCorp") to train and equip the

246126.1

EXHIBIT
*19*

Afghan police, advise the Afghan Ministry of Interior, and provide infrastructure assistance, including constructing several police training centers.

6.      Specifically, under the CIVPOL Contract, DynCorp was responsible for, among other things, establishing and maintaining a cadre of up to 2,000 experienced law enforcement personnel ("CIVPOL Personnel") to be available for speedy deployment by DOS on civilian peacekeeping missions overseas.

7.      In addition, the CIVPOL Contract required, among other things, the provision of in-country or off-site administrative, technical, logistical, or other services.

8.      Under the CIVPOL Contract, the State Department deployed DynCorp Personnel to Afghanistan for a U.S. CIVPOL mission.

9.      DynCorp was performing the tasks required under the CIVPOL Contract that otherwise might have been performed by other government agencies.

10.     DynCorp was acting under direct orders of the INL representative regarding CIVPOL program details.

11.     The State Department provided ongoing and continuous oversight and directives regarding the contract obligations.

12.     DynCorp was required to abide by DOS's foreign policy directives as dictated by the CIVPOL program.

13.     Pursuant to its obligation to provide in-country support services to CIVPOL Personnel, DynCorp was required to lease facilities in Kabul, Afghanistan.

14.     All aspects of DynCorp's CIVPOL operation in Kabul were established under the specific direction of the INL representative and the State Department.

2

15.    The CIVPOL Contract specifically identified the work to be performed under the contract and contained various provisions limiting DynCorp's discretion.

**I DECLARE UNDER PENALTY OF PERJURY THAT THE FOREGOING IS TRUE AND CORRECT.**

Executed on November 3, 2006

Angelic Little-Turner
Foreign Affairs Officer
International Narcotics and Law Enforcement Affairs
U.S. Department of State
Washington, D.C.

3

246126.1